1

1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Case No. 20-cr-00152-PAB-1
3    _____

4    UNITED STATES OF AMERICA,

5         Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,

8         Defendant.
     _____
9            Proceedings before KRISTEN L. MIX, United States

10   Magistrate Judge, United States District Court for the

11   District of Colorado, commencing at 2:45 p.m., June 4, 2020,

12   in the United States Courthouse, Denver, Colorado.

13   _____

14           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

16   _____

17                       APPEARANCES

18           HEATHER CALL, MICHAEL KOENIG, CAROLYN SWEENEY and

19   PAUL TORZILLI, Attorneys at Law, appearing for the

20   Plaintiff.

21           MICHAEL TUBACH, Attorney at Law, appearing for the

22   Defendants.

23   _____

24     INITIAL APPEARANCE, ARRAIGNMENT, DISCOVERY, DETENTION HEARING

25

2

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3      proceedings are herein transcribed, pursuant to order of

 4      counsel.)

 5              THE COURT:  Counsel, we're waiting to make sure

 6      that we can see the defendants in the next case, which is

 7      20-cr-00152, the United States of America v. Jayson Jeffrey

 8      Penn, Mikell Reeve Fries, Scott James Brady and Roger Born

 9      Austin.  We'll start with Mr. Penn as soon as he's visible

10      to the Court.

11              MR. TUBACH:  Your Honor, this is Michael Tubach

12      from O'Melveny & Myers and I represent Jayson Penn as he is

13      here now.

14              THE COURT:  All right, thank you.

15              MR. TUBACH:  Sitting next to me.

16              THE COURT:  All right.  So let me ask counsel for

17      the Government to enter his or her appearance in 20-cr-152.

18              MS. CALL:  Good afternoon, Your Honor.  This is

19      Heather Call for the United States and I am joined here

20      today with my colleagues, Michael Koenig, Carolyn Sweeney

21      and Paul Torzilli.

22              THE COURT:  All right, thank you.

23              We are here for, according the docket, an initial

24      appearance on these defendants.  However, based on the

25      paperwork that I have in front of me, I presume that counsel
```

1  have agreed to move forward with respect to an arraignment,

2  discovery conference and a detention hearing, at least as to

3  this defendant.

4          Is that right, Ms. Call?

5          MS. CALL:  Yes, I believe so, Your Honor.

6          THE COURT:  All right.  And counsel for the

7  defendant Mr. Penn, would you kindly enter you appearance

8  again, please.

9          MR. TUBACH:  Yes, of course, Your Honor.  My name

10  is Michael Tubach.  I represent Jayson Penn.  With me is my

11  colleague, Anna Pletcher, both with O'Melveny & Myers.

12  We've received a copy of the indictment and we enter a plea

13  of not guilty on behalf of Jayson Penn.

14          THE COURT:  All right, thank you.

15          MR. TUBACH:  And waive further reading.

16          THE COURT:  Thank you.  I will first inform your

17  client of the charges as this is an initial appearance.

18          Mr. Penn, you've been charged with one count of

19  trust in restraint of trade.  The penalty on that count is

20  not more than ten years imprisonment, not more than a

21  $1,000,000 fine or two times the gain or loss, whichever is

22  greater, or both imprisonment and a fine, not more than

23  three years of supervised released and a $100 special

24  assessment fee.

25          Sir, do you understand the general nature of the

4

1 charge against you?

2       MR. PENN:  Yes, Your Honor.

3       THE COURT:  Sir, you have the right to remain

4 silent.  You do not need to speak to anyone about the

5 circumstances that brought you to court today.  If you do

6 choose to speak to someone other than your attorney about

7 those circumstances, what you say can and probably will be

8 used against you in court.

9       If you are questioned by the police or law

10 enforcement, you have the right to refuse to answer

11 questions.  You also have the right to insist that an

12 attorney be present with you during questioning.  If you

13 choose to remain silent, your silence cannot be used against

14 you in court.

15       Do you understand your right to remain silent?

16       MR. PENN:  Yes, Your Honor, I do.

17       THE COURT:  Sir, you have the right to an

18 attorney.  I understand that you have counsel sitting next

19 to you.  I assume this is counsel that you have retained and

20 you are not asking me to appoint a lawyer for you without

21 cost to you; is that right?

22       MR. PENN:  That is correct, Your Honor.

23       THE COURT:  All right, thank you.

24       Then the next step in the proceeding is generally

25 for your counsel to enter a plea on your behalf to this

5

1    charge.  Counsel has already done so.  The not guilty plea

2    is accepted.

3           I do have a discovery conference memorandum and

4    order relating to Mr. Penn.  I'll give you speedy trial

5    dates with respect to this matter.  30 days is July 6th,

6    2020, 70 days is August 13th, 2020.  The discovery

7    conference memorandum and order has been electronically

8    signed by counsel for the Government and for the defendant.

9           I have a disclosure date for the Government of

10   August 4th, 2020.  What disclosure date would defense

11   counsel like for the defendant?  Do you want 30 days beyond

12   August 4th?

13          MR. TUBACH:  Yes, please.

14          THE COURT:  September 4th it is, and I will sign

15   this and make it an order of the Court effective today.

16          That leaves the issue of detention.  I'm always

17   curious as to what conversations counsel have had on this

18   issue when the Court is not aware in advance of the hearing

19   that there is going to be a detention issue heard at the

20   hearing.  The Court doesn't check for and is not made aware

21   of any pretrial services report.  The pretrial services

22   report is generally the source of information to the Court

23   about the defendant's suitability for a release on

24   conditions.

25          So in the absence of a pretrial services report, I

1    have to rely on whatever counsel for the Government and the

2    defendant can tell me about what agreements, if any, you

3    have reached as well as the defendant's suitability for

4    release on conditions.

5         I assume, because I have draft bond paperwork in

6    the file, that counsel have agreed that Mr. Penn should be

7    released on conditions and I would like to hear more about

8    that from counsel for the Government and counsel for the

9    defendant as well.

10        Ms. Call?

11        MS. CALL:  Yes, Your Honor.

12        So the Government is asking for conditions of

13   release that we believe are appropriate to ensure the safety

14   of the community including, in particular, the Government's

15   potential witnesses in this case as well as the defendant's

16   future appearance.  The Government and the defense have

17   attempted to reach an agreement, but were not able to do so

18   for many of the proposed terms that the Government has

19   proposed.

20        I believe defense counsel will each individually

21   raise the certain conditions that they object to, but the

22   Government is happy to discuss any particular one that the

23   Court would desire.

24        THE COURT:  So as I understand the conditions

25   being recommended by the Government for Mr. Penn's release,

1  they are that he will surrender his passport to the Clerk's

2  Office within two business days.  He'll not obtain a new

3  passport or other international travel document.  His travel

4  will be restricted to what's called the home district and

5  the district of Colorado without permission from the Court

6  to go elsewhere.

7          He may have no direct contact initiated by him

8  with employees of Broiler Chicken Suppliers, listed in an

9  attachment to the bond conditions to be provided to the

10  Court and the defendant, and no direct contact initiated by

11  him with employees of companies listed in a different

12  attachment to be provided to the Court and to the defendant.

13          He may not possess a firearm, a destructive device

14  or another dangerous weapon and he may not act as an

15  informant for any law enforcement agency without permission

16  from the Court.

17          Does that adequately summarize the conditions the

18  Government is seeking with respect to Mr. Penn's release?

19          MS. CALL:  Yes, Your Honor.  And the attachments,

20  I believe, are at the bottom of the paperwork that you have

21  received from pretrial.

22          THE COURT:  All right, thank you.

23          And counsel for the defendant, if you -- would you

24  like to address these conditions?

25          MR. TUBACH:  Yes, absolutely, Your Honor.

1          I do believe there was a pretrial services report

2     e-mailed to the Court by Mr. Hanley.  I don't know if the

3     Court hasn't received that.

4          THE COURT:  I did not receive any pretrial

5     services reports in connection with this matter.  I'm happy

6     to take a moment to look at it, but I have not received it

7     yet.  So --

8          MR. TUBACH:  I think that might be worth the

9     Court's time.  The pretrial services agency is not

10    recommending the conditions of release that the Government

11    is recommending.  It's simply recommending release on

12    personal recognizance.  I think on that point all parties

13    are agreed, and the real opening question for us and the

14    point on which we cannot agree with the Government has to do

15    with the travel restrictions, the giving up the passport and

16    the inability to have any contact with substantial members

17    of the chicken industry, and I'm happy to address those

18    unless the Court wants to look at the pretrial services

19    agency report first.

20         THE COURT:  Just give me a moment to locate the

21    pretrial services report.  They're not alphabetized on the

22    version of that electronic file that I have here.  Yeah,

23    there's a way to alphabetize them, please do that.  Thank

24    you.

25         All right, thank you for your patience, Counsel.

1    I've now reviewed the pretrial services report with respect

2    to Mr. Penn and I'll entertain argument about conditions.

3            Counsel.

4            MR. TUBACH:  Thank you, Your Honor.

5            Basically, the conditions that the Government has

6    asked to impose here would mean that Mr. Penn can't do his

7    job.  He's a chief executive officer of Pilgrim's Pride,

8    which is the second largest chicken producer in the United

9    States.  He travels extensively for work.  Pilgrim's Pride

10   has facilities in 14 states and Puerto Rico and the United

11   Kingdom and Mexico.  Last year Mr. Penn estimates that he

12   traveled three days a week.

13           The Government already agrees he's not a flight

14   risk.  They're fine with him being released on personal

15   recognizance and he has deep ties to the community.  He's

16   lived in Colorado for nine years, he owns a house here, he

17   has a wife of many years who's here with their two daughters

18   and he looks forward to the day where he can fight these

19   charges and he expects to be fully vindicated, but frankly,

20   imposing these conditions of release will mean that he

21   cannot do his job and that will -- vindication will come too

22   late if we have to wait until trial.

23           For the same reason, Your Honor, imposing the

24   stay-away orders from six of the suppliers in the chicken

25   industry, as well as eight large customers, would basically

1    mean that Mr. Penn can't do his job.  As chief executive

2    officer, his job is to meet with customers.  His job is also

3    to meet with suppliers.

4           As the Government well knows, the suppliers in the

5    chicken industry often sell chicken to each other and so the

6    (inaudible - audio cut out) with a substantial portion of

7    the industry basically is telling him, Don't do your job and

8    that is not a proper condition of release.

9           On the other terms, we don't have any resistance

10   to the firearm and informant conditions, although, frankly,

11   I don't know why a firearm term of condition is appropriate

12   in a price fixing case, but that's not something that Mr.

13   Penn has to worry about.  He does not own a firearm.

14          THE COURT:  Are you primarily concerned about the

15   travel restrictions or about the contact restrictions or

16   both?  I mean, you know, it strikes me that we've been in a

17   pandemic for the last several months and travel has been

18   seriously restricted.  How has your client been able to do

19   his job in light of the fact that it's difficult to get on

20   an airplane and has been for the last couple of months?

21          MR. TUBACH:  Your Honor, frankly, he has continued

22   to travel, even in the pandemic.  In particular, as the

23   Court may be aware or even knew, the pandemic has hit -- has

24   hit, you know, meat-producing industries hard and he's had

25   to travel for work and he's going to continue -- need to

1   continue to do that in his job, and there's just simply no

2   reason why he shouldn't be able to continue to do his job.

3           And if the idea is a flight risk, I think the

4   Government is clear that he is not a flight risk, and so

5   imposing these conditions is, frankly, punitive.

6           And the Government's argument, I think, is going

7   to be, Well, he can just come to the Court and get

8   permission to travel.  I think that's going to be a terrible

9   burden on the Court and on Mr. Penn if he travels as much as

10  he does.  You know, having to run to the Court every time he

11  has to go to a meeting somewhere is not a good use of

12  anyone's time.

13          THE COURT:  All right, thank you.

14          MR. TUBACH:  And frankly, the chicken industry is

15  an essential business in this pandemic and he needs to

16  continue to do his job.

17          THE COURT:  Thank you.  Let me ask the attorney

18  for the Government, Ms. Call, to present whatever argument

19  you'd like to present about the conditions.

20          MS. CALL:  Travel conditions, I think our basic

21  argument is that any travel, particularly international

22  travel, will create a risk of non-appearance for this

23  defendant.  I'll move on to the ones that we have a stronger

24  point on and that is the stay -- what defense counsel has

25  called the stay-away order for the suppliers and the

1   victims.

2           First off, for the victim corporation, that the

3   Government does believe that this is necessary to protect

4   the victims and witnesses in this case, and, you know, in

5   addition, the CBRA itself does obviously protect the right

6   of victims to be treated with fairness and with respect for

7   their dignity and privacy.

8           The Government does intend to call a number of

9   individual employees of the companies that are listed in

10  Attachment B that you have at trial, and we believe that

11  continued, direct interaction with these individuals by the

12  defendant would threaten their privacy and potentially their

13  safety from further crimes of the defendant in this case.

14          With respect to the competing chicken suppliers,

15  we did try to craft that restriction in a way that was

16  protecting the interest at heart while also at least -- as

17  least restrictive as possible.  You know, as alleged in the

18  indictment here, this case involves numerous instances of

19  each defendant, including Mr. Penn, having collusive

20  conversations with their competitors.  While the Government

21  does understand that there are certain legitimate reasons

22  for competing poultry suppliers to communicate in this

23  industry, for example, to cover shortages of meat, given the

24  nature of the defendant's activity, we so no reason why

25  other employees of the defendant's companies can't

1    accomplish these communications themselves.

2           THE COURT:  Well, let me ask the --

3           MR. TUBACH:  Your Honor.

4           THE COURT:  I'll let you talk again, defense

5    counsel.  Let me just ask a couple of questions here.  As I

6    understand it, one of the competing suppliers who the

7    Government is proposing that the defendant be prohibited

8    from communicating with is his own company.  Am I reading

9    that correctly?  It's Number 2 on Attachment A.

10          MS. CALL:  Your Honor, I don't believe that is

11   correct.  They were -- the Attachment As were specific to

12   each individual defendant and there is a chance that they

13   may have been mixed, and I apologize if that was on the part

14   of the Government.

15          I do want to note that we are requesting that if

16   these attachments do -- be filed along with the pretrial

17   condition, that we do file those separately under

18   restrictions because the identity of the victims and

19   potential co-conspirator companies are sensitive in this

20   case and have now been included in the indictment.

21          THE COURT:  All right.  Well, that's -- we'll get

22   there to the issue of whether these attachments are going to

23   be filed and if they're going to be filed under restriction,

24   but, you know, I'm extremely uncomfortable now that I have

25   -- don't have the correct information about what the

1    Government is proposing with respect to the restrictions on

2    suppliers.  I am looking at Attachment A stapled to the

3    appearance bond for Mr. Jayson Jeffrey Penn, and Number 2 is

4    Pilgrim's Pride Corporation, which is, as I understand, his

5    current employer.  So, you know, we're going to have to

6    figure this out somehow so that you can identify for me who

7    you are actually trying to restrict him from communicating

8    with.

9            Also, I'd like to ask you a question about the

10   bigger picture.  What am I going to hear about these other

11   codefendants?  Are they also all executives with this

12   company?  Is the Government attempting to restrict every

13   executive of the company from communicating with these

14   suppliers and alleged victims in the case?  And, if so, how

15   is the company expected to continue in business if four

16   executives can no longer talk to anybody and do their jobs?

17           MS. CALL:  Yes, Your Honor.  The defendants here

18   work for two different competing poultry suppliers.  Two of

19   them are executives, one is retired, I believe, and the

20   other is a vice-president of sales in a sales group where

21   there are a number of additional employees.  So we don't

22   believe that these restrictions would prevent the company

23   from being able to communicate with its -- with competing

24   suppliers if needed.

25           THE COURT:  Does one of the other defendants work

1  for Pilgrim's Pride?

2          MS. CALL:  One defendant formerly worked for

3  Pilgrim's Pride.

4          THE COURT:  The retired defendant?

5          MS. CALL:  Correct.

6          THE COURT:  And who's that?

7          MS. CALL:  That is Mr. Austin.

8          THE COURT:  All right.  So -- and you are

9  proposing basically the same restrictions with respect to

10  Mr. Austin as you're proposing with respect to Mr. Penn?

11          MS. CALL:  Yes.  And Mr. Austin does not oppose to

12  those restrictions for himself.

13          THE COURT:  All right.  So back to my first

14  question about having an accurate list of the suppliers that

15  the Government is suggesting that the defendant not be

16  permitted to contact, can you read that list to me so that I

17  can modify it?

18          MS. CALL:  For the reasons I stated earlier, I

19  would not want to read that list in open court.  I am happy

20  to provide a supplemental list e-mailed to the Court if that

21  would be amenable.

22          THE COURT:  And my courtroom deputy is indicating

23  that she thinks she may have located it, so I'm going to ask

24  her to print it and bring it up.

25          MR. TUBACH:  Your Honor, if could be heard

1   further?

2           THE COURT:  You may.  Let me just look at this

3   list --

4           MR. TUBACH:  Yep.

5           THE COURT:  -- first, Counsel, before you are so I

6   want to make sure I have all the information I need.  Thank

7   you.

8           MR. TUBACH:  Of course.

9           THE COURT:  For each one.  Give me just one

10  second, Counsel, we've just -- we're just receiving new

11  lists for each defendant and I want to make sure I'm keeping

12  the paperwork straight here.  On top of everything else, the

13  chair's not working.

14          MS. CALL:  Your Honor, this is Heather Call for

15  the Government.  I believe it would be of assistance, if the

16  correct list could not be identified, is if there are seven

17  company names on the list you have in your possession, it

18  would be correct to just -- only strike out the name of the

19  defendant's company.

20          THE COURT:  Well, I have a, what my courtroom

21  deputy tells me is the correct list for Mr. Penn and it has

22  six suppliers on it, according to the one that I have, and

23  the potential victims' list has eight.  Does that comport

24  with your records?

25          MS. CALL:  It does, Your Honor.

1             THE COURT:  All right, now I'll hear from defense

2     counsel again.  Thank you.

3             MR. TUBACH:  Yes, Your Honor.  Our -- thank you.

4             Our point is not that Pilgrim's Pride can't

5     function without Mr. Penn, although the (inaudible) not be

6     able to do so.  Our point is that Mr. Penn can't do his job

7     and it is not appropriate, we suggest, that Mr. -- that any

8     conditions of release essentially preclude Mr. Penn from

9     being able to do his job.

10            He can -- he is certainly -- we have absolutely no

11    objection to an order the Court might enter that would say

12    he is to have no contact with any witness on any list the

13    Court wants to provide about the facts of the case.  He's

14    already under strict instructions not to have any such

15    contact and we'd be happy to have the Court enter an order

16    to that effect, but to basically say, well, at this point,

17    moving forward, you're just not going to get to interact

18    with most of the industry is basically telling him to leave

19    and that's -- that is a draconian condition of release for

20    someone who is not a flight risk and for whom the Government

21    has not identified any concern of obstruction or tampering

22    with witnesses of any kind whatsoever.

23            The allegation in this indictment allege that Mr.

24    Penn did not have contact with competitors directly at all

25    about this, but that his subordinates did, and that contact

1   is more than five years old.  To say now, in 2020, that

2   there is contact in which Mr. Penn heard about more than

3   five years ago that justifies a stay-away order in its

4   entirety from a big chunk of the industry is really going

5   too far and we ask the Court not to enter it.

6          THE COURT:  Well, Counsel, a non-contact with

7   witness's condition is a very standard condition of release

8   in every kind of criminal case heard in this court, from

9   child pornography to drug dealing to guns to the whole

10  panoply.  And the reason for that, of course, is quite

11  obvious, that if a person who was accused of a crime has

12  regular contact with alleged victims of the crime while on

13  release, it can result in intimidation even if the subject

14  of the conversations in contact is something other than the

15  allegations in the indictment.

16          So to the extent that you're advocating for no

17  limitation on Mr. Penn's ability to contact alleged victims,

18  I'm not inclined to go that way.  It's very common, as I

19  said, to require released defendants not to have contact

20  with alleged victims.  However, the issue of suppliers is a

21  little less clear to me and it's a little less clear to me

22  what the Government's theory is there with respect to why

23  Mr. Penn should be prohibited from having business-related

24  contacts with these suppliers.  And perhaps I can ask Ms.

25  Call to elaborate on that a bit.

1          MS. CALL:  Yes, Your Honor.  The suppliers listed

2   here are competitors of the defendant's company and the

3   crime alleged here deals specifically with improper conduct

4   in relation to those competitors.  The companies we've

5   listed in Attachment A are the companies whose names are

6   anonymized in the indictment.  So there are specific

7   allegations as to communications between either Mr. Penn or

8   other co-conspirators with employees of those companies.

9          So the fact that essentially these companies are

10  co-conspirators combined with the fact that the Government

11  may wind up calling employees of these companies as

12  witnesses at trial as well.

13         THE COURT:  All right.

14         MR. TUBACH:  Your Honor, I have one suggestion.

15  If the -- and I hear the Court's concern about contacting

16  the witnesses, and what I would suggest then, because none

17  of the companies listed on Attachment A or B, the suppliers

18  or the customers, are individuals, if the Court has any

19  concern about Mr. Penn having contact with specific

20  individuals who would be witnesses, we could absolutely

21  fashion a condition of release that says he's not allowed to

22  have contact with specific individuals, but to say that he

23  can't have contact with Customer X, anybody at Customer X,

24  which may involve thousands and thousands of people who work

25  for that company, that is drawing a very broad brush.  And

1   again, if the concern is tampering with witnesses, we'd

2   suggest it would be easy enough for the Government to have

3   another list under seal that simply says, Don't have contact

4   with these individuals and we can live with that.

5          THE COURT:  What about that idea, Ms. Call?  The

6   defendant makes a fair point that some of these companies --

7   and I'm speculating, based on my diet and what I know about

8   chicken, some of these companies are huge and employ

9   thousands of people and, you know, an across-the-board

10  prohibition against contact with some of these companies

11  does seem to be rather broad.

12         Why can't the Government be more specific as to

13  the individuals who the Government wishes Mr. Penn not to

14  have contact with?

15         MS. CALL:  Yes, Your Honor.  I think perhaps a

16  reasonable accommodation here would be limiting the request

17  to employees of those companies who were specifically

18  involved in negotiations relating to price.  That is

19  essentially the nature of the criminal conduct -- or what

20  was undermined here, and I believe any employee of those

21  companies involved in price negotiations would be who we

22  would be concerned as potential witnesses or potential,

23  additional victims that could be effected if there further

24  crimes from the defendant.

25         THE COURT:  I --

1           MR. TUBACH:  Your Honor, the allegations in the

2    indictment are about the negotiations that happened more

3    than five years ago.  If Ms. Call is suggesting that current

4    employees who have nothing to do with any of that conduct

5    are employees who Mr. Penn should stay away, that shouldn't

6    be a concern because they're not going to be witnesses in

7    this case.

8           The witnesses in the case would be those who were

9    involved in the conduct that's alleged in the indictment and

10   we'd be happy to keep under seal a list of those people from

11   who Mr. Penn should not have any contact.

12          THE COURT:  Ms. Call, how would you respond to

13   that, that the list should be limited to those individuals

14   who work for these companies with respect to pricing issues

15   at the times alleged during the -- in the indictment?

16          MS. CALL:  (Inaudible) the conspiracy continued at

17   least as up to a certain point, and based on the law that a

18   conspiracy is presumed to continue, I don't believe that we

19   would agree with the characterization that it would be

20   limited to the time periods as alleged on that limitation

21   described by counsel.

22          THE COURT:  All right.  Well, since this is a

23   lengthy indictment and you are certainly more familiar with

24   it than I, can you tell me what time period the Government

25   would agree to with respect to limitations on the

1    defendant's ability to contact individuals involved in

2    pricing issues for these companies during that time period?

3              MS. CALL:  Yes, I believe -- and I may need a

4    clarification on defense counsel's point.  Is it individuals

5    who were employed at a certain time in that role in that

6    company?  I just want to make sure I'm responding to the

7    correct point.

8              MR. TUBACH:  Yes, Your Honor.  My point is that

9    the allegations as to Mr. Penn are limited to the time

10   period between 2012 and 2015.  If the Court wishes to impose

11   a stay-away order that would affect the individuals involved

12   in those negotiations, we'd be happy to live with that, but

13   not just anybody who happens to work at a -- at what the

14   Court can see are some very, very large companies.

15             THE COURT:  So the defendant -- making sure I

16   understand, the defendant's proposal is that the condition

17   of release prohibit the defendant from contacting price

18   negotiators for the supplier companies between 2012 and

19   2015; is that correct?

20             MR. TUBACH:  That's correct, Your Honor.

21             THE COURT:  And what does the Government have to

22   say --

23             MR. TUBACH:  And these would be specific

24   individuals.  I'm sorry, Your Honor.  I didn't mean to --

25             THE COURT:  Go ahead.  I -- go ahead.

1          MR. TUBACH:  They're specific individuals that,

2    obviously, the Government knows about and my suggestion,

3    because we'd want to make sure that Mr. Penn doesn't run

4    afoul of any Court order, we'd simply have the Government

5    list them.  They obviously know who they are because they've

6    filed the indictment and described the discussions.  It

7    would be easy enough to just list the individuals in a

8    sealed exhibit so that Mr. Penn can know to stay away from

9    those specific individuals.

10          THE COURT:  All right.  So to further clarify, the

11   defendant's proposal is that the defendant be prohibited

12   from contacting price negotiators for the supplier companies

13   between 2012 and 2015 who the Government will identify by

14   name; is that correct?

15          MR. TUBACH:  Suppliers and customers, Your Honor,

16   both.

17          THE COURT:  All right.

18          MR. TUBACH:  That's correct.

19          THE COURT:  And, Ms. Call, what's the Government's

20   response to that?

21          MS. CALL:  Your Honor, I don't believe the

22   Government is in a position to name each individual employee

23   of these victim companies who were involved in past

24   negotiations during this time.  The defendants in this case

25   engaged in many rounds of negotiations with these customers

24

1    involving numerous in-person meetings, and we do not have

2    insight into every attendee at -- in-person meetings with

3    the customers, I should note.  I don't believe we have

4    insight into every possible employee of the victim companies

5    that could have been involved in these negotiations.

6          THE COURT:  Well, I'm not talking about victims.

7    I'm inclined to not permit the defendant to contact any

8    employees of the alleged victim companies for the reasons

9    that I already discussed, which are that generally, when

10    defendants are released on bond on criminal charges, they

11    are precluded from contacting any victims of the alleged

12    offense.  And I think I agree with the Government, that it

13    would be difficult for the Government to identify by name

14    the employees of these victim companies who could be

15    separated out for an order that the defendant not contact

16    them.

17          So with respect to the alleged victims listed in

18    Attachment B, the Court is inclined to agree with the

19    Government that the defendant should be precluded from

20    having contact with any employees of the company victims

21    listed in Attachment B.

22          Now we're talking about the suppliers in

23    Attachment A and the defendant's proposal is that the

24    defendant be precluded only from contact with the price

25    negotiators for suppliers between 2012 and 2015 who the

1    Government will identify by name.

2           MS. CALL:  One moment, Your Honor, I'm working on

3    a response to that.

4           So I am attempting to understand the -- you know,

5    what actual communications the defendant does need to have

6    at his level within the company based on the representations

7    that we've heard from defense counsel about the purposes of

8    communications with competitors.  If it is to fulfill supply

9    shortages, it is -- I do not know why a CEO -- a person at

10   the level of a CEO would need to engage in these

11   conversations with companies who we believe are

12   co-conspirators in this crime.

13          In terms of a reasonable limitation, I don't know

14   that a limitation to adjust price negotiators at this

15   company, given Mr. Penn's role at Pilgrim's, would be

16   appropriate.

17          THE COURT:  Well, is the Government's interest in

18   preventing Mr. Penn from continuing to engage in price

19   negotiations with these suppliers or is the Government's

20   interest in precluding Mr. Penn from having any contact with

21   anybody who might be involved as a witness in the case

22   relating to previous allegations -- allegations of previous

23   illegal activity?

24          MS. CALL:  It would be the latter and I do want to

25   clarify.  When we talk about price negotiations, there are

1   two different kinds to be noted here.  There are the

2   legitimate kinds, for example, in covering a shortage of the

3   competitor, and there are, as alleged in the indictment,

4   what would be an illegitimate kind in terms of syncing up

5   Mr. Penn's company's prices with those of his competitors.

6          THE COURT:  Well, I understand.  You know, we're

7   really getting into the weeds here.  I have some sympathy

8   for this defendant's position that he's, (a), not a flight

9   risk, (b), not a danger to the community and that he should

10  be released on reasonable conditions of bond which include

11  his ability to continue to work so long as we can put in

12  safeguards that guarantee that, essentially, he's not going

13  to intimidate any witnesses or further engage in alleged

14  illegal conduct.  That's my point of view with respect to

15  this matter.

16          I do not think that it is in any way too

17  burdensome to ask the Government to identify the witnesses

18  for the suppliers during the timeframe alleged in the

19  complaint -- in the indictment with which this defendant was

20  allegedly involved and to preclude this defendant from

21  further contact with those named individuals who are

22  witnesses to the Government's complaints, essentially, about

23  the defendant's conduct.

24          So I am going to require the Government to

25  identify by name price negotiators for the suppliers listed

1    in Attachment A with whom the Government asserts the

2    defendant should have no contact because they are witnesses

3    to the allegations made in the indictment.  I'm going to

4    further order that the defendant have no contact with

5    employees of the alleged victims identified in Attachment B.

6           Now, with respect to the travel restriction, the

7    defendant argues that he should be permitted to travel for

8    purposes of doing his work and the Court tends to agree.

9    There's nothing in the pretrial services report or in

10   anything that I have heard today that leads me to conclude

11   that this defendant is a flight risk.  He's been apparently

12   traveling around the world during a pandemic to do his work,

13   undoubtedly aware of this investigation to a certain extent

14   and the possibility of charges being leveled, and I do not

15   find that it would be in his interest or the interest of the

16   Court to have him check in with the Court every time he

17   needs to fly somewhere for business outside of Colorado.

18          So I am inclined to order as follows with respect

19   to the conditions of release and I'll allow counsel to make

20   any last statement that they want to make about this:

21          That the defendant will be released on a personal

22   recognizance bond.  He will avoid all contact directly or

23   indirectly with the price negotiators identified by the

24   government with respect to the suppliers listed on

25   Attachment A.  Those price negotiators will be price

1    negotiators who are alleged witnesses to the conduct alleged

2    in the indictment between 2012 and 2015.  He will be further

3    prohibited from contacting any employees of the alleged

4    victims listed on Attachment B to the bond release

5    paperwork.  He may not possess a firearm, a destructive

6    device or another dangerous weapon and he may not act as an

7    informant for a law enforcement agency without prior

8    permission of the Court.

9            Those are my -- those are the conditions that I

10   intend to impose, and, as I said, I'll allow counsel to make

11   any final statements they wish to make.

12           The Government?

13           MS. CALL:  Yes, Your Honor.

14           The Government rests any further argument.  As to

15   logistics, the Government propose that we file under

16   restrictions these -- the revised Attachment A and

17   Attachment B following this hearing.

18           THE COURT:  Yes.  And as far as I'm concerned,

19   there need not be any revision to Attachment B unless you

20   think I don't have the correct one.  The one I have is --

21   lists eight companies as alleged victims, but yes, I would

22   require the Government to file under restriction the revised

23   Attachment A -- it's about 3:30 Colorado time now --

24   hopefully before the conclusion of our electronic filing

25   day, which is at midnight tonight.

1          Is that possible for the Government, Ms. Call?

2          MS. CALL:  That will be possible, Your Honor.

3     Yes.

4          THE COURT:  All right, thank you.

5          And counsel for the defendant, any further

6     comments?

7          MR. TUBACH:  Your Honor, yes.  Just a -- and I

8     realize that the Court is leaning against us here, but I did

9     -- if the purpose of this stay away from the customers is to

10    prevent witness tampering, then that would imply -- and

11    that's what the Court has done with respect to the

12    suppliers -- I just suggest that same logic applies with

13    respect to the customers in the same way.

14         I understand that stay-away orders are routinely

15    entered in lots of cases and the purpose of that is to

16    prevent intimidation of witnesses, and that's precisely what

17    I'm trying to accomplish by the compromise that I propose

18    with respect to the customers as well, that anybody who's a

19    potential witness, Mr. Penn would stay away from, but to say

20    that he can't have contact with a -- with a -- who started

21    working at one of these large companies last week when he's

22    not conceivably a witness in the case would seem to put a

23    real constraint on Mr. Penn's activities.

24         THE COURT:  I understand what you're saying, but

25    my concern remains, as I expressed earlier, that it may be

1   impossible for the Government to identify the alleged -- by

2   name, the alleged victims in each of these eight companies

3   that are listed in Attachment B.  They -- especially in

4   light of the fact that the conduct as alleged to Mr. Penn

5   occurred between 2012 and 2015.

6          So I do not think it is reasonable to impose on

7   the Government the same condition that I imposed with

8   respect to the suppliers; that is, to provide a specific

9   list of individuals.

10          The reason why I think there's a big difference is

11  the suppliers are witnesses and the Government should, at

12  the time of its indictment, have a very good handle on who

13  its witnesses will be with respect to the illegal conduct

14  alleged, but the same may not be true as to victims,

15  especially as to victims of conduct that's alleged to have

16  occurred more than five years ago, and for that reason, I am

17  not going to require that the Government specify names with

18  respect to the alleged victims in Attachment B.  I will

19  nevertheless preclude the defendant from contact with any

20  employees of the companies listed in Attachment B.

21          I suggest to you, Counsel, that Mr. Penn as a

22  successful CEO probably knows very well how to delegate and

23  my guess is that he's going to have no trouble delegating

24  the duties that he would otherwise undertake himself to

25  others in his company, given these restrictions on his

1    conduct on release.

2          All right, Mr. Penn, I need to make sure two

3    things.  First, that you understand the conditions of

4    release that I have explained to you and if you would like

5    me to go through them again so that they're clear, I will do

6    that.  Do you understand them?

7          MR. PENN:  I do understand them, Your Honor.

8          THE COURT:  All right.  And I also need to know

9    that you will authorize your signature on these bond release

10   documents containing the conditions that we've discussed

11   today.

12         MR. PENN:  I will, Your Honor.

13         THE COURT:  All right.  Then I will execute the

14   bond release documents once I have them appropriately

15   modified to reflect the decisions that I've made today.  And

16   Counsel, of course, will be checking Judge -- Chief Judge

17   Brimmer for any additional dates needed on Mr. Penn.

18         Is there anything else from the Government today

19   with respect to Mr. Penn?

20         MS. CALL:  No, Your Honor.

21         THE COURT:  Anything else from defense counsel for

22   Mr. Penn?

23         MR. TUBACH:  No, Your Honor, thank you.

24         THE COURT:  Thank you.  We're in recess with

25   respect to Mr. Penn.

1          (Whereupon, the within hearing was then in

2    conclusion at 3:27 p.m.)

3

4

5                    TRANSCRIBER'S CERTIFICATION

6    I certify that the foregoing is a correct transcript to the

7    best of my ability to hear and understand the audio

8    recording and based on the quality of the audio recording

9    from the above-entitled matter.

10

11   /s/ Dyann Labo                    June 10, 2020

12   Signature of Transcriber               Date

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com