IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     MIKELL REEVE FRIES,
3.     SCOTT JAMES BRADY, and
4.     ROGER BORN AUSTIN

       Defendants.

**DEFENDANT JAYSON PENN'S MOTION FOR BILL OF PARTICULARS**

Defendant Jayson Penn, by and through undersigned counsel, and pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, respectfully requests that the Court order the government to file a bill of particulars.

## I.     INTRODUCTION

The government must give an individual notice of the nature of a charge, *Hamling v. United States*, 418 U.S. 87, 117 (1974), "the first and most universally recognized requirement of due process," *Bousley v. United States*, 523 U.S. 614, 619 (1998).  To ensure that a defendant can actually prepare a defense and avoid the prejudice flowing from surprise at trial, district courts are authorized to require the government to provide a bill of particulars.  *See* Fed. R. Crim. P. 7(f).  The rule was amended in 1966 "to encourage a more liberal attitude by the courts towards bills of particulars" while preserving judicial discretion.  Fed. R. Crim. P. 7 advisory committee's note (1966).  This case exemplifies the wisdom of that rule.

In this case, the indictment purports to allege a sprawling conspiracy involving the sale of all broiler chicken in the United States over at least a five-year period.  But the indictment fails to provide basic information about the scope, participants, and roles played in the alleged conspiracy.  And the factual allegations it does assert raise vexing questions that make it all but impossible to frame a defense:

- It notes that there are seven, and perhaps more, chicken suppliers in the United States (Ind. ¶ 3), but does not state whether they were all involved in the conspiracy.
- It lists five customers (*id*. ¶¶ 21-25), but does not specify whether the conspiracy was limited to them.
- And even as to the customers listed, it creates needless ambiguity as to how they were

2

involved, if at all:  one customer, a "nationwide grocery-store chain," is defined at the beginning of the indictment as "Grocer-2" (*id.* ¶ 25), but its only other appearance in the indictment has nothing to do with price fixing or bid rigging (*id.* ¶ 63.b). Perhaps most fundamentally, the indictment describes eight discrete events scattered over the five-year period, but never states whether these events constitute all of the alleged bid-rigging activity, or simply illustrate what the government alleges is a part of a broader pattern; nor does it state which of the suppliers supposedly participated in which events or how Mr. Penn—who is not alleged to have had direct contact with any competitors—conspired to fix prices.

These omissions frustrate Mr. Penn's ability to mount a defense.  They also are entirely unnecessary.  If, as the government seems to believe, there was a single overarching conspiracy spanning multiple years and involving multiple firms and individuals, it can and should provide Mr. Penn notice of the relevant allegations.  But rather than list in straightforward fashion the bids or prices to specific customers that Mr. Penn allegedly conspired to fix, and the co-conspirators allegedly involved in these events, the government proposes to deliver 12.5 million documents and leave it to Mr. Penn to guess what he is alleged to have done wrong. The adversarial system in a criminal case is not supposed to work that way:  when the government accuses the defendant of a crime, it should tell him what he is alleged to have done. Rule 7 of the Federal Rules of Criminal Procedure provides the Court with the means to hold the government to that basic standard of fairness.

While bills of particulars are not needed in typical criminal cases, in complex antitrust cases such as this one, they are.  It is critical that individuals be apprised of what they are alleged to have done wrong.  Unlike in a bank robbery or drug dealing case, in antitrust cases the

3

government can use common and perfectly lawful commercial conduct—such as gathering competitor pricing information to make an independent pricing decision—to try to show a price-fixing agreement. The indictment proves this very point. For example, Mr. Penn's *only* alleged connection to one of the eight enumerated incidents in the indictment (Ind. ¶¶ 42-47 ("QSR-1's Dark Meat Supply for 2014")) is that he signed a contract with the customer on behalf of Pilgrim's Pride. (*Id.* ¶ 46.) There is nothing unlawful in that conduct—and nothing about it that provides notice to Mr. Penn of how he allegedly broke the law.

Having brought these charges, the government should be required to answer the most basic questions about its case: (1) who participated in the alleged conspiracy, when they joined, and when the conspiracy ended; (2) which bids or prices to which customers were allegedly rigged or fixed; and (3) what is the government's theory of how Mr. Penn participated in fixing or rigging these bids or prices. The Court should grant the motion for a bill of particulars and order the government to disclose this information so Mr. Penn can prepare for trial.

## II.     FACTUAL BACKGROUND

On June 2, 2020, the grand jury returned a one-count indictment against Mr. Penn and three co-defendants for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Ind. ¶ 1.) In the indictment, the government alleges a price-fixing and bid-rigging conspiracy between 2012 and 2017 relating to suppliers of broiler chicken products whose customers include nationwide restaurant franchises, large-scale grocers, and centralized buying cooperatives. (*Id.* ¶¶ 1, 3, 21-25.) The indictment describes with some factual detail eight separate incidents that allegedly constitute the "means and methods of the conspiracy." (*Id.* ¶¶ 32-77.) At the same time, the indictment suggests a broader conspiracy than these eight incidents. (*Id.* ¶¶ 28-31.) It alleges a

4

conspiracy whose purpose was "to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." (*Id.* ¶ 28.)  It contends that the acts alleged in the indictment formed "part" of the conspiracy alleged. (*Id.* ("It was part of the conspiracy ...."); *id.* ¶ 29 ("It was further part of the conspiracy ...."); *id.* ¶¶ 30, 31 (same).)  It alleges, with no factual detail, that the co-conspirators utilized their "continuing network" to reach agreements and understandings to submit aligned bids, to participate in conversations and communications relating to non-public information, and to monitor bids.  (*Id.* ¶ 29(a)-(c).)

Other than the four named defendants, the indictment does not name the other alleged co-conspirators or the associated supplier or customer companies.  (*Id.* ¶¶ 10-27.)  Although certain co-conspirators and suppliers are identified the indictment is vague as to whether there are others.  (*See id.* ¶¶ 1-3, 26, 28.)  Similarly, the indictment identifies five customers (*id.* ¶¶ 21-25), but does not specify whether the conspiracy is limited to them.

The government alleges that Mr. Penn is the Chief Executive Officer of one such supplier ("Supplier-1," which is Pilgrim's Pride Corporation ("Pilgrim's Pride")) and was an executive vice president at Pilgrim's Pride during the period of the alleged conspiracy.  (*Id.* ¶ 10.)  The government alleges five instances when he communicated with other employees of Pilgrim's Pride, allegedly as part of the conspiracy, between November 2012 and March 2015.  (*Id.* ¶¶ 37, 51-53, 59-61, 63-65, 69.)  It claims that some of these communications contained competitor pricing information of an unknown origin or originating from the customer.  (*Id.*)  The government also alleges that Mr. Penn signed agreements on behalf of Pilgrim's Pride in 2012 and 2013 with two customers and approved a discount for a third customer in 2012.  (*Id.* ¶¶ 38,

5

46, 70.) The government does not allege that Mr. Penn communicated with any competitor, directly or indirectly, at any point. (*See id.* ¶¶ 1, 10, 14, 28-31, 37, 38, 46, 51-53, 59-61, 63-65, 69, 70.)

Mr. Penn was arraigned on the indictment on June 4, 2020. A trial date of August 10, 2020 is currently set. During a telephone conversation on June 10, 2020, the government represented to defense counsel that it would be producing approximately 12.5 million documents, comprising 19 terabytes of data, to the defendants in discovery. On June 12, 2020, defendants filed a joint unopposed motion seeking to exclude 180 days from the speedy trial calculation pursuant to 18 U.S.C. § 3161(h)(7)(A) & (B)(i) – (iv) because of the complexity of the case.

### III.     LEGAL STANDARD

A district court may direct the government to file a bill of particulars where the indictment fails to "inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988) (internal citations omitted); Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is to "allow [the defendant] to prepare his defense, to minimize surprise at trial, and to enable [the defendant] to plead double jeopardy in the event of a later prosecution for the same offense." *Dunn*, 841 F.2d at 1029. A bill of particulars is appropriate where an indictment does not reveal the theory of the government's case sufficiently to enable the defendant to prepare for trial. *United States v. Levine*, 983 F.2d 165, 167 (10th Cir. 1992); *see also Cefalu v. United States*, 234 F.2d 522, 525 (10th Cir. 1956) (abuse of discretion to deny bill of particulars where indictment lacked sufficient particulars of government's theory). The sufficiency of the indictment is "determined

6

by practical rather than technical considerations." *Dunn*, 841 F.2d at 1029.

A court has broad discretion in ruling on a motion for a bill of particulars. *Id*. However, if a court determines that the interests of the defense and the government are closely balanced, the interests of the defendant "must prevail." *United States v. Rogers*, 617 F. Supp. 1024, 1027–28 (D. Colo. 1985); *see also King v. United States*, 402 F.2d 289, 292 (10th Cir. 1968).

## IV.   ARGUMENT

The indictment fails to "inform [Mr. Penn] of the charge against him with sufficient precision to allow him to prepare his defense." *Dunn*, 841 F.2d at 1029. The elements of the charged violation of Section 1 of the Sherman Act are (1) a price-fixing or bid-rigging conspiracy; (2) the defendant knowingly joined and participated in the charged conspiracy; and (3) the conspiracy occurred within the flow of, or substantially affected, interstate commerce. *United States v. U.S. Gypsum Co*., 438 U.S. 422, 430 (1978); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 479-80 (10th Cir. 1990). At the most practical level, Mr. Penn cannot reasonably be asked to sift through 12.5 million documents and guess which the government contends show how he conspired and who he conspired with; he must be apprised of where to look and how to understand the government's case against him. Given the enormous volume of discovery, if 50 lawyers spent only one minute reviewing each document and did nothing else for eight hours a day, it would take 520 days to review 12.5 million documents. And without particularization about the scope and participants in the alleged conspiracy, framing keyword searches intelligently would be impossible. Mr. Penn needs to know: (1) who participated in the alleged conspiracy, when they joined, and when the conspiracy ended; (2) which bids or prices to which customers were rigged or fixed; and (3) what is the government's theory as to how Mr.

7

Penn is connected to the conspiracy.

In antitrust cases like this one, which necessarily involve complex business transactions and voluminous innocuous communications, courts have repeatedly recognized that "greater specificity is warranted" than in the usual criminal case. *United States v. Bestway Disposal Corp.*, 681 F. Supp. 1027, 1030 (W.D.N.Y. 1988) ("Over the years, the courts that have confronted demands for bills of particulars in criminal antitrust cases generally have recognized that such cases are different from the 'ordinary' criminal case."); *United States v. Fischbach & Moore, Inc.*, 576 F. Supp. 1384, 1389 (W.D. Pa. 1983) (requiring a bill of particulars in light of the complexity of the antitrust case); *see also, e.g.*, *United States v. Wong*, 2007 WL 404807, at *2 (N.D. Cal. Feb. 2, 2007) (requiring bill of particulars in antitrust case); *United States v. Feil*, 2010 WL 1525263, at *3 (N.D. Cal. Apr. 15, 2010) (same); *United States v. Greater Syracuse Bd. of Realtors, Inc.*, 438 F. Supp. 376, 380 (N.D.N.Y. 1977) (courts are "unanimous" in recognizing antitrust cases are different when deciding a motion for a bill of particulars).

Because the three categories of information that Mr. Penn requests are necessary to reasonably prepare his defense and are comparable to what is granted in antitrust and other complex cases, the Court should order the government to provide a bill of particulars.

### A.  The government should identify the alleged co-conspirators.

Mr. Penn cannot defend himself against a conspiracy charge when he does not know with whom, among the myriad individuals with whom he communicated during the period in question, he is alleged to have conspired.  Mr. Penn needs to know the names of these individuals and companies, when they joined the alleged conspiracy, and when the conspiracy ended, so that he can search for relevant information in the 12.5 million documents he expects to

8

receive from the government. *See, e.g.*, *Rogers*, 617 F. Supp. at 1028 (government required to identify undisclosed and unidentified co-conspirators, aiders and abettors, and other individuals involved in the criminal acts charged); *United States v. Gomez*, 2011 WL 5828016, at *3 (D. Kan. Nov. 18, 2011) ("government shall identify the known but undisclosed coconspirators"); *United States v. Welch*, 198 F.R.D. 545, 551 (D. Utah 2001), citing *United States v. Nachamie*, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000) ("the disclosure of known unindicted coconspirators should turn on a consideration and weighing of multiple factors"); *United States v. Martoma*, 2013 WL 2435082, at *7 (S.D.N.Y. June 5, 2013) (granting motion for a bill of particulars and ordering government to identify all known coconspirators); *United States v. James*, 2007 WL 914242, at *15 (E.D.N.Y. Mar. 21, 2007) ("Courts have required the government to provide a list of any unindicted co-conspirators or 'co-schemers' if the government intends to introduce evidence about those individuals at trial."); *United States v. Kahale*, 789 F. Supp. 2d 359, 372 (E.D.N.Y. 2009) (granting bill of particulars seeking information about unindicted co-conspirators).[1]

One court has distilled six factors to assess the need for a bill of particulars listing unindicted co-conspirators: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the government otherwise has provided adequate notice of the particulars; (4) the volume of pretrial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's

---

[1] *See also United States v. Mobile Materials*, 881 F.2d 866, 870 n.2 (10th Cir. 1989) (on rehearing) (referring without discussion to a trial court's order on the government's disclosure of unnamed co-conspirators); *United States v. Washita Constr. Co.*, 789 F.2d 809, 813 n.4 (10th Cir. 1986) (same).

9

investigation." *Kahale*, 789 F. Supp. 2d at 372, citing *Nachamie*, 91 F. Supp. 2d at 572–73. Here, as in *Kahale*, at least four of these factors weigh in favor of disclosure: (1) the number of potential co-conspirators is potentially large; (2) "the alleged duration of the conspiracy, five years, is relatively lengthy" and the geographic scope of the conspiracy—nationwide—is expansive; (3) the government has not otherwise provided the particulars requested; and (4) the government will be overwhelming the defendants with "mountains" of discovery. *See id.* at 372-73. The government has provided no reason to believe the remaining two factors weigh against disclosure. Finally, as in *Kahale* and similar cases, "the relative complexity of the [] charges facing defendants … also weighs in favor of requiring disclosure." *Id.* at 373. The government should be ordered to identify all co-conspirators and victims of the alleged conspiracy.

### B. The government should identify any additional incidents of alleged price-fixing or bid-rigging.

Second, the government should be ordered to "provide enough information to apprise [Mr. Penn] of the nature of [his] own alleged overt acts as well as those of co-violators." *Rogers*, 617 F. Supp. at 1029. Although the indictment alleges eight specific incidents of collusion under headings such as "QSR-3's 8-Piece COB Supply for 2015" and "QSR-1's Dark Meat Supply for 2014," the expansive language used to describe the means and methods of the conspiracy suggests that these incidents are only examples of the allegedly fixed prices or bids the government may present at trial. For example, Paragraph 29(c) broadly alleges that the conspirators used the alleged "continuing network" "to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by Suppliers and co-conspirators for broiler chicken products sold in the United States." Paragraph 29(b) is similarly expansive and also vague, alleging the occurrence of "conversations and communications relating to non-public

10

information, such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States."

This does not give Mr. Penn "enough information about the offense charged so that he may prepare adequately for trial." *Rogers*, 617 F. Supp. at 1027 (granting motion for bill of particulars and ordering particularization of defendants' overt acts). During the five-year period in question, the implicated suppliers entered hundreds of bids for various chicken parts and various bird sizes, if not more. They conducted countless price analyses and built pricing models; they made thousands of pricing decisions with respect to many different broiler chicken products, such as dark meat, wings, and breast meat; they engaged in an untold number of negotiations and entered into hundreds of different contractual arrangements. Mr. Penn cannot sift through 12.5 million documents with no further guidance; he needs to know which bids submitted during the relevant period were allegedly rigged, which price and price-related terms were allegedly fixed, and what products in the general family of "broiler chicken products" are implicated. To prepare for trial, Mr. Penn asks that the government provide a list of implicated contracts or bids and certain critical particulars: the time frame, the customers, the relevant products, the allegedly impacted contractual terms or prices, the suppliers involved, and the names of those with whom he allegedly conspired.

Case law in the antitrust context supports Mr. Penn's request for this information. *Greater Syracuse*, 438 F. Supp. at 380-81 (ordering bill of particulars to sufficiently specify overt acts on which the government's theory rests in antitrust cases); *United States v. Metro. Leather & Findings Ass'n*, 82 F. Supp. 449, 455 (S.D.N.Y. 1949) (in price-fixing case, a defendant is entitled to "a statement identifying each separate occasion [of price fixing] relied

11

on"); *United States v. Allied Chem. & Dye Corp.*, 42 F. Supp. 425, 428-29 (S.D.N.Y. 1941) (same); *United States v. Tedesco*, 441 F. Supp. 1336, 1343 (M.D. Pa. 1977) (similar).[2]

### C. The government should identify how Mr. Penn is implicated.

Finally, the government should specify how the described incidents implicate Mr. Penn, including by identifying which acts of other employees at Pilgrim's Pride, if any, the government contends that Mr. Penn is responsible for and under what theory. *Dunn*, 841 F.2d at 1030 (defendant is entitled to "the theory of the government's case"). The indictment does not allege any contact, direct or indirect, between Mr. Penn and a competitor. Mr. Penn is entitled to know the government's theory as to how he joined and contributed to the charged conspiracy now, before he begins sifting through 12.5 million documents of discovery, so that he can prepare his defense. *Feil*, 2010 WL 1525263, at *3; *cf. United States v. Moore*, 556 F.2d 479, 483 (10th Cir. 1977) (affirming denial of motion for bill of particulars where indictment left no doubt about the government's theory of the case).

### D. The government's expected discovery productions will not obviate the need for the requested particulars.

While discovery can obviate the need for a bill of particulars in some cases, that is not necessarily the case where the discovery is extraordinarily voluminous. *See, e.g.*, *Wong*, 2007 WL 404807, at *2 (bill of particulars required despite government's production of 150,000 pages of discovery, plus thousands of images and minutes of audio and video surveillance); *Feil*, 2010 WL 1525263, at *3 (despite significant discovery, government required to identify the

---

[2] Counsel was unable to locate precedent in this Circuit addressing this issue in an antitrust case specifically. The sole District Court case denied such a motion after the information was voluntarily provided by the government. *United States v. Deffenbaugh Indus., Inc.*, 1991 WL 75788, at *1 (D. Kan. Apr. 19, 1991), *aff'd*, 957 F.2d 749 (10th Cir. 1992).

12

defendants' overt acts in support of the alleged conspiracy); *see also United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (denial of motion for bill of particulars in RICO case was abuse of discretion). In *Bortnovsky*, for example, it was an abuse of discretion to deny the defendants' motion for bill of particulars because, despite the discovery produced by the government, the defendants were forced to sort through 4,000 documents unrelated to the pending charges to determine what was relevant. *Bortnovsky*, 820 F.2d at 574-75.

The government has promised to produce 12.5 million documents in discovery in this case. These productions will not solve the problems created by the indictment's broad scope; they will compound them. Mr. Penn will be left to sift through the emails of more than a dozen corporations and hundreds of individuals—the vast majority of which are no doubt irrelevant—at an exorbitant time and expense. The government "[does] not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven [inculpatory]." *Id*. at 575. The government should be ordered to provide the requested particulars to allow Mr. Penn to reasonably prepare his defense.

## V.      CONCLUSION

The indictment in this case does not sufficiently reveal the particulars of the government's case against Mr. Penn. To allow Mr. Penn to prepare his defense and avoid surprise at trial, the Court should order the government to provide a bill of particulars.

Dated:  June 18, 2020

Respectfully submitted,

*s/ Michael F. Tubach*

Michael F. Tubach (Cal. Bar No. 145955)
Anna T. Pletcher (Cal. Bar No. 239730)
Megan Havstad (Cal. Bar No. 287938)
Brian P. Quinn (D.C. Bar No. 1048323)
**O'MELVENY & MYERS LLP**
Two Embarcadero Center
28th Floor
San Francisco, California  94111-3823
Telephone: 415-984-8700
Facsimile: 415-984-8701
E-mail:  mtubach@omm.com
             apletcher@omm.com
             mhavstad@omm.com
             bquinn@omm.com

Attorneys for Defendant
Jayson Jeffrey Penn

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of June, 2020, I electronically filed the foregoing **DEFENDANT JAYSON PENN'S MOTION FOR BILL OF PARTICULARS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Michael F. Tubach*
Michael F. Tubach