1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
   Case No. 20-cr-00152-PAB
3  _____

4  UNITED STATES OF AMERICA,

5       Plaintiff,

6  vs.

7  JAYSON JEFFREY PENN, et al.,

8       Defendants.
   _____
9

10       Proceedings before MICHAEL E. HEGARTY, United States

11 Magistrate Judge, United States District Court for the

12 District of Colorado, commencing at 3:02 p.m., October 13,

13 2020, in the United States Courthouse, Denver, Colorado.

14 _____

15       WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16 ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17 _____

18 INITIAL APPEARANCE, ARRAIGNMENT, DISCOVERY, DETENTION HEARING

19

20

21

22

23

24

25
```

```
 1                        APPEARANCES

 2              HEATHER CALL and CAROLYN SWEENEY, Attorneys at Law,

 3    appearing for the Plaintiff.

 4              MICHAEL TUBACH, Attorney at Law, appearing for the

 5    Defendant Penn.

 6              BRIAN KORNFELD, Attorney at Law, appearing for the

 7    Defendant Fries.

 8              BRYAN LAVINE, Attorney at Law, appearing for the

 9    Defendant Brady.

10              MICHAEL FELDBERG, Attorney at Law, appearing for

11    the Defendant Austin.

12              ELIZABETH PREWITT, Attorney at Law, appearing for

13    the Defendant Mulrenin.

14              JAMES BACKSTROM, Attorney at Law, appearing for the

15    Defendant Little.

16              JOHN FAGG, Attorney at Law, appearing for the

17    Defendant Lovette.

18              CRAIG GILLEN, Attorney at Law, appearing for the

19    Defendant Roberts.

20              BARRY POLLACK, Attorney at Law, appearing for the

21    Defendant Blake.

22

23

24

25
```

3

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Whereupon, the within electronically recorded |
| 3 | proceedings are herein transcribed, pursuant to order of |
| 4 | counsel.) |
| 5 | THE COURT:  This is a big case.  I know we probably |
| 6 | have all the lawyers, but do we have all the defendants or |
| 7 | just one at a time? |
| 8 | COURTROOM DEPUTY:  We probably want to do it one at |
| 9 | a time because they're all on summons so they should be by |
| 10 | phone or video. |
| 11 | THE COURT:  Okay. |
| 12 | COURTROOM DEPUTY:  Some are appearing. |
| 13 | THE COURT:  Okay, so let me do this.  Do we -- |
| 14 | they're all on summons? |
| 15 | COURTROOM DEPUTY:  Yes. |
| 16 | THE COURT:  Is Mr. Penn on the telephone? |
| 17 | MR. TUBACH:  Your Honor, I see -- this is Michael |
| 18 | Tubach.  I'm Mr. Penn's attorney.  I see him on video, but I |
| 19 | don't hear him. |
| 20 | THE COURT:  Okay.  Mr. Penn, will you unmute |
| 21 | yourself. |
| 22 | MR. PENN:  Can you hear me now, Your Honor? |
| 23 | THE COURT:  Yes, all right.  And does Mr. Penn |
| 24 | waive his personal appearance? |
| 25 | MR. TUBACH:  He does, Your Honor. |

4

1            THE COURT:  Mr. Fries, or Fries, however you
2  pronounce it, are you there?
3            MR. FRIES:  Yes, I am, Your Honor.
4            THE COURT:  And does his counsel waive his personal
5  appearance?
6            MR. KORNFELD:  Yes, Your Honor, this is Rick
7  Kornfeld on behalf of Mr. Fries, and we do so waive.  Thank
8  you very much.
9            THE COURT:  Thank you, Mr. Kornfeld.  And thank you
10  for your appearance.
11            Mr. Scott James Brady, are you on the line?
12            MR. BRADY:  Yes.
13            THE COURT:  Okay, and counsel for Mr. Brady?
14            MR. LAVINE:  Yes, Your Honor, it this is
15  Bryan Lavine.  We do waive.
16            THE COURT:  All right, thank you.  And Mr. Robert
17  Born Austin?  Has anybody seen Mr. Austin?
18            MR. FELDBERG:  Mr. Austin is on video, Your Honor.
19            THE COURT:  Thank you.  Can you hear me?
20            MR. FELDBERG:  Mr. Austin, you are on mute.  Your
21  Honor, this is Michael Feldberg.  I'm Mr. Austin's attorney.
22            THE COURT:  Okay.
23            MR. FELDBERG:  I see him and we waive personal
24  appearance.
25            THE COURT:  All right.  Did he give you a thumbs-up

5

1    or anything?

2              MR. FELDBERG:  Yes, he did.

3              THE COURT:  Thank you.

4              MR. FELDBERG:  Thank you.

5              THE COURT:  And Mr. Timothy R. Mulrenin.

6              MS. PREWITT:  My name is Liz Prewitt for

7    Mr. Mulrenin.  I see him on the video, and he waives personal

8    appearance and consents to this video.

9              THE COURT:  Okay, give me a thumbs-up.  Okay.

10             And William Vincent Kantola, please thumbs-up,

11   wherever you are.

12             MR. BACKSTROM:  This is James Backstrom for

13   Mr. Kantola.  Mr. Kantola is with me and he waives, Your

14   Honor.

15             THE COURT:  Thank you.  And William -- sorry, Jimmy

16   Lee Little, please.

17             MR. BRYNE:  Your Honor, Mark Byrne is here.

18             THE COURT:  Okay.

19             MR. BRYNE:  I don't know if I can see myself, and I

20   believe Mr. Little is here also.

21             MR. LITTLE:  Yes, I'm here.

22             THE COURT:  Thank you, Mr. Little.

23             MR. BRYNE:  Thank you, Your Honor.

24             THE COURT:  And William Wade Lovette?  Okay.  And

25   counsel?  Counsel for Mr. Lovette, please.  You have to

6

1    unmute yourself and make your appearance, sorry.  Who is

2    counsel for Mr. Lovette?  Is there anybody else who is

3    counsel in the case?

4            UNIDENTIFIED SPEAKER:  No.

5            UNIDENTIFIED SPEAKER:  Your Honor, I believe I see

6    him speaking.

7            THE COURT:  Wave -- counsel for Mr. Lovette, please

8    wave your hand.  Okay, we can't hear you.  All right,

9    assuming he's waving.  Love this.

10           Gary Brian Roberts?

11           MR. GILLEN:  Your Honor, this is Craig Gillen for

12   Mr. Roberts.  He will waive.  I have not yet entered a formal

13   notice of appearance, but I will.

14           THE COURT:  Do you see your client?

15           MR. GILLEN:  Yes, I do.

16           THE COURT:  Thank you.  And you do waive his

17   appearance?

18           MR. GILLEN:  Gary, go ahead and give a wave.  There

19   you go.

20           THE COURT:  Ricky Patterson Blake.

21           MR. POLLACK:  Good afternoon, Your Honor.  This is

22   Barry Pollack on behalf of Mr. Blake, who is on with me,

23   co-counsel Wendy Johnson, and Mr. Blake waives his

24   appearance -- personal appearance.

25           THE COURT:  Thank you, very good.

1          MR. FAGG:  Your Honor, this is John Fagg.  I'm

2    counsel for Mr. Lovette.  Are you able to hear us now?

3          THE COURT:  I do.

4          MR. FAGG:  Oh, great.  Thank you.

5          THE COURT:  I think that's everybody.  Am I missing

6    anybody on 20-cr-152?

7          All right.  Let's have counsel for the United

8    States make an appearance.

9          MS. SWEENEY:  Yes, Your Honor.  My name is Carolyn

10   Sweeney here for the United States, and I'm here with my

11   colleague Heather Call.

12         THE COURT:  Okay, say your name again.

13         MS. SWEENEY:  Carolyn Sweeney, and I'm here with my

14   colleague Heather Call.

15         THE COURT:  And we are all on summons on a

16   rearraignment on a superseding.  Is that right?

17         MS. SWEENEY:  Your Honor, four of the defendants

18   are here for rearraignment and six of the defendants are here

19   for an initial appearance.

20         THE COURT:  Okay.

21         MS. SWEENEY:  As well as I believe that we will be

22   discussing conditions of release for all defendants.

23         THE COURT:  Okay.  All right.  Well, let me do the

24   arraignment, I guess.  Is there only one count for all

25   defendants?

8

1          MS. SWEENEY:  Nine of the defendants -- all of the

2     defendants have one count and one of the defendants has an

3     additional count.

4          THE COURT:  All right.

5          MS. SWEENEY:  And then that's Mr. Little who has

6     two additional counts.

7          MR. BRYNE:  That's correct, Your Honor.

8          THE COURT:  So only one defendant, you said, has

9     more than one count?

10          MS. SWEENEY:  Yes.  So all of the defendants have

11     one count and Mr. Little has (inaudible) counts.

12          THE COURT:  Okay.

13          MS. SWEENEY:  (Inaudible).

14          THE COURT:  I will advise him separately, but all

15     the rest with him together on the first count.

16          So the first count in the superseding indictment

17     alleges a conspiracy to restrain trade, beginning at least as

18     early as 2012 and continuing through at least early 2019 in

19     Colorado.  All the defendants entered into and engaged in a

20     continuing combination and conspiracy to express and

21     eliminate competition by rigging bids and fixing prices and

22     other price-related items for broiler chicken products sold

23     in the United States.

24          The combination and conspiracy engaged in by the

25     defendants and conspirators was a, per se -- was, per se,

9

1    unlawful and, thus, unreasonable restraint of interstate

2    trade and commerce in violation of Section 1 of the Sherman

3    Act, 15 U.S.C. Section 1.  The potential penalty for that is

4    not more than ten years in prison, not more than a $1 million

5    fine or two times the gain or loss, whichever is greater, or

6    both imprisonment and a fine, not more than three years'

7    supervised release and $100 special assessment.

8            As to Mr. Little alone --

9            MR. BRYNE:  Counts 2 and 3, Your Honor.

10           THE COURT:  I have Count 2, which -- and 3.  Count

11   2 is a violation under 18 U.S.C. Code, Section 1001, false

12   statement; Count 3, 18 U.S. Code, Section 1512(c)(2),

13   obstruction of justice.

14           The Count 2, false statement, carries with it a

15   potential penalty of not more than five years in prison, not

16   more than a $250,000 fine, or both; not more than three

17   years' supervised release; and a $100 special assessment fee.

18           Count 3, not more than 20 years in prison, not more

19   than a $250,000 fine, or both; not more than three years'

20   supervised release; and a $100 special assessment fee.

21           Each one of you has a right to remain silent.

22   Anything you say in this court or to the United States

23   Government could be used against you or in the prosecution of

24   this case.  Each of you has a right to counsel.  If you

25   cannot afford one, I would appoint one for you at no cost to

1    you.

2            My understanding is that each attorney who has made

3    an appearance is retained and not appointed; is that correct?

4            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6            THE COURT:  Okay, good.

7            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

8            THE COURT:  All right.  If at any time --

9            UNIDENTIFIED SPEAKER:  That's correct.

10           THE COURT:  -- during representation any of you

11   finds that you can no longer afford your attorney and you

12   qualify, then I would appoint an attorney for you.

13           You also have the right to a trial by a jury.  At

14   that time you're presumed innocent until proven guilty.  The

15   Government must prove you're guilty beyond a reasonable

16   doubt.  You can challenge the Government's evidence, put on

17   evidence that you are innocent.  If you're found guilty,

18   appeal that conviction.

19           All right, those are the rights involved.

20           Are we ready to do something on release, then, for

21   each one of these -- let me ask Ms. Sweeney.

22           MS. SWEENEY:  Yes, Your Honor, I believe

23   (inaudible) and for all defendants.

24           THE COURT:  Okay.  And is it a PR or what it is?

25           MS. SWEENEY:  Yes, (inaudible) conditions of

1   (inaudible).  We provided that paperwork to the Court,

2   although we discovered there was a few that we provided to

3   the Court (inaudible).  There was an oversight on our part.

4            THE COURT:  There was no what?

5            MS. SWEENEY:  There was an oversight on our part,

6   so we need to just explain what we provided to the Court

7   (inaudible) two different (inaudible).

8            UNIDENTIFIED SPEAKER:  They're all --

9            THE COURT:  Okay, all right.  Well, I'm not going

10  to sit here and fill it out in front of everybody.  I'll do

11  that back in Chambers.

12           So you're not seeking anything beyond a PR, no

13  money bond; is that correct?

14           MS. SWEENEY:  For bond, yes, we are seeking to have

15  certain conditions of release, but (inaudible) bond, we're

16  not seeking -- we're seeking a signature bond, yes.

17           THE COURT:  What is -- what are the conditions?

18           MS. SWEENEY:  So if we can start with the four

19  previously arraigned defendants, I think that would make

20  sense.

21           THE COURT:  Who are they?

22           MS. SWEENEY:  That would be Mr. Penn, Mr. Fries,

23  Mr. Brady, and Mr. Austin.

24           THE COURT:  Go ahead.

25           MS. SWEENEY:  So, Magistrate Mix already entered

1   conditions of release and the only ones (inaudible) to modify

2   are Conditions (inaudible) and G, which are the no contact.

3   There were no two no-contact (inaudible).  Both were file

4   under seal.  Attachment A, included the list of potential

5   witnesses and co-conspirators.  Attachment B included a list

6   of (inaudible).

7          We have added some additional (inaudible) for

8   Attachment A.  And for Attachment B, understanding that

9   (inaudible) in this case, the victims are also customers of

10  the chicken suppliers.  We have asked that "B" be restrained

11  only (inaudible) communications about this case or about the

12  items alleged in the superseding indictment.

13         THE COURT:  Do I have those?  I don't know if I

14  have these attachments.  So Attachment A -- did you say

15  Attachment A is under seal?

16         MS. SWEENEY:  Attachment A and B were both filed

17  under seal.  The difference between the old attachment and

18  the new attachment is additional names.  And the difference

19  between the old Attachment B and the new Attachment B are

20  additional companies, additional names and we've lessened the

21  restrictions (inaudible) with those individuals and companies

22  listed in Attachment B, as reflected in the paperwork that we

23  provided to the Court.

24         THE COURT:  Okay.  Well, how am I supposed to know

25  whether I have new Attachment A or old Attachment A?

1          MS. SWEENEY:  So we've only provided a new

2     (inaudible) list to the Court at this time.  They were sent

3     (inaudible) office.  The new attachment (inaudible) contains

4     (inaudible) and the new Attachment A --

5          THE COURT:  Okay, hold on.  How many employees are

6     on new Attachment B?

7          MS. SWEENEY:  On new Attachment B, there are 14

8     specific individuals and 12 companies.

9          THE COURT:  Okay, I think I have that.  All right,

10    I'm assuming I have --

11         MS. SWEENEY:  And on new Attachment A, all of the

12    current -- all of the defendants are listed at the top and

13    the old Attachment A (inaudible) defendants.

14         THE COURT:  Okay.  Does counsel for each of the

15    four defendants who have already had conditions, are you

16    familiar with Attachments A and B?

17         MR. TUBACH:  Your Honor, this is Michael Tubach for

18    Mr. Penn.  Yes, I am.

19         THE COURT:  Thank you.

20         MR. KORNFELD:  Your Honor, Rick Kornfeld for

21    Mr. Fries.  I am, as well.  Thank you.

22         THE COURT:  Thank you.

23         MR. LAVINE:  Bryan Lavine for Mr. Brady.  I am, as

24    well.

25         THE COURT:  Thank you.

14

1          MR. FELDBERG:  Your Honor, Michael Feldberg for

2     Mr. Austin.  We are, as well.

3          THE COURT:  And I'm also taking by your comments

4     that you have no opposition to that?

5          So, Ms. Sweeney, do I need to fill out new

6     paperwork or just order that Attachments A and B filed under

7     restriction are part of Judge Mix's release order?  Is that

8     satisfactory to you?

9          MS. SWEENEY:  As part of Judge Mix's release order,

10    that is satisfactory.  And I just want to make the Court

11    aware that the attachments are (inaudible) for each

12    defendant.  Each defendant, there is a slightly different

13    group of people on the Attachment A's because we've excluded

14    their current colleague.

15         THE COURT:  Okay.  All right, that will be the

16    order of the Court.  Their release order will be amended by

17    Attachment A and Attachment B associated with each specific

18    individual defendant.

19         Anything else we need to do as far as those four

20    persons?

21         MS. SWEENEY:  Yes.  There is only one other item we

22    wanted to raise with the Court with regard to defendant

23    Austin.  (inaudible) Court aware that as part of our further

24    investigation (inaudible) there were two times.  And once in

25    June and once in July, the defendant Austin had direct

1   communication with an individual who was already listed on

2   Attachment A.  There were two telephone calls.  Like I said,

3   one in June and one in July.  We spoke to counsel about this

4   (inaudible) on the topic, but we simply wanted to bring it to

5   your attention and admonish defendant Austin as to the

6   consequences of violating his conditions of release.

7           If defense counsel has any additional information

8   to provide to the Court, we are very open to a hearing.

9           THE COURT:  Okay.  Will Mr. Austin please raise

10   your hand.

11           MR. AUSTIN:  I'm here, can you hear me?

12           THE COURT:  Yeah.  So, Mr. Austin, the quickest way

13   to go from where you are sitting to a jail cell is for you to

14   violate a court order.  Do you understand that?

15           MR. AUSTIN:  Yes, sir.

16           THE COURT:  All right, you do that again and it

17   comes to my attention, then you will be in prison, all right?

18           MR. AUSTIN:  Yes, sir.

19           THE COURT:  Thank you.

20           MR. FELDBERG:  Your Honor, may I be heard on this

21   for a moment.  I'm Michael Feldberg, Mr. Austin's lawyer.

22           THE COURT:  Yeah, the prosecution made a record,

23   you can too.

24           MR. FELDBERG:  Thank you, Your Honor.

25           And first of all, we apologize -- I apologize on

1    behalf of Mr. Austin for these inadvertent apparent

2    violations.  The Government told us about this a couple of

3    hours ago.  Apparently, there was a 5-minute-and-45-second

4    call on June 23 and a 3-minute-and-36-second call on July 10.

5    No subsequent calls in the ensuing three months plus to an

6    individual who was a close friend of Mr. Austin's, has been

7    for many years.  The individual's wife is quite ill.  They

8    keep in touch with each other, or have over the years,

9    largely about the other individual's wife's condition.

10         This won't happen -- this won't happen again.  It

11   hasn't happened again.  And, you know, they are sufficiently

12   close that Mr. Austin regularly played Words with friends,

13   with the other individual's wife, and after she became ill,

14   he would occasionally call her to joke around with her and

15   wish her well by saying it's her turn.

16         We're tracking down whether these calls were

17   returned calls or any other information we can found about

18   that.

19         THE COURT:  Sure, no problem.  Well, yeah, I always

20   live by the rule:  Fool me, once shame on you.  Fool me

21   twice, shame on me.  Okay?

22         MR. FELDBERG:  Yes, Your Honor.

23         THE COURT:  All right.

24         MS. SWEENEY:  And, Your Honor, I must apologize.  I

25   am looking at Attachment B.  Judge Mix's order had a stronger

1   restriction for those individuals (inaudible) we are

2   requesting a lesser restriction, as we described in the

3   (inaudible).  I apologize I did not raise that.

4          THE COURT:  You know what, your microphone stinks.

5   I think I heard every other word of what you just said.  I

6   think I have somewhat of what you meant, but say it again,

7   please.

8          MS. SWEENEY:  Sure, I will -- I'll try to get

9   further away.

10          THE COURT:  Try to slow down.

11          MS. SWEENEY:  Simply -- simply that the new

12   conditions of release I provided you had lesser restrictions

13   on the individuals listed in Attachment B in Judge Mix's

14   original order.  I apologize for not raising that sooner.

15          THE COURT:  What am I supposed to do about that?

16          MS. SWEENEY:  So you could -- we request that you

17   enter the -- sort of modify Judge Mix's orders and that way

18   all we would ask that you enter a new conditions of release

19   for the defendants that is identical to Judge Mix's orders,

20   except for the provisions in 7G.

21          THE COURT:  Why don't do you this, that way you can

22   all generate more attorney's fees.  You gen up the correct

23   order of release for each of these four individuals and

24   e-mail it to Chambers and we'll get it docketed, okay?

25          MS. SWEENEY:  We're happy to do that, Your Honor.

18

1              THE COURT:  All right.  With -- with defense

2    counsel, of course, all right.

3              MS. SWEENEY:  Yes, Your Honor.

4              THE COURT:  It needs to be a joint submission,

5    okay.

6              MS. SWEENEY:  Yes, Your Honor.

7              THE COURT:  All right.  Now, is that all for those

8    four?

9              MS. SWEENEY:  That is for the Government, Your

10   Honor.

11             THE COURT:  Okay.  Do you all just want to do the

12   same thing for the rest of the defendants, just submit a

13   joint submission to -- directly to Chambers by e-mail and

14   then we'll get it turned around and entered?

15             THE CLERK:  I think they've already done that.

16             THE COURT:  Oh, have they?

17             MS. SWEENEY:  Your Honor, for the additional

18   defendants, I believe there may be just a few points of

19   disagreement.  We've conferred with defense counsel, so I'm

20   happy to walk through what we're proposing for the new

21   defendants.

22             THE COURT:  All right.  Yeah, I know.  Go ahead.

23             MS. SWEENEY:  Okay.  So we are proposing

24   (inaudible) defendants (inaudible) situated.

25             THE COURT:  Hold on.  Wait, wait, wait.  There is

19

1    something wrong with your microphone, or unless somebody else

2    has their microphone on.  Are all you guys having a hard time

3    hearing her?

4              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6              (Multiple affirmative responses.)

7              THE COURT:  Okay, I can hear everybody else.

8              UNIDENTIFIED SPEAKER:  Yes, Your Honor.

9              THE COURT:  So you've got to fix whatever it is,

10   Ms. Sweeney, because you're just not very audible, okay?  And

11   I don't know -- you probably can't do it this very moment,

12   we'll just have to live with it.  But look into that, maybe

13   play around, get on Zoom, or whatever, but get your

14   microphone fixed, okay?

15             COURTROOM DEPUTY:  And we also could be --

16             MS. SWEENEY:  Yes, Your Honor.

17             COURTROOM DEPUTY:  -- getting feedback -- we could

18   be receiving feedback from other people's speakers as well.

19   So if you're not speaking, if you don't mind, please, muting

20   your computer.

21             THE COURT:  Yeah, we'll be patient and have you

22   turn your mute on and off, so I'm not going to rush you into

23   responding to any of my questions.  But I guess the way we've

24   got to proceed is everybody is mute, except for Ms. Sweeney,

25   and we'll see what that does.

1          Go ahead -- are we doing this defendant by

2   defendant or as a group?

3          MS. SWEENEY:  I believe we can do it in two

4   different groups, one with Mr. Lovette, and then one with the

5   rest of the defendants.

6          THE COURT:  Okay, so let's start with Mr. Lovette.

7          MS. SWEENEY:  Lovette?

8          THE COURT:  Go ahead.

9          MS. SWEENEY:  So we are requesting for him that the

10  same restrictions on international travel that he surrender

11  his passport to his attorney; that he not obtain a passport

12  or other international travel document; that he not be

13  permitted to travel outside the United States without prior

14  permission of the Court, except for that Mr. Lovette does --

15  his counsel did raise to us that he has a few business trips

16  planned to Canada and he proposed a reasonable proposal, to

17  allow Mr. Lovette to take those trips, with I believe is

18  reflected in his paperwork.  So that would be the one

19  exception that distinguishes Mr. Lovette from the others.

20         We are mindful of Magistrate Mix having permitted

21  Mr. Penn to travel internationally for work and so with that

22  in mind, we can come to an agreement.  We don't think it

23  needs to be litigated, but I just want to highlight that

24  difference.

25         THE COURT:  But is the form --

21

1          MS. SWEENEY:  We also --

2          THE COURT:  Hold on.  Is the form I have accurate

3    in its reflection what have you're requesting?

4          MS. SWEENEY:  It is.  We are requesting the one

5    other thing I want to raise with you is for 7K, we are

6    requesting in the first instance, as we did for the original

7    four defendants, a full (inaudible) of firearms.  However, if

8    Your Honor is not inclined to grant that, we would ask that

9    Mr. Lovette and all defendants be treated consistently with

10   the others that would be (inaudible) only -- that would

11   permit them use only for sporting purposes.

12         Other than that, what we submitted is accurate to

13   what we're requesting.

14         THE COURT:  So do you call going to a range and

15   shooting a gun sporting?

16         MS. SWEENEY:  Your Honor, I believe that was

17   contemplated -- that was contemplated under Judge Mix's

18   orders, yes.

19         THE COURT:  What other -- what other use does

20   anybody have lawfully for a gun other than to possess it and

21   to use it for sporting purposes?  You mean, like, they can't

22   conceal carry, is that what are you getting at?  Or what are

23   you getting at?

24         MS. SWEENEY:  That's the type of thing that we're

25   getting at, not to conceal carry or open carry.  However, I

 1   understand that a number of the defendants are avid hunters

 2   or collectors.

 3          So our initial request is a full -- a full

 4   restriction on firearms; however, if you're not inclined to

 5   give that, then we would ask for firearm to be used for

 6   sporting purposes only.

 7          THE COURT:  Well, do any of the defendants have any

 8   criminal history?

 9          MS. SWEENEY:  Minor criminal history from some of

10   the defendants, Your Honor, but nothing --

11          THE COURT:  Just traffic, whatever, DUI, or

12   something like that?

13          MS. SWEENEY:  I believe one of them had a

14   misdemeanor gun offense that was dismissed through

15   diversion --

16          THE COURT:  Okay.

17          MS. SWEENEY:  -- from about five years ago.

18          THE COURT:  Yeah.  Unless you think there is a risk

19   to the community, then with this type of charge I'm not

20   inclined to impose a gun restriction other than what you say,

21   which, you know, I guess so everybody can feel the weight of

22   being prosecuted by the United States Government, maybe you

23   can't carry it around with you, except you can take it to a

24   range or take it hunting.  Is that what you're -- that's what

25   you're suggesting, right?

23

1          MS. SWEENEY:  Yes, Your Honor, to be consistent

2   with the other four defendants.

3          THE COURT:  Okay.  So any objection from any

4   particular defense counsel?

5          MR. GILLEN:  Yes, Your Honor.  This is Mr. Gillen

6   on behalf of Mr. Roberts.

7          We object to that.  We fail to see the distinction

8   between having a gun for sporting purposes and having a gun

9   in your home, for example, to defend your home.  For example,

10  Mr. Roberts lives out on a farm in a rural area.  Just

11  recently on that farm, he had to shoot a coyote attacking

12  some of his livestock.  We believe there is no -- this is an

13  antitrust case involving commercial transactions that did or

14  did not happen.

15         This case doesn't, in our view, require the

16  restriction of any Second Amendment restrictions on any of

17  the defendants.

18         I understand before the four defendants had their

19  hearing before another magistrate; however, this is our first

20  time.  And we would like to say that we would like to have no

21  restrictions on Mr. Roberts as it relates to firearms.  To

22  say that you can have a -- a rifle for sporting purposes, but

23  you can't have a rifle or a pistol in your house when you

24  live out in the country to defend yourself and your family

25  makes no sense to us.  So we ask for no restrictions.

24

1          THE COURT:  Well, so the only restriction we were

2     talking about essentially was a conceal carry.  I mean,

3     obviously if you use a gun for sporting purposes, you're

4     going to have it in your house and, you know, I'm not going

5     to restrict somebody if they lawfully have a gun in their

6     house from using it for self-defense if the law permits you

7     under some kind Make My Day law.

8          So I think the preclusion we're talking about is

9     very narrow.  You're just taking a strict line on even that,

10    I assume?

11         MR. GILLEN:  Well, I am, Your Honor.  But, more

12    importantly, the way that the Government articulated their

13    restrictions did not contain the language the Court just

14    gave.

15         So if the restriction says you can't have conceal

16    and carry, then let's put down no conceal and carry.  But if

17    the Court is saying that it's okay to have firearms, to have

18    shotguns, to have rifles, other weapons in your house for

19    sporting purposes and for self-defense, then we should say

20    that as well.

21         I don't want any ambiguity out there so that

22    Mr. Roberts trips afoul of what the Government thinks these

23    restrictions are, which because what they have said seems to

24    be different than what you think.

25         THE COURT:  So -- but you're saying that as to the

25

1   four, their counsel conceded; is that correct?

2         MR. GILLEN:  I don't know whether they conceded or

3   not.  I wasn't representing anyone in the first four, but I

4   am representing Mr. Roberts now and we're not conceding to

5   anything.  I frankly am surprised that they -- that they

6   agreed to the terms they did, but that's -- that's on their

7   plate, not ours.

8         THE COURT:  Well, yeah, it may be on their plate,

9   it may not -- or it may not be on yours.  I mean, I'm not

10  inclined to treat identically situated persons differently,

11  because I think when you come to federal court, you to the

12  get equal justice for equal situations, so that's a problem.

13        MR. GILLEN:  Well, Your Honor, I think that the

14  solution would be a loosening of the restrictions that had

15  been placed on the initial four defendants.

16        THE COURT:  Yeah, but one judge doesn't loosen the

17  restrictions of another judge of equal rank and stature, so I

18  can't do that and I won't.  You can go back to Judge Mix and

19  ask for that, but I'm not going to do that.

20        So let me hear from the four:  Did you guys -- one

21  of you, just tell me, did you concede to the firearms

22  restriction?

23        MR. TUBACH:  Your Honor, this is Michael Tubach.  I

24  guess none of the other four are chiming in.  I'll chime in

25  briefly.  Mr. Penn does not own any firearms, so that's not

1    an issue.  I do believe it was a contested issue and it was

2    argued at some length before Judge Mix and this is what the

3    order was (inaudible).

4            THE COURT:  Yeah, your microphone --

5            MR. FELDBERG:  Your Honor, this is Mr. Feldberg,

6    Mr. Austin's lawyer.  We did ask Judge Mix at the initial

7    arraignment to permit self-defense.  She is not receptive to

8    that and ruled that it -- use of firearms would be limited to

9    sporting uses.

10           THE COURT:  Wait a second.  So she actually put on

11   the record that you could not use it if someone was coming

12   into your home guns blazing?

13           MR. FELDBERG:  She -- she didn't say that, Your

14   Honor.  I looked at the transcript again before this hearing.

15   She basically said, Let's keep it at sporting use.

16           THE COURT:  Okay.  Yeah, I would take that to

17   assume that in order to preserve life you could use it for

18   that reason too.  I think that's a safe assumption.  So my --

19   my assumption would be -- and all that was mentioned was

20   sporting use?

21           MR. KORNFELD:  Your Honor --

22           MR. FELDBERG:  Go ahead, Rick.

23           MR. KORNFELD:  Your Honor, this is Rick Kornfeld,

24   sorry.  This was an issue, although I had yet to enter my

25   appearance on behalf of Mr. Fries, but this was an issue for

27

1   Mr. Fries for sure because he is an avid hunter and owns a

2   hunting property, so the intention in this -- I think the

3   spirit in the request on behalf of Mr. Fries was exactly as

4   the Court articulates, that he may be able to use it for

5   hunting and/or go to the range.

6           In reviewing the transcript, there was not a robust

7   Second Amendment colloquy, but I think your point is well

8   taken, Your Honor.  I think that if under -- where he leaves,

9   Georgia law, if somebody invaded his home and he had access

10  to a firearm, God forbid that never happens, I think whether

11  that was a violation of bond conditions might be the least of

12  his and his family's problems, but we are content with the

13  language that exists in Judge Mix's order and appreciate the

14  Court's view of that language.

15          THE COURT:  Okay, here is how I'm interpreting it

16  and it will be -- it will be the restriction that I am

17  understanding has already been placed on the four and that

18  I'm placing on the others.

19          So you can use it -- it can be in your house.  You

20  know, other laws are going to govern what you can do with it

21  if somebody is entering your home, so you just have to abide

22  by those laws.  You can use it at the range, although, you

23  know, some guys like that and some guys don't, but whatever.

24  You could use it hunting, and I think sporting is broad

25  enough to include that if there is a coyote who is attacking

1   one of your sheep, you can use it in that means too if state

2   law or any other law that applies would allow you to do that.

3   You just can't carry it around in your truck or your car for

4   personal protection outside your house.  You can't conceal

5   carry.  Those are going to be the limits.

6           Now, I'll entertain any response from the

7   prosecution then I'll let any defendant speak up.

8           MS. SWEENEY:  Your Honor, I just want to note that

9   I was kicked off, but I heard most of what happened, and I've

10  reconnected.  Hopefully my connection is clearer.

11          I think what Your Honor is describing is what the

12  Government understood Judge Mix to order, so we have nothing

13  further.

14          THE COURT:  Okay.  Any other -- any defense counsel

15  want to say anything?

16          MR. GILLEN:  No, Your Honor.  On behalf of

17  Mr. Roberts, we thank you for the clarification about, what

18  he can and cannot do with his firearms, and I think that

19  we're -- we're good with that.

20          THE COURT:  Okay.  Well, so if there are some

21  pretty ardent firearms guys out there.  You've just got to be

22  prepping them for what might happen if they get a felony,

23  okay, because it ain't good with regard to guns.

24          All right.  So then where does that leave us?  I'm

25  going to articulate my position on the condition of the

1    firearms, so that's the interpretation the Court has for

2    that.

3            Any other amendments that need to occur with any

4    defendant as to the bond paperwork that has been submitted to

5    me?  Speak up only if you have an issue.  Go ahead.

6            MR. GILLEN:  Your Honor, on behalf of Mr. Roberts,

7    I have some issues.  And the issues deal with the -- the

8    Government's list of individuals that he cannot have any

9    contact with at all, what is referred to as Attachment A.

10           I do understand that, based upon discussions that I

11   had with the Government this afternoon, that a number of the

12   people that were listed on Attachment A had been moved over

13   to their Attachment B; however, I wish to bring up a few of

14   the individuals that remain on their Attachment A and explain

15   why we think that their requests are not realistic.

16           THE COURT:  Hold on a second.  Wait, wait, before

17   you mention names, are we -- are we intruding on anybody's

18   confidentiality by addressing specific people by their name?

19           MS. SWEENEY:  Your Honor, the Government would ask

20   that we not use specific names as we -- if you order these

21   attachments as part of the conditions of release, that we

22   would file this under seal.  Perhaps you could discuss with

23   an initial.

24           THE COURT:  Just use initials, please.

25           MR. GILLEN:  Yes, Your Honor.  The first

30

 1   individual, the initial is TF and that individual is

 2   Mr. Robert's best friend.  The spouses are good friends, if

 3   not best friends, and the children socialize with one

 4   another.  We don't -- we don't really know of any realistic

 5   reason why TF should not be moved over to Attachment B, which

 6   simply says don't talk about the case, don't ask -- don't

 7   talk about the allegations, very much like the individuals

 8   on -- on B.

 9           In addition, also TF, my understanding is also a

10   member of the church to which Mr. Roberts attends and,

11   Mr. Roberts, raise your hand in that representation is

12   correct.  Thank you.

13           So in addition, there is another individual that

14   the initials are KG.  The individual KG is in a similar

15   situation as the other individual TF in that KG also attends

16   the same church as Mr. Roberts, and there is no, in our view,

17   any realistic reason why there would be any no contact order,

18   but he should be moved over also to Attachment B.

19           THE COURT:  What are those initials, please.

20           MR. GILLEN:  The one that I just gave is KG.  The

21   first initial individual is TF.

22           THE COURT:  Yeah, I got that one.  So, okay, thank

23   you.

24           MR. GILLEN:  In addition -- same argument regarding

25   church affiliation and socializing in the community is PM.

```
1    That is the same individual.  So I believe those are the

2    individuals that -- that we went over that remained on

3    Attachment A that we had specific concerns about it.

4            Mr. Roberts, if that representation is correct, if

5    you could raise your hand again.  Thank you.

6            Thank you, Your Honor.

7            THE COURT:  Okay.  So, Ms. Sweeney.

8            MS. SWEENEY:  Yes, Your Honor.  So T- -- all three

9    of those individuals and everyone listed on Attachment A are

10   employees of competing chicken suppliers, but Attachment A is

11   not a straight-up no contact.  It is no direct contact

12   initiated by the defendant.  And we think in this case it is

13   important to ensure that the -- there does not continue to be

14   contact between co-conspirators and potential witnesses in

15   this case to protect the public from future crime by the

16   defendants.  And as alleged in the Indictment, in the

17   superseding Indictment in this case involves numerous

18   (inaudible) defendants have collusive conversations with

19   their competitors.

20           MR. GILLEN:  A brief response, Your Honor.  These

21   are folks that are best friends, close friends.  They go to

22   the same church.  And ordering Mr. Roberts not to talk with

23   him about the case and not to talk about the allegations

24   should be sufficient.

25           You simply, in our view, cannot choose to ban an
```

1    individual from speaking with his closest friends because the

2    Government alleges that they are in some way, of course,

3    unproven, co-conspirators and there is no, absolutely no

4    allegation, to my knowledge, of Mr. Roberts trying to do

5    anything to anybody to try to get them to alter their

6    testimony or to try to, quote, get anybody's story straight.

7    There is none of that, to my knowledge, and if there is, I

8    would appreciate for the Government to make such

9    representation as it will in order to justify this kind of

10   restriction on the individual life of Mr. Roberts.

11           THE COURT:  Okay, Ms. Sweeney, I have a proposal

12   for you, okay?

13           MS. SWEENEY:  Yes, Your Honor.

14           THE COURT:  So as to those three individuals, what

15   about you drafting up a statement that they have to sign that

16   discloses that I have ordered that they have absolutely no

17   communication regarding any business aspect whatsoever.  They

18   can talk about social items and talk about COVID-19, like we

19   all are, and that this would be under penalty of contempt

20   with possible imprisonment and they have to sign that?  Would

21   that be satisfactory?

22           MS. SWEENEY:  That would be satisfactory to the

23   Government, yes.

24           MR. GILLEN:  Thank you, Your Honor.

25           THE COURT:  You create such a form, okay, that's

1   satisfactory to you, Ms. Sweeney.  And if Mr. Roberts wants

2   to talk to those people, he has to get them to execute that

3   form, signed and dated under penalty of perjury, okay.

4            MR. GILLEN:  Thank you, Your Honor.

5            THE COURT:  Any other defense counsel, please.

6            MR. FAGG:  Sure, Your Honor, this is John Fagg for

7   Mr. Lovette.

8            THE COURT:  Okay.

9            MR. FAGG:  There is at least one individual who was

10  also on Attachment A where Mr. Lovette would seek the same

11  conditions.

12           THE COURT:  Give me the explanation, please.

13           MR. FAGG:  Do we have to coordinate --

14           THE COURT:  Sure.

15           MR. FAGG:  Sure.  There is an individual on that

16  list with the initials of CS who Mr. Lovette has known for

17  almost 50 years, their families go back even farther than

18  that.  Their families today are friends, their children are

19  friends, and they are very close.  This individual has health

20  issues that Mr. Lovette would like to be in touch with his

21  good friend about.

22           You know, our proposal actually was as it relates

23  to Attachment A, is that the Court enter an order that is

24  consistent with those individuals who are on Attachment B,

25  which is that the defendants are prohibited from discussing

1    the facts of the case with those individuals rather than

2    trying to carve out individual people and how those

3    communications could be had.

4         It's the Government's burden here to show that

5    this -- that these communications should not happen, and

6    similar with what Mr. Gillen just went through with regards

7    to Mr. Roberts, there is no suggestion that Mr. Lovette has

8    done anything to cause any sort of suspicion in terms of his

9    communications with the others, and we think that the

10   plaintiff's way for this Court to address is to simply say

11   that there can't be any communications about the facts of the

12   case.

13        THE COURT:  Well, I'm going to respect both sides,

14   so that's not the way I'm going to go.  I'll go with my same

15   order, unless Ms. Sweeney has something other than the

16   argument she made with regard to Mr. Roberts as far as the

17   connection with the three individuals he listed.  Any other

18   different arguments as to CS, Ms. Sweeney?

19        MS. SWEENEY:  Nothing further, Your Honor, except

20   that we would -- when we draft the order, we'll would also

21   include no discussion about the -- the case -- this case

22   right now.

23        THE COURT:  Thank you.  That will be the order of

24   the courtroom.  Anyone else, please.

25        Okay, what else can I do then?

1          UNIDENTIFIED SPEAKER:  Judge, we're ready on

2     Mr. Perez.

3          THE COURT:  Yeah, I'm not quite finished, I don't

4     think.  I'm just wrapping up this big case.

5          UNIDENTIFIED SPEAKER:  Oh, I'm sorry.

6          THE COURT:  So then I guess I'll enter each of

7     these bond documents as amended on the record and probably

8     put that as a notation on each of them.  Is that

9     satisfactory, Ms. Sweeney?

10          MS. SWEENEY:  Yes, Your Honor.

11          THE COURT:  Okay.  All right, anything else,

12     Ms. Sweeney?

13          MS. SWEENEY:  For the Attachments A and B, would

14     you like us to file this under seal or you have the current

15     version, how would you like --

16          THE COURT:  I do have the current version, so I

17     think the filing as it exists right now should be

18     satisfactory.

19          MS. SWEENEY:  Okay.  And we -- we did notice that

20     for two of the versions that you have there is a footnote

21     missing, so we will follow up in an e-mail with your

22     Chambers, copying relevant defense counsel as to the proper

23     full document with the footnote.

24          THE COURT:  Wait, a footnote missing on what?

25          MS. SWEENEY:  One of the Attachments A, there is a

1    footnote that permits the defendants -- says nothing in this

2    attachment that would permit the defendants from working

3    to -- just a second, I will pull it -- communications for any

4    purpose other than preparing a defense in this litigation.

5    And that footnote we note is just missing on two attachments.

6    So we will send that same list with just that footnote to

7    your Chambers for those defendants copying counsel if that

8    works.

9              THE COURT:  Yeah, okay, this is really messy, but I

10   guess I could live with that.

11             MS. SWEENEY:  Thank you, Your Honor.

12             THE COURT:  Do I need to -- so do I need to enter

13   additional discovery conference memorandum and orders.

14             MS. SWEENEY:  Yes, Your Honor, for the six new

15   defendants, we have prepared the discovery conference

16   memorandum and orders.

17             THE COURT:  Okay.  Are they all the same as far as

18   a Rule 11 disposition?

19             MS. SWEENEY:  I believe so, but I have not

20   confirmed that, Your Honor.

21             THE COURT:  Okay.  At least first one I'm looking

22   at says four, and I just want to make sure that's the

23   position of all the defense.

24             UNIDENTIFIED SPEAKER:  (Inaudible).

25             MR. GILLEN:  Correct for Mr. Roberts, Your Honor.

```
 1              THE COURT:  All right.  And speedy dates, for what
 2    it's worth, 30 days is November 12; 70 days is December 22.
 3    And have you already produced discovery, Ms. Sweeney?
 4              MS. SWEENEY:  To to the four original defendants we
 5    have.  We are -- there are millions of documents for
 6    discovery, so we are in the process of preparing it for the
 7    new defendants when you enter the protective order, but I
 8    think we asked for five weeks until November 24, the
 9    discovery deadline --
10              THE COURT:  Okay.
11              MS. SWEENEY:  -- for the new defendants.  And we
12    continue to produce discovery (inaudible) receive it for the
13    currently (inaudible) defendants.
14              THE COURT:  All right, so I'll enter those
15    discovery orders then.  Anything else from any defense
16    attorney?  If not, then we'll go on.  Speak now.
17              MR. FAGG:  Your Honor, sorry, this is John Fagg for
18    Mr. Lovette.  Just one point of clarification.  As it relates
19    to the condition of release, did I understand Your Honor
20    correctly that the Government will submit a conditions of
21    release document to Chambers that's consistent with the
22    Court's rulings today?
23              THE COURT:  No.
24              MR. FAGG:  For each of the defendants?
25              THE COURT:  I think I was going to execute the one
```

1   that's already submitted and order that it's amended as

2   stated on the record today.  Does that make sense?

3          MR. FAGG:  Okay.  Yes, thank you.

4          THE COURT:  And I'll put in a notation on each one

5   of them that it's being entered, although conditions have

6   either been explained or amended on this oral record, okay?

7          MR. FAGG:  Thank you.

8          THE COURT:  All right.

9          MR. BACKSTROM:  Your Honor, James Backstrom for

10  William Kantola.  Are you going to do the same thing as to

11  firearms?

12         THE COURT:  No, I'm not going to write anything on

13  that.  I'm just -- as to the defendant -- the defendants who

14  have already had release orders entered, those are explained

15  and/or amended as I've stated on this oral record.  And as to

16  the others that have not had orders entered, I'll enter those

17  with the same provision that they are explained or amended on

18  this oral record, okay.

19         MR. BACKSTROM:  Thank you, Your Honor.

20         THE COURT:  Thank you.  Anything else from anybody?

21         UNIDENTIFIED SPEAKER:  No, thank you.  No, Your

22  Honor, thank you.

23         UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

24         THE COURT:  What did you say?  Hold on a second.

25  My courtroom deputy needs to ask questions.

1          COURTROOM DEPUTY:  Just for my record, who is the

2    attorney appearing on behalf of Mr. Little?

3          MR. BRYNE:  Mark Byrne is appearing, B-Y-R-N-E.

4          COURTROOM DEPUTY:  Thank you, and on behalf of

5    Mr. Mulrenin.

6          MS. PREWITT:  Elizabeth Prewitt on behalf of

7    Mr. Mulvenin who is here.

8          COURTROOM DEPUTY:  Thank you.  And on behalf

9    Mr. Blake?

10          MR. POLLACK:  Barry Pollack.

11          COURTROOM DEPUTY:  Thank you very much.

12          THE COURT:  Thank you all.

13          MS. SWEENEY:  Thank you, Your Honor.

14          (Recess was taken.)

15          THE COURT:  Okay, I think we're ready.  Back on the

16    record in 20-cr-152.  It was brought to my attention that

17    since each defendant waived the right to plead not guilty,

18    we're going to proceed to immediate sentencing.  I'm ready to

19    hear allocution.  No?  Mr. Kornfeld, you're laughing at me.

20    You don't think that?

21          UNIDENTIFIED SPEAKER:  Not everybody is laughing,

22    no.

23          THE COURT:  I thought that was the law.

24          UNIDENTIFIED SPEAKER:  You got our attention,

25    Judge.

```
 1              THE COURT:  I asked you if you had anything else

 2   and you said no.  All right.  So let me go through the

 3   litany.

 4              So first of all, by your silence, you're agreeing

 5   that I guess I don't need to read the Indictment or further

 6   advise your clients, and by each of your statements you will

 7   enter a plea of, I assume, not guilty.

 8              We'll start with defendant Penn.

 9              COURTROOM DEPUTY:  Your Honor, Mr. -- I just

10   e-mailed him to jump on if he can.

11              MS. PREWITT:  Your Honor, Liz Prewitt for

12   Mr. Mulrenin.  Mr. Tubach advises he'll be joining, but

13   without his client.

14              THE COURT:  Yeah, that's -- does everybody waive

15   their client's appearance?

16              (Collective affirmative response.)

17              THE COURT:  Who am I waiting for for Penn?

18              COURTROOM DEPUTY:  Michael Tubach.  He's in the

19   process of joining.

20              THE COURT:  Okay, I'll move on then.  Mr. Austin?

21              MR. FELDBERG:  Your Honor, Michael Feldberg.  We

22   waive reading of the Indictment and plead not guilty.

23              THE COURT:  Thank you.  Mr. Little?  So one for

24   three.  Mr. Blake?

25              MR. POLLACK:  Your Honor, Mr. Blake enters a plea
```

1   of not guilty, waives formal reading of the Indictment and

2   asserts his right to a jury trial.

3           THE COURT:  Thank you.  Mr. Fries.

4           MR. KORNFELD:  Your Honor, on behalf of Mr. Fries,

5   we would waive further advisement, formal reading and enter a

6   plea of not guilty to Count 1, which is the only count we're

7   charged with.

8           THE COURT:  Thank you.  Mr. Mulrenin.

9           MS. PREWITT:  Your Honor, Mr. Mulrenin will enter a

10  plea of not guilty and also waive reading the Indictment.

11          THE COURT:  Thank you.  Mr. Lovette?  Oops.

12  Mr. Brady?

13          MR. LAVINE:  Your Honor, Mr. Brady waives reading

14  of the Indictment and enters a plea of not guilty.

15          THE COURT:  Thank you.  Mr. Kantola?  Mr. Roberts?

16          MR. TUBACH:  Your Honor, this is Michael Tubach.  I

17  redialed in on behalf of Mr. Penn.

18          THE COURT:  Go ahead.  Waive reading and enter a

19  plea.

20          MR. TUBACH:  Yeah, we waive further formal reading

21  of the Indictment and enter a plea of not guilty on behalf of

22  Mr. Penn.

23          THE COURT:  How about for Mr. Little?

24          MR. BYRNE:  Yes, Your Honor, Mark Byrne here.  Your

25  Honor, we waive reading the superseding Indictment and plead

1   not guilty.

2           THE COURT:  Thank you.  And how about for

3   Mr. Lovette?  Not back yet?  Mr. Kantola?  Or Mr. Roberts?

4           Any of you counsel see somebody signing on who

5   hasn't appeared yet, just advise them to freely speak, okay.

6           (Pause)

7           THE COURT:  Okay, looking for counsel for either

8   Mr. Kantola, Mr. Roberts, Mr. Lovette.

9           COURTROOM DEPUTY:  I'll see if I can raise them,

10  Your Honor.

11          THE COURT:  Okay, please, or it will be an hour.

12          MS. PREWITT:  I just reached out for counsel for

13  Mr. Kantola and he'll be calling in, Your Honor.

14          MR. BYRNE:  Your Honor, if we've already entered

15  the plead for our client, do you want us to stay on the -- on

16  the line or on the call?

17          THE COURT:  Not at all.  Thank you.

18          MR. BYRNE:  Okay.  Well, thank you very much, have

19  a good rest of the day.  I'm going to sign off.  This is Mark

20  Byrne for Mr. Little.  We entered our plea.

21          THE COURT:  Thank you.

22          MR. BYRNE:  Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Byrne.

24          MR. BYRNE:  Appreciate your patience.

25          THE COURT:  Yep, you too.

1          (Pause)

2          MS. PREWITT:  Your Honor, Liz Prewitt for

3    Mr. Mulrenin.  Can we be excused?

4          THE COURT:  Everybody can be excused who has

5    already entered their plea.

6          (Pause)

7          MS. SWEENEY:  And Your Honor, this is Heather Call

8    for the United States.  I've been reaching out to defense

9    counsel for Mr. Kantola, Lovette and Roberts, so I've left

10   them each messages and hope they can join momentarily.

11         THE COURT:  Okay, good.

12         (Pause)

13         MS. CALL:  Your Honor, this is Heather Call,

14   Heather Call here.  I did just reach counsel for Mr. Kantola

15   and he is hopping on the line momentarily.

16         THE COURT:  Thank you.

17         MR. BACKSTROM:  Hello?

18         THE COURT:  Who is on the line?

19         MR. BACKSTROM:  This is James Backstrom

20   representing William Kantola, Your Honor.

21         THE COURT:  Thank you.  Would you like to waive

22   further reading or advisement on the indictment?

23         MR. BACKSTROM:  Yes, Your Honor, we waive.

24         THE COURT:  Would you like to enter a plea on

25   behalf of your client?

44

1        MR. BACKSTROM:  Yes, Your Honor, we enter a plea of

2   not guilty.

3        THE COURT:  And do you also waive your client's

4   appearance solely for the purpose of entering that plea?

5        MR. BACKSTROM:  Yes, although he's with me right

6   now.

7        THE COURT:  Okay, very good.  Thank you.  Anything

8   further from you?

9        MR. BACKSTROM:  No, Your Honor.  Thank you for your

10  courtesy today.  I know it has been a long day.

11       THE COURT:  Not as long as some days have been

12  around here, so it wasn't that bad, but appreciate your

13  appearance today.  Okay, and good luck.

14       MR. BACKSTROM:  I can imagine.  Thank you kindly,

15  Your Honor.

16       THE COURT:  Thank you.

17       (Pause)

18       MS. SWEENEY:  Your Honor, this is Carolyn Sweeney.

19  We've attempted to reach out to the other two attorneys and

20  they have not responded to our multiple phone calls or

21  e-mails, so I don't know if you would like to reset this for

22  tomorrow.  We're also happy to continue to wait.

23       THE COURT:  Well, I'm inclined to leave the line

24  open.  I really don't want to set it for another day, but I

25  do have to go back and do some warrants and the rest of the

1   week I'm sure it is going to be full.  So if they can call in

2   today.  Is there a way -- can we leave the camera line open.

3           COURTROOM DEPUTY:  Yes.

4           THE COURT:  My courtroom deputy will just be

5   sitting here.  Do other work if you want to and when they get

6   on, I'll come out and take it, okay.

7           MS. SWEENEY:  Fantastic, and we'll continue to try

8   to reach them.

9           THE COURT:  Okay, thank you.

10          (Pause)

11          MR. FAGG:  Your Honor, this is John Fagg, and I'm

12  here with Mr. Lovette, if you can hear us.

13          COURTROOM DEPUTY:  I believe I just heard another

14  beep in as well.

15          MR. FAGG:  And Carolyn, this is John Fagg.  Can you

16  hear me?

17          THE COURT:  We can.

18          MS. SWEENEY:  Yes, I can.

19          THE COURT:  All right.  And go ahead and make your

20  appearance again, please.

21          MR. FAGG:  Sure, Your Honor, this is John Fagg for

22  Mr. Lovette.

23          THE COURT:  Okay.  And would you like to waive any

24  further reading of the Indictment or advisement for

25  Mr. Lovette?

1           MR. FAGG:  Yes, Your Honor, we do waive.

2           THE COURT:  Would you like to enter a plea, please.

3           MR. FAGG:  Yes, we enter a not guilty, plea.

4           THE COURT:  Thank you, that will be put on the

5    record.  That's all we need.  Thank you very much.

6           MR. FAGG:  Thank you.

7           THE COURT:  All right, take care.  Now we just have

8    Mr. Roberts?

9           COURTROOM DEPUTY:  Yes.

10          (Pause).

11          MR. GILLEN:  Hello?

12          THE COURT:  Yes.

13          MR. GILLEN:  This is Craig Gillen.

14          THE COURT:  Okay, Mr. Gillen, we're back on the

15   record in 20-cr-152.  Would you like to waive any further

16   reading or advisement?

17          MR. GILLEN:  Yes, Your Honor, I would.

18          THE COURT:  And would you like to enter a plea on

19   behalf of your client Mr. Gary Brian Roberts?

20          MR. GILLEN:  Yes, Your Honor.  I've spoken with him

21   over the phone and he has authorized me to enter a not guilty

22   plea to the indictment.

23          THE COURT:  All right, thank you.  And do you waive

24   his personal appearance for the not guilty plea?

25          MR. GILLEN:  Yes, I do, and he -- he does as well.

1            THE COURT:  Thank you, that's all I need.

2    Appreciate your patience.

3            MR. GILLEN:  Thank you, very much.

4            THE COURT:  The record is closed for today.  Okay,

5    thank you, you guys.

6            (Whereupon, the within hearing was then in

7    conclusion at 4:44 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    TRANSCRIBER'S CERTIFICATION

2    I certify that the foregoing is a correct transcript to the

3    best of my ability to hear and understand the audio recording

4    and based on the quality of the audio recording from the

5    above-entitled matter.

6

7    /s/ Dyann Labo                    October 23, 2020

8    Signature of Transcriber               Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```