IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Criminal Case No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  JAYSON JEFFREY PENN,
2.  MIKELL REEVE FRIES,
3.  SCOTT JAMES BRADY,
4.  ROGER BORN AUSTIN,
5.  TIMOTHY R. MULRENIN,
6.  WILLIAM VINCENT KANTOLA,
7.  JIMMIE LEE LITTLE,
8.  WILLIAM WADE LOVETTE,
9.  GARY BRIAN ROBERTS, and
10. RICKIE PATTERSON BLAKE,

      Defendants.

_____

**ORDER**

_____

This matter comes before the Court on defendants' various motions to dismiss the indictment. *See* Docket Nos. 293, 295, 296, 302, 303, 305-09. The government has filed a consolidated response opposing the motions. *See* Docket No. 415.

**I. BACKGROUND**

The superseding indictment charges each of the defendants in Count One with restraining trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and charges defendant Jimmie Lee Little in counts two and three with making false statements in violation of 18 U.S.C. § 1001 and obstructing justice in violation of 18 U.S.C. § 1512(c)(2). *See* Docket No. 101. The indictment alleges that defendants

"together with their co-conspirators . . . participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States." *See id.* at 9, ¶ 47.  Furthermore, the indictment alleges that defendants used this continuing network to "submit aligned . . . bids and to offer aligned . . . prices, and price-related terms." *Id.*, ¶ 48a.  Defendants allegedly "participate[d] in conversations and communications relating to non-public information such as bids, prices, and price-related terms . . . with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms." *Id.* at 10, ¶48b.  As a further part of the alleged conspiracy, the indictment states that defendants "monitor[ed] bids submitted by, and pries and price-related terms . . . offered by Suppliers and co-conspirators for broiler chicken products." *Id.*, ¶ 48c.

Defendants contend that the indictment should be dismissed.  Defendants' motions fall into three categories: (1) the indictment fails for lack of specificity; (2) Section 1 of the Sherman Act is unconstitutional; and (3) the statute of limitations has run.  *See generally* Docket Nos. 293, 295, 296, 302, 303, 305-09.

## II.  LEGAL STANDARD

"An indictment  is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *See United States v. Washington*, 653 F.3d 1251, 1259 (10th Cir. 2011) (citation omitted).  A court does not

examine "whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *Id.* (citation omitted).  Courts are to "employ practical rather than technical considerations" when evaluating an indictment.  *Id.*  Detailed allegations are not required; rather, "an indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (citations omitted).  The reviewing court must take the allegations in the indictment as true, *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quotations omitted), and should review the "entire document."  *United States v. Edmonson*, 962 F.2d 1535, 1542 (10th Cir. 1992).  Ultimately, the question is whether the indictment contains a "substantially accurate statement of the law" and "adequately warn[s] the [d]efendant of the charges."  *Id.* (citations omitted).

## III.  ANALYSIS

### A.  Specificity of the Indictment

All ten defendants argue that the indictment does not allege with requisite specificity that each defendant conspired to fix prices or rig bids in violation of the Sherman Act.  *See* Docket No. 295 at 4-6; Docket No. 296 at 5-8; Docket No. 302 at 5-7; Docket No. 303 at 6-11; Docket No. 305 at 3-7; Docket No. 306 at 3-4; Docket No. 307 at 6-9; Docket No. 308 at 6-10; Docket No. 309 at 9-11.

The Sherman Act makes illegal a conspiracy that is "in restraint of trade or commerce among the several States."  *See* 15 U.S.C. § 1.  Certain restraints are per se illegal.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (noting that certain

3

categories of constraints are "necessarily illegal").  Such restraints are per se illegal "because they 'always or almost always tend to restrict competition and decrease output.'"  *See id.* at 2283 (quoting *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723 (1988)).  One such restraint is a price-fixing agreement.  *See United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150, 218 (1940).  Such restraints are "horizontal restraints" in that they are "imposed by agreement between competitors," and, as a result, are per se unreasonable.  *See Sharp*, 485 U.S. at 723.  As relevant to defendants' motions to dismiss, violation of § 1 of the Sherman Act occurs when (1) there is a conspiracy between two or more competitors to fix prices and (2) those competitors knowingly joined the conspiracy.  *See* § 1.

 As to the first element, "[a] conspiracy is a combination of two or more persons acting in concert to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."  *United States v. Metropolitan Enters., Inc.*, 728 F.2d 444, 450 (10th Cir. 1984).  Co-conspirators "need not know of the existence or identity of the other members" and the agreement to join a conspiracy "need not be shown to have been explicit."  *Id.* at 451 (citations omitted).  No formal agreement or words or writing is necessary – there are no magic words that demonstrate a conspiracy.  *See United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990).  Rather, "[i]t is sufficient to show that [co-conspirators] tacitly came to a mutual understanding."  *Id.* The second element "[is] satisfied by showing that [a defendant] knowingly joined and participated in a conspiracy to rig bids."  *Metropolitan*, 728 F.2d at 449-50.

Read as a whole, and taking the allegations as true, the Court finds that the superseding indictment is sufficiently specific and puts defendants on "fair notice of the

4

charges against" them.  *See Washington*, 653 F.3d at 1259.  The first paragraph of the superseding indictment states that defendants "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."  Docket No. 101 at 1-2, ¶ 1.  It further states that this conspiracy was a "restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."  *Id.*  In addition, the indictment alleges that the "conspiracy consisted of a continuing agreement, understanding, and concept of action among the Defendants . . . the substantial terms of which were to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms for broiler chicken products sold in the United States."  *Id.* at 2, ¶ 2.  The indictment describes the broiler chicken industry, how products were sold and distributed, and the manner in which bids and negotiations typically took place.  *See id.* at 2-5, ¶¶ 3-11.  After laying this general framework, the indictment Identifies each defendant, stating where he worked and what company he worked for.  *See id.* at 5-7, ¶¶ 12-35.  In section III, the superseding indictment explains the means and methods of the conspiracy, adding more specific allegations about the conspiracy.  For example, paragraph 47 of the superseding indictment states:

> [i]t was part of the conspiracy that PENN, FRIES, BRADY, AUSTIN, MULRENIN, KANTOLA, LITTLE, LOVETTE, ROBERTS, and BLAKE, together with their co-conspirators known and unknown to the Grand Jury, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

The Court finds that these allegations are sufficiently specific.  An indictment is not required to be detailed, but, instead, "shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  *Resendiz-Ponce*, 549 U.S. at 110 (2007) (citations omitted).  The superseding indictment does exactly that.  It describes what the charge is – a violation of § 1 of the Sherman Act – and how defendants violated § 1, namely, by utilizing a network of suppliers to rig bids and fixed prices.  This is a "substantially accurate statement of the law" and "adequately warn[s] the [d]efendant of the charges."  *Edmonson*, 962 F.2d at 1542 (citations omitted). Nothing more is required.

Defendants disagree.  One group defendants argue that the indictment fails to "make a specific allegation of an agreement among the alleged conspirators."  *See* Docket No. 302 at 5; *see also, e.g.*, Docket No. 306 at 3-4; Docket No. 307 at 6-9. These defendants argue that, because the Sherman Act "does not, in clear and categorical terms, precisely identify the conduct which it proscribes," an indictment for a violation of the Sherman Act must "descend to particulars and allege the constituent ingredients of which the crime is composed."  Docket No. 302 at 5 (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978); *Frankfort Distilleries v. United States*, 144 F.2d 824, 830 (10th Cir. 1944)).  Defendants argue that, while the indictment provides episodes of actions allegedly in furtherance of the conspiracy, there is no allegation of an agreement and, as a result, the indictment fails to identify any "particulars."  The Court is unpersuaded.  The indictment clearly states that, beginning in 2012 and continuing through 2019, defendants "entered into and engaged" in a conspiracy to rig bids and fix prices for broiler chicken products.  *See* Docket No. 101 at

6

1-2. ¶ 1.  The second paragraph states that the defendants had a "continuing agreement" to "rig bids and to fix, maintain, stabilize, and raise prices" for broiler chicken.  *Id.* at 2, ¶ 2.  It is unclear what more defendants believe the indictment requires, particularly given the many pages of the indictment outlining particular "episodes" of alleged collusion, including text messages and emails.  *See, e.g.*, *id.* at 12-13, ¶ 56.

A second category of objections argues that the indictment fails to allege that defendants knowingly joined the conspiracy.  *See, e.g.*, Docket No. 307 at 9-11; Docket No. 309 at 11-13.  However, as the government notes, "the charge of conspiracy to violate a criminal law has implicit in it the elements of knowledge and intent." *Metropolitan*, 728 F.3d at 454 (citations omitted); *see also* Docket No. 415 at 17.  The act of entering into an agreement to fix prices demonstrates a knowing intent to join the conspiracy.  *See Metropolitan*, 728 F.3d at 453-54.  Here, the indictment alleges that defendants entered into the conspiracy "by rigging bids and fixing prices."  Docket No. 101 at 1-2, ¶ 1.  That is sufficient.[1]

---

[1] Several defendants rely on the Supreme Court's recent decision in *Nat'l Collegiate Athletic Assoc. v. Alston*, 141 S. Ct. 2141 (2021), for the proposition that a market analysis is required to demonstrate intent.  Or, in other words, that the per se rule is inapplicable to their case.  But defendants misread *Alston*.  The Supreme Court held that the NCAA, which supervises college sports and competitions, was a particular situation in the middle of the spectrum that required a rule of reason analysis.  *See id.* at 2155-57 ("That *some* restraints are necessary to create or maintain a league sport does not mean *all* aspects of elaborate interleague cooperation are." (citations omitted)).  The Supreme Court did not overrule per se analysis.  Rather, it affirmed, as it has before, that "some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look."  *Id.* at 2156 (citations omitted).  Defendants offer no argument why price fixing and bid rigging here falls under the middle of the potentially anti-competitive spectrum such that a more detailed analysis is required.  *Alston* requires no such result,

In support of both of these arguments, various defendants argue that the indictment contains insufficient information regarding their personal participation.  For example, Mr. Lovette argues that several of the alleged episodes contain "no allegation that Mr. Lovette knew the source of the pricing information."  *See* Docket No. 303 at 9.  Other defendants make similar arguments.  *See, e.g.*, Docket No. 296 at 8.  But defendants misunderstand what is required.  As previously stated, an indictment must permit a defendant to know the charge levied against him and set out the law of that charge.  The allegations must be taken as true, and a court is not permitted to weigh the relative evidence.  *See United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) ("[I]t is irrelevant that the charges ha[ve] not been established by evidence, because at a motion to dismiss[,] the indictment must be tested by its sufficiency to charge an offense." (citations omitted)).

Finally, several defendants argue that the indictment is deficient because it does not allege a conspiracy at all.  Instead, it alleges that competitors shared pricing information, which is not illegal.  *See, e.g.*, Docket No. 296 at 9 ("As this Court is well aware, the mere exchange of pricing information is not *per se* illegal."); Docket No. 302 at 8 ("Reading the superseding indictment in the light most favorable to the government, the most that can be inferred is that Mr. Austin exchanged price information with competitors.").  Defendants misread the indictment.  The indictment does not allege that, because defendants shared pricing information, they participated in a conspiracy.  Rather, it states that the defendants agreed to rig prices and, to that end, shared pricing

---

and the Court declines the invitation to do so here.

information.  *See* Docket No. 101 at 9-10, ¶ 48b ("It was further part of the conspiracy

that [defendants] utilized [their] continuing network . . . to participate in conversations

and communications relating to non-public information such as bids, prices, and price-

related terms.").  While defendants are correct that "it is not unlawful for competitors to

meet and exchange information necessary in preparation of a bid," *United States v.*

*Suntar Roofing, Inc.*, 897 F.2d 469, 475 (10th Cir. 1990), it is illegal if the information

sharing is "part of the sum of the acts which are relied upon to effectuate the

conspiracy."  *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).  Taking the

indictment as true the allegations are sufficient.

Accordingly, the Court finds that the superseding indictment is sufficiently specific

and puts defendants on "fair notice of the charges against" them.  *See Washington*, 653

F.3d at 1259.

### B.  Constitutionality of Sherman Act § 1

Mr. Kantola and Mr. Mulrenin argue that § 1 is unconstitutionally vague and, as a

result, does not provide fair notice of criminality.  *See* Docket No. 295 at 9-11; Docket

No. 307 at 2 n.1.  Additionally, Mr. Blake argues that the per se rule for price fixing is an

unconstitutional evidentiary presumption that usurps the role of the jury.  *See* Docket

No. 309 at 13-14.  The Court address each in turn and rejects both arguments.

#### 1.  Vagueness

Mr. Kantola and Mr. Mulrenin argue that § 1 is unconstitutionally vague because

of "the ever-changing legal standards and potential to chill beneficial conduct."  *See*

Docket No. 295 at 10.  Mr. Kantola further argues that the Supreme Court's decision in

*Nash v. United States*, 229 U.S. 373 (1913), upholding the constitutionality of § 1 is no

longer applicable because, at the time, the Sherman Act was a misdemeanor and "[n]ow the Act provides for penalties of up to 10 years in prison and fines routinely reach into the tens and hundreds of millions of dollars." Docket No. 295. The Court is unconvinced.

First, while Mr. Kantola argues that *Nash* is no longer applicable, the Supreme Court continues to cite and utilize *Nash*. *See, e.g.*, *Johnson v. United States*, 576 U.S. 591, 604, 618 (2015) ("Although the Court appeared to acknowledge the possibility of unconstitutionally indefinite enactments, it repeatedly rejected vagueness challenges to penal laws addressing . . . anticompetitive conduct." (citing *Nash*, 229 U.S. at 376-378). Mr. Kantola fails to explain how the Court may contradict the Supreme Court on this matter.

Second, Mr. Kantola neither cites nor lays out the standard for determining the vagueness of a law or identifies a case that has held that § 1 is unconstitutionally vague. He attempts to save his argument in reply, *see* Docket No. 456 at 6-7, but arguments raised for the first time in reply are waived. *Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016) ("[A] party waives issues and arguments raised for the first time in a reply brief." (quoting *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)). Even if the Court did consider the reply, Mr. Kantola's arguments themselves are vague. The Court will not develop Mr. Kantola's arguments for him. And, in any event, courts have found that § 1 is constitutional. *See, e.g.*, *United States v. Hsiung*, 778 F.3d 738, 750 n.6 (9th Cir. 2015); *United States v. Harwin*, 2021 WL 719614, at *7 (M.D. Fl. Feb. 24, 2021); *United States v. Usher*, 2018 WL 2424555, at *8 (S.D.N.Y. May 4, 2018).

### 2. Evidentiary Presumption

Mr. Blake argues that the per se rule for price fixing is an unconstitutional evidentiary presumption that usurps the jury's role. *See* Docket No. 309 at 13-14. Specifically, Mr. Blake argues that, by labeling prix fixing per se unreasonable, the per se rule is a conclusive evidentiary presumption that "takes an element away from the jury [and] violates the Fifth and Sixth Amendments." *See* Docket No. 309 at 14. The Court is unpersuaded.

First, like Mr. Kantola, Mr. Blake does not develop his argument. He offers citations to three cases that generally describe presumption analysis, but does not apply those cases to the superseding indictment or provide any argument as to why the per se rule is in fact unconstitutional. *See id.* Again, the Court will not develop Mr. Blake's arguments for him. While Mr. Blake tries to develop his arguments in reply, those arguments are waived. *Gutierrez*, 841 F.3d at 902.

Second, even on the merits, the Court agrees with the cases that have reasoned that the per se rule is not an unconstitutional presumption. *See, e.g.*, *United States v. Sanchez*, 760 F. App'x 533, 535 (9th Cir. 2019); *United states v. Giordano*, 261 F.3d 1134, 1143-44 (11th Cir. 2001); *United States v. Koppers Co., Inc.*, 652 F.2d 290, 293 (2d Cir. 1981); *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984). Rather than an evidentiary presumption, per se rules are "judicial interpretations of the Sherman Act." *See Fed. Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n*, 493 US. 411, 432-33 (1990). As a result, per se conduct is a type of definition of unreasonable conduct under the act. *See United States v. Mfrs. Ass'n of the Relocatable Bldg. Indus.*, 462 F.2d 49, 52 (9th Cir. 1972) (noting that price-fixing per se

11

rules "*defines* certain classes of pernicious conduct as unreasonable").  The jury still must weigh the evidence as to whether the per se violation occurred, but the jury does not make the legal conclusion that price fixing or bid rigging is an unreasonable restraint.  *See Koppers*, 652 F.2d at 294 (citations omitted).  The legal and statutory interpretation of per se rules thus takes nothing away from the jury.

### C.  Statute of Limitations

Mr. Roberts argues that the statute of limitations has run and, as a result, the charge against him must be dismissed.  *See* Docket No. 293 at 2.  Specifically, Mr. Roberts argues that the "most recent" conduct of Mr. Roberts identified in the indictment occurred between August 11 and September 3, 2014.  *See id.* at 2.  Because there is a five year limitations period, and the latest conduct occurred in September, 2014, the superseding indictment filed in October 2019 is untimely.  *Id.*  The Court disagrees.

As a general matter, a violation of § 1 "is subject to a five-year statute of limitations."  *Kemp*, 907 F.3d at 1270 (citations omitted).  "A Sherman Act conspiracy . . . remains actionable until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in overt acts designed to accomplish its objectives."  *Id.* (citations and quotations omitted).  "The crucial question is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy."  *Id.* (citations and alterations omitted).  The question is whether, "on the face of the indictment[,] . . . no overt acts in furtherance of the scope of the alleged conspiracy occurred after" October 6, 2014.  *Id.*  In doing so, the Court must "test the indictment solely on the basis

12

of the allegations made on its face, and such allegations are to be taken as true." *Id.* (citations omitted).

The indictment meets this standard.  The indictment alleges that "continuing through at least early 2019" the defendants engaged in a "conspiracy to suppress and eliminate competition by rigging bids and fixing prices."  *See* Docket No. 101 at 1-2, ¶ 1. Later, the indictment offers more allegations as to a particular episode, stating that "on or about September 7, 2017" the conspiracy sought to adjust prices on the 2018 and 2019 8-piece COB.  *Id.* at 39, ¶ 143.  The September 2017 date is clearly within the five year statute of limitations.  Given that the indictment alleges that the conspiracy was to rig prices, and that one such act happened in September 2017, the face of the indictment demonstrates an "overt act" that "occurred after" October 6, 2014.  *Kemp*, 907 F.3d at 1270.   That is all that is required.

Nonetheless, Mr. Roberts makes three arguments to the contrary.  First, Mr. Roberts argues that conspiracy was "complete" in 2012 when defendants "initially allegedly combined and conspired."  *See* Docket No. 293 at 8.  While that may be true in some circumstances, as discussed above, the indictment here alleges that the conspiracy continued through 2019, and offers examples of overt acts in furtherance of the conspiracy.  Mr. Roberts' citation to *United States v. Reitmeyer*, 356 F.3d 1313, 1318 (10th Cir. 2004), is unavailing.  There, the Tenth Circuit interpreted the Major Fraud Act and found that, "[u]nder the plain language of the Act, an offense is each knowing execution or attempted execution of a scheme or artifice to defraud or obtain money by false pretenses."  *Id.*  at 1317.  Thus, in the context of that statute – not the Sherman Act – the conspiracy was complete when the scheme was executed, which

13

was defined only in the context of the Major Fraud Act.  *Id.* at 1318.  That says nothing of whether a conspiracy to fix prices under § 1 is complete on formation.  And, as the Tenth Circuit has stated, a § 1 conspiracy "remains actionable until its purpose has been achieved or abandoned."  *Kemp*, 907 F.3d at 1270.

Mr. Roberts next argues that, even if that is true, it is not true as to him because there are no overt acts alleged in the indictment after 2014.  *See* Docket No. 293 at 8-9.  Mr. Roberts misunderstands what is required at this stage of the litigation.  A co-conspirator will be liable for the acts of his conspirators "until the conspiracy accomplished its goals or that conspirator withdraws."  *See United States v. Cherry*, 217 F.3d 811, 817 (10th Cir. 2000).  The withdrawal "must be active, and it [is] his burden to show that."  *See Smith v. United States*, 568 U.S. 106, 114 (2013).  It is Mr. Roberts' burden "to prove withdrawal from a conspiracy."  *Id.*  While Mr. Roberts argues the government "bears the burden of establishing compliance of the statute of limitations by presenting evidence that the crime as committed within the limitations period," *see United States v. DeLia*, 906 F.3d 1212, 1217 (10th Cir. 2018), the government has submitted evidence that the conspiracy continued through September 2017, as already discussed.[2]

---

[2] Mr. Roberts argues that the conspiracy cannot be continuing for another reason: the acceptance of payments are not in furtherance of the conspiracy.  *See* Docket No. 293 at 9.  While resolution of this argument is unnecessary given the Court's finding that indictment alleges the conspiracy continued through 2019 and Mr. Roberts has failed to show he left the conspiracy, the argument is unavailing in any event.  The Tenth Circuit in *Kemp* foreclosed Mr. Roberts' argument: "[A] Sherman Act violation is accomplished both by the submission of noncompetitive bids, *and* by the request for and receipt of payments at anti-competitive levels."  839 F.2d at 1271 (citations omitted).  The indictment alleges that Mr. Roberts accepted payment for a non-competitive bid on December 26, 2015, *see* Docket No.101 at 28, ¶ 107, well within the

Finally, Mr. Roberts requests that an evidentiary hearing be held on whether the statute of limitations applies.  *See* Docket No. 293 at 12.  Mr. Roberts offers no legal support for his request and only develops the argument in reply, *see* Docket No. 458 at 6-8, which is sufficient grounds to deny the request.  *Gutierrez*, 841 F.3d at 902.  In any event, such a hearing is inappropriate on a motion to dismiss.

## IV.  CONCLUSION

It is therefore

**ORDERED** that Defendant Roberts' Motion to Dismiss [Docket No. 293] is **DENIED**.  It is further

**ORDERED** that Defendant William Kantola's Motion to Dismiss [Docket No. 295] is **DENIED**.  It is further

**ORDERED** that Defendants Mikell Fries' and Scott Brady's Joint Motion to Dismiss [Docket No. 296] is **DENIED**.  It is further

**ORDERED** that Defendant Roger Austin's Motion to Dismiss [Docket No. 302] is **DENIED**.  It is further

**ORDERED** that Defendant William Lovette's Motion to Dismiss [Docket No. 303] is **DENIED**.  It is further

**ORDERED** that Defendant Roberts' Motion to Dismiss [Docket No. 305] is **DENIED**.  It is further

**ORDERED** that Defendant Jimmie Little's Motion to Dismiss [Docket No. 306] is **DENIED**.  It is further

_____

limitations period.

15

**ORDERED** that Defendant Timothy Mulrenin's Motion to Dismiss [Docket No. 307] is **DENIED**.  It is further

**ORDERED** that Defendant Jayson Jeffrey Penn's Motion to Dismiss [Docket No. 308] is **DENIED**.  It is further

**ORDERED** that Rickie Black's Motion to Dismiss [Docket No. 309] is **DENIED**.


DATED October 4, 2021.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

16