IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. JAYSON JEFFREY PENN,
2. MIKELL REEVE FRIES,
3. SCOTT JAMES BRADY,
4. ROGER BORN AUSTIN,
5. TIMOTHY R. MULRENIN,
6. WILLIAM VINCENT KANTOLA,
7. JIMMIE LEE LITTLE,
8. WILLIAM WADE LOVETTE,
9. GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,

    Defendants.

## UNITED STATES' MOTION TO EXCLUDE EXPERT TESTIMONY

The government respectfully moves to exclude expert testimony: (1) relating to benchmarking, which is not probative of any element of the crime; (2) relying on privileged materials and otherwise unreliable information; and (3) transmitting or interpreting hearsay in communications, such as text messages and emails. In the alternative, the government requests *voir dire* of defendants' expert witnesses.

*Benchmarking*. The defendants' likely expert testimony by Professor Snyder[1] revolves heavily around a competitive benchmarking analysis. According to defendants' expert disclosures:

> Professor Snyder will testify about the results of his benchmarking analyses. Benchmarking is a standard approach used by economists by which one set of data is compared to another. Professor Snyder used benchmarking to compare the prices at issue to prices that were not alleged to have been affected by the alleged conspiracy. To perform his benchmarking analyses, Professor Snyder relied on a data set comprised of *prices paid by a sample of buyers of comparable products and prices charged by a sample of suppliers of comparable products* across various time periods. Professor Snyder is expected to testify that the benchmarking analyses showed that the prices at issue were not systematically higher than a database of benchmark prices, including prices not alleged to have been affected by the alleged conspiracy, and, therefore, are inconsistent with the alleged price-fixing and bid-rigging conspiracy.

Attach. A at 1 (emphasis added) (footnote omitted).

The benchmarking analysis will not tend to disprove the existence of the conspiracy. A benchmarking analysis is a retrospective type analysis that compares one set of transactions that presumably occurred in an effectively competitive market against a set of transactions that occurred in a collusive market. While this type of analysis may be relevant in a private civil antitrust case involving treble damages, *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 164 (S.D. Ind. 2009) (describing benchmarking analysis as "appropriate for assessing common impact and damages in a class action"), this irrelevant and confusing econometric exercise has no place in this

---

[1] Defendant Blake also noticed an economic expert, Dr. Aparna Sengupta. Because Defendant Blake did not request reciprocal discovery, the government has no information about what Dr. Sengupta will testify to. It is possible that she similarly will testify about a benchmarking analysis.

criminal trial. The "prices paid by a sample of buyers of comparable products and prices charged by a sample of suppliers of comparable products" are unconnected to the conspiracy, its participants, or its victims. For example, it appears from the defendants' sparse disclosure that Professor Snyder's testimony will be along the following lines: the average price charged by the conspirator companies for 8-piece chicken products to KFC and the average price charged for 8-piece chicken products by non-conspirator companies to KFC both increased by approximately the same amount over the conspiracy period; or the average prices charged for dark meat chicken products by the conspirator companies to KFC and ABC Restaurant over the conspiracy period both increased by approximately the same amount. Therefore, the argument would conclude, there was no conspiracy to rig bids or fix prices. Such a comparison, untethered to any actual facts in this case, has no bearing on whether the conspiracy existed. A more permissible analysis would be of the sort counsel for defendant Roberts discussed in his opening statement: Tyson's plan in June 2014 was to raise its price to KFC by 19 cents per pound; the alleged conspiratorial activities occurred; and Tyson and KFC (RSCS) subsequently reached an agreement setting Tyson's price increase at approximately 19 cents per pound. Therefore, the argument goes, there was no conspiracy to rig bids or fix prices. This conclusion is incorrect, though the syllogism has the virtue of citing to the underlying facts of the charged conspiracy and its members.

      To establish the irrelevance of the defendants' expert benchmarking analysis, one need look no further than the economic literature that the defendants themselves cite. The defendants' supplemental disclosures cite to two articles. They provide

3

conclusive proof that a benchmarking analysis is irrelevant to this case. One article is entitled "Measuring Benchmark Damages in Antitrust Litigation."[2] There is of course no such thing as damages in a criminal antitrust case, and in any event the defendants themselves moved *in limine* to preclude the government from offering damages evidence in the form of consumer harm or loss. ECF 528 at 1 ("Defendants respectfully submit this motion *in limine* to exclude evidence of alleged losses or harms to end consumers resulting from the charged conspiracy."). The other article is entitled "Evaluating Market Power Using Competitive Benchmark Prices Instead of the Herfindahl-Hirschman Index."[3] Market power, or its analog, anticompetitive effects, is an element of a civil rule-of-reason Section 1 claim, *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018), but they irrelevant to this criminal case that charges a *per se* illegal price-fixing and bid-rigging conspiracy. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (noting *per se* illegal agreements among competitors such as price fixing do not require anticompetitive effects evidence).

Similarly, to assess whether any defendants knowingly joined the conspiracy, the defendants must show at a minimum that the data used in the analysis was something known to and used by the defendants during the conspiracy period. That is the minimum that would be required to establish that any analysis could shed light on any

---

[2] McCrary, Justin and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," J. Econometric Methods, 2014.
[3] Hausman, Jerry A. and J. Gregory Sidak, "Evaluating Market Power Using Competitive Benchmark Prices Instead of the Herfindahl-Hirschman Index," Antitrust L. J. 2007.

defendant's state of mind.[4] Evidence that does not pertain to actions a defendant took or what a defendant was actually aware of at the time cannot be used to establish his state of mind. Therefore, to the extent the defendants cannot show they were privy to the dataset at the time—and the government has not seen evidence that the defendants were—these data are not relevant to the conspiracy's existence and should be excluded.

*Privilege and Reliability*. On November 11, 2021, the government learned that the defendants in the *In re Broilers* civil litigation had claimed privilege over 136 of the defendants' trial exhibits, including documents related to the data obtained by and modified by Edgeworth Economics,[5] including how that data was modified. Upon receipt of the privilege claim, the government sequestered the materials. The civil defendants, who are the privilege holders, have since informed the government that they intend to assert privilege over additional documents soon. The defendants do not dispute the privilege claims as they have removed the potentially privileged exhibits from their exhibit list, and pledged to not offer them into evidence. The defendants to date, however, have failed to respond to the government's question of whether they intend to

---

[4] Because there are ten defendants, what was known to each defendant will vary. It may be the case that some defendants may not have known of any datasets in the ordinary course of business and therefore would be unable to offer any form of benchmarking analysis to demonstrate their state of mind.

[5] Edgeworth Economics is the economic consulting firm that the civil defendants retained to render economic expert services.

present expert testimony or other evidence that relies in some way upon the privileged materials.[6]

Any such testimony or evidence should be excluded. Information related to how Edgeworth modified the data is privileged, meaning that any economic expert necessarily cannot fully appreciate its origins or alterations, and reliance upon it would be unfounded. Therefore, the data that Edgeworth modified is not of the type reasonably relied upon by other economists in the field under Fed. R. Evid. 702.

There is also no basis for the Court or the parties to conclude, due to the privilege issues, that the evidence underlying the expert testimony is both relevant and reliable under Federal Rule of Evidence 703. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Likewise, the privilege issues prevent the defendants' experts from gaining the requisite "familiarity with the methods or reasoning used by" Edgeworth to modify the data. *HealthOne of Denver, Ind. v. UnitedHealth Grp. Inc., No*. 10-CV-01633-WYD-BNB, 2012 WL 94678, at *6 (D. Colo. Jan. 12, 2012).

Moreover, the government will be unfairly prejudiced by any expert testimony relying on privileged materials from Edgeworth, as there is no way to conduct meaningful cross examination of expert testimony that relies on sequestered materials. *Cf*. *Licciardi v. TIG Ins. Group*, 140 F.3d 357, 363 (1st Cir. 1998) (finding an abuse of discretion where district court admitted testimony by an expert where the opposing party "had no opportunity to . . . conduct a meaningful cross examination."); *Freund v.*

---

[6] The defendants' sparse expert disclosures, including no disclosures regarding Dr. Sengupta, are insufficient for the government to know the degree to which the experts have relied on the privileged documents.

*Fleetwood Enterprises*, 956 F.2d 354, 358 (1st Cir. 1992) (excluding expert testimony where a late disclosure prevented party from preparing a meaningful cross-examination of expert).

Finally, permitting the defendants to use the data from the civil litigation will run counter to the motion *in limine* that the defendants filed and the Court granted: to exclude evidence or argument regarding any civil litigation related to this criminal case. ECF 603 at 9. Any fair cross examination of expert testimony based on these data will require probing the data's reliability, which will entail presenting to the jury the fact that the data was manipulated by economic experts at Edgeworth during a lawsuit ahead of the defendants in this case receiving it. Even if remedies can be fashioned to limit the description of the lawsuit, it will be imperative for the jury, in assessing the weight to be given to the evidence, to know that Edgeworth altered the data for the purpose of a litigation that was *resisting* price-fixing claims against suppliers (including the suppliers that employed all ten defendants).

<u>*Interpreting Communications*</u>. The government suspects that the defendants may attempt to elicit expert testimony that transmits or interprets hearsay in communications, such as text messages and emails. As explained in their May 14, 2021, expert disclosure, Professor Snyder may testify that "documentary evidence suggest alternative, non-conspiratorial explanations and motivations for the challenged conduct." ECF 299.1 at 18.

The defendants should not be permitted to circumvent the hearsay rule through their expert witnesses. An expert may not simply transmit hearsay to the jury. *United*

7

*States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citing *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003)). Even if the defendants' experts appropriately rely on hearsay, they should not be permitted to disclose any such hearsay—such as co-conspirator or victim/customer communications—because the prejudice resulting from the publishing of inadmissible evidence to the jury substantially outweighs any probative value from those communications.

The defendants' experts also should not be permitted to interpret or opine on co-conspirator or victim/customer communications because they have neither the expertise nor the methodology to do so. Professor Snyder is an economist, and nothing in his experience suggests that his expertise encompasses those types of communications. The effect of permitting such testimony would simply be to cloak defense counsel's arguments in the veil of expert testimony, usurping the jury's fact-finding function and unfairly prejudicing the government.

Dated: November 26, 2021                    Respectfully submitted,

                                                                         By: /s/ Michael T. Koenig
                                                                             Michael T. Koenig
                                                                             Heather D. Call
                                                                             Carolyn M. Sweeney
                                                                             Paul J. Torzilli
                                                                             Trial Attorneys
                                                                             Antitrust Division
                                                                             U.S. Department of Justice
                                                                             Washington Criminal II Office
                                                                             450 Fifth Street, N.W.
                                                                             Washington, D.C. 20530
                                                                             Tel: (202) 616-2165
                                                                             michael.koenig@usdoj.gov
                                                                             Attorneys for the United States