1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 20-CR-00152-PAB
3
UNITED STATES OF AMERICA,
4
    Plaintiff,
5
vs.
6
JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12    Defendants

13  _____

              REPORTER'S TRANSCRIPT
14            Excerpt of Trial to Jury
            Testimony of Michael Ledford, Vol. 2
15  _____

16        Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:02 a.m., on the 9th day of November,

19  2021, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
      Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        APPEARANCES
 2            Michael Koenig, Carolyn Sweeney, Heather Call and Paul
 3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of
 4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing
 5    for Plaintiff.
 6            Anna Tryon Pletcher and Michael Tubach of
 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
 8    San Francisco, CA 94111-3823;
 9            Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
10    N.W., Washington, DC 20006, appearing for Defendant Penn.
11            David Beller, Richard Kornfeld and Kelly Page of
12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
13    CO 80202, appearing for Defendant Fries.
14            Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;
16             Laura Kuykendall and Megan Rahman of Troutman Pepper
17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
18    appearing for Defendant Brady.
19            Michael Felberg of Reichman, Jorgensen, Lehman,
20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
21    10017;
22
23
24
25
```

1                        APPEARANCES (Continued)

2              Laura F. Carwile of Reichman, Jorgensen, Lehman,

3     Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4     CA 94065; appearing for Defendant Austin.

5              Elizabeth B. Prewitt of Latham & Watkins, LLP,

6     555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7              Marci Gilligan LaBranche of Stimson, Stancil,

8     LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9     80218, appearing for Defendant Mulrenin.

10             James A. Backstrom, Counselor at Law, 1515 Market

11    Street, Suite 1200, Philadelphia, PA 19102-1932;

12             Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13    Bethesda, MD 20814, appearing for Defendant Kantola.

14             Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15    Street, Suite 1100, Los Angeles, CA 90017;

16             Dennis J. Canty, Canty Law Corporation,

17    1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18    appearing for Defendant Little.

19             John Anderson Fagg, Jr. and James McLoughlin of

20    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

```
1                    APPEARANCES (Continued)

2             Craig Allen Gillen and Anthony Charles Lake of

3   Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4   Atlanta, GA 30339;

5             Richard L. Tegtmeier of Sherman & Howard, LLC,

6   633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7   for Defendant Roberts.

8             Barry J. Pollack of Robbins, Russell, Englert, Orseck

9   & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10  DC 20006;

11            Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12  5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13  for the Defendant Blake.

14

15                         PROCEEDINGS

16       THE COURT:  We are back on the record in 20-CR-152.

17  The jury is not present.  The jury is not coming back until

18  10:00.  The defendants don't need to be present although many

19  are.  We are going to talk about exhibits and work through some

20  ones that we anticipate objections to.

21            So the government can go ahead and tell us which

22  exhibit we will start with.

23       MR. KOENIG:  Can we first give an update on

24  Mr. Skalak?

25       THE COURT:  Yes.
```

1          *MS. SWEENEY:*  So, Your Honor, just to clear the record

2     from yesterday, in early October the government learned there

3     were some potential health concerns for Mr. Skalak as defense

4     counsel stated.  The results were confirmed to the government

5     after the start of trial.  But after Your Honor shared the news

6     of the negative test result in the jury, his counsel shared

7     that he is comfortable testifying in person and he withdraws

8     his request for VTC, as does the government.

9          *THE COURT:*  Thank you.  Mr. Koenig, go ahead.

10         *MR. KOENIG:*  Should we get right to it?

11         *THE COURT:*  I think so.  We will need to break at

12    9:45 to give all of you a chance to have a break.

13         *MR. KOENIG:*  Very good.

14         The first exhibit is 454.  It's a single page.

15         *THE COURT:*  Yes, if you can display that.

16         *MR. POLLACK:*  I am sorry, we are having a little

17    trouble hearing back here both the Court and the government.

18         *MR. KOENIG:*  Is this better?

19         *MR. POLLACK:*  It is.  Thank you.

20         *MR. KOENIG:*  This one was originally *James* log 145.

21    The Court found that the government had not established that it

22    was in furtherance in the course of the conspiracy.  I think

23    that with yesterday's testimony from Mr. Smith regarding his

24    expectations about the price of chicken going down due to grain

25    going down, I think the government would respectfully request

1    that the Court reconsider that ruling.

2            MR. TUBACH:  Your Honor, my understanding was that

3    this document was actually withdrawn by the government, not

4    that the Court ruled on it.

5            MR. KOENIG:  I am sorry, I thought that there was a

6    duplicate and then -- I could be confused.  I thought it was a

7    duplicate with withdrew and there was another version; but if

8    I'm wrong, I'm wrong.

9            MR. TUBACH:  I think multiple people's notes on this

10   side show withdrawn.

11           MR. KOENIG:  Okay.

12           THE COURT:  Okay.  So is the basis for admission

13   then -- what effect do you think, Mr. Koenig, the withdrawal of

14   it during the *James* hearing proceeding has?

15           MR. KOENIG:  Well, there was 144 and 145, and I

16   thought those were the duplicates.  And we withdrew 144, but

17   not 145.  It's just 145 the government -- Your Honor ruled that

18   the government failed to show.

19           THE COURT:  145 is this one?

20           MR. KOENIG:  Yes.

21           THE COURT:  Okay.  So the answer is?

22           MR. KOENIG:  I am sorry?

23           THE COURT:  I think my microphone has a lot of

24   feedback on it, assuming it's just this one.  I'm not sure.

25           MR. TUBACH:  We also have substantive objections as

1    well, Your Honor, which we can address later.

2         MR. KOENIG:  I see where the confusion is.  The one

3    that was withdrawn is the one that got marked.  And it's

4    just -- it's a duplicate, so this is the same document as 145.

5    It just --

6         THE COURT:  Okay.  And then was the other one ruled

7    on?

8         MR. KOENIG:  Yes, and Your Honor said that it failed

9    to show -- the government at that time had failed to show,

10   although now I think in light of Mr. Smith's testimony

11   yesterday, we think that the government has made a sufficient

12   showing that this would be in furtherance.

13        THE COURT:  Response, Mr. Tubach?

14        MR. TUBACH:  Your Honor, I don't believe the testimony

15   of Mr. Smith has shown that any of this has to do with

16   price-fixing at all.  In fact, the fact that Mr. Tucker called

17   them morons is very consistent with the testimony of Mr. Smith

18   that the companies didn't like each other.  And we had long

19   testimony about why that was, because there was a whole

20   incident in the prior year where Golden Corral had tried to get

21   out of its contract.

22        MR. KOENIG:  I would say Mr. Tubach's very long

23   cross-examination that they didn't like each other definitely

24   brings this into focus that it is relevant and in furtherance

25   of the conspiracy.

1          *MR. TUBACH:*  The fact that the companies didn't like

2     each other has nothing to do with the conspiracy.  That is so

3     utterly clear.  I don't see how the government in good faith

4     can say that.

5          *THE COURT:*  So what's the distinction between dislike

6     of which there was some evidence and a price, giving them a

7     price that's consistent with --

8          *MR. KOENIG:*  Sure, Your Honor.  Internal discussions

9     about negotiations I think are plainly in furtherance of the

10    conspiracy.  It's a necessary step to effectuate in a

11    conspiracy, actually getting the contracts negotiated.  And

12    this is right -- this is, you know, forwarding the letter that

13    he said he sent to the suppliers from Ms. Moriggia, but he is

14    the one who wrote it.  And they are essentially kind of crude

15    language, but nevertheless, they are evaluating what he was --

16    what Pilgrim's was sent in the RFP.  And so I think it really

17    shouldn't be controversial.  I mean, if the letter comes in as

18    relevant, the RFP, then commentary on it certainly should come

19    in.

20          *THE COURT:*  Mr. McLoughlin?

21          *MR. McLOUGHLIN:*  Yes, Your Honor, a couple points.

22    First, the government had the opportunity yesterday if it

23    wanted to lay some additional foundation to ask Mr. Smith about

24    this, which it failed or declined to do.

25          The second point here is there is nothing about

1    Mr. Smith's testimony that adds any factual context that would

2    change Your Honor's initial determination that this was not in

3    furtherance of the conspiracy.  Mr. Smith offered no testimony

4    in which he had any personal knowledge of a conspiracy or

5    anyone communicating or agreeing a bid.  Mr. Smith, you know,

6    like the other fires we have seen, had nothing to offer except

7    the fact that he was unhappy about pricing.  So there is

8    nothing about the evidence at this stage that would change Your

9    Honor's initial determination.

10           You also have I think finally the circumstance, Your

11   Honor, where, you know, there is a -- and the government I am

12   certain will deny it, but there is a certain 403, 404 element

13   here where the government would love to have these text

14   messages where people call people morons and other things in

15   terms of casting the character or the tone of these

16   individuals, and in the case of, of course, Mr. Tucker --

17   Mr. Tucker is not even a defendant in this case -- to say, you

18   know, get the jury thinking these aren't great people.  And

19   when you combine all of that together again with the fact that

20   the government withdrew it in the *James* hearing, Your Honor

21   ruled the other one was not in furtherance, and there is simply

22   no basis on which to reconsider the ruling.

23           *THE COURT:*  Anything else, Mr. Koenig?

24           *MR. KOENIG:*  Yes, Your Honor.  First of all,

25   Mr. Smith's testimony was that he viewed them as supplier

1    partners.  This is certainly relevant to showing the nature of

2    the relationship.  So even if it's not in furtherance of the

3    conspiracy, it certainly goes to the nature of the relationship

4    which I believe Mr. Tubach acknowledged.

5         The other thing I would say is that nothing in this is

6    actually for the truth of the matter asserted.  "Check out the

7    memo" is a command.  "You better give them a low price ...

8    after all due to grain record, record low costs," that is not

9    something that is for the truth.  It's for their evaluation of

10   the memo.  "I will call you later" is not for the truth.  And

11   "They are morons," we are certainly not asking the jury to

12   conclude that the people at Golden Corral are, in fact, morons.

13        I do think, though, also it is a very common theme in

14   antitrust cases where, you know, it's this attitude that the

15   customer is the enemy and the competitor is the friend.  And I

16   think this certainly goes to show something along those lines.

17             THE COURT:  Last word, Mr. McLoughlin.  Go ahead.

18             MR. McLOUGHLIN:  Yes, sir.  The key point about

19   antitrust cases that the government ignores is *Matsushita*,

20   which is to say that the guidance in the Supreme Court is one

21   should be very cautious about what is an ordinary business

22   communication and characterizing that as something that is

23   either a function of the conspiracy or a result of the

24   conspiracy or is in furtherance of the conspiracy.  And that is

25   the principle that I think is the tie breaker with respect to

1  the admissibility of something as to whether it's in

2  furtherance.

3          And in this circumstance I think the tie clearly goes

4  to this is an ordinary business communication among -- not

5  competitors.  It is a copperweld type of communication within

6  the organization.  And when you combine the copperweld

7  principles with the presumption of an ordinary business

8  communication in *Matsushita*, the admissibility of this, given

9  its history on the *James* hearing, I think is not close.

10         THE COURT:  The objections will be overruled.  I think

11 that this is a statement in furtherance of the conspiracy under

12 801(d)(2)(E), that it would offer some evidence that in fact

13 there was -- at least within Pilgrim's there was an agreement

14 to hold the price at what it was.  It's true that it comes with

15 some disparagement or some sarcasm in regard to this particular

16 customer, but I think that the jury could find that there was

17 some evidence that, in fact, there was an agreement within

18 Pilgrim's to hold to a predetermined price.  So each of the

19 objections will be overruled.  That will be admissible.

20         Next one?

21         MR. BELLER:  Your Honor, if I may be heard quite

22 briefly, and that is simply based on the Court's order, I would

23 ask for a limiting instruction as to the Claxton defendants,

24 Mr. Fries and Mr. Brady.

25         THE COURT:  That will be denied.  This is a statement

1   against all -- this is admissible against each of the

2   defendants.  And regardless of whether or not when the jury may

3   find that they joined, this is evidence that can be considered

4   against all of them.

5          Ms. Henry?

6          *MS. HENRY:*  I wish to make the same objection that

7   Mr. Beller made on behalf of Koch and Mr. Kantola.

8          *THE COURT:*  Thank you.  That will be denied as well.

9          Next exhibit?

10         *MR. KOENIG:*  Next exhibit is Government Exhibit 410.

11  The bottom portion of the e-mail was ruled favorably by the

12  Court in *James* log 158.

13         *THE COURT:*  And by bottom, what portion of it?

14         *MR. KOENIG:*  The e-mail from Kevin Grindle to Lee

15  Moriggia submitting the bid.

16         *THE COURT:*  Okay.  And now you are asking to admit

17  that, but also the top portion?

18         *MR. KOENIG:*  Sure.  And the top portion wouldn't have

19  been within the scope of the *James* hearing because Lee Moriggia

20  is not a co-conspirator.  But the government does submit that

21  if you look at the times, the bid came in at 4:17.  She had

22  time to look through it and respond four minutes later with,

23  "Wow that is high pricing."  And I think that's clearly a

24  present sense impression, not to be confused with excited

25  utterance, but it does give her state of mind as to how she

1   viewed the bid immediately upon seeing it.

2          And the other thing is the second part, "I will look

3   over and get back to you," is 803(3) statement of intent or

4   plan.  It's not really for the truth, but to the extent it is,

5   it would fall under 803(3).

6          THE COURT:  I am sorry, which part are you talking

7   about now?

8          MR. KOENIG:  The second sentence, the "I will look

9   over and get back to you."

10          THE COURT:  Sorry.  I thought you were talking about

11   the lower e-mail.

12          Okay.  Response?  Anything else, Mr. Koenig, before we

13   get objections?

14          MR. KOENIG:  No.

15          THE COURT:  Thank you.

16          Mr. Tubach, go ahead.

17          MR. TUBACH:  We do object to this as hearsay.  It's

18   not --

19          THE COURT:  The top part?

20          MR. TUBACH:  Yes, the top part.  The bottom part I

21   believe has already been admitted.  The top part is hearsay.  I

22   don't believe there is any exception.  She is simply making a

23   statement which is being offered for the truth of the matter,

24   which is that she believes the price is high.  That's exactly

25   why it's being offered.

1          *THE COURT:*  Anyone else?

2          Mr. McLoughlin?

3          *MR. McLOUGHLIN:*  Yes, Your Honor.  The point here is

4     that if you look at this when you talk about a present sense

5     impression, the rule quite literally says describing an event

6     or explaining an event or condition.  These are neither events

7     nor conditions within the contemplated scope of the rule.  This

8     is a discussion about a contract negotiation.  And the risk we

9     have here as a general principle in the trial is that the

10    cumulative effect that the government is seeking in reading 803

11    is simply to swallow the rule and everything comes in.  And the

12    rule -- hearsay means something.  And so we would object to the

13    over-expansion here of the 801 -- 803(1), (2) and (3)

14    exceptions as the government has been applying them.

15         *THE COURT:*  Mr. Koenig, response?

16         *MR. KOENIG:*  Well, I guess two things.  The fact that

17    she got the bid, was able to review it and respond in four

18    minutes, I mean, if someone hands me a note and I look at it

19    and say, "Wow, that's high pricing," that is certainly a

20    present sense impression and again not to be confused with an

21    excited utterance like, "Oh, the bus just hit that guy."  I

22    think it clearly falls in there.

23         But it also, you know, is relevant to the conspiracy

24    even if it's not for the truth that Golden Corral in the course

25    of negotiations thought the pricing was high.  It gives their

1    state of mind even if it's not high.  And, you know, so it

2    shows their motivations in the negotiations to get pricing

3    lower.

4                 MR. COURT:  All right.  Mr. Fagg, go ahead.

5                 MR. FAGG:  The government obviously made a choice in

6    choosing to call Telly Smith to testify in this case and not

7    Ms. Moriggia.  If the government wanted to call Ms. Moriggia,

8    they could have brought her in and had her testify about this

9    document.  They chose not to.  And now the government is saying

10   they, talking about Golden Corral, but Ms. Moriggia is not

11   here.

12                THE COURT:  All right.  The hearsay objection will be

13   sustained as to the top part.  The lower part is admissible.

14   So if the government wants to submit a redacted version of 410,

15   but I don't find that it's a present sense impression.  I think

16   that it would essentially be coming in for the truth of the

17   matter asserted, that those are high prices according to Golden

18   Corral.  So I will sustain that objection.

19                MR. TUBACH:  Your Honor, I believe the lower portion

20   of the document has already been admitted into evidence.

21                THE COURT:  Through another exhibit number?

22                MR. TUBACH:  I believe so, Your Honor, but we will

23   double-check and get you that number.

24                THE COURT:  Right.  If it's in already, fine; but to

25   the extent it may not be, then as long as the top e-mail is

1    removed, it would be.

2            One moment, Mr. Koenig.

3            Mr. Koenig, go ahead.

4            MR. KOENIG:  Next is Government Exhibit 422, which was

5    James log entry 160.

6            MR. TUBACH:  Your Honor, this document is already in

7    evidence as Defendants' Exhibit 788.  I believe the attachment

8    is 789.

9            THE COURT:  Is it C-788?

10           MR. TUBACH:  D, as in dog, Your Honor.

11           MR. KOENIG:  I would have to go back to the

12   transcript.  I thought it was just the bottom part, but maybe

13   the top is.

14           THE COURT:  Ms. Grimm, do you show D-788 in?

15           COURT DEPUTY CLERK:  I don't.

16           THE COURT:  I don't.  That may be a cover e-mail or

17   something, but that's not in; but D-789 is in.

18           MR. TUBACH:  That could be exactly right, Your Honor.

19   Perhaps it was just the bid itself that came in.

20           MR. KOENIG:  Yeah, I think I do recall that from

21   yesterday.

22           MR. TUBACH:  On behalf of Mr. Penn, we have no

23   objection, but we would suggest that D-788 be admitted so the

24   jury know the two documents go together.  Otherwise, I think

25   there is going to be some confusion with a government exhibit

1   and a defense exhibit.

2            THE COURT:  That makes some sense.

3            Any objection, then, to offering instead of 422,

4   D-788?

5            MR. KOENIG:  No.

6            THE COURT:  Okay.  Any objections to the admission of

7   Exhibit D-788?  Okay.  That one will be admitted.

8            Next one, Mr. Koenig?

9            MR. KOENIG:  Sure.  Government Exhibit 498, which is

10  James log 174.

11           THE COURT:  Any objection?

12           MR. TUBACH:  Just to reiterate, I think we had the

13  same thing last time we had a hearing like this.  We want to

14  make sure we are preserving our objections from the James

15  hearing.  We don't have to repeat them.  But if that's

16  understood here, then we can say no further objections.

17           THE COURT:  Yeah, I think it's a good idea to make the

18  record as you did at the beginning of this hearing just so --

19  nothing wrong with protecting yourself in that way, but yes, I

20  will consider that those objections carry over.

21           MR. TUBACH:  Thank you.  And one objection carries for

22  all the defendants in this proceeding?

23           THE COURT:  Yes, that's correct.

24           Okay.  Exhibit 498 will be admitted as well.

25           MR. KOENIG:  453, which was James log 176.

1          *THE COURT:*  Any objection to the admission of

2     Exhibit 453?

3          *MR. FELDBERG:*  No further objection, Your Honor.

4          *THE COURT:*  All right.  That will be admitted as well.

5     And both 498 and 453 is co-conspirator hearsay.

6          Go ahead.  Next one?

7          *MR. KOENIG:*  448, which was *James* log 186.

8          *THE COURT:*  Any objection to the admission of

9     Exhibit 448?

10         *MR. TUBACH:*  No further objection.

11         *THE COURT:*  Exhibit 448 will be admitted.

12         *MR. KOENIG:*  One moment, please.

13         *THE COURT:*  Yes.

14         *MR. KOENIG:*  Next, Your Honor, we have a series of

15    texts, two of which were in the *James* log, two of which were

16    not, and it's been the subject of some briefing as early as --

17    as recently as this morning.  So in sequence the texts are

18    Government Exhibits 7909, then 449, 450 and 451.  449 and 451

19    were in the *James* log as Exhibit 188.  And the two that were

20    not are 9709 and 450, which we would suggest or we would

21    contend are not for the truth so much as giving context to the

22    overall conversation.

23         *THE COURT:*  I am sorry, so what was the first number

24    that you mentioned, the four digit one?

25         *MR. KOENIG:*  9709, and we can display that.

1              MR. FAGG:  I am sorry?

2              MR. KOENIG:  9709.

3              THE COURT:  It changed.  It may make sense to take

4     these as a group since -- assuming that there is some

5     interrelationship.

6              But any objections?  Mr. McLoughlin?

7              MR. McLOUGHLIN:  Your Honor, I believe that the

8     government -- someone is confused, either I am or the

9     government.  I don't believe 9709 is a predecessor to 449.

10    9709 is involving Misters Penn, Sandri, Lovette.  448 -- 449,

11    my mistake, I think there is actually an exhibit that is prior

12    to 9709.  Also it's not the first in the chain.  And if we are

13    going to be complete, we should probably -- we should include

14    the predecessor as well in the discussion.

15             THE COURT:  Would the government display 449?

16             MS. HENRY:  Your Honor, could we request that that be

17    blown up a little bit?

18             THE COURT:  Yes.

19             Mr. Koenig, response, then, to Mr. McLoughlin's point?

20             MR. KOENIG:  Sure.  I think -- and this actually goes

21    to a motion that I believe was filed by Mr. Austin as well

22    where they argued that, you know, we can only -- we should only

23    be able to introduce a stand-alone exhibit if we also introduce

24    a bunch of other exhibits that support their point.  I think

25    the government's prerogative is to introduce the exhibits it

1    wants to introduce.  And if the defendants think that that, you

2    know, is somehow an incomplete picture, they are free to

3    introduce their own exhibits or argue that to the jury or

4    cross-examine someone on it.

5         THE COURT:  I haven't had a chance to look through the

6    entirety of that brief which I think just came in, but the rule

7    of completeness does say at that time, so at that time probably

8    means what it says.  So assuming it comes within the rule,

9    assuming that whatever is asserted is incomplete comes within

10   the rule, that that may be important.

11        MR. KOENIG:  I think that what it would mean for like,

12   for example, 9709 is if we just, you know, showed the snippet

13   of the last sentence or something, and that's what the rule I

14   believe is meant to encompass.  It certainly isn't the case of

15   like an e-mail exchange.  If we want to introduce an e-mail and

16   there is 10 replies after it, we certainly -- in my experience,

17   we don't have to introduce the remaining chain for every single

18   e-mail that we introduce.  That would really be a cumbersome

19   process.  And again, you know, the government presents its

20   evidence and the defendants have a chance to show their

21   evidence.  And if the government is being incomplete, it does

22   so at its peril in front of the jury.

23        THE COURT:  Mr. McLoughlin?

24        MR. McLOUGHLIN:  A couple points, Your Honor.

25             Dealing quickly with the idea that you can just take a

1    snippet of a text message and put that in as an exhibit and

2    redacting the rest takes the rule of completeness and a variety

3    of other evidentiary rules and just turns them inside out.

4    That is not the kind of editorial strategizing that the rules

5    permit with respect to the government.

6         With respect -- we completely agree with Your Honor

7    that if they are going to take a communication exchange, a

8    conversation, it doesn't matter whether the conversation is an

9    e-mail or series of e-mails that happen to print out on one

10   page or text messages that happen to print out on separate

11   pages.  It is still an integrated conversation and that is what

12   the rule of completeness is directed toward.  It is not a

13   formalistic or what page it is on.  It is how do you understand

14   the context of the communication.  So the government's argument

15   there I think fails under the intended rule.

16        With respect to this exchange, if one does look at the

17   predecessor to 9709, you know, that is a photograph that was

18   again sarcastic and humorous, and without that you have no

19   context or understanding for 9709.  449 changes the tone or the

20   text a little bit and then you continue on.

21        Where again we have an issue here is, as Your Honor

22   has said, the *James* hearing is supposed to mean something.  And

23   we're, you know, as a defense group, we're drowning in paper

24   that changes here.  We thought we had a certain reliability

25   with respect to the *James* hearing.  There is no circumstances

1    that the government has articulated as to why 9709 and 450

2    could not have been submitted in the *James* hearing.  They made

3    a tactical decision and they should be bound by that tactical

4    decision, particularly here again where we are talking about as

5    you will see in 450 and 9709 essentially sarcasm where again

6    you have this 403, 404 component.

7         The government makes -- in its briefing on this issue

8    of 450 makes note of the fact that the individual is not named

9    here.  That individual is Fabio Sandri, who was the CFO at the

10   time and is now the CEO of, of course, a company that has

11   pleaded guilty to an antitrust violation.  So the implication

12   that somehow Mr. Sandri is the reason why this wasn't included

13   in the *James* log because in some way he wasn't involved, he is

14   some third person is counter-factual.  So the cumulation of all

15   of this as we would assert that 9709 and 450 should be

16   excluded, but if Your Honor is going to rule otherwise, then it

17   should be the predecessor to 9709 and the entire series that

18   should come in.

19        THE COURT:  Once again, Mr. McLoughlin, when you say

20   the predecessor to 9709, that's 9708?

21        MR. McLOUGHLIN:  No, Your Honor.

22        MR. FAGG:  Your Honor, we can get you that number.  I

23   am not sure unless the government knows.  We were able to piece

24   it together, but I apologize we don't know the Bates number.

25        MR. KOENIG:  It's basically a picture of like a plate

1    of chicken at Golden Corral or something.

2         MR. TUBACH:  Your Honor, I can explain.  It's very

3    simple.  Mr. Sandri, the CFO at Golden Corral, took a photo of

4    some of the food, sent it to Mr. Lovette, sent it to Mr. Penn,

5    and then this exchange starts.  And just to join in

6    Mr. McLoughlin's arguments, I mean, this 449 where Mr. Penn

7    writes, "I am a marketing guy at heart," that's obviously

8    sarcastic.  And "I raised OK corral 15 cents per pound to

9    ensure our Brand Promise is personally delivered," it has

10   nothing to do with price-fixing.  It has everything to do with

11   the enmity that the companies felt for each other.  It's

12   abundantly clear in the context of this entire text change.

13        What I would argue is that whatever the Court found

14   with respect to Exhibit 449 at the *James* hearing based on the

15   record at the time, the testimony now makes abundantly clear

16   that none of this text exchange has anything to do with any

17   purported conspiracy to raise prices.  It has to do with the

18   fact that these companies didn't like each other or at the very

19   least the Pilgrim's executives felt this way towards Golden

20   Corral.

21        And I know the Court has not been revisiting its *James*

22   rulings, but this morning the Court did revisit one of the

23   *James* rulings and admitted a document it previously hadn't, and

24   we think this one should go the other way.

25        MR. McLOUGHLIN:  Your Honor, we will be able to pull

1    up the picture in a moment, I think.

2             THE COURT:  I probably don't need to see it.

3             MR. McLOUGHLIN:  For the record, Your Honor, those

4    documents are Pilgrim's DOJ-484950-51 is the original

5    communication from Mr. Sandri with the picture.  And again,

6    it's hard to argue that sending sarcastic photographs here is

7    in furtherance of a price-fixing conspiracy.

8             THE COURT:  Go ahead, Mr. Koenig.

9             MR. KOENIG:  Sure, a couple things.  First of all, I

10   think it's well established right now that the defendants agree

11   that there is a lot of sarcasm laced in these text messages

12   which means that they are not for the truth of the matter

13   asserted.  Sarcasm is by definition false, so it doesn't even

14   fall within the hearsay exception.

15            I do think that, you know, the defendants by bringing

16   up on cross this strained relationship and trying to pin that

17   all on the actions of one of our witnesses brings this exchange

18   into -- certainly into relevant focus that it wasn't just a

19   one-sided thing.  And so they really can't have it both ways in

20   our view.  If Telly Smith did some things that strained the

21   relationship, we should be able to show that the other side was

22   doing similar things to the extent that's, you know -- I don't

23   know how I was going to end that sentence, I am sorry.

24            But the other thing is none of this in 9709 is for the

25   truth.  I mean, "Stuff the chicken in your pants?"  I mean,

1    that's not for the truth.  It's a command and it's also --

2    nobody takes that seriously that that's what the CFO was going

3    to do.  The "OK Corral Losers" certainly goes to showing the

4    sarcasm that's in 449 and in 450 and in 451.  So I think on the

5    whole these things really aren't, you know, hearsay, at least

6    the sarcasm parts.

7          The other thing I would say just about the *James* log

8    generally, you know, we've gone through great efforts to make a

9    complete *James* log record and we've tried to adhere to that.

10   But I would say that, you know, the log was submitted almost

11   three months before trial.  The hearing was almost two months

12   before trial.  And, you know, our case hasn't been static in

13   that time.  And I think we have done a pretty good job of, you

14   know, we didn't throw anything but the kitchen sink into the

15   *James* log, so we tried to limit it, but the case has changed.

16         And I think, you know, we should be afforded a little

17   flexibility to offer exhibits that maybe at the time didn't

18   have the same significance that they do now as evidence has

19   been unfolding.  And not to suggest that this is some sort of

20   license to just throw exhibits that weren't in the *James* log at

21   everybody all the time, which we haven't been doing, but to the

22   extent there is a document here and there that sheds light on

23   the case as it has evolved, I think it's only fair to give us a

24   little bit of leeway.

25         *THE COURT:*  Mr. Fagg?

1          *MR. FAGG:*  Briefly, Your Honor.  On that last point, I

2    think Mr. Koenig has perhaps chosen an inopportune time to make

3    that point about the case evolving.  The text message that

4    Mr. Lovette sent that was Exhibit 450, appears to be an

5    intermediary text between two text messages that were on their

6    *James* log.  So it's not as if some aspect of the case evolved

7    and they have now decided, oh, we shouldn't have skipped that

8    intervening Bates number that is the same time that's

9    intervening in between those texts.

10         The other point is that with -- and so it was not

11    included on the *James* log, neither was 47 -- I am sorry, 9709.

12    And then the other point is that the government is really

13    trying to have it both ways by saying this isn't hearsay.  It's

14    not offered for the truth, but actually it's offered to show

15    that these defendants disliked each other and it is in fact

16    evidence of them acting in furtherance of this conspiracy and

17    their internal communications and that's precisely the

18    impression that they are trying to give to the jury with these

19    text messages and so we respectfully submit that they should

20    have been included on the *James* log.

21         *THE COURT:*  All right.  Quickly.

22         *MR. KOENIG:*  Again, the defendants are the ones who

23    brought up this strained relationship.  We should get to rebut

24    that.  Second, the standard if it is not for the truth is not

25    in furtherance.  The standard is relevance.  And I think these

1    texts are certainly relevant to show the relationship that they

2    brought up.

3           The other piece I would add is, you know, even if they

4    are ruled to be hearsay, they still are relevant and would be

5    admissible against the person who uttered the words.  So, you

6    know, to the extent there was a text between two of these,

7    No. 450 that we didn't put in, the strained relationship really

8    wasn't at issue at the time.  It was only yesterday that we

9    learned of the defendants' position that there was a strained

10   relationship.  So I don't know -- we have just got to be able

11   to react to that.

12          THE COURT:  So as to Exhibit 9709, the objection to

13   that coming in as co-conspirator hearsay will be sustained.  It

14   wasn't on the *James* log.  It is a part of the continuation of

15   it.  So I don't believe that this would be a permissible

16   exception because things have happened since then.  However, I

17   will admit it not for the truth of the matter asserted, but

18   rather the effect on the recipient.  449 will be admitted as a

19   co-conspirator statement.

20          MR. KOENIG:  9709?

21          THE COURT:  Sorry, 449.

22          MR. KOENIG:  I guess I didn't -- I wasn't clear on the

23   9709, then.

24          THE COURT:  That's a document you said was not on the

25   *James* log, right?

1          MR. KOENIG:  Correct.  But we do think it's still

2     relevant and admissible, A, for effect on the listener, and B,

3     under 801(d)(2)(A).

4          THE COURT:  I just ruled that that is admissible.

5     It's not admissible as co-conspirator hearsay.  It is

6     admissible not for the truth of the matter asserted, but rather

7     for the effect on the recipient.

8          MR. KOENIG:  I am sorry.

9          MS. JOHNSON:  Your Honor, Wendy Johnson for Mr. Blake.

10    We would ask for a limiting instruction.

11         THE COURT:  There will be none.  So 449 will be

12    admissible as co-conspirator hearsay.  450, same ruling as

13    9709, not as co-conspirator hearsay, but it will be admissible

14    for the effect on the recipient.

15         MS. JOHNSON:  Same objection, Your Honor.

16         THE COURT:  All right.  And that will be denied.

17         MS. HENRY:  And, Your Honor, Roxann Henry.  I just

18    want to be clear because Ms. Johnson said on behalf of

19    Mr. Blake, but that is on behalf of Defendant Kantola as well.

20    And unless others -- I would like to make certain this covers

21    for everybody.

22         THE COURT:  Well, we talked about that at the very

23    beginning of the hearing.  So once again, things will all spin

24    out of control if we have to keep repeating ourselves.  That

25    was an understanding at the beginning of the hearing.

1          All right.  And 451 will be admissible as

2     co-conspirator hearsay as well.

3          Next documents?

4          MR. TUBACH:  The last part of the string I believe is

5     9707 and 9708.

6          THE COURT:  And those have not been -- oh, as to that

7     aspect of it, assuming that there is a claim that those need to

8     be part of it, there is some theory about it being part of the

9     chain needed, I agree with Mr. Koenig.  The government has not

10    put in e-mails -- for instance, hasn't admitted the middle

11    portions of e-mails.  It doesn't necessarily -- I don't think

12    the government has to necessarily include all of the chain as

13    long as there is no doctoring or omissions of part of the

14    middle of it that would somehow make it misleading to the jury.

15    That doesn't prevent the defendants from putting in the rest of

16    the chain, something that would help the jury, but I haven't

17    seen evidence that the government so far -- and I don't see it

18    here -- has made exclusions that would be misleading or cause

19    confusion.

20         MR. TUBACH:  Your Honor, I was just going to

21    short-circuit this because 9707 and 9708 are on the

22    government's list.  They want to include them, so just --

23         THE COURT:  There are a lot of things on both sides'

24    list.

25         MR. TUBACH:  The only thing we would ask, Your Honor,

1    is that that original document that includes the photograph of

2    the chicken from Mr. Sandri.  Otherwise this statement from

3    Mr. Penn that supposedly starts this whole thing where he says,

4    "That's right Fabio," makes no sense whatsoever.  I don't see

5    how you could have a rule of completeness that doesn't explain

6    what "That's right Fabio" means.

7         THE COURT:  Well, I am not sure that the jury would

8    understand the picture of a chicken product and Golden Corral

9    would just say, "That's right Fabio."

10        MR. TUBACH:  Well, there is also the text.

11        THE COURT:  What does the text say?

12        MR. TUBACH:  With the Court's indulgence.

13        MR. McLOUGHLIN:  The written portion is merely the

14   header that attaches the picture.

15        MR. TUBACH:  My apology.  I thought there was text

16   with that also.  Why don't we go back and check.  There may be

17   another text.  We would ask that that initial one be admitted;

18   otherwise, "That's right Fabio" makes no sense.

19        THE COURT:  I still haven't heard any evidence that it

20   would make any sense anyway, so that will be refused.

21        Mr. McLoughlin?

22        MR. McLOUGHLIN:  Your Honor, apologies for trying your

23   patience.  The government did not argue admissibility based on

24   effect on the listener.  I would like to at least note the

25   objection on the record here that for that exception to apply,

1    at least in theory the government should articulate that as a

2    result of that communication, it had an effect which caused the

3    listener to do something or not do something.  There is nothing

4    in the record, there is nothing that the government argues that

5    as a result of these communications, there was an effect

6    between or among Mr. Penn or Mr. Sandri or Mr. Lovette that

7    caused any of them to do anything.  And so I think the effect

8    on the listener argument where one has not articulated that

9    basis is inapposite, and so we would request that they be

10   excluded and that -- or otherwise our objection be registered.

11        THE COURT:  Right.  It's part of the -- when you are

12   arguing they are all part of a string, that's a natural

13   inference.  The government may not have articulated it, but it

14   seems obvious.

15        Mr. Tubach?

16        MR. TUBACH:  We have located the language in addition

17   to the photograph.  What Mr. Sandri said is -- with the

18   photograph, he says, "One in the plate and three on the trash,

19   take that losers!"  I can't believe I have to sit here and

20   argue this in federal court, but this is what we are doing.

21   Otherwise, there is no way to explain what it is Mr. Penn is

22   agreeing with.

23        This is the classic rule of completeness.  If this

24   were an e-mail, this would come in.  The fact that this was

25   printed out on separate pages because that's how they decided

1   to print it out doesn't mean it's not part of the same string.

2   If this were all printed out on a string in a phone, it would

3   obviously come in.

4        THE COURT:  Mr. Koenig, response to that?

5        MR. KOENIG:  If they want that exhibit in, more power

6   to them.

7        MR. TUBACH:  Mr. Penn has no objection, Your Honor.

8        THE COURT:  The issue is not whether they want it in,

9   but what the argument is now, because the text that accompanied

10  the photo explains the first of the series, which it appears to

11  do, 9709, whether it should be admitted at the same time.

12       MR. KOENIG:  The government has no problem marking

13  that as an exhibit and offering it if that's what Your Honor

14  would like.

15       THE COURT:  It's not marked yet?

16       MR. KOENIG:  No.  They may have marked it.

17       THE COURT:  Is it marked as a defense exhibit?  Why

18  don't we figure that out; and if so, that can be offered at the

19  same time.  I do agree and the government agrees too that they

20  will go ahead and admit that at the same time.

21       Okay.  Mr. Koenig, next?

22       MR. KOENIG:  The last two, 9707 and 9708 is still part

23  of the same string.  We had raised them -- flagged those for

24  the defendants because we were thinking that, you know, if we

25  had to argue, you know, that it was sarcasm, but that seems to

1    be a moot point.  We don't need to do 9708 -- or 9707 or 9708.

2    But in light of Your Honor's ruling, we would not have an

3    objection to getting a ruling on the admissibility of those as

4    well.

5          MR. TUBACH:  We would ask, Your Honor, if the prior

6    string is coming in, we do think 9707 and 9708 should come in.

7    And they were on the list of exhibits the government intended

8    to argue today for their admission.

9          MR. KOENIG:  Yeah.  I mean, I will say as a general

10   matter that because we put something on a list that we want to

11   get admitted certainly should not forever bind us that we have

12   to admit the exhibit then.  But in this case, you know, since

13   it's part of the same string, we will offer it.

14         THE COURT:  Offer both of those?

15         MR. KOENIG:  Yes.  One's just -- the one on the right

16   is an attachment to the text message.  And, you know, that's

17   just how the Pilgrim's vendor or whatever vendor it was

18   produced those things.

19         THE COURT:  So the answer is yes?

20         MR. KOENIG:  Yes.

21         THE COURT:  Okay.  Any objection to the admission of

22   those two?  Okay.  Those will be admitted as well, then.

23         MR. KOENIG:  If I could pass the torch to my

24   colleague, Ms. Call.

25         THE COURT:  You may.

1          MS. CALL:  Your Honor, the next exhibit is

2    Government's Exhibit 1409.  This is an e-mail between Defendant

3    Kantola and Misters MacKenzie, Wright and Buckert of Koch

4    Foods.  And it is a subset of an e-mail chain that was

5    contained on the government's *James* log at entry No. 19.  It is

6    a smaller portion of that chain.  And the statement by

7    Defendant Kantola here was the item that was quoted on the

8    government's *James* submission.

9          MS. HENRY:  Your Honor, we do object.

10          THE COURT:  One moment, Ms. Henry.

11          And Ms. Call, you said that it was part or -- part of

12    the series?  What was your comment regarding the *James* log?

13          MS. CALL:  Yes, *James* log entry 19 was the same e-mail

14    chain.  It just contained one additional e-mail, I believe, a

15    response that said "Ok."  This is just a smaller portion of

16    that chain.

17          THE COURT:  And the *James* log ruling was?

18          MS. CALL:  That it was conditionally admissible.

19          THE COURT:  Ms. Henry, go ahead.

20          MS. HENRY:  So in addition to the objections made at

21    the *James* hearing, we would ask that the full document that was

22    considered at the *James* hearing be used instead of this one --

23    that has already been labeled GX-1520 -- and so that it is in

24    fairness considered at the same time, the complete string.

25          THE COURT:  Okay.  Response to that, Ms. Call?

1              MS. CALL:  As I represented, Your Honor, the response

2     was "Ok."  I don't quite see how there is a fairness issue with

3     Defendant Kantola's statement, you know, "We are changing dark

4     meat from 30 back to" -- sorry, "to 30 back from 30 and a

5     half."  And a response that says "Ok" doesn't implicate any

6     misleading nature of this e-mail here.  I frankly this it's

7     helpful for the jury seeing this e-mail knowing the date and

8     the time sent as indicated in the header which is not indicated

9     in the response simply because the time zone is only indicated

10    on the top e-mail in the chain.

11             THE COURT:  Ms. Henry, anything else?

12             MS. HENRY:  Yes.  We believe that in fairness the

13    consideration of a response of someone who is not in any way

14    alleged to be a co-conspirator to a statement that the

15    government is contending is an inflammatory statement but that

16    somebody else who is not a co-conspirator looks at it and

17    simply says, "Oh, ok," that that is something that should be

18    considered in fairness in the same string with the material

19    that the government is seeking to admit.

20             THE COURT:  And who said "Ok" again?

21             MS. HENRY:  Mr. Buckert.

22             THE COURT:  From?

23             MS. HENRY:  Koch Foods.

24             THE COURT:  That objection will be overruled.  I find

25    that 1409 is admissible.  The defense can certainly --

 1    Ms. Henry, you can move the admission of 1520, but I don't find

 2    the admission of simply "Ok" is misleading or triggers the rule

 3    of completeness.

 4        Next one?

 5        *MS. CALL:*   The next exhibit is Government's Exhibit

 6    1526 and one of its attachments which is 1528.   The e-mail in

 7    1526 is an e-mail from Defendant Austin to Mr. Gay and

 8    Mr. Tucker of Pilgrim's Pride.   Subject line is Bid Summary.

 9    And it says, "Take a look at these and hopefully we can discuss

10    in about half an hour."

11        Attachment 1528 appears to be a type of memo written

12    by Defendant Austin regarding a conversation with Mike, who we

13    believe to be Mike Ledford from RSCS at the time.   I'll note

14    1528, it's not really offered for the truth of anything

15    asserted in it, but it rather shows Defendant Austin's state of

16    mind at this time in the negotiations.   It frankly doesn't

17    really appear to actually be a summary of a discussion, but

18    more so Mr. Austin's own impressions of it.

19        Just looking at the statements he says in it, it

20    includes things like, "I don't think Mike is over enthusiastic

21    about having another plant in Alabama," or "I am hearing that

22    several suppliers have dropped their price."   That doesn't

23    appear to be anything he heard from Mike Ledford, but is more

24    so his present impression of things he heard from other

25    sources.

1          And otherwise, in addition to them not being offered

2    for the truth, they are also simply opposing party statements

3    we would offer against Defendant Austin, but I think more

4    broadly they are admissible against everyone because of the

5    non-truth offer here.

6          THE COURT:  Response?

7          MR. FELDBERG:  Your Honor, on behalf of Mr. Austin, we

8    have no objection to 1526 or 1528.  I would note that contrary

9    to the argument made by counsel, 1528 starts out, "Having

10   talked to Mike I will summarize our discussion."

11         But the main point here is that the attachment to 1526

12   which happens to be 1527 we think should also be admitted

13   pursuant to the rule of completeness.  It is -- 1526 says,

14   "Take a look at these and hopefully we can discuss in about

15   half an hour."  1527 is the "these."  And without including

16   that, the jury is left without the context, without the

17   picture.  So we would move for the admission of 1527 at the

18   same time.

19         THE COURT:  Could you display 1527?

20         MS. CALL:  Yes, Your Honor.  To be clear, there are

21   two attachments to 1526.  It is both 1527 and 1528.  The

22   government has no opposition to also offering 1527 at this

23   time.

24         MR. TUBACH:  We have no objection on behalf of

25   Mr. Penn to the admission of all three of those documents, Your

1    Honor.

2          THE COURT:  Anyone else have any objections?

3          Ms. Johnson?

4          MS. JOHNSON:  On behalf of Mr. Blake, we would seek a

5    limiting instruction.

6          THE COURT:  That will be refused.  I think that this

7    is appropriately admitted just generally as to all.

8          Okay.  So 1526, 1527 and 1528, those will be admitted.

9          MR. FAGG:  Just for one point of clarification, if I

10   may, on 1527 I think what was displayed was just a placeholder

11   or maybe I missed it, but I assume 1527 would also be the

12   actual spreadsheet that -- there is a PDF of 1527 that the

13   government has produced and stamped.

14         THE COURT:  What does the government intend to admit

15   as to 1527, the paper file or paper plus native?

16         MS. CALL:  I believe this was a fairly condensed Excel

17   spreadsheet, so it probably would be more efficient to PDF the

18   native and do the paper version of that.

19         MR. TUBACH:  We have no objection as long as the PDF

20   captures all of the information contained in the spreadsheet

21   and we will verify that.  If it doesn't, we will make another

22   request.

23         THE COURT:  Sure, that's fine.  Does that work for

24   you, Mr. Feldberg?

25         MR. FELDBERG:  Yes, it does, Your Honor, as long as it

1    includes the substance.

2         THE COURT:  And to the extent it doesn't, we can

3    problem solve on that.

4         Next?

5         MS. CALL:  Next is Government's Exhibit 1521 and its

6    attachment 1521-1.  This consists of an e-mail chain between

7    Joe Grendys and Bruce MacKenzie at Koch Foods, as well as an

8    attachment including references to lowest competition prices.

9    This was contained in the government's *James* submission in

10   *James* log No. 23 that had a favorable ruling from Your Honor.

11        THE COURT:  All right.  Ms. Henry, go ahead.

12        MS. HENRY:  In addition to the objections made at the

13   *James* hearing, I think it is important to recognize that we

14   have now had testimony specifically from customers stating that

15   this is exactly the type of guidance that they gave to

16   suppliers.  And that was not available evidence at the time of

17   the *James* hearing and indicates that this is not a document in

18   furtherance of the conspiracy.  And moreover, there has been

19   nothing further related to Mr. MacKenzie.

20        THE COURT:  Okay.  Additional objections?

21        That objection will be overruled.  1521 and 1521-1

22   will be admitted as co-conspirator hearsay.

23        MS. CALL:  The next exhibit is Government

24   Exhibit 1519, 1519.  This consists of one e-mail between

25   Mr. Bruce MacKenzie and Joe Grendys at Koch.  It was contained

1    in the government's *James* submission as *James* log 24, which was

2    ruled on favorably by Your Honor.

3            THE COURT:  Any objection to the admission of 1519?

4            MS. HENRY:  No further objections.

5            THE COURT:  That one will be admitted as

6    co-conspirator hearsay.

7            MS. CALL:  The next is Government's Exhibit 1427.

8    Exhibit 1427 is a text message conversation between Defendant

9    Brady and Defendant Fries.  This was contained in the

10   government's *James* submission as *James* log No. 309, and it was

11   also ruled on favorably by Your Honor.

12           THE COURT:  Any objection to the admission of 1427?

13           MR. BELLER:  Thank you, Your Honor.  And the Court has

14   already heard from us extensively on this.  I won't belabor the

15   point.  I would note that reference to Roger, which I assume

16   the government will argue is Roger Austin, is hearsay within

17   hearsay.  I do not believe that that objection has yet been

18   made as to this.  And other than that, we will stand on the

19   objections that have already been articulated.

20           THE COURT:  Thank you, Mr. Beller.

21           Ms. Prewitt?

22           MS. PREWITT:  Just for clarification, was this

23   admitted yesterday?  My understanding is it was.

24           THE COURT:  I am not sure.  Ms. Grimm, do you show

25   1427 in?

1          *COURT DEPUTY CLERK:*  Not 1427.  I don't show it.

2          *MS. PREWITT:*  Is there perhaps a different version of

3    this?

4          *MS. CALL:*  There was a separate text message

5    conversation between Mr. Fries and Mr. Brady.  I believe it

6    might be Government Exhibit 1238 that is from two years later

7    that you might be thinking of.

8          *MS. PREWITT:*  Okay, sorry.  I will just note in

9    connection the *James* hearing this was not something that

10   Mr. Mulrenin or Mr. Roberts alleged as co-conspirators was in

11   relation to, so I would just object on the basis that there

12   should be a limiting instruction on this.

13         *MR. GILLEN:*  Yes, Your Honor.  Briefly, we would

14   object on those grounds.  And if the Court does admit it, we

15   would ask for a specific limiting instruction as to Mr. Roberts

16   and Mr. Mulrenin.  We believe the evidence has shown that under

17   the government's evidence, that there is no involvement with

18   Mr. Roberts or Mr. Mulrenin in this particular episode.  So we

19   think it's important, particularly in light of what happened

20   yesterday with the government trying in our view to confuse the

21   jury on the involvement of Roberts and Mulrenin in an episode

22   in which they knew that -- the government knew that they were

23   not involved because they had made inquiry of the witness and

24   he said he didn't even know Mr. Roberts or Mr. Mulrenin, but

25   the government followed up on redirect in doing exactly the

1   same thing which we were concerned about.

2          We will be filing a motion I believe today regarding

3   that matter and asking for the Court's remedy for a mistrial on

4   that, on what happened yesterday.

5          THE COURT:  Mr. Feldberg?

6          MR. FELDBERG:  Thank you, Your Honor.

7          In its ruling after the *James* hearing the Court found

8   that Mr. Austin became a member of the conspiracy by a

9   preponderance as of the date in late 2014, about two years

10  after this text exchange.  And as a result, we would ask the

11  Court to rule that this is not admissible with respect to

12  Mr. Austin.

13         THE COURT:  Response, Ms. Call?

14         MS. CALL:  Yes, Your Honor.  I believe as Your Honor

15  has been quite clear in multiple rulings, co-conspirators are

16  liable for acts of other conspirators even if before they

17  joined the conspiracy.  That said, the evidence in this case

18  does show that all three of the defendants who just objected

19  did join prior to those dates, including the fact that with

20  respect to Government's Exhibit 1427 that we are looking at

21  right now, these occurred on the date before the second round

22  of bidding was due for KFC.  And earlier that day Defendant

23  Brady had spoken to competitors Blake and Austin.  Prior to

24  speaking to Blake, Defendant Blake himself had earlier spoken

25  to Carl Pepper, the subordinate of Defendant Mulrenin and

1   Roberts at Tyson Foods.  Those phone records are already in

2   evidence and shows part of their own involvement in this

3   episode.

4        MS. PREWITT:  Your Honor, may I be heard briefly on

5   this?

6        THE COURT:  Yeah.

7        MS. PREWITT:  First of all, Defendants Mulrenin and

8   Roberts, Your Honor found at the *James* hearing they didn't join

9   the conspiracy until after this date.  They joined in 2013

10  according to Your Honor's James ruling.  Second, the reference

11  to Tyson as 31 back is, in fact, a false reference.  They were

12  not 31 back at this point in time.  That is because you will

13  see in the second line, "Ol Mike!  He is bluffing hard!"  Mike

14  is Mike Ledford who took the stand.  That's the customer.  So

15  the reference there to .31 back is something that was sourced

16  from the customer, which is why the government did not even try

17  to allege in the *James* hearing that Defendants Mulrenin and

18  Roberts were part of this particular episode in furtherance of

19  the conspiracy.

20       THE COURT:  Okay.  Response?

21       MS. CALL:  Regardless of any of that, I don't believe

22  there is any question of whether these statements were in

23  furtherance of the conspiracy.  And there is nothing showing

24  that this is not relevant as to Defendant Roberts and

25  Mulrenin's participation in that conspiracy.

1            THE COURT:  All right.

2            MS. PREWITT:  I have nothing more to say, Your Honor.

3            THE COURT:  Thank you.  Each of the objections will be

4    overruled.  Mr. Beller's objections will be overruled.  In

5    terms of joining, of course what Ms. Call noted is quite

6    correct that co-conspirators can join later and be liable for

7    acts that occurred before the date that they joined.

8            Mr. Gillen's objection and Mr. Feldberg's objections

9    will be overruled as well.  I find that this is admissible as

10   co-conspirator hearsay.

11           All right.  Next exhibits?

12           MS. CALL:  Yes.  The next exhibit is Government

13   Exhibit 1584, and I will note -- I will also add to that 1583

14   which is the underlying e-mail.  I don't believe the e-mail was

15   included on the list that was provided to defense counsel, but

16   we would offer the admission of the e-mail as well as the

17   attachment which is 1584.

18           THE COURT:  Let's display the e-mail, 1583, at this

19   time so people can see it.

20           MS. CALL:  Yes, Your Honor.  I will tell you there is

21   no content to the e-mail.

22           MR. TUBACH:  On behalf of Mr. Penn we have no

23   objection to either the e-mail or the attachment.

24           MR. FELDBERG:  No objection from Mr. Austin.

25           THE COURT:  Any objection to those two?

1          Those will be admitted.

2          Next?

3          *MS. CALL:*  Next exhibit is Government Exhibit 1544.

4    Exhibit 1544 is an e-mail chain between Defendant Austin,

5    Defendant Penn and then Mr. McGuire, Gay and Tucker, all

6    conspirators at Pilgrim's Pride.  This was contained on the

7    Government's *James* submission as *James* log No. 30.  I think I

8    may be incorrect at the moment, Your Honor.  So this was

9    actually -- the underlying e-mail chain here was contained in

10   *James* log 32, which was favorably ruled on by Your Honor.

11          The top e-mail on this chain -- I don't have a

12   computer with me -- was not contained in that, but is also,

13   frankly, just not offered for its truth.  Regardless of what

14   these two sentences in the top e-mail say, we are simply not

15   offering it for the truth.  And I will note that the statement

16   in that top e-mail was on *James* log item 30, which had been

17   withdrawn because the government believed it was duplicative.

18          *MR. FELDBERG:*  No objection.

19          *MR. TUBACH:*  We have no objection to the admissibility

20   of this document either.

21          *THE COURT:*  Anyone object?

22          All right.  Exhibit 1544 including the entirety it,

23   the top part as well, will be admitted.

24          *MR. McLOUGHLIN:*  Your Honor, if I may, the government

25   says particularly with respect to the top they are not offered

1    for the truth of the matter asserted.  Can we get on the record

2    the purpose for which they are offering it so there is no issue

3    about what the limits are that the government may argue with

4    respect to it?

5            THE COURT:  Well, I am admitting it for all purposes.

6    There weren't any objections to that unless someone wants --

7    believes that it should come in with that proviso.  I don't see

8    why necessarily.

9            MR. McLOUGHLIN:  Thank you, Your Honor.

10           THE COURT:  Next, Ms. Call?

11           MS. CALL:  Next is Government Exhibit 1538 and its

12   attachment, 1539.  The e-mail and attachment were contained on

13   the government's *James* log as entry No. 33, which was ruled on

14   favorably by Your Honor.

15           THE COURT:  Any objections to this?

16           MS. CARWILE:  Yes, thank you, Your Honor.

17           On behalf of Mr. Austin, we are not objecting to the

18   admission of 1538 and 1539, but I do believe while I --

19   Mr. Austin filed the motion on rule of completeness last night.

20   It does actually relate to these two exhibits.  And I think we

21   may be able to wrap up a summary of our objection as to these

22   two, Form 1546, which is next on the government's list, as one

23   as it regards the rule of completeness argument if Your Honor

24   is open to that.

25           THE COURT:  So 1546 I think is the one that you

1    mentioned; is that right?

2          *MS. CARWILE:*  It is.  It is.  However, Mr. Austin

3    included Government 1538 and 1539 as two of the documents it

4    was asking -- or we are asking to have admitted based on the

5    rule of completeness.  And given that the government is the one

6    offering these two exhibits, we think that our rule of

7    completeness argument is even more bolstered as to Defense

8    Exhibit D-839, which is the continuation of this exact e-mail

9    chain.

10          *THE COURT:*  Okay.  So let's hold that thought for a

11   second, Ms. Carwile, and let's hear from Ms. Call on that.

12          *MS. CALL:*  Yes, Your Honor.  As to Docket No. 804 that

13   I believe was filed by Defendant Austin last night, it's the

14   government's position that he simply fails to state how

15   Government's Exhibit 1546 puts anything out of context or is

16   misleading in any way and creates a fairness issue that is the

17   standard in the 10th Circuit.  The additional e-mails that

18   Defendant Austin cites in his briefing merely provides some

19   context of other discussion going on at the time, but it

20   doesn't clear up any misleading aspect of Government's 1546.

21          As the court in *United States v. Lemon* in the 10th

22   Circuit, which is 714 F. Appx. 851, said in an issue on this

23   exact rule, it says a statement by the defendant was "simply

24   not misleading because no further context was necessary to have

25   an appropriate impression of the statement."

1          The only statement that Defendant Austin took issue

2    with is "How's this" by Conspirator Tucker, which frankly isn't

3    really relevant to the issue here which is the issue of the

4    attachment which contains the competitor information.  Any

5    potential misleading nature that is clarified perhaps by the

6    exhibits offered by Defendant Austin is already clarified by

7    another exhibit the government has offered and was just

8    admitted by Your Honor which is Exhibit 1544 in which Defendant

9    Austin talks about how other competitors had aggressive

10   pricing.

11         So I don't believe there is anything that has -- with

12   the combination of 1544 and 1546 that serves any chance to

13   mislead the jury.  And I think frankly the addition of four

14   additional e-mails or however many it was has a greater chance

15   of causing confusion to the jury as to what's actually an issue

16   here.

17         THE COURT:  Can you display Exhibit 1546?

18         MS. CALL:  Yes, Your Honor.  It's a two-sentence

19   e-mail, I believe -- or two-word.

20         MS. CARWILE:  My understanding is 1546 is two

21   statements, one by Mr. Tucker and one by Mr. Austin.

22         MS. CALL:  I am incorrect.  Thank you.  I will add the

23   note as to that first sentence, I don't think Defendant Austin

24   pointed in his brief at least to anything misleading about that

25   first statement.  And in fact, there are toll records already

1   in evidence showing that Defendant Austin reached out to a

2   competitor at Marshall Durbin just before sending this e-mail.

3         THE COURT:  So at the bottom where it says, "How's

4   this," then there was an attachment originally to that?

5         MS. CALL:  Yes, Your Honor.  And I believe that was --

6   let me confirm it before I say it this time.  Yes, there is an

7   attachment to that.

8         THE COURT:  But that's not the D-839?

9         MS. CARWILE:  It's not.  It's actually D -- excuse me,

10  I-145 and it's -- excuse me.  This is the problem.  I am sorry,

11  the attachment to Government 1546 is Defense I-141 which is

12  Exhibit H in the motion that Mr. Austin filed.  It's attached

13  there.  I don't believe this particular attachment is offered

14  under the set of documents the government offers in this

15  string.  And in addition to D-839, we would be asking to add

16  I-141 as it's the attachment to the government's exhibit.

17        MS. CALL:  If Ms. Carwile could perhaps clarify, I

18  don't believe Government Exhibit 1546 has an attachment.

19        MS. CARWILE:  It has an attachment because Mr. Tucker

20  writes "How's this," and he is attaching an Excel spreadsheet

21  to which Mr. Austin responded, so the Excel file name at the

22  bottom of 1546 is the attachment.

23        THE COURT:  Okay.  So why don't we try to -- let me

24  try to break this down a little bit.  What is the relationship

25  between 1538 and 1539 and anything else?  Why wouldn't those

1    two be independently admissible?

2         MS. CARWILE:  Thank you, Your Honor.  I would ask that

3    we pull up Defense 839.  I think it will make this clearer.

4    It's attached to the motion Mr. Austin filed last night as

5    Exhibit F.

6         THE COURT:  D-839?

7         MS. CARWILE:  Yes.

8         MS. CALL:  We are pulling it up at the moment, Your

9    Honor.

10        MS. CARWILE:  When Your Honor is ready, I can address

11   the argument that you've asked me about.

12        THE COURT:  I am ready.  Go ahead.

13        MS. CARWILE:  Yes.  So the government is proffering at

14   this time 1538 and 1539.  Those exhibits are the first e-mail

15   that are -- that is present on D-839.  Mr. Tucker writes, "This

16   is crude but does it show what we need it to," with an

17   attachment.  The government is offering those two exhibits at

18   this time.

19        Mr. Austin is simply asking for the rule of

20   completeness which we've noted in this brief would require the

21   admission at the same time of D-839 which is just the

22   continuation of the government's exhibit they are proffering at

23   this time.  We believe that they are required to be admitted at

24   the same time under the rule.

25        These are not being admitted through a witness is our

1    understanding, so there is no chance to cross-examine anyone

2    about this missing set of e-mails.  And the government's

3    argument that Mr. Austin can introduce this document in his

4    case is a bit disingenuous given that other e-mails of this

5    nature have been objected to on hearsay and foundation grounds

6    when offered by defendants as to their own statements.

7            THE COURT:  Okay.  Response to that, Ms. Call?

8            MS. CALL:  I don't believe the government ever made

9    the argument that counsel is calling disingenuous that

10   Defendant Austin will be able to introduce these in his own

11   case, so I would disagree with that representation in that it

12   was never made.  But simply there is still no pointing to how

13   the "How's this" versus other e-mails in the chain clears up

14   any confusion or misleading nature of what is contained in

15   Government's Exhibit 1538, 1539 and 1546.  I simply don't see

16   how these, you know, help the jury understand any issue of fact

17   actually relevant here.

18           MS. CARWILE:  So just to be clear, right now I am only

19   discussing 1538 and 1539 which the government just proffered.

20   And I don't see how someone could argue that the response from

21   a charged co-conspirator in this case to an e-mail that the

22   government is including could not be relevant to facts at issue

23   in this case.  And certainly it should be introduced at the

24   same time to provide context, explanation and a fair impression

25   to the jury under the rule of completeness.

1          THE COURT:  Can we pull up 1538 and 1539 side by side?

2          Okay.  Anything else, Ms. Carwile?

3          MS. CARWILE:  Not unless Your Honor needs

4    clarification, no.

5          THE COURT:  I find that 1538 and 1539 are

6    independently admissible.  I don't think that the rule of

7    completeness applies as to those two exhibits.  I will overrule

8    the objection, but we may have -- the issues may come up in

9    just a minute if we are now going to 1546.

10          All right.  Next one?

11          MS. CALL:  The next exhibit is 1546.  And I will note

12    that I confirmed 1546 does not have an attachment.  I believe

13    Ms. Carwile may have been referring to the attachment that was

14    sent in the underlying e-mail which is not a part of the e-mail

15    in 1546 which replied to that.

16          THE COURT:  Yeah, I assume the "How's this," that's

17    1539.  The attachment's 1539, right?

18          MS. CARWILE:  It's not.  It's actually a slightly

19    revised attachment based on the feedback in D-839.

20          THE COURT:  Oh, okay.  So -- okay.  So Ms. Carwile,

21    then as to this one, 1546, argument?

22          MS. CARWILE:  Yes, Your Honor.  So this is outlined

23    probably more clearly, although with many more pages in our

24    brief.

25          THE COURT:  And as I said, I don't know when you filed

1    the brief, but I haven't had a chance -- it must have been

2    overnight or early this morning.  I haven't had a chance to

3    look at it.

4         *MS. CARWILE:*  I understand.  Summarizing what's in the

5    brief, Government's 1546 standing alone is incomplete.  And the

6    rule of completeness requires that the conversation, the one

7    continuous conversation that Mr. Austin and Mr. Tucker are

8    having regarding the attachment in Government 1546 be admitted

9    at the same time.

10        What is happening here is that in Government 1538 and

11   39, Mr. Tucker is sending Mr. Austin a spreadsheet for which he

12   is asking, "This is crude but does it show what we need it to?"

13   Mr. Austin responds with a note regarding not suggesting

14   meeting competitor pricing which is present in D-839,

15   Attachment F to Mr. Austin's motion.  And in response

16   Mr. Tucker sends a slightly revised spreadsheet to Mr. Austin

17   with a question, "How's this?"  And then Mr. Austin responds,

18   "You can put Marshall Durbin in."

19        Now, two -- actually three missing parts of this

20   conversation.  The first is the comment Mr. Austin made which

21   prompts Mr. Tucker to ask, "How's this?"  As I outlined in the

22   brief, without the context or the explanation of the prior

23   e-mail, the jury may be misled to understand that Mr. Tucker's

24   "How's this" refers to the competitor pricing chart found in

25   the attachment, which I am hearing now the government isn't

1    intending to introduce but we would ask be introduced based on

2    again the rule of completeness.

3            THE COURT:  And that's I-141?

4            MS. CARWILE:  Yes, Your Honor, it is.  Now, "How's

5    this" inferring -- there has been evidence the government has

6    elicited Mr. Tucker is an alleged co-conspirator.  He is

7    writing to Mr. Austin "How's this" about a spreadsheet which

8    contains competitor pricing.  That by itself will mislead the

9    jury into believing Mr. Tucker is asking "How's this" as

10   relates to that competitor set of pricing.

11           But what D-839 makes clear is that Mr. Austin is

12   saying, I think you need to add an FP column as well as to our

13   competitor pricing -- I am paraphrasing of course -- but we are

14   not suggesting meeting that pricing, meaning the competitor's

15   pricing.  And to that Mr. Tucker responds, "How's this," making

16   the edits that Mr. Austin has suggested in D-839.  Taken alone

17   these e-mails don't make sense.  They infer something different

18   than they actually mean.

19           THE COURT:  Response?

20           MS. CALL:  Yes, Your Honor.  I can briefly orally

21   state this now, but if it's at all difficult talking between

22   six different exhibits, we are also happy to submit a short

23   response in writing over the lunch hour.  But regardless, I'll

24   say I don't think there is any added assertion into "How's

25   this?"  First off, it's not an assertion.  It's a question.

1   But with that said, Government Exhibit 1538 which we were just

2   discussing earlier that evening says, "This is crude but does

3   it show what we need it to," from Mr. Tucker.

4          And there is nothing that "How's this" adds to that

5   that creates a misleading impression that Defendant Austin

6   never intended to have competitor information in that

7   spreadsheet.  And regardless, the statement at issue by

8   Defendant Austin here is, "You can put Marshall Durbin in at

9   96.60," which has nothing to do with Pilgrim's own prices that

10  are contained in that spreadsheet, but rather has to do with

11  the competitor's pricing which is actually the fact at issue

12  here.

13          *THE COURT:*  All right.  I agree with Ms. Carwile.  I

14  think that this is a rule of completeness issue.  I think in

15  particular I-141 would need to be admitted at the same time as

16  1546, but also for the reasons Ms. Carwile explained, I think

17  D-839, even though it does not contain hearsay that would

18  normally not be admissible by defendant, I think in this rare

19  except rule of completeness would argue that that be admissible

20  as well to explain the entire context.  So I will agree and the

21  government should move the admission of that at the same time

22  and I-141 as well.

23          *MS. CALL:*  Just for clarification, the exhibit you are

24  noting that the government should move the admission of, is

25  this what is marked I-140 and I-141?

1          THE COURT:  I think it's I-141 is the attachment?

2          MS. CARWILE:  Yes, Your Honor, I-141 is the attachment

3    and then in addition D-839.  The attachment to D-839 is already

4    in at 1539, so the only thing missing there is D-839.

5          THE COURT:  Okay.  Next?

6          MS. CALL:  I apologize.  Could I see D-839?

7          THE COURT:  Do you have the document that was filed

8    overnight which was the Docket No. 804?  If you have that, it's

9    an attachment to it.

10         MS. CALL:  Which attachment?  The exhibit stickers are

11   cut off.

12         MS. CARWILE:  For the record, it's attachment to

13   Docket 804, Exhibit F.  And the Bates number is

14   Pilgrim's-0005997726.

15         MS. CALL:  And just to be clear, that is not the

16   e-mail that says, "How's this?"  Was your ruling that this

17   e-mail should also be introduced because I didn't hear a

18   reference to it.

19         THE COURT:  That's correct, for the rule of

20   completeness.

21         MS. CALL:  All right.  Thank you.

22         THE COURT:  So we have about 10 minutes left and then

23   we will have to take our break.

24         MS. CALL:  I have four more documents.  The next

25   exhibit is 1567 and its attachment 1568.

1          MR. McLOUGHLIN:  Your Honor, if I might, it might save

2     a little time.  1567 and 1568 are the same as a practical

3     matter with 1522 and 1523, which I believe may have been

4     admitted.  I think there is some additional -- there is an

5     additional entry on 1522, but Your Honor indicated yesterday

6     you don't want to have basically the same exhibit in twice.  I

7     think that 1522 and 23 cover off 1567 and 68.

8          THE COURT:  Ms. Grimm, do you show 1522 and 1523 in?

9     I don't show those have been admitted, Mr. McLoughlin.

10         MR. McLOUGHLIN:  Your Honor, I apologize.  We were

11    going to cover it later.  It is in the same list here so we

12    could deal with them all at once.

13         THE COURT:  I see.  Got it.

14         MS. CALL:  To be clear, Your Honor, they are separate

15    e-mails sent to different people, so I don't believe they are

16    duplicative.

17         THE COURT:  All right.  Then going back to 1567 and

18    1568, any objection to the admission of those exhibits?

19         MR. McLOUGHLIN:  We would object, Your Honor, because

20    1522 and 1523 include everything on 1567 and 68, so therefore

21    there is no reason for there to be duplicative exhibits.  And

22    so we would -- there is another issue there, Your Honor, and

23    that is -- that's more confusing.  If you look at 1567, you see

24    that -- versus 1522 and 23, you see that the time stamps wind

25    up I believe being somewhat different because of the time

1    zones, and so they can confuse the jury.

2         So if you look at 1522, the document that is 1567 is

3    shown as being sent at 8:12:50 p.m. central standard time.  If

4    you look at 1567, it appears to be possibly universal time so

5    it's shown being sent at 2:12:50 a.m.  I say it's universal

6    time because there is no time referenced there, so I am

7    guessing.

8         And so where we have in 1522 and 1523 everything in

9    central standard time, what you see is that not only in 1522 is

10   you see the original e-mail is sent on November 29th.  In 1567

11   it shows that it is sent on November 30th because it crosses

12   over midnight.  So the prospect for confusion here between the

13   two sets of exhibits, even though again they are all the same,

14   for the jury is very substantial.  And we would propose, Your

15   Honor, that that kind of confusion be avoided if we use 1522

16   and 1523 where it's all in central standard time and all of

17   that be eliminated.

18            THE COURT:  Response, Ms. Call?

19            MS. CALL:  Your Honor, it is extremely misleading for

20   Mr. McLoughlin to call these e-mails the same where one was

21   sent to Defendant Penn and Defendant Austin and is extremely

22   relevant what they received including what attachment they

23   received, and that is Government Exhibit 1567; whereas

24   Exhibit 1522 is forwarding that on to Defendant Lovette where

25   it is again extremely relevant what Defendant Lovette received

which is the attachment contained in 1523.  Just because the

attachments may be the same does not make this duplicative.

MR. McLOUGHLIN:  Your Honor, if I may, that statement

that it is misleading is self-fulfilling from the government.

There is not a thing misleading about the argument we are

making here.  The text of the below e-mail that says Begin

Forwarded Message is exactly the same as 1567.  It's the same

text.  It goes to these same people.  It's the same e-mail.

All it adds is that it gets forwarded.  It shows that that

e-mail, which is identical, is forwarded to Mr. Lovette.  The

notion that it is misleading because they are separate is just

dishonest.

MR. TUBACH:  Your Honor, perhaps having the physical

documents would make it easier for the Court to see what's

actually going on here.  It's sometimes difficult to see on the

screen.

THE COURT:  I have it side by side.  It seems to be --

it shows the same thing.

MR. TUBACH:  It's the same thing.  And we will note

that 1567 was not on -- 1567 and 1568 were not on the *James*

log.  They only offered 1522 and 1523, so that's what we should

go with.  It seems the government wants to introduce multiple

copies of the same exhibit.

MR. McLOUGHLIN:  I would note, Your Honor, the

government does not address the issue of the confusion of the

1    time stamps that's 1522 and 1523 versus 1567 and 1568 create.

2    That is confusion for the jury.

3         MS. CALL:  I am happy to address that.  I believe

4    Mr. King already testified as to the time zone that these

5    messages from Pilgrim's were produced in and the top e-mail in

6    the chain was in universal coordinated time, so I don't believe

7    the jury will be confused by that.

8         THE COURT:  And what about the fact that 1522

9    incorporates 1567, and therefore assuming that 1522 is going to

10   be admitted, that it's just -- it would spare us another

11   exhibit on the list?

12        MS. CALL:  I think, Your Honor, the issue is the

13   attachments, that you would have to assume, like you said, that

14   the attachment was the same thing when the e-mail was

15   forwarding.  And that is precisely why we would need both

16   exhibits to establish who received what.

17        MR. TUBACH:  Your Honor, if the government has any

18   good faith basis to believe the attachment on the one e-mail is

19   different than the attachment on the other, we should hear that

20   right now.  Otherwise, the government should not be making

21   those kind of arguments.

22        THE COURT:  Well, so is the government intending to

23   admit 1522 and 1523?

24        MS. CALL:  Yes, Your Honor.

25        THE COURT:  So I guess I still don't quite understand

 1    why 1567 and 1568 are needed if 1522 and 1523 are going to be

 2    admitted.

 3        MS. CALL:  Yes, Your Honor.  And simply I am frankly

 4    trying to do what I believe Mr. Tubach on Friday argued was

 5    quite necessary that the jury needs to understand how Defendant

 6    Penn received the e-mail.  And you don't know exactly what

 7    Defendant Penn received unless you have Government's Exhibit

 8    1567 and 1568.  Otherwise, you'd have to make that assumption

 9    that it is the same attachment to Government's Exhibit 1522

10    which is what Defendant Lovette received.

11        So the question would be if only looking at 1522 in

12    isolation, did Defendant Penn alter anything in the

13    spreadsheet?  Is this a new spreadsheet he created?  And 1567

14    and 1568 clarify any confusion.

15        MR. TUBACH:  Your Honor, there is no confusion and the

16    government knows it.  If the government has any good faith

17    basis to suggest that those two spreadsheets are different, we

18    would have heard that.  There is no difference.  And the

19    attachment in 1522 is exactly -- we will not argue and I will

20    represent to the Court we will not argue that the spreadsheet

21    that Mr. Penn received is any different than the one he

22    forwarded to Mr. Lovette.

23        MR. McLOUGHLIN:  And for Mr. Lovette, Your Honor, the

24    same statement of fact.  The two spreadsheets are absolutely

25    identical as we compared them and we will not make an argument

1    that they aren't.

2          THE COURT:  Why don't we take up the admissibility of

3    1522 and 1523 at this time.  Any objection to the admission of

4    those documents?

5          MR. TUBACH:  No further objection, Your Honor.

6          THE COURT:  What was the objection, then, Mr. Tubach?

7    I was not quite sure.  We are talking about 1522 and 1523.

8          MR. TUBACH:  Yes.  That's the one we were arguing

9    should be admitted --

10          THE COURT:  Right.  But is there an objection to that?

11          MR. TUBACH:  No further objection other than the *James*

12    log which we have already argued.

13          THE COURT:  I understand.  So those two exhibits will

14    be admitted.  And then given the fact that those two will be

15    admitted, I am going to refuse 1567 and 1568 as duplicative

16    because they are subsumed by 1522 and 1523.  I really don't

17    think that -- No. 1, no one is going to argue that the

18    attachment isn't the same.  Moreover, even though no one is

19    going to argue it, I cannot fathom that the jury could somehow

20    slice things so thin that they would have any doubts whatsoever

21    that that was the attachment.  So I don't see any prejudice to

22    the government as to that in any event.

23          I agree that there is testimony by Mr. King and that

24    would probably just go to the weight in terms of the time

25    stamp, but nonetheless, there is a little bit of an added

1    benefit with 1523 on that issue as well.

2              MS. CALL:  If I may confirm, Your Honor, just for the

3    government's understanding that both the Court and the

4    defendants would have no objection to the government arguing

5    that Exhibit 1523 which is being admitted is what was received

6    by Defendant Penn and Defendant Austin.

7              THE COURT:  The indication by Mr. McLoughlin and

8    Mr. Tubach was that they will not be arguing that the

9    attachment is anything other than 1523.

10             MR. TUBACH:  Exactly, Your Honor.  He simply forwarded

11   what he got.

12             MS. CALL:  I don't believe we heard from counsel for

13   Defendant Austin on the issue.

14             MR. FELDBERG:  I didn't realize I had been invited to

15   this party.

16             THE COURT:  I guess you have been.

17             MR. FELDBERG:  It certainly looks like this is the

18   attachment that Mr. Tucker forwarded to several people

19   including Mr. Austin on November 29th, so we don't contest

20   that.

21             THE COURT:  All right.  We will go ahead and take our

22   recess at this time.  Plan on reconvening at 10:00 o'clock.  We

23   will bring the jury in at that time.  The court will be in

24   recess.  Thank you.

25             (Recess at 9:46 a.m.)

Michael Ledford - Direct

1    (Reconvened at 10:01 a.m.)

2    THE COURT:  Let's bring the jury back in.  And the

3    defendants are all here.

4    MR. TORZILLI:  Shall we get the witness?

5    THE COURT:  Yes, let's do that.

6    (Jury present.)

7    THE COURT:  Good morning, ladies and gentlemen.  I

8    hope that traffic was better, although maybe parking was worse,

9    I don't know.  But as you will recall, we are going to continue

10   with the direct examination of Mr. Ledford.  As soon as he has

11   a chance to sit down, we'll get going.

12   Go ahead, Mr. Torzilli.

13   MR. TORZILLI:  Thank you, Your Honor.

14   (**Michael Ledford** was sworn.)

15   **DIRECT EXAMINATION**

16   BY MR. TORZILLI:

17   Q.  Good morning, Mr. Ledford.

18   A.  Good morning.

19   Q.  I would like to start out this morning by passing to you a

20   document that's not in the binder but that I have in my hand.

21   MR. TORZILLI:  And I would like to elicit the

22   assistance of Ms. Grimm.

23   THE COURT:  You may.

24   BY MR. TORZILLI:

25   Q.  Mr. Ledford, if you could look that exhibit over.  It's

Michael Ledford - Direct

1    marked as Government Exhibit 9710.

2    A.   Okay.

3    Q.   Have you had a chance to look that over, Mr. Ledford?

4    A.   Yes.

5    Q.   Do you recognize Government Exhibit 9710?

6    A.   Yes.

7    Q.   What is it?

8    A.   It is an e-mail from the CombineNet system that we used to

9    conduct our RFPs on, from the system e-mail to Roger Austin

10   dated September 26, 2012, in essence inviting Pilgrim's to

11   participate in that year's RFP.

12   Q.   Mr. Ledford, did the same or similar e-mail message go to

13   the other competing chicken suppliers at or around the same

14   time as the message in 9710?

15   A.   Yes.

16   Q.   Did the message go out under your name and your signature,

17   your name?

18   A.   Yes, mine and the rest of the poultry purchasing team.

19   Q.   And what was the purpose of the message that you sent in

20   9710?

21   A.   The purpose of this message was to invite them to

22   participate as part of the RFP for the 2012 negotiations, 2013

23   calendar year.

24   Q.   And that's the same negotiations that we were discussing in

25   your testimony yesterday afternoon; is that correct?

Michael Ledford - Direct

1   A.  Yes.

2         MR. TORZILLI:  Your Honor, at this time offer 9710

3   into evidence.

4         THE COURT:  Any objection to the admission of

5   Exhibit 9710?

6         MR. FELDBERG:  No objection from us, Your Honor.

7         THE COURT:  All right.  Exhibit 9710 will be admitted.

8         MR. TORZILLI:  Permission to publish 9710?

9         THE COURT:  You may.

10  BY MR. TORZILLI:

11  Q.  Mr. Ledford, does the e-mail contained in 9710 have a

12  deadline?

13  A.  Yes.

14  Q.  What was the -- what's the deadline stated in 9710?

15  A.  October 10th, 2012.

16  Q.  And what did the October 10th, 2012 deadline pertain to?

17  A.  It pertained to getting their submissions back into the

18  system.

19  Q.  And what specific submission was at issue in the message

20  appearing in 9710?

21  A.  Their bids.

22  Q.  And in the year 2012 were there multiple rounds of bids?

23  A.  Yes, there was.

24  Q.  What round did the e-mail in 9710 pertain to?

25  A.  I believe this pertains to round one.

Michael Ledford - Direct

1      MR. TORZILLI:  Thank you.  We can take that down.

2    BY MR. TORZILLI:

3    Q.  So Mr. Ledford, after you received the competing suppliers'

4    first round bids, what happened next in the 2012 negotiation

5    process?

6    A.  After we receive their bids, we would have taken those in

7    internally and looked them over.  We would have completed

8    analysis on the bids and come up with, you know, a strategy for

9    how to proceed forward.  And then typically we would have gone

10   into providing feedback to the suppliers that would have either

11   been in-person meetings, phone calls or something of that

12   nature.

13   Q.  And that would all have occurred before round two started?

14   A.  Yes.

15   Q.  And was there a round two in 2012?

16   A.  Yes, there was.

17   Q.  How did round two get kicked off?  How did it get started?

18   A.  It would have been kicked off the same way round one was.

19   We would have sent them something out asking them to make

20   submissions again just like they did for round one, and in that

21   case that would be for the second round of negotiations.

22   Q.  Mr. Ledford, would you please turn to Tab 35 in the binder

23   in front of you?  You should find there a document marked

24   Government Exhibit 1439.

25   A.  Okay.

Michael Ledford - Direct

1    *Q.*  Do you recognize Government Exhibit 1439?

2    *A.*  Yes, I do.

3    *Q.*  What is it?

4    *A.*  It is an e-mail from the CombineNet system to Roger Austin

5    dated November 7, 2012, inviting them to participate in round

6    two of the 2012 RFP process.

7    *Q.*  Is this an example of a transmittal kicking off or starting

8    the round two bidding that you just testified to a minute ago?

9    *A.*  Yes, it is.

10          *MR. TORZILLI:*  Your Honor, the government moves 1439

11   into evidence.

12          *MR. FELDBERG:*  No objection from us, Your Honor.

13          *THE COURT:*  Any objection to the Exhibit 1439?  That

14   exhibit will be admitted.

15          *MR. TORZILLI:*  And permission to publish 1439.

16          *THE COURT:*  Yes, you may.

17   *BY MR. TORZILLI:*

18   *Q.*  Mr. Ledford, did the same or similar transmittal e-mail go

19   to all the competing chicken suppliers at or around the same

20   time as this message to solicit their round two proposals?

21   *A.*  Yes, it did.

22   *Q.*  And what was the approximate date that the round two

23   invitation -- the invitations for round two went out to the

24   chicken suppliers?

25   *A.*  November 7th, 2012.

Michael Ledford - Direct

1    *Q.*  Did you and your team have a deadline that you asked the

2    chicken suppliers to make their submissions by?

3    *A.*  Yes, we did.

4    *Q.*  What was that deadline?

5    *A.*  November 14th.

6    *Q.*  And was there a particular time of the day on November 14th

7    that you wanted the proposals back?

8    *A.*  Yes.  We asked for them to be back by noon.

9    *Q.*  And do you recall why you asked for a noon deadline on that

10   day?

11   *A.*  My assumption would be we wanted to get to work on it that

12   afternoon.

13   *Q.*  So was the timing important in terms of submitting bids

14   back to RSCS?

15   *A.*  Yes, it was.

16   *Q.*  Can you explain why?

17   *A.*  So November 7th, we're coming up against a deadline pretty

18   close to the end of the year and we had no contracted pricing

19   past December 31st.  Also this particular year we had some

20   external consultants in and were following a little bit more of

21   a robust process with meetings with internal stakeholders

22   across all of the brands, as well as some franchisees that were

23   on this negotiation team that we had formed.  And so things

24   were just taking a little bit longer than normal going through

25   that process, so we certainly were definitely by November 7th

Michael Ledford - Direct

1   getting under the gun with just a little bit of time left until

2   the end of the year.

3   Q.  What external consultants were in RSCS at or around the

4   time that you wrote the message that appears in 1439?

5   A.  A group called PWC or PriceWaterhouseCoopers.

6   Q.  What was -- at least to the best of your understanding,

7   what was the nature of their engagement by RSCS?

8   A.  In essence, it was to find cost savings to drive -- to

9   improve margins in the Yum Brand system.

10  Q.  And just to be clear, do you know what PWC -- do you know

11  what it stands for?

12  A.  PriceWaterhouseCoopers.

13  Q.  Thank you.  Do you know whether PriceWaterhouseCoopers was

14  retained by RSCS or another entity?

15  A.  I believe it was RSCS.

16  Q.  And during your time at RSCS besides the

17  PriceWaterhouseCoopers engagement that was occurring in the

18  November 2012 time frame, are you aware of any other

19  consultants that were either retained by RSCS or that were

20  interacting with RSCS employees?

21  A.  I am not.  The only caveat to that I would say is that

22  PriceWaterhouseCoopers when we initially engaged with them went

23  by a different name, and I do not remember what that name was

24  that they went by.

25  Q.  Did you at or around the time of the deadline you specified

Michael Ledford - Direct

1  receive second round bids from competing suppliers?

2  *A.*  Yes.

3  *Q.*  Including from Pilgrim's Pride?

4  *A.*  Yes.

5  *Q.*  Who from Pilgrim's Pride submitted the company's second

6  round bid?

7  *A.*  My assumption would be that it was Roger Austin.

8  *Q.*  Why is that your assumption?

9  *A.*  Because he was our main point of contact that I dealt with.

10 *Q.*  Would you turn to tab one of your binder.  And you should

11 find there an exhibit marked as Government Exhibit 1529.

12 *A.*  Okay.

13 *Q.*  Are you there?

14 *A.*  Yes.

15 *Q.*  Do you recognize government Exhibit 1529?

16 *A.*  Yes, I do.

17 *Q.*  What is it?

18 *A.*  It is an e-mail from Roger Austin to myself with a subject

19 of Round 2 dated November 6, 2012, and he is submitting his

20 round two offer on the RFP.

21 *Q.*  Can you turn now to Tab 2?  And you should find there an

22 exhibit marked as Government Exhibit 1531.

23         Do you see it?

24 *A.*  Yes.

25 *Q.*  Do you recognize this?

Michael Ledford - Direct

1   A.  Yes, I do.

2   Q.  What is it?

3   A.  It is the attachment from that previous e-mail in the

4   previous document with a note on it, a message on it from Roger

5   Austin to myself detailing some of what Pilgrim's was asking

6   for in that bid that year.

7   Q.  And then will you turn to Tab 3?  And you should find

8   what's been marked as Government Exhibit 9694.

9   A.  Okay.

10  Q.  And can you turn through the pages, and after you do that,

11  let me know whether you recognize it.

12  A.  Yes, I recognize it.

13  Q.  What do you recognize it to be?

14  A.  It is Pilgrim's Pride's cost model for fresh chicken on the

15  bone.

16  Q.  Is this a bid submission?

17  A.  Yes, it was.

18  Q.  What round bid submission is this?

19  A.  Round two.

20  Q.  For what company?

21  A.  Pilgrim's Pride.

22      MR. TORZILLI:  Your Honor, at this time government

23  offers 1529, 1531, and the printed and native versions of 9694

24  into evidence.

25      THE COURT:  First of all, taking 1529, any objection

Michael Ledford - Direct

1    to that exhibit?

2              MR. TORZILLI:  Actually, if I may, Your Honor, I

3    neglected to mention this, I believe that through the testimony

4    of Mr. Sangalis back on day four of trial 1529 was already

5    admitted.  Sorry for not mentioning that sooner.

6              THE COURT:  Okay.

7              MR. FELDBERG:  Your Honor, we have no objection.

8              COURT DEPUTY CLERK:  1529 was already admitted.

9              THE COURT:  That's right.  It was admitted through

10    Mr. Sangalis.

11              Any objection to 1531 or 9694 from anyone else?

12              MR. TUBACH:  I am just figuring out the new exhibit

13    number beginning with the 9000 series is the same as 1530?

14              MR. TORZILLI:  It's an earlier iteration.  9694

15    includes -- if I may, Your Honor, 9694 includes as a cover

16    sheet the tip image that indicates it's a native file.  And

17    then the subsequent pages are, if not exactly the same

18    printouts, very close to the same printouts as 1530.

19              MR. TUBACH:  If they are not exactly the same, we can

20    have them both admitted.

21              THE COURT:  In other words, no objection?

22              MR. TUBACH:  Yes.

23              THE COURT:  Then 1531 and 9694, the paper and the

24    native versions, will be admitted.

25              MR. TORZILLI:  Thank you, Your Honor.

Michael Ledford - Direct

1          THE COURT:  Actually, 1531 is already in too.

2          MR. TORZILLI:  Thank you.  My apologies for the

3     oversight.  And Your Honor, permission to publish 1531.

4          THE COURT:  You may.

5     BY MR. TORZILLI:

6     Q.  Sir, up on the screen is what's been admitted into evidence

7     as Government Exhibit 1531.

8          And can you explain what this document is, please?

9     A.  Yes.  This is a note from Roger Austin to myself with some

10    explanation around their bid for round two of the 2012

11    negotiation.

12    Q.  And Mr. Ledford, in the first paragraph there are

13    references to a 40 percent share.

14    A.  Yes.

15    Q.  Do you see that?

16    A.  Yes.

17    Q.  Could you explain what you understand the references to the

18    40 percent share to be?

19    A.  Yes.  During this time period Pilgrim's was 40 percent of

20    the weekly volume needs for chicken on the bone for KFC.

21    Q.  And what was -- what did you understand Mr. Austin to be

22    conveying in this document to you about its 40 percent share

23    volume?

24    A.  He was conveying that the prices that they had submitted in

25    this round two were contingent upon them maintaining 40 percent

Michael Ledford - Direct

1   share of the KFC chicken-on-the-bone fresh eight-piece volume.

2   Q.  So what did you understand him to be indicating to you

3   about a situation whereby Pilgrim's Pride wound up with a lower

4   than 40 percent share of volume of KFC business?

5   A.  That they would need to relook at those numbers and

6   possibly resubmit different numbers if they did not obtain the

7   40 percent share.

8   Q.  Did you have an understanding of whether a resubmission

9   would include prices that were higher than what's contained in

10  the submission here or lower?

11          MR. BELLER:  Objection, speculation.

12          THE COURT:  He can answer based upon his knowledge of

13  the course of conduct.  Overruled.

14  A.  It's my assumption that that meant that the prices would be

15  higher if they did not get the 40 percent.

16  BY MR. TORZILLI:

17  Q.  And I would like to now direct your attention to the last

18  sentence of the first paragraph.  It starts with:  If that is

19  the case.

20          Will you please read that aloud.

21  A.  "If that is the case, we may have to look at the reduction

22  of a plant in the small bird category."

23  Q.  Did you have an understanding of what Mr. Austin was

24  referring to there?

25  A.  Yes, I did.

Michael Ledford - Direct

1    Q.   What's your understanding?

2    A.   If we did not have the volumes that they were anticipating

3    to give them that year, that they may have to take out one of

4    their production facilities that produced products for KFC.

5    Q.   And did you have -- at the time that you were reviewing

6    this material, did you form a reaction to the statement that

7    you just read aloud?

8    A.   I do not recall.

9    Q.   Had Pilgrim's Pride or other suppliers that you had been

10   dealing with at RSCS raised with you the prospects of reducing

11   plants in the small bird category?

12   A.   Yes.   That certainly was a topic that had come up.

13   Q.   Can you summarize the nature of the discussions that were

14   brought to your attention in that regard?

15        MR. FELDBERG:   Objection, Your Honor.   Could we have a

16   specificity as to who said what to whom?

17        THE COURT:   Objection will be sustained.   If you could

18   ask the witness to clarify if he recalls.

19   BY MR. TORZILLI:

20   Q.   Mr. Ledford, with respect to Mr. Austin specifically, did

21   you have discussions with him about -- prior to the memo that

22   appears in 1531 regarding the possibility of reducing capacity

23   of small bird production?

24   A.   Yes.

25   Q.   Can you summarize the nature of those discussions?

Michael Ledford - Direct

1   A.   Yes.  So at the time KFC was again closing restaurants, you

2   know, several hundred a year, so year over year the volume that

3   we were bidding out to the suppliers during this time period

4   was less each year, specifically on chicken-on-the-bone fresh

5   eight-piece product.  So there was the sense of your

6   traditional QSR eight-piece volume was declining and there were

7   other markets like grocery retail, deli business at the time

8   that was on the incline.  Ours was going down.  And they needed

9   to make a decision if our volume was going to keep eroding how

10  many plants or production facilities they would need in order

11  to support our business.

12  Q.   Did any other chicken supplier other than Mr. Austin, other

13  than Pilgrim's Pride, provide the same or similar type messages

14  to you and your team at RSCS up to at least the November 2012

15  time frame?

16  A.   I can only recall maybe one other supplier having that

17  similar conversation with.

18  Q.   What supplier besides Pilgrim's do you recall that coming

19  up with?

20  A.   I believe it was Tyson because they were really the only

21  other supplier that we had that had multiple facilities that

22  supplied KFC.

23  Q.   And we've been using the term "small bird."  Can you

24  explain what small bird means in this industry?

25  A.   Yes.  So small bird is typically a bird that's under

Michael Ledford - Direct

1    5 pounds.  Traditionally it's going to be between 4 and 4-1/2

2    pounds live weight.  And that is traditionally the chickens

3    that are used for eight-piece QSR industry and in addition like

4    chicken that you would get at the deli at a grocery store.

5         MR. TORZILLI:  Your Honor, permission to publish 9694

6    at Page 2 of the printout.

7         THE COURT:  You may.

8         MR. TORZILLI:  Thank you.

9    BY MR. TORZILLI:

10   Q.  Sir, on the screen now to your left is the second page of

11   Exhibit 9694.  What is this?

12   A.  This is the summary sheet for all of the fresh

13   chicken-on-the-bone products for Pilgrim's for their round two

14   submission for the 2012 negotiation.

15   Q.  I would like to direct your attention to two entries

16   towards the bottom.  It's third and fourth from the bottom.  So

17   the first one I would like to talk to you about is the entry

18   Non-Inject Wings - Bulk Packed.  Do you see that?

19   A.  Yes.

20   Q.  And we talked about what that product was yesterday, but I

21   wanted to ask you about the pricing formula entry on that line.

22   A.  Yes.

23   Q.  And could you read that aloud into the record and then

24   explain what that entry means?

25   A.  "UB market previous month average."  UB stands for quoted

Michael Ledford - Direct

1   market in the chicken industry called Urner-Barry.  So UB

2   stands for Urner-Barry market taking the previous month's

3   average price for every day of that month, and that would be

4   the charged price for the -- for that individual product for

5   KFC for the following month.

6   Q.  You said Urner-Barry is a quoted market.  Can you explain

7   what you mean by that, please?

8   A.  Yes.  It's a company that runs basically a market quoting

9   service to -- every day they issue a market on all the various

10  products in the chicken industry and publish that.

11  Q.  And is it fair to say that anyone can gain access to what

12  the Urner-Barry market is for any given day?

13  A.  Yes.

14  Q.  And then can you explain the pricing formula for the next

15  entry, the precounted wings?

16  A.  Yes.  That market price and formula was UB market previous

17  month average plus 10 cents per pound.

18  Q.  So Pilgrim's second round bid, then, for the following

19  year, 2013, for these two wings prices were UB market and UB

20  market plus.10?

21  A.  Yes.

22  Q.  Which stands for what?

23  A.  10 cents per pound.

24      MR. TORZILLI:  We can take that document down.  Thank

25  you.

Michael Ledford - Direct

1    *BY MR. TORZILLI:*

2    *Q.*  If you can, sir, now turn to -- it should be Tab 8 in your

3    binder.  You should find Government Exhibit 1435.

4           Are you there?

5    *A.*  Yes.

6    *Q.*  What's Government Exhibit 1435?

7    *A.*  It's an e-mail from Scott Brady to Steve Campisano and Mark

8    Oechsli and he has copied myself on it.

9    *Q.*  Is this an e-mail that you received around what time -- or

10   what date I should say?

11   *A.*  It is dated December 5th, 2012.

12   *Q.*  When did the e-mail chain that appears in 1435 begin?

13   *A.*  It began on November 14th, 2012.

14   *Q.*  And what's the subject matter of the e-mails that appear in

15   1435?

16   *A.*  It says KFC Bid.

17   *Q.*  Okay.  So these e-mails are about the KFC bid that was

18   going on in the fall of 2012?

19   *A.*  Yes, that's correct.

20          *MR. TORZILLI:*  Your Honor, at this time government

21   offers 1435 into evidence.

22          *THE COURT:*  Any objection to the admission of Exhibit

23   1435?

24          *MR. LAVINE:*  No objection, Your Honor.

25          *THE COURT:*  Exhibit 1435 will be admitted.

Michael Ledford - Direct

1          MR. TORZILLI:  Thank you, Your Honor.  And permission

2     to publish.

3          THE COURT:  You may.

4          MR. TORZILLI:  Thank you.

5          And if we can focus on the very first e-mail in this

6     chain.

7     BY MR. TORZILLI:

8     Q.  So, sir, just to start, can you orient us in terms of this

9     first e-mail as to who sent it and when it was sent.

10    A.  The e-mail was from Scott Brady and it was dated

11    November 14, 2012.

12    Q.  How does November 14, 2012 correlate to the deadline that

13    you had asked the suppliers for their second round bids?

14    A.  I believe this is the same.

15    Q.  And what was the time that you had required the bid

16    submissions to come in on that date?

17    A.  Noon.

18    Q.  Okay.  I want to ask you now about the substance of the

19    e-mail from Mr. Brady and in particular his communication about

20    wings which is in the second sentence.  If you could read that

21    aloud, please.

22    A.  "On the wings we would like to be at market for the bulk

23    packed and market plus .10 on the precounted."

24    Q.  So do you understand that to be -- well, what do you

25    understand Mr. Brady to be doing in that sentence there?

Michael Ledford - Direct

1    *A.*  He was wanting the price for bulk wings and precounted

2    wings to be off of the Urner-Barry market.

3    *Q.*  And how does the price that Mr. Brady is including in this

4    e-mail compare to the prices that Mr. Austin submitted in the

5    chart that we were looking at a moment ago for those same

6    products?

7    *A.*  It's the same formula.

8    *Q.*  So it's the same price for both of those products?

9    *A.*  Yes.

10   *Q.*  Did you have -- well, let me start with first you.

11           Did you have any communications with Mr. Austin or

12   Mr. Brady about what they should be bidding for their wings in

13   the second round for 2012?

14   *A.*  Yes.  I would have spoken with both of them.

15   *Q.*  And what sort of feedback would you have provided them?

16   *A.*  I would have provided them general feedback on how that

17   stacked up against a competitive price or where we were trying

18   to get to in general.

19   *Q.*  Did you ask them to submit wings prices that were identical

20   to each other?

21   *A.*  No, I did not.

22   *Q.*  Did you ask them to communicate or coordinate with each

23   other regarding what their wings bids should be for round two?

24   *A.*  No, I did not.

25   *Q.*  Why not?

Michael Ledford - Direct

1   *A.*  Again, I wanted their best price, a fair price.  I didn't

2   need two suppliers communicating to each other about what the

3   KFC price should be.

4   *Q.*  How, if at all, would two competing suppliers communicating

5   with each other interfere with your ability to get the best

6   price?

7        *MR. FAGG:*  Objection, Your Honor.

8        *MR. TUBACH:*  Calls for speculation, lack of

9   foundation.

10        *THE COURT:*  Overruled.

11   *A.*  It could artificially keep the price higher than it should

12   have been.

13   *BY MR. TORZILLI:*

14   *Q.*  Did Mr. Brady or Mr. Austin ever tell you that they were in

15   communication or coordination with each other about their wings

16   bids for round two of 2012?

17        *MR. FELDBERG:*  Object to the form of the question.  It

18   assumes facts not in evidence.

19        *THE COURT:*  Overruled.  He can answer.

20   *A.*  No.

21   *BY MR. TORZILLI:*

22   *Q.*  If you can turn to Tab 38.  You should find there an

23   exhibit -- is it marked as 1500-1?

24   *A.*  Yes.

25        *MR. TORZILLI:*  So for the record the witness is

Michael Ledford - Direct

1    looking at an exhibit that is Government Exhibit 1500 but has

2    the top e-mail redacted, and as a consequence we have marked

3    that version of the exhibit 1500-1.

4    *BY MR. TORZILLI:*

5    Q.  Do you recognize the single e-mail that you see on 1500-1?

6    A.  Yes.

7    Q.  What do you recognize it to be?

8    A.  It's that same e-mail from Scott Brady to Mark Oechsli

9    talking about their wing pricing for that bid.

10   Q.  So this is the same e-mail?

11   A.  Yes.  It appears to be.

12   Q.  Okay.  And can you now flip to Tab 39?  And you should find

13   there what's been marked as Government Exhibit 1501.

14          Do you recognize 1501?

15   A.  Yes.

16   Q.  What do you recognize it to be?

17   A.  It is the RFP form for bid submissions for that round two.

18   Q.  Who submitted this?

19   A.  This is the Claxton bid.

20   Q.  For what round?

21   A.  Round two.

22          MR. TORZILLI:  Your Honor, at this time we move to

23   admit 1501 into evidence.

24          *THE COURT:*  Just 1501?

25          *MR. TORZILLI:*  Yes, sir.

Michael Ledford - Direct

1          THE COURT:  Any objection to the admission --

2          MR. LAVINE:  May I have one moment, please, Your

3   Honor?

4          THE COURT:  You may.

5          MR. LAVINE:  Your Honor, we would object on the

6   redaction.  We don't understand why the initial e-mail is

7   redacted.  The full thing should come in.

8          THE COURT:  He is just moving the admission of 1501 at

9   this time.

10          MR. TORZILLI:  Your Honor, if I may.

11          THE COURT:  One second.  Let Mr. Lavine have a chance

12   to take a look at it.

13          MR. LAVINE:  Your Honor, we have no objection to 1501.

14          THE COURT:  Anyone else?  All right.  1501 will be

15   admitted.

16          MR. TORZILLI:  Your Honor, if it is in any way going

17   to increase efficiency, we would be more than happy to move for

18   the admission of 1500 unredacted, but wouldn't show the witness

19   the top e-mail which we'd continue to display in redacted form

20   at this time.

21          THE COURT:  All right.  Well, I am not sure, are you

22   moving the admission of Exhibit 1500?

23          MR. TORZILLI:  Sure.

24          THE COURT:  All right.  Any objection to the admission

25   of Exhibit 1500?

138

Michael Ledford - Direct

1          MR. LAVINE:  Let me have one moment.

2          THE COURT:  Sure.

3          MR. TORZILLI:  And just to be clear, Your Honor, fully

4   unredacted.

5          MR. LAVINE:  Your Honor, if I understand 1500 comes in

6   unredacted?

7          THE COURT:  Yes.  But what Mr. Torzilli mentioned is

8   that he would continue to ask Mr. Ledford about 1500-1.  In

9   other words, he wouldn't show him the top e-mail.

10          MR. LAVINE:  That's fine, as long as the unredacted

11  portion comes in.

12          THE COURT:  Yes.  It will come into evidence.

13          MR. LAVINE:  Thank you, Your Honor.

14          THE COURT:  Anyone else, 1500?  Okay.  Exhibit 1500

15  will be admitted.

16          MR. TORZILLI:  Thank you, Your Honor.

17          And permission to publish 1501.

18          THE COURT:  1500-1?

19          MR. TORZILLI:  1501.

20          THE COURT:  I am sorry, you may display 1501, yes.

21  BY MR. TORZILLI:

22  Q.  If we can focus on the top chart that has a title over on

23  the left-hand side called Fresh COB.  Do you see that,

24  Mr. Ledford?

25  A.  Yes.

Michael Ledford - Direct

1    *Q.*  What does fresh COB mean?

2    *A.*  It means fresh chicken on the bone.  These were the

3    eight-piece chicken-on-the-bone products and the supplemental

4    parts that we discussed yesterday.

5    *Q.*  And over on the -- sort of in the middle and then going

6    towards the right, there is a series of columns that I want to

7    ask you about.  The first one is Estimated System Annual

8    Volume.  What's that mean?

9    *A.*  It was the volume for each product in the KFC system.

10   *Q.*  So is that the total amount of product -- total amount of

11   volume for each of the products that you estimated you would be

12   needing to buy from all the suppliers for the upcoming calendar

13   year?

14   *A.*  Yes, that is correct.

15   *Q.*  And then what's the next column mean, Supplier's Total

16   Annual Capacity?

17   *A.*  It was the amount of volume that they were specifically

18   bidding on for their company.

19   *Q.*  Okay.  And then to the right of that is Round 1 FOB per

20   Pound.  What does that mean?

21   *A.*  That was their price FOB, which means at their facility

22   door, not including freight.

23   *Q.*  What is the final column, Round 2, what does that mean?

24   *A.*  That was their round two submission on the FOB prices.

25   *Q.*  And Mr. Ledford, can you direct us to which entry is the --

1   we talked about yesterday purple label eight-piece COB product.

2   Do you remember that?

3   A.   Yes.

4   Q.   Could you direct us to which of these products, if any, is

5   the purple label product?

6   A.   It is the very last one, the last row.

7   Q.   And what is the descriptor for that purple label product?

8   A.   KFC 8PC COB Fried.

9             MR. TORZILLI:   Okay.   You can put that exhibit aside.

10            We'll take that down.   Thank you.

11   BY MR. TORZILLI:

12   Q.   After you received the second round bids from the competing

13   chicken suppliers, what was the next step in your negotiation

14   process?

15   A.   We would have received them in much like the first rounds,

16   had internal meetings.   And then the next step would have been

17   to provide feedback to the suppliers.

18   Q.   And what form or forms did the feedback to the round two

19   bids take?

20   A.   It could either be a face-to-face meeting, a phone call,

21   some were e-mails or a combination thereof.

22   Q.   For face-to-face meetings, who attended those meetings in

23   this time frame?

24   A.   I believe in this time frame at this point in the

25   negotiation, it would have certainly been the poultry

Michael Ledford - Direct

1    purchasing team.  And I believe at this point we had the

2    broader sort of larger group that we had assembled that

3    included a couple of franchisees and a stakeholder

4    representative from each of the brands.

5    Q.  What was the purpose of having franchisee and stakeholder

6    representative presence at the meetings?

7    A.  I mean, the overall purpose of the whole process --

8    especially again this year we had the consultants in there --

9    was to get to the best price we could get to.

10   Q.  Do you recall having -- being part of a meeting with

11   representatives of Pilgrim's Pride in late November 2012?

12   A.  Yes, I do.

13   Q.  And just generally if you could describe who the

14   participants were at that meeting.

15   A.  Yeah, from the RSCS and the Yum Brands side, it was that

16   group that I just referenced.  It would have been members of

17   the poultry purchasing team; I believe Dan Woodside, who was

18   our president and CEO was there as well; Jim Olson, who is a

19   franchisee; Mike Kulp, who is a franchisee in the franchisee

20   system.  And I don't remember exactly who from each brand, but

21   I believe we had a representative from each of the main brands,

22   KFC, Pizza Hut and Taco Bell.

23   Q.  Who from Pilgrim's Pride attended?

24   A.  I believe Roger Austin would have definitely been there.  I

25   am not sure if anyone else on his sales team would have been

Michael Ledford - Direct

1   there, but it also would have included executives higher than

2   him in the organization.  I believe it was sort of what we

3   would have called like a top to top.

4   Q.  Would you turn to Tab 6 of your binder?  You should find

5   there an exhibit marked as 1542.

6           Do you recognize 1542?

7   A.  Yes, I do.

8   Q.  What type of document is this?

9   A.  This is an invitation from myself.

10  Q.  And so an invitation to -- for what?

11  A.  For -- the subject is Pilgrims Negotiation Call.

12  Q.  Is this a calendar invite from your e-mail?

13  A.  Yes, it is.

14  Q.  And is the calendar invite from your e-mail that appears

15  here for the meeting that you were just describing a moment

16  ago?

17  A.  Yes, it is.

18          MR. TORZILLI:  At this time, Your Honor, government

19  moves 1542 into evidence.

20          THE COURT:  Any objection to the admission of

21  Exhibit 1542?

22          MR. FELDBERG:  Not from us, Your Honor.

23          THE COURT:  All right.  Exhibit 1542 will be admitted.

24          MR. TORZILLI:  Thank you, Your Honor.

25          And permission to publish 1542?

Michael Ledford - Direct

1       THE COURT:  Yes, you may.

2   BY MR. TORZILLI:

3   Q.  Mr. Ledford, when did the meeting occur?

4   A.  It occurred on November the 27th, 2012.

5   Q.  And it says here the start and end time, 9:30 p.m. to

6   10:00 p.m.  That's 30 minutes of time.  Did the meeting, in

7   fact, last more than 30 minutes to the best of your

8   recollection?

9   A.  I do not recall.

10  Q.  Okay.  Do you recall any of the details about the meeting?

11  A.  Yes.

12  Q.  Okay.  What details do you recall?

13  A.  Generally speaking, I believe we shared with them like an

14  overall sort of a state of the business for Yum Brands,

15  provided them feedback, and I believe they in turn did the

16  same.

17  Q.  During that meeting did you get any indication whatsoever

18  that Mr. Austin was in communication with his competitors about

19  the negotiation process?

20  A.  No.

21  Q.  Had you learned of that at that time, what would have been

22  your reaction?

23      MR. FELDBERG:  Objection, calls for speculation.

24      THE COURT:  Sustained.

25  BY MR. TORZILLI:

144

Michael Ledford - Direct

1  Q.  Was there any discussion at the meeting whatsoever about

2  the possibility of Mr. Austin being in communication with his

3  competitors?

4          MR. FELDBERG:  Asked and answered.

5          THE COURT:  Essentially.  Sustained.

6  BY MR. TORZILLI:

7  Q.  After the meeting concluded, Mr. Ledford, what was the next

8  step in the process?

9  A.  Typically speaking, we were trying to close things out and

10  get to a final price with Pilgrim's in this case to award

11  business.

12  Q.  And you said -- you used the term "close things out."  Can

13  you just explain a little more what you mean by that?

14  A.  Yes, come to an agreement with Pilgrim's on what their

15  prices were going to be on each item, volumes, and basically

16  get to a spot, an agreement, if you will, that both parties

17  could agree to and proceed with signing a contract accordingly.

18  Q.  In the late November time frame, so around the time that

19  the meeting we were just talking about occurred, where were you

20  in the process with competitors other than Pilgrim's Pride?

21  A.  We would have been in the same exact spot with the rest of

22  the suppliers.

23  Q.  And did there come a time where you did, in fact, close

24  things out and come to agreements with the suppliers?

25  A.  Yes.

Michael Ledford - Direct

1   Q.  And what would have been the way in which you formalized,

2   if at all, your agreements with the suppliers?

3   A.  Yes.  We had exhibits that was essentially our contract,

4   the way we contracted these negotiations out every year.  And

5   we would have drafted those up.  It would have included the

6   chicken-on-the-bone pricing model and then pricing for all the

7   further processed items that we spoke about yesterday.  And we

8   would have sent that to Pilgrim's.

9   Q.  Will you turn to Tab 21?  You should find an exhibit marked

10  as 1514.

11          Are you there?

12  A.  Yes.

13  Q.  Do you recognize 1514?

14  A.  Yes.

15  Q.  What is it?

16  A.  It is an e-mail to myself from Ric Blake dated

17  December 17th, 2012, attaching the 2013 SBRA agreement.

18  Q.  What's an SBRA agreement?

19  A.  It was essentially our contract.  It stood for I believe

20  Supplier Business Relationship Agreement.

21  Q.  Okay.  And will you now turn to Tab 22?

22          Do you recognize Government Exhibit 1515?

23  A.  Yes, I do.

24  Q.  What's Government Exhibit 1515?

25  A.  It is the eight-piece chicken-on-the-bone pricing model for

146
Michael Ledford - Direct

1    George's.

2    Q.  Is it signed by anyone from George's?

3    A.  Yes, it is.

4    Q.  Who signed it?

5    A.  Darrell Keck.

6    Q.  And is this the agreement between RSCS and George's that

7    was arrived at at the conclusion of the 2012 negotiation

8    process you were involved in?

9    A.  Yes.

10         MR. TORZILLI:  Your Honor, government moves to offer

11   1515 into evidence.

12         THE COURT:  Any objection to the admission of

13   Exhibit 1515?

14         Exhibit 1515 will be admitted.

15         MR. TORZILLI:  Thank you, Your Honor.

16         And permission to publish 1515?

17         THE COURT:  You may.

18         MR. TORZILLI:  Thank you.

19   BY MR. TORZILLI:

20   Q.  So on the screen is Page 1 of Government Exhibit 1515,

21   Mr. Ledford.  And can you just generally describe what this

22   page reflects?

23   A.  Yes.  This page generally reflects the pricing model to --

24   in line item detail to process a KFC eight-piece spec chicken

25   all the way from the live cost, chick cost, all the way through

Michael Ledford - Direct

1    to processing.  It's got their margin in there and a final

2    cost.

3    Q.  What's the final price in the agreement for eight-piece

4    COB?

5    A.  .9622.

6    Q.  Now, does this page have the price for dark meat?

7    A.  No, it does not.

8    Q.  Okay.  Where would the dark meat price be typically

9    reflected in an SBRA agreement?

10   A.  Typically it was on the summary sheet with all the other

11   supplemental parts.

12   Q.  Would you turn to page -- it's got Page No. 4 on the bottom

13   in the center.  At the top it says Exhibit 2.

14   A.  Okay.

15   Q.  What's Page 4, Exhibits 2?

16   A.  Exhibit 2 on Page 4 is the supplemental dark meat

17   chicken-on-the-bone price.

18   Q.  And what was the agreed to price for supplemental dark meat

19   in this contract?

20   A.  It is the eight-piece price less 30 cents per pound.

21   Q.  And can you remind us what that mean?

22   A.  Yes.  You take the eight-piece price on the previous page

23   of the .9622 and subtract 30 cents from that.

24   Q.  Thank you.

25              And you said that you had arrived at contracts with

Michael Ledford - Direct

1   all the suppliers; is that right?

2   A.  Yes.

3   Q.  Will you turn to Tab 23, please, where you should find

4   Government Exhibit 1552.

5            What this?

6   A.  This is the pricing model on Exhibit 1 of the contract from

7   Pilgrim's Pride.

8   Q.  Is this the contract that memorialized the agreement that

9   resulted from the negotiations we have been talking about?

10  A.  Yes.

11  Q.  Is it signed?

12  A.  Yes.

13  Q.  Who signed it?

14  A.  Jayson Penn.

15  Q.  On behalf of?

16  A.  Pilgrim's.

17  Q.  Is it signed by RSCS?

18  A.  Yes.

19  Q.  Who signed it?

20  A.  I did.

21          MR. TORZILLI:  Your Honor, government offers 1552.

22          THE COURT:  Any objection to the admission --

23          MR. FELDBERG:  No objection from us, Your Honor.

24          THE COURT:  Anyone else?

25          All right.  1552 will be admitted.

Michael Ledford - Direct

1        MR. TORZILLI:  Thank you, Your Honor.

2        Permission to publish the first page of 1552?

3        THE COURT:  You may.

4   BY MR. TORZILLI:

5   Q.  Sir, can you direct us to where the eight-piece -- the

6   bottom line eight-piece price is on this contract?

7   A.  Yes.  It's the last line that says .9703.

8   Q.  And then if you can turn to again Page 4, Exhibit 2 of this

9   contract.

10  A.  Okay.

11  Q.  Is this the supplemental dark meat exhibit?

12  A.  Yes, it is.

13  Q.  And what's the agreed to price?

14  A.  Eight-piece price less 30 cents per pound.

15  Q.  And but the total price for Pilgrim's Pride bottom line for

16  dark meat is different is it fair to say than the previous

17  contract because the eight-piece prices are different?

18  A.  Yes.

19  Q.  So even if they -- if a price is both .30 back, that's only

20  one aspect of the total dark meat price; is that fair to say?

21  A.  That's correct.

22        MR. TORZILLI:  One moment, Your Honor.

23        THE COURT:  Sure.

24        MR. TORZILLI:  I would like with the assistance of

25  Ms. Grimm to hand to the witness another exhibit.

150

Michael Ledford - Direct

1          *THE COURT:*  You may.

2     *BY MR. TORZILLI:*

3     *Q.*  Have you had a chance to look at what's been marked as

4     Government Exhibit 1503?

5     *A.*  Yes.

6     *Q.*  What's 1503?

7     *A.*  It is the eight-piece pricing model for Claxton Poultry.

8     *Q.*  Is this the agreement that resulted from the negotiations

9     that we've been discussing?

10    *A.*  Yes.

11    *Q.*  Is it signed?

12    *A.*  Yes.

13    *Q.*  Who signed it?

14    *A.*  Scott Brady.

15    *Q.*  On behalf of?

16    *A.*  Claxton Poultry.

17    *Q.*  And who signed it on behalf of UFPC?

18    *A.*  I did.

19    *Q.*  And can you remind us what UFPC is?

20    *A.*  Unified Food Service Purchasing Co-op, the co-op for Yum

21    Brands that later changed the name to RSCS.

22          *MR. TORZILLI:*  The government offers 1503 into

23    evidence.

24          *THE COURT:*  Any objection to the admission of Exhibit

25    1503?

Michael Ledford - Direct

1       *MR. LAVINE:*  No objection, Your Honor.

2       *THE COURT:*  Exhibit 1503 will be admitted.

3       *MR. TORZILLI:*  Thank you.

4       Permission to publish 1503?

5       *THE COURT:*  You may.

6  *BY MR. TORZILLI:*

7  *Q.*  Sir, what's the eight-piece price that was agreed to

8  between RSCS or UFPC and Claxton for eight-piece chicken on the

9  bone?

10  *A.*  .9625.

11  *Q.*  And if you can again turn to Exhibit 2, which is on Page 4

12  of the Exhibit 1503.

13  *A.*  Okay.

14  *Q.*  What is this?

15  *A.*  It is the supplemental dark meat pricing.

16  *Q.*  And what is the agreed to supplemental dark meat price for

17  Claxton?

18  *A.*  It is the eight-piece price less 30 and a half cents per

19  pound.

20  *Q.*  That's the .3050 stands for 30 and a half cents?

21  *A.*  Yes.

22  *Q.*  Mr. Ledford, I would like to switch gears a little bit and

23  talk to you about an organization called AgriStats.  Are you

24  familiar with that organization?

25  *A.*  Yes, I am.

152

Michael Ledford - Direct

1   Q.   What is AgriStats?

2   A.   AgriStats is a third-party benchmarking organization that's

3   used in the poultry industry.

4   Q.   Do you have an understanding of what benchmarking

5   information AgriStats provides?

6   A.   Yes.

7   Q.   What's your basis for your understanding about what

8   benchmarking information AgriStats provides?

9   A.   Generally speaking, they provide -- I am going to date

10   myself here -- in my time it was books.  I am sure it's

11   probably electronic now.  They had a book for live operations

12   benchmarking, production or operations benchmarking, and then

13   sales, there was a sales book for sales benchmarking.

14   Q.   You said you are dating yourself.  So can you just explain

15   the basis of your understanding of what information AgriStats

16   has or provides?

17   A.   Yes.  In my time period on working for a couple different

18   of the fully integrated poultry suppliers in the early part of

19   my career from 1995 or so to 2006, early 2007, I certainly

20   received AgriStats books as part of my job then, but I have not

21   looked at any AgriStats information since probably early 2007.

22   Q.   So for the past 14 years or so you haven't had access to

23   that information?

24   A.   That's correct.

25   Q.   You mentioned a sales book.  Can you describe based on your

Michael Ledford - Direct

1  understanding what a sales book is?

2  A.  Yes.  It was a big thick book that basically had every

3  product that is sold in the chicken industry in it.  They were

4  also divided amongst bird size or bird type; retail bird, which

5  is a medium size chicken; small bird, there was a small bird

6  book for the chickens that were in that 4-pound range that we

7  talked about before and so on.  And it sort of ranked each

8  processing facility by where they were in the scheme of things

9  on price for each item individually.

10 Q.  Did you have an understanding of where the price

11 information for each item was derived from?

12 A.  Yes.

13        MR. BELLER:  Your Honor, I am going to object to this

14 ongoing line of questioning given the testimony that this

15 witness has not looked at or accessed the information in 14

16 years as to why it's relevant to the jury's determination.

17        THE COURT:  Response?

18        MR. TORZILLI:  I think AgriStats has come up in the

19 trial.  This is an individual who has some personal knowledge,

20 albeit back to 2007 which can certainly be a topic for

21 cross-examination, but he has personal knowledge that's

22 relevant to not only clarifying the previous cross-examination,

23 but also providing the jury, I think, with some understanding

24 of what we're talking about.

25        THE COURT:  Sustained.  His information is limited to

154

Michael Ledford - Direct

1  just as recently as 2007.

2  *BY MR. TORZILLI:*

3  *Q.* Sir, let me ask you about -- thank you, Your Honor.

4      Let me ask you about an organization called Express

5  Markets. Are you familiar with them?

6  *A.* Yes, I am.

7  *Q.* What do you understand Express Markets to be?

8  *A.* Express Markets is a sister company or subsidiary of

9  AgriStats that quotes -- fairly similar to Urner-Barry, they

10  are a quoted market of actual spot load transactions of various

11  products in the chicken industry.

12  *Q.* What's your basis for your understanding of what

13  information Express Markets has available?

14  *A.* I have subscribed to their services since at least 2007 and

15  continue to this day.

16  *Q.* So you're a current subscriber of Express Markets.

17  *A.* Yes.

18  *Q.* For the information that Express Markets provides, what do

19  you understand or from where is the information coming from, to

20  the best of your understanding?

21      *MR. BELLER:* Objection, foundation, hearsay,

22  relevance.

23      *THE COURT:* Overruled.

24  *A.* It's my understanding that it's reported from actual

25  invoice transactions from the poultry suppliers.

155

Michael Ledford - Direct

1    *BY MR. TORZILLI:*

2    Q.  So just so I understand your previous answer, who is

3    submitting the information to Express Markets?

4    A.  The poultry suppliers.

5    Q.  And do you know what type of sales are included in the

6    Express Markets reports?

7    A.  It's my understanding that it is what we would refer to as

8    spot products and not contracted stuff they are selling on the

9    open market that's not already previously committed to.

10   Q.  Okay.  So the transactions that are occurring are not

11   occurring, at least for the reported information, not occurring

12   pursuant to a contract that's in place.

13   A.  That's my understanding.

14   Q.  To the best of your knowledge, does Express Markets provide

15   information, any information about contract prices?

16   A.  No, that is not my understanding.

17   Q.  And to the best of your understanding, does Express Markets

18   provide any information about bids or pricing proposals?

19   A.  No.

20   Q.  I want to ask you about a term sometimes referred to or a

21   term called covering shortages.  Is that a term you are

22   familiar with?

23   A.  Yes.

24   Q.  Can you explain what your understanding of the term

25   covering shortages is?

Michael Ledford - Direct

1    *A.*  Yes.  In particular on fresh chicken on the bone, there

2    comes times from time to time where a processor late in the day

3    if the birds come in lighter than they are expecting or at any

4    weight higher or lower than they are expecting, they could find

5    themselves short on those orders since all of this product is

6    being shipped fresh.  And if they are short, covering shorts

7    would mean covering product from another supplier to cover

8    their shortages.

9    *Q.*  How frequently -- in your experience at RSCS, how

10   frequently did covering shortages occur?

11   *A.*  It's fairly frequent.

12   *Q.*  Okay.  And can you describe your understanding of what was

13   involved in the process of covering shortages?

14   *A.*  Well, really the way I looked at it, there was two

15   different ways it could be handled.  The first way, if it was

16   something that what I would call not systemic that wasn't going

17   to be a recurring thing, it was just sort of things didn't work

18   out that way, the way they anticipated, my expectation and my

19   understanding was that they were handling that themselves.

20   Whether that meant switching from an internal plant and order

21   from one of their existing plants to one of their other plants

22   or getting with one of the other suppliers and having them

23   cover that PO for them or actually even potentially buying that

24   product for them.  That would be the first scenario.

25           The second scenario, if it was something where one of

Michael Ledford - Direct

1    the suppliers every Friday was going to be short two or three

2    loads, then we would want to get involved at RSCS to correct

3    that issue so we weren't fighting a supply issue on every

4    Friday afternoon in this example.  And then we would give that

5    volume to another supplier and take it away from the supplier

6    who was having trouble with the shorts.

7    Q.  Thank you.  And just to be clear, then, the process of

8    covering shortages involved communications directly between the

9    suppliers; is that right?

10   A.  Yes.

11   Q.  And you were aware that that was going on at your time at

12   RSCS?

13   A.  Yes.

14   Q.  Were you okay with that?

15   A.  Yes, I was.

16   Q.  Why were you okay with that?

17   A.  I was okay with it because we were shipping at my time

18   there roughly call it 300 truckloads of fresh chicken on the

19   bone a week.  I certainly could not get involved in every

20   single load on all 300.  I had a day job, so to speak.  And

21   again if it was not something that was going to be systemic

22   that was going to be happening every week, I was fine with them

23   covering that so that was one less thing that we had to worry

24   about.

25   Q.  Was at least to the best of your understanding, though, was

Michael Ledford - Direct

1    covering shortages a way for competing suppliers to learn info

2    about each other's prices?

3    A.   Possibly.

4    Q.   Why do you say possibly?

5    A.   I didn't really get involved in it, so I -- you know, I

6    certainly didn't dictate to them if they needed to buy the

7    product from another supplier at what they had contracted to us

8    or if it was going to be another price, so for that reason I

9    say possibly.

10   Q.   You said a few moments ago that shortages were -- I think

11   you said fairly frequent.

12   A.   Yes.   It wasn't uncommon.

13   Q.   Can you specify a little bit more about what you mean by

14   fairly frequent, like daily, monthly, weekly?

15        MR. TUBACH:   Your Honor, lacks foundation to the

16   extent the witness just testified that he expected them to

17   resolve it themselves.

18        THE COURT:   Overruled.

19   A.   You know, it would be hard for me to put a number on it,

20   but maybe the best way for me to describe it is weather events.

21   You know, if it was really cold, if you had you an ice storm,

22   or if it was super hot, sort of a weather event on either end

23   of the spectrum or anything that would cause those chickens not

24   to put on their weight that you would anticipate them to put on

25   in the natural growing condition or if there was some sort of

Michael Ledford - Direct

1   an outbreak of an illness.  It would really be hard for me to

2   put a number on it, but again I tried not to be involved in

3   those that were caused from that manner, but I would say that

4   it wasn't uncommon.

5   *BY MR. TORZILLI:*

6   *Q.*  Okay.  Did you, Mr. Ledford, expect that the suppliers

7   would use any information they obtained about their

8   competitors' pricing through covering shortages to use that

9   information in their bids or negotiations with RSCS?

10        *MR. BELLER:*  I am going to object to the relevance of

11  that.  That's not a determination as to whether or not that

12  conduct is legal, only what his anticipation is, and therefore

13  it's not relevant.

14        *THE COURT:*  Overruled.

15  *BY MR. TORZILLI:*

16  *Q.*  You can answer.

17  *A.*  I am sorry, could you ask the question again?

18  *Q.*  Yes, sir.  Did you expect the suppliers to use any

19  information about their competitors' prices that they gained in

20  covering shortages, to use that in their negotiations, bids or

21  pricing proposals to RSCS?

22        *MS. HENRY:*  Objection, lack of foundation.  He hasn't

23  testified he had any expectation.

24        *THE COURT:*  Overruled.  He can answer.

25  *A.*  I don't think that that was my expectation.

Michael Ledford - Direct

1   *BY MR. TORZILLI:*

2   *Q.*  Why not?

3   *A.*  I mean, really, so there is things that go into place.  So

4   you negotiate a price, and then there is variables within that

5   price throughout the year that can change.  For instance, we

6   took positions, commodity hedging positions, if you will, on

7   the corn and the soybean meal that are used to grow the

8   chickens.  We were such a big buyer of those, when we would

9   take a position, we could move the market on the Chicago Board

10  of Trade for corn pricing.  So when we executed those, for

11  instance, the first supplier to execute on those purchases

12  would get the price we asked them to.  By the time you got to

13  the seventh supplier, typically speaking their grain price was

14  going to be higher than the first guy that locked it in.  And

15  there was factors like that that would change throughout the

16  year that wouldn't necessarily be apples to apples for what you

17  negotiated on the bid cycle.

18  *Q.*  So is it fair to say any information obtained in covering

19  shortages might not be meaningful for purposes of a bidding or

20  negotiation process for RSCS?

21          *MR. FAGG:*  Objection, leading.

22          *THE COURT:*  Sustained.

23  *BY MR. TORZILLI:*

24  *Q.*  Sir, I would like to now ask you about a little different

25  situation.  Were there any times when you were at RSCS where

Michael Ledford - Direct

1   you provided feedback to suppliers about their bids and that

2   you provided them information to four decimal places?

3   A.   Yes.

4   Q.   How frequently did that occur?

5   A.   I think that happened fairly frequently.

6   Q.   Could you describe the circumstances under which you would

7   provide feedback to four decimal places to suppliers in the

8   bidding and negotiation process?

9   A.   You know, I can remember an example of giving a supplier a

10  feedback where they were essentially very close to the same

11  price as my highest price bid, so I would give them feedback.

12  For instance, you are .000X from my highest price supplier

13  meaning that in essence you are the highest price.   And

14  typically speaking, the guy that was the highest price bid was

15  at risk of losing business or losing volume for that next year.

16  Q.   What was the purpose of providing the type of feedback that

17  you just described?

18  A.   To have that supplier lower their price.

19  Q.   You were trying to get a lower price?

20  A.   Yes.

21  Q.   Could you turn to Tab 15 of your binder?   You should find

22  Exhibit 9004.

23  A.   Okay.

24  Q.   Do you recognize 9004?

25  A.   Yes, I do.

Michael Ledford - Direct

1  Q.  What is it?

2  A.  It is an e-mail from myself to Scott Brady dated

3  October 1st, 2013.

4  Q.  Thank you.  I will stop you there.

5        And is the e-mail contained in Government Exhibit 9004

6  an example of the circumstances you were just describing?

7  A.  Yes, it is.

8        MR. TORZILLI:  Your Honor, move to admit 9004 into

9  evidence.

10        THE COURT:  Any objection to the admission of

11  Exhibit 9004?

12        That exhibit will be admitted.

13        MR. TORZILLI:  Thank you, Your Honor.

14        Permission to publish 9004?

15        THE COURT:  You may.

16  BY MR. TORZILLI:

17  Q.  If we can focus on the very top e-mail.  I am sorry,

18  actually the top e-mail and the middle e-mail.

19        Sir, if we can start by discussing the e-mail that

20  appeared the second one in the sequence or the one from Scott

21  Brady.  And if you can describe what the situation underlying

22  that e-mail is.

23  A.  Scott sent me either cost-plus model for the

24  chicken-on-the-bone eight-piece and is asking me how it looks,

25  so he is requesting my feedback.

Michael Ledford - Direct

1    Q.  And in -- what's the situation here?  What's the -- at what

2    point in the process is this e-mail emerging?

3    A.  This would have been in a bid submittal.  Judging by the

4    date, my assumption is it would be like a first round bid.

5    Q.  And then you responded to Mr. Brady's e-mail.  That's the

6    top e-mail in 9004.  Is that fair to say?

7    A.  Yes.

8    Q.  And can you summarize what you were conveying do Mr. Brady?

9    A.  I was conveying to him that at those prices he would be my

10   second highest price supplier by very tight margins.

11   Q.  And then you have at the very end of your message a

12   sentence in parenthesis.  Do you see that?

13   A.  Yes.

14   Q.  Will you please read that aloud?

15   A.  "(I take business away from the highest every chance I

16   get.)"

17   Q.  And what did you mean by highest?

18   A.  Highest price.

19   Q.  And where was Claxton at the time?  What was Claxton ranked

20   at the time that you were writing this e-mail?

21   A.  They were the second to the highest.

22   Q.  So what was the implication that you were trying to -- what

23   was the message you were trying to deliver to Mr. Brady here?

24   A.  If they kept that price, that they would more than likely

25   lose volume.

Michael Ledford - Direct

1   Q.   Now, this is an example where Claxton is at or near the

2   highest price supplier.  Did you ever provide this type of

3   feedback to someone who was the lowest bidder or the lowest

4   price supplier?

5   A.   No.  Theirs would have looked different than this one.

6   Q.   Why would it have been different?

7   A.   I don't take volume away from the lowest price supplier.  I

8   try to get as much volume from the lowest price supplier as I

9   can.

10  Q.   You don't mention in here -- well, let me ask you, do you

11  mention who the supplier is that is the highest, the one

12  supplier that was higher than Claxton at the time?

13  A.   No, I do not.

14  Q.   Was it ever your typical practice to tell one supplier the

15  identity of another supplier when giving the type of feedback

16  like what we're looking at here in 9004?

17  A.   No, it was not.

18  Q.   Why not?

19  A.   It was not necessary.

20  Q.   Why wasn't it necessary?

21  A.   I'm just trying to convey to them the pricing in relation

22  to the price.  It really is -- there is no relevance to who

23  that supplier is.

24  Q.   Mr. Ledford, did there come a time in 2013 where you asked

25  some chicken suppliers what it would take to supply KFC with

Michael Ledford - Direct

1  2-pound, 4-ounce bids that was then current volume?

2  A.  Yes.

3  Q.  Can you tell us the background or what caused you to arrive

4  at that request?

5  A.  Yes.  In essence, it was a cost savings initiative.  KFC

6  buys -- or in my time there they bought a 2-pound, 8-ounce

7  target chicken for their fried chicken.  And the question of

8  asking the suppliers could they provide us with a 2-pound,

9  4-ounce chicken, so it's a little bit smaller chicken and when

10  you are buying by the pound and paying by the piece, it's sort

11  of an indirect way potentially to get after a cost savings.

12  And theoretically if the price was the same per pound, but the

13  piece size is smaller, it's kind of an indirect way to get at a

14  cost savings.

15  Q.  Whose idea was it to approach the suppliers with this

16  request?

17  A.  To the best of my memory, I think it was the consultants.

18  Q.  And remind us what consultant that was.

19  A.  PriceWaterhouseCoopers.

20  Q.  Take a look, please, at Tab 13.  You should find government

21  Exhibit 1607.

22  A.  Okay.

23  Q.  What's this?

24  A.  At the top it's an e-mail from Roger Austin to myself.

25  Q.  And what's at the bottom?

Michael Ledford - Direct

1   *A.*  At the bottom is an e-mail from myself to Roger Austin

2   requesting information on that 2-pound, 4-ounce ask.

3   *Q.*  So the e-mails, is it fair to say the e-mails appearing in

4   1607 relate to your request about what it would take for in

5   this case Pilgrim's Pride to supply KFC with a 2-pound, 4-ounce

6   chicken?

7   *A.*  Yes.

8   *Q.*  And it contains Mr. Austin's reply to you?

9   *A.*  Yes, it does.

10  *Q.*  And then subsequent discussion?

11  *A.*  Yes.

12        *MR. TORZILLI:*  Your Honor, government moves 1607 into

13  evidence.

14        *THE COURT:*  Any objection to the admission of

15  Exhibit 1607?

16        *MR. FELDBERG:*  No, Your Honor.

17        *THE COURT:*  Exhibit 1607 will be admitted.

18        *MR. TORZILLI:*  Thank you.  Your Honor.

19        Permission to publish?

20        *THE COURT:*  You may.

21  *BY MR. TORZILLI:*

22  *Q.*  If we can look at the very first e-mail in this sequence,

23  Mr. Ledford, the e-mail from you.

24        First, could you summarize what you're communicating

25  to Mr. Austin and -- well, who did you send this e-mail to?

167

Michael Ledford - Direct

1    A.   Yes, I sent it to Roger Austin.

2    Q.   Did you send it to anyone else?

3    A.   Scott Tucker is also copied on the e-mail.

4    Q.   What, if any, role did Scott Tucker have around the time of

5    this e-mail with respect to the RSCS account?

6    A.   Scott was sort of a junior member of Roger Austin's sales

7    team.

8    Q.   And could you summarize what you were conveying to

9    Mr. Austin and Mr. Tucker here?

10   A.   Yes.  I was asking them to update a spreadsheet that I had

11   attached to the e-mail that had various different bird sizes

12   and asked them to fill out how much volume they could do in

13   those size ranges for KFC if we were to move our specifications

14   to those different weights.

15   Q.   Okay.  And what was your request with respect to the

16   2-pound, 4-ounce chicken?

17   A.   Basically I was asking them what it would take for their

18   company to supply KFC with a 2-pound, 4-ounce chicken and what

19   the quantities would be in that size range.

20   Q.   And what did you mean by what would it take?

21   A.   So really knowing what I already knew about the industry

22   and the bell curve of a 4-pound live weight chicken, I knew

23   there wasn't a lot of volume there at that current moment

24   because it was on the far left tail end of the curve where

25   you've got very minimal supply.

168

Michael Ledford - Direct

1    Q.  Can you explain what you mean by bell curve for a 4-pound

2    chicken?

3    A.  Yes.  So not all chickens -- a chicken is a live animal.

4    They target, for instance, a 4-pound live weight, but in

5    essence 50 percent of the chickens are going to be smaller than

6    4 pounds, 50 percent are going to be higher.  As you get out on

7    the edges of that bell curve or that histogram, the volumes get

8    lesser and lesser as the bell curve comes down.

9          So when you are asking for a 2-pound, 4-ounce, you are

10   getting into those chickens that are on the really far

11   left-hand side or the smallest side of that bell curve of that

12   target 4-pound chicken, and there is just not a lot of volume

13   there.

14   Q.  I would like to ask you about the last sentence of the

15   first paragraph of your message.  It starts with, "When you get

16   up"?

17   A.  Yes.

18   Q.  Could you read that sentence aloud, please?

19   A.  "When you get up off the floor from laughing, yes I am

20   seriously asking."

21   Q.  What do you mean by that?

22   A.  I was conveying to them that I already knew -- I didn't

23   want them to come back with the standard, No, there is nothing

24   there, Mike.  You know this.  You know enough about the bell

25   curve of a 4-pound chicken.

1    I wanted them to take it seriously and really look at

2  if KFC were to change their spec, what would their company do

3  in order to supply us with chickens.  Did that mean they were

4  going to target a 3-1/2 pound chicken?  And I would assume that

5  would come with some additional cost.  I was looking for some

6  concrete answers to if we did this, what would it take.  And I

7  didn't want them to just give me a fast, No, we don't have

8  anything in that size range.

9  Q.  Did you send the same or similar request to chicken

10  suppliers besides Pilgrim's?

11  A.  Yes.

12  Q.  Which chicken suppliers?  Which other chicken suppliers did

13  you send this request to?

14  A.  I sent it to every supplier who did eight-piece chicken for

15  KFC.

16  Q.  Did that include Claxton?

17  A.  Yes.

18  Q.  Could you turn to Tab 14?  And you should find

19  Exhibit 1601.

20  A.  Okay.

21  Q.  What is this?

22  A.  It is a similar e-mail chain between myself and Scott Brady

23  regarding what Claxton's data was on that 2-pound, 4-ounce

24  chicken.

25  Q.  Is this the same or similar request but at this time being

Michael Ledford - Direct

1   posed to Claxton?

2   *A.*  Yes, it was.

3   *Q.*  And here did you include anyone besides Mr. Brady in your

4   original request?

5   *A.*  Yes.

6   *Q.*  Who was that?

7   *A.*  Mikell Fries.

8          *MR. TORZILLI:*  At this time the government moves 1601

9   into evidence.

10          *THE COURT:*  Any objection to the admission of

11  Exhibit 1601?

12          *MR. FELDBERG:*  No, Your Honor.

13          *THE COURT:*  1601 will be admitted.

14          *MR. TORZILLI:*  Permission to publish?

15          *THE COURT:*  You may.

16  *BY MR. TORZILLI:*

17  *Q.*  So again here, Mr. Ledford, in your message you ask the

18  same "what would it take" question and the same "when you get

19  up off the floor laughing" statement; is that right?

20  *A.*  Yes.

21  *Q.*  And were those two, that question and that "get off the

22  floor laughing" statement, was that provided to all the chicken

23  suppliers?

24  *A.*  Yes, I believe so.

25  *Q.*  Did you ask any of the chicken suppliers to communicate

Michael Ledford - Direct

1    with one another about the request that we just looked at?

2    A.   No.

3    Q.   Okay.  Did you -- did anyone ever -- did any of the chicken

4    suppliers ever tell you that they were communicating about

5    their request?

6    A.   No.

7    Q.   So in particular, did Roger Austin or Scott Brady ever tell

8    you they were in communication with each other about your

9    request?

10   A.   No.

11   Q.   Would you have expected them to be in communication with

12   each other about your request?

13   A.   No.

14   Q.   Why not?

15   A.   I think the information I was looking for was specific to

16   each company.  So, for instance, what Pilgrim's had in a

17   2-pound, 4-ounce bid and their availability to do that in my

18   belief is it would have been different than what another

19   supplier would have wanted.  So I would not have thought -- it

20   would not have been my expectation that they would have talked

21   about it.

22   Q.   In your view, would it have been appropriate for them to be

23   communicating about that?

24          MR. FELDBERG:  Objection, that's irrelevant.

25          THE COURT:  I am going to sustain the objection.

Michael Ledford - Direct

1    *BY MR. TORZILLI:*

2    *Q.*   Sir, was there a time when KFC was considering launching a

3    boneless product that resembled its traditional bone-in

4    product?

5    *A.*   Yes.

6    *Q.*   Do you know -- do you recall the approximate time frame

7    that consideration was being undertaken?

8    *A.*   To the best of my memory, it was around 2013.

9    *Q.*   And were there -- was there a supplier that RSCS was

10   working with to get that product launched?

11   *A.*   Yes.

12   *Q.*   What supplier was that?

13   *A.*   We worked with Tyson to launch that product.

14   *Q.*   And did there come a time when RSCS attempted to bring any

15   other suppliers onboard for that product launch?

16   *A.*   Yes.

17   *Q.*   What supplier was that?

18   *A.*   Pilgrim's.

19   *Q.*   And were you dealing with -- was RSCS dealing with anyone

20   in particular at Pilgrim's on getting Pilgrim's to be part of

21   that product?

22   *A.*   Yes.

23   *Q.*   What person?

24   *A.*   Roger Austin.

25   *Q.*   And could you summarize the nature of the discussions that

Michael Ledford - Direct

1   occurred between you and Mr. Austin about the launch of that --

2   or Pilgrim's participation in the launch of that product?

3   A.   Yes.   We were talking about pricing and discussions around

4   some of the assumptions they were making on what the price

5   should be.   We were also providing them feedback on what our

6   expectation would have been for that price.

7   Q.   And what were the results of the discussions that you were

8   having with Pilgrim's in terms of Pilgrim's participation in

9   that product?

10  A.   To the best of my memory, I do not think that we ever

11  closed a deal with Pilgrim's to produce that product.

12  Q.   If you could turn to I believe it's Tab 59 of your binder.

13  You should find a document marked as 1707.

14  A.   Okay.

15  Q.   What's 1707?

16  A.   It is an e-mail from myself to Roger Austin.

17  Q.   What's the subject?

18  A.   Boneless Cost.

19  Q.   And actually, let me -- I am sorry I didn't ask this

20  sooner.   Is the top portion of the document that you have in

21  front of you redacted?

22  A.   Yes.

23  Q.   So do you have what's been marked as 1707-1?

24  A.   Yes.

25          MR. TORZILLI:   So just for the record, 1707-1 is a

1   redacted version of 1707 redacted to exclude the top e-mail.

2          THE COURT:  All right.

3   BY MR. TORZILLI:

4   Q.  Okay, sir.  What is the topic of the e-mails that you see

5   in the exhibit in front of you?

6   A.  Boneless Cost.

7   Q.  And what -- does it relate to a product?

8   A.  Yes.

9   Q.  Does it relate to the product that -- the boneless product

10  that we were just talking about?

11  A.  Yes, it does.

12         MR. TORZILLI:  Your Honor, move to admit 1707 as

13  redacted.

14         THE COURT:  In other words, 1707-1?

15         MR. TORZILLI:  Yes, sir.

16         Any objection to the admission of 1707-1?

17         MR. FAGG:  Yes, Your Honor.  It's hearsay.

18         THE COURT:  Any additional objections?

19         That objection will be overruled.  Exhibit 1701-1 will

20  be admitted.

21         MR. TORZILLI:  Permission to publish?

22         THE COURT:  You may.

23  BY MR. TORZILLI:

24  Q.  Mr. Ledford, first focusing on the initial e-mail in the

25  chain, who wrote that?

Michael Ledford - Direct

1   *A.* When you say initial, you mean the one at the bottom?

2   *Q.* The one at the bottom.

3   *A.* Roger Austin wrote that.

4   *Q.* Could you summarize what you understand him to be conveying

5   to you?

6   *A.* Yes. He is conveying to me the prices that Pilgrim's would

7   be able to sell that boneless product to KFC for.

8   *Q.* Would it be fair to consider that information to be a bid?

9   *A.* Yes.

10          *MR. TUBACH:* Can we have a brief side bar?

11          *THE COURT:* We may.

12      (At the bench:)

13          *THE COURT:* Mr. Tubach, go ahead.

14      *MS. HENRY:* If Mr. Torzilli could move away from the

15   mic, it would be a good idea.

16          *MR. TORZILLI:* We did turn the mic off, but I will

17   move away anyway.

18          *THE COURT:* Good thing to move away in case people

19   forget to turn off the mic.

20          *MR. TUBACH:* Your Honor, this is an entirely different

21   incident than anything we have been given notice of that the

22   government intends to offer. I don't believe this document was

23   on the *James* log and I don't believe the government -- in fact,

24   the government I believe withdrew this document as an exhibit

25   they were going to intend to show this witness, so this seems

Michael Ledford - Direct

1    outside the scope of the indictment.  It's mentioned nowhere in

2    the indictment and the government didn't provide us with notice

3    that this was the kind of -- this was the incident they were

4    intending to prove was conspiratorial.  If they are not

5    intending to prove it's conspiratorial, then it's irrelevant.

6          THE COURT:  Response, Mr. Torzilli?

7          MR. TORZILLI:  We certainly did not withdraw it in any

8    way as to use with this witness.  We added it relatively

9    recently.  I do have a couple more questions on it, but can

10   very quickly move on.  And just to be clear, we have not

11   alleged in any way, shape or form that this is an instance of

12   a -- a stand-alone instance of collusion amongst competitors,

13   but are interested in providing this information because it

14   related to the circumstances that RSCS was dealing with chicken

15   suppliers and in particular in this case Pilgrim's in the

16   February 2013 time frame.

17         MR. TUBACH:  Your Honor, it's not related to any

18   conspiracy the government is trying to prove.  It's totally

19   irrelevant.  I don't see what the relevance of this entire line

20   of inquiry is.

21         THE COURT:  Mr. Torzilli, could you be a little more

22   specific in terms of what relevance 1707 has?

23         MR. TORZILLI:  Sure.  This is the February 2013 time

24   frame, the time frame when we just looked at a very direct,

25   very explicit conspiratorial action between Mr. Austin and

Michael Ledford - Direct

1    Mr. Brady occurred with respect to the reduced weight product.

2    And what I am interested in showing is what at or around the

3    same time was occurring with respect to negotiations on another

4    product, this negotiation occurring between these same people,

5    Mr. Ledford and Mr. Austin.

6          MR. TUBACH:  Your Honor, the incident is after this

7    e-mail.  It's a month later.  There is zero relevance to

8    anything the government is trying to prove here.

9          MR. FELDBERG:  There was zero evidence of any

10   collusive behavior between Mr. Austin and Mr. Brady with

11   respect to the request for reduced rate chicken.

12         MR. TORZILLI:  I have to disagree with that.

13         MR. LAVINE:  This is Bryan Lavine.  I have to agree

14   with Mr. Feldberg on this.  There was no evidence at all there

15   was any conspiratorial action between Mr. Austin and Mr. Brady.

16   In fact, I think the witness said he was expecting each

17   supplier to provide their own information because each supplier

18   was totally different.  There is nothing in that record that

19   shows any type of conspiratorial action between Mr. Brady and

20   Mr. Austin.

21         THE COURT:  Mr. Torzilli, anything else?

22         MR. TORZILLI:  Nothing further from the government.

23         THE COURT:  Okay.  So Mr. Tubach, you're then

24   objecting -- I can't remember.  Was 1707 offered?

25         MR. TUBACH:  It was not offered yet.  He is showing it

Michael Ledford - Direct

1    to the witness.  We object to the admission of 1707 and we

2    object to this entire line of inquiry relating to boneless

3    chicken.

4         THE COURT:  So there is an objection to the question

5    on the grounds of?

6         MR. TUBACH:  Relevance.

7         MR. TORZILLI:  Your Honor, if I may, just to clarify

8    the record, I think the last question was --

9         THE COURT:  Mr. Torzilli, if you can keep your voice

10   down just a little bit.

11        MR. TORZILLI:  Your Honor, I was offering 1707-1 into

12   evidence which drew the objections that initiated the side bar.

13        THE COURT:  Yeah, I can't remember.  So -- hold on one

14   second.  So had 1701 been offered then?  Okay, Mr. Feldberg is

15   indicating yes.  I will assume that that is true.  So the

16   objection to Exhibit 1707-1 is relevance.  And someone else

17   wanted to make a point?  I am not sure.

18        MS. PREWITT:  Elizabeth Prewitt for Mr. Mulrenin.  I

19   object on a 403 basis here if you look at the content of the

20   e-mail.

21        MR. TUBACH:  Just to amplify that a little bit, here

22   is Mr. Ledford saying how disappointed he is in the pricing

23   Pilgrim's is offering.  The only reason to do that is trying to

24   paint Pilgrim's in a bad light, and particularly Mr. Austin.

25   And Mr. Torzilli has conceded now he is not trying to say there

Michael Ledford - Direct

1  is anything conspiratorial going on here, so he is trying to

2  make us look bad.

3          THE COURT:  Without ruling on the 403 objection, I do

4  find that the government has failed to establish the relevancy

5  of this.  That objection will be sustained.  Thank you.

6          MR. TUBACH:  One final thing.  I believe 1707-1 might

7  have been admitted over our objection.  We would ask that the

8  Court instruct the jury that it's not admitted any way the

9  Court wants to.

10          THE COURT:  Yeah.  Mr. Torzilli, do you agree it was

11  admitted?  I lost track of it.

12          MR. TORZILLI:  I thought you said it was admitted and

13  then the objections came and then we had the side bar.

14          THE COURT:  Okay.  Normally once I have admitted

15  something it's admitted, but in this instance I will change my

16  mind on that.  But I would caution the defendants that if you

17  object late, it's probably in the future going to always be in.

18          All right.  Thank you.

19      (In open court:)

20          THE COURT:  Ladies and gentlemen, that will be

21  sustained and 1707-1 which I admitted is going to be refused at

22  this time.

23  BY MR. TORZILLI:

24  Q.  Mr. Ledford, you indicated yesterday that you left RSCS in

25  approximately May of 2014; is that correct?

180

Michael Ledford - Direct

1   A.  Yes, that's correct.

2   Q.  When did you start at Chick-fil-A?

3   A.  Three weeks later, towards the end of May of 2014.

4   Q.  Did there come a time when you learned what Chick-fil-A's

5   strategy was towards negotiating with chicken suppliers?

6   A.  Yes.

7   Q.  Could you summarize what that strategy was?

8   A.  Yes.  In general terms at Chick-fil-A we are not looking

9   for the lowest price.  We would call it more of we are looking

10  for a fair price with the chicken suppliers.  We want a price

11  that they can make a healthy margin at, that we can make a

12  healthy margin.  And that way they want to do business with us.

13  It's not an adversarial relationship.  And that way they'll

14  want to grow with us as well.

15  Q.  How, if at all, did the strategy that Chick-fil-A was

16  employing in its negotiations with chicken suppliers differ

17  from the strategy that you had undertaken at RSCS?

18  A.  At RSCS price was, you know, the -- a very big

19  consideration and at Chick-fil-A it wasn't as important as it

20  was at RSCS.

21          MR. TORZILLI:  May I have a moment to confer, Your

22  Honor?

23          THE COURT:  You may.

24          MR. TORZILLI:  Thank you, Your Honor.

25  BY MR. TORZILLI:

Michael Ledford - Direct

1    Q.  When you were leaving RSCS, what was the supply situation

2    like for KFC restaurants to the best of your knowledge?

3    A.  Yes.  We were approaching Mother's Day weekend that week.

4    And Mother's Day was always -- at least it was when I was

5    there, Mother's Day week is always the single largest week of

6    sales for KFC.  Typically speaking, their volume would increase

7    roughly 25 percent week over week of any other week for that

8    week of Mother's Day.  So that was going on, but there was also

9    a very tight supply situation with the suppliers.  In fact, we

10   were short for many of the suppliers.  And we'd actually -- if

11   memory serves me correctly, I believe we had restaurants that

12   actually had to close because they did not have chicken.

13   Q.  And what was the supply situation like when you left RSCS?

14   A.  The same.

15   Q.  It was in the same state?

16   A.  Yes.

17   Q.  During your time at RSCS, sir, did you ever ask any of the

18   defendants that you identified yesterday to coordinate with

19   each other on any of their bids or their negotiations?

20        MR. BELLER:  Objection.  This has all been asked and

21   answered.

22        THE COURT:  I am going to sustain the objection on

23   vagueness.  It wasn't clear what time period was being asked.

24   BY MR. TORZILLI:

25   Q.  How about during 2012 and 2013 negotiation periods, did you

182
Michael Ledford - Direct

1    ever ask any of the defendants you identified yesterday to

2    coordinate with each other on their bids or their negotiations?

3         MR. BELLER:  Same objection.

4         THE COURT:  Sustained.

5         MR. TORZILLI:  Your Honor, at this point the

6    government has no further questions for this witness.  And we

7    would like to ask to be able to admit some exhibits into

8    evidence without a witness sponsor at this time.

9         THE COURT:  Okay.  You may.  Go ahead.

10        MR. TORZILLI:  Can we excuse the witness?

11        MS. PREWITT:  Your Honor, may we have a side bar?

12        THE COURT:  Yes, let's do that.

13    (At the bench:)

14        THE COURT:  Ms. Prewitt, go ahead.

15        MS. PREWITT:  Your Honor, the witness is still on the

16    stand.  Our understanding was that these documents would be

17    displayed once the witness had left the stand.

18        THE COURT:  That's fine, yes.  We can do that.  So

19    I'll excuse him and then we'll go through that.  Mr. Torzilli,

20    any estimate on how long this process may take?

21        MR. KOENIG:  This is Mr. Koenig.

22        THE COURT:  Sorry, Mr. Koenig.

23        MR. KOENIG:  It's 14 documents.

24        THE COURT:  Okay.  That may take a while.  So I will

25    go ahead and excuse the witness and then we'll start the

Michael Ledford - Direct

1    process.

2         *MR. LAVINE:*  This is Bryan Lavine, if I could raise an

3    issue here.  I am confused as to which documents are being

4    admitted.  If they are talking about any documents relating to

5    Mr. Ledford, we are not agreeing to that until Mr. Ledford is

6    thoroughly through with his cross-examination.  I don't mean to

7    interrupt, I apologize, Your Honor, but it seems that what we

8    are having here is the government is admitting documents and

9    they are choosing maybe not to display them to the jury during

10   the direct examination and then waiting until afterwards and

11   having them displayed to the jury in a sense twice.  They

12   admitted them during the direct and then they try to show them,

13   publish them later on.  That doesn't seem appropriate, Your

14   Honor.  If they have a sponsoring witness, they should do it

15   during the sponsoring witness and not when the witness is not

16   testifying.

17        *THE COURT:*  I think we talked about this yesterday.

18   What we agreed to is the government would be offering certain

19   exhibits, but it would be done at the end of the direct.  And

20   then, of course, the defendants would have the opportunity to

21   cross-examine after that.

22        *MR. FELDBERG:*  Your Honor, this is Michael Feldberg.

23   With respect to documents that the government intends to offer

24   now that are communications to or from Mr. Ledford, I assume

25   they are fair game for cross-examination.

184

Michael Ledford - Direct

1          THE COURT:  Response to that, Mr. Koenig?

2          MR. KOENIG:  We are only doing the ones that are

3    relevant to Golden Corral.

4          MR. TUBACH:  Then I object to doing this at all.  We

5    are in the middle of a witness' testimony and they now want to

6    publish documents to the jury that have nothing to do with this

7    witness.  That seems -- frankly, I have never seen it.  It

8    doesn't seem appropriate to me.

9          MR. LAVINE:  Bryan Lavine again.  That goes to the

10   point that I am talking about.  They are trying to show

11   documents or publish documents to the jury and the individual

12   that has sponsored the document is gone, so you can't really

13   cross-examine them.  It just doesn't make any sense the way

14   they are doing this, Judge.

15         THE COURT:  Mr. Koenig?

16         MR. KOENIG:  I am quite certain that the documents we

17   went over this morning could not be sponsored by Telly Smith as

18   they were text messages between Jayson Penn and Bill Lovette.

19         MR. TUBACH:  Your Honor, Michael Tubach.  The only

20   reason to do that now is to parade documents in front of the

21   jury that the government likes to present, but we are in the

22   middle of a witness' testimony.  And the evidence the

23   government is trying to put in front of the jury now has

24   nothing to do with this witness and is going to confuse the

25   jury.

Michael Ledford - Direct

1          THE COURT:  Well, this ship has sailed.  This is an

2     issue that had come up yesterday.  The government indicated

3     that it wanted to move them in, but didn't want to do it at the

4     end of the cross which based on previous experience could be a

5     long time later and even further away from the subject of

6     Golden Corral.  My recollection is that the reason the

7     government wanted to put these in at the end of Mr. Ledford's

8     direct is because we were trying to not have some big long

9     break in the testimony yesterday.

10          Moreover, the theory that the government has to always

11     have a sponsoring witness is unsupported.  And while there

12     could be issues if it had to do with some opportunity for

13     cross-examination, and Mr. Feldberg made the point about

14     whether something might be fair game, that is a different

15     point.  But with these Golden Corral documents that is not the

16     issue here.  So as a result I am going to --

17          MS. HENRY:  Your Honor, may I be heard?

18          THE COURT:  Yes.  Go ahead.

19          MS. HENRY:  There is also the additional problem that

20     delaying the cross after the direct in this manner also will

21     not allow the jury to hear the cross in close proximity to the

22     direct and will basically change their mindsets in between so

23     that they will have more difficulty remembering, and it affects

24     our ability to cross effectively as well.

25          THE COURT:  Once again, these were all things that

Michael Ledford - Direct

1    came up yesterday and we've talked about this.  That ship has

2    sailed, so the objections will be overruled.

3            MR. TUBACH:  That's fine.  I respect the Court's

4    ruling.  But my memory from yesterday is that the government

5    was going to move into evidence exhibits that were relevant to

6    this witness, not that the government was going to move into

7    evidence exhibits that were irrelevant to the witness.  And I

8    apologize if I misunderstood that that's what we were

9    discussing.

10           THE COURT:  Yeah, I don't recall that.  I don't think

11   that was specified.  It could have been an assumption, but it

12   was not an appropriate assumption.

13           Thank you.

14     (In open court:)

15           THE COURT:  Ladies and gentlemen, we are not going to

16   break quite yet.  We will take full advantage of our five

17   minutes.  But Mr. Ledford, you can stand down, but coordinate

18   with government counsel as to when to return for your

19   cross-examination, okay?

20           Ladies and gentlemen, so the government is going to

21   move the admission of certain documents.  Once that process is

22   done, then we will go ahead and have Mr. Ledford back in and

23   we'll have cross-examination at that time.

24           All right.  Mr. Koenig, go ahead.

25           MR. KOENIG:  Thank you, Your Honor.

Michael Ledford - Direct

1          First the government moves to admit Government

2   Exhibit 454.

3          THE COURT:  All right.  By previous ruling, ladies and

4   gentlemen, that document is admitted.

5          MR. KOENIG:  May we publish?

6          THE COURT:  You may.

7          MR. KOENIG:  I think we will have to blow up the

8   bottom and then the top.

9          THE COURT:  All right.  Next one?

10          Everyone good?

11          You can go on to the next one.

12          MR. KOENIG:  All right.  The government next moves

13   Exhibit 422 into evidence, please.

14          THE COURT:  Is that subject to a previous ruling?  I

15   am not sure.

16          MR. TUBACH:  I believe, Your Honor, D-788 and D-789

17   were substituted for that.

18          MR. KOENIG:  Oh.

19          THE COURT:  That's right.  Did you hear that,

20   Mr. Koenig?

21          MR. KOENIG:  Yes.

22          THE COURT:  And I think the offer is D-788, right?

23          MR. KOENIG:  Yes.

24          THE COURT:  So ladies and gentlemen, by previous

25   ruling D-788 will be admitted.

Michael Ledford - Direct

1          *MR. KOENIG:*  We don't need to publish that one.

2          Exhibit 498 the government offers into evidence.

3          *THE COURT:*  By previous ruling, ladies and gentlemen,

4   that exhibit has been admitted.  That will be admitted as well.

5          And one more quick one, Mr. Koenig?

6          *MR. KOENIG:*  Can we publish this?

7          *THE COURT:*  Yes, if you want to publish it.

8          *MR. KOENIG:*  I am sorry, I didn't ask.  My apologies.

9          *THE COURT:*  All right.  Next portion?  Everyone good

10   with that one?  Everyone good?  Okay.

11          We will go ahead and take the lunch -- that was the

12   entirety of it, Mr. Koenig?

13          *MR. KOENIG:*  Of that document you mean?

14          *THE COURT:*  Of that exhibit.

15          Okay.  Ladies and gentlemen, we will break for lunch

16   at this time and we will plan on reconvening at 1:30, same as

17   usual.  Keep your yellow juror buttons visible.  Don't talk to

18   anyone about the case.  The jury is excused for lunch.  Thank

19   you.

20          (Jury excused.)

21          Anything before we recess?

22          *MS. CALL:*  Very briefly.  One proposal from the

23   government just before we break, I think we are all trying to

24   manage allowing defense counsel to have appropriate time to

25   lodge their objections to various pieces of evidence while also

Michael Ledford - Direct

1    allowing the government to be able to efficiently present its

2    case and not have such a long gap between witnesses and

3    relevant documents.  And I think the government would propose

4    if the Court would consider perhaps excusing the jury tomorrow

5    for the full day because there is still a large volume of

6    documents that we have to get through and that may be an

7    efficient way to do so.

8         THE COURT:  That's possible.  Another thing to think

9    about, but it depends on whether we would have enough testimony

10   for tomorrow without having gotten to those other exhibits, but

11   of course it would be a lot better for the jury to have four

12   days in a row off and take off Friday, but I am not sure that's

13   practical.  My guess is that the jury wouldn't -- it's not that

14   big of a deal, but I don't know if that would be possible.

15        Ms. Prewitt?

16        MS. PREWITT:  Your Honor, I am going to get some dirty

17   looks from my colleagues, but I would vote that we actually do

18   what we did today and just come early and try to move through

19   the admissibility objections just because we are trying to

20   proceed with the trial and we are taking a lot of breaks, and I

21   would just like to make that a suggestion.

22        THE COURT:  Okay.  Sorry, but so that would be an

23   endorsement of the first proposal?

24        MS. PREWITT:  To come early tomorrow as opposed to --

25   have the jury come slightly later, but not the whole day, Your

 1    Honor.

 2            Mr. Feldberg?

 3            *MR. FELDBERG:*  Without consultation with any of the

 4    other lawyers in the case, Your Honor, first of all, Mike

 5    Ledford is an important witness.  We don't know how long the

 6    cross-examination is going to be.

 7            *THE COURT:*  I see.  That would have the effect of

 8    delaying Mr. Ledford's --

 9            *MR. FELDBERG:*  It may carry over into tomorrow, No. 1.

10    No. 2, for those of us who are not from this immediate area, if

11    there were to be a time devoted purely to exhibits, if it could

12    be -- without the jury, if it could be Friday, at least from my

13    perspective that would be preferable to Wednesday.

14            *THE COURT:*  Why don't people think about that over the

15    lunch hour.  Ms. Prewitt is right, I mean, I don't know how

16    long it's going to take to get through these, but I would hate

17    to -- No. 1, you don't want to tell the jury you might be

18    coming in and then they come in and you tell them to go home

19    again.  That would be worse than having them go home for the

20    whole day when we could have gotten some testimony in during

21    part of it.  So I don't really know about the prediction of how

22    long it's going to take to get through, so think about that as

23    well.

24            *MS. CALL:*  Yes, Your Honor.  And just to briefly state

25    it, I think just the ad hoc nature of four hours here, two

Michael Ledford - Direct

1    hours there is just becoming a little difficult for the

2    government scheduling witnesses who are all coming in and out

3    of town.  And it does sound like it will be a considerable

4    amount of time for the remaining objections.

5        THE COURT:  Once again, I won't decide now, but think

6    about that.  And we'll obviously need to figure out -- if it

7    affects what time the jury comes in tomorrow, we will need to

8    make a decision, okay?

9        We will be in recess for lunch.  Thank you.

10        (Recess at 12:05 p.m.)

11        (Reconvened at 1:35 p.m.)

12        THE COURT:  Let's go ahead and bring the jury back in.

13        MR. KOENIG:  Your Honor, may I go to the podium?

14        THE COURT:  Yes, please do.

15        (Jury present.)

16        THE COURT:  All right, Mr. Koenig.  Did you have some

17    other exhibits?

18        MR. KOENIG:  We do.

19        THE COURT:  Go ahead.

20        MR. KOENIG:  The government moves 453 into evidence.

21        THE COURT:  Ladies and gentlemen, by prior ruling the

22    Court has admitted Exhibit 453.

23        MR. KOENIG:  May we publish it?

24        THE COURT:  You may.

25        Next exhibit?

Michael Ledford - Direct

1          *MR. KOENIG:*  Government moves 448 into evidence.

2          *THE COURT:*  Once again, ladies and gentlemen, by prior

3    ruling the Court has admitted 448 and it may be displayed as

4    well.

5          *MR. KOENIG:*  May we publish?

6          *THE COURT:*  You may.

7          All right.  Next?

8          *MR. KOENIG:*  The government moves 9711 into evidence.

9          *THE COURT:*  And was that the photograph?

10         *MR. KOENIG:*  Well, the photograph is the attachment to

11   this, so we can move both 9711 and 9712.

12         *THE COURT:*  Okay.  By prior ruling, ladies and

13   gentlemen, 9711 and 9712 are admitted.

14         *MR. KOENIG:*  And may we publish, sir?

15         *THE COURT:*  You may.

16         *MR. KOENIG:*  All right.  Can we publish 9712?

17         *THE COURT:*  You may.

18         *MR. KOENIG:*  I am sorry, can we also move 9713 into

19   evidence?

20         *THE COURT:*  Okay.  9713 will be admitted by prior

21   ruling, ladies and gentlemen.

22         And that may be published as well.  Are we admitting

23   9712, then?

24         *MR. KOENIG:*  Yes.  We will publish that first.

25         *THE COURT:*  Go ahead.

Michael Ledford - Direct

1          MR. KOENIG:  May we publish 9713?

2          THE COURT:  Yes, you may.

3          MR. KOENIG:  The government moves 9709 into evidence.

4          THE COURT:  Ladies and gentlemen, this has been

5    admitted by prior ruling not for the truth of the matter

6    asserted, but rather for the effect on the listener or

7    recipient.

8          That may be published to the jury.

9          MR. KOENIG:  Thank you.

10          THE COURT:  All right.

11          MR. KOENIG:  The government moves 449 into evidence.

12          THE COURT:  By prior ruling, ladies and gentlemen,

13   Exhibit 449 is admitted.

14          MR. KOENIG:  May we publish?

15          THE COURT:  You may.

16          All right.  Next?

17          MR. KOENIG:  Next is 450 the government moves to

18   admit.

19          THE COURT:  By prior ruling, ladies and gentlemen,

20   this will be admitted not for truth of the matter asserted, but

21   rather for the effect on the recipient or the listener.

22          MR. KOENIG:  May we publish?

23          THE COURT:  You may.

24          Everyone good on that one?

25          All right.  Next one?

194

Michael Ledford - Cross

1          MR. KOENIG:  The government moves 451 into evidence.

2          THE COURT:  By prior ruling, ladies and gentlemen,

3  that is admitted, 451.

4          MR. KOENIG:  May we publish?

5          THE COURT:  You may.

6          Next exhibit?

7          MR. KOENIG:  Finally, the government moves 9707 and

8  9708.

9          THE COURT:  By prior ruling, ladies and gentlemen,

10  both of those exhibits have been admitted.

11          MR. KOENIG:  And may we publish?

12          THE COURT:  You may.

13          MR. KOENIG:  And if we can just publish the last one,

14  9708, please.  We might have to zoom in on this in parts.

15          Thank you.

16          THE COURT:  Any others?

17          MR. KOENIG:  No.

18          THE COURT:  Are we ready, then, to recall Mr. Ledford?

19          MR. BELLER:  Your Honor, may I stand at the lectern?

20          THE COURT:  Yes, go ahead.

21          Mr. Ledford, if you don't mind, if you could just

22  resume the witness stand.  Thank you.

23          MR. BELLER:  Thank you, Your Honor.

24                        **CROSS-EXAMINATION**

25  BY MR. BELLER:

Michael Ledford - Cross

1   *Q.* Are you all settled, Mr. Ledford?

2   *A.* Yes.

3   *Q.* Mr. Ledford, my name is David Beller.  I represent

4   Mr. Mikell Fries.  And I am going to be asking you some

5   questions this afternoon.

6   *A.* Okay.

7   *Q.* In terms of getting started, I am going to be handing

8   Ms. Grimm a binder, and then I will ask you when to reference

9   it and which tab to go to.

10       *MR. BELLER:* Your Honor, I believe that you already

11   have a binder.  I have provided one to Ms. Grimm for you.

12       *THE COURT:* I do.  I have it.  Thank you.

13       *MR. BELLER:* Thank you.  May I approach?

14       *THE COURT:* You may.

15   *BY MR. BELLER:*

16   *Q.* So Mr. Ledford, I want to start -- and I am not going to

17   ask you to look at any of those quite yet.

18   *A.* Okay.

19   *Q.* I want to start with a better understanding of your unique

20   background.  And some of this you already covered with

21   Mr. Torzilli just a little bit, but I want to make sure that I

22   understand your experience in the chicken industry.

23       It is fair to say that you worked throughout your

24   career on both the supplier side and on the buyer's side; is

25   that right?

196

Michael Ledford - Cross

1    A.   That's correct.

2    Q.   Starting with Gold Kissed sometime in the mid nineties?

3    A.   Right.

4    Q.   After gaining experience with Gold Kissed, you moved to

5    Seaboard Farms.

6    A.   That's correct.

7    Q.   Also on the supplier's side.

8    A.   Yes.

9    Q.   You held the position of international sales and logistics

10   manager, right?

11   A.   Yes.

12   Q.   After four years or so at Seaboard, you moved back to Gold

13   Kissed.

14   A.   That's right.

15   Q.   Once you went back to Gold Kissed, you were the division

16   sales manager; is that right?

17   A.   That is correct.

18   Q.   Working there until about 2007.

19   A.   Yes.

20   Q.   And so fair to say it's about 10 years working on the

21   supplier's side?

22   A.   Yeah, probably -- I think 11.

23   Q.   11 years on the supplier's side.  And that's when you I

24   believe you told the jury transitioned over to the buyer's side

25   working for both Popeye's and working for RSCS and now working

Michael Ledford - Cross

1  for Chick-fil-A.

2  *A.*  That is correct.

3  *Q.*  Fair to say that you have decades of experience working in

4  the chicken industry?

5  *A.*  Yes.

6  *Q.*  Decades of experience working for some of the biggest names

7  in fast-food in the United States.

8  *A.*  Yes.

9  *Q.*  Now, you earlier spoke a little bit about QSR.  And for our

10  purposes is it fair to say QSR and fast-food are terms that we

11  can use interchangeably?

12  *A.*  Yes.

13  *Q.*  And so if you say QSR, I say QSR, really what we are

14  talking about is a fast-food restaurant, right?

15  *A.*  Correct.

16  *Q.*  So based on your decades of experience, you know the ins

17  and outs of this industry probably as good as or better than

18  the majority of people even in the industry.

19  *A.*  Yes.

20  *Q.*  So you testified on direct examination about a tight range

21  of supplier prices.  And so I want to hone in just a little bit

22  on that portion of your testimony, if we can.

23       A tight range in prices benefits the franchisee,

24  right?

25  *A.*  Yes.

Michael Ledford - Cross

 1  Q.  And when I say a tight range, I am talking about the price

 2  difference between your most expensive poultry producer or

 3  supplier and your least expensive.  Is that how you also

 4  understand it?

 5  A.  Yes.

 6  Q.  So we're trying to get those -- you, I should say, are

 7  trying to get those in as tight of a range or as low of a

 8  number as what you practically can.

 9  A.  Yes.

10  Q.  Fair to say that one of the reasons for that is you don't

11  want a franchisee or a KFC store owner in Colorado paying a

12  different price for his or her chicken than a franchisee owner

13  in, say, Florida, right?

14  A.  Not paying a drastically different price.

15  Q.  A drastically different price, and I appreciate that.  And

16  there are, of course, going to be some differences.  And some

17  of the differences in my sort of extreme example is the

18  freight.

19  A.  Exactly.

20  Q.  That may be different, right?

21  A.  Yes.

22  Q.  Fair to say it costs more money to transport a chicken to

23  Homer, Alaska than what it does to Orlando, Florida.

24  A.  Absolutely.

25  Q.  Okay.  Now, when you have a wide range or a wider range of

Michael Ledford - Cross

1    prices between different suppliers, you may very well be

2    getting complaints from your franchisees, correct?

3    A.   You could, yes.

4    Q.   So the best way to prevent some of these complaints or some

5    of these problems is to have different suppliers placed

6    strategically throughout the country, right?

7    A.   Yes.

8    Q.   So going on that example if we have, say, Claxton, Georgia

9    and we have Claxton Poultry based in Claxton, Georgia, it's

10   going to be easier to source chicken to, say, Florida.

11   A.   I don't know if I would say easier.  I think I would

12   reference that as least landed cost is how we would talk about

13   it, the lowest cost that we could get from the closest shipping

14   point.

15   Q.   Perfect.  Because if you have a truck that's driving

16   hypothetically 200 miles, it's going to be cheaper to transport

17   than if you have a truck traveling 6,000 miles.

18   A.   Absolutely.

19   Q.   Okay.  Now, these suppliers are supplying the same basic

20   product.  Is that fair to say?

21   A.   Yes, it is.

22   Q.   So whether you are a plant in Claxton, Georgia producing

23   KFC or a plant at JBS in Greeley producing KFC, it's going to

24   be the same chicken with very slight differences.  Is that fair

25   enough?

Michael Ledford - Cross

1   A.   Yes.

2   Q.   And that's because KFC specifically has very, very detailed

3   and specific standards for their chicken, right?

4   A.   Correct.

5   Q.   And all the suppliers are expected to meet those standards.

6   A.   Yes.

7   Q.   Certainly when you were at RSCS if there was a producer

8   that did not meet those strict standards, you would have

9   replaced the producer, right?

10  A.   I mean, there is stages.  Before you would get to

11  replacement, you would put them on a corrective action plan and

12  things like that.  You wouldn't just really do it at the drop

13  of a hat, so to speak.  But yes, if you could not get them to

14  producing product to your quality of standards, eventually you

15  would have to take action on that, yes.

16  Q.   Very good.  I appreciate that.  So that also means that CFA

17  or Chick-fil-A I assume has the same -- different standards,

18  but very, very high standards for the manufacturing and

19  production of their products.

20  A.   Yes, that's correct.

21  Q.   So we talked a little bit about why we keep the -- or why

22  you keep the different suppliers in a very, very tight range.

23  I want to talk to you a little bit about how you go about doing

24  that, okay?

25           MR. TORZILLI:  Your Honor, I object to the question.

Michael Ledford - Cross

1   It does misstate prior testimony.

2            *THE COURT:*  Overruled.

3   *BY MR. BELLER:*

4   *Q.*  Are you with me that we are going to talk about how you go

5   about or how you went about keeping suppliers in a tight

6   financial range?

7   *A.*  Yes.

8   *Q.*  One method that you used is by telling suppliers directly

9   if their price was not competitive, right?

10  *A.*  Yes.

11  *Q.*  I think we saw an example of that that we'll get to here in

12  just a little bit.

13          You, Mr. Ledford, would even go so far as to point out

14  to them specific areas in their pricing calculations that they

15  would need to lower to get the lower price that you wanted,

16  correct?

17  *A.*  Yes, that's correct.

18  *Q.*  For example, you would tell them if their WOG yield was too

19  low.

20  *A.*  Yes, that's something I would do.

21  *Q.*  WOG being WOG or without giblets?

22  *A.*  Correct.

23  *Q.*  And to remind the jury, WOG yield is the weight of the

24  processed chicken divided by the weight of the whole chicken;

25  is that right?

Michael Ledford - Cross

1    A.   Yes, that's correct.

2    Q.   Now, a couple of -- and I am going to keep asking about

3    that, but I want to try to understand these terms a little bit

4    better because the jury has heard quite a bit about live weight

5    and they've heard quite a bit about processed weight.  And I am

6    wondering if you can explain to the jury the difference between

7    those two definitions.

8    A.   Sure.  So the live weight is simply exactly what it is.

9    It's a live chicken, what it weighs with the animal completely

10   intact, so to speak.  A WOG weight or without giblets would be

11   after it's gone through what the industry would call first

12   processing.  So that's basically it has been slaughtered at

13   that point.  Blood has been drained out of it.  The feathers

14   have been removed.  The internal organs have been removed and

15   the head has been removed.  In general terms back during this

16   time period, a percentage yield for a WOG weight would have

17   been approximately 70 to 71 percent of the weight of the live

18   chicken.

19   Q.   I appreciate that.  Thank you, Mr. Ledford.

20        So when talking about WOG yield being too low, that

21   was that 73 percentage that you just explained to the jury,

22   right?

23   A.   Yes.

24   Q.   So if a supplier raises their WOG yield, that would

25   ultimately bring down the bottom line cost of the chicken,

Michael Ledford - Cross

1    correct?

2    A.   That's correct, yes.

3    Q.   Okay.  So another example is that you would give suppliers

4    percentages to show them how far out of line their price was

5    compared to other suppliers.

6    A.   That's correct.

7    Q.   So hypothetically you're 4 percent too high, fair?

8    A.   Fair.

9    Q.   Sounds familiar with something you may have said before?

10   A.   Absolutely.

11   Q.   Probably more than once.  Is that also fair to say?

12   A.   That's fair.

13   Q.   And at other times you would provide feedback in actual

14   dollars and cents, correct?

15   A.   That's correct.

16   Q.   So again hypothetically you may say, "Hey, Mr. Fries,

17   you're a penny too high."

18   A.   Yes.

19   Q.   Okay.  So this type of feedback that you would provide to

20   the different suppliers is something that you did throughout

21   the negotiation process, right?

22   A.   Yes.

23   Q.   So I guess to put a definition on it or to give it a term,

24   it's fair to say that you provided directional guidance to the

25   suppliers on where their price needed to be.

204

Michael Ledford - Cross

1   A.   Yes.

2   Q.   Because the initial price, those round one what we could

3   call offers or bids, that was just the starting place of

4   negotiation, fair?

5   A.   Fair.

6   Q.   Certainly there was never a time where somebody provided a

7   round one bid in response to an RFI and you said thank you,

8   it's a contract.

9   A.   No, I don't believe that's ever happened.

10   Q.   All right.  So opening offer and then there is negotiation,

11   right?

12   A.   Yes, absolutely.

13   Q.   Okay.  Now, it's also fair to say, Mr. Ledford, that when

14   you would give this directional guidance, that you expected the

15   suppliers to follow it, right?

16   A.   Yes.

17   Q.   And you have some leverage in order to ensure that the

18   suppliers follow your guidance.

19   A.   Yes, I certainly had different points of leverage

20   throughout negotiations, that's correct.

21   Q.   So let's talk about one of those points of leverage.  One

22   of those points of leverage is if they did not follow your

23   directional guidance and George's, for example, price is too

24   high, you're going to take away volume.

25   A.   Possibly, yes.

Michael Ledford - Cross

1   Q.   Okay.  Maybe a better way to say it is you would at least

2   threaten to take away volume, correct?

3   A.   Correct.

4   Q.   And, in fact, that happened over the years.  You took

5   volume away from George's when they wouldn't follow your

6   directional guidance, right?

7   A.   Yes, I did.

8   Q.   Now, in that example after you took away volume, George's

9   went back and said, Excuse me, Mr. Ledford.  We'll follow your

10  directional guidance now.  Can we have our volume back?

11       Do you recall that?

12  A.   Yes, I do recall that.

13  Q.   And do you recall what your answer to that was?

14  A.   Yes, I do recall what my answer to that was.

15  Q.   Can you share to the jury what your answer to their plea

16  for more volume was?

17  A.   I believe if memory serves me correctly it was something

18  along the lines of, No, it's too late.  We have already given

19  it away.

20  Q.   So fair to say, then, that threatening to take away volume

21  proved to be a pretty effective negotiation strategy for you;

22  is that right?

23  A.   Yes, I believe so.

24  Q.   Also fair to say that usually the threat to take away

25  volume proved to be enough leverage to have the supplier

Michael Ledford - Cross

1    actually move their price down?

2    A.   I believe in some cases yes.  I mean, I think -- you know,

3    I can recall other cases where I might not have been able to

4    get them down exactly to where I wanted them to --

5    Q.   Sure.

6    A.   -- but yes, it certainly was a leverage point.

7    Q.   So let's switch gears just a little bit and let's talk a

8    little bit more about what the jury has heard about and that is

9    this cost-plus model, okay?  So when we're talking about a

10   cost-plus model, the supplier or the chicken producer fills out

11   a spreadsheet and that spreadsheet is called the cost-plus

12   model, right?

13   A.   Yes.

14   Q.   They fill in their anticipated or expected costs for the

15   next contract year.

16   A.   Correct.

17   Q.   All right.  And I say year.  Sometimes it can be multiple

18   years depending on the company, depending on the round, that

19   kind of thing; is that right?

20   A.   On chicken on the bone in my time at RSCS, I don't believe

21   we ever did anything past one year.

22   Q.   And do you know of a time where RSCS evolved into a

23   multi-year contract?

24   A.   Not with certainty, I do not.

25   Q.   No problem.  And let's be clear.  You left in I think May

Michael Ledford - Cross

1    of 2015, right?

2    A.   2014.

3    Q.   2014, excuse me.  So when we're talking about the -- or

4    excuse me, when we are talking about that cost-plus model, and

5    I want to narrow it down and talk about some of the different

6    costs that are contained within that model, okay?  There could

7    be something like a chick cost, right?

8    A.   Yes.

9    Q.   The chick cost -- and I think Mr. Torzilli asked you about

10   this -- how much it cost to lay, incubate and hatch a chick,

11   right?

12   A.   Yes.

13   Q.   There is a specific cost that's associated with that.

14   A.   Correct.

15   Q.   How much it costs for corn for the chicken, for example.

16   That's another cost, right?

17   A.   Yes.

18   Q.   How much is soybean meal, right?

19   A.   Yes.

20   Q.   How much is housing for the chicken.

21   A.   Yes.

22   Q.   Okay.  This is actually -- since I said housing for the

23   chicken, let's talk about this for just a moment.  It costs

24   money to care for the chickens as they are growing, right?

25   A.   Absolutely.

Michael Ledford - Cross

1    *Q.*   The chickens are grown in huge chicken houses, right?

2    *A.*   Yes.

3    *Q.*   They are free to run around the houses.  They are not

4    caged.

5    *A.*   Correct.

6    *Q.*   They have bedding that they walk on.

7    *A.*   Correct.

8    *Q.*   They have a constant supply of water, right?

9    *A.*   Correct.

10   *Q.*   Somebody has to go and check on them frequently -- well,

11   usually several times a day, right?

12   *A.*   That is correct.

13   *Q.*   Make sure that house is cool enough in the summer.

14   *A.*   Yes.

15   *Q.*   Make sure that it's warm enough in the winter.

16   *A.*   Yes.

17   *Q.*   And there is a cost associated with all of that.

18   *A.*   That is correct.

19   *Q.*   All right.  It costs money to process the chickens as well,

20   right?

21   *A.*   Yes.

22   *Q.*   And when I say process the chickens, I am talking about

23   gathering the chickens out of the chicken house and bringing

24   them to the plant, right?

25   *A.*   Yes.

Michael Ledford - Cross

1   Q.  And then preparing them in the plant to be packaged and

2   sent to KFC restaurants, for example.

3   A.  Yes.

4   Q.  That also includes labor.

5   A.  Yes.

6   Q.  And so when labor costs go up, the cost-plus model will

7   also reflect that labor cost of it cost me more in labor this

8   year than it did last year, right?

9   A.  Yes.  That's certainly a possibility.

10  Q.  So certainly that also means that with inflation and, for

11  example, minimum wage goes up, that labor cost on the cost-plus

12  model would also go up, right?

13  A.  Yes.

14  Q.  Other things that are taken into account is packaging,

15  correct?

16  A.  Correct.

17  Q.  Transport.

18  A.  Correct.

19  Q.  Margin.

20  A.  Yes.

21  Q.  You give feedback on all of these numbers, right?

22  A.  Yes.  That's certainly a possibility.

23  Q.  Some suppliers are very exact about their cost-plus model

24  reflecting actual costs, right?

25  A.  Yes.

Michael Ledford - Cross

1   Q.  And others are not as exact about having it show actual

2   cost; is that correct?

3   A.  Yes, but I would also add that different suppliers also

4   count chickens, is what the industry would call it, a little

5   bit differently amongst each supplier as well.

6   Q.  Sure, absolutely.  So when you get all of these models or

7   all of these offers, rather, and when we are talking about

8   directional guidance, an example of that may be, boy, I am

9   looking at all of this.  Your chick cost is too high, right?

10  A.  Yes.

11  Q.  And so Claxton may have a chick cost hypothetically that is

12  quite a bit different than Pilgrim's chick cost, and you will

13  identify that difference between the two different costs.

14          MR. TORZILLI:  Objection to the hypothetical question.

15          THE COURT:  Overruled.  He can answer.

16  A.  Yes, that is a possibility for sure.

17  BY MR. BELLER:

18  Q.  Sure.  And so in that case you may say to Mr. Fries, boy,

19  it looks like your chick costs are out of line.  You need to

20  pull that number down.

21  A.  Yeah.  It would have been more like you're X percent off or

22  you're X cents off from competitive.  When I look at your

23  model, the items that stand out to me where you're higher than

24  others, I might not just tell him chick cost.  I might tell

25  them one or two, maybe three places.  If I were you, that's

Michael Ledford - Cross

1    where you could trim some price down to get in line with really

2    more what we're looking for.

3    Q.  Absolutely.  So you don't actually know what a supplier's

4    chick cost is, for example, right?

5    A.  With certainty, no.  I know what they put on the model, but

6    I don't know if that's exactly what their cost is or not.

7    Q.  Sure.  So you are not getting receipts to say --

8    A.  Correct.

9    Q.  -- let me see how much you paid for eggs last month, right?

10   A.  Right.  They are not audited numbers.

11   Q.  So I think you testified that you may say either a

12   percentage or I see this chick cost may need to come down a

13   little bit.  Fair to say that some suppliers get to their

14   bottom line, their bottom line price, by adding up all of their

15   costs and giving you that bottom line price, right?

16   A.  Yes.

17   Q.  Okay.  And that includes margin.

18   A.  Yes.

19   Q.  Other suppliers may choose or decide on their bottom line

20   price and then fill their model going up, right?

21   A.  That's a possibility, yes.

22   Q.  So, for example, when we were saying that you may say, hey,

23   you're a penny too high, if the supplier is following your

24   directional guidance, they are going through their model and

25   they are trying to find a place to either pull out a penny or a

Michael Ledford - Cross

1   fraction of a penny in order to get their model down a penny,

2   right?

3   A.   Yes.

4   Q.   So the supplier needs to take that penny or a combination,

5   a fraction of the penny, out of one of their costs.

6   A.   Yes.   They need to take it out of one of the line items or

7   several of the line items.

8   Q.   Or several of the line items.   So it may be chick costs.

9   They can pull a penny or a fraction of a penny out of chick

10  costs, right?

11  A.   That's a possibility, yes.

12  Q.   They can pull a penny or a fraction of a penny out of

13  labor, correct?

14  A.   Yes, that's a possibility as well.

15  Q.   Or they can pull a penny or a fraction of a penny out of

16  margin, for example.

17  A.   Yes.   They can pull it from wherever they wanted to.

18  Q.   Wherever they wanted to.   So it's a fair statement, then,

19  that margin on a cost-plus model does not necessarily mean that

20  that's the supplier's profit for that chicken, right?

21  A.   That's a fair statement.

22  Q.   And so that also means that comparing margin from one

23  supplier to another supplier may also not necessarily be a

24  completely accurate comparison.

25  A.   That's correct.

Michael Ledford - Cross

1    Q.   Because margin is just one part of this cost-plus model

2    that people fill in numbers in order to get that bottom line

3    for you, right?

4    A.   Yes.

5    Q.   Okay.   So switching gears just a little bit, I want to chat

6    with you about your request for a reduced sized bird, okay?

7    Mr. Torzilli asked you a little bit about that and I want to

8    have a better understanding of that.

9    A.   Okay.

10   Q.   KFC uses a very specific size bird for its product, right?

11   A.   Yes.

12   Q.   I think you had testified that KFC targets a 2.8-ounce

13   bird.

14   A.   Correct.

15   Q.   Other fast-food restaurants or QSRs use a different size

16   bird than what KFC uses.

17   A.   Correct.

18   Q.   Now, when I say a different size bird, by and large the QSR

19   industry or even the broiler industry uses the same breed bird

20   or combination of breeds; is that right?

21   A.   Yes.   There is only two major breeders left in the United

22   States.

23   Q.   Okay.   So when we're talking about a different size bird,

24   it's all the same breed of bird.   It's just how old and how big

25   that particular bird is, right?

214
Michael Ledford - Cross

1  A.  Technically they are not all the same breed.  There is a

2  couple of different -- there is a few different options, but

3  yeah, I get what you're saying.  I mean, they are approximately

4  generically speaking the same raw material, if you will, in a

5  live chicken and the size requirement of it, yes.

6  Q.  Sure.  And these are -- these are types of birds that have

7  been bred through the years to grow very big very quickly

8  relatively speaking, right?

9  A.  Yeah.

10  Q.  So we are talking about the different size birds that are

11  used.  KFC uses a different size bird than Chick-fil-A, right?

12  A.  I mean, they are generally speaking a very similar target

13  live weight.

14  Q.  Understood.  Processed weight is different, right?

15  A.  Yes.

16  Q.  Bigger birds are needed for grocery stores, right?

17  A.  Correct.

18  Q.  So tray pack, for example, that's usually a much larger

19  bird than a QSR bird.

20  A.  Yeah, that's going to be a 6-1/2 pound or even bigger

21  chicken, yes.

22  Q.  Almost double or actually more than double the bird that is

23  sold in QSRs, right?

24  A.  Not quite double.  Less than double, but bigger.

25  Q.  Bigger, okay.  Rotisserie chicken is a small bird, but

Michael Ledford - Cross

1    still a different size than, say, a Popeye's bird, right?

2    A.   Yes.   It would on the larger end of that bell curve.

3    Q.   Popeye's bird, since you worked for Popeye's, is 2.1 to

4    2.5-ounce, right?

5    A.   I honestly don't remember the exact size.   I know it's

6    smaller than KFC and it's on the bottom end of the bell curve.

7    It's the smallest chicken in that 4-pound live weight.

8    Q.   And we'll talk about this a little bit more.   So it's a

9    4-pound live weight, so you have got a 4-pound bird or at least

10   you are targeting or growing for a 4-pound bird.   And then once

11   it is processed through the facility, you have the small birds,

12   the smallest birds, going to Popeye's.   You have another size

13   going to KFC.   You have another size going to Pollo Tropical,

14   right?

15   A.   Yes.

16   Q.   And you have another size going to CFA or Chick-fil-A.

17   A.   Yes.

18   Q.   Bojangles also uses a small bird; is that fair?

19   A.   Yes.

20   Q.   And in this differentiation of bird sizes, these are

21   depicted in or can be depicted in I think what you called

22   either a bell curve or a histogram; is that right?

23   A.   Correct.

24   Q.   Now, I am going to show you for demonstrative purposes only

25   what has been marked as Defense Exhibit I-108.

216
Michael Ledford - Cross

1           MR. BELLER:  If we could just show it to the witness

2     for just a moment.

3           Before this is published to the jury, may I show this

4     to the witness through Ms. Grimm, please?

5           THE COURT:  Let me first of all just ask if there is

6     any objection to the use of the demonstrative.

7           MR. TORZILLI:  One moment.  Your Honor, I object only

8     because there is no source on it, so I would object on

9     foundation grounds to the accuracy of the depiction.

10          THE COURT:  Okay.  We'll hold that and you can hand

11    that up through Ms. Grimm to the witness.

12          MR. BELLER:  Very good.  Thank you.

13    BY MR. BELLER:

14    Q.  Let me know when you have had an opportunity to take a look

15    at that, Mr. Ledford.

16    A.  I am good.

17    Q.  Does that look familiar to you, Mr. Ledford?

18    A.  Yes, it does.

19    Q.  Is that the type of histogram or bell curve that you were

20    referring to when you were trying to explain to the jury both

21    your answers to Mr. Torzilli's questions and your answers to my

22    questions?

23    A.  Yes, it is.

24    Q.  And do you believe that that accurately and appropriately

25    would assist the jury or explain to the jury by demonstrative

Michael Ledford - Cross

1    means what you're talking about as we go through these next

2    series of questions?

3    A.  Yes.

4         MR. BELLER:  Your Honor, at this time I would ask to

5    be able to publish I-108 to the jury for purposes of a

6    demonstrative -- as a demonstrative, excuse me.

7         THE COURT:  Any additional objections?

8         MR. TORZILLI:  No.  I will withdraw the prior

9    objection, though.

10        THE COURT:  It may be published to the jury.

11        Ladies and gentlemen, as you may recall, an exhibit

12   that is used for demonstrative purposes only won't be sent back

13   to you to the jury room.  It's just for you to look at in court

14   and to assist a witness in explaining something.

15        It may be published to the jury.

16   BY MR. BELLER:

17   Q.  So since the jury has this in front of them, Mr. Ledford, I

18   want to ask you a couple questions so the jury can also

19   understand what we are talking about.

20        So at the top it says weight distribution of a 4-pound

21   live weight bird, right?

22   A.  Yes.

23   Q.  And so really what this means is that if you have a hen

24   house and you have chicks that have been placed in this hen

25   house -- and the chicks are placed in the hen house within

Michael Ledford - Cross

1  hours of hatching.  Is that fair to say?

2  A.  Yes, that's true.  It wouldn't be called a hen house.  It's

3  a broiler house.

4  Q.  Broiler house, excuse me.  A hen house is when the eggs are

5  actually laid, right?

6  A.  Yes.

7  Q.  Very good.  Thank you for that distinction.  Because when

8  the chicks are placed into the broiler house, you're placing

9  chicks that have been all hatched on that day, right?

10  A.  Yes.  They're one-day-old chicks.

11  Q.  One-day-old chicks, males and females.

12  A.  In most cases, yes.

13  Q.  And certainly we are not sizing these chicks before they go

14  into the broiler house, right?

15  A.  No.  That would be impossible.

16  Q.  Impossible to do.  So you put these chicks into a broiler

17  house just like puppies.  Some get big.  Some don't grow as

18  large.  Is that fair to say?

19  A.  That's correct.

20  Q.  All right.  So you have -- for example, you have males that

21  may grow a lot larger than females, right?

22  A.  Yes.

23  Q.  And even within the males and the females, there is going

24  to be size variation between them.

25  A.  Yes, just like people.

219

Michael Ledford - Cross

1   Q.  Just like people.  And certainly once they have grown and

2   they are ready to be processed, it is relatively impossible to

3   only go into a broiler house and collect just the little girls,

4   right?

5   A.  Yeah, you can't do that.

6   Q.  You've got to gather up the little girls, the big boys and

7   everything in between, correct?

8   A.  Correct.

9   Q.  So this represents what would be a 4-pound live weight bird

10  taken out of a broiler house on the same day at the same time;

11  fair to say?

12  A.  Yes.

13  Q.  Now, we have live weight at the top.  That's they go into

14  the facility as a live weight.  They come out a processed or a

15  WOG weight, right?

16  A.  Yeah, they come out of the first processing portion of the

17  plant as a WOG, yes.

18  Q.  Very good.  So your bottom axis, which is your X axis

19  across the bottom, you have anything below a 2-ounce all the

20  way up to a 3.87-ounce WOG bird, right?

21  A.  Yes.

22  Q.  So Popeye's in this example wants 2.5 to a 2.37-ounce bird,

23  right?

24  A.  No, that would be KFC's.  Didn't you say 2.5?

25  Q.  I did.  That's because I missed a digit in there.  Let me

Michael Ledford - Cross

1    try that again.  Wants a 2.25 to a 2.37-ounce bird.

2    A.   That's correct.

3    Q.   All right.  KFC wants a 2.5 to around a 2.7, 2.8-ounce

4    bird, right?

5    A.   That's correct.

6    Q.   And then we go on with Publix or Kroger grocery stores want

7    something a little bit bigger, and then they want the

8    rotisserie that they want the largest in this particular

9    histogram.

10   A.   Correct.

11   Q.   Now, CHA or Chick-fil-A is going to be on a different bell

12   curve or different histogram; is that right?

13   A.   Yeah.  They would overlap a little bit, but yes.  We are a

14   4-1/2 target weight, not a 4-pound.

15   Q.   And then you have large bird, and that's going to be a

16   completely and totally different histogram further on the

17   right.

18   A.   Correct.

19   Q.   So when we're talking about availability, Popeye's wants

20   2.25 to 2.37, there is only a certain percentage of chickens

21   that are coming out of a single broiler house that's going to

22   satisfy their size specifications or their size desires, right?

23   A.   That is correct.

24   Q.   Okay.  Say for just a moment that a supplier loses a KFC

25   account.  That supplier is not going to have a customer who

221

Michael Ledford - Cross

1  will want to take or who is available at that moment to take

2  the birds between 2.5 and 2.75, right?

3  A.  That's correct.

4  Q.  So the broiler house is still producing these birds.  You

5  are still getting that size, but you may not necessarily have a

6  customer for those -- for that size, right?

7  A.  That would be a possibility, yes.

8  Q.  All right.  So now can we talk for just a moment about the

9  far left side of the histogram?  And we are talking about that

10 yellow 2 and less than 2.  Do you see that?

11 A.  Yes.

12 Q.  That is fair to say a very small bird for human

13 consumption, right?

14 A.  Yes.  You are getting into the cornish hen side of things.

15 Q.  Cornish hen side of it.  And cornish hen is really sort of

16 a specified term, right?

17 A.  It is, yes.

18 Q.  So just because, you know, we may have here a 2, it doesn't

19 mean that we can package it and sell it as a 2, right?

20 A.  Correct.

21 Q.  Now, a lot of the manufacturing processes are also

22 automated for these birds, right?

23 A.  That is correct.

24 Q.  So if you have a two -- a No. 2 on this, it may not

25 necessarily go through the same processing as a larger bird.

Michael Ledford - Cross

1   A.   Correct.

2   Q.   And that's because it's not going to stay in the shackles

3   quite as well because it's too small.

4   A.   That's correct.

5   Q.   It's not going to go through the deboning machine because

6   the machine is really just going to shred up.

7   A.   It will tear it up.

8   Q.   Tear up that size of a bird, right?

9   A.   Yes.

10  Q.   And so there is little to no market for those small birds,

11  right?

12  A.   That's a fair statement.

13  Q.   So if, for example, a producer says I don't want to produce

14  a 4-pound bird, I want to try to shift my histogram to the left

15  and I'm going to try to grow a 3.5-pound bird, you're going to

16  end up with a lot more of those little tiny birds, right?

17  A.   That's a fair assumption, yes.

18  Q.   Those little tiny birds that are difficult, if not

19  impossible, to try to process through the automated machinery,

20  right?

21  A.   Correct.

22       MR. BELLER:  And we can take the I-108 down now.

23  Thank you.

24  BY MR. BELLER:

25  Q.   So we talked about perhaps ad nauseam that KFC eight-piece

Michael Ledford - Cross

1  bucket has a precise size specification, right?

2  A.  Yes.

3  Q.  One of the reasons for that is the cook time that it takes

4  to actually fry or cook KFC's chicken, right?

5  A.  That would certainly be one of the reasons, yes.

6  Q.  One of the reasons.  And so if you have a chicken that is

7  too big and at the restaurant they automate the cooking and put

8  the chicken in for the very specific amount of time, take the

9  chicken out, if the chicken is too large, it's going to be raw

10  inside, right?

11  A.  Correct.

12  Q.  On the other hand, if the chicken is too small, it's going

13  to be burnt to a crisp.

14  A.  That's a possibility, yes.

15  Q.  And so you need or RSCS needs uniformity in its product

16  size, correct?

17  A.  Yes.

18  Q.  So you testified to Mr. Torzilli's question that you

19  reached out to suppliers asking if they would be willing to

20  supply a 2.4-ounce bird to KFC, correct?

21  A.  Maybe just a little bit different way.  It was what would

22  it take to get your company to supply the 2.4-ounce bird.

23  Q.  Thank you.  What would it take to get your company to go

24  from -- now I am paraphrasing -- a 2.8 to a 2.4-ounce bird.

25  A.  Correct.

Michael Ledford - Cross

1    Q.  You wanted the same volume of this smaller bird than -- as

2    what you were currently buying, right?

3    A.  That's a fair assumption, yes.

4    Q.  And you viewed this as a research project for RSCS.

5    A.  Yes, that's correct, yes.

6    Q.  Is that because either PriceWaterhouseCoopers or is it your

7    board that asked you to look as to whether or not this would be

8    possible?

9    A.  To the best of my memory, I believe it came from

10   PriceWaterhouseCoopers.

11   Q.  So this research project -- well, when you asked the

12   suppliers to take on this research project, you knew that

13   supply for that 2.4-ounce bird was already short, right?

14   A.  Yes.

15   Q.  You also knew that the volume was not there to be able to

16   provide these birds to you, correct?

17   A.  Yes.  In its current form, I knew that there was not

18   anything there for KFC.

19   Q.  Couldn't be done.

20        MR. BELLER:  So can we see I-108 again?

21   BY MR. BELLER:

22   Q.  So what you were asking the suppliers to do is to produce

23   the same volume that KFC was currently buying, but in the size

24   that's depicted on the bell curve in gray, right?

25   A.  Yes.

Michael Ledford - Cross

1   Q.  And so that means that if that was going to happen, that

2   Popeye's, Bojangles would have to be displaced, right?

3   A.  Yes.

4   Q.  And not only would Popeye's and Bojangles have to be

5   displaced, but the suppliers would have to find a new customer

6   to take those green columns which was the KFC -- then existing

7   KFC size.

8   A.  Yes.

9   Q.  Ultimately you knew at the time you made this request that

10   there simply wasn't enough chickens in those gray columns,

11   right?

12   A.  Correct.

13   Q.  So is it fair to say that at the time you asked the

14   suppliers to undergo this research project, you knew that it

15   was a tough ask for them, correct?

16   A.  Yes.  That's why I said, "When you get up off the floor

17   from laughing."  I mean, In essence what I was asking them to

18   do is shift their whole bell curve down to the left.  So

19   instead of -- in this graph instead of the 2.875 being the

20   midpoint, it was going to need to be something more like the

21   2.5 or the 2.675.  And I was asking them in essence what it

22   would take, how much it would cost KFC if that's what we wanted

23   to do.

24   Q.  Absolutely.  So you wanted them to shift their entire bell

25   curve to the left which would result in a lot more of those

Michael Ledford - Cross

1   yellow birds in that 2 category that have no market, no home,

2   and can't be easily processed, right?

3   A.   That's correct.

4   Q.   And you would agree with me that what you were asking for

5   is, in fact, laughable, right?

6   A.   Yes.

7   Q.   Is it fair to say that this big ask, this laughable ask was

8   not a request to the suppliers to enter into a contract with

9   you, right?

10  A.   No, certainly not, not at this point.

11  Q.   And so you were shown on direct examination Exhibit 1607,

12  Government Exhibit 1607.

13        MR. BELLER:   Is it possible to pull that up?   This has

14  already been published.   Excuse me.   This has been admitted.   I

15  believe it was published, but I don't know for certain.

16        THE COURT:   Let me just double-check.   It has been

17  admitted.   Whether or not it was published -- you can publish

18  it now if you would like.

19        MR. BELLER:   Thank you.   We would.   Can we publish

20  1607, please?

21        And on 1607 if we can zoom in to the part that was

22  written by Roger Austin, please.

23  BY MR. BELLER:

24  Q.   Mr. Austin tells you in response to your request:   We have

25  no such product available, right?

Michael Ledford - Cross

1   A.   Correct.

2   Q.   So he is saying we don't have anything in this category

3   that we can give to you.  It just doesn't exist, right?

4   A.   That's correct.

5   Q.   Now, if we can then zoom up on your response to Mr. Austin

6   right above that.  What you say in response to Mr. Austin is,

7   "I need the spreadsheet filled out like I had asked for to help

8   illustrate this point," right?

9   A.   Yes.

10  Q.   This point that we've now explained to the jury through

11  this diagram is what you needed help explaining to whoever

12  asked you for this and that it's a laughable absurd ask, right?

13  A.   Yeah.  Really the piece of information that Mr. Austin gave

14  to me in regards was the part below that where he told me for

15  every ounce or something like that that you take the weight

16  down, this is your increased cost.

17  Q.   Right.

18  A.   That's really what I needed to help explain the point.

19  Q.   That it couldn't be done realistically.

20  A.   Or that it would cost an extreme amount of money to do so.

21  Q.   Right.  Not again a serious request to have these suppliers

22  actually enter into this contract with you, but rather to play

23  a research project.

24  A.   I wouldn't say that it wasn't serious.  I intentionally put

25  on my e-mail, "I am seriously asking this question," so I

Michael Ledford - Cross

1    honestly wanted them to take answering it seriously, but yes, I

2    knew the answer that there was none available certainly when I

3    asked it.

4    Q.   Certainly.  You weren't playing a joke on them, right?

5    A.   No.

6    Q.   You were dead serious that you needed to know this

7    information.

8    A.   Correct.

9    Q.   Even though you knew the answer, which is that it couldn't

10   be done.

11   A.   Correct.

12   Q.   Okay.  Part of the reason that this was a big ask and

13   couldn't be done is because it would take at least a year to

14   execute even if it was possible, right?

15   A.   Yeah, I don't know that I would classify it as it couldn't

16   be done.  I mean, it could be done.  Everything's got a cost.

17   But again, like I said, it would take a lot of time; you are

18   right in that.  And it would take a lot of money to do it.

19   Q.   It would take at least a year to be done, right?

20   A.   I think that's a fair statement.

21   Q.   And that's because suppliers allocate volume at least a

22   year out, right?

23   A.   Correct.

24   Q.   It takes a year of planning the volume from egg laying to

25   processing the resulting chicken.

Michael Ledford - Cross

1   A.   Yes.

2   Q.   And since these chickens are already obligated to other

3   buyers a year out, the suppliers are obligated to fulfill those

4   contracts, right?

5   A.   That is correct.

6   Q.   It would take at least a year to shift volume from Popeye's

7   to KFC.

8   A.   Well, the only -- once maybe call out to the year, I think

9   it depends on where within the year it was.  So typically

10  speaking, most QSR or fast-food chains negotiate contracts in

11  the fall generally speaking.  So if this request was coming in

12  the spring, it could have been nine months, not a year.  I

13  think it really depends on when you're asking that question.

14  Q.   Sure.  And in addition to these birds potentially being

15  taken from Popeye's and given to you, another option would have

16  been for Popeye's to agree to use a larger bird, right?

17  A.   Yes.

18  Q.   And pay for a larger bird.

19  A.   Yes.

20  Q.   Now, ultimately because of all the issues we just discussed

21  including volume commitment to other customers, you viewed this

22  request as a little bit outrageous, right?

23  A.   It was a big ask for sure, yes.

24  Q.   Outrageous being your words to the government when they

25  interviewed you.

Michael Ledford - Cross

1    A.  I don't specifically remember saying outrageous, but I'll

2    take your word for it.

3    Q.  No problem.  I want to ask you about another statement you

4    made to the government when they interviewed you.

5            Mr. Ledford, you interviewed with the government on

6    October the 2nd of 2020, right?

7    A.  Yes.

8    Q.  Now, do you recall Mr. Torzilli asking you about whether

9    you would have expected the different suppliers to be in

10   communication with each other regarding this ask?

11   A.  I don't believe Mr. Torzilli asked me any questions on

12   October the 2nd.  It was somebody else.

13   Q.  That was my poor question.  And let me start over, okay?

14           You testified to this jury this morning that you would

15   not have expected the suppliers to be in communication with

16   each other regarding your ask to produce a smaller weight or a

17   lower weight bird.  Do you recall that?

18   A.  Yes, I do.  That's correct.

19   Q.  Now, you did, in fact, interview with the government on

20   October the 2nd, 2020; is that right?

21   A.  Yes.

22   Q.  You interviewed with them via WebX, right?

23   A.  Correct.

24   Q.  This was in the middle of the pandemic?

25   A.  Yes.

Michael Ledford - Cross

1    Q.   As we sit here in masks.

2    A.   Yes.

3    Q.   It was perhaps early, earlier in the pandemic.  Present at

4    that particular video teleconference was Special Agent Matthew

5    Koppenhaver, right?

6    A.   Yes, I believe that's correct.

7    Q.   Special Agent LaNard Taylor was present.

8    A.   I believe so.

9    Q.   Many members of the Department of Justice Antitrust

10   Division were present, including Michael Koenig, right?

11          MR. TORZILLI:  Objection, relevance.

12          THE COURT:  Overruled.

13   BY MR. BELLER:

14   Q.   Including Michael Koenig.

15   A.   I believe that's correct.

16   Q.   Ms. Laura Butte, she was present?

17   A.   I don't specifically remember her, but ...

18   Q.   Fair enough.  Mr. Torzilli was present.

19   A.   Yes.

20   Q.   Ms. Sweeney was present.

21   A.   Yes.

22   Q.   And you were asked questions very similar to what you've

23   been asked today, right?

24   A.   Yes.

25   Q.   You were asked if you would be -- you were asked on whether

Michael Ledford - Cross

1  or not you expected the suppliers to communicate regarding this

2  e-mail and this request, right?

3  A.  I believe that's correct.

4  Q.  Okay.  And what you told the Department of Justice and the

5  special agents is that you would not be surprised if suppliers

6  asked each other about this request for information because it

7  was a little outrageous and you knew it was difficult.  Does

8  that sound familiar?

9  A.  Vaguely, yes.

10  Q.  Okay.  I know it's been a while.  I appreciate what you

11  are -- that you are trying to remember and answer my questions

12  honestly.

13        So you knew it was a difficult request.

14  A.  Yes.

15  Q.  And it would not surprise you if the suppliers talked with

16  each other about this.

17  A.  Surprise me?  That would be consistent, I believe, with

18  what you said I said to them on October 2nd of 2020, so yes, I

19  don't think it would have surprised me.

20  Q.  You also made this request for a reduced weight bird of

21  Claxton Poultry, right?

22  A.  Yes.

23  Q.  So I know that you were asked on direct examination about

24  Pilgrim's, but I want to be clear.  You made the request of

25  Claxton as well?

Michael Ledford - Cross

1   A.  Yes.  I believe I made it of all our chicken-on-the-bone

2   suppliers.

3   Q.  Very good.  And as to Claxton you asked Mr. Brady this same

4   question.

5   A.  Okay.

6   Q.  Is that fair?  Do you recall that?

7   A.  I believe that's correct.

8   Q.  Within three days of your e-mail asking about the

9   availability of a 2.4-ounce bird, you heard back from

10  Mr. Brady, right?

11  A.  I don't remember how many days I heard back from him.  I am

12  sorry.

13  Q.  Very good.

14        MR. BELLER:  This has not been introduced, Your Honor.

15  May we have Government Exhibit 1601 shown only to counsel and

16  the witness and the Court, of course.

17  BY MR. BELLER:

18  Q.  Before you look at that document, Mr. Ledford, let me ask

19  you, so my question was within three days of your e-mail asking

20  about the availability of a 2.4-ounce bird, you heard back from

21  Claxton.  Would it refresh your recollection if you had an

22  opportunity to look at an e-mail exchange between you and

23  Mr. Brady?

24  A.  Yes.

25        MR. BELLER:  If we can show the witness 1601, please.

Michael Ledford - Cross

1   *BY MR. BELLER:*

2   *Q.* If you can take a moment and read that to yourself and let

3   me know whether that refreshes your recollection.

4        *MR. TORZILLI:* Your Honor, I believe 1601 was admitted

5   in evidence during direct examination of this witness.

6        *MR. BELLER:* And if it was, Your Honor, this is going

7   to make the next series of questions much easier.

8        *THE COURT:* It has been.

9        *MR. BELLER:* Excellent.

10        Can we publish that for the jury, please?

11        *THE COURT:* You may.

12   *BY MR. BELLER:*

13   *Q.* Mr. Ledford, this is an e-mail exchange between you and

14   Mr. Brady that occurs -- well, your e-mail is March 5th.

15   Mr. Brady's reply is on March 8th. Do you recall this

16   exchange?

17   *A.* Yes, I do.

18        *MR. BELLER:* Thank you. We can take that down now.

19   *BY MR. BELLER:*

20   *Q.* The response that you received from Mr. Brady was

21   consistent with what you had expected with this being an

22   outrageous request, right?

23   *A.* I guess I think the one thing based on my feedback to him,

24   I was wanting to know a little bit more specifically on what

25   would it take, what would it cost to do this.

Michael Ledford - Cross

1    Q.  Sure.  Because consistently what you were receiving --

2    generally, I should say, what you were receiving from the

3    suppliers is that we can't do it, right?

4    A.  That's correct.

5    Q.  Is it fair to say that the request or this project for KFC

6    for this reduced weight bird ultimately died, right?

7    A.  Yes, that's correct.

8    Q.  Didn't go any further.

9    A.  That's correct.

10   Q.  So I want to talk to you about other than this 2.4 --

11   2-pound, 4-ounce weight bird, I want to talk about other

12   situations in which you're not surprised that the suppliers

13   would talk to each other, okay?

14        There are days as you testified that a supplier cannot

15   fulfill volume commitment that was made to RSCS, right?

16   A.  Yes.

17   Q.  Same is true for Chick-fil-A, right?

18   A.  It's a little bit different with Chick-fil-A because we are

19   not shipping fresh product, so there is typically speaking not

20   surprises.

21   Q.  Understood.  Chick-fil-A is frequently frozen, right?

22   A.  Right.

23   Q.  And being frozen it allows Chick-fil-A to have more of a

24   stockpile on product.

25   A.  Correct.

Michael Ledford - Cross

1   Q.  And with a stockpile of product while there may be covers

2   and shorts, it's not nearly as dire as what it would be with

3   RSCS because RSCS and KFC is all fresh product, right?

4   A.  Correct.

5   Q.  Is that correct?

6   A.  Correct.

7   Q.  Thank you.  I think I may have spoken over your answer.

8   That was my fault.

9        So when a supplier is unable to fill an order, we

10  would say that that supplier is short, right?

11  A.  Yes.

12  Q.  So, for example, KFC in Birmingham, Alabama ordered however

13  much chicken.  And they were supposed to receive it from

14  Pilgrim's through a distributor, and Pilgrim's just doesn't

15  have the chicken available, right?

16  A.  Correct.

17  Q.  And a short happens for a multitude of reasons; you would

18  agree with me?

19  A.  Yes, I would.

20  Q.  So, for example, a supplier could have a maintenance issue

21  at one of their plants, right?

22  A.  Yes.

23  Q.  There is something called a line that's inside a plant?

24  A.  Yes.

25  Q.  The line is a line of equipment that processes chicken,

Michael Ledford - Cross

1   right?

2   A.   Correct.

3   Q.   So if there is a maintenance issue on a line and a line is

4   down, you're not able to process depending on the amount of

5   time potentially thousands or hundreds of thousands of

6   chickens, right?

7   A.   Yes, that's a possibility.

8   Q.   A truck breaks down trying to deliver an order, right?

9   A.   That can happen as well, yes.

10  Q.   Unfortunately as we've seen, trucks can tip over and you've

11  got chickens on the side of the road, right?

12  A.   Yes.

13  Q.   Regardless of the reasons, when it's not systematic you

14  wouldn't have expected the suppliers to call you to tell you,

15  hey, I'm going to be short on this restaurant in Birmingham,

16  right?

17  A.   No, I would not expect that.

18  Q.   You only wanted to be notified if it was a systemic

19  problem.

20  A.   That's correct.

21  Q.   So systemic problem meaning every Friday a company is

22  short.  You want to know about it.

23  A.   Yes.

24  Q.   One, so that you can take care of the underlying problem,

25  and two, so that you can cut back their volume the next year

Michael Ledford - Cross

1  because they can't necessarily reach their volume that they

2  committed to this year, right?

3  A.  Yes.  You want to ensure that that restaurant in

4  Birmingham, Alabama gets their chicken every Friday.

5  Q.  Absolutely.  Thank you.

6          Now, you would agree with me that there was no policy

7  at RSCS that said if a supplier is short, they are required to

8  call you and tell you, right?

9  A.  No, in my time there, we did not have a policy.

10  Q.  They did not have to clear the cover -- or the short

11  through you.

12  A.  No, they did not.

13  Q.  You would agree with me that covers and shorts happened

14  often enough that had it all gone through you, you probably

15  would have spent a good portion of your day doing nothing but

16  dealing with covers and shorts, right?

17  A.  Yes.  And I did not have time for that.

18  Q.  Understood.

19          Now, a distribution center can also fill a shortage,

20  right?

21  A.  Yes, they could.

22  Q.  So in other words, chicken is brought from the plant in

23  Claxton, Georgia to a distribution center loaded onto different

24  trucks and then driven around and dropped off at all the

25  different KFCs.

239

Michael Ledford - Cross

1   A.   Yes, that's correct.

2   Q.   And so that distribution center may have some additional

3   chicken inside of it, right?

4   A.   Yes.

5   Q.   So when there is a cover and short of purchase orders, the

6   purchase order for the short is not sent to you at RSCS, right?

7   A.   No.   We do not receive purchase orders.

8   Q.   So again if we are doing the example of Claxton selling to

9   Pilgrim's, Claxton is going to generate an invoice and send it

10  to Pilgrim's for payment, right?

11  A.   Yes.

12  Q.   And RSCS, you and your team, had already prenegotiated the

13  price of Claxton's chicken, correct?

14  A.   Yes.   We had prenegotiated the price of chicken with us,

15  yes.

16  Q.   And so the buy/sell transaction between Claxton and

17  Pilgrim's in this example wouldn't affect the market price of

18  that chicken, right?

19  A.   Can you say more there?   I don't know that I 100 percent

20  understand what you are asking.

21  Q.   Well, that was because it was a terrible question,

22  Mr. Ledford, so let me back up and change that just a little

23  bit.

24        Since the prices are already negotiated by you,

25  Claxton selling to Pilgrim's is going to be at the price that

Michael Ledford - Cross

1  you negotiated, right?

2  A.  I do not know that.

3  Q.  So you don't know if they may have upcharged your chicken?

4  A.  I do not know.

5  Q.  Okay.  If they sold your chicken at the price that you

6  negotiated, Pilgrim's then would know what price Claxton

7  charged you, right?

8  A.  Yes, for that period they would, yes.

9  Q.  All right.  This cover and short is important in the market

10 because it guarantees that continuous -- not guarantees, it

11 assists in that continuous and constant supply of chicken,

12 right?

13 A.  What do you mean by market?

14 Q.  Yeah, so in other words, when the suppliers are covering

15 for each other's shorts, it makes sure or it assists that

16 Birmingham, Alabama KFC from not running out of chicken.

17 A.  Yes, right.

18 Q.  Now, Mr. Torzilli asked if you knew how often or how

19 frequent it is for the different suppliers to cover another

20 supplier's short, okay?  The relevant period that we're asking

21 you about or that the jury is hearing about is between 2012 and

22 2019.  Are you familiar with that?

23 A.  Yes.

24 Q.  Are you familiar with or do you have knowledge that Claxton

25 sold other suppliers about $10 million worth of chicken during

Michael Ledford - Cross

1  that period of time?

2  A.  No, I do not have knowledge of that.

3  Q.  Okay.  So we spoke a few minutes ago about your at least

4  first interview with the Department of Justice that happened on

5  October the 2nd of 2020, right?

6  A.  Yes.

7  Q.  Would you agree with me, Mr. Ledford, that you first

8  learned about this criminal case in approximately June of 2020.

9  A.  I believe that's correct, whatever day the indictment came

10  out, yes.

11  Q.  Fair to say that it was relatively big news in the

12  industry?

13  A.  Yes.  It was huge news.

14  Q.  And you had knowledge that you and RSCS and KFC were, I

15  guess, involved so to speak in the indictment; is that fair?

16  A.  Yes, after seeing the indictment, yes.

17  Q.  Okay.  So the indictment I think you said, while we don't

18  have a date, but I think you said you learned about the

19  indictment when it came out in about June of 2020.

20  A.  Yes.

21  Q.  When the indictment came out, you had never been

22  interviewed or spoken to by the Antitrust Division of the

23  Department of Justice; is that fair?

24  A.  No, that's fair.

25  Q.  And while you were a part of or at least, I guess, the

Michael Ledford - Cross

1    subject of the indictment, no federal agent ever interviewed

2    you until October of 2020, right?

3              MR. TORZILLI:  Objection, relevance.

4              THE COURT:  Relevance?

5              MR. BELLER:  The relevance, Your Honor, is the timing

6    of the investigation.  I believe the timing of the

7    investigation is extraordinarily relevant for the jury to know

8    about.

9              THE COURT:  Let's have a side bar.

10       (At the bench:)

11             THE COURT:  All right.  Mr. Beller, so where is this

12   going and what do you mean by the timing is relevant?

13             MR. BELLER:  Thank you, Your Honor.

14             I believe the fact that the government did not

15   interview Mr. Ledford despite his obvious importance has been

16   stated to the jury until after the indictment was already six

17   months old I believe is relevant.  I also believe it is

18   relevant because we have now referenced the October 2nd 302

19   several times.  I think it goes directly to his ability to

20   proceed then versus his memory now.  I don't plan on going much

21   further into this, but I do believe the timing of the

22   investigation is very important, especially considering that

23   the agents are not going to be testifying to these particular

24   matters subject to the *Brooks* case and presumably the *Ray* case.

25             THE COURT:  Mr. Torzilli, anything from the United

Michael Ledford - Cross

1   States?

2        MR. TORZILLI:  Yes, Your Honor, two things.  One, I

3   don't see the relevance of asking whether he was interviewed.

4   I understand asking questions about his interview and prior

5   statements and I certainly understand that's fair game for

6   cross exam, but asking him about when he wasn't interviewed I

7   think just frankly isn't relevant, doesn't actually make

8   whether the conspiracy existed or whether any of these

9   defendants participated any more or less likely or bear on his

10  credibility, which are the issues that are salient for

11  cross-examination.  And then I also have a form objection that

12  I want to raise and can elaborate on it at an appropriate

13  moment.

14       MR. TUBACH:  Your Honor, this is Michael Tubach.  I

15  also wanted to join in Mr. Beller's argument about why this is

16  proper.  It seems highly proper to inform the jury, as I did in

17  my opening statement, that they indeed charged my client

18  without having interviewed a single person at Pilgrim's Pride

19  who worked with him.  And I think the fact they didn't

20  interview any of the key witnesses they are now calling before

21  they filed these charges explains why the government's charges

22  here are so unfounded.  They haven't done their homework.

23  That's a classic defense argument to use in closing.

24       MR. BELLER:  Your Honor, if I may, the thoroughness of

25  an investigation is always relevant.

Michael Ledford - Cross

1          MR. TORZILLI:  I think what Mr. Tubach said is a

2     perfectly fine argument and that's precisely what closing

3     argument is for; and this is cross-examination, not closing

4     argument.

5          THE COURT:  Hold on.  Mr. Feldberg next.  I can't hear

6     you, by the way.

7          MR. FELDBERG:  You need the underlying facts in

8     evidence to support the argument.  And the fact here is that

9     this witness and lots of other witnesses were not interviewed

10    pre-indictment.  That's the point.  Mr. Tubach opened on it.  I

11    opened on it.  And as Mr. Torzilli just conceded, it's proper

12    argument.  You need the underlying facts and this is one of

13    those facts.

14         THE COURT:  All right.

15         MR. TORZILLI:  Your Honor, I do have one other

16    objection.

17         THE COURT:  Is this a form objection?

18         MR. TORZILLI:  Yeah, it is.  And I think it's an

19    incredibly improper question I would be happy to elaborate on.

20         THE COURT:  Go ahead.

21         MR. TORZILLI:  Mr. Beller used the word "subject" to

22    imply to Mr. Ledford and I ask that it be stricken.  There is

23    no evidence that Mr. Ledford was ever subject of the

24    investigation.  That's completely inappropriate.

25         THE COURT:  The phrase was used.

Michael Ledford - Cross

1        Mr. Beller?

2        *MR. BELLER:*  Your Honor, as the Court knows, I was

3 trying to be extraordinarily careful to not call him a witness.

4 I realize that everybody in this room recognizes that the word

5 subject does have a different meaning to us.  I do believe that

6 it has a different meaning to only us and not a single person

7 in that jury.  With that said, I think Mr. Torzilli's statement

8 is well-founded.  I recognize and hear what he is saying given

9 our additional, I think, knowledge of the use of that word.

10 And so if there is a different word that he suggests I use so

11 that it's not one implying that he was a subject of the actual

12 investigation, I am happy to do so.

13        *THE COURT:*  I think he was -- you may have described

14 to him the question as being a subject of the indictment.  Is

15 he named in the indictment?

16        *MR. BELLER:*  No, Your Honor.  He is named only in

17 coded form only.  And I believe that in the translated form he

18 is, in fact, named in there, but it's -- you know, I believe

19 his moniker was QSR-1, employee 1, or something along those

20 lines.

21        *MR. FAGG:*  Your Honor, John Fagg.

22        Just to be clear, he is referenced by an anonymous

23 indicator in the indictment.

24        *THE COURT:*  Okay.  But not in any type of way that

25 implies he is part of the alleged conspiracy, correct?

Michael Ledford - Cross

1          MR. FAGG:  Correct.

2          THE COURT:  Okay.  Here is what I am going to do.

3   First of all, as to the objection to the question concerning

4   the timing and when he was interviewed relative to the date of

5   the indictment, that objection will be overruled.

6          As to the objection to the use of the term "subject"

7   in the question, that will be sustained.  And I'll ask

8   Mr. Beller to simply rephrase the question.

9          All right.  Thank you.

10      (In open court:)

11         THE COURT:  The objection will be sustained in part

12  and overruled in part.

13  BY MR. BELLER:

14  Q.  Just a few more questions on this subject, Mr. Ledford.

15         At the time the news of the indictment broke, you had

16  not been interviewed by anyone at the Department of Justice; is

17  that fair?

18  A.  That is correct.

19  Q.  Not a federal agent.

20  A.  No, no federal agents.

21  Q.  Or a prosecutor.

22  A.  That's correct.

23  Q.  You weren't interviewed by the DOJ for the first time until

24  roughly five months after the indictment; is that right?

25  A.  That is right.

Michael Ledford - Cross

1   *Q.* And never again interviewed until just a few weeks ago,

2   correct?

3           *MR. TORZILLI:* Objection, foundation.

4           *THE COURT:* Overruled. He can answer.

5   *A.* I believe it was maybe a couple months ago.

6   *BY MR. BELLER:*

7   *Q.* In September?

8   *A.* Yes.

9   *Q.* I guess more than a few weeks. September is when you were

10  interviewed. So you were not interviewed between October of

11  2020 until September of 2021. You were interviewed in

12  September of 2021 several times in order to prepare you for

13  your testimony today; is that right?

14  *A.* Yes.

15  *Q.* Okay. So in your direct examination from this morning, you

16  spent some time speaking with Mr. Torzilli about whether

17  suppliers should or should not be communicating. Do you recall

18  that?

19  *A.* Yes.

20  *Q.* Now, if you knew suppliers were talking, fair to say you

21  would have cut volume from them, right?

22  *A.* I think that would have been a possibility.

23  *Q.* That was or was not?

24  *A.* I think it would have been a possibility.

25  *Q.* Okay. Sir, I want to talk just a little bit about your

Michael Ledford - Cross

1  specific dealings with Claxton Poultry, okay?  During

2  negotiations you worked with Scott Brady, right?

3  A.  Yes, Scott and Michael.

4  Q.  Scott Brady and Mikell Fries, right?

5  A.  Yes.

6  Q.  Now, Scott Brady, his title is the manager of national

7  accounts; is that right?

8  A.  I believe so.

9  Q.  And fall of 2012 was the first year you were working with

10  Mr. Brady while he was at Claxton; is that right?

11  A.  Yes.

12  Q.  And I say while he was at Claxton and that's because he was

13  previously at Pilgrim's.

14  A.  Correct.

15  Q.  And at Pilgrim's he sold a different product, right?

16  A.  Yes, I believe that's correct.

17  Q.  Further processed.  Does that sound familiar?

18  A.  That does sound familiar, yes.

19  Q.  So in fall of 2012, Mr. Brady was the new guy on these

20  negotiations.

21  A.  Yes, that's a fair statement.

22  Q.  So Mr. Fries in fall of 2012 had been up until that point

23  your usual person or point of contact for these KFC

24  negotiations; is that right?

25  A.  Yes, that's correct.

Michael Ledford - Cross

1  Q.  And at that time his title was also national accounts

2  manager, correct?

3  A.  I believe that's correct.

4  Q.  Jerry Lane at this period of time was the president of

5  Claxton Poultry.

6  A.  That is correct.

7  Q.  And Jerry Lane was the president of Claxton Poultry both

8  during the 2013 and the 2014 contract negotiations.

9  A.  Yes.

10  Q.  And that's because as you know, Mr. Fries did not become

11  president/CEO until 2016.

12  A.  Correct.

13  Q.  So let's talk a little bit more about this 2013 contract.

14         So the 2013 contract is negotiated in fall and early

15  winter of 2012, right?

16  A.  Yes.

17  Q.  Going into this negotiation you knew that suppliers'

18  margins were negative, right?

19  A.  I do not recall what their margins were.

20  Q.  Very good.  Do you recall that their margins were negative

21  even if you may not remember their specific margins?

22  A.  That period of time I do not.

23  Q.  So in your role at RSCS, you would frequently consult with

24  and report to the board of directors, right?

25  A.  Yes, every quarter.

250

Michael Ledford - Cross

1  Q.  Every quarter.  And part of that reporting every quarter

2  was from time to time putting together a PowerPoint

3  presentation, correct?

4  A.  Every time.

5  Q.  Every time.

6  A.  Yes.

7  Q.  And you played a part in drafting and publishing those

8  PowerPoint presentations, right?

9  A.  Yes.  I did them myself.

10 Q.  Did you do them all yourself?

11 A.  If it regarded chicken, yes.

12       MR. BELLER:  If we can show only the witness, counsel

13 and the Court, please, Defense Exhibit F-810.

14 BY MR. BELLER:

15 Q.  And I believe if it would be easier, I know it's on your

16 screen, but Mr. Ledford, this is also in the binder that I

17 handed you under the Tab of F-810.  Sir, if it would be easier

18 to reference the binder, you are welcome to.

19 A.  The screen is good.

20 Q.  Okay.  Do you recognize what is depicted in F-810?

21 A.  Yes, I do.

22 Q.  I am sorry?

23 A.  Yes, I do.

24 Q.  Okay.  And is this PowerPoint presentation or is this

25 report something that you and RSCS used in the ordinary course

1    of the business?

2    A.  Yes.

3    Q.  Did you, the board and RSCS rely on this document in

4    conducting its business?

5    A.  Could you tell me more about what you mean by rely on?

6    Q.  Yes, absolutely.  Is this something that either you, the

7    board or RSCS as a larger entity would use in order to make

8    decisions and/or assist you in making decisions?

9    A.  Yes.

10   Q.  And to the best of your knowledge, understanding that you

11   have a limited amount of information in front of you, is this

12   document accurate and reliable?

13   A.  To the best of my knowledge.

14          MR. BELLER:  Your Honor, at this time I would move for

15   the admission of F-810.

16          THE COURT:  Any objection to the admission of F-810?

17          MR. TORZILLI:  No objection, Your Honor.

18          THE COURT:  F-810 may be admitted.

19          MR. BELLER:  Thank you, Your Honor.  And may I

20   publish?

21          THE COURT:  You may.

22          MR. BELLER:  May I please have Page 10 of F-810?

23   BY MR. BELLER:

24   Q.  If you could take just a moment, and I will give you a few

25   minutes, Mr. Ledford, to get to Page 10 of F-810.

Michael Ledford - Cross

1    A.   Okay.

2    Q.   Have you had a chance to review Page 10 of F-810?

3    A.   Yes.

4    Q.   Is it fair to say that you wrote and reported to the board

5    on Page 10 that suppliers, meaning chicken suppliers' margins,

6    were in the negative, right?

7    A.   Yes.

8    Q.   In fact, Mr. Ledford, there were record losses for the

9    chicken suppliers in 2011 and 2012, right?

10   A.   Yes.

11   Q.   At least six poultry companies had gone bankrupt in the

12   prior 24 months, correct?

13   A.   That's correct.

14   Q.   Supply of broiler chicken was down.

15   A.   Yes.

16   Q.   Supply was down because of a severe drought across the

17   country, right?

18   A.   Yes.

19   Q.   The severe drought caused a reduction in supply because the

20   producers needed to offset their increased cost of feed, right?

21   A.   That's a fair assumption.

22   Q.   Okay.  And by that what I mean is if there is a drought,

23   there is not as much corn.  And if there is not as much corn,

24   the corn price has gone up, correct?

25   A.   Correct.

Michael Ledford - Cross

1   Q.  If the corn price has gone up, it costs more to feed the

2   chickens.

3   A.  Correct.

4        MR. BELLER:  Okay.  We can take the exhibit down.

5   Thank you.

6   BY MR. BELLER:

7   Q.  Because of all of this, supply going into contract

8   negotiations, supply of small bird plants was continuing to

9   shrink with higher long-term margins in the bigger bird

10  categories, right?

11  A.  Correct.

12  Q.  So with lower production across the industry, there was

13  expected to be a slight to moderate market inflation across all

14  product types for 2013, right?

15  A.  Yes.  That's what I said in the document.

16  Q.  Demand was expected to increase for chicken.  If it would

17  help you, and since --

18  A.  Yes, I see that now, yes.

19  Q.  Very good.  So let me ask the question again.  Demand was

20  expected to increase for chicken; is that right?

21  A.  That is correct.

22  Q.  Hot wings, for example, was expected to go up 27 to

23  32 percent, right?

24  A.  Could you direct my attention to that?

25        MR. BELLER:  Yes.  If we can have the exhibit brought

Michael Ledford - Cross

1   up, please, and specifically I am looking at Page 11.

2           This can be published to the jury as well, please.

3           *THE COURT:*  It can.

4           *MR. BELLER:*  Thank you.

5   *BY MR. BELLER:*

6   *Q.*  Fair to say that hot wings were expected to go up 27 to

7   32 percent?

8   *A.*  Yes.

9   *Q.*  The wing market was at a record level, right?

10  *A.*  I believe so.

11  *Q.*  Supply was tighter than ever?

12  *A.*  It was certainly tight, yes.

13  *Q.*  Would you agree with me that for most of 2012 wing price

14  was averaging about $2.50 a pound?

15  *A.*  That sounds directionally accurate based on the best of my

16  knowledge.

17  *Q.*  Okay.  Very good.  And at this time despite the wing market

18  or the wing price averaging $2.50 a pound, UFPC or RSCS was

19  paying an average of less than $1.70; is that right?

20  *A.*  Yes.

21  *Q.*  80 cents less than the market price.

22  *A.*  That sounds right.

23  *Q.*  Or about 30 percent, correct?

24  *A.*  That sounds right.

25  *Q.*  I am not a math wizard, but I think 30 percent is about

1    right.

2            So chicken was in demand as a lower priced option

3    compared to beef and pork.

4    A.   Yes.

5    Q.   So you testified to the jury that for 2012, UFPC or RSCS

6    pricing was below market on wings.  But you would agree with me

7    that you were also below market on tenders, right?

8    A.   Without being shown something, I don't remember what the

9    market was on tenders.

10           MR. BELLER:  Very good.  Sir, can we have only for

11   counsel, the witness and the Court Exhibit F-810?  Excuse me, I

12   am sorry, with F-810 that is in evidence, if we could have

13   Page 10, please.

14           THE COURT:  Yes, and that may be published.

15           MR. BELLER:  Thank you.

16   BY MR. BELLER:

17   Q.   So chicken was in demand as a lower option compared to beef

18   and pork.

19   A.   Yes.

20   Q.   And if we turn to Page 13, UFPC, RSCS was below market on

21   tenders, dark meat and eight-piece, right?

22   A.   Yes, that's correct.

23   Q.   Very good.  Thank you.

24           Is it fair to say, Mr. Ledford, that going into this

25   negotiation you needed Claxton, didn't you?

Michael Ledford - Cross

1   A.  Yes.

2   Q.  You needed them to ensure supply of chicken.

3   A.  Yes.

4   Q.  You needed them to meet your strategic objectives.

5   A.  Yes.

6   Q.  And that's because they tended to offer a more competitive

7   price, right?

8   A.  I do not remember specifically.

9          MR. BELLER:  If we can have Page 15 of that exhibit,

10  please.

11         If you could take just a moment to review Page 15.

12         And if we could publish it as well, please.

13         THE COURT:  You may.

14  BY MR. BELLER:

15  Q.  Claxton and other small producers tended to offer more

16  competitive pricing; is that right?

17  A.  Yes.  That's what I said in the document.

18  Q.  Very good.

19         MR. BELLER:  Your Honor, seeing the time I am very

20  happy to keep going or this is a good time for a break.

21         THE COURT:  This is a good time for a break.  Ladies

22  and gentlemen, we will take the mid-afternoon break at this

23  time.  We will take 20 minutes.  Plan on reconvening 25 minutes

24  to 4:00.  Thank you.  The jury is excused.

25         (Jury excused.)

Michael Ledford - Cross

1          Mr. Ledford, you are excused until after the break.

2     Thank you very much.

3          Let's talk quickly, if we can, about the plan for

4     tomorrow.  Have people had a chance to discuss that?  Do we

5     have a plan for tomorrow?

6          MS. CALL:  Your Honor, we have not had an opportunity

7     to discuss.  I will note it seems like cross-examination may be

8     somewhat long for Mr. Ledford.  And he has traveled back and

9     forth I believe three times already, so it probably makes sense

10    to at least have the opportunity to finish his testimony.  I

11    think the government's suggestion would then be once his

12    testimony is complete to perhaps excuse the jury tomorrow,

13    whatever time of day that would be, if possible, so that we can

14    switch to addressing these exhibits because I think the

15    government's next several witnesses are relatively shorter in

16    terms of expected testimony.  And there runs a greater risk

17    that we wouldn't have the opportunity to put evidence in at a

18    time where would be understandable and relevant for the jurors.

19         THE COURT:  Okay.  Let's assume that we finish

20    Mr. Ledford.  Reactions to the idea that whatever time that

21    examination ends we then take up the issue of exhibits even if

22    that means excusing the jury at whatever point that is?

23         Mr. Feldberg?

24         MR. FELDBERG:  Wouldn't it be better for the jury, not

25    to say counsel, if there is going to be some time without the

258
Michael Ledford - Cross

1   jury that it be Friday following the Thursday holiday so they

2   have more time off consecutively?

3          THE COURT:  Yes, but that assumes that it would be all

4   day Friday, and I am not sure we've determined that.  I just --

5   I don't have a good basis to estimate.

6          MR. FELDBERG:  But we could actually make a decision

7   about that.  If we continued with witnesses through the day

8   tomorrow and then we could make a judgment as to how much time

9   the prosecution needs to put in whatever exhibits they still

10  want to put in, they could do that Friday.  They would have --

11  and we would have a better idea at the end of testimony

12  tomorrow where we are in progressing with the testimony and how

13  much time might be needed to put in the exhibits.  That's just

14  a suggestion.  I haven't conferred with co-counsel.

15         THE COURT:  Let's hear the suggestions from Mr. Fagg

16  and Mr. Tubach, and then we will get the reaction of Ms. Call.

17         MR. FAGG:  One thought, Your Honor, that is as it

18  relates to tomorrow, I anticipate that the government is going

19  to want to put in a large number of additional documents.  And

20  so it would be quite challenging to get ready for the other

21  witnesses' testimony tomorrow in addition to preparing on those

22  documents.  And so some additional time in addition to the

23  reasons Mr. Feldberg mentioned I think would make our time

24  together discussing those documents more efficient.

25         THE COURT:  Well, I think that that may go a little

 1   bit against what Mr. Feldberg suggested.  I think

 2   Mr. Feldberg's suggestion is that we try to use tomorrow for

 3   witness testimony regardless of whom and then try to devote

 4   Friday to documents.

 5        MR. FAGG:  I am sorry if I wasn't clear, Your Honor.

 6   I was agreeing with Mr. Feldberg and his suggestion.  I think

 7   that if we had -- we will need time to get the documents from

 8   the government.  We don't yet have that list, I don't believe,

 9   and I apologize if we do, but there are a larger number of

10   documents I think in looking at the schedule that the

11   government has proposed for their witnesses.  I think there is

12   a hundred exhibits that they anticipate going through.  And so

13   I was agreeing with Mr. Feldberg with proceeding with witnesses

14   tomorrow and pushing off our document discussion until perhaps

15   Friday.

16        THE COURT:  Mr. Tubach?

17        MR. TUBACH:  I was just going to offer a data point.

18   I calculated the amount of time we spent per exhibit this

19   morning and it was 3.6 minutes per exhibit.  That may not be

20   accurate going back, and I believe the first time we did this

21   it was something like in the high 2s, 2 minutes, 2-point

22   something per document.  So depending on how many more exhibits

23   the government wants to introduce without a witness, we could

24   without perfection but in some way calculate roughly how long

25   that's going to take to get through.  And that would help us

Michael Ledford - Cross

1   plan when we should do that because frankly I don't know if

2   it's going to be another two hours or if it's going to be an

3   all-day event.  I think that would help us figure that out.

4           THE COURT:  Just like in the chicken industry,

5   quantification has its purposes.  That could be a way of

6   estimating.

7           Mr. Gillen?

8           MR. GILLEN:  Your Honor, earlier the government had

9   sent out an e-mail delineating certain documents that they

10  intended to introduce after the testimony of the witnesses that

11  they had projected for this week.  So we have that list out

12  there with us.  The question to me would be are there going to

13  be additional documents and exhibits, and I would assume

14  probably there would be.

15          In the event that that is the case, I would concur

16  with my colleagues that it would be I think probably an

17  excellent use of time to go forward with testimony tomorrow,

18  get in that testimony.  And then if they give us a list of the

19  documents that we would be reviewing for Friday, we would have

20  Thursday to get all that together so that we could have a full

21  review and evaluation of those documents on Friday.

22          THE COURT:  Understood.

23          Ms. Call, reaction to those suggestions?

24          MS. CALL:  Yes, Your Honor.

25          So I think defense counsel do have -- the list they

Michael Ledford - Cross

1   have been referring to is the one they filed with Your Honor as

2   Exhibit 1 to one of the filings this week.  And I did the math

3   this morning eyeballing it.  It was approximately 143 exhibits

4   that remained on that list which was exhibits to be introduced

5   absent sponsoring witnesses for essentially the rest of the

6   government's case in chief.  With Mr. Tubach's math that would

7   be approximately eight and a half hours of hearing that would

8   be dedicated to those.

9           As we discussed on Friday or Monday, either last

10   Friday or this Monday, there is the additional issue of the

11   exhibits that then underlie our summary exhibits as sources

12   just connecting names with phone numbers and employers.  Taking

13   Your Honor's suggestion, we had attempted to stipulate to that,

14   but we never heard back, so there are an approximate a hundred

15   additional documents that are simply sources for that

16   information.  I doubt it would be three minutes per document

17   for that kind, and we could perhaps address them on a grouping

18   basis, but it would be over a full day of court at least with

19   the documents that we are discussing.

20           *THE COURT:*  Okay.  The next question is let's assume

21   that because it looks like we would use all day Friday, would

22   the government have witnesses to fill up all day tomorrow?

23           *MS. CALL:*  It is hard to approximate I will say not

24   having anticipation of the length of cross-examination

25   tomorrow.

Michael Ledford - Cross

1          THE COURT: Sure. But if anything -- right.  Go

2    ahead, sorry.

3          MS. CALL: I think we will have them available.  It

4    would be helpful to have some certainty on whether there is any

5    chance they would get called because these folks obviously

6    would like to go home if they could.  And I think it does risk

7    prejudicing our case, as I said, with just these shorter

8    witnesses.  If we get four witnesses ahead in one afternoon,

9    we're then putting in a large number of the documents for the

10   jury to consider at one time that relate to the testimony of

11   five different individuals possibly.

12         THE COURT: Well, I think that what it sounds like is

13   we may be able to have a full day tomorrow of witnesses.  And

14   if we have a full day but we don't finish the witnesses that

15   you were hoping, it may not necessarily be a catastrophe.

16   After all, the witness is going to have to perhaps go home

17   anyway because of Veterans Day.  And if the witnesses -- if you

18   run out of witnesses, the planned witnesses, we could send the

19   jury home and then use whatever time remained of tomorrow to go

20   through exhibits again.  So that sounds to me like a good plan.

21   Can the government do that?

22         MS. CALL: Yes.  I think we can make that work, Your

23   Honor.  And I will just note for timing purposes that we would

24   plan to introduce some of the documents we addressed this

25   morning after Mr. Ledford's testimony, so that does add likely

Michael Ledford - Cross

1   an hour, an hour and a half to tomorrow's timing.

2           THE COURT:  Remind me, which exhibits would those be?

3           MS. CALL:  All of the ones that the government offered

4   when I was speaking during the hearing from 8:00 to 10:00 this

5   morning.

6           THE COURT:  Okay.  I'm not sure it will take that

7   long, but I understand.  Okay.

8           Does that sound like a plan?  Is that workable?  So

9   the proposition would be we just tell the jury to come back

10  tomorrow.  I don't think I will say anything about Friday yet,

11  but the anticipation would be that they would be off on Friday.

12          Mr. Gillen?

13          MR. GILLEN:  Yes, Your Honor.  That plan sounds fine

14  except for one glitch, and that is the government said if they

15  finish early with the witnesses tomorrow, then we go into the

16  exhibits -- and the documents that they publish to the jury,

17  then we would go into the examination of the tendered exhibits.

18  And what I want to know is what specifically are the exhibits

19  that they are going to be tendering.  We don't need to get

20  something at 10:00 or 11:00 o'clock tonight and be prepared for

21  it tomorrow afternoon.  I think that's what some of my other

22  colleagues were referencing.  We just want to have an efficient

23  examination of the exhibits and time to prepare.

24          THE COURT:  I understood Ms. Call, but she can correct

25  me if I'm wrong, to say that she was going to be offering the

Michael Ledford - Cross

1   ones that we took up this morning and were ruled on, and

2   therefore there wouldn't be an issue of preparation.

3           MR. GILLEN:  Correct.  I misunderstood, because what I

4   thought she said was that after they did the publishing of

5   those documents the Court admitted, that we would then begin an

6   examination of their tendered documents which would be in

7   controversy.  If I am mistaken, then I am sorry.

8           THE COURT:  Response, Ms. Call, for clarification?

9           MS. CALL:  Yes, Your Honor.  I believe your

10  understanding was correct.  I will note there is obviously a

11  longer list we hope to get to in terms of one subject matter.

12  There was just one document remaining we didn't get to, so I

13  would hope to perhaps introduce that at the same time as the 19

14  or so we did address this morning, but aside from that it would

15  be nothing else that has not already been addressed and ruled

16  on.

17          THE COURT:  Why don't you do this, Ms. Call.  I am not

18  going to say we will do it today, but if you can communicate

19  that exhibit, because it could come up today, we might be able

20  to take that up at 5:00, but we'll see.  But other than that,

21  it will just be the ones that -- in any event, it will just be

22  ones tomorrow after Mr. Ledford finishes that we've talked

23  about today, okay?

24          MS. CALL:  And just so counsel is informed, it is

25  Government Exhibit 1547.

Michael Ledford - Cross

1        THE COURT:  All right.  Does that plan work for

2   everyone?

3           Mr. Fagg?

4        MR. FAGG:  One last question for the government, and

5   that is simply the witnesses that they do plan to call

6   tomorrow, does the government intend to call the witnesses as

7   they appear in the latest order?

8        MS. CALL:  Yes.

9        MR. FAGG:  Thank you.

10       THE COURT:  Why don't we plan -- obviously we have

11  taken up most of the break and I will give you a break.  Why

12  don't we plan on everyone being ready quarter of, okay?  The

13  Court will be in recess.

14      (Recess at 3:30 p.m.)

15      (Reconvened at 3:46 p.m.)

16       THE COURT:  Let's go ahead and get the jury back in.

17      (Jury present.)

18       THE COURT:  Go ahead, Mr. Beller.

19       MR. BELLER:  Thank you, Your Honor.

20  BY MR. BELLER:

21  Q.  Good afternoon again, Mr. Ledford.

22  A.  Good afternoon.

23  Q.  We are in the home stretch, okay?

24      Mr. Ledford, I had asked you about the wing market and

25  the wing price, and this is going into the 2013 contract

266
Michael Ledford - Cross

1  negotiation.  You spoke about the PowerPoint presentations that

2  you had given to the board, so I want to show or direct your

3  attention to another one.

4        MR. BELLER:  This has not been admitted.  If we can

5  have Exhibit F-813, please.

6  BY MR. BELLER:

7  Q.  Do you see Exhibit F-813, Mr. Ledford?

8  A.  Yes, I do.

9  Q.  Mr. Ledford, what is the date on the front of F-813?

10  A.  September 2013.

11  Q.  And is this document a document that you prepared in

12  anticipation of negotiation for that round of -- or that period

13  of negotiations for the following year's contract?

14  A.  Yes.  This looks like it's part of our sourcing process,

15  which the first process was to do a category profile.

16  Q.  Like the other exhibit we showed which is F-810, is this

17  document, F-813, also used in the ordinary course of RSCS's

18  business on the date on the document?

19  A.  Yes.

20  Q.  And is it something that RSCS relied on in conducting its

21  business?

22  A.  Yes.

23  Q.  And is it accurate and reliable to the best of your

24  knowledge?

25  A.  Yes, to the best of my knowledge.

Michael Ledford - Cross

1              *MR. BELLER:*  At this time I would offer F813 --

2              *THE COURT:*  Any objection to the admission of F-813?

3              *MR. TORZILLI:*  No, Your Honor.

4              *THE COURT:*  F-813 will be admitted.

5              *MR. BELLER:*  Thank you.

6         And if we could publish Page 65, please.

7              *THE COURT:*  You may.

8              *MR. BELLER:*  So you don't have to count 65 pages.  We

9    will show it on the screen.

10             *MR. TORZILLI:*  There were 65 pages, Your Honor.  This

11   does not have 65 pages.

12             *THE COURT:*  Let's see if we have possibly a hard copy

13   that's complete for Mr. Torzilli.

14             *MR. BELLER:*  It will be depicted on the screen.  We

15   are also happy to provide Mr. Torzilli a copy of this as soon

16   as we find it.

17             *THE COURT:*  Mr. Torzilli, if you look at the screen,

18   is that sufficient for us to ask a few questions?

19             *MR. TORZILLI:*  I would like to see the full document

20   in hard copy to see if there are any issues that I need to

21   bring up with respect to objecting to the admission of the

22   entirety of the document.

23             *THE COURT:*  That's fine.  I think Mr. Tubach might

24   have --

25             *MR. TUBACH:*  I have a copy for counsel.

Michael Ledford - Cross

1          THE COURT:  If I don't mind sharing, that's great.

2          MR. TORZILLI:  Thank you.

3          THE COURT:  Mr. Beller, if you can hold off for just a

4     second and let Mr. Torzilli take a look at it.

5          MR. BELLER:  I am happy to.

6          MR. TORZILLI:  We do object to embedded hearsay

7     appearing on certain pages of this document that I can specify.

8     And it's Pages 128 through 141 both inclusive.

9          THE COURT:  I have already admitted the exhibit, so

10    those objections will be overruled.

11          All right, Mr. Beller.  Go ahead.

12          MR. BELLER:  If we can have the graph in the bottom

13    right quadrant zoomed in, please.

14    BY MR. BELLER:

15    Q.  Mr. Ledford, do you recognize the graph that is on the

16    screen in front of you?

17    A.  I do.

18    Q.  This is a graph that was prepared with this presentation

19    that was given to the board to discuss wings, right?

20    A.  So I don't know that this particular document went to the

21    board of directors, but it certainly would have been used

22    internally.  This level of detail with this many pages I am

23    pretty certain the board would not have seen.

24    Q.  No problem.  This was something that was prepared for

25    RSCS's use, and this particular chart tracks market cost as

Michael Ledford - Cross

1   well as UFPC price for wings over a period of time from 2011 to

2   2013; is that right?

3   A.   That's correct.

4   Q.   And it's fair to say that the market price for wings went

5   up significantly in 2012; is that right?

6   A.   Yes.

7   Q.   And so contracts for wings as entered into for, say, 2011,

8   suppliers were being paid roughly $1.70 for wings for 2011 and

9   2012, right?

10   A.   Yes.

11   Q.   And being paid $1.70 for wings during 2011, 2012 while

12   wings on the market went up significantly to around $2.50 and

13   sometimes higher during that same period.

14   A.   That is correct.

15        MR. BELLER:   Thank you.   We can remove that exhibit.

16   BY MR. BELLER:

17   Q.   Now, when we broke we were talking about the need that RSCS

18   had for smaller chicken producers, including Claxton Poultry.

19   So I want to pick up there.

20        You wanted to utilize the smaller suppliers, suppliers

21   like Claxton, to push the higher cost suppliers to come down,

22   right?

23   A.   Yes.   On this occasion that is correct.

24   Q.   So you kicked off the negotiation for the 2013 contract,

25   and I believe you kicked it off you had testified on

Michael Ledford - Cross

1    September 26, 2012; is that right?

2    A.   Sounds right.

3    Q.   And you did this as you testified by sending out an e-mail

4    to all the suppliers who are approved to sell KFC products.

5    A.   That is correct.

6    Q.   So not only do you invite the suppliers to provide you with

7    their price submission, but you also provide them with the

8    cost-plus model that they are supposed to use to formulate that

9    submission, right?

10   A.   Yes, for fresh chicken on the bone, that would be correct.

11   Q.   I am sorry, would you repeat that answer?  I didn't hear

12   you.

13   A.   For fresh chicken on the bone, we would have provided the

14   cost model, yes.

15   Q.   Thank you.  And Claxton was one of those approved KFC

16   suppliers who received this invitation from RSCS, right?

17   A.   That is correct.

18   Q.   So I think that what we had established on direct

19   examination is that on October 9th, 2012, Claxton submitted its

20   initial price proposal to RSCS to supply in 2013.  Do you

21   recall that?

22   A.   I believe that's correct.

23        MR. BELLER:  Okay.  I believe that that was entered

24   into evidence as Government's Exhibit 1505 and 1506.  Your

25   Honor, I would like to use those two exhibits in order to

Michael Ledford - Cross

1    create a demonstrative.  So I want to show you a demonstrative

2    that is, as I said, created from 1505 and 1506.  This is I-108,

3    Page 2.

4            Again, this is solely for the purpose of

5    identification and not because we intend to admit it.

6            If we can please pull up I-108, Page 2.

7    BY MR. BELLER:

8    Q.  Do you recognize what is shown on this demonstrative piece

9    of paper, sir, or demonstrative screen?

10   A.  Yes.

11   Q.  All right.  So this accurately shows, does it not, that on

12   round one, October 9, 2012, Claxton's eight-piece price

13   submission was .9620, right?

14   A.  Yes.

15   Q.  Their wings bulk was $1.8120, correct?

16   A.  I don't remember specifically what the wing prices were.

17   Q.  No problem.  Would it help you if you had the opportunity

18   to look at Government's Exhibit 1505 and 1506?

19   A.  Yes, it would.

20           MR. BELLER:  These are already admitted and I believe

21   published, Your Honor.

22           THE COURT:  Not 1506.  1505 is.

23           MR. BELLER:  Very good.  Is 1506 admitted and not

24   published?

25           THE COURT:  Not admitted.

Michael Ledford - Cross

1          MR. BELLER:  Not admitted, very good.

2          MR. TORZILLI:  If I may, 9692 is the government

3    exhibit that's associated with 1505.

4          MR. BELLER:  I am sorry?

5          THE COURT:  Exhibit 9602 is associated?  What do you

6    mean?

7          MR. TORZILLI:  9692 I believe was admitted into

8    evidence and is the attachment.

9          MR. BELLER:  If I may clarify, I believe that the

10   numbering for the government changed, so I appreciate that.  So

11   what I am asking about is 9692.  And Your Honor, I do believe

12   that that is admitted; is that correct?

13         THE COURT:  That's correct.

14         MR. BELLER:  And may I publish 9692, please?

15         THE COURT:  You may.

16         MR. BELLER:  Does the government have 9692 to be able

17   to show the witness?

18         Thank you.

19   BY MR. BELLER:

20   Q.  Do you see 9692 on your screen?

21   A.  Yes.

22   Q.  Is it fair to say that 9692 shows that Claxton on

23   October 9th, 2012 submitted an eight-piece price of .9620?

24   A.  Yes.

25   Q.  A bulk wing price of $1.8120?

Michael Ledford - Cross

1    A.  Yes.

2    Q.  A wing precounted of $1.9120?

3    A.  Yes.

4    Q.  And dark at 30 back.

5    A.  That's correct.

6    Q.  Very good.

7            MR. BELLER:  If we can go back to I-108, Page 2,

8    please.

9    BY MR. BELLER:

10   Q.  Do you see I-108, Page 2?

11   A.  Yes.

12   Q.  Does that accurately reflect the numbers that we just went

13   through on 9692?

14   A.  Yes, it does.

15           MR. BELLER:  Your Honor, I would ask to publish I-108,

16   Page 2, purely for demonstrative purposes.

17           THE COURT:  Any objection?

18           MR. TORZILLI:  No, sir.

19           THE COURT:  I-108 may be displayed to the jury for

20   demonstrative purposes.

21   BY MR. BELLER:

22   Q.  So on both the government's exhibit as well as the

23   demonstrative that is in front of you, Mr. Ledford, it says

24   Wings Bulk and in parentheticals it says +85.  Do you see that?

25   A.  Yes.

Michael Ledford - Cross

1   Q.   Is it fair to say that +85 was derived by taking the

2   eight-piece price and adding an 85-cent markup?

3   A.   Yes.

4   Q.   So if you add the eight-piece price with the 85 cents,

5   that's how you come to a wings bulk price of $1.8120; is that

6   right?

7   A.   Yes.

8   Q.   And then same thing with wings precounted.  You add an

9   additional here dime for the extra labor and time required to

10  count out all of the different wings and put them in a box

11  versus simply a weighted price; is that right?

12  A.   That's correct.

13  Q.   Okay.  Thank you.

14          On this document we have that dark meat is 30 back.

15  So I want to spend just a moment talking about a dark meat

16  price.

17          MR. BELLER:  We can take down this exhibit.  Thank

18  you.

19  BY MR. BELLER:

20  Q.   So dark meat, here we are calling it 30 back, is a dollar

21  amount that is subtracted from the eight-piece price, right?

22  A.   That's correct.

23  Q.   So in order to know the actual price of the dark meat, you

24  also have to know what the COB price is, correct?

25  A.   The COB, yes.

Michael Ledford - Cross

1    *Q.*  The COB, excuse me, the COB price or the eight-piece price.

2    So you would agree with me it's like going into a store and

3    seeing a sign for 20 percent off.  While something may be

4    20 percent off, you have no idea how much that item costs

5    unless you actually look at the original price tag, right?

6    *A.*  Correct.

7          *THE COURT:*  Mr. Beller, sorry to interrupt.  I wanted

8    to clarify something.  So the bell curve demonstrative I think

9    was also marked as I-108.

10         *MR. BELLER:*  It was, Your Honor.  It was I-108,

11   Page 1, and this is I-108, Page 2.  If the Court would prefer,

12   I am very happy to have all pages relabeled with their own

13   label if that would make it easier.

14         *THE COURT:*  Well, I think we would -- for instance, if

15   there is a multi-page demonstrative, if you just indicate what

16   page it is and then we will make a notation that I-108, Page 1

17   only, and we can go page by page.  That's not a problem.  But

18   otherwise there is confusion as to what portion of that

19   document.  So what page was the bell curve, do you recall?

20         *MR. BELLER:*  I do, Your Honor.  That was I-108,

21   Page 1.

22         *THE COURT:*  And the one that you just got finished

23   using?

24         *MR. BELLER:*  That is I-108, Page 2.

25         *THE COURT:*  That's fine.  Thank you.

Michael Ledford - Cross

1          Go ahead.

2          *MR. BELLER:*  And I will do a better job making sure

3     the record is clear as I go through these.

4          *THE COURT:*  No problem.

5     *BY MR. BELLER:*

6     *Q.*  So dark meat we were talking about.  So when you as the

7     buyer say to all the different suppliers, I want everyone at 31

8     back, what you're saying is you want their formula to depict 31

9     cents back from their COB price, right?

10    *A.*  Yes.

11    *Q.*  You're not dictating the actual cost of the dark meat.  You

12    are only dictating the formula cost, right?

13    *A.*  Correct.

14    *Q.*  So you were shown on direct examination Government's

15    Exhibit 1515, Page 4.

16         *MR. BELLER:*  And I am wondering if we can pull that

17    up.

18         Your Honor, I do believe that this was published.

19         *THE COURT:*  You may.

20    *BY MR. BELLER:*

21    *Q.*  Do you see what is shown to the jury and on your screen as

22    1515, Page 4?

23    *A.*  Yes.

24    *Q.*  All right.  You would agree with me that this was George's

25    dark meat price, right?

Michael Ledford - Cross

 1   A.  I don't see George's written.

 2   Q.  Understood.  Why don't we just say a supplier's.

 3   A.  Okay.

 4   Q.  This is a supplier's dark meat formula, correct?

 5   A.  Correct.

 6   Q.  How much does dark meat cost on 1515, Page 4?

 7   A.  The eight-piece price less 30 cents.

 8   Q.  Right.  So by looking at this, are you able to tell the

 9   jury what the cost is, what the price is?

10   A.  No.

11   Q.  And you say no because you have to know the COB price,

12   right?

13   A.  That's correct.

14   Q.  So simply knowing that one supplier is 30 back is not going

15   to tell anyone else how much they're actually paying or

16   charging for dark meat; is that right?

17   A.  That's correct.

18        MR. BELLER:  Let's pull up another one, 1552, also

19   admitted into evidence and I believe published, Your Honor.

20   This is Page 4.

21        THE COURT:  Yes, you may publish that.

22        MR. BELLER:  Thank you.

23   BY MR. BELLER:

24   Q.  Do you recall testifying about this document on direct

25   examination?

Michael Ledford - Cross

1   A.   Yes, I do.

2   Q.   Do you recall that this is Pilgrim's dark meat price?

3   A.   I do.

4   Q.   Can you tell the jury what Pilgrim's is charging for their

5   dark meat by looking at this document?

6   A.   No.

7   Q.   We know it's simply I believe 30 back, right?

8   A.   Correct.

9   Q.   But we don't know back from what.

10   A.   Correct.

11   Q.   Very good.  So I want to talk -- thank you.

12        I want to talk a bit more about round one bidding

13   2012.  Just like in past negotiations, after the suppliers

14   submitted their first round bid, you gave suppliers feedback on

15   their bids, right?

16   A.   Correct.

17   Q.   And this feedback is something that you usually did by

18   telephone.

19   A.   Yes.

20   Q.   Big suppliers may be in person, little suppliers telephone?

21   A.   I mean, I don't know if I could definitely say big versus

22   small, but some would be in person, some could be by phone for

23   sure or a combination of.

24   Q.   Sure, and thank you.

25        Do you recall, Mr. Ledford, that following this first

Michael Ledford - Cross

1   round of negotiations, that you said that you wanted all the

2   providers to be 31 back on their dark meat?

3   A.   I do not specifically recall that.

4   Q.   Do you recall that the average price on eight-piece after

5   round one was at .9812?

6   A.   I do not.

7          MR. BELLER:   If we can show, not publish, Your Honor,

8   Government Exhibit 1528.

9   BY MR. BELLER:

10  Q.   Actually, before you look at that, if you had the

11  opportunity to review an e-mail, do you know if the contents

12  may refresh your recollection on, No. 1, whether you asked

13  everyone to be at 31 back, and No. 2, whether the average was

14  .9812?

15  A.   Reviewing an e-mail would certainly help.

16  Q.   Okay.   If you could review that to yourself.   When you are

17  done reviewing it, let me know whether or not that has

18  refreshed your recollection.

19  A.   Okay.   I have reviewed it.

20  Q.   And does that refresh your recollection as to what you told

21  suppliers for what suppliers' average price was after round one

22  in 2012?

23  A.   No, it does not.

24  Q.   Very good.   We can move on.

25          Do you recall that as we established just a moment ago

280

Michael Ledford - Cross

1    that Claxton came in after round one with an eight-piece bid

2    price of .9620 for COB?

3    A.   Yes.

4    Q.   Let's talk then a little bit about round two.

5             After contacting and providing feedback to the

6    suppliers on round one, you asked them to submit a second

7    round, right?

8    A.   Correct.

9             MR. TORZILLI:   Your Honor, may I object and ask that

10   the document presently being displayed to the witness be

11   removed from the display?

12            THE COURT:   It's not being displayed to him.

13            Go ahead, Mr. Beller.

14            MR. BELLER:   Thank you.

15   BY MR. BELLER:

16   Q.   After negotiating with suppliers, you asked them to submit

17   a round two bid, right?

18   A.   Correct.

19   Q.   And in that round two bid, I believe that you were asked on

20   direct examination about Pilgrim's bid.  And so I would like to

21   ask you a little bit more about Pilgrim's bid.

22            MR. BELLER:   If we can see 9694, please, and I believe

23   that this is admitted and has been published?

24            THE COURT:   I believe so.

25            MR. BELLER:   And I believe the spreadsheet that goes

Michael Ledford - Cross

1   with it may be 1532.

2   BY MR. BELLER:

3   Q.  Do you see this document in front of you?

4   A.  Yes.

5   Q.  Bulk price for wings for Pilgrim's is what amount?

6   A.  $1.77.

7   Q.  And precounted for wings is what amount?

8   A.  $1.87.

9   Q.  And the eight-piece price is what?

10  A.  .9770.

11          MR. BELLER:  Thank you.  We can remove that.

12  BY MR. BELLER:

13  Q.  You also testified that Claxton submitted an offer at this

14  same -- or roughly the same time.  That is government

15  Exhibit 1501.

16          MR. BELLER:  If we can have 1501, please.  And Your

17  Honor, I believe this has been admitted and published.

18          THE COURT:  Yes, it has been, and it may be.

19  BY MR. BELLER:

20  Q.  And so Mr. Torzilli had asked you about this round one and

21  round two.  As to round two, will you read the wings bulk

22  price, please?

23  A.  $1.76.

24  Q.  And precounted?

25  A.  $1.86.

Michael Ledford - Cross

1   Q.  And so when you were asked whether or not those two prices

2   were -- I believe it was exactly the same, that's actually

3   incorrect, right?

4   A.  I believe I said the formula was the same.

5   Q.  The formula was the same.  The price is a penny different.

6   A.  That's correct.

7   Q.  And in terms of precounted, precounted being a dime more

8   than bulk, it's pretty standard in the industry, right?

9   A.  Not uncommon.

10  Q.  All right.  10 cents is usually deemed to be a fair price

11  for the labor and time involved in counting the wings.

12  A.  I certainly believe so at this time, yes.

13  Q.  Very good.  So since we have this exhibit up, if you would

14  please look at the eight-piece price and the dark meat price,

15  please.

16  A.  Okay.

17  Q.  So I want to show you a demonstrative.  This is I-108,

18  Page 3.  If you could take a look at I-108, Page 3.

19          On I-108, Page 3, Line 1 was I-108, Page 2.  You would

20  agree with me?

21  A.  Yes.

22  Q.  And the second line is round two, Claxton, that we just

23  went through in the prior document; is that correct?

24  A.  Correct.

25  Q.  Here we have eight-piece price at .9620.  Wings this time

Michael Ledford - Cross

1    has come down from the prior bid, right?

2    A.   Yes.

3    Q.   And it's come down to now $1.76, right?

4    A.   Correct.

5    Q.   Counted, $1.86?

6    A.   Correct.

7    Q.   Again reflecting that same 10-cent standard fair price for

8    precounted, right?

9    A.   Correct.

10   Q.   And 30 back.

11   A.   Correct.

12   Q.   So because the eight-piece price doesn't change, that means

13   your dark meat price also did not change between round one and

14   round two; is that right?

15   A.   That is correct.

16   Q.   However, the wing price went down.

17   A.   Correct.

18        MR. BELLER:   Thank you.   We can take the exhibit down.

19   BY MR. BELLER:

20   Q.   You would agree with me, Mr. Ledford, that market price is

21   usually a pretty fair place to at least start negotiations.

22   A.   It's certainly not unfair.

23   Q.   And it's also a common place to start negotiations, right?

24   A.   I think it would depend on which product.

25   Q.   So we had established that wing market in 2012 had record

Michael Ledford - Cross

1    highs in the last half of the year, correct?

2    A.   Yes.

3    Q.   Record highs on market for the last half of the year, and

4    the suppliers were receiving significantly less than market,

5    right?

6    A.   That is correct.

7    Q.   So they could have not had a contract with KFC and had been

8    making roughly 80 cents more.

9    A.   That is correct.

10   Q.   On these wings in the open market, right?

11   A.   Yes.

12   Q.   The government had shown you and I believe entered into

13   evidence and published Government's Exhibit 1501.

14        MR. BELLER:   Your Honor, is that correct?

15        THE COURT:   That's correct.

16        MR. BELLER:   If we can show that to the witness,

17   please.

18        THE COURT:   You may.

19        MR. BELLER:   And for the jury, excuse me.

20   BY MR. BELLER:

21   Q.   Again, showing $1.76 and $1.86 on wings.  I believe that --

22   well, let me back up.

23        When the cost model is e-mailed and sent to the

24   supplier, there is also instructions on that model for how to

25   fill out the model; is that right?

Michael Ledford - Cross

1   A.  Correct.

2   Q.  And that includes notations about wing prices, right?

3   A.  I'm not sure.

4   Q.  No problem.  How about bullet No. 7?  If you could look at

5   bullet No. 7 on this exhibit.

6   A.  Yes.

7   Q.  And if you could read bullet No. 7 to the jury.

8   A.  The FOB price for Q3 (effective 7/1/13) will be based on

9   the Urner-Barry Wing Meat Block average between March 10th,

10  2013 and June 8th, 2013.

11       MR. BELLER:  Thank you.  I am done with that exhibit.

12  BY MR. BELLER:

13  Q.  What you wanted was a flat price on wings instead of a

14  market-based price on wings, right?

15  A.  Correct.

16  Q.  And you wanted a flat price on wings because the wing

17  market in 2011 and 2012 was extremely unstable and

18  unpredictable, right?

19  A.  That is correct.

20  Q.  So if you have a flat fee for wings, it's going to provide

21  that stable pricing to both you and your franchisees' needs,

22  right?

23  A.  Correct.

24  Q.  Thank you.

25       Now, one quick question.  You had testified to the

Michael Ledford - Cross

1  jury that KFCs were closing stores and closing stores in

2  relatively high numbers during that period of time, right?

3  A.  Correct.

4  Q.  And closing stores because the market was down, right?

5       MR. TORZILLI:  Objection, foundation.

6       THE COURT:  Overruled.

7  A.  I would certainly classify or explain it as KFC sales were

8  definitely down.

9  BY MR. BELLER:

10  Q.  KFC sales were down.  And so what I am getting at is KFC

11  sales were down for a number of different reasons.

12  A.  Correct.

13  Q.  And it wasn't because of the chicken suppliers that sales

14  were down, right?

15  A.  No, it was not.

16  Q.  So we've spoken about round one.  We've spoken about round

17  two for 2012.  And so I want to talk a little bit about round

18  three.

19       After you received the round two negotiations, you set

20  up a call with the different suppliers to provide them feedback

21  and directional guidance off of their round two offers, right?

22  A.  Correct.

23  Q.  Do you recall that your call with Claxton Poultry happens

24  on November the 28th, 2012?

25  A.  I do not remember the specific date.

Michael Ledford - Cross

1          MR. BELLER:  If we could have defense Exhibit H-642.

2     BY MR. BELLER:

3     Q.  Let me ask you before you look at the screen, if you had

4     the opportunity to look at a meeting invite, do you think that

5     that may refresh your recollection on whether you had a call

6     with Claxton on November the 28th, 2012?

7     A.  Yes, it would.

8     Q.  If you could take a look at what's on your screen, please.

9     A.  Okay.

10    Q.  Does that refresh your recollection?

11    A.  Yes, it does.

12    Q.  Fair to say that you had a call with Claxton on

13    November 28, 2012?

14    A.  That is correct.

15    Q.  And that call included both Mr. Fries and Mr. Brady, right?

16    A.  That is correct.

17         MR. BELLER:  And we can take that down, please.  Thank

18    you.

19    BY MR. BELLER:

20    Q.  The purpose of that call on November the 28th was to

21    discuss the second round bid submission, right?

22    A.  Yes.

23    Q.  And to provide Claxton with further directional guidance on

24    where you wanted them to be on price.

25    A.  Yes.  It was to provide them feedback.

Michael Ledford - Cross

1  Q.  And to -- I think as you said on direct examination -- to

2  close things out regarding the contract, right?

3  A.  Yes.

4  Q.  So after the second round of submissions and after the

5  calls, there is a third round of offers that were received by

6  you, correct?

7  A.  Yes, I believe this particular year we did have three

8  rounds.

9  Q.  And Claxton Poultry provided you with a round three, didn't

10  they?

11  A.  Yes.

12  Q.  Do you recall that they provided you round three on

13  December the 3rd, 2012?

14  A.  I do not remember the exact date.

15  Q.  If you had the opportunity.

16  A.  Yes, it would certainly help.

17  Q.  Thank you.

18       MR. BELLER:  If we could have A -- excuse me, Defense

19  Exhibit A-574.

20  BY MR. BELLER:

21  Q.  Take a look at what I am showing you on the screen and let

22  me know whether or not that has refreshed your recollection.

23  A.  Yes.

24  Q.  Do you recognize what is depicted on A-574?

25  A.  Yes.

1    Q.   And A-574 is -- well, actually I am not going to ask you

2    off the document, okay?

3    A.   Okay.

4    Q.   On December 3rd, 2012, did you receive another e-mail

5    submission of what Claxton intended to do with their round

6    three bid?

7    A.   Yes.

8    Q.   And do you recall that they weren't making any changes

9    since their round two except they were changing case weight,

10   right?

11   A.   That's correct.

12   Q.   So despite only changing case weight, what that means for

13   all intents and purposes is that everything remained the same

14   from round two, right?

15   A.   Well, with the exception of the case weight, yes.

16   Q.   Yeah, excuse me, pricing-wise it remained the same --

17   A.   Correct.

18   Q.   -- except for case weight.

19          So let's go back to the Demonstrative I-108, and this

20   is now Page 3.  If you can take a look at I-108, Page 3,

21   Page 4.

22          Fair to say based on that e-mail that this accurately

23   depicts your knowledge of where pricing was on December 3rd,

24   2012?

25   A.   Yes.

Michael Ledford - Cross

1          MR. BELLER:  Your Honor, I would ask to publish Page 4

2    to the jury.

3          THE COURT:  Any objection to publishing I-108, Page 4

4    for demonstrative purposes only?

5          MR. TORZILLI:  No objection.

6          THE COURT:  It may be.

7    BY MR. BELLER:

8    Q.  And does that accurately reflect where Claxton's bid was

9    after three rounds?

10   A.  Yes.

11   Q.  Again, with the exception of case weights to be fair.

12   A.  Correct.

13   Q.  Now, do you recall that on December 3rd, 2012, this round

14   three offer from Mr. Brady came in at 4:53 p.m. eastern

15   standard time?

16   A.  I do not recall that.

17   Q.  Can I refresh your recollection?

18   A.  Please do.

19   Q.  Excellent.

20         MR. BELLER:  Can we show the witness A-574, please?

21   BY MR. BELLER:

22   Q.  Take a moment to review A-574, and let me know if your

23   memory is refreshed that you received this communication or it

24   was sent on December 3rd at 4:53 p.m. eastern standard time.

25   A.  Yes, that is correct.

Michael Ledford - Cross

1          MR. TORZILLI:  Objection as to the time zone that

2    appears in the header of this e-mail.

3          THE COURT:  Overruled.

4          MR. BELLER:  We can take that down, please.  Thank

5    you.

6    BY MR. BELLER:

7    Q.  So you testified to the jury quite a bit that if you didn't

8    like somebody's price, one of the tools that you had in your

9    pocket is to take away volume, right?

10   A.  Correct.

11   Q.  Or to threaten to take away volume, correct?

12   A.  Correct.

13   Q.  So four hours after receiving Mr. Brady's round three

14   submission where he doesn't change the price, you gave him

15   directional guidance.  Do you recall that?

16   A.  I do not recall specifically four hours later giving him.

17         MR. BELLER:  Can we have Government's Exhibit 1402,

18   please.

19         Your Honor, I do not recall if this has been admitted.

20         THE COURT:  Let me check.  I don't show it as having

21   been admitted.

22         MR. BELLER:  Very good.

23   BY MR. BELLER:

24   Q.  If you can take a look at Government Exhibit 1402, read it

25   to yourself and tell me whether that refreshes your

292

Michael Ledford - Cross

1    recollection as to when you may have responded to Mr. Brady's

2    round three submission.

3    A.   Yes, it does.

4    Q.   Approximately four hours later, right?

5    A.   Correct.

6          MR. BELLER:   Thank you.   We can take that down,

7    please.

8    BY MR. BELLER:

9    Q.   You recall telling Mr. Brady that if these are your final

10   numbers, Claxton will likely lose some volume, right?

11   A.   Correct.

12   Q.   You were pretty explicit with Mr. Brady that if Claxton's

13   numbers did not change, they would, in fact, lose volume,

14   right?

15   A.   Correct.

16   Q.   Fair to say, Mr. Ledford, that your threat to Claxton to

17   remove volume and take away volume had its intended effect,

18   right?

19   A.   I'm not sure.   I don't recall what exactly their final

20   number was.

21   Q.   Well, do you recall that within an hour of your feedback,

22   Claxton came in with an even lower third round bid?

23   A.   I do not recall that.

24         MR. BELLER:   If we can show the witness Defense

25   Exhibit A-577, and if we can please not publish this.

Michael Ledford - Cross

1          Your Honor, this is Government's Exhibit 1403.  I do

2    not believe that the government moved for its introduction.

3          THE COURT:  That's correct.  1403 is not in.

4    BY MR. BELLER:

5    Q.  Do you recall that within an hour of your directional

6    guidance, your threat to reduce volume, that Claxton came in

7    with a lower third round bid?

8    A.  Yes, that's correct.

9    Q.  This revised third round bid came in at 9:53 p.m. eastern

10   standard time on December 3rd, 2012.

11   A.  Correct.

12   Q.  Do you recall that they changed their wing price?

13   A.  Yes.

14   Q.  Their wing price bulk and their wing price precounted.  Do

15   you recall that?

16   A.  I'm not sure.  It just says wing pricing.

17   Q.  Very good.

18          MR. BELLER:  If we can show Defense Exhibit 751 not

19   admitted at this point.

20          THE COURT:  A-751?

21          MR. BELLER:  Give me just one moment.

22          MS. HENRY:  What's the number again, please?

23          MR. BELLER:  Give me just a moment.

24          Your Honor, this is already admitted, so therefore I

25   will use the government's exhibit and that's 1503.  And if we

294

Michael Ledford - Cross

1   can confirm that that is, in fact, in and has been published.

2          THE COURT:  Yes, it has been admitted and it may be

3   published.

4          MR. BELLER:  Thank you.

5   BY MR. BELLER:

6   Q.  Do you recall that this is the final contract price for

7   Claxton Poultry?

8   A.  Yes.

9   Q.  And if you can look at the numbers for wings and also for

10  precounted, because I am going to ask you to recognize those

11  numbers on a demonstrative here in just a moment.

12  A.  I do not see them on the page that's currently on the

13  screen.

14  Q.  Very good.  Give me just one moment.

15          Page 2, I believe.  Page 3?  They are all in.  We'll

16  go through them.  Page 3, how is that?

17  A.  No, that's the feed calculation sheet.

18  Q.  So 1503, if we can start with Page 4.

19          Page 4 shows KFC's COB dark meat at eight-piece minus

20  30 and a half, right?

21  A.  That would be the dark meat.

22  Q.  Yeah, the dark meat price.

23  A.  I am looking at wing prices on my screen.

24          MR. BELLER:  Can we have Page 4?

25  A.  Okay.  I've got it.

1   *BY MR. BELLER:*

2   *Q.*  Okay.  So that's dark meat showing at 30 and a half back,

3   right?

4   *A.*  That is correct.

5   *Q.*  Very good.  Next page.  It's COB white meat showing COB

6   plus 20 cents, correct?

7   *A.*  Yes.

8   *Q.*  The next page is whole wings showing COB plus 65 cents,

9   right?

10   *A.*  That's correct.

11   *Q.*  We have bites and tenders after that.

12          So on the front page of 1503 at the very bottom it

13   shows your COB price or your COB price -- excuse me, your FOB

14   price at .9625.  Do you see that?

15   *A.*  Yes.

16   *Q.*  Very good.

17          *MR. BELLER:*  If we can show you the demonstrative,

18   Page 5.

19   *BY MR. BELLER:*

20   *Q.*  So we have the -- we talked about the second round after

21   December 3rd.  And the second round after December 3rd, the

22   eight-piece price was .9620, correct?

23   *A.*  Yes.

24   *Q.*  The wings bulk was .9620 plus .65, so that ended up being

25   1.6120; is that right?

Michael Ledford - Cross

1   A.   On December 3rd?

2   Q.   Yes, the second round December 3rd.

3   A.   Yes.

4   Q.   Then we have the wings precounted is $1.7120 with 30 and a

5   half back for dark meat.

6   A.   Yes.  I believe there is one mistake on the page, though.

7   Q.   Tell me.

8   A.   Chicken on the bone was .9625 on the final, according to

9   the contract we just looked at.

10        MR. BELLER:  And so let me show you one more, Defense

11   Exhibit A-578.

12   BY MR. BELLER:

13   Q.   Do you recognize what is depicted in A-578?

14   A.   Some sort of cover page.

15   Q.   That's because it's in native form, so let me get the

16   non-native form for you.

17        Do you see the non-native form on your screen?

18   A.   Yes, I do.

19        MR. TORZILLI:  Objection.  That's the native form on

20   the screen.

21        THE COURT:  That appears to be the native form on the

22   screen.

23        MR. BELLER:  The native form.  Thank you for

24   correcting my misstatement.

25        THE COURT:  Go ahead.

Michael Ledford - Cross

1    *BY MR. BELLER:*

2    *Q.*   It shows a final contract price of .9625; is that right?

3    *A.*   No.   I see .9620.

4    *Q.*   And then is there an additional fee that is added at the

5    end for a supplier's fee that RSCS gets?

6    *A.*   I'm not seeing it on this page.

7    *Q.*   Understood.   Give me just one moment.

8       *MR. BELLER:*   So what I am trying to do is clear up

9    I-108, Page 5, so if we can show that to the witness, please.

10   *BY MR. BELLER:*

11   *Q.*   I-108, Page 5, that one shows the .9620 that we were just

12   looking at with A-578, right?

13   *A.*   Correct.

14   *Q.*   And that shows also $1.6120 per wings bulk, correct?

15   *A.*   Yes.

16   *Q.*   And $1.7120 for wings counted.

17   *A.*   Correct.

18   *Q.*   With 30 and a half back.

19   *A.*   Correct.

20   *Q.*   So we have on December 3rd as you testified that Mr. Brady

21   submitted an additional bid, didn't change the price.   You

22   threatened to take volume.   And within three hours Claxton

23   resubmitted another price that was lower on wings bulk and

24   wings precounted; is that correct?

25   *A.*   That is correct.

298
Michael Ledford - Cross

1  Q.  Very good.  Now, before this contract was finalized, there

2  was a small fee or a sourcing fee that RSCS added on to the COB

3  price, right?

4  A.  I believe that's correct.

5  Q.  And the COB price then went from .9620 to .9625; is that

6  right?

7  A.  Yes.

8       MR. BELLER:  And if we can show Demonstrative I-108,

9  Page 6, and publish to the jury, please.

10       THE COURT:  Any objection to the use of I-108, Page 6

11  for demonstrative purposes only?

12       MR. TORZILLI:  No objection, Your Honor.

13       THE COURT:  Page 6 of I-108 may be shown for

14  demonstrative purposes only.

15  BY MR. BELLER:

16  Q.  So this demonstrative completes the 2013 KFC contract as

17  negotiated and entered into by Claxton Poultry, right?

18  A.  Correct.

19  Q.  And you would agree with me that following your directional

20  guidance, Claxton Poultry reduced their price of wings, right?

21  A.  Yes.

22  Q.  Not only do they reduce their price of wings, but they also

23  reduce their price of dark meat.

24  A.  That is correct.

25  Q.  Thank you.  So I want to talk to you just a little bit

1  about how your 2012 negotiations ended up amongst all

2  suppliers.

3        You would agree with me that you believed that you had

4  a successful negotiation in 2012 for the 2013 contract, right?

5  A.  That is correct.

6  Q.  You negotiated a savings estimate of $5.5 million on KFC

7  fresh chicken, correct?

8  A.  I do not remember that number exactly.

9        MR. BELLER:  If we can pull up Defense Exhibit F-808.

10  BY MR. BELLER:

11  Q.  Mr. Ledford, do you recognize what is shown on your screen

12  as Defendants' Exhibit F-808?

13  A.  Yes, I do.

14  Q.  This is another one of those PowerPoint presentations that

15  you put together for -- well, for your own use, RSCS's use and

16  the board's use, correct?

17  A.  Yeah, and probably I would add to the brand.  We'd go to

18  the leadership teams at the brands as well.

19  Q.  Very good.  That is helpful.  I appreciate that.

20        And this one is from December of 2012, correct?

21  A.  Yes.

22  Q.  So this is at the end of the negotiation process with

23  recommendations to the brand and/or the board on how to provide

24  awards.

25  A.  Correct.

Michael Ledford - Cross

1  Q.  Right?  And when I say awards, I am talking about

2  contracts.

3  A.  Right.

4  Q.  Okay.  You would agree with me that just like the other two

5  that we've done this through, that this PowerPoint is used in

6  the ordinary course of RSCS's business, right?

7  A.  Yes.

8  Q.  And it is something that is relied on by RSCS in conducting

9  its business.

10  A.  Yes.

11  Q.  That it is accurate and reliable.

12  A.  Yes.

13       MR. BELLER:  At this time I would offer Defense

14  Exhibit F-808.

15       THE COURT:  Any objection to the admission of F-808?

16       MR. TORZILLI:  No objection.

17       THE COURT:  F-808 will be admitted.

18       MR. BELLER:  And if we can publish Page 7, please.

19       THE COURT:  You may.

20  BY MR. BELLER:

21  Q.  Take a moment and look at Page 7 of this, Mr. Ledford.  Let

22  me know when you have had a chance to review it.

23  A.  Okay.

24  Q.  You would agree with me that you negotiated a savings

25  estimated at $5.5 million on KFC fresh chicken.

Michael Ledford - Cross

1    A.   That is correct.

2    Q.   You negotiated a difference from a lowest to a highest

3    per-pound range of only .0085 cents per pound, right?

4    A.   I do not recall.

5            MR. BELLER:   If we can see Page 11 of the document,

6    please.

7    BY MR. BELLER:

8    Q.   Specifically I am going to draw your attention to the

9    footnote.

10   A.   Okay.

11   Q.   Is that correct that you negotiated a difference from

12   highest to lowest per-pound range of only .0085 cents per

13   pound?

14   A.   That's correct.

15   Q.   And that .0085 cents per pound was the tightest range in

16   recent history, right?

17   A.   That is correct.

18   Q.   You also negotiated a price of 1 cent per pound in case

19   weight savings from Claxton Poultry, right?

20   A.   Correct.

21   Q.   The per piece cost you negotiated, that's how much is a

22   wing, how much is a leg, right, was also the tightest range at

23   .005 cents per piece, correct?

24   A.   Correct.

25   Q.   You negotiated a flat price on wings instead of that

Michael Ledford - Cross

1    market-based price that we've been talking about.

2    A.   Correct.

3    Q.   And by negotiating that way, Mr. Ledford, you provided a

4    more stable pricing -- you provided more stable pricing for

5    your franchisees, right?

6    A.   Correct.

7    Q.   You were able to successfully keep dark meat in the same

8    30-cent area that you had targeted going into negotiations,

9    right?

10   A.   That is correct.

11   Q.   And the wing inflation was below the forecast for the 2013

12   market.

13   A.   That is correct.

14   Q.   So that's a very, very long-winded and lawyerly way of

15   saying that the 2012 negotiation for the 2013 contract was very

16   successful for RSCS.

17   A.   Yes, it was.

18   Q.   That year you also added Case Farms as a supplier, didn't

19   you?

20   A.   I believe that's correct.

21   Q.   And by adding Case Farms as a supplier, you provided

22   savings in both FOB cost and freight, right?

23   A.   I do not remember freight, but certainly FOB, yes.

24   Q.   Great.

25           MR. BELLER:   Can we have Page 46, please?

Michael Ledford - Cross

1  *BY MR. BELLER:*

2  *Q.*  And if you look at the bullets on the far right side of

3  that particular slide, you would agree with me that you

4  provided savings in both FOB cost and freight.

5  *A.*  Correct.

6  *Q.*  Both Tyson's and Pilgrim's came back generally in line with

7  where you asked them to be with directional guidance, right?

8  *A.*  Without seeing the -- I mean, I don't recall exactly on the

9  Pilgrim's.  You have done a good job of refreshing my memory on

10  the Claxton, but I don't recall on the Pilgrim's piece of that

11  question.

12  *Q.*  No problem.  Challenge accepted.

13       *MR. BELLER:*  Can we go to Page 6, please?

14  *BY MR. BELLER:*

15  *Q.*  Mr. Ledford, you are a good sport, sir.

16       Mr. Ledford, Page 6 under the Sourcing Event Overview,

17  if you could focus on the final bullet, and for purposes of

18  highlighting it's on the right-hand side.

19  *A.*  Okay.

20  *Q.*  So my question was both Tyson's and Pilgrim's came back

21  generally in line with where you asked them to be.

22  *A.*  That is correct.

23  *Q.*  You awarded the top three lowest price suppliers with

24  additional volume that year.

25  *A.*  Correct.

 1   *Q.*  Claxton, my client, Mr. Fries, was awarded more volume,

 2   right?

 3   *A.*  Correct.

 4   *Q.*  You reduced the volume from the highest four price

 5   suppliers, correct?

 6   *A.*  That is correct.

 7   *Q.*  Reducing volume for Pilgrim's?

 8   *A.*  I do not remember specifically if I reduced volume for

 9   Pilgrim's.

10   *Q.*  Do you recall their volume was decreased from 38 percent to

11   37-1/2 percent?

12   *A.*  I do not.

13        *MR. BELLER:*  Can we go back to Page 46, please?  If we

14   can zoom in on the table, please.

15   *A.*  Okay.  I have got it.

16   *BY MR. BELLER:*

17   *Q.*  Okay.  Does that refresh your recollection?

18   *A.*  Yes.  You are correct.

19   *Q.*  Very good.  Tyson had reduced volume, right?

20   *A.*  That is correct.

21   *Q.*  From 15 percent to 13 percent.

22   *A.*  Correct.

23   *Q.*  Mar-Jac went from 6.3 percent to 5.5 percent.

24   *A.*  That's correct.

25   *Q.*  The difference from lowest to highest per-pound cost was

Michael Ledford - Cross

1   only .0085 cents per pound.

2   A.  Correct.

3   Q.  Well, good news.  We are done with 2012.  Let's you and I

4   talk about 2013 for just a few minutes, okay?

5   A.  Okay.

6   Q.  So before you kicked off negotiations in the fall of 2013,

7   you had meetings with your five major suppliers again, right?

8   A.  Yes.

9   Q.  That included George's?

10  A.  Yes.

11  Q.  Simmons?

12  A.  Yes.

13  Q.  Tyson?

14  A.  Yes.

15  Q.  Koch?

16  A.  Yes.

17  Q.  And Pilgrim's Pride.

18  A.  Yes.

19  Q.  Your five biggest.  You reviewed your goals with them for

20  the year, didn't you?

21  A.  Yes.

22  Q.  You asked them for their points of view on this upcoming

23  negotiation.

24  A.  Yes.

25  Q.  And it was a year where you knew that there was a

Michael Ledford - Cross

1   relatively steady supply of small bird, right?

2   A.  Correct.

3   Q.  That was in stark contrast to what happens the next year in

4   2014 when the supply of small bird is very low, right?

5   A.  That is correct.

6   Q.  So is it fair to say that from your perspective as a buyer,

7   2013 was a much more ideal time to buy chicken.

8   A.  Absolutely.

9   Q.  And certainly to negotiate chicken.

10  A.  Yes.

11  Q.  So you going into that negotiation as the buyer were

12  expecting to take advantage of the market.  You had some

13  leverage here, right?

14  A.  That is correct.

15  Q.  Claxton Poultry was one of the suppliers who submitted a

16  price proposal for the 2014 contract; is that right?

17  A.  Yes.

18  Q.  And they did this sometime in October of 2013; is that

19  right?

20  A.  Yes.

21  Q.  I can show you Defense Exhibit A-288.

22          Do you recognize what is depicted in Defendants'

23  Exhibit A-288?

24  A.  Yes, I do.

25  Q.  Is this -- let me back up.

Michael Ledford - Cross

1          Is feedback something that you give to suppliers in

2    written format from time to time after they've submitted a bid?

3    A.   Yes.

4    Q.   And is this feedback frequently done in written form?

5    A.   Yes.

6    Q.   And this feedback in written form, is this a method and a

7    type that you use in the ordinary course of your business?

8    A.   Yes.

9    Q.   Do you rely on documents such as this in conducting your

10   business?

11   A.   Yes.

12   Q.   Is this A-288 a fair, accurate and reliable depiction of

13   what you believe the feedback to have been given to Claxton

14   Poultry in October of 2013?

15   A.   Yes, it is.

16          MR. BELLER:  Based on that, I would tender A-288

17   please.

18          THE COURT:  Any objection to the admission of A-288?

19          MR. TORZILLI:  No, Your Honor.

20          THE COURT:  A-288 will be admitted.

21          MR. BELLER:  Thank you.  And if we can publish that to

22   the jury, please.

23          THE COURT:  You may.

24          MR. BELLER:  If we can zoom in on the table itself,

25   please.

Michael Ledford - Cross

1  *BY MR. BELLER:*

2  *Q.*  To be clear, this is feedback that -- just one moment.  You

3  would agree with me that the 2013 price submission from Claxton

4  was .9496, right?

5  *A.*  Correct.

6  *Q.*  And their round one offer was .9627; is that right?

7  *A.*  Correct.

8  *Q.*  So you noted to them that they were 4 percent away from a

9  competitive bid; is that right?

10  *A.*  That's correct.

11  *Q.*  So the bid this year round one is .9627.  And to remind the

12  jury of the year prior, the contract price was .9625, right?

13  *A.*  Yes.

14  *Q.*  A difference of .0002 cents.

15  *A.*  From the contracted price, yes.

16  *Q.*  Contracted price to the new bid.  Dark meat after round one

17  was also at 30 and a half back, right?

18  *A.*  Yes.

19  *Q.*  Again, all consistent with where last year's price contract

20  ended up.

21  *A.*  Correct.

22      *MR. BELLER:*  We can take that down.  Thank you.

23  *BY MR. BELLER:*

24  *Q.*  When you provided feedback to Claxton, you let them know

25  that their eight-piece price was 4 percent away from a

Michael Ledford - Cross

1   competitor's bid.  We just covered that.

2   A.  Yes.

3   Q.  You would agree with me that a competitive price equals the

4   lowest price, right?

5   A.  In some cases.

6   Q.  Well, when you're telling somebody you're 4 percent away

7   from a competitive bid, frequently that means you're

8   calculating that 4 percent based upon what your lowest bid is

9   at the time.

10          MR. TORZILLI:  Objection, foundation.

11          THE COURT:  Overruled.  He can answer.

12  A.  Yeah, I think the best way to describe competitive price is

13  it typically could be one of three things.  It could mean the

14  lowest.  It could mean an average or it might actually be the

15  second lowest.  If we -- we often use nonincumbents as well in

16  this.  And if a nonincumbent was the lowest price supplier,

17  often we would figure they didn't really know what they were

18  bidding on, so we would throw that one out.  So it could have

19  been the second lowest, it could have been the lowest or it

20  could have been the average.

21  BY MR. BELLER:

22  Q.  Great.  I really appreciate that explanation.

23          By telling Claxton that they are 4 percent away,

24  really what you're doing is telling them pull your eight-piece

25  price down, right?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Yeah, that's the directional guidance.  You're telling them

3    if you want volume, if you want the contract, you better knock

4    down that price, right?

5    A.   Correct.

6    Q.   You wanted to submit -- you wanted Claxton to submit their

7    second round bid by November the 5th.

8    A.   That sounds right.

9    Q.   And you expected that bid to reflect the feedback that you

10   had given them, fair?

11   A.   Fair.

12   Q.   You did, in fact, provide feedback to Mr. Brady directly

13   about -- excuse me.  Let me say that again.

14        You provided feedback to Mr. Brady directly about his

15   first bid submission, didn't you?

16   A.   Yes.

17   Q.   And I think that you had been asked about that on direct

18   examination.

19        MR. BELLER:  And if we can have Government

20   Exhibit 9004, please.  And I believe this is admitted and has

21   been published.

22        THE COURT:  It has and it may be.

23        MR. BELLER:  Thank you.

24        And if we can zoom in on the body of the e-mail,

25   please.  And if we can zoom in on that very top e-mail from

1    Mr. Ledford to Mr. Brady.

2    *BY MR. BELLER:*

3    Q.  So what you say to Mr. Brady is "You would be my second

4    highest supplier with price only .0003 from the highest,"

5    right?

6    A.  Correct.

7    Q.  And you said, perhaps accurately, "I don't think that's

8    where y'all want to be.  (I take business away from the highest

9    every chance I get.)"

10   A.  That's exactly right.

11   Q.  That feedback was given to him on October the 1st, 2013,

12   right?

13   A.  Yes.

14   Q.  You told him or you were telling him at that point that you

15   will take business away from him unless he reduces his price.

16   A.  Yes.  That's what I was signaling.

17   Q.  And that they're a very, very small range from the next

18   highest bidder.  They are very close.

19   A.  Correct.

20   Q.  Is that right?

21   A.  Yes.

22          *MR. BELLER:*  Your Honor, if I can inquire if F-815 is

23   in evidence?

24          *THE COURT:*  815 did you say?

25          *MR. BELLER:*  That's correct.

1          *THE COURT:*  I don't show F-815 as being in.

2          *MR. BELLER:*  May we show F-815 to the witness, please?

3          *THE COURT:*  We are also very close to 5:00 o'clock.

4          *MR. BELLER:*  This is a good time to stop, Judge.

5     Thank you.

6          *THE COURT:*  Ladies and gentlemen, we will go ahead and

7     break for the day.  Same time tomorrow, 8:30.  So if you could

8     be ready to go at 8:30.  Keep the admonitions in mind, please.

9     Don't let people talk to you about the case.  Don't slip into

10    that.  You don't want to do that.  Keep up the good work in

11    terms of not talking to anyone.  And the jury is excused for

12    the evening.  Hope you have a good evening.

13          (Jury excused.)

14          Mr. Ledford, you are excused.  So if you could come

15    back for testimony at 8:30.

16          *THE WITNESS:*  Yes, sir.

17          *THE COURT:*  Thank you very much.

18          Do we want to talk about that exhibit that was

19    referred to as one that Ms. Call wanted to introduce tomorrow

20    after Mr. Ledford which was 1547 at this time?

21          *MS. CALL:*  Yes, Your Honor.  I would suggest that and

22    I think it's six words, the only part would be different than

23    something else in evidence, so it shouldn't take too long.

24          *THE COURT:*  This is 1547.  Let's see if we can put

25    that up on the screen.  We could also put it up on the document

1   viewer.

2          *MS. CALL:*  I have paper copies if any defense counsel

3   would like any.

4          *THE COURT:*  As we noted before, if any of the

5   defendants choose to leave, they can, but they can stay if they

6   would like.

7          Okay.  And are we now displaying the entirety of 1547?

8          *MS. CALL:*  Yes, Your Honor.

9          *THE COURT:*  Go ahead, Ms. Call.

10         *MS. CALL:*  The government offers Exhibit 1547.  This

11  is an e-mail chain from Defendant Jayson Penn to Scott Tucker

12  and Defendant Austin and Jason McGuire.  You will notice the

13  underlying e-mail may look familiar.  I believe it is contained

14  already in Government's Exhibit 1567, if I am getting that

15  correct.  I apologize, 1567 was not admitted this morning.

16  Your Honor may recall that was the duplicate of -- well,

17  duplicate of what had been forwarded to Mr. Lovette in

18  Government Exhibit 1522.

19         *THE COURT:*  Okay.  So there is -- 1522 has a portion

20  of this on it?

21         *MS. CALL:*  Yes, the second e-mail down saying,

22  "Jayson, please see the attached spreadsheet," that is

23  contained in 1522, so that new content would be that top

24  e-mail, do we have TSN price idea from Defendant Penn.

25         *THE COURT:*  And in terms of *James* log?

1    MS. CALL:  I will speak up.  I believe the microphone

2   may be out of battery or not on.  The light is on, but it does

3   not seem to be projecting.

4    THE COURT:  Probably battery, if you can speak up.

5    MS. CALL:  This was not contained on the government's

6   James log.  I will note the only new content in here from an

7   item that was on the James log would be a question.  And there

8   is circuit precedent under United States v. Jackson, 88 F.3d

9   845, in the 10th Circuit establishing that questions are simply

10   not assertive of anything and are therefore not hearsay.

11    THE COURT:  All right.  Thank you.

12    Objections, Mr. Tubach?

13    MR. TUBACH:  Yes, Your Honor.  This was not on the

14   James log.  They are clearly introducing it for the purpose of

15   showing Mr. Penn was asking about Tyson pricing.  They had

16   every opportunity to put it on the James log because they put

17   the e-mail immediately below it on the James log.  They chose

18   not to do this one.  And as the Court said earlier, the James

19   hearing has to mean something.  And what it means is that what

20   they offer into evidence comes in and what they don't offer

21   into evidence doesn't come in.

22    THE COURT:  Anyone else?  Ms. Call, go ahead.

23    MS. CALL:  I simply don't think the James hearing

24   bounds the government to its presentation of all evidence in

25   this case.  And if evidence is otherwise admissible under the

1    Federal Rules of Evidence, then its lack of presentation in the

2    *James* hearing does not preclude its admission unless the only

3    means for admission is 801(d)(2)(E) perhaps.

4           As I said, the new content in here, although some of

5    it was on the government's *James* log, is simply not hearsay and

6    is admissible on that ground alone.  As a second point, I would

7    note we would still have 801(d)(2)(A) as to Defendant Penn, but

8    this should be admissible against all defendants because it is

9    not hearsay.

10          THE COURT:  Anything else, Mr. Tubach?

11          MR. TUBACH:  No, Your Honor.  It's clearly hearsay and

12   we think it should not be admitted.

13          THE COURT:  Anyone else?

14          MR. McLOUGHLIN:  Your Honor, with respect to the issue

15   of a question not being a statement, I think that is an

16   overstatement.  In a particular case depending on the words in

17   the question, certainly it may not be declarative, but to

18   create a universal rule from that is not something I think the

19   10th Circuit has done and I think the government misstates.

20          THE COURT:  The Court will -- I consider this to be a

21   statement by Mr. Penn.  It's admissible for that purpose.  I do

22   sustain the objection as to it being co-conspirator hearsay.  I

23   agree with Mr. McLoughlin and Mr. Tubach some questions may not

24   be hearsay, but this one has some content.  It's asking, as

25   Mr. Tubach mentioned, about a competitor price or at least it

1   seems to be doing that.  And for that reason I don't think that

2   it would fall within that exception.  So I will have a limiting

3   instruction as to this particular -- as to the upper e-mail

4   that it be considered against -- it may be considered against

5   Mr. Penn only.

6          *MR. TUBACH:*  Your Honor, with that ruling we would ask

7   that an additional e-mail be admitted for completeness and

8   that's the response to the question, Do you have Tyson price

9   idea?  And perhaps we could get E-570 put up on the screen for

10  the Court to review.  I actually have a copy I can hand up

11  through Ms. Grimm.

12         *THE COURT:*  Do you have that, Ms. Call?

13         *MS. CALL:*  No.

14         *MR. TUBACH:*  I have a copy.  We could put it up on the

15  screen.  This is the response, Your Honor, to the question, do

16  we have Tyson price idea or TSN price idea.

17         *MR. FELDBERG:*  Your Honor, we would join Mr. Tubach's

18  request.

19         *MS. PREWITT:*  We would join the request too, on behalf

20  of Mr. Mulrenin.

21         *MR. GILLEN:*  Additionally from Mr. Roberts, Your

22  Honor.

23         *THE COURT:*  Response, Ms. Call?  Have you had a chance

24  to take a look at it?

25         *MS. CALL:*  Yes, briefly, Your Honor.  I think the fact

1    that they believe a response is relevant simply shows that this

2    is introduced for effect on the listener and it's still not a

3    hearsay purpose.  They similarly haven't pointed to a fairness

4    issue that would bring Rule 106 into play, so I just don't

5    believe it's necessary to force the government to introduce an

6    exhibit that the defendants may want in evidence but doesn't

7    affect the meaning of the underlying e-mail and the fact that

8    this request was made by Defendant Penn to his subordinates.

9         *MR. TUBACH:*  Your Honor, the key is this.  What the

10   government wants to do is to try to show that if Mr. Penn is

11   asking about Tyson price idea, he must be asking Mr. Austin to

12   go out and ask Tyson what their price idea is.  And

13   Mr. Austin's response quite clearly is an educated guess.  He

14   doesn't know.  And the response Mr. Penn is getting from

15   Mr. Austin is based on the educated guess that Mr. Austin gives

16   him.  That is absolutely necessary to explain the context of

17   what Mr. Penn is asking about.

18        *THE COURT:*  Anything else, Ms. Call?

19        *MS. CALL:*  No, Your Honor.

20        *MR. McLOUGHLIN:*  Your Honor, we had discussion on the

21   case law this morning, Your Honor, and if one looks at *U.S. v.*

22   *Lemon*, 714 F. Appx. 851 at 860, the 10th Circuit discusses the

23   Seventh Circuit's test, the four-part test with respect to the

24   rule of completeness.  And the 10th Circuit makes clear that

25   one of the rules, one of the factors is to ensure a fair and

1    impartial understanding of the declarant's statement.  And to

2    the extent you have this communication and provides that kind

3    of fair and impartial understanding which the subsequent e-mail

4    does, there is a compelling argument that it meets the rule of

5    completeness.

6              *THE COURT:*  All right.  Go ahead, Ms. Call.

7              *MS. CALL:*  Very briefly, I think it sounds like

8    multiple defendants have requested this come into evidence.

9    And it does seem to be a non-hearsay purpose, so I would ask

10   that this be admitted against all defendants.

11             *THE COURT:*  Any objection?

12             *MS. HENRY:*  I didn't hear it.

13             *THE COURT:*  She asked that it be admitted against all

14   defendants because -- Ms. Call, were you talking about the

15   response from Mr. Austin being for a non-hearsay purpose?

16             *MS. CALL:*  I think it really would have to be both

17   1547 and E-570.

18             *MR. TUBACH:*  This isn't a negotiation about whether an

19   admission against one defendant, whether they ought to concede

20   that it's required to be admitted against all if the rule of

21   completeness requires the admission of another document.  If

22   the rule of completeness requires or a rule that E-570 ought to

23   be admitted to explain 1547, that doesn't mean the other

24   defendants have to give up their rights to not have 1547

25   admitted against them.

1      THE COURT:  Well, she is just suggesting that that

2    be -- she is just saying that with the admission of E-570, that

3    in her opinion it would then change the -- it should be

4    admissible for all.  It seems like there is some objection.  We

5    don't have to hear from anyone.  I just wanted to find out if

6    there were objections.

7      MS. CALL:  I apologize, Your Honor.  I do have the

8    language from *Jackson* which I cited in front of me.  I think

9    this is of the exact same kind of question that was relevant in

10   that case where in that one the question was simply, "Is this

11   Kenny," which implies something to it.  And what the court said

12   is the mere fact that the declarant conveyed a message with her

13   question does not make the question hearsay.  And then it

14   points the D.C. Circuit in *United States v. Long* saying it is

15   difficult to imagine any question that does not in some way

16   convey an implicit message.  Rather, the important question is

17   whether an assertion was intended.

18         And there simply doesn't seem to be an assertion

19   intended.  And "Do we have a TSN price idea," is really solely

20   a question.

21      THE COURT:  Well, as I said before, I think that the

22   question carries with it -- is a little bit more -- perhaps the

23   word is assertive because as Mr. Tubach said, which I agree

24   with, it suggests that there is going to be a gathering of

25   Tyson price information.  E-570 then I think puts that in a

1    better perspective.  I do think that meets one of the factors

2    in *Lemon*; and as a result, I do believe it's appropriate to

3    admit E-570.

4          If the government doesn't want to offer E-570, I don't

5    think it necessarily has to.  And we can figure out a way to

6    admit it.  For instance, I could ask if defendant wishes to --

7    the jury is not going to know -- move the admission of a

8    related document at that time so the government doesn't have to

9    be admitting exhibits that it thinks are not part of its case.

10          *MR. TUBACH:*  I am happy to do that if that's the

11   preference of the Court.

12          *THE COURT:*  Would you prefer to use that procedure for

13   the admission of E-570?

14          *MS. CALL:*  One moment, Your Honor.

15          *THE COURT:*  One moment, Mr. Pollack, and I will let

16   Ms. Call focus her attention on whatever point you want to make

17   too.

18          *MS. CALL:*  I don't mind offering it on the

19   government's behalf at the time we offer the remaining

20   exhibits.

21          *THE COURT:*  Mr. Pollack?

22          *MR. POLLACK:*  I would just request that the limiting

23   instruction be given to both documents.  Whether it's hearsay

24   or not hearsay, it simply has no relevance or probative value

25   to Mr. Blake if it's not being offered under 801(d)(2)(E).

1          THE COURT:  So what you mean by that, Mr. Pollack, is

2     that the 1547 would carry with it a limiting instruction that

3     it could be considered only against Mr. Penn and E-570 only

4     against Mr. Austin.

5          MR. POLLACK:  I guess that's -- I guess that's right.

6     Obviously, my interest is that it cannot be considered against

7     Mr. Blake, so -- I don't know how that's communicated.  But

8     unlike 801(d)(2)(E) where if Mr. Blake later joined the

9     conspiracy, he would then be responsible for this statement,

10    there is simply no relevance and no probative value to

11    Mr. Blake.

12         MS. CALL:  Your Honor, I believe evidence can be

13    relevant to the existence of a conspiracy even if it is not

14    admitted under the hearsay exception contained in 801(d)(2)(E)

15    so long as however it is admissible, it is admissible and

16    relevant.  It should be admitted against all defendants here

17    when it is relevant to the existence of the conspiracy.  So,

18    you know, because this is not hearsay, we would say that no

19    limiting instruction would be proper.

20         THE COURT:  I haven't seen the cases that would

21    support that.  I mean, certainly co-conspirator hearsay is

22    admissible against all of the charged conspirators, but I

23    haven't seen a case where something is admitted other than as

24    co-conspirator hearsay but, as the case that you -- that we

25    talked about earlier says, might otherwise be admissible.  If

1   it's otherwise admissible -- I just haven't seen a case that

2   would say, oh, yeah, it could be admissible against all the

3   defendants, all the conspirators.  But if you have a case that

4   says that -- that's why at this time I am only going to admit

5   it against the defendant whose statement it was.

6          MS. CALL:  Would Your Honor be receptive to some

7   briefing on that issue?

8          THE COURT:  Yes.

9          MS. CALL:  Thank you, Your Honor.

10         THE COURT:  My ruling stands for the present time, but

11  I, of course, would accept any briefing on that specific issue.

12         Mr. Tubach?

13         MR. TUBACH:  The only amendment I might offer to that

14  is we would want E-570 admitted to help explain Mr. Penn's

15  request.  It's not that E-570 has no relevance to Mr. Penn's

16  question because that's the whole reason why we'd admit it.

17  And obviously, we wouldn't want it to be admitted against

18  Mr. Penn.  We want it to be admitted as to Mr. Penn, but that's

19  just a wording choice.

20         THE COURT:  Well, I am not going to give that because

21  that would essentially direct the jury, I think, in -- I don't

22  think that would be an appropriate instruction to the jury

23  or -- but what I would intend to do is upon admitting 1547, I

24  would indicate that that can be -- that the upper portion of

25  it -- it's not up right now, but I think it's a statement of

1   Mr. Penn -- that can be considered against Mr. Penn only.  And

2   then the government is going to admit E-570 as well, and I

3   would indicate that the upper portion of that could only be

4   considered in relationship to Mr. Austin.

5           So what would you suggest saying so that the jury

6   wouldn't think that we can't use that to explain what Mr. Penn

7   received back?

8           *MR. TUBACH:*  I do think it is -- perhaps a limiting

9   instruction doesn't need to -- can simply say it's being used

10  as the response to the question.  So the jury -- what I want to

11  make sure the jury doesn't do is say, well, I can't look at

12  E-570 to explain what Mr. Penn's question was and that's the

13  difficulty I am having.  And with the limiting instructions as

14  I am sitting here struggling to figure out a way where we can

15  have E-570 considered to explain Mr. Penn's question, but it

16  doesn't come in as to anyone else.

17          *THE COURT:*  Well, then it could be -- the limiting

18  instruction could be E-570 can be considered for purposes of --

19          *MR. TUBACH:*  In relation to Mr. Penn and Mr. Austin?

20          *THE COURT:*  Does that work for you, Ms. Call?  Not

21  that Mr. Tubach's negotiating anything.

22          *MR. TUBACH:*  And not that the jury is going to

23  remember the precise words we use in all this.  I just need to

24  be able to argue that E-570 explains what --

25          *THE COURT:*  Yeah, I understand your point.

1          MS. CALL:  I understand the issue.  If we may, perhaps

2     in a brief, and we may be able to better consider a proper

3     limiting instruction over the evening.  That may be a good way

4     to deal with this.

5          THE COURT:  Yes.  We can try talking about that and

6     we'll try to get the better -- a better limiting instruction

7     language for that.  And maybe someone can remind me.  Let's try

8     to talk about that first thing tomorrow.  Maybe we can just tie

9     that loose end up.

10          MR. TUBACH:  We can be here a few minutes early, Your

11     Honor, to do that.

12          THE COURT:  Mr. McLoughlin?

13          MR. McLOUGHLIN:  Your Honor, yes.  Under the

14     no-deed-goes-unpunished category, if the government is going to

15     submit a brief, of course, that leaves the defendants in the

16     dark until they file it.  If we are going to have a discussion

17     first thing in the morning, we would request that Your Honor

18     give the government a time to make its filing so we have the

19     opportunity then to read any cases and be prepared to respond

20     with cases of our own since --

21          THE COURT:  What I will say is this.  Either side can

22     submit briefs.  You know what the issue is, so either side can

23     do that.  But try to get them in as early as possible.  Try to

24     keep them really short.  This is a discrete issue.  It could

25     recur, which is one reason it's worth briefing, but like I

1    said, I would like to tie this loose end up first thing, so a

2    10-page breach probably would not be focused on tying it up

3    tomorrow at 8:30.  All right?

4         MS. CALL:  Just one logistical issue I wanted to note.

5    I understand that there have been several briefs filed over the

6    last several days by defendants under Level 2 restriction.  For

7    some reason the government has been unable to access them at

8    all and we haven't quite had the ability to go to the clerk's

9    office given the time we spend here in court, but I think there

10   is a filing issue.

11        THE COURT:  Well, the other thing is we've got to get

12   this filing stuff under restriction under control.  The case is

13   going on.  It's a public trial.  And I can't really think of

14   too many justifications for filing anything under restriction

15   at this point, all right?

16        MS. PREWITT:  That would even go to -- we can file it

17   publicly.  That would even go to citing Grand Jury transcripts

18   or referring to them generally because we were just being

19   sensitive given the protective order.

20        THE COURT:  Typically that's not true.  I know that

21   was the practice and I know that I have approved a million

22   requests to put things under.  It's just that it's spun out of

23   control.

24        MS. PREWITT:  Understood, Your Honor.

25        THE COURT:  Okay.  All right.  Anything else?

1          MR. KORNFELD:  Just briefly, Your Honor.  I don't know

2     if we have clarity -- at least I don't have clarity regarding

3     Friday.  And the informal poll of my colleagues that I can

4     whisper to, it seems like maybe doing testimony as the Court

5     suggested all day tomorrow and using Friday for the evidentiary

6     issues makes some sense, but I don't know if we dotted that I

7     yet.

8          THE COURT:  I think that that is the plan.  The plan

9     is that Friday is going to be devoted entirely to that effort,

10    and it's possible, although perhaps unlikely, that some of

11    tomorrow at the end of day could as well.

12         MR. BYRNE:  That means the clients, if they don't want

13    to be here on Friday, don't have to be here on Friday, right?

14         THE COURT:  Yes, that's an excellent point.  Unless

15    just something unexpected happened tomorrow, I think that it

16    sounds like there is plenty of things to do on Friday, so

17    probably there would be very little chance that we would be

18    doing any type of testimony on Friday.

19         MR. BYRNE:  Thank you, Your Honor.

20         THE COURT:  We will be in recess until 8:25 tomorrow.

21       (Recess at 5:25 p.m.)

22

23

24

25

327

```
 1                            INDEX
 2   WITNESSES
 3       Michael Ledford
 4           Direct Examination By Mr. Torzilli        116
 5           Cross-examination By Mr. Beller           194
 6                          EXHIBITS
 7   Exhibit       Offered   Received   Refused   Reserved   Withdrawn
 8   A-288                   307
 9   448                     192
10   449                     193
11   450                     193
12   451                     194
13   453                     191
14   454                     187
15   498                     188
16   D-788                   188
17   F-808                   300
18   F-810                   251
19   F-813                   267
20   1435                    133
21   1439                    120
22   1500                    138
23   1501                    137
24   1503                    151
25   1515                    146
```

1                            INDEX (Continued)

2      EXHIBITS

3      Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4      1542                     142

5      1552                     149

6      1601                     170

7      1607                     166

8      9004                     162

9      9694                     125

10     9707                     194

11     9708                     194

12     9709                     193

13     9710                     118

14     9711                     192

15     9712                     192

16     9713                     192

17                       REPORTER'S CERTIFICATE

18         I certify that the foregoing is a correct transcript from

19     the record of proceedings in the above-entitled matter.   Dated

20     at Denver, Colorado, this 2nd day of December, 2021.

21

22                                   S/Janet M. Coppock

23

24

25