IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>1.   JAYSON JEFFREY PENN,<br>2.   MIKELL REEVE FRIES,<br>3.   SCOTT JAMES BRADY,<br>4.   ROGER BORN AUSTIN,<br>5.   TIMOTHY R. MULRENIN,<br>6.   WILLIAM VINCENT KANTOLA,<br>7.   JIMMIE LEE LITTLE,<br>8.   WILLIAM WADE LOVETTE,<br>9.   GARY BRIAN ROBERTS, and<br>10. RICKIE PATTERSON BLAKE,<br><br>    Defendants. | Criminal Case No. 20-cr-00152-PAB |

**DEFENDANTS' JOINT MOTION *IN LIMINE* TO PROHIBIT WITNESSES FROM DESCRIBING INFORMATION SHARING AS "WRONG", "IMMORAL" OR OTHERWISE INAPPROPRIATE**

Defendants, by and through undersigned counsel, respectfully move *in limine* for an order prohibiting witnesses from describing information sharing as "wrong", "immoral" or otherwise inappropriate.

**INTRODUCTION AND BACKGROUND**

The only issue in this case is whether the Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by "conspiring to fix prices and rig bids for broiler chicken products beginning at least as early as 2012 and continuing through at least early 2019." (ECF No. 921 at Instruction No. 14.) However, in an attempt to lower its burden of proof and to sway the jury, the government

repeatedly elicited testimony from lay witnesses in the first trial that Defendants' conduct was "immoral", "wrong" or "cheating". Presumably, the strategy is grounded in the expectation that if the jury repeatedly hears that the Defendants were immoral cheaters based upon non-legal standards idiosyncratic to each witness, the path to conviction is shorter and less steep. By presenting testimony from numerous customers that his or her expectation was that chicken suppliers would keep their own pricing information to themselves during the bidding process, and by conflating that expectation with the essential elements of a violation of Section 1 of the Sherman Act, the government forces the Defendants to justify and defend their conduct, not based upon the statute, but based on the opinion and expectations of the witness. During the first trial, the government asked seven of the nine fact witnesses if he or she had ever asked or wanted chicken suppliers to communicate with each other during contract negotiations or to discuss their bids with another supplier. (*See, e.g.*, 10.27.21 Tr. 267:15-269:4 (Olson); 11.3.21 Tr. 1289:3-10 (Lewis); 11.8.21 Tr. 1893:8-22 (Smith); 11.8.21 Tr. 2055:9-25 (Ledford); 11.15.21 3013:21-3014:11 (Skalak); 11.17.21 Tr. 3403:4-3404:9 (Hoyt); 11.17.21 Tr. 3341:18-25 (Brink).)[1] The government further confused the issue by sometimes using the phrase "coordinate" (*see, e.g.*, 11.4.21 Tr. 1572:11-25 (Fisher)), typically following up by asking the witness "Why not?" – a question that invites the witness to offer his or her personal opinion or armchair economic evaluation, and prompted the following responses:

- "I expect both suppliers to be working earnestly to give us their best price, and I think for them to share their information ends up not having as much of a free market." (10.27.2021 Tr. 268:25-269:2 (Olson));

---

[1] Appendix A attached includes a chart of the relevant testimony this motion seeks to preclude.

2

- "I wanted the best price for each of them and a fair price, not folks getting together and talking, deciding what my price should be." (11.8.2021 Tr. 2055:23-25 (Ledford));

- "If suppliers talked about payment terms with each other, it would put Sysco at a disadvantage of what negotiations we would be able to achieve with suppliers." (11.17.2021 3404:21-23 (Hoyt).)

The government belabored this point repeatedly in various forms. One exchange with Mr. Lewis is illustrative:

Q. Can you explain the basis for your answer? . . .

A. I believe it's morally wrong. In fact, I think it's a form of cheating.

Q. What do you mean by cheating?

A. Well, it's not right.

Q. What do you mean not right?

A. Well, it's against all the moral standards that I live by.

(11.3.21 Tr. 1310:20-1311:8 (Lewis).).

The government also elicited testimony from Robert Bryant about whether he thought communicating with other chicken suppliers was wrong. (11.1.21 Tr. 835:16-836:25 (Bryant).) The recent Second Circuit decision, *United States v. Connolly*, 2022 U.S. App. LEXIS 2566 (2d Cir. Jan. 27, 2022), highlights the unfair prejudice and jury confusion that results from this strategy, particularly when executed through alleged co-conspirators, but the logic is no less persuasive as to testimony from "victims", or government ethics experts.

The government's strategy of eliciting testimony from fact witnesses regarding their expectations and whether they believed certain conduct was "wrong", "immoral" or "cheating" is legally improper for several reasons. First, under Federal Rule of Evidence 401, customers' views

3

about the propriety of Defendants' conduct or their expectations are inadmissible because they do not make it more or less likely that the Defendants' conduct violated each essential element of Section 1 of the Sherman Act. Fed. R. Evid. 401. The Defendants cannot be convicted for antitrust violations purely because the witnesses feel that their activity, including information sharing, is "wrong", "immoral" or "cheating".

Second, such testimony is inadmissible under Federal Rule of Evidence 403 because it is confusing, misleading, and unfairly prejudices the Defendants by focusing the jury's attention on the witnesses' views that the alleged business practices are unethical and "distracts the jury from its task of deciding the disputed facts within the framework of the law as instructed by the Court." *Concord Boat Corp. v. Brunswick Corp.*, No. LR-C-95-781, 1998 U.S. Dist. LEXIS 23663, at *8 (E.D. Ark. Mar. 2, 1998); Fed. R. Evid. 403.

Third, these opinions violate Federal Rule of Evidence 701(b), which permits lay witness opinion testimony only when helpful to determining a fact in issue or to clearly understanding the witness's testimony. Fed. R. Evid. 701(b). There is no "fact" about the Defendants' conduct made more or less likely by these opinions; nothing about the witnesses' testimony about the facts of the Defendants' conduct with respect to the Sherman Act is made more understandable by these opinions. Instead, the government hopes the jury will deliberate having adopted the belief that the Defendants were immoral cheaters, thereby easing the path to its sought-after legal conclusion— that there was a Sherman Act violation.

Fourth, these questions about alleged conduct, such as information sharing (conduct about which the witness had no personal knowledge), elicited—and were intended to elicit—speculation that the conduct resulted in "not having as much of a free market" (10.27.21 Tr. 268:25-269:2

4

(Olson)) or that "privacy and confidentiality is paramount to having a competitive bid." (11.8.21 Tr. 1893:13-16 (Smith).) Such opinions can only be expressed by experts qualified as required by Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Fed. R. Evid. 702(a)-(c). They are neither. And, such lay witness testimony is also precluded by Rule 701(c). Fed. R. Evid. 701(c).

## LEGAL STANDARD

Irrelevant evidence is not admissible at trial. *See* Fed. R. Evid. 402. The Court may also exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury . . . ." Fed. R. Evid. 403. The Court has broad discretion on admissibility and "has not only the discretion but also the duty to exclude evidence of little or no relevance or probative value which might have a prejudicial effect." *Sec. State Bank v. Baty*, 439 F.2d 910, 913 (10th Cir. 1971).

"The purpose of Rule 701 is 'to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions [that] merely tell the jury what result to reach.'" *United States v. Marquez*, 898 F.3d 1036, 1049 (10th Cir. 2018) (quoting *United States v. Brooks*, 736 F.3d 921, 931 n.2 (10th Cir. 2013)). "Rule 701 was amended to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge" and instead "must be the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) (citing Fed. R. Evid. 701 Advisory Committee's note to 2000 amendments). The Rule "allow[s] nonexpert witnesses to give opinion testimony when, as a matter of practical

5

necessity, events which they have personally observed cannot otherwise be fully presented to the court or the jury." *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979).

## ARGUMENT

### A. Lay Opinion Testimony Regarding the Permissible Activity of Information Sharing Is Not Relevant to the Jury's Determination of the Elements of Count One.

The first hurdle to admissibility is whether the opinion from lay witnesses that he or she believed information sharing was "wrong", "immoral" or "cheating" makes a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Here, the jury must determine (1) whether "the charged price-fixing and bid-rigging conspiracy existed at or about the times alleged;" and (2) that the defendant "knowingly—that is, voluntarily and intentionally— became a member of the conspiracy charged in the indictment[.]" (ECF No. 921 at Instruction No. 14.)[2] Customer representatives' expectations and desires with respect to suppliers' communications, and why they held such views, are irrelevant to these essential elements. Whether a testifying customer representative did or did not want chicken suppliers talking with each other about their prices or bids, and why he or she held those beliefs, does not make it "more or less probable" that any Defendants formed a price-fixing and bid-rigging conspiracy or that any Defendant knowingly joined such conspiracy. *Cf.* Fed. R. Evid. 401.

Similarly, the testimony of an alleged co-conspirator that he regretted asking for price information from competitors and "felt like it was wrong to ask" for such information (11.1.21 Tr. 835:16-836:25 (Bryant)) does not make it "more or less probable" that any Defendant knowingly

---

[2] Evidence about what is "fair", "competitive", "morally wrong", or "cheating" or complaints of "disadvantage" especially have no relevance when the government has insisted, and the Court has determined to apply a *per se* standard.

6

entered into an agreement to rig bids or fix prices. Fed. R. Evid. 401. On January 27, 2022, the Second Circuit Court of Appeals spoke unambiguously to this government strategy in *United States v. Connolly*, 2022 U.S. App. LEXIS 2566 (2d Cir. Jan. 27, 2022), a case in which the government, including the Antitrust Division, similarly used and sought to justify use of cooperators' descriptions of conduct as "wrong" or "unfair" to persuade the jury that the defendants had committed the charged wire fraud. Defendants Connolly and Black were derivatives traders who worked for a LIBOR panel bank. They were convicted of wire fraud in violation of 18 U.S.C. §§ 1349 and 1343 for inducing co-workers to submit LIBOR rates the government characterized as false statements in the defendants' efforts to manipulate the LIBOR benchmark rate to benefit their trading positions. *Id.* at *3, *5. The Second Circuit contrasted the testimony that the cooperators knew the conduct was "wrong" or "intuitively wrong" with the fact that the government had to prove that the submissions were false within the meaning of §§ 1349 and 1343, which meant that the government, the Second Circuit held, had to prove the bank could not have borrowed at the submitted interest rate on the day of the charged LIBOR submission.

The Second Circuit explained that evidence that the alleged co-conspirators "'knew' the practice of altering [the bank's] LIBOR submissions to benefit [its] trader positions was 'wrong' at the time they engaged in it" ***does not impact*** whether the government proved that the "wrong" conduct is "plainly within the statute." *Id.* at *22, *33-34 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)). Reversing the convictions, the Second Circuit ruled in part that, even assuming the defendants' acts were "wrong" because it gave the bank an "unfair advantage", the government had "failed to prove conduct that was within the scope of the statute prohibiting wire fraud schemes." *Id.* at *22, *58; *see also Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020)

7

(reversing convictions for property fraud because "not every corrupt act by state or local officials is a federal crime").

Similarly, the belief of any alleged co-conspirator or any customer representative that price sharing or other conduct among competitors was "wrong" is not relevant to determining whether there was an agreement to rig bids and fix prices. Nor should the government be enabled to lead the jury to believe that information sharing is sufficient evidence to convict under 15 U.S.C. § 1 or otherwise be permitted to "use the criminal law to enforce (its view of) integrity . . . ." *Cf. Kelly*, 140 S. Ct. at 1574; *Connolly*, 2022 U.S. App. LEXIS 2566 at *33.

The government has argued that "wrongfulness testimony is relevant to establish . . . knowing membership in the conspiracy" and that the purpose of a *mens rea* requirement is "to separate wrongful conduct from otherwise innocent conduct." (ECF. No. 565 at 8) (quoting *Carter v. United States*, 530 U.S. 255, 268 (2000).) The flaw in this rationale, however, is the same as in the *Connolly* case: opinion testimony regarding the wrongfulness of conduct does not make it more or less likely conduct in violation of the Sherman Act took place. Rather than "separat[ing] wrongful conduct from otherwise innocent conduct," the government would have the jury conflate information sharing and coordination of bids as "wrong", "immoral" or "cheating", priming the jury to equate information sharing with a restraint of competition prohibited by the Sherman Act even though that is not the law. *Carter*, 530 U.S. at 268; *see also United States v. Aranda-Daiz*, 31 F. Supp. 3d 1285, 1290, 1293 (D.N.M. 2014) (citing *Old Chief v. United States*, 519 U.S. 172, 191-92 (1997) (excluding evidence of defendant's statements "that make more probable his status as a felon or as a previously removed illegal alien" because "those facts could support conviction on an improper ground -- for example, that, because [the defendant] is a felon and an alien illegally

8

in the country who intends to return if deported, he is a bad person, and the jury should punish him for being a bad person and not for conduct related to the drug trafficking charges against him")).

Two other decisions are particularly persuasive critiques of the strategy of conflating ethics, morality, or a witness's notions of right and wrong with proof of a violation of law. Both reject it. *See Concord Boat Corp.*, 1998 U.S. Dist. LEXIS 23663, at *5-9 (excluding expert testimony in antitrust case when "[t]he subjects on which [the expert witness] has opinions essentially deal with the ethical nature of the conduct and about whether it was right or wrong" because "the jury may incorrectly assume that a breach of an 'ethical obligation' equals a violation of a legal standard"); *see also Hedquist v. Walsh*, No. 16-CV-265-J, 2018 U.S. Dist. LEXIS 242158, at *11-17 (D. Wyo. Mar. 15, 2018) (excluding expert testimony when the expert's opinions "only address ethical issues" and "do not contain a sufficient nexus to a material issue" in the case); *accord Connolly*, 2022 U.S. App. LEXIS 2566, at *52.

## B. Any Probative Value of Such Wrongfulness Testimony Is Outweighed by the Danger of Jury Confusion and Unfair Prejudice to the Defendants.

The government's repeated eliciting of customer representatives' opinions about chicken suppliers communicating about bids is misleading, confusing, and unfairly prejudicial and should not be permitted under Rule 403. Such questions prompt customers to speculate that communications between chicken suppliers result in an unfair, anticompetitive bidding process or a less advantageous price to the customer. Customer representatives testified that:

- "Because if one supplier knows what another supplier is bidding, then it's possible that those numbers could not be as aggressive as they normally would have been." (11.8.21 Tr. 1893:18-20 (Smith));

- "Because I would not have wanted them talking during the negotiation to artificially make the price higher than it should have been." (11.10.21 Tr. 2571:20-22) (Ledford));

9

- "Because we want a fair price competitive process to have fair competitive pricing." (11.17.21 Tr. 3337:10-11) (Brink));

- "Because it would defeat the purpose of having pricing that's independent of each other so I can compare pricing between all companies." (11.17.21 Tr. 3338:4-6) (Brink).)

This testimony conflates chicken suppliers communicating with each other—which is legal conduct—with terms that describe a restraint of trade in violation of 15 U.S.C § 1, such as "fair competitive pricing" and "fair competitive process." *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16. (1978) (Mere "exchanges of information [between competitors] do not constitute a *per se* violation of the Sherman Act."). The government's question to Mr. Ledford exemplifies the misleading and prejudicial effect of this line of questioning:

> Q: How, if at all, would two competing suppliers communicating with each other interfere with your ability to get the best price? . . .
>
> A: It *could artificially* keep the price higher than it should have been.

(11.9.21 Tr. 2179:4-12 (Ledford) (emphasis added).) There, the government asked about the legal activity for which "[t]here may be legitimate reasons that would lead competitors to exchange price information other than fixing prices or rigging bids." (ECF No. 921 at Instruction No. 18.) The speculation of Mr. Ledford, or any other witness, about what conduct could or could not keep a price higher than it "should" be, allows the government to confuse the jury and distract from its burden to prove a violation of the Sherman Act. While in some circumstances, the impact of confusing and misleading testimony could be ameliorated by an effective cross-examination, that is not possible here. There is no effective way for Defendants to rebut the message to the jury— that the Defendants are bad men, immoral cheaters who deserve to be punished, and the Sherman Act is one way to do it—regardless of whether the conduct is actually proscribed by the Act. One

10

can establish the witness is not an expert in the Sherman Act and not an economist, but as a practical matter, there is no impeachment on his or her personal beliefs. Cross-examination does not permit a rebuttal to the witness's moral code and views of right and wrong; it simply provides the witness the opportunity to reiterate his or her personal beliefs.

The jury confusion and unfair prejudice is magnified by the government's reference in its closing argument to the witnesses' expectations and the government's effort to confuse those expectations with the controlling legal standard. For example, the government argued that "you heard from the customers and you heard from Robert Bryant about what competition is supposed to be. . . .That's how competition is supposed to work but that's not what happened here." (12.8.21 Un. Tr. 16:11-13, 16:16-17.)[3] The government also argued for a conviction because Defendants' actions were a form of cheating (*see* 12.8.21 Un. Tr. 28:21), borrowing language from Robert Lewis, who testified that suppliers calling competitors about period pricing was "morally wrong" and "a form of cheating." (11.3.21 Tr. 1309:17-1311:8 (Lewis).) The government substituted the language of cheating and fraud for the controlling legal standard: "They swore that there were no communications about price with their competitors." (12.8.21 Un. Tr. 17:10-11.) (There were no such sworn statements, but the exaggeration played to the government's theme.) But, as the Court instructed the jury—six weeks after hearing all of this confusing and misleading testimony and argument—"[m]ere exchanges of information, even regarding price, are not necessarily illegal in the absence of additional evidence that *an agreement to engage in unlawful conduct resulted from,*

---

[3] Defendants have cited to the official, certified transcript where available. "Un. Tr." citations refer to the unofficial, draft transcripts. Defendants defer to the Court to the extent its recollection differs from what is included in the draft transcript.

11

*or was a part of, the information exchange.*" (ECF No. 921 at Instruction No. 18) (emphasis added).) Because this instruction came so late after so many witnesses testified to their opinions of wrongfulness with no knowledge any such conduct occurred, jury confusion was not merely likely to result, it was the tactically intended result.

Additionally, because information sharing is permissible under the Sherman Act, such testimony risks the Defendants being characterized as "bad men" who deserve to be punished not because they violated the statute but because of general wrongdoing. *See United States v. Youts*, 229 F.3d 1312, 1317 (10th Cir. 2000) (citing *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985) (requiring the court to "identify specifically the permissible purpose for which such evidence is offered and the inferences to be drawn therefrom")). The very purpose of Federal Rule of Evidence 404(b) is to prevent the jury from "convict[ing] a 'bad man' who deserves to be punished not because he is guilty of the crime charged but because of his prior . . . misdeeds . . . ." *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979).

**C.   Lay Testimony about the Possible Effects of the Defendants' Alleged Conduct Is Impermissible under Rules 701 and 702.**

The government repeatedly elicited testimony from customer representatives that the sharing of information could result in unfair pricing and competition or higher prices with no expert qualifications, knowledge, or study of the Defendants' conduct or the literature regarding the impact of various levels of knowledge and competitor information on competitive decisioning. Indeed, the government emphasized the witnesses' lack of "suspicion", i.e., knowledge, about the Defendants' conduct, including information sharing, in order to cloak the conduct in an air of illicit conspiracy. Whether information sharing does or does not result in higher or lower prices, either generally or in this case, is the subject of economic research and academic literature. An informed

12

view requires technical or other specialized skill, experience, training, or education. *See United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (explaining that lay opinion testimony should not "provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events"). Further, such an opinion must be based upon sufficient facts or data to which reliable principles and methods are applied. *Cf.* Fed. R. Evid. 702(a)-(d).

After customers' direct testimony that information sharing could have pernicious effects on competition or pricing, Defendants were forced to make the point on cross-examination that these customers know their competitors' prices, yet their industry remains highly competitive. (*See, e.g.*, 10.27.21 Tr. 347:20-348:4 (Olson) (agreeing that "if two competitors know each other's price, one competitor might decide to beat that price to get more volume" and that "when two competitors have information about each other's prices . . . you can make an independent decision based on that information to lower your prices or compete in some other way").) This is expert-style cross-examination to show the "expert" has not taken into account facts or data inconsistent with his or her "expert" opinion. The entire direct/cross-examination exercise is within the scope of *Daubert* to exclude unreliable expert testimony. 509 U.S. 579 (1993). The government should not be permitted to offer such opinion testimony, particularly since it failed to disclose witnesses who would give what are proper expert opinions in the pre-trial expert disclosures required by the Court.

The Rule 701(c) prohibition of these opinions offered by the customer representatives or alleged co-conspirators is crisply stated—either it is testimony about the impact of information sharing or "coordination", or it is testimony about whether the conduct is wrong or immoral. If it is the former, such testimony requires specialized skill, experience, training or education and must

be based upon sufficient facts or data to which reliable principles and methods are applied, making it testimony admissible only under Rule 702. If it is the latter, for the reasons stated above, it is not helpful to the jury and inadmissible under Rules 701(b) & (c), 401 and 403. *See Marquez*, 898 F.3d at 1049 ("The purpose of Rule 701 is 'to exclude testimony where the witness is no better suited than the jury to make the judgment at issue[.]'"); *Garcia*, 413 F.3d at 215 ("Rule 701 was amended to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge" and instead "must be the product of reasoning processes familiar to the average person in everyday life."); s*ee also Concord Boat Corp.*, 1998 U.S. Dist. LEXIS 23663, at \*5-9; *Hedquist v. Walsh*, 2018 U.S. Dist. LEXIS 242158, at \*11-17; *accord Connolly*, 2022 U.S. App. LEXIS 2566, at \*37-42.

## CONCLUSION

For all of these reasons, Defendants respectfully request that the Court exclude any testimony describing information sharing as "wrong", "immoral" or otherwise inappropriate and testimony regarding witnesses' reasons for holding such beliefs.

Dated:  February 3, 2022

Respectfully submitted,

*s/ John A. Fagg, Jr.*
John A. Fagg, Jr.
MOORE & VAN ALLEN PLLC
Attorney for William Wade Lovette
100 North Tryon Street, Suite 4700
Charlotte, NC 28202
(704) 331-3622
johnfagg@mvalaw.com

*s/ Michael F. Tubach*
Michael F. Tubach
O'MELVENY & MYERS LLP
Attorney for Jayson Jeffrey Penn
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
(415) 984-8700
mtubach@omm.com

*s/ Richard K. Kornfeld*
Richard K. Kornfeld
RECHT KORNFELD, P.C.
Attorney for Mikell Reeve Fries
1600 Stout Street, Suite 1400
Denver, CO 80202
(303) 573-1900
rick@rklawpc.com

*s/ Michael S. Feldberg*
Michael S. Feldberg
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
Attorney for Roger Born Austin
750 Third Avenue, Suite 2400
New York, NY 10017
(212) 381-1965
mfeldberg@reichmanjorgensen.com

*s/ Bryan Lavine*
Bryan Lavine
TROUTMAN PEPPER HAMILTON SANDERS LLP
Attorney for Scott James Brady
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
(404) 885-3170
Bryan.lavine@troutman.com

*s/ Elizabeth Prewitt*
Elizabeth B. Prewitt
LATHAM & WATKINS LLP
Attorney for Timothy R. Mulrenin
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
elizabeth.prewitt@lw.com

*s/ James A. Backstrom*
James A. Backstrom, Counsellor at Law
Attorney for William Vincent Kantola
1515 Market Street, Suite 1200
Philadelphia, PA 19102-1932
(215) 864-7797
jabber@backstromlaw.com

*s/ Mark A. Byrne*
Mark A. Byrne
BYRNE & NIXON LLP
Attorney for Jimmie Lee Little
888 West Sixth St, Suite 1100
Los Angeles, CA 90017
(213) 620-8003
markbyrne@byrnenixon.com

*s/ Craig Allen Gillen*
Craig Allen Gillen
GILLEN, WITHERS & LAKE, LLC
Attorney for Gary Brian Roberts
400 Galleria Parkway, Ste. 1920
Atlanta, GA 30339
(404) 842-9700
cgillen@gwllawfirm.com

*s/ Barry J. Pollack*
Barry J. Pollack
Attorney for Rickie Patterson Blake
ROBBINS, RUSSELL, ENGLERT, ORSECK, & UNTEREINER LLP
2000 K Street N.W., 4th Floor
Washington, DC 20006
(202) 775-4514
bpollack@robbinsrussell.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

<u>*s/ John A. Fagg, Jr.*</u>