IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

PUBLIC VERSION

**1. JAYSON JEFFREY PENN,**
**2. MIKELL REEVE FRIES,**
**3. SCOTT JAMES BRADY,**
**4. ROGER BORN AUSTIN,**
**5. TIMOTHY R. MULRENIN,**
**6. WILLIAM VINCENT KANTOLA,**
**7. JIMMIE LEE LITTLE,**
**8. WILLIAM WADE LOVETTE,**
**9. GARY BRIAN ROBERTS,**
**10. RICKIE PATTERSON BLAKE,**

    Defendants.

## UNITED STATES' OMNIBUS *MOTIONS IN LIMINE*

The government respectfully submits the following motions *in limine*[1] requesting that the Court (1) bar the defendants from making improper jury-nullification arguments and references to facts not in evidence; (2) preclude the defendants from referencing the first trial or the hung jury in front of the new jury; (3) exclude any testimony from defense witness Cesar Urias relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4) permit the government to offer testimony

---

[1] The government reads the Court's December 22, 2021 Order, ECF 925, to set forth that all prior rulings remain in effect. The government therefore does not repeat requests from its previous motions *in limine* absent changed circumstances.

1

and documents relating to Tyson Foods and Pilgrim Pride's antitrust training and compliance policies; and (5) permit the government to offer the testimony of two agents regarding the investigation based on their personal knowledge.

*(1) Jury Nullification and Facts not in Evidence*

The government respectfully moves for an order barring the defendants from making improper jury-nullification arguments and references to facts not in evidence—"cardinal rule[s]" which were repeatedly violated in the defendants' jury addresses in the first trial. *United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010); *Arizona v. Washington*, 434 U.S. 497, 513 n.32 (1978); Model Rules of Prof'l Conduct R. 3.4(e).

In the first trial, the defendants repeatedly referenced facts with no apparent purpose other than to invoke the prejudices and sympathy of the jury—even though the Tenth Circuit has "disapprov[ed] of the encouragement of jury nullification." *United States v. Gonzalez*, 596 F.3d 1228, 1237 (10th Cir. 2010); *see also United States v. Warwick*, No. 16-CR-4572 MCA, 2017 WL 5027295, at *2-3 (D.N.M. Oct. 30, 2017) (collecting cases). Examples include:

- Counsel for defendant Little referred to Little's wife as disabled and needing constant care, R. Tr. Oct. 26 at 190:16-18. *But see United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (upholding exclusion of evidence that defendant "devoted his life to caring for his son" as irrelevant and prejudicial).

- Counsel for multiple defendants referred to and described their client's family, children and grandchildren, R. Tr. Oct. 26 at 162:19-22 (Penn); *Id.* at 180:12-18 (Austin); R. Tr. Oct. 27 at 46:1-3 (Mulrenin); *id.* at 69:2-4 (Blake). *But see United States v. Santana-Camacho*, 931 F.2d 966, 967-68 (1st Cir. 1991); United States v. Lloyd*, 807 F.3d 1128, 116263 (9th Cir. 2015); *United States v. Rainone*, No. 09–CR–206, 2013 WL 389004, at *1-2 (N.D. Ill. Jan. 13, 2013).

- Counsel for defendant Austin told the jury he had never previously been in trouble with the law, R. Tr. Oct. 26 at 180:12-18. *But see United States v. Dochee,* No. 08–CR–108–4, 2009 WL 102986, at *1 (N.D. Ill. Jan. 15, 2009).

- Counsel for defendants inappropriately referenced punishment their clients may receive, with repeated references to the charge as a felony and the consequence of prison, R. Tr. Dec. 8 at 156:4-6; R. Tr. Dec. 26 at 174, 182-184; R. Tr. Nov. 6 at 6:4-10. *But see Shannon v. United States*, 512 U.S. 573, 579 (1994); *United States v. Parrish*, 925 F.2d 1293, 1299 (10th Cir. 1991).

- Counsel for defendant Little invited the jury to speculate about why the government dropped one of the charges, R. Tr. Dec. 9. at 71:19-72:7. *But see United States v. Reed*, 641 F.3d 992, 993-94 (8th Cir. 2011).

- Counsel for multiple defendants repeatedly asked the jurors to put themselves in the defendants' shoes, *e.g.*, R. Tr. Dec. 9 at 43:7-12. *But see United States v. Roman*, 492 F.3d 803, 806 (7th Cir. 2007); *United States v. Letourneau*, No. 11 CR 182, 2013 WL 3834410, at *2 (N.D. Ill. July 24, 2013).

- Counsel for defendant Roberts instructed the jury that the stain of being indicted in this society cannot be removed and that his client would be better off getting shot, R. Tr. Dec. 9 at 115:21-116:10.

Defense counsel also often asserted facts not in evidence—including "facts" that were plainly false. The damage to the government's case goes beyond anything that the government could—or should have to—cure in its closing argument or rebuttal. As the Tenth Circuit has noted, while counsel are entitled to speak with "eloquence and compassion…one thing they may not do is use closing argument [or cross-examination for that matter] to introduce massive amounts of putative evidence not in the trial record and then proceed to launch broadside attacks on an opposing party's right to bring suit or defend itself." *Whittenburg v. Werner Enterprises Inc.*, 561 F.3d 1122, 1133 (10th Cir. 2009). That appears to be a number of the defendants' strategy in this case. Examples include:

3

- Counsel for defendant Austin made multiple references to untrue "facts," including that "no one from the prosecution sought to get Mr. Austin's side of the story," R. Tr. Oct. 26 at 182:15-25.

- Counsel for defendants Austin and Little both stated in opening that there was no benefit to their clients, R. Tr. Oct. 26 at 177:9-15, 186:10-18, when in fact their bonuses were tied to company profits and business unit sales.

- Counsel for at least six defendants referenced facts not in evidence (and at times false) during cross examination by using phrases such as "are you aware that…," "would it surprise you if…," or "in fact…," without properly using a document to refresh or impeach, *e.g.*, R. Tr. Oct. 2 at 168:23-25, 169:1-7 (Penn); R. Tr. Nov. 2 at 201:6-7 (Blake); *id.* at 224:22 (Austin); R. Tr. Nov. 3 at 120:20-22 (Little); R. Tr. Nov. 4 at 188:4-7 (Brady); *id*. at 33:9-11 (Lovette).

- Counsel for defendant Blake expressed Blake's lack of knowledge regarding an exhibit, even though Blake never testified, R. Tr. Dec. 9, 2021 at 138:5-8.

The defendants' pattern of interjecting jury-nullification arguments and stating facts not in evidence is improper; risks misleading the jury; invites inefficiency by provoking mini-trials on minutiae; and prejudices the government. The government therefore urges the Court to bar defendants from doing so.

*(2) First Trial and Hung Jury*

The government respectfully moves for an order barring the defendants from referencing the first trial or the hung jury in front of the new jury. In *Arizona v. Washington*, 434 U.S. 497 (1978), the Supreme Court recognized that defense counsel's references to a prior trial during opening statement, coupled with remarks that a prosecutor previously hid evidence in the last trial, can be so "improper and highly prejudicial" that declaring a mistrial was not only appropriate but manifestly necessary, *id*. at 499, 515, because such remarks created a risk of "taint[ing]" the entire jury with impropriety and bias, *id*. at 512-13. The Sixth Circuit, in *Colvin v. Sheets*, likewise

4

upheld a trial court's decision to declare a mistrial immediately after defense counsel referenced a prior hung jury in closing. 598 F.3d 242, 255(6th Cir. 2010). In upholding the trial court's decision to declare a mistrial, the Sixth Circuit quoted the Supreme Court to explain the limits on attorney argument: "To make statements which will or cannot be supported by proof is, if it relates to significant elements of the case, professional misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney . . . to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict." *Id*. at 254 (quoting *Washington*, 434 U.S. at 513 n.32).

References to a prior trial hence always invites improper jury speculation. And the resulting prejudicial effect invariably outweighs any probative value, because the inability of a prior jury to reach a verdict has no bearing whatsoever on finding guilt in the current trial. *See Washington*, 434 U.S. at 509 ("The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been *uniformly rejected* in this country.") (emphasis added). Defense counsel should therefore be prohibited from making references to the first trial and the hung jury.[2]

(3) <u>Testimony of Cesar Urias</u>

The government respectfully moves to exclude any testimony from defense witness Cesar Urias relating to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] If defense counsel seeks to impeach or refresh a witness using testimony from the prior trial, the government respectfully requests that defense uses the term "another proceeding," in a way that invites no speculation by the jury.

5

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "[E]xtrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Extrinsic evidence of specific instances of conduct *is* admissible if probative of the character for truthfulness or untruthfulness of *another* witness, but *only if* the witness currently testifying is being cross-examined. Fed. R. Evid. 608(b)(2).

In its first omnibus motions *in limine*, the government moved to prohibit the defendants from presenting evidence or argument of specific instances of conduct unrelated to the charges in this case ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇ The Court ruled that "defendants should be precluded from introducing evidence 'unrelated to truthfulness[.]'" (ECF No. 640 at 1-2). ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The government further moves to exclude Mr. Urias's testimony entirely if the defendants are not able to articulate the relevance of his planned testimony.

(4) <u>Antitrust Training and Compliance Policies</u>

The government respectfully moves the court to allow testimony of witnesses from Pilgrim's Pride and Tyson Foods about antitrust training and information-sharing

policies received by certain defendants in this case. Such evidence may be offered to show the existence of the conspiracy and the membership of certain defendants. As this Court has previously found (ECF 603 at 6-7), such use is proper and relevant.[3]

The anticipated testimony will reveal defendants' attendance at trainings and will describe the high-level contents of such trainings and policies. The testimony may describe that such trainings outlined conduct prohibited by the antitrust laws, though the witness will not describe precisely what conduct was proscribed or express any legal opinions. In addition, the government anticipates that one witness will testify to defendants Penn's and Lovette's review and approval[4] of GX 9865, a document from early 2014 which prohibited Pilgrim's Pride employees from any "discussion or communication by a Company officer or employee with a competitor concerning a variety of topics…includ[ing] past, present, or future purchase costs or sales prices, pricing policies, bids, discounts" and other price-related terms." GX 9865, attached as Attachment 1. The government also intends to show defendant Roberts received antitrust training *the day before* his only calls with defendant Penn over a nearly

---

[3] Despite this ruling, the Court refused several exhibits relating to antitrust trial based on (1) lack of knowledge as to whether certain trainings were actually attended by defendants; (2) lack of knowledge of the *contents* of trainings for certain defendants; and (3) the risk that GX 9754, a PowerPoint presentation and part of Tyson Foods' antitrust training, may prejudice defendants by confusing the jury on the law. Tr. Nov. 18, 2021 at 13:1-14:8, 108:5-20.

[4] The fact that Pilgrim's Pride not only had, but that defendants Penn and Lovette reviewed and approved, a policy specific to antitrust and information-sharing was not known to the government until January 14, 2022. The government has now received additional documents and identified witnesses regarding that policy. The documents have already been provided to the defendants and the government anticipates supplementing its exhibit and witness list promptly before the pretrial conference in this matter.

7

decade-long timespan. Lastly, the government plans to seek admission of the contents of trainings and policies that were known to defendants. *See, e.g.*, GX 9865 (Attachment 1), GX 9754 (attached in pdf form as Attachment 2).

Courts squarely addressing this issue have ruled in favor of admitting testimony and documents, including legal opinions, to show a party's knowledge, motive, or state of mind. *See, e.g., Vazquez-Valentin v. Santiago-Diaz*, 459 F.3d 144, 151-52 (1st Cir. 2006) (admitting documents containing legal opinions where offered to show state of mind); *United States v. Hobbs*, 190 F. App'x 313, 316-17 (4th Cir. 2006) (admitting legal opinion testimony offered to demonstrate defendant's intent); *Gomez v. Rodriguez*, 344 F.3d 103, 114-15 (1st Cir. 2003); *United States v. West*, 230 F.3d 1361, 2000 WL 1106038, at *3 (6th Cir. July 10, 2000) (unpublished opinion) (admitting legal opinion testimony offered to prove defendant's motive).

The First Circuit's reasoning in *Gomez*, 344 F.3d at 103, is particularly instructive. *Gomez* involved a section 1983 suit alleging that city officials failed to renew their contracts because of their political affiliations. *Id.* at 103. The First Circuit held the trial court abused its discretion by precluding testimony of a witness who had counseled the city officials on the scope of the law and its requirements with regard to renewing the plaintiffs' contracts. *Id.* at 108-09, 115. The court of appeals described a "clear line" between admissible and inadmissible non-expert legal opinion evidence. *Id.* at 115. Legal opinion evidence that draws a fact-specific conclusion about the ultimate legal issue in a case—e.g., a legal opinion concluding "that a search was unreasonable and thus illegal," *id.* at 114—was inadmissible. But, legal opinion evidence that assists the

jury in distilling issues of fact—e.g., evidence demonstrating the motive or state of mind of a particular party, *id.* at 115—fell on the admissible side of the line. The First Circuit thus held that the witness' testimony should have been admitted, because "it was admissible to show the [defendant's] understanding at the time and his ensuing state of mind." *Id.*

Here, as in *Gomez*, the United States will offer the trainings and compliance policies to demonstrate the state of mind of defendants at the time they engaged in the illegal price-fixing conspiracy charged in the indictment. This evidence demonstrates that when defendants engaged in the illegal conspiracy, they did so knowing that (1) what they were doing was wrong, and (2) their employers', competitors', and customers' prices were confidential and sacred. The evidence is particularly probative because defendants have argued that price sharing among competitors was a typical, competitive practice, when in fact it was condemned by policies approved by the defendants. *Compare* Oct. 26, 2021 Tr. at 162 (Counsel for defendant Penn:, "[T]hat's what good companies do."), *with* GX 9865.

The probative value of such testimony outweighs any minimal risk of prejudice, especially because the government does not intend to into elicit testimony as to *what* specific conduct the antitrust laws prohibit. *Cf.* R. Tr. Nov. 18, 2021 at 108 (excluding GX 9754 due to the risk of jury confusion on the law). Should the Court nevertheless determine that certain portions of the trainings or policy should be excluded under Rule

9

403,[5], the Rule 403 balancing test applies statement by statement rather than excluding the entire set of evidence. *See also Gomez*, 344 F.3d at 115.

*(5) Agent Testimony*

The government respectfully moves to permit agent testimony about the government's years-long investigation based on their personal knowledge. The government plans to call (a) Special Agent Matthew Koppenhaver from the United States Department of Commerce Office of Inspector General to provide brief introductory testimony towards the beginning of trial, and (b) FBI Special Agent LaNard Taylor to sponsor the government's summary exhibits at the end of trial. In both instances, the testimony will be limited to facts about which each agent has first-hand knowledge. Specifically, SA Koppenhaver's testimony will focus on how the investigation was initiated and investigative techniques used. Such testimony will provide the jury with context regarding the nature of the evidence to be presented, and a framework to process the evidence as it is received. SA Taylor's testimony, by contrast, will focus on explaining how investigative steps led to the creation of the government's summary exhibits. Agent Taylor's testimony will thereby aid the jury's ability during deliberations to assimilate voluminous evidence from a years-long investigation and a lengthy trial.

*Introductory Testimony*. SA Koppenhaver will first give general background on

---

[5] For example, both documents contain references to punishment upon conviction for criminal antitrust offenses and therefore unnecessarily invite the jurors to speculate as to the consequences of their verdict. *Shannon v. United States*, 512 U.S. 573, 579 (1994).

10

the origins of the investigation, *i.e.*, that it arose from news outlets reporting observations about broiler chicken pricing. SA Koppenhaver will then explain how he (and others involved in the investigation) served grand jury subpoenas on several competing chicken suppliers, and other industry participants, to probe whether there was any evidence of bid rigging or price fixing. Through those subpoenas, the investigation collected more than 14 million documents, including emails and text messages. SA Koppenhaver will say that grand jury subpoenas were also served on phone companies, such as Verizon and AT&T, to obtain toll records. In total, the investigation received more than 100,000 pages of toll records.

SA Koppenhaver will then explain, at a general level, the process of reviewing the evidence collected, including how the evidence was searched for inter-competitor communications and for pricing events that could have provided an opportunity for price fixing and bid rigging. Upon finding such communications or events, he and others searched the toll records in relevant times to determine whether there were any phone calls between competitors or other persons of interest in proximity to the communications or events. He will also explain that he and SA Taylor conducted numerous interviews and executed several search warrants for electronic devices. Agent Koppenhaver's testimony will orient the jury as to the types of industry participants interviewed during the course of the investigation and types of evidence collected. His testimony will be "squarely based on personal knowledge," *United States v. Diíaz-Arias*, 717 F.3d 1, 13 (1st Cir. 2013), and therefore constitutes lay opinion testimony rather than the "overview testimony" which "set[s] forth for the jury the script

11

of the testimony and evidence the jury could expect the government to present in its case-in-chief.'" *United States v. Brooks*, 736 F.3d 921, 930 (10th Cir. 2013) (quoting *United States v. Moore*, 651 F.3d 30, 54-55 (D.C. Cir. 2011)). But even if Agent Koppenhaver's testimony were considered "overview testimony," it falls squarely within the permissible zone described in *Brooks.* "Courts generally allow overview testimony to the extent it concerns how an investigation began, the law enforcement agencies involved, or the investigative techniques used." *Id.* at 930. SA Koppenhaver's testimony will be just that: he will not speak to specific evidence; he will only speak to his own actions and first-hand observations; and he will not offer any opinions except those relating to why he viewed investigative steps—of which he was a part—as appropriate under the circumstances.[6]

*Concluding Testimony*. Towards the end of trial, after the vast majority of the government's case-in-chief, SA Taylor will explain the investigative steps that led to the creation of the government's summary exhibits. For example, SA Taylor will use specific exhibits underlying the summary exhibits to explain how he and others used keyword searches for things such as competitor names and prices to identify emails and text messages, and that following review of those communications he and others searched for phone records between specific competitors on specific dates. SA Taylor will then point the jury to where those underlying exhibits and phone records appear in the summary exhibits.

---

[6] SA Koppenhaver's testimony is also relevant to defense counsel's repeated attempts to discredit the integrity of the investigation based on conjecture rather than actual facts, which SA Koppenhaver will provide.

SA Taylor's testimony does not qualify as "summary testimony" because he will summarize nothing at all. *See United States v. Ray*, 370 F.3d 1039, 1046 (10th Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005), Rather, his testimony will focus on investigative steps taken by himself and other members of the team.

SA Taylor's testimony will be based on his knowledge and experience gathered from years of working on the instant investigation in the chicken industry, rather than summarizing or repackaging prior testimony. This is permissible based on Tenth Circuit law, which approves the use of agent lay opinion testimony based on review of voluminous materials in a complex investigation. *United States v. Marquez*, 898 F.3d 1036, 1049 (10th Cir. 2018) (finding no error "plain or otherwise" in admitting agent testimony regarding defendants' role in conspiracy and the meaning of code-words based on listening to "[h]undreds of hours of calls" while overseeing [the] investigation"); *see also United States v. Duran*, 941 F.3d 435, 448 (10th Cir. 2019) ("The foundational requirement for personal knowledge 'is not difficult to meet.'") (quoting *United States v. de Lopez*, 761 F.3d 1123, 1132 (10th Cir. 2014)).

Finally, even if SA Taylor's testimony were to be considered "summary" testimony, it is proper under the test articulated for summary testimony in *Ray*. 370 F.3d at 1046-47. In *Ray*, the defendant challenged the admission of summary charts and summary testimony during the testimony of a law enforcement witness. In that case, the law enforcement witness summarized the prior testimony of witnesses from the course of the trial concerning drug quantities and other matters. *See* Brief of Appellant, *United States v. Ray*, 2003 WL 24305204 at *5. In approving the use of summary

testimony in the case, the Tenth Circuit adopted a two-part test for determining whether lay summary witness testimony is permissible. First, the court asks whether the summary testimony "aids the jury in ascertaining the truth." *Ray*, 370 F.3d at 1046 (quoting *United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995)). The court assesses "the length of trial, the complexity of case, and the possible confusion generated by a large number of exhibits" as part of this inquiry. *United States v. Renteria*, 720 F.3d 1245, 1253 (10th Cir. 2013). Here, SA Taylor's testimony is proper under Rule 701 and *Ray* because the re-trial in this case is anticipated to last 22 days; the government expects to call roughly the same number of fact witnesses, if not more, and to introduce roughly the same number of exhibits; and the phone records remain voluminous. In such circumstances, SA Taylor's testimony will unquestionably aid the jury in understanding the evidence and ascertaining the truth, *see Renteria*, 720 F.3d at 1253; *Ray*, 370 F.3d at 1046-47, by making it more digestible and by providing the context of the investigative steps that were taken and why. *See also Ray*, 370 F.3d at 1047 (first prong met because the "trial lasted twenty-three days and involved over fifty witnesses testifying to a large number of complex and understandably confusing transactions."); *Renteria*, 720 F.3d at 1253 (first prong met because "the trial lasted five weeks and consisted of thirty witnesses, several of whom were experts and all of whom provided evidence of an alleged conspiracy over three years in multiple locations.").

As for the second part of the *Ray* test, the court considers "the possible prejudice that may result to the defendant in allowing [summary] evidence." *Ray*, 370 F.3d at 1047. To gauge prejudice, the *Ray* court asked whether the summary witness was

14

subject to cross examination or objection, *id*., as well as whether a limiting instruction ameliorated any potential for harm. *Id.* at 1047 n.8; *but see Renteria*, 720 F.3d at 1253 (explaining that the absence of a limiting instruction is not fatal when the defendant fails to request such an instruction).

SA Taylor's testimony will not unfairly prejudice the defendants. As in *Renteria*, SA Taylor will be subject to "extensive cross examination." 720 F.3d at 1253, by *ten* defense teams consisting of highly talented and experienced practitioners. There is also little danger that SA Taylor's will amount to a closing argument. His testimony will be about the investigation and the steps he and others took to further the investigation; he will not provide his interpretation of documents. If anything, cross examination of SA Taylor may provide the defendants with ten extra closing arguments of their own. Finally, as with the summary exhibits at the first trial, the Court could give a similar instruction to the jury regarding SA Taylor's testimony.

For the reasons stated, the Court should permit testimony by SA Koppenhaver and SA Taylor in the manner outlined above.

Dated: February 3, 2021    Respectfully submitted,

/s/ Michael T. Koenig
MICHAEL KOENIG
HEATHER CALL
PAUL TORZILLI
CAROLYN SWEENEY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 616-2165

15

Email: michael.koenig@usdoj.gov
*Attorneys for the United States*