**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.  JAYSON JEFFREY PENN,
2.  MIKELL REEVE FRIES,
3.  SCOTT JAMES BRADY,
4.  ROGER BORN AUSTIN,
5.  TIMOTHY R. MULRENIN,
6.  WILLIAM VINCENT KANTOLA,
7.  JIMMIE LEE LITTLE,
8.  WILLIAM WADE LOVETTE,
9.  GARY BRIAN ROBERTS,
10. RICKIE PATTERSON BLAKE,**

      Defendants.

---

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO THE DEFENDANTS'
MOTIONS IN LIMINE AND OTHER PRETRIAL MOTIONS**

---

      The government respectfully submits this consolidated response to the

defendants' motions in limine and other pre-trial motions.

      **1.  Sysco Credit Terms are Relevant to the Charged Conspiracy Because
         Payment Terms are a Component of Price [ECF No. 990]**

      Defendant Lovette's motion to exclude evidence alleged in the superseding

indictment that he (then-CEO of Pilgrim's Pride) agreed with Joseph Grendys (CEO of

Koch Foods) to refuse Sysco's demand to extend payment terms—a component of

price should be denied. ECF No. 990. The defendants claim the allegations about

Sysco credit terms "does not relate to alleged price-fixing or bid-rigging," ECF No. 990 at 1, because credit terms "are not 'prices' that can be fixed," *id*. at 3. *See also id*. at 4.

But there is no dispute that fixing credit terms is price fixing. The Supreme Court settled that issue long ago in *Catalano, Inc. v. Target Sales, Inc*., 446 U.S. 643, 648 (1980), explaining "credit terms must be characterized as an inseparable part of the price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing." Fixing credit terms is therefore not "independent," ECF No. 990 at 4, from the alleged conspiracy to fix prices or rig bids, but instead exactly the kind of criminal behavior the Sherman Act condemns and which the government charged here. Moreover, the government presented evidence at trial that payment terms are a price component and that payment terms affect chicken purchasers' profit. For example, Melissa Hoyt testified that payment terms affect the total price Sysco pays its suppliers—Sysco's payments to its suppliers differ depending on whether the terms are net and longer, or discounted and shorter. GX 9700, Tr. 3393:3-3394:17.

The remainder of defendant Lovette's arguments are similarly unavailing. First, whether defendant Lovette and Mr. Grendys were agreeing about the actual terms Sysco sought or the terms they knew Sysco were going to seek in the future is immaterial; it is axiomatic that, for a Sherman Act violation, "the agreement is the crime, even if it is never carried out." ECF No. 921 at Instruction No. 18. Second, the agreement is relevant to the charged conspiracy, as it shows how the ongoing conspiracy of chicken suppliers worked in action to fix prices and rig bids—*i.e.*, a

customer proposed a price-term change, and the conspirators communicated and agreed on a strategy to oppose the change. That Sysco sought to extend its payment terms with *all* of its suppliers does not change the fact that it sought to change payment terms with its chicken suppliers—including Pilgrim's Pride and Koch Foods. It also does not change the fact that the chicken suppliers utilized the network to create a plan to resist the payment term changes and hence keep the price-related term favorable to suppliers.

Moreover, the evidence is relevant to establish Defendant Lovette's relationship with a high-level co-conspirator executive at Koch—a competing chicken supplier. ECF No. 559 at 8 (identifying Joe Grendys as a co-conspirator). Government Exhibit 803 shows that Defendant Lovette was comfortable discussing payment terms with Mr. Grendys, and it shows their mutual expectations regarding future customer negotiations,[1] with no hesitation or fear of reprisal when reaching out to each other. *See United States v. Beachner Cons. Co.*, 729 F.2d 1278, 1282 (10th Cir. 1984) (explaining factors courts use to determine whether several instances of bid-rigging constitute an overarching conspiracy, including whether participants "took no precautions and expressed no fear when approaching a fellow [conspirator] to rig a bid."). Thus, the

---

[1] Although not determinative of relevance, the conversation between Defendant Lovette and Mr. Grendys in GX 803 occurred before either company—Pilgrim's Pride or Koch Foods—came to any agreement with Sysco on credit terms. *Compare* GX 803 (dated May 1, 2016) *with* GX 9700 (Pilgrim's Pride final payment terms agreement signed by Pilgrim's on July 5, 2016); GX 9701 (Koch Foods interim payment terms signed by Koch Foods on September 16, 2016).

evidence is relevant to show Defendant Lovette's connection to and participation in the conspiracy.

For those reasons, the Court should deny Defendant Lovette's motion *in limine* and continue to permit evidence of the inter-competitor agreement to reject Sysco's credit terms.

2. **Evidence Relating to Tyson Foods' Calendar Year 2015 Pricing for Popeye's is Relevant to the Charged Conspiracy [ECF No. 954]**

The government respectfully requests that the Court deny Defendant Roberts' motion to exclude evidence relating to Tyson Foods' 2015 pricing for Popeye's Louisiana Kitchen. Evidence relating to pricing for Popeye's in 2015 has significant probative value for Defendant Roberts' participation in the overarching conspiracy, as evidenced by the Indictment and Superseding indictment in this case, which describes conduct related to Popeye's pricing in 2015. Fed. R. Evid. 401; ECF Nos. 1, 101; *Mendelsohn v. Sprint*, 402 Fed. App'x 337, 349 (10th Cir. 2010). Whether the government decides to introduce additional evidence relating to Popeye's pricing in 2015 has no bearing on whether such evidence is relevant, and does not require the government to justify its use under Rule 404(b). Evidence relating to Popeye's 2015 is relevant and intrinsic to the conspiracy, and therefore should not be excluded from trial.[2]

---

[2] Defendant Roberts also argues that these documents are not relevant because the government has not alleged their participants—other than himself, defendant Mulrenin, and Carl Pepper—to be co-conspirators. That is incorrect as a factual matter because the government alleged Steven Cullen was a co-conspirator declarant in its initial *James* submission. ECF No. 491 at 7 n.2 ("The government originally submitted 31 *James* log declarants, but subsequently withdrew the statement of Steven Cullen. Tr. 78:23-79:15. As the government has made clear, however, Cullen is still considered a co-conspirator.

Defendant Roberts argues that because "the Government failed to allege pricing in 2015 for Popeye's as relating to the alleged price fixing and bid rigging conspiracy in the Superseding Indictment," the evidence in question "provides no background or context for the charged offense." His argument is factually incorrect and his conclusion does not follow. The Superseding indictment details discussions among competitors agreeing to limit the discount offered to Popeye's for its 2015 big-box promotion. ECF No. 101 at 33-34. The relevance of the Popeye's pricing for calendar year 2015—which was negotiated in 2014—is highlighted in a March 25, 2015 email where the Popeye's buyer asks for "some type of discount" for the promotion set to occur in September 2015 "[d]ue to the increases we incurred this year." *Id.* at 33.[3] The majority of the documents he cites to in his motion contain versions of an email chain for which this Court has specifically found a statement from Defendant Roberts that "Popeyes is done" is in furtherance of the conspiracy under Rule 801(d)(2)(E). ECF No. 559 at 32 (*James* Log Entry 143; GX-984, 985, 986, 988, 992, 995, and 996). Therefore, that evidence, and

Tr. 56:21-23."). Furthermore, the purpose of a *James* hearing is not to allege each and every co-conspirator as an end in itself. The purpose is to prove the existence of the conspiracy and, for statements by co-conspirators to be used at trial, to prove the declarant was a member of the conspiracy. Thus, the fact that the government may not have alleged in the *James* hearing that some of the participants in an email conversation to be co-conspirators does not mean they are not co-conspirators. Finally, there is no rule that co-conspirators can only make statements in furtherance of the conspiracy if the audience is limited to other members of the conspiracy.

[3] Additional evidence of the relevance of this time period can be found in this Court's Order denying the defendants' Rule 29 motions. *See* ECF No. 932 at 15-16 regarding this exact email exchange ("A reasonable jury could conclude that Mr. Mulrenin's attempt to match Tyson pricing to competitor pricing was pursuant to an agreement to fix prices.").

additional evidence relating to Popeye's pricing for calendar year 2015, is intrinsic and relevant to the conspiracy. Because the evidence is intrinsic to the conspiracy, the government need not address defendants' Rule 404(b) arguments, as Rule 404(b) does not control their admissibility.

And finally, as long as the evidence presented at trial is additional evidence of the same crime, the fact that it was not included in the Indictment or Superseding Indictment does not prevent the government from presenting relevant evidence at trial. *See United States v. Ocampo*, 148 Fed. App'x 703, 706 (10th Cir. 2005). For example, relevant evidence isn't limited to evidence directly proving an element of the crime. For example, documents establishing defendant Robert's roles and responsibilities in price negotiations are relevant. As this Court has previously noted in its Order relating to Defendants Roberts and Mulrenin's motion for a mistrial, presenting evidence at trial not contained within the indictment does not amount to an impermissible constructive amendment as long as the evidence presented at trial has not "broadened the possible bases for conviction beyond those found in the operative charging document." ECF No. 889 (*citing United States v. Miller*, 891 F.3d 1220, 1231-32 (10th Cir. 2018).[4]

For those reasons, Defendant Roberts' motion should be denied.

3. **Use of the Phrase "Price Fixing" and "Bid Rigging" is Appropriate in Witness Testimony and Examination [ECF No. 1000]**

---

[4] In its order, the Court denied as premature Defendants Roberts' and Mulrenin's motion for a mistrial based on an alleged constructive amendment of the Superseding Indictment.

The Court should reject the defendants' request to prohibit use of the phrase "price fixing" and "bid rigging" during witness examinations. Such testimony from Robert Bryant and Carl Pepper, for example, who have direct personal knowledge of, and who participated in, the price fixing and bid rigging conspiracy, will be help the jury to "clearly understand[] the witness's testimony" and to "determin[e] a fact in issue," that is, the existence of the charged price-fixing conspiracy and knowing participation in it. Fed. R. Evid. 701(b).

The defendants' reliance on the defunct "ultimate issue" doctrine is without merit. Rule 704(a), which abolished the ban on ultimate-issue testimony, Fed. R. Evid. 704(a), Advisory Committee Notes, provides: "An opinion is not objectionable just because it embraces an ultimate issue." In abolishing the old rule, the Advisory Committee cast aside the very same arguments made by defendants, describing them as "empty rhetoric" that "generally served only to deprive the trier of fact of useful information." *Id*.

Instead, the law simply requires that lay opinion testimony be helpful to the trier of fact and not waste time. *See* Fed. R. Evid 701, 702, 403, and 704. Admission to participating in "price fixing" and "bid rigging" by a witness with direct, personal knowledge would be helpful to the jury in, for example, determining the existence of the conspiracy charged and the purpose behind what the defendants describe as mere "information exchange." As such, the Tenth Circuit has endorsed "testimony about a defendant's substantive guilt" by those with "direct personal knowledge," including by use of terms central to the ultimate issue such as "fraud," "kickbacks," and even describing their view that the conduct was "illegal." *United States v. Brooks*, 736 F.3d

921, 931 n.2 (10th Cir. 2013);[5] *see also Okland Oil Co. v. Knight*, 92 F. App'x 589, 600

(10th Cir. 2003) (party's use of the term "kickback" in civil case was not prejudicial

because the opposing party was free to dispute the characterization and present its own

theory of the case); *United States v. Morris*, 573 F. App'x 712, 723 (10th Cir. 2014).

Other courts of appeal have similarly allowed testimony by conspirators and other lay

witnesses using common terms descriptive of the offense, including "kickbacks,"

"bribes," "coconspirator," "conspiracy," "fraud." *See, e.g.*, *United States v. Souffrant*, 517

F. App'x 803, 813 (11th Cir. 2013); *United States v. Thompson*, 708 F.2d 1294, 1298

(8th Cir. 1983); *United States v. McClintic*, 570 F.2d 685, 690 (8th Cir. 1978); *United*

*States v. Parris*, 243 F.3d 286, 289 (6th Cir.2001); *United States v. Auzenne*, No. 2:19-

CR-53-KS-MTP, 2020 WL 6276173, at *2 (S.D. Miss. Oct. 26, 2020).

The permissible realm of testimony from antitrust witnesses is no different. In

fact, "witnesses in antitrust cases have uniformly been permitted to testify concerning

the existence of agreements and understandings." *United States v. Standard Oil Co*.,

316 F.2d 884, 890 (7th Cir. 1963) (collecting cases). Courts have therefore admitted

testimony about participation in "price fixing" agreements without issue. *See, e.g.*, *Cole*

*v. Hughes Tool Co*., 215 F.2d 924, 940 (10th Cir. 1954) (testimony that there was no

agreement to "fix prices").

---

[5] The defendants' cherry-picked reliance on the very same footnote in *Brooks* is misplaced and fails to note the distinction the Tenth Circuit drew concerning the precise kind of testimony defendants challenge here. In cautioning against the use of an overview agent to opine on a defendant's guilt, the Court opined that such testimony is instead for "witnesses with direction personal knowledge," like the cooperators in this case.

Accordingly, witnesses with knowledge should be allowed to use the terms "price fixing" and "bid rigging" in describing their own conduct. These witnesses will testify that they were involved in a price-fixing conspiracy—including what they mean by that term—and identify who else was involved. They have and will continue to testify that the purpose of their actions was to fix prices and rig bids. Hearing the words in those lay terms will be helpful for the jury in understanding the testimony. As the defendants point out, it is critically important for the jury to understand the distinction between price sharing and price fixing. Prohibiting cooperating witnesses from testifying about their conspiratorial purpose—that is, to fix prices and rig bids—would deprives the jury of useful information.

The defendants rely on inapposite cases from other Circuits affirming a trial court's discretion to exclude testimony to "legal conclusions," such as asking a witness whether he "unlawfully, knowingly and willfully conspired." *United States v. Baskes*, 649 F.2d 471 (7th Cir.). Price fixing and bid rigging are terms neither couched in legal conclusions nor of art requiring an understanding of the contours of criminal law. Instead, price fixing and bid rigging are terms whose "lay meaning…matches [their] legal meaning," and as such, any risk of juror confusion is minimal at best. *United States v. Wright*, 836 F.2d 548 at *2 (4th Cir. 1987). Indeed, the defendants asked numerous potential jurors in *voir dire* to describe their understanding of the term "price fixing" in front of the entire venire panel. Trial Tr. at 174—182. Not one described mere exchange of prices. Finally, the relief defendants seek is overbroad, as there are myriad ways the term could be used entirely properly—such as asking an agent what crimes

they are investigating or asking an expert whether or how price fixing and bid rigging would change his/her analysis.

In requesting that such terms be excluded in their entirety, the defendants are effectively asking the Court to forbid the government from countering the defendants' claim that they committed no crime. But the government is entitled to present its theory of the case through its witnesses, using common terms related to and describing the crime. Accordingly, the motion should be denied.[6]

### 4. Testimony Related to Compliance and Compensation is Relevant to the Defendants' State of Mind and Motive [ECF No. 994]

The Court should refuse Defendant Penn's, Roberts', and Mulrenin's motion to exclude (1) evidence of internal Tyson antitrust trainings; (2) evidence of internal company policies, (3) evidence of compensation (including personnel documents), and (4) the testimony of any employee at Tyson[7] who can testify about such antitrust-compliance issues. All of that evidence is relevant. As the government argued in its Omnibus Motions *in Limine*, ECF No. 976-1, testimony and documents demonstrating the defendants' states of mind and motives behind what they describe as mere "information sharing" is relevant to proving the existence of the conspiracy and their knowing participation in it.

---

[6] The defendants request only that "government lawyers and witnesses" be prohibited from using the term "price fixing," but the defendants' lawyers and witnesses should be subject to the same restrictions as the government, should the court be inclined to grant the defendants' motion.

[7] Since the filing of its witness list, the government has learned that Ms. Tara Love no longer works at Tyson Foods. As such, the government plans to file an amended witness list the week of February 8,2022, substituting in a witness who reported directly to Ms. Love before she left Tyson.

_Evidence Related to Compliance._ Although the defendants characterize the government's inclusion of certain exhibits on its Exhibit List (including exhibits related to trainings or policies) and notice of a compliance witness as a motion for reconsideration, that is simply not the case. The Court specifically ruled that "evidence of antitrust training is relevant." ECF No. 603 at 7. Moreover, the government anticipates that any testifying compliance witness will be able to provide personal knowledge regarding the defendants' attendance at antitrust trainings in the days and months preceding their participation in collusive activity, _see_ ECF No. 976-1 at 8; the fact that some defendants even approved trainings or policies related to antitrust and information sharing; and which materials were presented. All of that is highly relevant to the existence of a conspiracy and whether defendants knowingly joined it.

As the government described in its omnibus motions _in limine_, ECF No. 976-1 at 8, courts squarely addressing the issue have ruled in favor of admitting testimony and documents, including legal opinions, to show a party's knowledge, motive, or state of mind. As the government's motion explains, evidence on trainings and compliance policies demonstrate that, when defendants engaged in the illegal conspiracy, they knew that (1) what they were doing was wrong, and (2) their own prices, their competitors' prices, and their customers' prices were confidential and sacred. _See_ ECF No. 976-1 at 9.

Although the Court previously excluded evidence related to internal compliance policies or codes of conduct as they are not "standards by which the jury will need to assess the charge," ECF No. 603 at 7, the defendants are wrong in arguing that "the

mere fact that the government seeks to offer some of the documents through a testifying witness does nothing to change the admissibility analysis." ECF No. 994 at 4-5. The addition of a testifying witness with personal knowledge will cure any defect in relevance and reduce possible prejudice to the defendants. Testimony about such documents will make it clear that the jury does not need to "assess the charge" using such documents and the jury will not be confused that a violation of a code is a violation of law. Rather, the testimony and compliance codes themselves will go to the state of minds of the defendants who approved and were obligated to obey them. Testimony with context and personal knowledge on how the internal policies or codes were used— especially when considered alongside testimony on antitrust trainings—will better "shed light on whether [the defendants] knew that the scheme was illegal." *United States v. Morris*, 573 F. App'x 712, 722 (10th Cir. 2014) (admitting lay witness testimony by accountant who warned defendant of the illegality and potential ramifications of his scheme). The witness testimony will eliminate any "substantial doubt that either defendant ever saw the training materials," ECF No. 994 at 3; explain how the codes of conduct came to be; be subject to thorough cross-examination and thereby minimize any prejudice to defendants (especially any prejudice that cannot be cured by redaction or a limiting instruction).

   *Evidence Related to Compensation*. Finally, the Court previously held that "evidence of how each [defendant] would benefit from higher chicken prices is relevant to motive for the alleged price fixing conspiracy and will be admitted." ECF No. 603 at 5. Despite the defendants' attempts in broad strokes to paint compensation as

inadmissible, the government's anticipated evidence is distinct from documents the court previously found inadmissible—such as evidence on personal wealth or annual compensation, ECF No. 994 at 5-6. Instead, the government's evidence will show how the defendants' compensation was tied to increased pricing and profits, including that certain defendants received bonuses in record amounts following their collusive, historic price increases. The admission of such documents and testimony is therefore not only consistent with the Court's prior ruling but relevant to why certain defendants chose to join the conspiracy.

The Court should therefore deny defendant Penn's, Roberts', and Mulrenin's motion.

**5. Defendants' Request to Exclude Lay Testimony on Wrongfulness Should be Refused [ECF No. 989]**

The defendants also moved for an order prohibiting witnesses from describing information sharing as wrong, immoral, or inappropriate, which the Court should deny. ECF No. 989. As in the initial trial, the government's witnesses will testify about wrongfulness in two overlapping contexts. First, the government anticipates customers and cooperators to tell the jury that pricing was protected information, based on the nature of contract negotiations and their expectations once contracts were in place, and that it was wrong and impermissible for competing suppliers to share both future and current pricing. Essentially, the broiler chicken industry is the polar opposite of competing gas stations seeing each other's posted prices across the street; customers' prices were closely held and they did not want those prices disclosed outside the one-on-one, customer-supplier relationship. Second, the government anticipates customers

and cooperators to testify that sharing confidential information for the purpose of raising, stabilizing, coordinating, fixing, and rigging prices was wrong and impermissible.

The Court already ruled that "whether a witness believes something was 'wrong' or improper may be relevant to the jury's determination of the elements of Count One" and that there is "little danger of jury confusion given the ability of defendants to explore what a witness had in mind." ECF No. 604 at 3-4. That order remains in effect "absent a change in circumstances warranting reconsideration." ECF No. 925 at 3. The defendants' motion fails to articulate a change in circumstances—much less circumstances warranting reconsideration.

Indeed, the Court's previous ruling is well-supported. As the government explained in its opposition to the defendants' first attempt at exclusion, ECF No. 565, such testimony is relevant to this case under Rule 401 and appropriate under Rule 701(b). When paired with efforts to conceal what the defendants argue was completely innocent price sharing, such testimony helps show the existence of a conspiratorial agreement.

Contrary to the defendants' arguments that "customer representatives' expectations and desires" are irrelevant, ECF No. 989 at 6, testimony on expectations of confidentiality in the industry helps prove that defendants entered the charged conspiracy knowingly because it gives rise to an inference that they were aware of the wrongful nature of their conduct but did it anyway. Indeed, the purpose of the Sherman Act is to protect competition and, in this market, competition is in the first instance for the benefit of the customer witnesses—so these witnesses set expectations for what

competition looks like. If these witnesses consider sharing among competitors to be wrong or inappropriate, this makes it considerably more likely that competition was reduced and hence more likely that the conspiracy existed. *Cf. Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (Sotomayor, J.) (information exchange is more likely to be anticompetitive where the information is confidential and not "publicly available.").

Moreover, the defendants have repeatedly argued that information exchange is not itself illegal—but the government has explained that such exchange is often a means to accomplish an unlawful price-fixing conspiracy (and the Court has credited this argument). *See* Pretrial Conf. at 31:12-14 ("Obviously any actual conspiracy to fix prices that's illegal almost invariably involves price sharing, so price sharing may be necessary for bid rigging or price fixing."); *Todd v. Exxon*, 275 F.3d at 198 ("Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement."). Whether price sharing ultimately is a means to an unlawful end, of course, depends on the circumstances. But this weighs in favor of allowing the testimony, as making sense of the legality of this information sharing requires assessing the context of this market and how competition is supposed to work in this market. *Cf. United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.16 (1978) (in assessing whether information exchange is anticompetitive, the court assesses "[a] number of factors including most prominently the structure of the industry involved and the nature of the information exchanged"). As such, the testimony serves an important purpose of helping the jury to separate "wrongful conduct from otherwise innocent conduct." *Carter v. United States*, 530 U.S. 255, 268 (2000).

The practical effect of the defendants' motion is thus to prevent the government from presenting evidence to rebut the defendants' claim that information sharing is entirely innocuous, which is unfairly prejudicial to the government. For example, the defendants themselves argued several times that there is "nothing wrong" with price sharing. As counsel for defendant Austin said in opening statement, "Did Mr. Austin and other suppliers occasionally share information? Of course they sometimes did. There is nothing wrong with that." C. Tr. at 111:8-12. *See also* C. Tr. at 2473:8-11 (Counsel for Austin: "All we are showing is that it is not anything unusual, untoward, wrong, illegal, inappropriate, whatever word the government wants to use, for competitors to speak with each other."). Counsel for defendant Penn also invoked questions of wrongfulness and morality when asking Mr. Bryant, "Nothing wrong with wanting to be in the middle of the pack, is there, Mr. Bryant?" C. Tr. 997:6-7, ignoring that the desire to coordinate with competitors in order to end up in a certain bidding position can be part of an unlawful agreement. As the defendants have themselves invoked questions of wrongfulness, the government should be permitted to refute the allegations by asking customers to explain how they expected competition to work.

Questions on wrongfulness therefore ought to be continued to be held permissible during this second trial, including on redirect examination when the government asks customer witnesses to expand on why they considered price-sharing morally wrong. For example, although the Court eventually curtailed the amount of questioning on the subject at the first trial during the examination of Mr. Robert Lewis, *see* R. Tr. 1549-50, there was nothing inappropriate about the line of questioning and it

was entirely consistent with the Court's prior ruling for the government to ask Mr. Lewis to expand on his statement that it would be "morally wrong" for the chicken suppliers to discuss bid submissions.

Nor is the testimony unfairly prejudicial under Rule 403. It merely explains each customer's rationale for why he or she would have preferred a fair competitive process over one that is compromised by collusion. *See, e.g.*, ECF No. 989 at 9-10. And there is nothing unfairly prejudicial about customers and co-conspirators explaining their reactions to the conspiracy and to collusive actions. *See United States v. Locke*, 643 F.3d 235, 241-42 (7th Cir. 2011) (affirming trial court's admission of witness testimony in wire fraud case "commenting on how their companies react to false information on applications"). As stated above, such testimony may give rise to fair inferences about a given defendant's state of mind, but it is not an inappropriate opinion on whether the *mens rea* element has been satisfied. *See id.* (noting that the same witness testimony "must be stretched beyond [its] capacity" to conclude that it was opining on whether the elements of the crime at issue were met).

Finally, there is no danger that the jury would conflate immorality with a violation of the Sherman Act. There is no indication the jury conflated the issues in the prior trial where such testimony was permitted, and there is no reason to think the jury would "equate information sharing with a restraint of competition," ECF No. 989 at 8, with extensive jury instructions on the issue. The defendants' motion should therefore be denied.

6. **Defendants' Request to Exclude Overview Testimony (Including Relating to the Seizure of Defendant Brady's Mobile Device) Should be Rejected [ECF No. 961]**

The defendants request exclusion of overview testimony and any references to the seizure of Defendant Brady's mobile device. As described in greater detail in the government's omnibus motions *in limine*, ECF No. 967-1 at 10-12, SA Koppenhaver[8] will provide introductory testimony—based on personal knowledge he gained while investigating the charged conspiracy—permissible under *United States v. Brooks*, 736 F.3d 921 (10th Cir. 2013), and similar precedent.

The government does not intend to offer into evidence any information or records from the seizure of defendant Brady's mobile device through SA Koppenhaver. He will, however, provide overview testimony outlining the investigative techniques in this case, including the execution of numerous search warrants for electronic devices. As a part of that testimony, the government anticipates SA Koppenhaver will testify to the events that led agents to seek Defendant Brady's device—including, among other things, the fact that counsel for Defendant Brady's employer had been unable to provide relevant text messages from his device (relevant texts missing from Defendant Brady's phone that were known to exist because they were found on Defendant Fries' phone). Agent Koppenhaver's testimony will describe those investigative steps as exactly what they are: investigative steps, not "accusations."

---

[8] The government is preparing an amended witness list that will include both agents Taylor and Koppenhaver. As they note in their filing, defendants fully prepared cross-examination of Agent Koppenhaver in the original trial of this matter and any prejudice by late notice is minimal, if any.

An investigation underlying criminal charges is of course relevant, and it is highly likely that the defendants will continue to put the government's investigation on trial in a retrial of this matter. As such, there is nothing improper or factually irrelevant about the background of the government's investigation and how it progressed over time.

As the defendants acknowledge, SA Koppenhaver may testify about the investigative techniques used in the investigation (ECF No. 961-1, p. 8) (citing *Brooks*, 736 F.3d at 930)—but they incorrectly argue that testimony regarding the seizure of Defendant Brady's mobile device is irrelevant. To the contrary, testimony regarding the "investigative techniques used" (including collection of evidence from mobile devices) is relevant because it aids the jury in "'constructing the sequence of events in the investigation.'" *Brooks*, 736 F.3d at 930 (quoting *United States v. Flores-de-Jesus*, 569 F.3d 8, 19 (1st Cir. 2009)).

Any resulting prejudice from such testimony is minimal, as the government has no intention of providing more than an overview of the fact that Defendant Brady's phone was seized. Moreover, any minimal prejudice from the fact of the seizure is no different from what is already present at trial, where SA Koppenhaver and others will testify about the service of numerous grand jury subpoenas, interviews of individuals by law enforcement, chain of custody, and execution of several search warrants for electronic devices.

7. **Defendants' Request to Modify the Preliminary Instruction is Unnecessary and Misleading [ECF No. 988]**

The Court should deny the defendants' request to modify the preliminary instruction. In the first trial, the defendants requested a substantive preliminary

instruction distinguishing unlawful and lawful conduct, including by explaining that information exchange does not on its own establish a price-fixing agreement. ECF No. 592. The Court declined this request, though it agreed to give a preliminary jury instruction setting forth the three elements of a Sherman Act violation. ECF No. 603. The defendants now request reconsideration of the Court's ruling, ECF No. 988, but there is no reason for the ruling to be disturbed.

Specifically, the defendants ask the Court to summarize the lengthy Jury Instruction No. 18, ECF No. 921, as part of a preliminary instruction to "prevent the jury from observing weeks of evidence" without legal guidance. ECF No. 988. But it remains unnecessary to give the jurors a preliminary instruction beyond the elements of the crime.

The defendants claim the jury "struggle[d] to understand the complexity of the application of antitrust law to the facts," *id.*, but there is no indication that jurors in the first trial failed to distinguish between lawful and unlawful conduct. And, as the government explained in its opposition to the defendants' proposed preliminary instruction in the first round, ECF No. 562, a Sherman Act violation is not complicated to understand. In particular, although the defendants ask for an instruction about what falls "within the scope of the first element," ECF 988, the first element (*i.e.*, that there was a conspiracy) is straightforward: All the jury must find is agreement. ECF No. 243 at 2 ("[T]he crime is the agreement itself and . . . success or even overt acts are not elements of the offense[.]").

Moreover, giving the defendants' proposed excerpted Instruction No. 18 is misleading and incomplete without also giving the jury information on *how* to find a price-fixing agreement. That is, the jury should not be asked to distinguish between lawful and unlawful conduct without fully understanding what unlawful conduct may look like in the first place. Accordingly, the jury should not be exposed to Jury Instruction No. 18 without first understanding what kinds of evidence can establish an unlawful agreement (as set forth in Jury Instruction No. 17). But rather than reading multiple lengthy instructions to the jury (in addition to the three elements of the Sherman Act), the government simply respectfully requests that the court not change its prior ruling.

8. **The Court Should Decline the Defendants' Request to Consider Its Ruling on Cross Examining Mr. Bryant on Falsehoods [ECF No. 1001]**

The defendants' motion to reconsider the permissible scope of Mr. Bryant's cross examination should be denied. The defendants' motion merely rehashes arguments that the Court has already rejected. Nothing in his trial testimony provides the changed circumstances that would warrant the Court permitting irrelevant and unfairly prejudicial inquiry into extrinsic matter. Indeed, as detailed further in the government's motion *in limine* ECF No. 957 (restricted), the only relevant circumstance that has changed counsels in favor of further restrictions on cross examination, and the government continues to request that Mr. Bryant's cross examination be limited to exclude the fact of untruthfulness.[9]

---

[9] In the first trial, the Court permitted cross examination into Mr. Bryant's prior dishonesty because the Court considered the government's case to be reliant heavily on Mr. Bryant as the only insider witness. Tr. T. 396:19-397:1. As such, the Court permitted additional leeway on cross examination. At the re-trial, however, the

In any case, as the defendants admit, the Court permitted the defendants to question Mr. Bryant regarding whether he was dishonest. The defendants asked Mr. Bryant whether he lied to prosecutors and agents about activities not involving antitrust or any defendant in the case, multiple times and on multiple issues. Tr. T. 957:23-958:15; Tr. T. 1037:7-11. The defendants' brief also implicitly concedes, as it must, that when Mr. Bryant answered these questions and others about prior dishonesty, his trial testimony was truthful.

The defendants, drawing on Mr. Bryant's truthful testimony, now ask the Court to enlarge an already expansive cross examination to include the details of Mr. Bryant's prior dishonesty. As Mr. Bryant's trial testimony confirmed, these details do not relate at all to the existence of the price-fixing conspiracy or to any defendant's knowing participation in the conspiracy--the elements of the crime charged. Rather, the dishonesty that the defendants hope to elicit at trial relates to ███████████████

███████████████████████████████████████████

███████████████████████████. As the Court rightly noted when it denied the defendants' prior attempts to cross examine Mr. Bryant on this information, it is not permissible under Fed.R.Evid. 608, Tr. T. 398:6-8, and raises serious concerns of unfair prejudice under Rule 403, Tr. T. 397:23-25.

---

government intends to present at least one other conspiracy insider witness. With multiple insiders testifying at the re-trial, this rationale is significantly lessened. With additional insider witness testimony, the defendants have no further need for any additional leeway.

The defendants assert that "Bryant's lies related to various crimes for which the government will decide whether to prosecute after he testifies." ECF No. 1001 at 6. This is baseless. In reality, the defendants have taken in isolation a few lines appearing in reports of interviews with Mr. Bryant relating to ███████████████████, and jumped to the conclusion that ████████████████████████████████ ██████████████████████. ECF No. 1001 at 5. Mr. Bryant has not been charged with any of these hypothesized offenses, as the defendants correctly note, and Mr. Bryant has never admitted to committing them, though he *has* admitted to being dishonest in prior government interviews. As the Court explained in denying the defendants prior request to inquire in the hypothesized offenses:

> Well, there is no impeachment of crimes in the air. There just isn't. I mean, it's like Jimmy Carter, you know, sinning in your heart. You can't prosecute – you can't impeach President Carter for something like that either.

Tr. T. 393: 4-7. Like the last trial, there is no basis for the defendants to inquire into the unfairly prejudicial details of these hypothesized offenses.

**************

For the foregoing reasons, the defendants' motions should be denied.


Dated: February 7, 2022          Respectfully submitted,

                                 /s/ Michael Koenig_____
                                 MICHAEL KOENIG
                                 HEATHER CALL
                                 CAROLYN SWEENEY
                                 PAUL TORZILLI
                                 Antitrust Division
                                 U.S. Department of Justice
                                 450 Fifth Street NW, Suite 11048
                                 Washington D.C. 20530

Tel: (202) 616-2165
michael.koenig@usdoj.gov
Attorneys for the United States