1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 20-CR-00152-PAB
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
   SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
   TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
   JIMMIE LEE LITTLE,
10 WILLIAM WADE LOVETTE,
   GAR BRIAN ROBERTS,
11 RICKIE PATTERSON BLAKE,

12      Defendants

13 _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 2

15 _____

16         Proceedings before the HONORABLE PHILIP A. BRIMMER,

17 Chief Judge, United States District Court for the District of

18 Colorado, commencing at 2:29 p.m., on the 26th day of October,

19 2021, in Courtroom A201, United States Courthouse, Denver,

20 Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                          APPEARANCES

 2          Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3   Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

 4   Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

 5   for Plaintiff.

 6          Anna Tryon Pletcher and Michael Tubach of

 7   O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 8   San Francisco, CA 94111-3823;

 9          Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10   N.W., Washingon, DC 20006, appearing for Defendant Penn.

11          David Beller, Richard Kornfeld and Kelly Page of

12   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13   CO 80202, appearing for Defendant Fries.

14          Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15   LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16           Laura Kuykendall and Megan Rahman of Troutman Pepper

17   Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18   appearing for Defendant Brady.

19          Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22

23

24

25
```

1                           APPEARANCES (Continued)

2                    Laura F. Carwile of Reichman, Jorgensen, Lehman,

3       Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4       CA 94065; appearing for Defendant Austin.

5                    Elizabeth B. Prewitt of Latham & Watkins, LLP,

6       555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7                    Marci Gilligan LaBranche of Stimson, Stancil,

8       LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9       80218, appearing for Defendant Mulrenin.

10                   James A. Backstrom, Counselor at Law, 1515 Market

11      Street, Suite 1200, Philadelphia, PA 19102-1932;

12                   Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13      Bethesda, MD 20814, appearing for Defendant Kantola.

14                   Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15      Street, Suite 1100, Los Angeles, CA 90017;

16                   Dennis J. Canty, Canty Law Corporation,

17      1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18      appearing for Defendant Little.

19                   John Anderson Fagg, Jr. and James McLoughlin of

20      Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21      Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1    APPEARANCES (Continued)

2            Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5            Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8            Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11           Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                   PROCEEDINGS

16           (Jury selection was sealed.)

17   *THE COURT:*  Ladies and gentlemen, let me mention the

18   following things to you:  One of them I mentioned to you last

19   time, and that is when the jury is coming in and out of the

20   courtroom, all of us will stand up.  It's out of respect for

21   the jury.  You have been going out the front door.  You are not

22   going to be going out the front door anymore.  You are going to

23   be going out this door over here because we have a jury room

24   back there.

25           So we are going to take a break mid-afternoon.  And

1    when we do so, that will be your first opportunity to see the

2    jury room.  Mr. Keech will show that to you.  And then when

3    you're brought back into the courtroom, once again everyone

4    will stand.  Once you get to your seat, the seat that you are

5    sitting in now, just go ahead and sit down.  Your natural

6    tendency may be to stand too because everyone else is standing,

7    but we're standing for you.  So once all of you have taken a

8    seat, then I'll direct everyone else that they can take a seat,

9    okay?

10        You can bring water into the courtroom if you choose,

11   but don't bring anything else, not coffee, not any other type

12   of thing, but water is fine.  As you will see in the jury

13   deliberation room, there are -- there is a microwave.  There is

14   a refrigerator.  You can bring your lunch if you choose to do

15   that and keep it in there and eat lunch there.  You can do what

16   you want.

17        I don't allow gum chewing during court.  That goes for

18   everyone.  Make sure that your cellphones -- everyone was

19   really great during the past couple of days silencing their

20   cellphones.  If you have a cellphone, you can leave it back

21   there.  These are secure hallways and no one would be able to

22   get in, so I recommend that you leave it back there or just

23   turn it off.  You're not going to be able to answer your phone

24   anyway and you don't want your phone to be going off while

25   we're in court.

1          And once again, the attorneys and the witnesses are

2     going to be instructed to avoid any contact with you.  Of

3     course, the witnesses don't know who you are and that's why

4     it's important for you to keep those yellow juror buttons

5     visible.  That really helps a lot in terms of identifying them.

6          Also, ladies and gentlemen, as I mentioned to you,

7     there are two alternates among you.  Don't make any assumptions

8     regarding who they are.  It could be any of you.  It doesn't --

9     we don't pick like the first two people or last two people or

10    anything like that, so it could be any of you.  I am going to

11    at this time, ladies and gentlemen, read to you an introductory

12    jury instruction.

13         Members of the jury, at the end of the trial, I will

14    give you detailed guidance on the law and on how you will go

15    about reaching your decision, but now I simply want to

16    generally explain how the trial will proceed.  This criminal

17    case has been brought by the United States Government.  I will

18    sometimes refer to the government as the prosecution.  The

19    government is represented by Michael Koenig, Carolyn Sweeney,

20    Heather Call, Paul Torzilli, Laura Butte and Jill Rogowski.

21         Defendant Jayson Penn is represented by Michael Tubach

22    and Anna Pletcher.

23         Defendant Mikell Fries is represented by Richard

24    Kornfeld, David Beller and Kelly Page.

25         Defendant Scott Brady is represented by Bryan Lavine,

1    Megan Rahman and Laura Anne Kuykendall.

2         Defendant Roger Austin is represented by Michael

3    Feldberg, Julie Withers and Laura Carwile.

4         Defendant Timothy Mulrenin is represented by Elizabeth

5    Prewitt, Marci LaBranche and Caroline Rivera.

6         Defendant William Kantola is represented by Roxann

7    Henry and James Backstrom.

8         Defendant Jimmie Little is represented by Mark Byrne

9    and Dennis Canty.

10        Defendant William Lovette is represented by John Fagg,

11   Dru Nielsen, Frank Schall, James McLoughlin and Katelyn Price.

12        Defendant Gary Roberts is represented by Craig Gillen,

13   Anthony Lake and Richard Tegtmeier.

14        Defendant Rickie Blake is represented by Barry

15   Pollack, Wendy Johnson and Christopher Plumlee.

16        The Indictment charges each defendant with a

17   conspiracy to suppress and eliminate competition by rigging

18   bids and fixing prices and other price-related terms for

19   broiler chicken products sold in the United States.  The

20   Indictment also charges Defendant Little with obstruction of

21   justice.

22        The Indictment is simply the description of the

23   charges made by the government against the defendants.  It is

24   not evidence of guilt or anything else.  Each defendant has

25   pleaded not guilty and is presumed innocent.  A defendant may

1    not be found guilty by you unless all 12 of you unanimously

2    find that the government has proved his guilt beyond a

3    reasonable doubt.  There are multiple defendants in this case

4    and you will have to give separate consideration to the case

5    against each defendant.

6         The first step in the trial will be the opening

7    statements.  The government in its opening statement will tell

8    you about the evidence which it intends to put before you.

9    Just as the Indictment is not evidence, neither is the opening

10   statement.  Its purpose is only to help you understand what the

11   evidence will be.  It is a road map to show you what is ahead.

12   After the government's opening statement, each defendant may

13   make an opening statement.

14        Evidence will be presented from which you will have to

15   determine the facts.  The evidence will consist of the

16   testimony of the witnesses, documents and other things received

17   into the record as exhibits, and any facts about which the

18   lawyers agree or to which they stipulate.  The government will

19   offer its evidence.  After the government's evidence, each

20   defendant may present evidence, but no defendant is required to

21   do so.  I remind you that each defendant is presumed innocent

22   and it is the government that must prove each defendant's guilt

23   beyond a reasonable doubt.  If the defendants submit evidence,

24   the government may introduce rebuttal evidence.

25        At times during the trial, a lawyer may make an

1    objection to a question asked by another lawyer or to an answer

2    by a witness.  This simply means that the lawyer is requesting

3    that I make a decision on a particular rule of law.  Do not

4    draw any conclusion from such objections or from my rulings on

5    the objections.  If I sustain an objection to a question, the

6    witness may not answer it.  Do not attempt to guess what answer

7    might have been given had I allowed the answer.

8         If I overrule the objection, treat the answer as any

9    other.  If I tell you not to consider a particular statement,

10   you may not refer to that statement in your later

11   deliberations.  Similarly, if I tell you to consider a

12   particular piece of evidence for a specific purpose, you may

13   consider it only for that purpose.

14        During the course of the trial, I may have to

15   interrupt the proceedings to confer with the attorneys about

16   the rules of law that should apply.  Some of these conferences

17   may take more time, so I will excuse you from the courtroom.  I

18   will try to avoid such interruptions whenever possible, but

19   please be patient even if the trial seems to be moving slowly

20   because conferences often actually save time in the end.

21        You are to consider all the evidence received in this

22   trial.  It will be up to you to decide what evidence to believe

23   and how much of any witness' testimony to accept or reject.

24   After you have heard all the evidence, I will instruct you on

25   the rules of law which you are to use in reaching your verdict.

1   The government and each defendant will then each be given time

2   for their final arguments.

3        Let me give you some information about whether or not

4   you choose to take notes.  If you would like to take notes

5   during the trial, you may.  On the other hand, you are not

6   required to take notes.  If you do decide to take notes, be

7   careful not to get so involved in note-taking that you become

8   distracted, and remember that your notes will not necessarily

9   reflect exactly what was said, so your notes should be used

10   only as memory aids.  Therefore, you should not give your notes

11   precedence over your independent recollection of the evidence.

12        You should also not be unduly influenced by the notes

13   of other jurors.  If you do take notes, leave them in the jury

14   room at night and do not discuss the contents of your notes

15   until you begin deliberations.

16        I do not permit jurors to ask questions of witnesses

17   or of the lawyers.  If you are unable to hear a witness or a

18   lawyer, please raise your hand immediately and I will see that

19   that is corrected.

20        Each defendant is charged in the Indictment with a

21   violation of 15, United States Code, Section 1.  This law makes

22   it a crime to unreasonably restrain trade.  The Indictment

23   charges the defendants with conspiring to rig bids and fix

24   prices in the broiler chicken industry between as early as 2012

25   and early 2019.  To find a defendant guilty of this crime, you

1    must be convinced that the government has proved each of the

2    following elements against him beyond a reasonable doubt:

3            First, that the charged price-fixing conspiracy

4    existed at or about the time alleged;

5            Second, that the defendant knowingly, that is

6    voluntarily and intentionally, became a member of the

7    conspiracy charged in the Indictment knowing of its goal and

8    intending to help accomplish it;

9            And third, that the conspiracy affected interstate

10   commerce.

11           During the course of the trial, you should not talk

12   with any witness or with any of the defendants or with any of

13   the lawyers at all.  In addition, during the course of the

14   trial, you should not talk about the trial with anyone else

15   whether in person, on a pod-cast, on the web or on any social

16   media platform.  Also, you should not discuss this case among

17   yourselves until I have instructed you on the law and you have

18   gone to make your decision at the end of the trial.  It is

19   important that you wait until all the evidence is received and

20   you have heard my instructions on the controlling rules of law

21   before you deliberate among yourselves.

22           Let me add that during the course of the trial you

23   will receive all the evidence you properly may consider to

24   decide the case.  Because of this, you should not attempt to

25   gather any information on your own you think may be helpful.

1   Do not engage in any outside reading or research on this case,

2   including through the use of the internet, cellphones, smart

3   phones or paper resources.  Do not attempt to visit any places

4   mentioned in the case and do not in any other way try to learn

5   about the case outside of the courtroom.

6        Now that the trial has begun, you must not listen to

7   or read about it in the media.  The reason for this is that

8   your decision in this case must be made solely on the evidence

9   presented at the trial.

10       The court reporter is making stenographic notes of

11   everything that is said.  This is basically to assist any

12   appeals.  However, a typewritten copy of the testimony will not

13   be available for your use during deliberations.  On the other

14   hand, any exhibits will be available to you during your

15   deliberations assuming that they have been admitted.

16       All right.  Let us now -- and let me ask Mr. Koenig,

17   do you need to have anything set up from a technical matter

18   before the government's opening?

19       *MR. KOENIG:*  Sure.  If I can just use the document

20   viewer for the demonstrative.

21       *THE COURT:*  And Mr. Beller, do you want to get things

22   set up now for the defense openings or can we have Mr. Koenig

23   do his first?  Whatever you think is best.

24       *MR. BELLER:*  Your Honor, if the Court would allow us

25   to do it now.

1          THE COURT:  Sure, go ahead.  Everyone will stay put.

2   We will just wait for a couple of minutes while we get some

3   technical matters set up.

4          MR. KOENIG:  Can I just add the only difference

5   between the one I showed you and this one is we just put an

6   exhibit sticker marked 9999.

7          THE COURT:  Understood.

8          So ladies and gentlemen, Mr. Keech is getting some

9   legal pads or at least some pads of paper just in case any of

10  you wish to take notes during the openings, okay?

11         Mr. Beller, as far as you can tell, are we ready

12  technically?

13         MR. BELLER:  I believe so.

14         THE COURT:  And Ms. Call, looks like you were at the

15  document viewer making sure that's working.

16         Is the government set from a technical standpoint?

17         MR. KOENIG:  I believe so.

18         THE COURT:  Okay, great.

19         Mr. Koenig, opening on behalf of the United States.

20                    **OPENING STATEMENT**

21         MR. KOENIG:  All 10 defendants in this courtroom

22  plotted and schemed to cheat their customers and to make more

23  money.  They conspired to raise prices together.  If you look

24  at the screen, you'll see the names of all 10 defendants from

25  five independent chicken companies, Pilgrim's, Pilgrim's Pride,

1  Tyson, Claxton, Koch, George's, 10 defendants from five chicken

2  companies that were supposed to be competing, five chicken

3  suppliers that sold chicken to places like Chick-fil-A, KFC,

4  Popeye's, Church's Chicken, Boston Market, food distributors

5  like Sysco, US Foods, to grocery stores like King Soopers.

6  Five chicken suppliers that were competitors, but the 10

7  defendants in this courtroom worked together to make sure they

8  were not competing.

9        The evidence the government will show you is that all

10 10 defendants conspired behind their customers' backs to raise

11 prices, and that is the crime they are charged with.  You're

12 going to see evidence as far back as 2012 or a little bit

13 before that even and continuing for the better part of the

14 decade.

15       What I would like to do is first focus you on 2014.

16 2014 is the year the conspiracy went into overdrive.  The

17 conspiracy targeted KFC and a bunch of other fast-food

18 restaurants for massive price increases, historic price

19 increases, and they pulled it off.  Toward the end of 2014 when

20 all the dust had started to settle, you're going to see an

21 e-mail from Defendant Jayson Penn, who is sitting right there,

22 to his boss, the CEO at the time of Pilgrim's Pride, Bill

23 Lovette who is right there.

24       Defendant Penn said 2014 was chicken nirvana, chicken

25 nirvana, because they chose to cheat rather than compete.  And

1    why did they do it?  Let me give you a sense of the kind of

2    money that was on the table.  In 2014 for the coming year KFC

3    entered into contracts with its suppliers to buy somewhere

4    between 8 and 9 million pounds of chicken on the bone, 8 to

5    9 million pounds, but not for the year and not for the month.

6    That was per week, 8 to 9 million pounds per week.  And

7    defendants in this room conspired to raise prices in the ball

8    park of 15 cents a pound.  That's like over a million bucks a

9    week and that's just one week for one customer.  Money is what

10    motivated the defendants.

11          And here is how they did it.  In the mid summer of

12    2014, they started to coordinate their stories, the

13    competitors.  They decided -- and you will hear this

14    testimony -- to blitz the customers, to scare them, to threaten

15    to take away their chicken, restaurants like Kentucky Fried

16    Chicken, Church's Chicken.  That's why they knew it would work.

17    Chicken is in the name.

18          They agreed on 15 cents before they submitted their

19    price increases to KFC.  You're going to see an e-mail listing

20    all -- you're going to see an e-mail listing several

21    competitors' price increases all in that 15-cent ball park

22    before they went to the customer.  And you're going to see

23    evidence that that kind of information went all the way to the

24    top.  And when KFC got those price increases, they tried to

25    negotiate.  They said doors will close.  But the fix was in and

1    the defendants didn't budget.

2           In fact, you'll hear words that Mr. Austin right over

3    here said words to the effect.  "The price is the price.  I

4    just need to know how much chicken you want."  They knew they

5    didn't have to budge.  They knew they didn't have to negotiate

6    because they had conspired to raise prices together.  And KFC

7    was just the first step.  They knew that if they got KFC to

8    fall first, other customers would go down like dominos.

9           You're going to see an e-mail from one of the people

10   in the conspiracy who said, "Got KFC and BM."  BM, you'll see

11   evidence that that's Boston Market.  "Got KFC and BM.  Rest

12   still to come.  Everybody is getting that price increase."

13   You'll see another e-mail.  "Everybody will be paying through

14   the nose.  Once KFC is inked, we will be hitting these other

15   next week."  And they pulled it off.  2014 was chicken nirvana.

16          Now, let me tell you about the evidence you're going

17   to see.  This was a conspiracy so it was secret.  If you

18   weren't in the conspiracy, it was difficult to see from the

19   outside.  And there is going to be several categories of

20   evidence we are going to show you, phone records, texts,

21   e-mails, and it's all going to come together like puzzle pieces

22   to form a picture that will be crystal clear.

23          You'll see a pattern.  You'll see a customer puts out

24   a request for competitive pricing.  You'll see the defendants

25   calling each other, five different competing companies, working

1    the phones, building a united front, calling competitors

2    outside of just these 10 defendants.  You will see texts,

3    e-mails building the united front and then the submission of

4    higher prices together.

5             So let me just give you the example from the 2014 KFC.

6    Right before bids were due you are going to see phone records.

7    You're going to see Defendant Penn at Pilgrim's calling

8    Defendant Roberts or on the phone with Roberts at Tyson,

9    Defendant Brady and Roberts on the phone.  Then you'll see the

10   two Tyson defendants talking to each other, Roberts and

11   Mulrenin.  You'll see Defendant Austin, Defendant Brady on the

12   phone.  You'll see Defendant Little from Pilgrim's with

13   Defendant Kantola at Koch.  Then you are going to see a call

14   between Jayson Penn and Roger Austin of Pilgrim's, and that's

15   where you'll see the e-mail listing the prices right after that

16   call.

17            Now, you're going to see a lot of toll records, phone

18   calls, but this was a secret conspiracy, so you're not going to

19   see recordings.  But you are not going to have to guess on what

20   was said on a lot of those calls and that's because you're

21   going to see the defendants in their own words describing what

22   happened, text messages, e-mails, telling each other price

23   increases before they even sent them.  And they weren't

24   exchanging the price increase information out of curiosity.

25            You'll hear testimony from a conspiracy insider,

1    someone who is there who has a deal with the government for his

2    testimony.  And he is going to tell you that when he got on the

3    scene and he saw this exchange, he thought that's not how this

4    is supposed to work, words to that effect.  But he will also

5    tell you he learned that they were doing it to form the united

6    front to increase prices together.

7            And as I said with the KFC example, they were shocked.

8    They tried to negotiate, but they were stonewalled.  The price

9    is the price.  And after KFC pushed back, you'll see calls

10   between Austin, Lovette and Penn all from Pilgrim's.  And you

11   won't have to guess what happened on that call either because

12   you'll see Defendant Austin and Brady on the phone and then

13   Brady reporting to his boss, Mikell Fries, what happened.

14           Greeley, and you'll learn that Greeley is where

15   Pilgrim's was headquartered where Defendants Penn and Lovette

16   had their offices, "Greeley told him," Roger Austin, "not to

17   come down on price."  That's competitor to competitor.  Every

18   single one of KFC's chicken suppliers that year, suppliers that

19   were supposed to be competing, forced KFC into massive historic

20   price increases.  Chicken nirvana.  And you'll see the pattern,

21   the pricing requests, working the phones, building the united

22   front, submission of aligned higher prices.

23           You're also going to hear from victims, conspiracy

24   outsiders.  You will hear witnesses from KFC, from Pollo

25   Tropical, which is a chain in Florida, Golden Corral.  They

1    will tell you that they were stonewalled.  The price was the

2    price.  You'll hear from Chick-fil-A.  You'll hear from Sysco.

3    And they'll tell you about their interactions with people in

4    the conspiracy.

5           Now, I have been focused on 2014, but as I said, it

6    went for years before to years after.  What you'll see is in

7    2012 the group of the defendants tried to do the same thing to

8    KFC, just not in overdrive.  You'll see Defendants Lovette,

9    Penn, Austin, Brady, Fries, Kantola.  You'll see a text from

10   Defendant Brady to his boss, Mikell Fries, saying he just

11   talked to Roger Austin and he said to raise our prices.  And

12   Mr. Fries texted back, "Tell him we're trying."  And Mr. Brady

13   said, "Will do."

14          In 2017 you'll see another very similar example making

15   a run at KFC.  You'll see Defendant Blake from George's, Austin

16   from Pilgrim's, Kantola from Koch, Brady from Claxton.  But as

17   I mentioned, it wasn't just KFC.  Church's Chicken at one point

18   was trying to build up an inventory of frozen in case, you

19   know, the transportation, you know, if there is a snowstorm and

20   trucks can't make, it they will have frozen on supply.  You're

21   going to see Defendants Roberts and Mulrenin, Kantola and Koch,

22   Little at Pilgrim's conspiring to raise those freezing costs.

23   Same cast of defendants to raise quality assurance costs to

24   Church's Chicken.

25          You'll see Defendants Brady and Fries and Mulrenin

1    when Chick-fil-A wanted to switch to antibiotic-free chicken

2    conspiring to raise those prices.  You are going to see the

3    CEO, Bill Lovette, e-mailing with the CEO of the competitor

4    Koch Foods when Sysco wanted more favorable pricing terms.  You

5    will see CEO to CEO communication agreeing not to do it.

6            Now, you'll see the pattern.  It will be clear as day.

7    But one thing I'll mention is that in order to get all those

8    puzzle pieces in front of you, there will be after the

9    government's first witness a bunch of witnesses who will talk

10   about sort of technical aspects of the documents you'll see,

11   and that's again to make sure you get the puzzle pieces, so you

12   can see the picture.  And we will try to speed through that.

13           Now, the judge mentioned there is one other count in

14   this case and that's obstruction of justice against Mr. Little.

15   In August of 2020, federal agents investigating this very

16   conspiracy we are here talking about today knocked on

17   Mr. Little's door.  They asked him a bunch of questions, but

18   one of them was, "Before you retired did you have

19   communications with your competitors, whether it's text,

20   e-mail, phone, whatever?"  And he said, "Outside of trade

21   shows, no."  The agents paused.  They gave him a chance to

22   think about his answer.  They asked the question again.  Same

23   response.

24           And what you're going to see is that Mr. Little had

25   thousands of contacts with competitors, thousands.  He lied to

1    obstruct the agents' investigation.

2          Once the evidence is in, the closing arguments are

3    done and you begin your deliberations, look at the picture and

4    the patterns that form right in front of you.  I assure you it

5    will be as clear as day.  If you do, you are sure to reach the

6    correct verdict which is to return guilty verdicts against all

7    10 defendants.

8          Thank you.

9          THE COURT:  Thank you, Mr. Koenig.

10          All right.  Mr. Fagg, are you going to give the first

11   closing?

12          MR. FAGG:  Yes, Your Honor.

13          THE COURT:  Go ahead.

14          MR. FAGG:  First opening, if that's all right.

15          THE COURT:  I don't know why I keep saying that.

16   First opening.

17          Go ahead.

18                        **OPENING STATEMENT**

19          MR. FAGG:  There was no conspiracy.  There was no

20   agreement among these men to rig prices, to rig prices -- to

21   fix prices or to rig bids.  You're not going to see any

22   conspiracy.  You're not going to see any conspiracy involving

23   Mr. Lovette.  Instead, what you're going to see in the course

24   of this case is that it was legitimate business conduct and

25   market forces that drove those price changes that you heard

1    about.  And what you're going to see is independent business

2    decisions that each one of these 10 men made in the best

3    interest of their own companies.

4            And now it's the government that brought this case

5    charging an eight-year conspiracy involving these 10 men.  But

6    because the government brought the case, they have to prove to

7    you beyond a reasonable doubt that these men entered into a

8    conspiracy to fix prices and rig bids.  And the evidence isn't

9    going to show that because there was no conspiracy.

10           Ladies and gentlemen, my name is John Fagg and I along

11   with my colleagues are here proudly representing Bill Lovette.

12   And Bill was the CEO of Pilgrim's Pride from 2011 until 2019

13   when he retired after a four-decade career in the chicken

14   industry.

15           And so let's look at what the evidence in this case is

16   not going to show about Mr. Lovette.  The prosecutor told you

17   about witnesses you will hear from in the course of this case.

18   We want you to listen to those witnesses.  You will not hear a

19   single witness say that I heard or I saw Bill Lovette enter

20   into an agreement with any competitor to fix a price or rig a

21   bid.  You won't hear a single witness get on that stand and say

22   that he or she has any personal knowledge that Bill Lovette was

23   involved in a conspiracy or that he instructed anybody to fix a

24   price or rig a bid, not a single one, zero.

25           And the evidence will show when you look at the

1    documents the government has collected over 16 million

2    documents and they carefully combed through those documents.

3           THE COURT:  Mr. Fagg, why don't you hold on for just a

4    second.  Did someone lose a pen?

5           THE JURY:  Got it.

6           THE COURT:  Sorry, Mr. Fagg.  Go ahead.

7           MR. FAGG:  Thank you, Your Honor.

8           The government has carefully combed through those

9    16 million documents.  And what are those documents going to

10   show?  They are not going to show you that Bill Lovette entered

11   into a conspiracy with anyone, and he most certainly didn't

12   enter into a conspiracy to fix prices or rig a bid.  So the

13   government is going to try and show you e-mails and text

14   messages and phone calls.  You saw here already this afternoon

15   right as the trial kicked off chicken nirvana.  Chicken nirvana

16   has nothing to do with the conspiracy.  It's two employees of

17   Pilgrim's Pride e-mailing with one another.

18          The government told you that it's difficult to see

19   from the outside this conspiracy.  Well, the evidence is going

20   to show you that the reason for that is because there was no

21   conspiracy.  And so if you look at the actual evidence, the

22   hard evidence, and we are going to ask you to do that

23   throughout this trial and it's going to be a long trial, but if

24   you look at the actual evidence and instead of making

25   inferential leaps, you examine the hard evidence, what you will

1   see is that every decision that Bill Lovette made was an

2   independent decision in the best interests of his employer,

3   Pilgrim's Pride, period.

4          So let me give you a little road map of where I would

5   like to go today.  To start I want to talk to you a little bit

6   about the chicken industry.  Then we will talk about Bill

7   Lovette and his role at Pilgrim's Pride.  And you'll learn how

8   industry forces and Pilgrim's strategy explain these price

9   increases that you heard about from the government this

10  afternoon.  And then we will end by talking a little bit more

11  about the evidence and how that evidence will not show that

12  Mr. Lovette agreed to enter into any conspiracy.

13         So since I have the privilege of speaking with you

14  first on behalf of the defense, I want to start off by talking

15  about the chicken business and how it works.  We're not going

16  to ask you to become experts in the chicken industry, but there

17  are some important components that we want you to understand,

18  that will be important to understand.  And you'll see that

19  there are lawful explanations for these price changes that

20  occurred.

21         So as you've heard over the last couple of days, the

22  market we are going to be talking about is the broiler chicken

23  market, and that's just a fancy of way of talking about the

24  chicken that we eat.  And the broiler chicken market has three

25  sizes of birds.  And the three different sizes of the birds,

1    the small bird, the medium bird and the large bird, they are

2    really important because they have difference uses and

3    generally speaking they have different buyers, different

4    customers.

5            And something about the broiler chicken market that's

6    also important is that it's a commodity market.  And what you

7    see in commodity markets is that the products, in here the

8    chickens, they are not all that different from supplier to

9    supplier other than their size which we'll come back to.  And

10   the evidence will show that in commodity markets and

11   particularly in agricultural commodity markets there are two

12   characteristics that are important.  One, you have very similar

13   prices between suppliers.  And why is that?  Because the

14   product that one supplier sells is not all that different than

15   the product its competitor sells.

16           Now, you will see that even though the product is

17   similar, there can still be big differences in the companies

18   and big differences in their profitability.  And why is that?

19   It's because of things like how many regions a particular

20   company services or their reliability in servicing their

21   customers and their reputations.  And the other thing that

22   you'll see in a commodity market is that there can be large

23   price fluctuations from year to year.  These just happen in

24   commodity markets.

25           And the evidence is going to show that between 2012

77

1    and 2019 the price of chicken fluctuated from year to year.

2    The reason why it fluctuated from year to year the evidence is

3    going to show you is because of supply and demand and factors

4    like weather that have a big impact on supply.  The evidence is

5    going to show you that it was these factors that drove these

6    price increases, not a conspiracy.

7         So let's get back to the chicken size.  The fast-food

8    industry that you heard about, they use the small bird.  And

9    they need all of their birds -- all of their chicken to come

10   from the small bird.  And the reason for that is these are

11   massive chains with locations all throughout the country.  And

12   they need to be able to give a uniform set of instructions to

13   all their different locations because those locations need to

14   know how long to fry the chicken breast to go on your chicken

15   sandwich so they are safe to eat.

16        So the evidence is going to show that these small

17   birds are hard to raise, and the reason for that is because

18   each one of these fast-food companies needs a specific size

19   bird.  And they all have their own individual sizes.  So it's

20   tough work to raise those birds.

21        On the other end of the spectrum, you have the big

22   birds.  And the big birds are what are used when you go in the

23   grocery store and you go to the meat section and you see a

24   chicken breast for sale.  It's also the chicken that's used to

25   go into chicken salad that you get at your local deli.  And

1   what you'll see is that throughout this time period the supply

2   and the demand for these different size birds fluctuated

3   significantly.  And what happens when supply goes down and

4   demand goes up?  Prices go up.  It's natural functions of

5   supply and demand.  And what happens when the market

6   overcorrects?  All of the sudden supply is up and demand is

7   down, prices go down.

8          The evidence in this case is going to show you just

9   how these market forces were at work.  And the evidence is also

10  going to show you that over the course of these years, that the

11  most profitable segment of the industry was that big bird

12  market.  There is more meat on the chicken when you have a big

13  bird that you can sell.  And the specifications that a customer

14  requires for a big bird are much less.  No one cares what size

15  chicken it was when they go into the grocery store to buy a

16  piece of meat.

17         And what this meant was that the chicken suppliers

18  could sell more of their birds for the highest possible price

19  because they didn't have to meet all these specifications or

20  these requirements from their customers.  And the evidence will

21  also show you that the profit margins on these bigger birds for

22  the chicken supplier companies were much higher than they were

23  with the small birds.

24         And so what happened?  The supplier started converting

25  their processing facilities from small birds to big birds.  And

1    the differential in the prices that the suppliers were getting

2    for the small birds and the big birds were so pronounced that

3    some of the suppliers got out of the small bird business all

4    together and at the exact same time the demand for small birds

5    was going up.

6              See, the evidence is going to show that some of these

7    fast-food companies like Chick-fil-A were growing like

8    gangbusters.  People were lining up to get their hands on a

9    Chick-fil-A chicken sandwich.  And at the same time you had

10   grocery stores like Costco and Publix that were selling more

11   and more of the rotisserie chickens in their ready-to-eat

12   section of the grocery stores, so the demand for these small

13   birds was up.

14             And what this meant was for the producers that were

15   producing these small birds like Pilgrim's, it gave them a real

16   opportunity.  These natural market forces gave them an

17   opportunity to raise their prices.  So when the time came for

18   Pilgrim's to negotiate in 2014, Pilgrim's understood that this

19   demand was up and that the supply was down.  So they raised

20   their prices and they raised their prices substantially.  And

21   other suppliers also raised their prices.  And they did this

22   because they understood the value of the product that they were

23   selling.  They understood that the value of the product that

24   they were selling had gone up.

25             And what these markets factors also meant and the

1    evidence in this case is going to show you is that some of

2    these buyers like KFC that focused on getting chicken at the

3    lowest possible price, they couldn't get their chicken at the

4    price they wanted.  And some of them were angry, but they

5    didn't want to accept that the supply was down and the prices

6    were going up.  But the evidence is going to show that that's

7    exactly what happened.  It was not a conspiracy.  It was market

8    forces and good business decisions that drove these price

9    changes.

10        Let's drill down a little bit on Bill Lovette and how

11   he fits into this picture.  Before Bill Lovette joined

12   Pilgrim's, it wasn't doing so great.  It wasn't particularly

13   well run.  See, it was trying to be everything to everybody.

14   It wasn't data driven.  It wasn't focused.  And as a result, it

15   wasn't getting the full value for the chickens that it was

16   producing.

17        So in January of 2011, Bill Lovette joined Pilgrim's

18   as its new CEO.  And he took over at a time when Pilgrim's

19   was -- basically just started emerging from bankruptcy.  And

20   within just days of arriving, he implemented a new vision for

21   Pilgrim's, become the best and most respected company in the

22   industry.  And then he deployed a strategy to turn Pilgrim's

23   around.  And you'll hear about the strategy in the course of

24   this case, but I want to talk to you about three key

25   components:  One, convincing Pilgrim's employees to think

1    analytically about the whole bird, something that became known

2    as the whole bird equivalent, and we'll talk about that; two,

3    instilling a steadfast focus on data and analytics that allowed

4    Pilgrim's to understand and then price its chicken

5    appropriately; and then three, a laser focus on a key set of

6    customers that became known as the key customer strategy.

7         So the whole bird equivalent.  When Mr. Lovette got to

8    Pilgrim's, he worked with other employees to get them to think

9    in this new way about the whole bird equivalent.  And what this

10   really means is that you're thinking about selling the chicken

11   for the whole bird and not just thinking about selling some of

12   its parts to particular customers and selling really high

13   volume of particular parts to particular customers, thinking

14   about what is the whole bird equivalent when you are making

15   your sales decisions.  And when you don't think about selling

16   chicken through this whole bird equivalent, you cannot get full

17   value for the product that you're producing.

18        And so at Pilgrim's the evidence is going to show you

19   that they developed this unique tool, something that was called

20   the net dock report.  And that net dock report helped them to

21   analyze the way that they were selling their chicken and in

22   what parts and how all of that fit together.  And what the net

23   dock report provided is a way to clear out the noise of these

24   individual contracts and specific customers and it brings it up

25   a level.  And it allows people like Mr. Lovette to look at how

82

1    the company is doing in a very data analytical, methodical way.

2    And you will see throughout the course of this case the

3    importance of this focus on data analytics and having the right

4    tool in place.

5              So let's look at a net dock report.  I am not going to

6    ask you to study this in any detail.  Obviously, it's

7    incredibly detailed and it's chalk full of information and

8    analytics, but what it provides is again a way for Pilgrim's to

9    analyze the different ways in which it's selling its chicken.

10   And this example is just one week and these reports are created

11   week after week.

12             And the evidence is going to show that every piece of

13   information that's in that net dock report is either Pilgrim's

14   information or it's information that's publicly available.  And

15   what the evidence is going to show is that Mr. Lovette used

16   this net dock report week after week in meeting after meeting

17   to evaluate Pilgrim's business units and see if it was getting

18   the most value for the chicken it was producing.

19             And part of the other -- one of the other things that

20   Pilgrim's did around this time when they were focused on this

21   data analytics, they established a new group of financial

22   professionals who were given the responsibility for determining

23   the prices to customers.  And this internal data analytics

24   group, they developed these mathematical models and they

25   gathered all this hard data and that gave them a view of how

1    Pilgrim's should be selling its chicken and it gave that group

2    the power to set its prices.

3          And when the pricing authority was given to these

4    internal financial professionals, the pricing authority was

5    taken away from the external facing salespeople, the people

6    that are typically dealing with the customers, people like

7    Mr. Little and Mr. Austin.  And what the evidence will show is

8    that all this data analytics, it gave Pilgrim's something that

9    it never had before and that was price courage.  And what do I

10   mean by price courage?  What I mean is the willingness and the

11   ability to insist on the price that your product is worth.

12         And you'll see that in order to get that price

13   courage, Pilgrim's had these data analytics financial

14   professionals doing work time and time again running model

15   after model.  And why is this important?  For one, it's

16   important because this is the information that Mr. Lovette used

17   to evaluate how the company was doing and to see if it was

18   selling its products in the right way.  And two, why are all

19   these people doing all this work?  Why are they running all

20   these models if all you have to do is pick up the phone and

21   call a competitor and agree on a price?  It would make no

22   sense.

23         So let's talk about the key customer strategy.  Before

24   Bill Lovette joined, Pilgrim's was trying to be everything to

25   everybody.  I am just going to briefly touch on this, but once

1   he joined, that strategy changed.  And they developed a core

2   set of key can customers that they could partner with for joint

3   value and that they could grow with.  And you will see in the

4   course of this case that all these changes were fundamental and

5   they made a big difference to Pilgrim's profitability.

6        So let's talk for a moment about the evidence that we

7   think the government is going to try and present against

8   Mr. Lovette.  You heard earlier about this e-mail with Sysco.

9   Don't be fooled.  That e-mail has nothing to do with fixing

10  prices or rigging bids.  Look at the text of the e-mail.  It's

11  two executives venting about a giant food supplier trying to

12  delay its payment terms.  And what happens when someone delays

13  their payment terms?  They get to keep the money.  They get to

14  go spend it however they want.  And the supplier doesn't get

15  paid.  That's what this is about.

16       And look, as you look at that e-mail, look at the rest

17  of the evidence in this case because what you're going to see

18  is it is taken out of context.  The government argues that

19  these 10 men agreed amongst each other not to fix a certain

20  price, but to raise prices.  Now, why is that important?

21  Because the government needs to show you that there was an

22  agreement, a conspiracy to raise prices.  And the evidence is

23  going to show you that it was market dynamics, not a

24  conspiracy.  And look very closely at the evidence as it

25  relates to Mr. Lovette.  You will not see evidence of any

1    agreement to fix prices or rig bids.

2          Now, the government talked about the 2014 and the 2015

3    negotiations.  And yes, I mean, some of the customers were

4    unhappy.  KFC was unhappy.  And maybe some of them were unhappy

5    about the way that those negotiations unfolded or Pilgrim's

6    approach in those negotiations.  And the government is going to

7    call witnesses who will say they are shocked.  You heard it

8    today.  They are shocked that Pilgrim's wouldn't negotiate.

9          But that is not enough.  The evidence will show that

10   Pilgrim's studied the market.  They understood the value of the

11   product that they were selling.  And Pilgrim's made independent

12   decisions about the prices at which it would sell its products.

13   If a customer didn't like it, they could go buy the product

14   somewhere else.  Pilgrim's was ready to sell it to somebody

15   else.

16         And let's be clear, this is not a case about customer

17   satisfaction or customer service.  This isn't a popularity

18   contest.  Some of you might even think that Bill Lovette, as

19   the CEO of Pilgrim's, should have known what Pilgrim's 40,000

20   or 50,000 or 60,000 employees, what each and every one of them

21   was doing at all times, but this is not a case about corporate

22   responsibility.  This is a federal criminal trial against Bill

23   Lovette and it's the government that chose this path.  And

24   because the government chose this path, they are the ones that

25   have to prove to you beyond a reasonable doubt the charge

1    against him.

2          And when you think about a conspiracy, when you think

3    about a criminal conspiracy to violate the antitrust laws,

4    that's not something that you just stumble into.  In a criminal

5    case it is much, much different.  The government has got to

6    prove to you beyond a reasonable doubt that each one of these

7    individuals, Bill Lovette included, knew that there was a

8    conspiracy and agreed to join that conspiracy.  Think about

9    that as this evidence comes in because the evidence is not

10   going to show you that.

11         So at the end of this case, we are going to ask you to

12   return a verdict that speaks the truth, a verdict that Bill

13   Lovette is not guilty of the charge against him.

14         Thank you.

15         THE COURT:  Thank you, Mr. Fagg.

16         Ladies and gentlemen, we will go ahead at this time

17   and take our mid-afternoon break.  So Ladies and Gentlemen of

18   the Jury, as I indicated to you before, Mr. Keech is going to

19   show you the jury room and that's where you'll go.  There are

20   bathrooms back there.  He will show you -- give you the tour,

21   so to speak.  Then the break will last until 10 minutes to

22   4:00, but you won't come back out here.  You will assemble

23   outside of the door and get all lined up.  Take the same seats

24   when you come back in.  And Mr. Keech will let you in then when

25   you are all ready, okay?

1          Keep the admonitions in mind.  You can't talk about

2     the case at all amongst yourselves.

3          The jury is excused for the mid-afternoon break.

4          Court will be in recess.  Thank you.

5          (Jury excused.)

6          MR. KOENIG:  Your Honor, we wanted to raise one issue.

7          THE COURT:  We will raise it right before they come

8     back in.

9          (Recess at 3:31 p.m.)

10         (Reconvened at 3:53 p.m.)

11         THE COURT:  Mr. Koenig, did you have an issue?

12         MR. KOENIG:  I do, thank you.

13         First of all -- well, two things, really.  We didn't

14    receive slide decks from anybody in advance.  We didn't want to

15    interrupt the jury presentation.  I just got the one that

16    Mr. Tubach is going to use and I would ask for the rest of them

17    as well in advance.

18         THE COURT:  Well, I don't require that they be

19    exchanged.  I appreciate the fact that you did.  I think that

20    they were shown in an effort -- you showed yours just to make

21    sure it was going to be okay.

22         MR. KOENIG:  Well, the other part of it is that this

23    slide deck, all but two pages we would say is inadmissible

24    hearsay.

25         THE COURT:  Yeah, just like with your closing, you may

88

1   have certain types of slides.  They may not be admissible.

2   They are more in the way of a demonstrative.  And those are

3   typically okay.  Now, to the extent an exhibit is shown or

4   something that a defendant may attempt to introduce, the

5   defendant has to have a good faith belief, not a remote hope,

6   that the exhibit will be admissible.

7       MR. KOENIG:  That's what I am saying.  I don't think

8   these have a remote hope.

9       THE COURT:  And these are for Mr. Penn?

10      MR. KOENIG:  Yeah.

11      THE COURT:  Any response?

12      MR. TUBACH:  I have got well north of a remote hope of

13  getting these documents into evidence Your Honor.  We will get

14  these document into evidence.

15      THE COURT:  I am not going to police that during the

16  openings.  But once again, I appreciate the point, but I am

17  going to assume that each of the defendants has a good faith

18  belief in the admissibility of something that they are going to

19  show the jury.

20      MR. KOENIG:  Can I state my basis for the record?

21      THE COURT:  Absolutely.

22      MR. KOENIG:  First of all, a couple of the slides are

23  excerpts from a McKenzie report which is something that the Yum

24  Brands/KFC, an outside party they hired to do the report.  Two

25  of the other slides are e-mails where it appears there is one,

1   an out-of-court assertion by Jayson Penn, and another one, an

2   out-of-court assertion by Jason McGuire that are highlighted.

3   I don't know how they are getting those in because under

4   801(d)(2)(E), that's not what it is.  It's not an admission

5   against a party opponent, so I don't know how they are coming

6   in.

7          THE COURT:  Mr. Tubach, how about that?  How would you

8   get that in?

9          MR. TUBACH:  Your Honor, they are going to go to state

10   of mind.  This is exactly the kind of evidence we are going to

11   be introducing throughout because it shows there was no

12   conspiracy.

13          THE COURT:  You introducing your own client's

14   statements?

15          MR. TUBACH:  Yes, absolutely, because that statement

16   will show that there was no conspiracy.

17          THE COURT:  I am not going to let you show anything

18   that has one of your client's statements in it unless it's

19   something that the government is going to be introducing, you

20   know the government will be introducing it.  That's hearsay.

21          MR. TUBACH:  But, Your Honor, it's not hearsay because

22   we are not introducing it for the truth of the matter asserted.

23          THE COURT:  I am still not going to let you introduce

24   it -- show it to the jury during openings.

25          MR. TUBACH:  If I can just be heard briefly.

1           THE COURT:  Yes, go ahead.

2           MR. TUBACH:  The quote from Mr. Penn says "Lose

3   400,000 pounds KFC at 20 cents a pound at $80,000," and it goes

4   on.  We are not introducing that slide, that statement to show

5   that you actually lose $400,000 to KFC at 20 cents of $80,000.

6   That's not at all --

7           THE COURT:  I am not going to allow it.

8           MR. TUBACH:  Okay.  I will not show this statement to

9   the jury.

10          THE COURT:  Right, just that slide.

11          MR. TUBACH:  Thank you.

12          THE COURT:  Then are we ready for the jury?  Okay.

13  Let's bring the jury in.

14          (Jury present.)

15          THE COURT:  All right.  Ladies and gentlemen, now we

16  will have our next closing argument.  And I believe,

17  Mr. Tubach, are you going to be delivering it?

18          MR. TUBACH:  Yes, Your Honor.  You said closing

19  argument.

20          THE COURT:  Sorry.  This is opening.  Go ahead.

21          MR. TUBACH:  Thank you very much, Your Honor.

22                        **OPENING STATEMENT**

23          MR. TUBACH:  In 2015 the price of small chicken sold

24  to fast-food restaurants went up.  The government wants you to

25  believe that those prices went up because of a price-fixing

1    conspiracy, but the evidence is going to show you something

2    very different.  The price of small birds in 2015 went up for

3    one reason and one reason only, the supply and demand for small

4    birds.  You see, the supply of small birds had been going down

5    for years, but the demand for small birds was increasing and so

6    prices went up.  In other years when the reverse was true,

7    prices went down.  That's what happens in a market.

8          And what was Mr. Penn's role, Jayson Penn's role in

9    all this?  Not much, honestly.  Mr. Penn who worked at

10   Pilgrim's Pride signed off on some pricing recommendations made

11   by others at the company where he worked.  So the government's

12   case against Mr. Penn is going to be filled with sound bites,

13   snippets of documents and not much else.  It will be like a

14   jigsaw puzzle, but missing most of the important pieces.

15         What we're going to do in this trial is show you those

16   missing pieces, tell you the whole story.  Where the government

17   shows you one snippet of an e-mail in a long negotiation with a

18   customer and asks you to fill in the gap and speculate that

19   there was price-fixing going on, we're going to show you the

20   actual negotiations themselves, how Pilgrim's submitted its

21   bid, what bid it submitted, what Mr. Penn's role was in that

22   and what the result was, because the whole story is very

23   different from what the government wants you to believe.

24         And once you've heard the whole story, a few things

25   will be crystal clear.  Jayson Penn never fixed prices with

1    anyone.  Jayson Penn never told anyone to fix prices.  And

2    Jayson Penn didn't know of anyone fixing prices.  The evidence

3    will show that every single decision Mr. Penn made at

4    Pilgrim's, and he made thousands, was in Pilgrim's own best

5    interest based on what he thought was in its own best interest.

6         The evidence will show that Jayson Penn is no price

7    fixer.  He is a self-made man who worked his way up from the

8    bottom from the chicken processing line to the top of the

9    company.  He is deeply data driven and analytical.  Data

10   analysis is what drove every decision he made and is what made

11   him successful.  It is his north star.  And as you will see, he

12   was very good at it.  No shortcuts, no easy way out, just hard

13   work day in and day out.

14        So the evidence will show that the whole idea that

15   Jayson Penn would take a shortcut by fixing prices with his

16   competitors rather than make his own decision about pricing is

17   contrary to how Mr. Penn has worked his entire life.  And

18   that's why even though the government has combed through

19   16 million documents and conducted over 100 witness interviews

20   they still do not have a single witness who will get on that

21   witness stand and tell you that he made an agreement with

22   Jayson Penn to fix prices.  And they do not have a single

23   document that shows that Jayson Penn was fixing prices because

24   the evidence will show that Jayson Penn never fixed prices with

25   anyone.

1          Let me tell you something else the government didn't

2     mention.  They filed these charges against Mr. Penn without

3     having interviewed a single person at Pilgrim's Pride where

4     Mr. Penn worked for the entire time the government alleges

5     there was a conspiracy going on.  Instead, the government filed

6     these charges and destroyed a man's career and reputation based

7     on innuendo and guesswork.  The evidence will show that Jayson

8     Penn gave his all to a vital food industry in this country and

9     he did so with honor and with integrity and he never fixed

10    prices with anyone.

11         My name is Michael Tubach.  And Anna Pletcher, my

12    colleague, and I are honored to represent Jayson Penn.  Before

13    I dig into the details of this case, I want to give you one

14    idea, an important idea for you to keep in mind as you hear the

15    evidence.  The government has charged Mr. Penn with agreeing

16    with his competitors to fix prices and rig bids.  In its

17    opening statement, the government told you that some

18    individuals shared pricing information and sometimes that

19    information was sent to Jayson Penn along with other

20    information as he was evaluating what bid Pilgrim's ought to

21    submit.

22         And the question you are going to have to decide in

23    this case is whether Jayson Penn got that information as part

24    of a price-fixing agreement he was involved in or he got that

25    as market intelligence to help him make his own decision about

1    Pilgrim's price.  You will hear that people in this industry

2    got market intelligence from all kinds of sources all the time,

3    third-party analysts, research companies, public data, the

4    industry rumor mill, brokers, customers, distributors, and yes,

5    sometimes competitors.  And Mr. Penn used that information to

6    help him decide what was in Pilgrim's own best interests.  As

7    you will hear, that's what good companies do.  In fact,

8    companies would be foolish not to get as much market

9    intelligence as they can.

10         The owner of a gas station in deciding what price to

11   charge looks across the street to see what his competitor is

12   charging.  United Airlines in setting its fares looks at what

13   American Airlines is charging.  That's not price-fixing.

14   That's market intelligence.  That's exactly what the evidence

15   will show Jayson Penn did.  At all times he was a fierce

16   competitor looking out for his own company's interest and not

17   the interest of his competitors.

18         Over and over Mr. Penn looked for ways to beat his

19   competition, not join them in a price-fixing conspiracy.  We

20   will show you that evidence so you can see for yourself.  So

21   when the government shows you information sharing among

22   competitors and asks you to make a leap that it's a

23   price-fixing conspiracy, keep your antenna up.

24         Let me tell you just a little bit about Mr. Penn.  The

25   government has never met Mr. Penn.  They don't know him.  They

1    have never spoken to him.  These days corporate executives are

2    almost stereotypes, right?  Mr. Penn is no stereotype.  He is a

3    real human being and he is sitting right over there.  He is 53

4    years old.  He is married to his wife Carol and they have four

5    children, all girls.

6            As you will learn, he was not born with a silver spoon

7    in his mouth.  Mr. Penn has worked in the chicken industry his

8    entire life.  He started out on the chicken processing line and

9    most of his career has been spent on the operations side making

10   sure companies are operating as smoothly and efficiently as

11   possible.

12           He has become a champion of what we have come to call

13   chicken math.  You would think that selling chicken wouldn't be

14   that complicated, right?  You raise them, you process them, and

15   you sell them to whoever wants to buy them.  And maybe that's

16   the way it was in the old days, but those days are long gone.

17   Pilgrim's Pride where Mr. Penn worked alone processes 7 million

18   chickens every day, almost all of which are sold to customers

19   fresh to be used right away.  At that scale it takes

20   sophisticated analysis to run a chicken business properly.  And

21   that has always been Mr. Penn's strength, to crunch the data

22   and figure out how a chicken company can be better run.  It's

23   detail-oriented work.  It's not for everyone, but it's what

24   Mr. Penn loves to do.

25           So when Bill Lovette became the CEO of Pilgrim's in

1    2011, he asked Mr. Penn to join him.  At the time Pilgrim's

2    Pride was in terrible shape.  It had just emerged from

3    bankruptcy.  It was having a terrible time turning itself

4    around.  It was literally the laughingstock of the industry.

5    Turning that company around after years of mismanagement was

6    not going to be easy.  It would require talent, grit, a deep

7    knowledge of the business and an enormous time commitment.  And

8    this was the perfect challenge for Mr. Penn.

9            So he took the job.  He and his family moved out here

10   to Colorado.  And then he and Mr. Lovette took on the challenge

11   of rebuilding a public company.  The vision that Mr. Lovette

12   set for the company was both simple and daunting, to be the

13   best managed and most respected company in the industry.

14   Mr. Penn threw himself into that challenge.  This was a chance

15   for him to show that chicken math could work on a big scale.

16           So what did Mr. Lovette and Mr. Penn do to turn the

17   company around?  They took the company down to the studs and

18   rebuilt it from the ground up.  Mr. Lovette's counsel told you

19   about some of those change already, and I won't go through them

20   now.  I just want to make one point here.  All of those changes

21   show that Pilgrim's was charting its own path, making its own

22   decisions about what was in its best interests, because the

23   only way you could hope to realize the vision of becoming the

24   best company in the industry was to beat your competition, not

25   join them.

1          And once they implemented this strategy, Pilgrim's

2     began to turn around.  That happened because they rebuilt the

3     business the old-fashioned way, through long hours, tough

4     choices and hard-nosed competition.

5          The government devoted much of its time to talking

6     about KFC pricing for 2015, so let me address that head on.

7     The government's case is that because the prices all went up a

8     lot in 2015, there must have been price-fixing going on.  The

9     evidence will show that this is wrong.  In fact, it was market

10    forces that drove up those prices, not any agreements among

11    competitors.

12         As you've heard some from Mr. Lovette's counsel, long

13    before those 2015 negotiations began in 2014, the market for

14    small bird was changing.  Big birds were becoming much more

15    profitable than small birds, so chicken producers had to make a

16    choice.  They could either keep selling small birds and make

17    less money or they could switch over to big birds and make more

18    money.  Not surprisingly, many chicken producers had already

19    started switching over to big birds.

20         When I click this, it's supposed to show you a slide

21    which it's not doing.  There we go.  I will show you a simple

22    chart here.  You can see that from 2005 to 2014 the number of

23    small bird plants in the U.S. went down from 40 to 30.  In

24    other words, 25 percent of the small bird plants from 2005 had

25    switched over to making other birds by 2014.  Now, at the same

1    time demand for small birds was going up.

2            Mr. Lovette talked to you about that a little bit.

3    Those delicious rotisserie chickens that we like to buy at the

4    supermarkets, a lot more of those getting bought.  Chick-fil-A

5    was growing like crazy.  Popeye's was growing.  So the demand

6    for small birds was going up.  So what happens when demand is

7    high and supply is low?  Prices are going to go up.  Everyone

8    in the industry, including KFC and the company that negotiated

9    for KFC called RSCS, which you will hear about, they saw this

10   coming a mile away.

11           Remember, KFC only bought small birds.  So if the

12   industry kept shifting from small birds, KFC would be in

13   serious trouble.  RSCS, the negotiator for KFC, started to get

14   nervous about whether they would be able to buy enough chicken.

15   Before the negotiation for 2015 pricing even started, they

16   asked Pilgrim's, then its largest supplier, to make a

17   presentation about what its view of the small bird industry

18   was.

19           Mr. Penn and others at Pilgrim's Pride flew down to

20   Louisville, Kentucky and made a 150-page PowerPoint

21   presentation to RSCS showing them all kinds of data and

22   analysis.  And all that data and slides pointed to one

23   conclusion.  If RSCS wanted to ensure that it had a sufficient

24   supply of chicken for KFC, prices for small birds would have to

25   go up.  RSCS in fact was so worried about whether they would be

1    able to buy enough chicken, they went out and hired an outside

2    independent consulting agency called McKenzie & Company to

3    evaluate the situation and give them advice.  McKenzie did

4    their own deep dive into the chicken industry, and then they

5    reported back to the RSCS board of directors.  And they came to

6    the same conclusion as Pilgrim's.

7          Let me show you just two slides from that

8    presentation.  The first slide shows the four key findings that

9    McKenzie presented to RSCS, again KFC's negotiator.  I am going

10   to focus here just on the third one.  And it reads:  If current

11   trends of available supply continue, the KFC system runs

12   significant risk of shortages over the next three years, the

13   impact of which could be in the range of 500 million to

14   1-1/2 plus billion in lost revenue.  In other words, if things

15   keep going the way they are, you're in trouble.

16         The second slide I want to show you McKinsey confirmed

17   for RSCS the reason why they were in trouble.  It was because

18   people -- the companies were shifting from small birds to big

19   birds.  And as you can see here at the top, it says:  Low corn

20   prices and improved productivity have resulted in a 3X greater

21   profit margin for large birds.

22         And you can see that in the chart.  On the right there

23   you can see that for every pound of large bird chicken they

24   sold, producers made about 30 cents in profit; whereas for

25   every pound of small bird they sold, they made about 10 cents

1   in profit.  So on with this information, RSCS asked Pilgrim's

2   what profit margin it needed.  Pilgrim's told RSCS to expect

3   that Pilgrim's would increase its profit margin by 10 cents per

4   pound.

5          In August of 2014 when it was finally time to submit

6   the bid to RSCS, the financial professionals at Pilgrim's put

7   together a detailed draft bid using a specific form that RSCS

8   required, and that draft bid included a recommendation to

9   increase the profit margin by 10 cents.  They sent that

10  recommendation to Mr. Penn and backed it up with charts and

11  data.

12         Mr. Penn reviewed the draft bid, spoke with those who

13  had made the recommendation and conferred with Mr. Lovette.

14  And they agreed with the recommendation to increase the profit

15  margin by 10 cents.  That was the margin increase that

16  Pilgrim's had determined they needed before the bidding process

17  had begun and that was the margin increase they had told RSCS

18  to expect in those prenegotiation meetings.

19         As one of the financial professionals put it in

20  recommending the 10-cent increase, quote, "I believe we should

21  do the 10 cents per pound because we have been prepping them

22  for that for the last few meetings."  So that was the bid that

23  Pilgrim's submitted to RSCS.  And the negotiations continued.

24  Some suppliers reduced their prices, but Pilgrim's had done its

25  homework and knew what price it needed for the chicken.  If

1    RSCS wanted to buy its chicken from somewhere else at a cheaper

2    price, that was fine.  They just had to tell Pilgrim's how much

3    chicken they wanted to buy at the price that Pilgrim's was

4    willing to sell it.

5          Did Pilgrim's look at what other companies were doing

6    to help them make that decision?  Absolutely, they did.  Why?

7    Because that's just smart business.  You always want to know

8    what your competition is doing.  As you will learn, information

9    is king.  The more information you have, the better decisions

10   you can make.  So that was Pilgrim's Pride's strategy.  Where

11   did all the other suppliers end up?  We will show you that

12   evidence so you can see for yourself whether it suggests

13   price-fixing or whether it points to competition.

14         The first and most obvious question is:  Did the

15   suppliers all end up at the same price?  Here is a chart

16   showing the suppliers' final prices for 2015 to KFC.  What does

17   this chart tell you?  You can see on the left it lists the

18   names of the suppliers and on the right are the prices per

19   pound for the 8-piece COB, which you will come to learn is

20   chicken on the bone.

21         You can see that the prices varied from a low of about

22   1.03 per pound to a high of about $1.08 and a half per pound.

23   That may look like a small difference, but as you will learn in

24   this case, when you are calculating prices out to the hundredth

25   of a penny, 5-1/2 cents is huge.  So the prices were not the

1    same and they weren't even close.  And, in fact, you will learn

2    that the prices for 2015 were farther apart than they had been

3    the year before.

4         Now, the government also talked about profit margins

5    and many of the suppliers ended up with the same margins even

6    if the prices were different.  Let's look at that as well and

7    we will show you what the margins were.  Here you see again the

8    suppliers on the left and the margins on the right.  The

9    evidence will show that the margins are not the same either.

10   In fact, they are quite far apart.

11        Now, the government pointed out that the -- the prices

12   all went up a lot in 2014 to 2015, but those prices all went up

13   because the suppliers were all in the same small bird market

14   facing the same market forces.  You will see that the market

15   was like the wind.  It blew all of the suppliers' prices in the

16   same direction.  They didn't all end up at the same place.  In

17   fact, they ended up farther apart from each other than they had

18   been before, but they were all blown in the same direction by

19   the market.

20        Now, another question you might ask is did Pilgrim's

21   sell about the same amount of chicken to KFC in 2015 that they

22   did in 2014?  You will learn that one hallmark sign that there

23   is no collusion is if suppliers are taking business away from

24   each other.  And that's what you would expect because why would

25   anybody enter into a price-fixing agreement where someone

1    steals your business?  What will the evidence show?  It will

2    show that other suppliers took a lot of business away from

3    Pilgrim's sales to KFC, in fact, more than $300,000 in revenue

4    every week.  That was a substantial loss in sales, but that was

5    part of Pilgrim's strategy in putting their bid together.

6            Pilgrim's was willing to lose that business to KFC and

7    sell it elsewhere, and that's exactly what happened.  Other

8    companies, such as George's and Koch, took a different

9    approach.  They raised their prices less than Pilgrim's, and as

10   a result, KFC bought more from them.  What will this evidence

11   tell you?  That these suppliers were following different

12   strategies in this negotiation.  That is you will learn is a

13   hallmark sign of no collusion.

14           So while the government alleges that there was

15   price-fixing to KFC in 2015, the evidence will show that the

16   prices were different, they were more different than the year

17   before, the margins were different, and the suppliers took

18   business away from each other.  That's what the undisputed

19   objective evidence will show.  And as you will see, Mr. Penn's

20   reaction to this when he learned that he would lose $300,000 in

21   revenue was nothing like you would expect from someone who was

22   involved in a price-fixing conspiracy.

23           I want to address one other issue.  The government

24   mentioned in opening this idea that Mr. Penn said 2014 was

25   chicken nirvana and that's supposed to be evidence in some way

1   of a price-fixing conspiracy.  Well, I've got that e-mail right

2   here and this has nothing to do with price-fixing.  In fact,

3   what this is, this is a classic example that you will see over

4   and over again of the government taking a snippet and a sound

5   bite out of an e-mail and trying to make it mean something that

6   it doesn't.

7           This was an e-mail between Mr. Lovette, Mr. Penn and

8   the CFO at the time, Fabio Sandri.  And they had just received

9   a public financial analyst's report about Tyson, one of the

10  competitors.  And they were in long paragraphs making fun of

11  Tyson for what a terrible business strategy it has, including,

12  "I say bring it on."  Bring it, and it's got lots of characters

13  in there.

14          Mr. Penn:  "They don't need to be in the chicken

15  business."  This is what the government will do throughout this

16  case, show you little snippets of documents and try to convince

17  you it has something to do with price-fixing when it has

18  nothing at all to do with price-fixing.

19          THE COURT:  Mr. Tubach, two minutes left.

20          MR. TUBACH:  Thank you, Your Honor.

21          The government bears the burden to prove beyond a

22  reasonable doubt that Jayson Penn committed a crime.  This is

23  the highest burden in the law.  Mr. Penn is presumed innocent

24  and remains innocent unless and until the government can prove

25  his guilt beyond a reasonable doubt.  If after you have heard

1   all the evidence you have any reasonable doubt about whether

2   Mr. Penn committed this offense, you must find him not guilty.

3          The case you are going to hear will give you many

4   reasons to doubt the government's case against Mr. Penn.  The

5   government's case will consist of inferences and innuendos,

6   cherry-picked sound bites and failing to tell you all of the

7   evidence.  The government brought these charges against

8   Mr. Penn, remember, without having found any witness that would

9   tell you that Mr. Penn was fixing prices with anyone.  And the

10  evidence, some of which I previewed here for you today, will

11  show that Jayson Penn never fixed prices with anyone, period.

12         At the end of the case, I am going to have an

13  opportunity to come back and speak with you again.  And at that

14  time I am going to ask you to return the only verdict that the

15  facts and the evidence will support as to Jayson Penn, not

16  guilty.

17         Thank you very much.

18         *THE COURT:*  Thank you, Mr. Tubach.

19         Next, Mr. Feldberg.

20         Go ahead.

21         *MR. KOENIG:*  Your Honor, can I have a side bar?

22         *THE COURT:*  Very briefly.

23    (At the bench:)

24         *THE COURT:*  Okay, Mr. Koenig, can you hear me?

25         *MR. KOENIG:*  I can.

1          *THE COURT:*  Mr. Feldberg, can you hear me?  If you

2    push the button, then you can speak.

3          *MR. FELDBERG:*  Yes, Your Honor.

4          *THE COURT:*  I still can't hear you speaking.

5          *MR. FELDBERG:*  Can you hear me now, Your Honor?

6          *THE COURT:*  Try it one more time, Mr. Feldberg?  That

7    works.

8          Mr. Koenig, go ahead.

9          *MR. KOENIG:*  I think there is a couple things going on

10   here.  First of all, the portions that were just extremely

11   argumentative like talking about gas stations and airlines and

12   what is smart business and then also bringing in personal

13   details that are not going to be coming in at trial like who he

14   is married to and whether he had a silver spoon in his mouth,

15   that's just totally inappropriate in the government's opinion.

16         *THE COURT:*  At this time I am going to overrule the

17   objection.  Of course, if you mention something like family

18   background during opening, I expect that evidence will be

19   introduced during the course of the trial, so I assume that the

20   defense counsel will be doing that.  There is a little bit of

21   argument.  I don't think it's too heavy-handed.  I haven't

22   heard anything that so far I would consider to be improper, so

23   that objection will be overruled, all right?

24      (In open court:)

25         *THE COURT:*  Mr. Feldberg, go ahead.

1          MR. FELDBERG:  Thank you, your Honor.

2                        **OPENING STATEMENT**

3          MR. FELDBERG:  Members of the jury, I am Michael

4    Feldberg.  My colleagues Julie Withers, Laura Carwile, and I

5    have the responsibility and have the privilege to represent

6    Roger Austin in this federal criminal trial.  This is a

7    criminal case.  This is as serious as it gets.  The prosecutors

8    have charged Mr. Austin with a felony.  This is the most

9    frightening, terrible thing that has ever happened to Roger

10   Austin because the evidence will show he is not guilty.

11         As the Court has already instructed you, Mr. Austin is

12   presumed innocent.  And that presumption remains until the end

13   of the case and is only overcome by the prosecution if they are

14   able to prove beyond a reasonable doubt that Roger Austin

15   knowingly entered into a conspiracy to agree to fix prices or

16   rig bids.  The prosecution will not be able to prove that

17   charge for one simple reason.  He did not.

18         Before telling you a little bit about Roger Austin, I

19   want to outline the five major reasons why the evidence will

20   show that Roger Austin is not guilty.  No. 1, there was no

21   agreement to fix prices or rig bids.  The various competing

22   suppliers' prices were different.  Their profit margins were

23   different.  And the differences among their prices and profit

24   margins increased during the time period of the so-called

25   conspiracy.  Pilgrim's Pride set its own price based on its

1    unique business strategy.  The evidence will show that all the

2    suppliers' prices were different every year.  Does that sound

3    like an agreement to fix prices?

4           No. 2, Pilgrim's Pride, the company Mr. Austin worked

5    for, made independent data-driven decisions on what it would

6    bid.  Those decisions were made by a team of financial

7    analysts, as Mr. Tubach explained, based at Pilgrim's

8    headquarters in Greeley, Colorado, spent many hours studying

9    numbers, preparing spreadsheets and analyzing what was in

10   Pilgrim's independent best interest.  If there really was a

11   conspiracy to fix prices or rig bids, none of this work would

12   have made any sense.

13          No. 3, Roger Austin had no authority to decide what

14   bids Pilgrim's would make or prices Pilgrim's would charge.

15   For most of the time period alleged in this case he was based

16   in Louisville, Kentucky so he could be close to KFC.  He was

17   the customer guy.  His job was to keep the customer happy, to

18   make sure KFC had all the chicken it needed because if KFC did

19   not have chicken, it didn't have much to sell.  Bidding and

20   pricing decisions were made by the financial analysts in

21   Greeley, Colorado, not by Roger Austin in Louisville.

22          No. 4, there was competition among the suppliers.  The

23   suppliers competed vigorously with each other and took business

24   away from each other.  For example, in the summer of 2014,

25   there was a growing shortage of smaller chickens, the size that

1    KFC buys.  Pilgrim's financial team made a decision to take

2    advantage of the tight supply and to raise prices and be the

3    price leader even if it meant losing volume.  Other suppliers

4    made different decisions.

5          As a result, Pilgrim's lost volume as you can see.

6    They sold an estimated 3.2 million pounds per week to KFC in

7    2012, and it was reduced by more than half to

8    1.34 million pounds per week by 2018 with a big reduction in

9    2015.  Other suppliers made different choices and took business

10   away from Pilgrim's.  In 2015, the year that saw the largest

11   price increases because of the supply and demand factors that

12   I've described and others have described to you, the spread

13   among the competing suppliers' prices was greater than it had

14   been in prior years.  If this were a conspiracy to fix prices,

15   you would expect the suppliers' prices to be closer together,

16   not further apart.

17         The prosecutor said this was a conspiracy to raise

18   prices, but that is not what the evidence will show actually

19   happened.  In one year, 2015, prices went up because of the

20   shortage of supply of small birds that we've talked about, a

21   shortage everyone, including KFC, knew would cause prices to

22   rise.  In other years like 2014 and 2018, prices went down when

23   there was an abundant supply of small birds.  This isn't

24   price-fixing.  This isn't a conspiracy to raise prices.  This

25   is competition and the law of supply and demand.

1           Now, the fifth reason, the prosecutor said that the

2    defendants did what the prosecutors accused them of doing for

3    money.  There will be no evidence that Roger Austin had

4    anything to gain from a conspiracy to agree to fix prices or

5    rig bids.  He had no motive.  There was no benefit to him, no

6    bonus or payday.  He did not have Pilgrim's stock options.  And

7    the principle discretionary component of his bonus calculation

8    was volume of sales to KFC which decreased over the time period

9    involved in this case.  Does it make sense to you that someone

10   would risk his reputation, his career, his standing in the

11   community, risk criminal charges for no benefit at all?

12          Now, what evidence does the prosecution have to try to

13   prove beyond a reasonable doubt that Roger Austin knowingly

14   entered into a conspiracy to agree to fix prices or rig bids?

15   They will likely argue that Mr. Austin made and received a lot

16   of phone calls with people who worked for other suppliers.  For

17   the most part, the evidence will not show what was said on

18   those calls, but they want you to assume that something bad

19   happened.

20          What do we say to that?  Of course Mr. Austin spoke

21   with people at other suppliers.  The evidence will show there

22   were lots of reasons for him to do so.  They were friends.

23   Many had worked together.  And quite often, sometimes as often

24   as weekly, one supplier would run into a problem with a plant

25   or a truck and couldn't meet its supply commitments so would

1    reach out to other suppliers to see if they could cover the

2    shortage.  We're talking about fresh chicken here which has a

3    very short shelf life.  There is a phrase in this business

4    that's likely to come up in the trial, "Sell it or smell it."

5          It happened regularly that suppliers had to cover

6    shorts for each other and the customer, Mr. Austin's customer,

7    wanted the suppliers to communicate with each other so they

8    could cover each other's shorts.  Did Mr. Austin and other

9    suppliers occasionally share information?  Of course they

10   sometimes did.  There is nothing wrong with that.  The charge

11   here is a conspiracy to agree to fix prices and rig bids, not a

12   conspiracy to share information.

13         And for all the reasons we've talked about, the

14   evidence will show there was no agreement, no conspiracy.

15   Every sensible business tries to find out as much as it can

16   about what its competitors are doing, not because they are in a

17   conspiracy, but because they are trying to figure out their own

18   best strategy to compete, and that's what the evidence will

19   show Pilgrim's did here.

20         The evidence will also show that suppliers

21   communicated because they wanted to know whether customers were

22   bluffing when they would say to one supplier, hey, the other

23   guy is 5 cents or 5 percent cheaper.  There is nothing wrong

24   with trying to find out if a customer is bluffing.  The

25   customer might not like it because the supplier might call its

1    bluff, but that's part of normal business give-and-take.

2         And you'll see from the evidence that when Roger

3    Austin tried to gather information from multiple sources

4    including the customers themselves about what other suppliers

5    were doing, he explicitly told his bosses in Greeley that he

6    did not, he did not want them to think that he was suggesting

7    meeting those prices.  That's what the evidence will show

8    really happened here.  To the extent the various suppliers

9    spoke with each other about prices, the information was just a

10   data point, just like the information the suppliers got from

11   customers, published reports and historical information.

12        Like any business, Pilgrim's wanted as much

13   information as it could get about what its competitors were

14   doing, not so it could agree with them to fix prices, but so

15   that it could make what it considered the best decisions in its

16   independent interest.  A lot of that information came from

17   customers themselves.

18        You will see evidence that Mike Ledford, who was the

19   lead negotiator for much of the time period for RSCS, the

20   buying cooperative for KFC, not only told Mr. Austin other

21   suppliers' prices, but he also told Mr. Austin that KFC wanted

22   all the suppliers at close to the same price even if it meant a

23   supplier moving to a higher price.  Why would KFC want that?

24        The evidence will show that KFC wanted prices to be as

25   close together as possible because it had franchisees, hundreds

1    of them, maybe thousands of them, and it didn't want one

2    franchisee to have to pay more than the others.  It wanted

3    uniformity or as close to uniformity as it could get.  The

4    evidence doesn't begin to approach proof beyond a reasonable

5    doubt that Mr. Austin entered into a conspiracy to agree to fix

6    prices or rig bids.

7         Now, let me tell you a little bit about Roger Austin.

8    He is 65 years old, lives on a farm in Georgia, has been

9    married for 40 years, has two children in their thirties and

10   five grandchildren.  He has never been in any kind of trouble

11   with the law.  He worked in the poultry business for 40 years

12   until his retirement in August 2018 long before any charges

13   were filed in this case.

14        During the years in question in this case, 2012 until

15   his retirement in 2018, Mr. Austin was one of many

16   vice-presidents of Pilgrim's Pride.  The evidence will show

17   that Roger Austin was the customer guy for Pilgrim's.  His job

18   was to keep KFC happy and ensure that KFC had a sufficient and

19   continuous supply of chicken.  He did not have authority to set

20   prices or to determine how Pilgrim's would bid for KFC's

21   business.  He spoke with KFC.  He learned what KFC wanted.  And

22   he then communicated that information to Pilgrim's headquarters

23   where a financial analytics group analyzed all the data and

24   instructed him what bids he could offer to KFC.

25        Mr. Austin lived during most of the relevant time in

1    Louisville, Kentucky, so that he could be close to KFC.  As the

2    evidence will show, he often disagreed with the financial

3    analytics group in Greeley and he argued for lower prices.  But

4    his superiors in Greeley sometimes decided on a strategy to opt

5    for higher prices even if it meant less volume.  As you listen

6    to the evidence over the coming weeks, I urge you to consider

7    the following questions:

8         If the prices were fixed, how come all the prices were

9    different?

10        If prices were fixed or bids rigged, how come the

11   suppliers competed with each other and took business away from

12   each other?

13        Isn't what happened here what business people do every

14   day, try to find out as much as they can about what their

15   competitors are doing so they can make their own best decisions

16   about what to do?

17        Was there in fact an agreement to fix prices or rig

18   bids when each supplier's prices and profit margins were

19   different every single year?  And there is no evidence, zero,

20   of any supplier agreeing that it would not bid for KFC's or any

21   other customer's business.

22        How can Roger Austin be part of a conspiracy to fix

23   prices when he had no authority to set prices?

24        Did Mr. Austin have any motive to enter into a

25   conspiracy to agree to fix prices or rig bids?  There will be

1    no evidence that he benefited in any way from this so-called

2    conspiracy.

3              And please ask yourselves whether what happened here

4    was simply a function of the ordinary laws of supply and

5    demand.  In one year the supply of chicken was tight and prices

6    went up.  In other years there was greater supply and prices

7    went down.

8              Now, there is a natural tendency to think that if the

9    Department of Justice charges someone with a serious crime, he

10   must have done something.  Yes, the burden of proof is on the

11   prosecution to prove each defendant guilty beyond a reasonable

12   doubt, but still I suspect some of you may be thinking there

13   must be something.  How could the prosecutors make such a big

14   mistake?  I'll tell you how.

15             The evidence will show that before completely

16   overturning Roger Austin's life and charging him with a felony

17   based on a bunch of phone records and a handful of texts and

18   e-mails spread out over eight years, no one from the

19   prosecution sought to get Mr. Austin's side of the story, asked

20   anyone what happened in the phone calls, what the texts and

21   e-mails meant or sought to interview any of the relevant

22   people.  Before charges were brought against Roger Austin, the

23   prosecution interviewed virtually no one, not anyone from the

24   suppliers and customers.  They never even tried to understand

25   what really happened.

1          Was this a fair investigation where the prosecution

2    seeks to get both sides of the story before making a decision

3    to charge someone with a felony or was it ready, fire, and only

4    then when it's too late aim?

5          The prosecutor told you about 2012 in its opening

6    statement.  The evidence will show that KFC, the customer, got

7    the prices it wanted.  Take a look at one page of an RSCS

8    PowerPoint from December 2012.  While KFC had anticipated there

9    might be a need for follow-up calls with a couple of suppliers,

10   quote, "They have come back generally in line with where he

11   asked them to get."  KFC got the prices it wanted.

12         And let's talk about the price increase negotiated in

13   2014 for 2015.  Everyone including KFC knew that there was

14   going to be a shortage of small birds of the kind KFC wanted

15   because they were not profitable for the suppliers, and that as

16   a result, prices would go up.  The problem was so acute that in

17   the summer of 2014, RSCS on behalf of KFC hired McKenzie &

18   Company, one of the world's leading business consulting firms.

19              THE COURT:  Two minutes left, Mr. Felberg.

20              MR. FELDBERG:  Thank you.

21         I was going to show you some McKenzie slides, but

22   Mr. Tubach already did that, so I am not going to bother you

23   with them again.  I will just say one word about the

24   prosecutor's mention of an insider who is going to testify.  I

25   am not going to preview here what you are going to hear from

1    the insider.  All I want so say now is please listen carefully

2    to what he says and what he doesn't say, and then think

3    carefully about whether the testimony of this one person

4    amounts to proof beyond a reasonable doubt of a conspiracy to

5    agree to fix prices or rig bids.  Put differently, would you

6    want someone you care about to be convicted of a felony based

7    on his testimony.

8         When you review the evidence and consider all the

9    questions this case raises, I submit to you that you will

10   conclude that the prosecution will not have met its burden of

11   proving beyond a reasonable doubt that Roger Austin knowingly

12   and intentionally entered into a conspiracy to agree to fix

13   prices or rig bids.

14        Thank you.

15        *THE COURT:*  Thank you, Mr. Feldberg.

16        All right.  Who wants to go next?

17        Mr. Canty, go ahead.

18                        **OPENING STATEMENT**

19        *MR. CANTY:*  Good evening.  My name is Dennis Canty.  I

20   represent Jimmie Little.  Mr. Little is charged in a

21   price-fixing conspiracy.  He is also charged with obstruction

22   of justice.  He is not guilty of either charge.  I am going to

23   outline for you what the evidence will show about Mr. Little.

24   There will be a lot of evidence presented to you in this case,

25   a lot of documents, a lot of people testifying.  There will be

1    a lot of companies and names to try to keep straight and try to

2    remember.  You're going to learn a lot about the chicken

3    business and a lot about how it works, way more than you ever

4    wanted to know.

5         As the evidence is presented to you, I am asking you

6    to be very careful and pay close attention to how Mr. Little

7    fits into all this and exactly what the government is able to

8    show that he did.  At the end of this trial, we will talk again

9    about the evidence that you've seen and it will be clear that

10   Mr. Little is not guilty of a price-fixing conspiracy or

11   obstructing justice.

12        So who is Jimmie Little?  Mr. Little spent his life

13   working in the chicken industry.  He started at the bottom at a

14   Church's fast-food restaurant and later became a Church's

15   franchisee.  Eventually he joined Pilgrim's Pride.  And during

16   the time period that we are concerned with here, he was

17   vice-president of sales national accounts until he retired in

18   2016.

19        I don't know what comes to your mind when you hear

20   vice-president of sales, but Mr. Little was not the head of a

21   department or a division at Pilgrim's.  He did not have a

22   single person reporting to him.  He may have had a fancy title,

23   but the evidence will show that he was a sales representative,

24   a sales representative for certain specific Pilgrim's national

25   accounts.  He provided customer service for some of those

1    national accounts.  Those accounts included Church's, Pollo

2    Tropical and some others.

3         Importantly, it did not include KFC.  KFC was not one

4    of his accounts.  The evidence will show that Mr. Little had no

5    involvement whatsoever in pricing or contract negotiations for

6    KFC.  The evidence will show that Mr. Little did not have

7    pricing authority for any of Pilgrim's accounts.  As you have

8    already heard and you will hear more of, Pilgrim's pricing was

9    based upon many factors.  There was a team at Pilgrim's

10   responsible for pricing models, the math guys, the chicken math

11   guys, and Mr. Little wasn't one of them.

12        For his accounts he was given the price by Pilgrim's

13   financial analysts and he communicated that pricing information

14   to his customers.  The evidence will show that Mr. Little's job

15   was sales and customer service.  The evidence will show that he

16   received a salary and was eligible for a bonus, but his bonus

17   was based on customer service and the volume of chicken sold,

18   not pricing.  In fact, to the extent that Pilgrim's' volume of

19   sales went down because Pilgrim's prices were high,

20   Mr. Little's compensation would suffer.  He had no incentive

21   for Pilgrim's prices to be higher.  He had every incentive to

22   compete for business with lower prices.

23        On the subject of competition, the government in its

24   opening said that 10 defendants from five chicken companies

25   conspired together when they were supposed to be competing.

1    They said the evidence would show that these 10 men chose to
2    cheat rather than compete.  I am going to suggest to you that
3    when you look carefully at the evidence in this case, it's
4    going to prove the corollary.  Look at the evidence.  When the
5    evidence shows these people are competing, it shows they are
6    not cheating.
7          Mr. Little's job was customer service.  What does
8    customer service mean in the chicken business?  It means
9    troubleshooting and keeping customers happy.  As you can
10   imagine, various issues arise with supplying fresh chicken all
11   over the United States.  Delivery trucks are late.  Chicken may
12   be delivered that doesn't meet specifications.  Chicken can be
13   missing from a delivery.  There can be spoilage issues.  These
14   are the kinds of things that Mr. Little dealt with on a daily
15   basis.
16         The evidence will show that Pilgrim's is a big
17   company.  They sold a huge amount of chicken, and consequently
18   there are always customer service issues.  Another customer
19   service issue that Mr. Little would deal with is customer
20   shorts.  You will hear about a short.  A short is when a
21   supplier isn't able to deliver the amount of chicken that the
22   customer expected.  Customers like fast-food restaurants can't
23   simply just close their doors because they run out of chicken.
24   They have to find another way to get chicken, from somebody
25   else, another supplier.

1           In this situation the suppliers, Pilgrim's, Koch,

2    Tyson, all of them would speak to each other and arrange to

3    help cover the short.  In other words, Pilgrim's would help out

4    Tyson if Tyson didn't have enough chicken to deliver to the

5    customer and vice versa.  This was for the benefit of the

6    customer.  Suppliers would cooperate to help the customer, not

7    harm the customer.  This would require Mr. Little to talk to

8    his counterparts at other suppliers in order to coordinate with

9    them to cover their shorts.  You will hear that this happened

10   often, and this was a reason that Mr. Little spoke to other

11   suppliers and it had nothing to do with pricing.

12          How did Mr. Little communicate with these people?  How

13   did he do his job?  The evidence will show that Mr. Little was

14   on the phone a lot talking to his customers, talking to other

15   people at Pilgrim's, working through customer service issues.

16   Sometimes he talked to other suppliers.  The government told

17   you that Mr. Little had thousands of phone calls with other

18   suppliers.  I'm not sure, that may be true, but they will want

19   you to conclude that these calls are evidence that Mr. Little

20   entered into an agreement to fix prices.

21          But you are not going to hear from any witness that

22   Mr. Little entered into an agreement to fix prices with anyone.

23   The evidence will show that Mr. Little was doing his job

24   serving his customers and he did it on the phone.  And there

25   was nothing wrong with that.  And just because he spoke to

1    other suppliers doesn't mean he agreed with anyone to fix

2    prices.

3         The government spent a lot of time talking about the

4    2014 negotiations for the 2015 KFC contract.  Again, the

5    evidence will show Mr. Little was not involved in those

6    contract negotiations in any way.  The evidence will show that

7    KFC was not his account, that Mr. Little was not involved in

8    negotiations with RSCS for the KFC contract.  He was not

9    included in Pilgrim's internal pricing discussions regarding

10   the KFC contract and pricing model.

11        The only conduct by Mr. Little that the government

12   identifies are a handful of phone calls that Mr. Little

13   happened to have made on three days during a six-week time

14   period of the negotiations that they are concerned with.  The

15   evidence will show that Mr. Little's calls were more likely

16   about customer service issues he was dealing with and not the

17   KFC contract negotiations because he simply wasn't involved in

18   those negotiations.  So please listen closely to the evidence

19   that the government introduces and decide whether it actually

20   implicates Mr. Little in the price-fixing conspiracy.

21        The evidence actually shows that Mr. Little is focused

22   on customer service, has no pricing authority; instead, just

23   relayed pricing information given to him by the Pilgrim's

24   financial analyst, and he spent a lot of time on the phone.

25   That's it.  That's what the evidence will show.  It will not

1   show beyond a reasonable doubt that Mr. Little entered into an

2   agreement with anybody else in this courtroom to fix prices.

3          Let's talk about the obstruction of justice charge.

4   What is that all about?  Mr. Little was interviewed by Special

5   Agent Koppenhaver and Special Agent Taylor on August 31, 2020

6   at his home.  The government has said that evidence will show

7   that during his interview he lied about having contacts with

8   suppliers and competitors outside of industry trade shows.  The

9   government maintains that these alleged false statements

10  somehow amount to obstruction of justice.

11         You will hear that the agents came to Mr. Little's

12  home unannounced.  You will see evidence that the government

13  was already planning to indict Mr. Little when they came to his

14  home.  You will see evidence in the agents' own words that

15  having planned to indict him, they went to his home with the

16  specific intent of catching Mr. Little before he could get a

17  lawyer's advice.

18         The evidence will show that Mr. Little had retired

19  from Pilgrim's almost four years before federal agents came

20  knocking at his door.  When they came knocking, you will hear

21  that he was home alone with his wife Teresa who is disabled and

22  needs constant care.  The evidence will show that he is not

23  given information about the purpose of the agents' interview.

24  He wasn't told he was being investigated.  He wasn't told he

25  was in the agents' crosshairs.  And you will hear that although

1    the agents recorded many witnesses that they interviewed in

2    this case, they didn't record this one.

3              The government alleges that the agents asked whether

4    he had any contacts with suppliers and competitors outside of

5    industry trade shows and that Mr. Little said no.  And then the

6    government says the evidence will show that Mr. Little had

7    thousands of phone calls with suppliers.  Of course, he did.

8    That was part of doing his job.  He couldn't do his job without

9    doing that.  And it doesn't make any sense that he would try to

10   lie about it.

11             You won't hear exactly what Mr. Little said during

12   that interview because the agents didn't record it.  They

13   recorded plenty other witnesses when they went to interview

14   them, but when they got to Mr. Little's home, they didn't turn

15   on the recorder.  And he is the only one charged with

16   obstruction of justice based on what supposedly happened during

17   that interview.

18             So how did Mr. Little supposedly obstruct justice?

19   The government says that the evidence shows that there's false

20   statements that he didn't speak with competing suppliers

21   outside of the trade shows.  That's how he obstructed his

22   investigation.  He is not accused of hiding any documents,

23   interfering with any witnesses or destroying physical evidence

24   or anything like that.  The government simply says that

25   Mr. Little told them that he didn't speak with competing

1    suppliers and he had.  The evidence will show it's not true.

2    Mr. Little's statements at the interview, whatever they were,

3    had no impact on the government's investigation and certainly

4    did not obstruct it.

5         So please listen carefully during the trial to the

6    evidence about Mr. Little in particular.  The evidence won't

7    show that the government has proven by any standard let alone

8    beyond a reasonable doubt that Mr. Little is guilty of agreeing

9    to rig bids or fix prices or guilty of obstruction of justice.

10   The evidence will show that Mr. Little is not guilty of the

11   charges brought against him.

12        Thank you for your attention.

13        THE COURT:  Thank you very much, Mr. Canty.

14        Ladies and gentlemen, it's almost 5:00 o'clock.  We

15   will go ahead and recess for the day.  Let me remind you about

16   some of the things that you should avoid overnight and through

17   the rest of the trial.

18        First of all, make sure that you don't expose yourself

19   to any media.  So just in case you see -- if you start hearing

20   something on the radio, if you start to see something on the

21   television or you happen to glance at a newspaper and see

22   something there or you see something on-line, don't look at it.

23   Avert your eyes.  Avoid reading anything about this particular

24   case.

25        Also, just in case you have a family member who

1   perhaps thinks he or she knows about the case or has been

2   exposed to media and might even try to guess what case you're

3   on or something of that nature, do not let yourself get exposed

4   to that information either.  Tell that person, sorry, can't

5   talk to you.  Don't tell me.  Walk away.  Do whatever it takes.

6   Don't just passively allow yourself to be exposed to things

7   that are occurring outside of the courtroom because, once

8   again, that information is not subject to the same guarantees

9   of cross-examination, trustworthiness, all those other things

10  which a trial is designed to do to make sure that the evidence

11  in a trial is tested and is something that the jury can

12  consider when it finally is deliberating in the case.

13          Don't do any research on your own, and that would

14  include even some terms.  In the event, since you are not

15  lawyers, you hear some terms and you don't know what they mean,

16  don't look up those terms.  Those are things which it's the

17  attorneys' job or my job to inform you about.  So don't look up

18  any term that may be unfamiliar to you even if you just look it

19  up in a dictionary.  Don't do any research about the chicken

20  industry or anything of that nature either.  And as was

21  mentioned in that introductory instruction, just in case over

22  the course of the trial you hear of some locations -- I am not

23  saying that you would avoid driving by a KFC on the way home --

24  but you would not want to try to find where someone's office is

25  or things of that nature.  Don't do that.

 1            I am going to have you come back tomorrow at 8:30.

 2    That will be our usual start time.  So when you come back to

 3    the courthouse, try to make sure that you're back in the jury

 4    room ready to go at 8:30, okay?  So that will involve obviously

 5    getting here before 8:30 so that you can get through security

 6    and so that you can get yourself situated.  I think that they

 7    will probably have hopefully the line for jurors to go through

 8    security, so you may be able to get through security quicker

 9    that way.

10            All right.  Ladies and gentlemen, at this time you are

11    excused for the evening.

12            (Jury excused.)

13            Please be seated.  Anything that we should take up at

14    this time?

15            MR. KOENIG:  Yes, Your Honor.

16            THE COURT:  Mr. Koenig, go ahead.

17            MR. KOENIG:  I made the objection before

18    Mr. Feldberg's opening and it appears that -- he just went over

19    the top.  And I -- I think this just has to end.  I mean,

20    saying would you want someone you care about to be convicted by

21    somebody else, I mean, and claiming that the government -- they

22    moved that the agents couldn't testify to certain stuff.  They

23    want them sticking to the facts that they found.  And then they

24    are saying that the investigation was unfair and one-sided.

25    And then giving personal details, Mr. Little's wife is

1    disabled.  This is all just meant to pander to the jury and it

2    just has to end in my opinion.

3         THE COURT:  Well, Mr. Koenig, it's not uncommon that

4    there would be a mention of a little bit of background,

5    personal background, on a defendant in the course of a criminal

6    case.  Obviously, it can't go overboard.  I haven't heard

7    anything that I would consider to be overboard.  Was there some

8    rhetoric?  Was there an attempt to play to some emotions?

9    Yeah.  That's what happens during closings in particular, but

10   to some degree in openings too.  Once again, I didn't think

11   that anything I heard today crossed the bounds of argument, not

12   that I am giving those who will be giving their openings

13   tomorrow a license to go overboard.  I just haven't heard

14   anything that I would consider today to cross that line.

15        MR. KOENIG:  All right.  Thank you.

16        THE COURT:  Anything else?

17        Yes, go ahead.

18        MR. POLLACK:  Yes, Your Honor.  Last night and frankly

19   for the last several nights literally throughout the night we

20   have been getting new productions of documents from the

21   government.  While we were sitting here today, we got several

22   additional new productions from the government.  The government

23   has changed its exhibit list.  It told us the exhibit list that

24   they gave us before trial is now no longer operative, but they

25   haven't given us a new exhibit list.  Every night we get a list

1    of the witnesses that they believe are going to be coming up

2    and a list of exhibits that they intend to introduce through

3    that witness.

4           There is almost no correlation between the exhibits on

5    those lists and the exhibits on the exhibit list.  There might

6    be half of them that were on the exhibit list and then half of

7    them are ones that weren't on the exhibit list.  And then an

8    hour or so later we'll get a new e-mail saying the e-mail from

9    two hours ago is no longer operative.

10          It really, as we now move into the witness portion, it

11   is going to make preparing for the witnesses and being

12   efficient impossible.  And so I am not sure exactly what relief

13   I am looking for at the moment.  Maybe it's just cathartic.

14   But at some point I think we are going to have to have some

15   guidance from the Court and maybe a ruling from the Court that

16   if exhibits are not provided until 1:00 a.m., they can't be

17   used with a witness that day.

18          *THE COURT:*  Right.

19          Mr. Koenig?

20          *MR. KOENIG:*  Yes, Your Honor.  We had an agreement

21   that we would provide exhibit numbers two days before witnesses

22   are called, and that's what we've been doing.  I don't know

23   what he is talking about with witnesses or exhibits not being

24   on our exhibit list.  That, you know, I don't believe that to

25   be the case.

1          The other thing I will point out is just last night or

2    I can't remember what night it was because they all blur

3    together, we just got a stack of 300 new defense exhibits.  I

4    mean, you know, I don't quite understand where this is coming

5    from.  We are trying to abide by our two day in advance

6    agreement and, you know, because it's 1:00 in the morning,

7    that's trial.

8          THE COURT:  Well, let me say -- thank you, Mr. Koenig.

9    At the beginning of a trial and in particular a trial like this

10   one where there are lots and lots of exhibits and lots and lots

11   of witnesses, the parties would naturally be trying to get into

12   a bit more of a rhythm.  We are not there yet.  Things are

13   rough.  Things are getting produced perhaps at the last minute.

14   I am not trying to cast aspersions on either side.

15         I do believe that, of course, the United States has an

16   interest in making sure that it provides that advance notice

17   that we had been talking about.  And the reason that we had

18   talked about that is because it would make for a more efficient

19   trial presentation.  We're all interested in trying to try the

20   case as efficiently as possible so that we don't get into a

21   time crunch at the very end.

22         I believe the fact that the government has that

23   incentive to carry out its side of the bargain because, of

24   course, once the defense case starts, it will rely upon the

25   defendants for that same type of notice for defense witnesses.

1    So I am not going to make any rulings on it at this point in

2    time, I don't think we are quite there, but I would urge the

3    attorneys to think about those important values of efficiency

4    and to the extent possible make sure that notice is given in

5    advance to help defense counsel now, government later, to be

6    able to prepare for witnesses so that we are efficient, okay?

7              Anything else?

8              Yes.

9              *MR. POLLACK:*  I just wanted to thank Your Honor.

10             *MR. McLOUGHLIN:*  Your Honor, on behalf of Mr. Lovette,

11   to Mr. Pollack's point there are some documents that we have

12   asked for in the way of exhibits last week that we haven't

13   received yet, but also we have been getting these significant

14   volumes of documents each night, but there is no *Brady* or

15   *Jencks* material that has been identified.  We have been getting

16   data dumps virtually for months and certainly at a much higher

17   level over the last 30 days without any identification of *Brady*

18   which has required us to go through mountains of records.

19             We want to put on the record an objection to the

20   government's failure to identify sufficiently *Brady* or *Jencks*

21   *Act* material by burying that material in mountains of data and

22   not identifying it for us.  Whether that will continue or not,

23   we don't know, but we want the record to be made that up to

24   today we do not believe the government has met its

25   responsibilities.

1           *THE COURT:*  A responsibility to do what,

2    Mr. McLoughlin?

3           *MR. McLOUGHLIN:*  To provide *Brady* material or *Jencks*

4    *Act* material, Your Honor, in such a way that we can process it

5    and find it and use it as opposed to burying it within millions

6    or tens of millions of pages that we have to figure out how to

7    try to review and identify in a very short period of time.

8           *THE COURT:*  Okay.  Thank you.

9           Any response, Mr. Koenig?

10          *MR. KOENIG:*  Sure.  Right before we started this

11   afternoon's session, we handed out a compact disc that said

12   *Jencks* material on it labeled -- was it labeled as such or we

13   told them?

14          *MS. CALL:*  We told them.

15          *MR. KOENIG:*  Anyway, that was the purpose of that.

16   The *Brady* material, I really -- I don't know what exactly he is

17   talking about.  I mean, we've identified -- you know, we

18   produce what we get and then we produce according to our

19   agreement what we're going to be using with the witnesses.

20   We've been putting on 302s.  Maybe that's what they are talking

21   about?  I am at a loss, to be honest.

22          *THE COURT:*  Well, once again, I don't know.  I would

23   simply make the following comment, and that is there should be,

24   and I am not assuming that there isn't, but there should be a

25   clear distinction between exhibits or lists of exhibits or

1    things being used with a witness that is for upcoming days and

2    new production of documents that may be triggered by the

3    government's ongoing responsibilities to produce any documents

4    that they become aware of.

5         Obviously, now that we're underway, it would be

6    inappropriate to bury some type of document in a bunch of other

7    documents for purposes of just hiding it.  If for whatever

8    reason the government found some documents that are really bad

9    for the government, one would hope that the government would

10   lay that card on the table and not bury it among a pile of

11   other documents, once again, not assuming that the government

12   has done that at all.  I am just saying that we need to, once

13   again, try this case efficiently; and as a result, any types of

14   gamesmanship with document production should not happen.  Once

15   again, I am not assuming at all that the government is doing

16   anything of the sort, okay?

17        MR. KOENIG:  I am sure we are not, but I appreciate

18   it.

19        THE COURT:  Yes.  Okay.  Anything else before we

20   recess?

21        All right.  We will be in recess, then, until

22   8:30 tomorrow.

23        One other thing and that is if there is some issue,

24   and I am hoping that we don't get into this practice, but if

25   there is some burning issue that we need to take up before

1   8:30, before we start, let Mr. Keech or next week Ms. Grimm

2   know right away and then estimate how long you think it may

3   take to resolve that.

4        I don't want to get the jury conditioned to thinking,

5   oh, when he says 8:30, it never means 8:30.  It's always later.

6   We are always just sitting around doing nothing even though I

7   had to fight my way through traffic.  So I want to -- once

8   again, I want to start on time, but if you have some brief

9   issue to take up before we convene in the morning, let the

10  courtroom deputy know that, all right?  We will be in recess.

11  Thank you.

12      (Recess at 5:14 p.m.)

13                          INDEX

14  OPENING STATEMENT

15      By Mr. Koenig                                        64

16      By Mr. Fagg                                          72

17      By Mr. Tubach                                        90

18      By Mr. Feldberg                                     107

19      By Mr. Canty                                        117

20                   REPORTER'S CERTIFICATE

21      I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.  Dated

23  at Denver, Colorado, this 18th day of January, 2022.

24

25                          S/Janet M. Coppock