IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

    Defendants

_____

REPORTER'S TRANSCRIPT
Trial to Jury, Vol. 19

_____

      Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 8:34 a.m., on the 22nd day of November,

2021, in Courtroom A201, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

```
 1                        APPEARANCES

 2           Michael Koenig, Carolyn Sweeney, Heather Call and Paul

 3    Torzilli, Laura Butte and Jillian Rogowski, U.S. Department of

 4    Justice, 450 Fifth Street N.W., Washington, DC 20530, appearing

 5    for Plaintiff.

 6           Anna Tryon Pletcher and Michael Tubach of

 7    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

 8    San Francisco, CA 94111-3823;

 9           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

10    N.W., Washington, DC 20006, appearing for Defendant Penn.

11           David Beller, Richard Kornfeld and Kelly Page of

12    Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

13    CO 80202, appearing for Defendant Fries.

14           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,

15    LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

16            Laura Kuykendall and Megan Rahman of Troutman Pepper

17    Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,

18    appearing for Defendant Brady.

19           Michael Felberg of Reichman, Jorgensen, Lehman,

20    Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21    10017;

22

23

24

25
```

APPEARANCES (Continued)

1

2          Laura F. Carwile of Reichman, Jorgensen, Lehman,

3   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

4   CA 94065; appearing for Defendant Austin.

5          Elizabeth B. Prewitt of Latham & Watkins, LLP,

6   555 11th Street, N.W., Suite 1000, Washington, DC 20004;

7          Marci Gilligan LaBranche of Stimson, Stancil,

8   LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO

9   80218, appearing for Defendant Mulrenin.

10          James A. Backstrom, Counselor at Law, 1515 Market

11   Street, Suite 1200, Philadelphia, PA 19102-1932;

12          Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,

13   Bethesda, MD 20814, appearing for Defendant Kantola.

14          Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth

15   Street, Suite 1100, Los Angeles, CA 90017;

16          Dennis J. Canty, Canty Law Corporation,

17   1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596,

18   appearing for Defendant Little.

19          John Anderson Fagg, Jr. and James McLoughlin of

20   Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

21   Charlotte, NC 28202-4003, appearing for Defendant Lovette.

22

23

24

25

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                    PROCEEDINGS

16         THE COURT:  We are back on the record in 20-CR-152.

17   The jury is not present.  We have on our agenda this morning to

18   get through the summary exhibits and also, if we can, to rule

19   on a few miscellaneous matters regarding certain exhibits, but

20   we really need to get through the summary exhibits.  We just

21   cannot have any further delays in having the jury actually do

22   what they are supposed to be doing, which is to hear the

23   evidence in this case.  So I think that we left off at 14-1.  I

24   think we had finished up the previous summary.

25         So Mr. Beller, do you have anything on 14-1 or

1    something preliminary?

2         *MR. BELLER:*  Everything prior to 14-1.  I simply want

3    to note that the government has filed new exhibits removing

4    certain entries based upon the orders of the Court last week.

5    And so, Judge, I am not asking the Court start over from the

6    beginning, but I believe we have new exhibits that have been

7    filed that start from the beginning.  So suffice it to say that

8    I continue to object to those exhibits as modified.  I don't

9    think we need to revisit all of them, but it does include now

10   limiting instructions starting at 1-1 through 10-3.  That's

11   all.

12        *THE COURT:*  Okay.  14-1 -- so the objections have to

13   be succinct.  They can't be repetitive.  I noted in going back

14   over a lot of the other ones the same objections are being made

15   by multiple parties which is fine, but the rule is that they

16   carry over.  So as a result, there really doesn't need to be a

17   repetition of the same objection, okay?  So objections to 14-1?

18        Mr. Fagg?

19        *MR. FAGG:*  Your Honor, I am sorry.  Just one point on

20   one of the revised exhibits that we received, 5-1.  There is an

21   entry on there from 9/22 of 2014.  It's a statement of Jimmie

22   Little from 8:46 a.m. where Mr. Little says "I need 2015

23   pricing for splits and breast!"  And I believe that that

24   statement was subject to a limiting instruction that was only

25   applicable to Mr. Little, and my understanding was that those

1    were to come out.

2            THE COURT:  What exhibit number was that?

3            MR. FAGG:  5-1, Your Honor, on Page 1 of 2.

4            THE COURT:  Right.  And which entry?

5            MR. FAGG:  It's Exhibit 563.  The time entry is

6    9/22/2014 at 8:46 a.m.

7            THE COURT:  Oh, 563?  Okay, right.

8            Ms. Grimm, do you show a limiting instruction on that

9    one?

10           COURT DEPUTY CLERK:  On which one, Your Honor?

11           THE COURT:  563.

12           COURT DEPUTY CLERK:  I don't have that.

13           THE COURT:  I don't have it annotated on my list.

14           MR. FAGG:  Okay.  I will look back on it.

15           THE COURT:  Let's double-check that.  Obviously, if

16   there is one, we need to have it appropriately limited.  I just

17   didn't show it on my exhibit list.

18           MR. FAGG:  I will look back.

19           THE COURT:  Thanks.  14-1.  Anything on 14-1?

20           Ms. Johnson?

21           MS. JOHNSON:  Your Honor, no.  We also have it on our

22   records as admitted to Little only.

23           THE COURT:  Yeah, let's check the unofficial

24   transcript on that because we will need to make sure we are

25   right on that.  So nothing on 14-1?

1          MS. HENRY:  Your Honor, I am assuming that the

2    objections that we've made overall apply today as we go through

3    the rest of the exhibits?

4          THE COURT:  Well, I am not sure what you mean by

5    overall.

6          MS. HENRY:  The objections that basically talk to the

7    fact that some of the issues are -- some of the documents have

8    already been published, and maybe we can point those out as we

9    go through -- there are some more that come up -- and the

10   misleading nature of the overall way in which these are

11   compiled and put together.

12         THE COURT:  Yes.  Those two objections can be carried

13   over from our previous discussion because they are general and

14   applicable to the nature of these particular documents, yes.

15         All right.  Anyone else?  Let's switch, over, then to

16   14-2.

17         Ms. Henry?

18         MS. HENRY:  Your Honor, I also want to point out that

19   any continuing objections to documents themselves that were

20   made, for example, through the *James* hearing would also apply

21   with regard to the documents as they are put on this list, et

22   cetera.

23         THE COURT:  Yes.  As we've talked, the *James* hearing

24   objections do carry over, yes.

25         All right.  Any additional objections on 14-2?

1          Mr. Beller?

2          MR. BELLER:  Thank you, Your Honor.  As to this one

3    specifically, I would simply lodge an objection that this is

4    cumulative in that all of the text exchanges between Mikell

5    Fries and Scott Brady have already been admitted.  Those have

6    already been extracted from the logs and turned into its own

7    exhibit.  And based on that I believe this -- including it also

8    in this exhibit is cumulative.

9          THE COURT:  All right.  Any additional objections to

10   14-2?

11         All right.  Let's turn our attention to the next one,

12   which is 14-3.

13         Ms. Pletcher, go ahead.

14         MS. PLETCHER:  Thank you, Your Honor.  I want to make

15   sure this microphone is working.  I heard questions from the

16   gallery that maybe it's not.

17         THE COURT:  It seems to be work working.

18         MS. PLETCHER:  Your Honor, I just wanted to point out

19   on this one that we have another example as we have seen

20   previously of selected excerpting from e-mails that is in

21   direct contrast with the exhibits that we saw in *Renteria*.  And

22   the example I would like to point to is the first document,

23   No. 1544.

24         If we could pull up 1544.

25         And I will just point out the selective nature of the

1    excerpting and how it is very -- how misleading it can be in

2    contrast to what we saw in *Renteria*.

3         So the very first selection in the Exhibit 14-3 is an

4    e-mail quote that says, "I will also be having some other

5    discussions today to get the pulse."  And on 1544 that

6    particular sentence is on the second page at the bottom of the

7    remaining first paragraph.  Again, it's just one sentence

8    excerpted from a two-page chain of e-mails for which there is a

9    significant amount of context that would inform the meaning of

10   that particular sentence.  And because that is selectively

11   excerpted, not published in 14-3, it presents a very stark

12   contrast again with *Renteria* and the neutral nature of the

13   business records that were presented in that case.  And that's

14   the basis for our specific objection on this particular

15   exhibit.  Thank you.

16        *THE COURT:*  Okay.  Ms. Henry?

17        *MS. HENRY:*  We would also just point out that there

18   are really only four documents that are purportedly summarized

19   here.

20        *THE COURT:*  All right.  Anything else?

21        All right.  Ms. Call, did you want to respond?

22        *MS. CALL:*  Sure.  Very briefly, Your Honor, because I

23   think these -- many of these points have been addressed in the

24   briefing.  But in regards to the practice of excerpting, I

25   don't know that anything has been pointed to as to why the

1    excerpting is misleading.  And I think frankly seeing the

2    records in context, you do have an understanding of what the

3    scouting is and I haven't heard argument as to the meaning of

4    that term otherwise, the scouting being calls following that

5    afternoon where Defendant Austin calls his competitors.

6          And for the number of documents, I will point out, and

7    my count could be off, but I think it is seven documents, not

8    four.  But regardless, I don't think that affects the aid to

9    the jury in reviewing the documents in this format including

10   toll records that contain dozens of line items.

11         *MS. HENRY:*  Your Honor, just to correct that, there

12   are only four documents.  They are, however, broken up into

13   different sections and there are seven sections, but there are

14   four documents.

15         *THE COURT:*  Right.  Okay.

16         Mr. McLoughlin?

17         *MR. McLOUGHLIN:*  Your Honor, if you go to the second

18   page of that exhibit, we see the first entry is a repeat of the

19   e-mail from 2:21 p.m., which is on Page 1, which has the quote

20   of the price reduction spreadsheet.  The second entry -- the

21   first entry on the second page says, "Subsequent e-mail to Bill

22   Lovette forwards the attachment metadata, Price Reduction

23   Impact List."  And then just below that one has the e-mail

24   which says Jayson Penn to Bill Lovette with exactly the same

25   entry.

1          So what the government has done, it has quoted the

2    same e-mail three times, but on the second page it has in

3    essence made a red flag argument that is not included in the

4    text of the e-mail as an excerpt, saying it was forwarded as an

5    attachment, when, in fact, then directly below it they have the

6    attachment.  So if this exhibit is to be included at all, that

7    first entry on Page 2 which is duplicative and argument and

8    misleads because it inserts their text should be deleted.

9    Thank you.

10          *THE COURT:*  Thank you, Mr. McLoughlin.

11          Ms. Call?

12          *MS. CALL:*  Yes, Your Honor.

13          You may recall 1522 being subject to some discussion

14    already previously, but I will note a couple things in turn.

15    First, 1538 and 1539 which appear on the first page of 14-3 are

16    not a hundred percent duplicative of what is contained in 1522

17    and 1523.  You'll see that 1523, the quoted portion includes a

18    price for the company listed as Durbin.  That is not included

19    in the attachment that was 1539, which is included on 14-3,

20    which is understood by viewing in context following the sending

21    of that spreadsheet Defendant Austin e-mailing Mr. Tucker

22    saying, You can put Marshall Durbin in at 96.60," which, in

23    fact, was done.

24          As to the duplicative nature of the second page, as

25    the government noted previously on the record, the e-mails are

1    going to two separate individuals -- well, three separate

2    individuals at least.  And we had previously attempted to

3    introduce a separate exhibit that was the e-mail from Scott

4    Tucker to Defendant Austin and Penn and its attachment, which

5    was the same attachment as is contained in 1523.  Defendants

6    had objected on it being duplicative and stated they would

7    not -- they did not oppose that the attachment was the same

8    between the two e-mails.

9            The way it's excerpted here I think makes clear, you

10   know, this is one document and the attachment is the attachment

11   to the later in time e-mail, so I don't think this is

12   misleading in any way and really reflects what is in 1522 and

13   1523.  And as I have noted previously, it is important who

14   receives what, including that attachment.

15           THE COURT:  Mr. McLoughlin?

16           MR. McLOUGHLIN:  Your Honor, I would just note in

17   terms of confusion for the jury, the second e-mail on that

18   page, Page 2, indicates it was sent at 5:45 Eastern time.  The

19   first e-mail says it was sent at 9:12 Eastern time.  So to the

20   extent a later e-mail says a subsequent e-mail forwards the

21   attachment to Mr. Lovette and to the extent it implies that the

22   next e-mail down is the sent e-mail, it is, in fact, before,

23   not after.

24           THE COURT:  Ms. Call?

25           MS. CALL:  I thought it was my tired eyes, but I did

1    notice that while reading this as well.  That may very well be

2    an error in a time conversion process or it may very well be an

3    a.m. that should be a p.m.  And we will confer on that before

4    this is introduced and correct it to the extent possible, but I

5    will note it's not misleading.  The actual document is -- they

6    are in this order in sequence.  And any errors in accuracy in

7    these 400 approximately rows that are summarized here would go

8    to the weight, not the admissibility of the evidence.  And the

9    witness will be subject to cross-examination, of course, on it.

10        THE COURT:  I think we should try to take a look at

11   that before just for efficiency sake.

12        Mr. Fagg?

13        MR. FAGG:  Sure, Your Honor.  Setting aside those

14   issues, I do think that the entry that's at the top of Page 2,

15   which is currently the 9:12 p.m. Eastern e-mail, I think the

16   notation in there that "Subsequent e-mail to Bill Lovette

17   forwards attachment metadata," I mean, perhaps I wasn't

18   following Ms. Call's point and my recollection on the

19   discussion of those exhibits isn't clear, but that does seem to

20   me to be completely unnecessary in light of the following

21   e-mail which presumably came afterwards.

22        I am not aware of any other summary excerpt in these

23   charts in which includes something that's not in the text.

24   Here it's talking about some future event.  That text,

25   "Subsequent e-mail to Bill Lovette forwards attachment

1    metadata" does not appear in the e-mail and I don't think it's

2    proper for this summary chart.

3              THE COURT:  Ms. Call, anything else on Mr. Fagg's

4    point?

5              MS. CALL:  I would just note that the native is being

6    submitted, so that metadata would be what is sent to the jury

7    and is not bringing in anything that's not being put into

8    evidence.

9              THE COURT:  All right.  Ms. Henry, go ahead.

10             MS. HENRY:  Your Honor, I just want to make certain

11   again that we are preserving our objections from yesterday that

12   these proceedings for the purpose of using them for an advisory

13   opinion are not appropriate, and also we believe these are very

14   argumentative.

15             THE COURT:  Yes.  As a general matter, yes they are.

16   And if there are specific issues, obviously they need to be

17   articulated.

18             Anyone else on 14-3?

19             Ms. Call?

20             MS. CALL:  Just one proposition.  If Your Honor were

21   to make a ruling that -- and I believe it's 1538 and 1539 which

22   you had previously excluded as duplicative, but if you were to

23   determine that they were admissible, the government would cite

24   to those records in the summary for the initial e-mail in that

25   chain from Mr. Tucker to Defendant Penn and Austin, which

1   establishes that that attachment was received by them.  It's

2   essentially an email that's already in the later chain in 1522,

3   but I think that could be the way around some of these issues

4   for this specific record.

5          THE COURT:  Let me ask you this, and that is so what's

6   the status in terms of being admitted or not of 1538 and 1539?

7          MS. CALL:  One moment.  We are pulling up the precise

8   exhibit number.  I am realizing 1538 is actually the citation

9   on the previous page, the one that did include Durbin.  There

10  is another exhibit number and we are pulling it up.  That was

11  the one that had not been admitted as duplicative because it

12  was the e-mail from Mr. Tucker to Defendant Austin and Penn.

13  And I believe it is Exhibits 1567 and 1568.

14          Looking at the exhibit, I confirmed that is correct.

15  1567 and 1568 were the e-mail from Mr. Tucker to Defendant

16  Austin and Defendant Penn.

17          THE COURT:  All right.  But the exhibits on the

18  various government summaries either have been admitted or the

19  government anticipates or I have ruled on them already; is that

20  correct?

21          MS. CALL:  That's correct.  I will note in

22  double-checking that over the weekend, there is one exhibit

23  cited that has not yet been admitted or ruled on, and I did

24  plan to bring that up later today or can do it now.

25          THE COURT:  Well, at some point we have to make sure

1    to do that because I am presuming that they've been admitted or

2    will be admitted.

3              *MS. CALL:*  Yes.

4              *THE COURT:*  Okay.  Additional objections on 14-3?

5              Mr. Beller?

6              *MR. BELLER:*  Your Honor, I would note that Mr. Fagg's

7    record and objection as to the reference to metadata is also on

8    the last line of 14-2.  And so to the extent the Court rules on

9    Mr. Fagg's objection as to 14-3, I would simply note for

10   consistency sake that the same issue presents itself on the

11   preceding exhibit.

12             *THE COURT:*  Okay.  All right.  Let us turn our

13   attention to the next one which is 16-1.

14             Go ahead, Mr. Kornfeld.

15             *MR. KORNFELD:*  Thank you, Your Honor.  Your Honor, we

16   would object to this on relevance grounds under 401(a).  The

17   Court will recall Mike Ledford's testimony, particularly

18   testimony elicited from Mr. Beller and others on

19   cross-examination where Mr. Ledford essentially said that under

20   the dynamics of the small bird chicken industry, this was

21   effectively an impossibility.  And that although this says, "I

22   am seriously asking," he admitted under cross-examination that

23   he knew this was impossible.

24             And the Court will recall testimony about the bell

25   curve, the chicken bell curve size and how shifting it to the

1    left to the smaller birds would render a portion of those birds

2    effectively to be, you know, the size of humming birds and

3    unusable in the marketplace.  So we don't think this is

4    relevant in light of the testimony from the very individual who

5    initiated this request.

6            And the government continues to persist in putting

7    this in as a "incident" in furtherance of the conspiracy.  And

8    I would argue that if the Court disagrees with us that it's

9    relevant under 401(a), it would be inadmissible under 403.

10   It's unduly prejudicial in light of Mr. Ledford's testimony.

11   It has little probative value.  And then looking at some of the

12   language of 403 in addition to the unfair prejudice, it

13   confuses the issues.  It misleads the jury.  And it wastes time

14   in that they are considering a supposed issue that the witness

15   at the heart and soul of the issue said is a nonissue on

16   cross-examination.  So for all those reasons, we would object

17   to 16-1 in its entirety.

18           *THE COURT:*  Thank you, Mr. Kornfeld.

19           Additional objections on 16-1?

20           Ms. Henry?

21           *MS. HENRY:*  I just want to point out that all of the

22   three documents were published extensively during Ledford's

23   testimony.

24           *THE COURT:*  All right.

25           Ms. Call?

1          MS. CALL:  Very quickly.  First, there are four, not

2    three documents.  There are phone records in this as well that

3    were not published during Mr. Ledford's testimony.  Second, to

4    address the reduced weight, I suppose, episode, I believe

5    Mr. Ledford did testify that he was seriously asking for a

6    price, and he said that repetitively even during

7    cross-examination, so I simply don't agree with the

8    characterization made by counsel for Mr. Fries.

9          MR. TUBACH:  Your Honor, very briefly, I think

10   Ms. Call may have misspoken and said he was requesting a price.

11   I don't believe there is anything about price in any of these

12   discussions.  They were requests to ask what would it take to

13   do this.  There was never a request to say what would your

14   price be for a 2-pound bird, which goes to the nature of the

15   relevance objection of Mr. Kornfeld.

16         THE COURT:  Actually, I don't think that's right.  As

17   I recall, Mr. Ledford was insistent that he wanted a number

18   from the suppliers, you know, what they would charge for that

19   product.  And he was -- as I recall, he was insistent upon

20   that.  He didn't particularly care how they got to that number,

21   but he did the want a number.  That was my recollection.

22         MR. KORNFELD:  Your Honor, I think that might be true

23   in the direct, but I think he elucidated that issue on

24   Mr. Beller's cross where he effectively admits that it's -- he

25   knew under the conditions, his understanding of the production

1    realities, as well as the marketing and sales realities of the

2    small bird market that essentially he knew he was sending these

3    folks on a fool's errand to give him a price because they

4    weren't going to do it because it made no economic sense.

5        So I am not disagreeing with the Court's initial -- or

6    with its recollection of his -- something to the effect -- I

7    have the same vague recollection as the Court, but I would ask

8    the Court maybe to think about that testimony in light of some

9    of the answers on cross-examination that directly addressed the

10    very issue we're discussing.

11        THE COURT:  Right.  No, I distinctly recall that

12    testimony, Mr. Kornfeld.

13        MR. KORNFELD:  Thank you, Your Honor.

14        THE COURT:  Okay.  Anything else on 16-1?

15        Let's switch to the next which is 17-1.

16        Ms. LaBranche?

17        MS. LaBRANCHE:  Thank you, Your Honor.

18        Your Honor may recall that Mr. Tegtmeier did a long

19    and thoughtful objection to 10-1 last week, and I just want to

20    raise for the Court the same issues come up here.  The

21    government at -- on 11/1 of '13 indicates that there are

22    back-to-back phone calls between Mr. Brady and Mr. Mulrenin.

23    However, if we pulled up -- and we don't have to.  I won't

24    belabor this -- but if we pulled up the exhibit that's relied

25    on in 9720, what the Court would actually see is that the call

 1  that Mr. Brady made to Mr. Mulrenin at 9:42 a.m. lasted for

 2  zero minutes.

 3          And the reason that matters, Your Honor, as it relates

 4  to Mr. Mulrenin in this particular exhibit is that right now as

 5  it stands, it looks like Mr. Brady called Mr. Mulrenin and they

 6  spoke, had a phone call, and then an hour later Mr. Mulrenin

 7  called Mr. Brady and they spoke and had a phone call.

 8  Otherwise, Mr. Mulrenin is not anywhere mentioned on this

 9  particular exhibit.

10          As the Court has heard repeatedly in this trial, there

11  are plenty of legitimate reasons for competitors to be speaking

12  to each other.  To have what the government knows is a

13  zero-minute call included into this chart is I think very

14  misleading and argumentative.

15          THE COURT:  All right.  Thank you.

16          Additional objections?

17          Ms. Henry?

18          MS. HENRY:  Your Honor, this is an objection that

19  we've discussed a little bit yesterday.

20          If we could pull up Government's Exhibit 9748.

21          With regard to the phone call that is supposedly

22  summarized here on 17-1, and for me it's at the bottom of the

23  page, but it's the 3:49 p.m. Eastern time one.  And then there

24  is another 4:20 p.m. Eastern time one.  The summary is not

25  accurate.  The phone call was to a very specific number.

1          And if we could come to the next page.  Yes.

2          You will see in the stipulation that was entered into,

3    the number 770-536-8818, according to the stipulation that was

4    entered into by the government which they have marked here as

5    Exhibit 9748, is a Koch Foods office telephone number.  To

6    summarize it as a conversation or a phone call with Bill

7    Kantola is misleading and inaccurate.  And that's with regard

8    to both of those entries on 17-1.

9          THE COURT:  Right.  Those back-to-back calls,

10   Ms. Henry.  Yeah, okay.

11          Anyone else have objections?

12          Ms. Call, go ahead.

13          MS. CALL:  Yes, Your Honor.  So I will go in reverse

14   order for the Defendant Brady to Defendant Kantola calls.  This

15   same argument I believe was made last week, so I will try to be

16   brief, but essentially the two exhibits cited herein, 9010 is

17   Defendant Brady's contact list which included the number called

18   here as Bill Kantola.  Exhibit 7040, and this is one we will

19   get to later today with respect to 90-10, which is a summary

20   regarding phone number sources, that is an e-mail from

21   Defendant Kantola listing in his own e-mail signature the

22   office line that is being called here as well.

23          So not only does Scott Brady have in his contact list

24   and he believes he is calling Defendant Kantola, which we

25   realize is a non-hearsay, not for the truth purpose, but

1    Kantola broadcasts himself out to the world as being reachable

2    at that phone number.  And we think that will be admissible as

3    essentially a business record.  And this was briefed a week or

4    two by the government, and I can pull up that ECF number.  I

5    believe it might be 822.  We believe it would be admissible for

6    the purpose of showing Defendant Kantola's association with

7    this phone number.

8              THE COURT:  And what about Mr. Mulrenin point?

9              MS. CALL:  I will note I am not as quick at pulling up

10   a phone record as I wish.  I haven't checked the accuracy of

11   Ms. LaBranche's statement, but I will at least say the fact of

12   a phone call, and that is all that's being represented here,

13   between competitors is relevant particularly when followed up

14   with another phone call between competitors and other contacts

15   those days involving some of the same individuals.

16             And I will note just for a good faith basis, although

17   it's not included in this summary, I believe this is the same

18   day or the morning after Defendant Brady e-mailed Defendant

19   Fries saying "I will make some calls" in response to this

20   e-mail from UFPC.  That e-mail was only admitted under

21   801(d)(2)(A), so it's not included on this summary.  But that

22   is the basis for these calls, including the one from Defendant

23   Brady to Defendant Mulrenin being included herein.

24             THE COURT:  Ms. Henry?

25             MS. HENRY:  First of all, 7040, which is the document

1    that Ms. Call mentioned as having a signature line on it, has

2    not been admitted into evidence.  Secondly, this issue is truly

3    one of argument.  If they want to put in the phone number that

4    was actually on the phone call record, that's one thing.  But

5    once they try and make the argument that it is Mr. Kantola's

6    phone number based on other exhibits, that is not a summary.

7    It is pure argument and does not belong here.

8         Second of all, the number in the Brady exhibit, which

9    was entered solely not for the truth of the matter asserted,

10   reflects that the number that they are now trying to summarize

11   was purportedly Mr. Kantola's home number, which is directly

12   contradicted by the stipulation that the government has already

13   entered into which makes it very clear it's an office number.

14        THE COURT:  Ms. Call, anything else?

15        MS. CALL:  No, Your Honor.  I don't see a reference to

16   this being a home number, but I will just make the record of

17   that, I suppose.

18        THE COURT:  I'm sorry?  When you say this, what do you

19   mean?

20        MS. CALL:  If Ms. Henry could perhaps repeat herself

21   because I missed slightly the point about it being a home

22   number, if she can.

23        MS. HENRY:  The other document that Ms. Call

24   referenced as purportedly a basis for putting this in and

25   arguing it in this manner, again there will be a significant

1   argument on this point, so it's not an appropriate summary

2   document.  That document lists it as a home number which, as I

3   said, is directly contrary to the stipulation.  So what we have

4   here is very conflicting information with regard to this phone

5   number.  So trying to put it in here as his number -- as a

6   phone call to him is simply misleading and not an accurate

7   summary.

8           THE COURT:  All right.  Ms. Call?

9           MS. CALL:  I understand the argument now.  So thank

10   you, Ms. Henry.  So I believe what Ms. Henry was referring to

11   is Defendant Brady's contact list pulled from his phone lists

12   it as a home number.  The summary is not listing this as a home

13   number.  It's just listing the association with Kantola.  But I

14   will rely on 7040 which I believe will come into evidence and

15   we can address that at the appropriate time, where Defendant

16   Kantola does list that as the office line associated with him

17   and his e-mail signature.

18           MS. HENRY:  It is not listing this as associated with.

19   It is listing this as a phone call with him.  That is not an

20   accurate summary.

21           THE COURT:  Okay.  Mr. Lavine?

22           MR. LAVINE:  Yes, Your Honor.  As we have put forth

23   our thoughts on this as far as the argumentative nature of

24   these summaries, I will just point out to Your Honor that the

25   first set of phone calls is listed on the 1st of November, and

1   then they bring in an e-mail dated the 18th of November.  So

2   you have got 17 days and all of the sudden they put an e-mail

3   here and say that this is tied to it.  It clearly goes to the

4   whole issue that these are nothing more than argumentative by

5   the government.  Thank you, Your Honor.

6            THE COURT:  Thank you.

7            Ms. LaBranche, go ahead.

8            MS. LaBRANCHE:  Thank you, Your Honor.

9            Further to Mr. Lavine's point, I think the argument

10  Ms. Call just made in response to my concern about the two

11  phone calls demonstrates why this exhibit is pure argument, not

12  a summary chart.  What she told the Court when she stood up was

13  that the reason that this zero-minute phone call would somehow

14  be relevant and included in this chart is because she believes

15  there was an e-mail the day before or so where Mr. Brady said

16  that he would reach out to some people.

17           I think we've made this point a lot so I won't belabor

18  it, but the fact of the matter is the government has no idea

19  what was said on any of these phone calls.  And the fact that

20  she is arguing that an e-mail from the day before must

21  therefore mean that that is exactly what is being discussed on

22  the phone calls in the next days, that's a hundred percent

23  argument, Your Honor.

24           THE COURT:  All right.  Any additional objections,

25  Mr. Fagg?

1          MR. FAGG:  One other point, Your Honor, further to the

2     point that was just raised by Mr. Lavine and Ms. LaBranche.

3          The government made reference last week to some

4     summary charts in that *Aiyer* in the Southern District of New

5     York.  And I did take a look at those charts over the course of

6     the weekend.  And particularly as it relates to Mr. Lavine's

7     point about the disparate time between the communications, in

8     the summary charts that we looked at in that case, the

9     communications that were excerpted spanned for the different

10    exhibits, one is 4 minutes and 9 seconds.  The next one is 1

11    minute and 1 second.  The next is 17 minutes and 7 seconds.

12    The next is 5 minutes and 9 seconds.  And then the last one was

13    1 minute and 49 seconds.

14         And so they weren't connecting all these different

15    pieces of dots -- connecting all these different dots of

16    information in those charts.  What it was is they are chat

17    records, Bloomberg chat records between these traders where

18    they are talking about any number of different things over this

19    relatively short period of time, and it excerpts out the pieces

20    that are talking about the transactions at issue.  And so I

21    don't believe that the analysis or the reference to the *Aiyer*

22    case holds up.

23         THE COURT:  Thank you.

24         MR. BELLER:  Maybe a final point, Your Honor.

25         I would note that on November the 18th of 2013 there

1     is the e-mail from Mr. Ledford to Mr. Austin.  Your Honor, that

2     was -- this is document No. 1713.  That was admitted pursuant

3     to a limiting instruction and that being that the e-mail or the

4     document was offered not for the truth of the matter asserted,

5     but rather only for the effect on the listener.  By taking out

6     a simple snippet, I believe that it risks misleading the jury

7     that it is that particular statement in isolation that is

8     offered for effect on the listener as opposed to the entire

9     e-mail that was admitted for the effect on the listener.  So I

10    think that that risks prejudicing the defendants and is

11    somewhat misleading.  So for that reason I would also object to

12    the entire exhibit.  Thank you.

13          THE COURT:  All right.  Ms. Call, do you want to

14    respond to any of the more recent points?

15          MS. CALL:  Yes, Your Honor.

16          So I was able to look back at the exhibit I was

17    referencing that was admitted against Defendant Brady, which is

18    Government's Exhibit 1700, and that was actually the very

19    morning of November 1st within an hour of Defendant Brady's

20    call to Defendant Mulrenin.  So when I say there was a good

21    faith basis when Defendant Brady says he'll make some calls and

22    within that hour calls Defendant Mulrenin, that is precisely

23    why this call is included and not misleading in any way, here

24    just really the existence of the call.

25          With respect to Exhibit 1713 that Mr. Beller just

1    mentioned, I agree there was a limiting instruction.  That is

2    noted here.  I will note that the effect that was apparent on

3    the face of the document was a subsequent e-mail that I believe

4    was admitted against Defendant Austin where he said, "We can

5    talk in the morning," and words to the effect of "after I do

6    some scouting."  The next morning you essentially see that

7    scouting borne out being these calls to competitors followed by

8    the text messages between Defendant Brady and Fries recounting

9    some of those conversations where Defendant Brady says, "Roger

10   is at 30 back and not moving."

11          So I agree the e-mail is admitted for a limited

12   purpose.  Some of that limited purpose for effect is borne out

13   on the face of the document, but that same effect is borne out

14   in the acts that followed being these phone calls and text

15   messages, so I believe the inclusion here is really for that

16   same limited purpose and doesn't create any risk of a hearsay

17   use.  It's still being offered simply for the effect.

18          Additional objections on 17-1?

19          Let's turn our attention to the next one which is

20   18-1.

21          Ms. LaBranche?

22          *MS. LaBRANCHE:*  The only thing I would note is we did

23   receive updated summary -- an updated version of 18-1

24   yesterday.  On the second page there is still references to

25   testimony in two of the last three boxes.  I think that

 1   probably is an oversight on the government's part, but I would

 2   just want to make sure those references are removed.

 3           THE COURT:  Ms. Call, why don't you go ahead and

 4   address that.

 5           MS. CALL:  Yes, Your Honor.  So this has been

 6   discussed on I think two occasions now.  The first as you may

 7   recall is I believe the government attempted to introduce

 8   evidence, and I could be mistaken, but I think the government

 9   tried to introduce evidence regarding this February 3rd Claxton

10   bid submission, after which -- and I cannot recall at this

11   moment who -- counsel for one of the defendants said this is

12   already on the record.  The government doesn't need to

13   introduce this document.  And Your Honor proposed that it would

14   be permissible under 611 to cite to testimony.

15           And I am referring here to the Fisher testimony on

16   Page 2.  This was specifically discussed at a prior hearing.

17   And Your Honor stated your belief that it would be permissible

18   to cite testimony in this way to establish just this date of

19   the bid submission.

20           With regard to the Bryant testimony, the objections

21   that have been raised to date about testimony appearing on a

22   summary have been to testimony specifically relating to time

23   zones and making it appear on the summary that this witness was

24   somehow testifying about this conduct when they weren't.

25   That's not a concern here because these witnesses both were

1    testifying about these exact bidding negotiations.  Mr. Bryant

2    testified about this exact exhibit, 1919, and the timing of it

3    occurring after a call from Defendant Austin where he was

4    provided the numbers that he wrote down in his handwritten

5    notes.

6           So I believe these would be a proper basis for

7    including testimony in a summary under 611, somewhat similar

8    albeit different from *Renteria* where an agent referred to --

9    relied on testimony in a summary, although for that case it was

10   about dates.  Here, I guess, it actually is about dates.  It's

11   putting this in sequential order based on testimony from

12   witnesses during the course of trial.

13          *THE COURT:*  Mr. Feldberg?

14          *MR. FELDBERG:*  If it's about dates, the entry that

15   includes the reference to Bryant testimony doesn't contain any

16   dates.  So the document is potentially misleading in that

17   respect.  Secondly, perhaps I misunderstood, but I thought the

18   Court's direction was that references to testimony should not

19   be included on any of the summary exhibits.  It was not limited

20   in the way Ms. Call just argued.  So I would just make those

21   two points to the Court.

22          *THE COURT:*  Thank you, Mr. Feldberg.

23          Ms. Henry?

24          *MS. HENRY:*  And to be clear, the Bryant testimony

25   reference is new as of this morning or last night?  I mean, it

1   wasn't in any of the earlier ones, so it's not in one that we

2   have previously looked at or that we were thinking we were

3   discussing today here either.  It's a completely new addition.

4           *THE COURT:*  Mr. Beller?

5           *MR. BELLER:*  Thank you, Your Honor.

6           Your Honor, I am going to reference 1919 also being

7   undated.  And I am not going to repeat argument or objection

8   other than to note that that undated document being placed

9   immediately before the February the 3rd Claxton and Pilgrim's

10  submissions without actual numbers certainly could mislead the

11  jury into believing that the Claxton bid and the Austin bid in

12  F-853 and also 1825 and 1826 mirror the numbers given by

13  Mr. Bryant in Exhibit 1919, which we know, of course, now is

14  not at all the case and that 1919 reflected actual period

15  pricing for the month of February, not future bid submissions.

16  And while that is argument, by not including the numbers in

17  F-853, 1825 and 1826, it does risk misleading and therefore it

18  is more prejudicial than what it is probative.

19          *THE COURT:*  Thank you, Mr. Beller.

20          Ms. Call?

21          *MS. CALL:*  Yes, Your Honor.  So just to discuss the

22  Mr. Bryant testimony a little more thoroughly.  I believe he

23  said words to the effect that as the February 3rd deadline was

24  drawing near, he received a call from Mr. Stiller from

25  Pilgrim's who was disappointed that he did not have

1   competitors' bid numbers.  He then testified to calling

2   Defendant Austin who said something to the effect of, "I will

3   go get it."  He calls him back with numbers.  And he testified

4   to his belief that these numbers were bid numbers.  I don't

5   believe it's misleading because the jury has heard this

6   testimony and they've heard the cross-examination --

7         THE COURT:  Just so I am clear, you don't think what's

8   misleading?

9         MS. CALL:  The inclusion of Mr. Bryant's notes ahead

10  of the Claxton bid submission I don't believe implies that that

11  is the Claxton number that was submitted on February 3rd.  In

12  fact, the jury has already seen evidence showing suppliers

13  changing their bid numbers up until the day they were due.  I

14  can think of at least one exhibit that's admitted with respect

15  to Defendant Kantola raising the dark meat price on October 10

16  of 2012, the day it was due.  So even if the numbers don't

17  match the bid, I don't think that's at all inconsistent with

18  evidence that's come in or misleading.

19        And I frankly think the sequential order here is in

20  line with the testimony on the record regarding Mr. Bryant

21  receiving this information from Defendant Austin ahead of the

22  February 3rd -- and I believe Mr. Bryant said early February

23  bid deadline.

24        THE COURT:  Okay.  Ms. LaBranche?

25        MS. LaBRANCHE:  Thank you, Your Honor.

1        If the government wants to argue what witnesses said

2   during their testimony, that's appropriate for closing

3   argument.  It's not appropriate for a summary chart.  And to

4   the extent they think that they can do that because in their

5   mind somehow this evidence is already before the jury, then I

6   would also object on cumulative grounds.

7        THE COURT:  Ms. Call, go over with me one more time.

8   So what did Bryant, Mr. Bryant say in terms of the timing of

9   that?

10        MS. CALL:  Yes, Your Honor.  So I don't have the

11   unofficial transcript in front of me, but he said that there

12   was an early February bidding deadline and that ahead of that

13   he received a call from Tim Stiller, after which he called

14   Defendant Austin to discuss, I guess, what -- I think he said

15   something along the lines of -- please for give my language --

16   that Mr. Stiller had told him, "You don't know shit."  And

17   Defendant Austin had said he would go get information.

18        He then testified along the lines of that Defendant

19   Austin called him back and said -- I believe the term was, "I

20   got it," and then provided numbers to him.  Mr. Bryant

21   testified his belief was that these numbers were the bid prices

22   of competitors leading up to that bid deadline and that this

23   occurred ahead of the deadline.  I don't believe he testified

24   specified to a specific date.

25        But, you know, I believe the aid to the jury in these

1  charts is putting this information in context.  And I don't

2  believe it's misleading putting these notes here, you know,

3  ahead of the bidding deadline because that is Mr. Bryant's

4  testimony and how the evidence has been presented to him -- or

5  to the jury.

6       And like I said, in *Renteria*, although it was adding

7  specific dates based on testimony, that's precisely what was

8  done in the 611 charts in that case, that items were put in

9  context with respect to time based on testimony.  And this

10 simply is not misleading.  There is not purported to be a date

11 in the exhibit here.  It's just putting it in an approximate

12 context in terms of dates and times with other information

13 relating to these negotiations based on Mr. Bryant's testimony.

14      *THE COURT:*  Okay.  Mr. Feldberg?

15      *MR. FELDBERG:*  I am pleased to be able to agree with

16 Ms. Call, to the best of my recollection, he was not specific

17 about any dates in his testimony putting aside the fact that,

18 as we all know, if that really was Mr. Bryant's belief, he was

19 wrong.  The evidence is clear that those weren't bids.  Bids

20 hadn't been formulated yet.  But aside from that, the specifics

21 are that he was, as best as I can recall, he was unable to

22 place any particular dates on these events.

23      *THE COURT:*  Thank you, Mr. Feldberg.

24      Anyone else?

25      All right.  Let's shift over to the next one which is

1    18-3.

2         Ms. Pletcher?

3         *MS. PLETCHER:*  Thank you, Your Honor.

4         We object to this summary chart in particular with

5    respect to the first collection of texts under the date of

6    2/17/2017.  I will draw the Court's attention to the Exhibit

7    No. 1855.  It's a text from Mr. Stiller to Mr. Penn that says,

8    "Want a 2 min KFC update?"  When the government published this

9    series of texts to the Court, we objected on the grounds that

10   there was no factual support to insert this text conversation

11   between Mr. Stiller and Mr. Penn, which is an entirely

12   different text conversation than the one between Mr. Stiller

13   and Mr. Austin that's represented by all of the other texts

14   identified under this particular date.

15        And the Court agreed that it would be an unnatural

16   flow of a conversation to insert one line from one text

17   exchange into an entirely different text conversation with

18   different people, and that would be misleading and prejudicial

19   to Mr. Penn.  And we assert that that is still the case.  And

20   in doing that, this exhibit is misleading and prejudicial to

21   Mr. Penn.  And we would ask that the government remove the

22   insertion of 1855 from this series of texts that are entirely

23   unrelated, and on that ground we'd object.

24        *THE COURT:*  Thank you, Ms. Pletcher.

25        Ms. Call, response?

1          MS. CALL:  Yes, Your Honor.  I believe some of the

2     argument as to why this was misleading was based on potential

3     juror confusion as to the participants.  If I am correct, I

4     don't believe every participant in these text message exchange

5     were identified on the face of the document.  I believe here

6     particularly Mr. Stiller wasn't.

7          But here the participants are clearly lined out in

8     this chart.  You can see that Defendant Penn is not in the

9     other -- not involved in the other text messages.  I think it's

10    very appropriate for the jury to consider this evidence in

11    sequence as to each individual's involvement in these

12    negotiations at the time, including with respect to what's

13    going on here and the conversations that are happening.  It's

14    very relevant that Mr. Stiller was texting Defendant Penn about

15    KFC 27 minutes before he directed Defendant Austin to tell the

16    industry he was going to hold.

17         I don't believe the jury will be misled.  And I think

18    frankly every person in this courtroom likely handles multiple

19    text message conversations at the same time and can understand

20    to the extent they have different participants that they are

21    not the same conversation.

22          MS. PLETCHER:  Ms. Call's argument explains exactly

23    why inserting one person's text communication into an entirely

24    different conversation is misleading.  It creates a narrative

25    that is not supported by the natural flow of the two

1     conversations and that in its essence is argument.  It's

2     perfectly appropriate for closing argument.  It's entirely

3     inappropriate for a chart either under 1006 or 611.

4          THE COURT:  Additional -- yes, Mr. Fagg, go ahead.

5          MR. FAGG:  Thank you, Your Honor.

6          With respect to Exhibit 1894 that appears at 8:09 a.m.

7     on February 21st, we would object to the inclusion of most of

8     that e-mail, but not -- the fact that the government doesn't

9     include the end of it.  There is one additional sentence in

10    that e-mail where it says, you know, the following, "Let's only

11    speak fact based data when we discuss and leave emotions

12    aside."

13         The next sentence in that e-mail, and it's the final

14    sentence in that e-mail, says "Current AgriStats pricing, QA

15    costs, downgrade costs, alternative sales (WOGs, Kroger,

16    Safeway HT, Popeye's, Church's)."  And we think that additional

17    language from Mr. Stiller's e-mail to Mr. Bryant is necessary

18    to understand what Mr. Stiller was talking about, and so we

19    object to the inclusion of this reference of 8:09 without the

20    full text, especially given that it's only one sentence.

21         THE COURT:  Additional objections?

22         Ms. Call?

23         MS. CALL:  Your Honor, I can be pretty brief on this.

24    I just don't believe it is misleading the way it is excerpted

25    here.  The term "fact based data" is used which I believe

1    covers the information that Mr. Fagg conveyed, so I don't

2    believe additional -- I don't believe it misleads the jury.

3    Tim Stiller isn't even on the calls listed here, so I don't

4    think there is an implication necessarily that he was and

5    that's what he is reporting on.  This simply puts the sequence

6    of what's going on in these negotiations at the time, and I

7    don't think it's misleading to excerpt in the way that the

8    government has here.

9         THE COURT:  Was there an objection, Ms. LaBranche?

10        MS. LaBRANCHE:  I apologize, Your Honor.  No.  I was

11   trying to get up to get something.

12        THE COURT:  I wasn't quite sure.

13        MS. LaBRANCHE:  Sorry about that.

14        THE COURT:  That's no problem.

15        Anybody else?  Let's switch over to 20-1.

16        Ms. Pletcher, go ahead.

17        MS. PLETCHER:  Thank you, Your Honor.  Two objections

18   to this summary chart.  First is that it relies on only four

19   documents.  And in actuality it's only three because

20   Exhibit 2001 and 2002 are variants of the same e-mail chain.

21   And under *Renteria* the exhibit must assist the jury.  The

22   exhibit in selectively excerpting from just three e-mail chains

23   certainly does not assist the jury; and in fact, I think the

24   opposite.  The jury is much better prepared if they were to

25   actually read the full context of each of these documents.

1          The second objection is that this document contains no

2    phone calls, no objective or transactional data or information

3    at all which puts it again in very stark contrast to the

4    summary charts in *Renteria* and to what the case law approves of

5    is an appropriate chart under 611 or 1006.  The entire chart is

6    made up of selective excerpts from e-mails, again nothing

7    objective, nothing transactional, just pure selective

8    subjective selections from a variety of e-mails.  So for those

9    two reasons we object to the entire exhibit under 1006 and 611.

10          *THE COURT:*  Thank you.

11          Additional objections?

12          Ms. Call?

13          *MS. CALL:*  All right.  I think I have three responses

14    to that.  First is more kind of a general point regarding

15    taking each summary in isolation.  As the Court has found

16    previously in its rulings, you know, these summaries together

17    aid the jury in understanding the facts in context and they

18    summarize an excerpt from hundreds of sources.  I think if we

19    look at one particular less than a month long period and the

20    sources that are summarized there, we kind of lose sight of the

21    fact of how these assist the jury in a case with as many

22    documents as there are.

23          I will note for these particular documents, and I was

24    trying to pull them up, I believe they are several page e-mails

25    and they are quite long to read and understand and see like who

1    is who in the e-mails and when they are being sent.  So I

2    believe this is helpful in summarizing these discussions that

3    were going on at the time at Pilgrim's.

4           With respect to the kind of objective transactional

5    standard that was raised by Ms. Pletcher, I don't believe I

6    have seen that or heard that argument before or seen it in the

7    briefings.  I don't believe I have seen it in the case law

8    that's been cited that a 611 or 1006 summary somehow can only

9    include numbers or phone calls.  I believe the government cited

10   in its briefing plenty of summaries that do contain different

11   kinds of information like photographs and things of that kind,

12   so, you know, if defendants have case law to support this kind

13   of new standard they are bringing in now on the day these are

14   being introduced, I would love to see it, but I don't think

15   that is the state of the law regarding 611 and 1006.

16          And, of course, this Court has wide discretion in

17   determining what would be useful and what would aid the jury in

18   understanding the evidence here.

19          THE COURT:  Ms. Pletcher?

20          MS. PLETCHER:  Thank you, Your Honor.

21          To respond to Ms. Call's last point about the standard

22   of the law, the fact is that the more subjective the data that

23   is excerpted into a summary chart, the farther away we get from

24   the foundation of 1006 and 611, which is that it should be --

25   it should be helpful to the jury and that it should be,

1    especially under 1006, should be a neutral explanation of the

2    data.  But even under 611 the subjectivity involved in choosing

3    e-mails alone and selections from those e-mails just pulls us

4    much farther away from the foundational tenets of the law,

5    which is that it should be helpful to the jury, it should be

6    neutral, and argument should be saved for closing argument.

7            THE COURT:  Thank you, Ms. Pletcher.

8            Additional objections on 20-1?

9            All right.  Let's switch over to 90-10.

10           MR. FAGG:  Your Honor, before we move there, can we

11    circle back on 5-1?

12           THE COURT:  Yup.

13           MR. FAGG:  Thank you.  I did have a moment, Your

14    Honor, to look at the transcript just to confirm what I had

15    said previously.  The transcript --

16           THE COURT:  And just to remind me and the record,

17    which exhibit were we focusing on?

18           MR. FAGG:  It is Exhibit 563, Your Honor.

19           THE COURT:  Okay.  Go ahead.  Yes, right.

20           MR. FAGG:  So I did have a chance to look back at that

21    transcript when this was considered, and it is from November

22    the 12th.  And the discussion begins on Page 114, and at

23    Page 118 Your Honor ruled that Exhibit 563 was admissible

24    against Defendant Little only.  And I would note for the Court

25    that a prior version of Exhibit 5-1 from the government

1    acknowledged that the statement is only -- may only be

2    considered against Defendant Little.

3           THE COURT:  Thank you for checking that.

4           MR. BYRNE:  Just to follow up on that.  And I think

5    when it was admitted on the 17th, it was not admitted with a

6    limiting instruction.  I think that was an oversight.  So that

7    might be why there is some confusion.

8           MS. CALL:  Some clarity that might be necessary.

9    Exhibit 563 was admitted during cross-examination of Mr. Brink

10   by Mr. Canty, and that might have been the basis for Your

11   Honor's determination.

12          THE COURT:  Well, I guess the issue is still the state

13   of the record.  If the exhibit was admitted with a limiting

14   instruction, then it was admitted with a limiting instruction.

15          MS. CALL:  So at the time it was admitted, there was

16   no limiting instruction given.

17          THE COURT:  And when was that?

18          MS. CALL:  That was during the cross-examination of

19   Mr. Brink.

20          THE COURT:  I guess I am confused.  So what day was

21   that?

22          MS. CALL:  I am pulling that up.  It was either the

23   16th or the 17th.  I am looking at Pages 39 to 40.  I believe

24   it was November 17th.

25          THE COURT:  Okay.  But Mr. Fagg had indicated that on

 1    November 12th it was admitted with a limiting instruction.

 2         *MS. CALL:*  I believe on November 12th it was discussed

 3    at a hearing and not yet offered, and the government was

 4    planning to offer it absent a sponsored witness.  At that time

 5    the Court stated its intention to provide a limiting

 6    instruction.  However, that limiting instruction was not given

 7    when it was introduced by Mr. Canty.

 8         *THE COURT:*  Does that match what your recollection is,

 9    Mr. Byrne?

10         *MR. BYRNE:*  Well, yes.  But I think the Court's ruling

11    was at the time the exhibit was admitted, it should be admitted

12    with a limited instruction.  And a limiting instruction wasn't

13    given when it was admitted through Brink, but that doesn't mean

14    that it shouldn't have been.

15         *MS. CALL:*  One perhaps thing to add is at the time it

16    was introduced during cross-examination, Your Honor did ask if

17    there were any objections to its introduction and there were

18    none.

19         *THE COURT:*  Well, it was admitted without a limiting

20    instruction, so that's the state of the record.

21         Ms. Henry?

22         *MS. HENRY:*  Your Honor, just for clarification, we

23    were unaware that we would have to make further objections when

24    we had already made the objections at the time of the

25    discussion, so that is the reason why we did not object at the

1   time because we had understood pursuant to what we had

2   discussed earlier that those objections would be preserved and

3   that we were not in a position where we were interrupting the

4   jury flow to give additional objections that had already been

5   ruled on or decided at least by Your Honor earlier.

6          THE COURT:  Well, it's a material difference when a

7   defendant moves the admission of something like that.  And

8   moreover, there should have been a contemporaneous limiting

9   instruction.  If that were the case, no one even mentioned it

10  until now.

11         MS. HENRY:  Just to note it was only Defendant Little

12  that moved it in.  It was not on behalf of the other

13  defendants.

14         THE COURT:  Exactly.

15         Okay.  Let's switch gears, then, back to what we were

16  talking about which is 90-10.  And this has been revised

17  recently.

18         So Ms. Call, why don't you give me an explanation.  So

19  this used to have lots of phone numbers on it.  Now it doesn't.

20  Why is that?

21         MS. CALL:  Do you mean exhibit numbers, Your Honor.

22         THE COURT:  I am sorry, what?

23         MS. CALL:  I believe you said it used to have phone

24  numbers on it.  There are still phone numbers on it.  There are

25  not cites to quite as many underlying exhibits as it used --

1    oh, my apologies.  I thought you said only phone numbers.  What

2    happened in the interim, so previously the government's other

3    summaries cited sources for every phone number and every

4    employer association, and we had some extended discussion about

5    that.  In the interim, the parties were able to reach a

6    stipulation as to many of these phone numbers and employers.  I

7    do have that with me today and I did want to discuss the

8    appropriate way to enter that onto the record at the

9    appropriate time in front of the jury.

10            So that stipulation is cited here at the very top of

11   90-10 now.  It's Government Exhibit 9748.  And much of the

12   information in 90-10 is from that stipulation with the

13   exception of the rows that have footnotes that provide

14   additional sources for items that weren't agreed to.

15            I will note it may seem a bit circular having a

16   stipulation and then a summary to then cite that in another

17   summary, but that was specifically requested by the defendants

18   in our communications on the stipulation, that they did not

19   want our other summaries, meaning the ones we have just gone

20   through, to cite to a stipulation based on some sort of concern

21   that it gave credence that the defendants were somehow agreeing

22   to the nature of those summaries.

23            So in an effort of compromise, we have made this

24   interim summary that provides much of that same information,

25   some additional information that is then cited in the remaining

1     summaries as a source for phone numbers and employers.

2          THE COURT:  Okay.  Objections to Exhibit 90-10?

3          Ms. Henry?

4          MS. HENRY:  Your Honor, this is the same objection

5     that we made earlier with regard to the phone number issue.

6          If we could pull up Government Exhibit 9748 and go to

7     the second page.

8          This is where it is clear that the No. 770-536-8818 is

9     a Koch Foods office telephone number.  In Exhibit 90-10 the

10    government is attempting to make an argument with regard to

11    that phone number.  We do not believe the argument is

12    appropriate in a summary exhibit, and therefore the provision

13    in the exhibit that has Bill Kantola and then a footnote to

14    Footnote 4 should be deleted from the summary.  If they wish to

15    make an argument, they can make an argument with regard to the

16    phone number, but it should not be on a summary exhibit.

17         THE COURT:  Thank you.

18         Why don't we respond to that one.  Hold on for just a

19    moment, Mr. Feldberg.

20         Ms. Call, go ahead.

21         MS. CALL:  Yes, Your Honor.  I think perhaps now would

22    be the appropriate time to address the admissibility of

23    Government Exhibit 7040 for the purpose of associating that

24    phone number, if Your Honor is inclined to do that, because I

25    think that is --

1          *THE COURT:*  It might make sense.  Go ahead.

2          *MS. CALL:*  If we can connect the government's computer

3     to the screen and pull up Exhibit 7040.

4          This is an e-mail from Defendant Kantola containing

5     his e-mail signature for Koch Foods and listing that very

6     office line as associated with him.  The government previously

7     in writing kind of briefed this issue.  And it turns out I was

8     correct earlier, it was ECF-822 making the argument that an

9     e-mail signature is proper and admissible under 803(6) as a

10    business record.  Essentially that the individuals who work at

11    companies are under a kind of business duty or a compulsion to

12    provide accurate information in their e-mail signatures.  They

13    hold themselves out like this on a daily basis to their

14    customers, to others who see those e-mail signatures.

15         And because of that, the records have such a high

16    degree of reliability that they should be admissible under

17    803(6) as non-hearsay because of the business interest and

18    keeping accurate records, but also their employees' interest in

19    providing their means of contact to others on a very routine

20    basis.

21         And I know I have cited law previously, and I don't

22    have it in front of me at the moment, regarding the ability of

23    the Court to take judicial notice of 803(6) foundation.  And I

24    think an e-mail signature is really the kind of thing that

25    that's proper for.  This is the kind of record that we see on a

1    daily basis for all kinds of businesses and have that same kind

2    of reliability because of that use.

3         There are some other cases that find items such as,

4    you know, letters on company letterhead to be proper under

5    803(6) because of the reliability that businesses have in

6    putting things on their letterhead, and I believe we cited to

7    that in our filing in 822.  And I guess I would conclude on

8    that argument that an e-mail signature is reliable because of

9    that everyday daily use by businesses in broadcasting that kind

10   of information.

11        THE COURT:  All right.

12        Ms. Henry?

13        MS. HENRY:  Your Honor, first of all, what Ms. Call

14   has gone through is an argument with regard to the phone number

15   and how we should look at it and what it means.  With regard

16   to -- and I don't want to get off base here, but with regard to

17   the summary 90-10, this is pure argument.  It is -- it goes to

18   the issue of a phone number that is, in fact, on an e-mail

19   signature being a specific number that you reach this person

20   at.

21        I think, first of all, everyone knows that many, many

22   businesses, and she has not addressed this as anything other

23   than that, you may be able to reach me, for example, through an

24   office phone number, but that office phone number also means

25   that you can get -- in the last office I was in where we had an

1    e-mail signature with an office phone number on it, you could

2    reach 150 different people with that exact same office phone

3    number.

4         So the purpose here to suggest that this is the only

5    person that you reach through the office phone number is an

6    argumentative purpose and frankly not accurate, and there is no

7    basis for doing that.  So with regard to 90-10, nothing here is

8    anything other than pure argument.

9         With regard to 7040 and the admission of it, to the

10   extent that the government wants to redact this only for the

11   purpose of showing the e-mail signature, I'm not certain I

12   object.  Otherwise, there is a lot in it.

13        THE COURT:  Okay.  So in other words, the other -- the

14   statements above Mr. Kantola's electronic -- or his name there?

15        MS. HENRY:  Above and below.

16        THE COURT:  All right.

17        Ms. Call, go ahead.

18        MS. CALL:  Yes, Your Honor.  We are happy to redact

19   that statement.  We are, A, not offering it for the truth, but

20   perhaps to eliminate the need for a limiting instruction, we

21   can eliminate Defendant Kantola's statement there.

22        MS. HENRY:  I should be clear that we probably do need

23   the date on there because the date may be relevant also.

24        THE COURT:  And Ms. Henry's suggestion was above and

25   below, so it would be the Roberts e-mail as well.

1          MS. CALL:  Yes.  I think the government would be fine

2    including the header information on the top e-mail and then the

3    signature line.

4          MS. HENRY:  We would be happy with just the From and

5    To and the signature line -- I mean the From and Sent, excuse

6    me, the Sent date, the From and Sent date and the signature

7    line.

8          THE COURT:  Ms. Call?

9          MS. CALL:  I realize we are splitting hairs a little

10   bit, but I believe Your Honor previously found that e-mail

11   header information is not hearsay, so I don't think it's

12   necessary to redact that To line in the e-mail.

13         MS. HENRY:  Your Honor, this is being admitted only

14   under some exception related to the e-mail signature which is

15   why we believe that it is appropriate to redact only the From,

16   Sent and the e-mail signature.

17         THE COURT:  All right.  Anyone else on this one?

18         MR. FELDBERG:  I had a different point, Your Honor.

19         THE COURT:  Yes, go ahead.  And this is on 7040 or on

20   90-10?

21         MR. FELDBERG:  It's on 90-10, but I think others want

22   to speak to 7040, so why don't I defer.

23         THE COURT:  Fine.  Let's talk about 7040 right now.

24         Mr. Tegtmeier?

25         MR. TEGTMEIER:  Thank you, Your Honor.

1          Again, this is irrelevant and not material to any

2   allegation against Brian Roberts.  If the Court wishes to use

3   a -- admit this for that purpose that was suggested, certainly

4   Mr. Roberts should be deleted from this e-mail and it should be

5   redacted accordingly.

6          THE COURT:  Thank you.

7          Additional objections, once again, talking now just

8   about 7040.

9          Mr. Fagg?

10         MR. FAGG:  Thank you, Your Honor.  With respect to

11  7040, I would also note that it is 801(d)(2)(A) and therefore

12  has a limited admissibility.  And I have a related point to a

13  different exhibit that's referenced in here at the appropriate

14  time.

15         THE COURT:  Ms. Call?

16         MS. CALL:  Yes, Your Honor.  So I appreciate

17  Mr. Fagg's comment because there are frankly really three bases

18  for admissibility of this, although I do think the correct one

19  would be 803(6) because of the reliability of this kind of

20  information.  The other one would be eight 801(d)(2)(A).  The

21  third would be the non-hearsay purpose of this is how Defendant

22  Kantola is holding himself out to his conspirators, which is

23  here Brian Roberts.  So there are three ways the Court could

24  find, but I do think the appropriate one would be 803(6).

25         I did want to briefly respond to the argument of the

1    misleading nature of 90-10 in attributing this to Defendant

2    Kantola.  I will note that in the very next line after this

3    phone number is attributed to Defendant Kantola, it also

4    attributes it to a Koch Foods office telephone.  So I don't

5    believe it's misleading.  I think it's very clear reading this

6    that it's associated both with Defendant Kantola specifically

7    and with the office.

8            THE COURT:  Anyone else on 7040?

9            The objections will be overruled.  As to 7040, I do

10   believe that the -- I will -- I shouldn't say all the

11   objections are overruled.  I do sustain Mr. Roberts' objection.

12   I think that the "To" line should come out.  The "Re" line

13   should come out.  The government has agreed to take out the

14   statements of Mr. Kantola above the signature line, and also

15   the bottom e-mail should come out too.

16           The rest of it I do agree with the government that

17   when a person lists himself and identifies numbers, it is a

18   business record.  The person has every incentive whatsoever to

19   make sure that that information is correct.  It does have

20   reliability.  And as a result, I don't think it's any type of

21   pure argument as Mr. Kantola argued.  Rather, it's admissible

22   generally as a business record under 803(6).

23           Now let's get back to 90-10 generally.

24           And Mr. Feldberg?

25           MR. FELDBERG:  I think Mr. Fagg wants to go first.

1          THE COURT:  That's fine.  You can yield time.

2          MR. FELDBERG:  As long as I can get it back.

3          THE COURT:  Yes.  You're not giving it up.

4          MR. FAGG:  With respect, Your Honor, on 90-10 for the

5     entry for Joe Grendys --

6          THE COURT:  One thing.  Sorry, Mr. Fagg.  I just

7     remembered, so if you turn to -- now sticking with 90-10, I

8     don't see an actual footnote associated with Mr. Kantola.

9     There was one at the bottom, but there is no number next to his

10    name.

11         MS. HENRY:  The second page.

12         THE COURT:  I don't see it on my revised one.

13         MS. CALL:  Your Honor, I believe if you look at the

14    third number down next to Mr. Kantola's name, there is a

15    forward footnote next to the phone number.

16         THE COURT:  For some reason the revised exhibit I got

17    basically deleted all the phone numbers, but I don't know why

18    that is.

19         MS. CALL:  May I pass it up, Your Honor?

20         THE COURT:  Sure.

21         MS. HENRY:  I believe you might have the file version

22    that has redactions.

23         THE COURT:  Could be.  Whatever it is, it's unreadable

24    as to any phone number.

25         MS. CALL:  Ms. Henry is correct, Your Honor.  The

1    government did file redacting the phone numbers out in the

2    public filing, so my apologies for not giving that to you ahead

3    of this.

4           THE COURT:  Yes, that is exactly what happened.  Okay,

5    yeah, that makes sense.

6           Mr. Fagg, go ahead.

7           MR. FAGG:  Thank you, Your Honor.

8           So as we understand 90-10, the purpose of this exhibit

9    is to show phone numbers and company -- an employment period

10   for various individuals.  For Mr. Grendys, who is listed on

11   Page 1, the footnote cites to Exhibit 803 and then it lists

12   Mr. Grendys with Koch Foods.  Your Honor, we think that the

13   citation there to 803 is argumentative.  What that e-mail is is

14   the e-mail between Bill Lovette and Joe Grendys regarding the

15   65-day terms from Sysco.

16          As the government has just agreed to do with respect

17   to Mr. Kantola, there was a -- what I would describe as a

18   non-argumentative way to put in Mr. Kantola's contact

19   information.  We believe that the citation here to Government

20   Exhibit 803 is simply an attempt by the government to get

21   another bite at that exhibit.  There are other exhibits, even

22   exhibits that are cited within the summary exhibits such as

23   Government Exhibit 1521 and 1519, which I note also apply or

24   which surround Footnote 1, which Is Government Exhibit 1520,

25   for another Koch Foods employee.

1          And so we believe 1519 and 1521, Your Honor, are a

2    more appropriate, less argumentative means of showing that

3    Mr. Grendys worked at Koch Foods, which I don't believe anybody

4    in this case disputes, and the reference to Exhibit 803 is

5    simply argumentative.

6          *THE COURT:*  Thank you, Mr. Fagg.

7          Mr. Feldberg?

8          *MR. FELDBERG:*  Thank you, Your Honor.

9          Your Honor, we have a suggestion.  There is an

10   individual named Eric Oare, O-A-R-E, who is referred to on

11   Exhibit 90-10.  And I think the purpose of the exhibits is

12   simply to provide a basis for Mr. Oare's e-mail address and

13   phone number at a certain point in time when he was employed by

14   Marshall Durbin.

15         The exhibits cited for this are 9745 and 9746 and

16   9747, the text of which are completely irrelevant.  9745 is a

17   congratulations message, an announcement of a new distribution

18   center manager.  The individual is not otherwise involved or

19   mentioned in the case.  9746 is an auto response out-of-office

20   message from Mr. Oare.  And 9747 is about a new football coach

21   at the University of Kentucky.

22         We would suggest that these exhibits be redacted so

23   that they show, as the government wishes, the e-mail address

24   and phone number for Mr. Oare and the other material be

25   redacted.  We have suggested versions for 9745 and 9747 which

1    with the Court's permission I would circulate through Ms. Grimm

2    to the Court.  I am happy to give copies to counsel -- I think

3    these are the two -- and circulate to other counsel.  But

4    that's just, I think, a suggestion to avoid unnecessary

5    material being cited.  Thank you.

6         *THE COURT:*  Thank you, Mr. Feldberg.

7         Ms. Call?

8         *MS. CALL:*  So I think I had two objections to respond

9    to.  The first was regarding Exhibit 803 associating

10   Mr. Grendys with Koch.  Exhibit 803 has already been deemed

11   admissible by Your Honor, and the government does plan to offer

12   it later today after the testimony I believe of Ms. Hoyt.  And

13   on that it does associate Mr. Grendys with Koch.

14        To the extent we could, the government attempted to

15   use sources that were already going to be admitted for some

16   other purpose.  I don't think it's a bite at the apple.  It's

17   just an efficiency not having to introduce two exhibits rather

18   than one.  So I don't see an issue there using that to

19   associate Mr. Grendys with Koch.  And after his name in that

20   e-mail, I believe it does say Koch.

21        With respect to Mr. Oare, I am trying to respond on

22   the fly here and I'll apologize.  I note the defendants

23   previously, and I realize it's not necessarily relevant, but we

24   did attempt to seek stipulation on Mr. Oare's employment and

25   defendants were not willing to do so.  It seems like a bit of a

1    circular way to establish this same thing.  And I see the

2    probable intent of defendants is redacting out who these

3    e-mails were sent to because they were sent to competitors of

4    his.

5            So I don't know that I have a problem with these

6    redactions at the moment, but I would request an opportunity to

7    just review them a little more closely.

8            THE COURT:  That's fine.  They seem appropriate.  It

9    boils down to what is the purpose of the citation at least.

10   So -- and assuming that Mr. Feldberg is correct, and I think he

11   is in terms of the content of those, if anything, it would

12   focus the jury more on what's relevant.  It seems like a good

13   idea.

14           MS. CALL:  I will note I think we can do this --

15   because of the events of Friday, the government's resources are

16   a little strained right now given there are still team members

17   working from their homes, but I think we would be able to do

18   these redactions before this afternoon.

19           THE COURT:  Right.  And actually we should probably

20   have made a record on that.  So obviously the government

21   counsel and in addition some team members are present today.  I

22   assume that the DOJ protocols regarding exposure to someone who

23   has tested positive are being complied with and did not prevent

24   you from being in person today?

25           MS. CALL:  Correct, Your Honor.

1       *THE COURT:*  Okay.  Mr. Feldberg, go ahead.

2       *MR. FELDBERG:*  I just wanted to say we had not

3  prepared a redacted version of 9746, but we can do so and

4  consult with government counsel and hopefully reach an

5  accommodation.

6       *MS. CALL:*  What might be reasonable if this is

7  acceptable to Your Honor, I don't believe we plan to publish

8  this document when 90-10 is admitted, so we will ensure that

9  the redactions are applied before these are sent back to the

10  jury.

11       *THE COURT:*  Is that all right with you, Mr. Feldberg?

12       *MR. FELDBERG:*  Makes sense.

13       *THE COURT:*  Yeah, I think that that might be good.

14       Mr. Fagg?

15       *MR. FAGG:*  Sure, Your Honor.

16       Just very briefly, I think in light of sort of that

17  development with regard to Mr. Oare, we think it makes even --

18  it makes our argument under 803 even stronger in that 803 would

19  be essentially the one document that has any substantive

20  relevance as it relates to the underlying case, but that's not

21  the purpose of this chart which makes it even more

22  argumentative.  And as to the argument about efficiency or

23  duplicity, I would note that 1521 and 1519 are two exhibits

24  that appear on Government Exhibit 14-2, both of which show that

25  Mr. Grendys worked for Koch Foods.

1          *THE COURT:*  Okay .

2          *MR. TEGTMEIER:*  Your Honor, I do have one matter I

3     would like to raise with the Court.  As you know, we objected

4     to all these going to the jury because they are certainly going

5     to be the focus of the jury as there will be few other

6     documents that they are going to be able to access easily.

7     These are going to be easily accessed.  There is very few of

8     them.

9          And when they focus on these, they perhaps will do

10    what I did when I first looked at them.  They are going to look

11    for what the basis is that this is -- the exhibit is there to

12    assist them.  And they are going to look at it and they are

13    going to go, wow, we have got green here and we have got coral

14    here.  And I know I raised this with 10-1, Your Honor, but they

15    also have this blue.  And I will go back here and try to figure

16    out what the rational basis is for using the different colors

17    on the phone calls and the green.

18         As I go back through them and I study them correctly,

19    I see all of the e-mails are in green.  And then the phone

20    calls don't appear to have a rational basis for the use of

21    color to designate coral and blue.

22         So what does happen, however, is that woven throughout

23    all these exhibits, these summary or demonstrative exhibits, is

24    that there is blue and there is coral with each specific

25    episode.  And what the jury is likely to assume is that these

1    have a rational basis connecting each of these defendants to

2    this conspiracy.

3         And so because of that, since we haven't heard any

4    rational basis for the color schemes that were used by the

5    government, I am asking that the Court not allow this and

6    certainly direct the government not to use color designating

7    the distinction between e-mails and then particularly regarding

8    these phone calls.  If there is a rational basis for the use of

9    blue or cobalt or orange, whatever that color is, then perhaps

10   we should have that stated by the government so that we can

11   consider this, but they have not done so.

12        And, Your Honor, it is fine to use color in exhibits

13   or charts or demonstrative exhibits, but if they are misleading

14   in any way -- and in this case I am clearly suggesting that

15   they are misleading.  They are an attempt to show that certain

16   calls relate to this conspiracy in a certain way.  There is no

17   reason that all these phone calls can't be in white, against

18   white paper background.

19        If they want to designate an e-mail and all e-mails

20   are the same, well, fine, they can use a neutral color, but

21   there is no reason to.  All of these should be on a chart that

22   does not have a color background because it emphasizes

23   something about a conspiracy.  It's a lot different when we

24   have a conspiracy alleged with 10 particular individuals than

25   it would be if we had one or two so you could separate out

1    those messages.

2         Here it's hard to do that.  You can't just take a

3    color and say, okay, this is Mr. Roberts and this is

4    Mr. Mulrenin and this is Mr. Fries.  They are all interrelated.

5    And to designate with color is suggesting to the jury that

6    there is a rational basis for putting those colors together for

7    each of the individuals.

8         *THE COURT:*  All right.

9         Mr. Kornfeld?

10        *MR. KORNFELD:*  Thank you, Your Honor.

11        Just very briefly, and not to disagree at all with my

12   fellow Coloradan colleague, Mr. Tegtmeier, but I think the

13   overarching issue is not necessarily the colors or the

14   structure of these exhibits.  It is whether or not these

15   exhibits go back to the jury.

16        As I said on Friday, I think the government has every

17   right to pull out or put up a chart or focus in on a particular

18   line of an e-mail in their closing argument, but I think at

19   least from my perspective, and I know others share this

20   perspective on the defense side, the key is whether they go

21   back and the attended prejudice to them going back.  So again,

22   I want to frame our micro-objections to each specific summary

23   within the context of that macro-objection.

24        Thank you.

25        *THE COURT:*  All right.  So any -- were there any

1   additional objections on any of the exhibits that we haven't

2   already talked about, for instance, something that was based on

3   the revision over the weekend?

4        MR. FAGG:  Can we have one moment to confer on that,

5   Your Honor?

6        THE COURT:  Sure.  Actually, why don't we do this.

7   Why don't we take our break and that will give you a chance to

8   confer.  Why don't we plan -- since you are going to, we will

9   take 20 minutes.  Why don't we plan on reconvening 10

10  minutes -- 20 minutes of 11:00.  And then after we get those

11  last ones, I will rule on the summary exhibits.  Then we will

12  turn to some of those miscellaneous exhibits that I haven't had

13  a chance to rule on of which there was some briefing over the

14  weekend.

15       We will be in recess.

16     (Recess at 10:18 a.m.)

17     (Reconvened at 10:36 a.m.)

18       THE COURT:  Okay.  Were there additional things based

19  upon the revisions over the weekend that people wanted to bring

20  up?

21       Ms. Call?

22       MS. CALL:  Yes, Your Honor.  For Exhibit 90-10, I

23  believe there is one more source reflected on it that has not

24  been addressed or ruled on, and that is on Page 1, Government

25  Exhibit 1520, which is an e-mail from Lance Buckert at Koch.  I

1    will note --

2         THE COURT:  I am sorry, can we go back?  Which one are

3    we talking about now?

4         MS. CALL:  So 90-10, and that's the first footnote

5    cites Exhibit 1520 as a source for the employer of Mr. Lance

6    Buckert.  And that source I will note is an e-mail from

7    Mr. Buckert.  It was actually on the *James* log as entry 19.  A

8    different part of that string has already been admitted in

9    Government Exhibit 1409, but this is a part of the chain that,

10   A, was on the *James* log, and B, shows Mr. Buckert's association

11   with Koch Foods through his e-mail address.

12        THE COURT:  Ms. Henry?

13        MS. HENRY:  Your Honor, if we could pull up Government

14   Exhibit 1409 and put it next to it here.  Can we put them both

15   on the screen?  I don't know.  That would be helpful,

16   Government Exhibit 1520 and 1409.

17        I confess to being somewhat confused here in the sense

18   that when 1409 was discussed, Your Honor, I specifically

19   requested that we use 1520 instead and the government objected

20   to that.  What this is right now is if they want both of these

21   in, this is just cumulative.  I don't have a problem if they

22   want 1520 instead of 1409, but to try and put them both in is

23   just cumulative.

24        THE COURT:  Ms. Call?

25        MS. CALL:  Yes, Your Honor.

1          So as for 1520, we wouldn't plan to publish this at

2     the time it's offered.  It is simply establishing Mr. Buckert's

3     employer.  I will note 1409 does not actually contain

4     Mr. Buckert's e-mail address or associate him with Koch.  1520

5     does because the string of information following his name on

6     the From line of that e-mail address.

7          I believe the reason the government sought to offer

8     1409 was because the relevance of the time of Mr. Kantola

9     sending his e-mail that's at the top of the chain of 1409, and

10    now simply it is the same admissible information essentially

11    that's in 1520 used to establish a different fact.  So while I

12    agree they contain some of the same information, they also

13    contain different information between the two of them and are

14    being offered for two different purposes.

15          MS. HENRY:  So to be clear, it is not different

16    information between the two of them.  1520 encompasses

17    everything that is on 1409.

18          MS. CALL:  There is no time zone on Mr. Kantola --

19    Defendant Kantola's e-mail in 1409 -- or 1520, I apologize.

20          THE COURT:  Anything else, Ms. Henry?

21          MS. HENRY:  No, Your Honor.

22          THE COURT:  All right.  Then I will go ahead and rule

23    on the summary exhibits.

24          Mr. Beller?

25          MR. BELLER:  Thank you, Your Honor.

1          Prior to doing that, I think there is just a couple of

2    catchall issues that the defense wishes to raise.  If the Court

3    would please reference Government's Exhibit 10-2.  And Your

4    Honor, this is the version that was provided by the government

5    to us yesterday afternoon.

6          THE COURT:  Yes.  Hold on.

7          MR. BELLER:  Thank you.

8          THE COURT:  Got it.

9          MR. BELLER:  Thank you.

10         Your Honor, at the bottom of Page 1, this is in

11   reference to Exhibit No. 953.  The limiting instruction has

12   been typed out. This statement is not admitted for the truth

13   the matter asserted, but only in order to explain the context

14   of comments back by Mr. Tucker.

15         Your Honor, admittedly my notes on 953 are not

16   particularly clear, but I do not believe that that was the

17   actual instruction that was read by the Court.  So I raised

18   that with a request from the Court to go back to the

19   instruction that was given and ask that to whatever extent a

20   limiting instruction is listed, that that be consistent with

21   what was read to the jury at the time that exhibit was

22   introduced.

23         THE COURT:  Yeah, maybe we can double-check that right

24   now against the unofficial transcript.  I don't have a notation

25   on that, Mr. Beller, but I think that's a good idea.  It does

1    seem a little unusual in terms of the language.  I don't recall

2    that.

3              Ms. Henry?

4              MS. HENRY:  Your Honor, also with regard to the

5    exhibits we recently received that were redone, I believe the

6    government represented that the limiting instructions are now

7    on the document.  We would disagree with that.  Just looking,

8    and just looking at Government Exhibit 1-1, the document that

9    is 114 that is referenced as an exhibit there, it has a

10   limiting instruction on it.  I believe that the -- the excerpt

11   is not the part with the limiting instruction.  But since they

12   have also put down the exhibit on this, the exhibit itself is

13   subject to the limiting instruction and that exhibit is

14   referenced in these charts.  And limiting instructions related

15   to the exhibits that are referenced should also be put on the

16   chart.

17             THE COURT:  Can you repeat that again, Ms. Henry?  I

18   didn't quite follow it.  Sorry.

19             MS. HENRY:  I probably was a little confusing, sorry,

20   and I didn't know to how many of these this applies.  We didn't

21   have the time over the break to go through it.

22             But with regard to 1-1, on 6/3/2013 there is an

23   excerpt from Exhibit 114.  114 itself had a limiting

24   instruction.  And because that exhibit is referenced, the

25   limiting instruction related to that exhibit which is put on

1    the chart should also be put on the chart.  And we believe that

2    that may apply to a couple of others in here as well.

3            THE COURT:  If there was a limiting instruction on

4    that one, I think that Mr. Bradley's statements could only be

5    considered as to the effect on the listener, but not for the

6    truth of the matter asserted.

7            MS. HENRY:  Correct, Your Honor.

8            THE COURT:  Ms. Call?

9            MS. CALL:  To respond briefly to the last two

10   objections raised.  Regarding 114, and I believe Ms. Henry did

11   point out the limiting instruction does not apply to

12   Mr. Roberts' statement.  I think it would be confusing and

13   potentially misleading to the jury to indicate a limiting

14   instruction when the only portion of the exhibit excerpted is a

15   statement for which they can consider it for the truth of the

16   matter asserted.  So I don't think it would be appropriate to

17   mark the limiting instruction on the summary there.

18           As to 953 which Mr. Beller raised, I did have an

19   opportunity to look back at the unofficial transcript and I

20   think that the disconnect is what is articulated as the

21   instruction in Exhibit 10-1 is the way the Court stated the

22   instruction during the hearing when it was first discussed as

23   opposed to how it was articulated to the jury.  Recognizing

24   that the transcript isn't also official and exact, we are happy

25   to change it to be closer to how it was articulated to the

1  jury.

2      *THE COURT:*  It should be, yeah.  That should be the

3  case.  Whatever is said to the jury is what's the appropriate

4  limiting instruction.

5      *MS. CALL:*  We will check those.

6      *MS. HENRY:*  Your Honor, we don't believe it would be

7  misleading at all to include the limiting instruction in the

8  column where they have referenced the exhibit.

9      *THE COURT:*  I think that we should do that because I

10  know Ms. Call makes a good point that that wasn't, but I think

11  that to be consistent to have the jury understand the effect of

12  the notations, I think it would be appropriate.  So even though

13  this is a statement by one of the defendants, Mr. Roberts, and

14  not Mr. Bradley, I still think it would probably be a good idea

15  to note that it was subject to a limiting instruction just so

16  we create an expectation that the limiting instruction makes

17  the proper reference.

18      Ms. Call?

19      *MS. CALL:*  To the extent we will be revising these, I

20  do want to make sure we do it appropriately.  So the way the

21  instructions are written right now, this statement is to be

22  considered not for.  And that's because of this issue that

23  there is multiple e-mails in a given chain, not all of which

24  were subject to the limiting instruction precisely.  So I am

25  trying to figure out how best to put it for when a portion is

1   excerpted that's not quite subject to the limiting instruction,

2   how to articulate that.  I suppose we could say something along

3   the lines this exhibit is subject to a limiting instruction

4   such that statements by -- however the Court articulated.

5        THE COURT:  You can do that.  How many of those

6   entries would then need to be revised?  How many do you think

7   that would incorporate or reflect the fact that the government

8   didn't feel there was a need for a limiting notation?

9        MS. CALL:  I cannot guess.  There is the chance there

10  is a fair number given the number of e-mails that include

11  co-conspirator statements, as well as e-mails by customers

12  kicking off that conversation, but I would have to confirm the

13  precise number.

14       THE COURT:  Mr. Tegtmeier?

15       MR. TEGTMEIER:  In this particular example, Your

16  Honor, we are dealing with the rule of completeness issue as

17  well because this is a very small excerpt of that string that

18  she is referring to in Exhibit 1-1.

19       THE COURT:  Ms. Call, other issues?

20       MS. CALL:  No, Your Honor.

21       Anyone have anything?

22       Mr. McLoughlin?

23       MR. McLOUGHLIN:  Your Honor, I just want to confirm

24  that Your Honor's instruction with respect to this would apply

25  to all of the summary exhibits and not just to this particular

1    exhibit because there would be others to which I think Your

2    Honor's instruction would apply.

3         THE COURT:  Right.  The government is going to check

4    on that.  I don't want to create a big logistical issue at the

5    last second, but I do think as a general matter if we can do

6    that without creating that big logistical issue, it would be

7    appropriate to do so, even though as Ms. Call points out, the

8    statement, for instance, here by Mr. Roberts is admissible

9    without that, but I think as a general matter note you would

10   want the annotations or the bracketed indications to reflect

11   what the limiting instruction was.

12        Mr. McLoughlin?

13        MR. McLOUGHLIN:  I think the vast majority of limiting

14   instructions were noted on prior drafts.  And so I think to

15   Your Honor's concern, it should not be difficult for the

16   government to go back to those prior drafts and pull them out.

17        THE COURT:  Ms. Call?

18        MS. CALL:  I think that's probably right.  And I am

19   not complaining in any way.  I will just note again it is a

20   little bit logistically difficult given that we have the folks

21   who are able to sticker exhibits currently working in another

22   location than the attorneys.  And it's a bit of a nightmare at

23   our multiple work spaces at the moment, but we will certainly

24   do the best we can to by this afternoon remedy those.

25        THE COURT:  Yeah, I have no doubt that's probably

1   logistically tricky despite some previous draft which doesn't

2   reflect the current.

3           Okay.  Anything else?  All right then the Court will

4   rule on the summary exhibits.

5           First of all, we happen to have within the 10th

6   Circuit two cases, *United States v. Ray*, which is reported at

7   370 F.3d 1039, a 10th Circuit case from 2004, and more recently

8   United States v. *Renteria*, 720 F.3d 1245, a 10th Circuit

9   opinion from 2013 that discuss the use of summary exhibits.

10          As noted in the *Renteria* case -- and *Renteria*, by the

11  way, was in a different context.  It was a different type of

12  case.  In fact, it was a drug conspiracy case.  And in it the

13  United States introduced four summary charts that were based

14  upon certain types of information, a UPS document, Money Gram

15  document, Western Union documents.  The UPS and wire transfer

16  records were admitted in that case as a business record.

17          The 10th Circuit noted that summary evidence of that

18  nature would usually be permissible under Federal Rule of

19  Evidence 1006, but as those exhibits came in during the trial

20  in *Renteria*, the special agent added dates from the testimony

21  of a couple of witnesses regarding the wire -- money wires that

22  they initiated, and as a result, the defendants complained that

23  the charts were an impermissible summary of testimony rather

24  than documents under Rule 1006.  The 10th Circuit held,

25  however, that Rule of Evidence 611(a) allows for such summary

1    evidence otherwise inadmissible under Rule 1006.

2           And in discussing that issue, the Court in *Renteria*

3    referred back to *United States v. Ray* and noted the test that

4    was adopted in *Ray* and applied that same test in *Renteria*;

5    namely, that first the Court considers whether the summary

6    chart aids the jury in ascertaining the truth.  The relevant

7    factors include the length of the trial, the complexity of the

8    case, the possible confusion generated by a large number of

9    exhibits, and noted that in *Renteria* all of those factors

10   favored admission.

11          The trial in *Renteria* lasted five weeks, consisted of

12   30 witnesses, several of whom were experts and all of whom

13   provided evidence of an alleged conspiracy over three years on

14   multiple occasions.  And then second, the Court considers any

15   resulting prejudice looking at whether, for example, the

16   preparer was available for cross-examination and whether the

17   Court gave any limiting instructions.  The Court in *Renteria*

18   didn't find any -- found them to be admissible and that the

19   Court did not abuse its discretion.

20          In applying those factors here, first of all, whether

21   the summaries aid the jury in ascertaining the truth, this

22   particular case is set for 32 days.  Based upon the estimation

23   provided over the weekend in terms of the defendants'

24   witnesses, it looks like the defense may rest about a week

25   earlier.  However, the government will have an opportunity to

1  submit a rebuttal case and, of course, we have the closing

2  arguments.  I am not sure how long it will last.  The case

3  could very well last the full 32 days.

4        So far the United States has called 29 witnesses.  By

5  the time they call Ms. Evans, it will be 30.  The revised

6  defense witness list is 30.  I am not taking that into account

7  really because, of course, the defense doesn't have to call

8  anyone.

9        To date the United States I believe has introduced

10  already hundreds of exhibits.  The defense has I think

11  introduced a large number of exhibits, maybe approaching a

12  hundred.  The bottom line is as we have identified from the

13  very beginning in this particular case, the government's case

14  is largely a document case.

15        The summaries which the Court will admit will be

16  accompanied by the following limiting instruction.  This

17  particular instruction is adopted from the Sixth Circuit

18  pattern instructions, namely 7.12A, and will read in the case

19  of each summary that's admitted essentially as follows:

20        The exhibits noted in -- and then I will fill in the

21  blank in terms of which summary -- have already been admitted

22  into evidence.  This summary is admitted in evidence because it

23  may assist you in understanding the evidence that has been

24  presented, but the summary itself is not evidence of the

25  material it summarizes and is only as valid and reliable as the

1    underlying material it summarizes.

2          The 10th Circuit case law has established that for a

3    summary that's admitted under Rule 611(a) and 1006, the

4    underlying exhibits must be admitted.  That will be the

5    circumstance.  Some of those exhibits have not been admitted

6    yet, but the Court has previously ruled on them and it is

7    anticipated that they will be.  But in *United States v. Irvin*,

8    a 10th Circuit case from 2012, and also *United States v. Mann*,

9    Footnote 4, a 10th Circuit case from 1989, that same

10   proposition is noted under 10th Circuit law that the underlying

11   documents not only have to be admissible, but they have to be

12   admitted.

13         With that background, then, I will turn to Exhibit 1-1

14   and I will review the various objections that have been made to

15   it.  Mr. Mulrenin objected as to the argumentative nature of

16   the summary because phone calls were interspersed between texts

17   that really don't relate to one another.  He also objected

18   because the exhibits had already been admitted and published to

19   the jury.  Mr. Kantola and Mr. Penn and Mr. Lovette made

20   similar arguments about the exhibits already having been

21   admitted and published.

22         First of all, as to Mr. Mulrenin's first point about

23   it being argumentative, the Court does not find it

24   argumentative.  The Court will overrule the objection.

25   Naturally summaries -- and these have been discussed in my

1    previous rulings and orders concerning the summaries -- involve

2    by their nature some type of a selection.  The material at

3    issue here, of course, is a lot different than *Renteria*.

4    *Renteria* was a drug case.  This is not a drug case.  And it

5    would be very rare, it almost would be just statistical

6    information that actually could be summarized in terms of

7    boiling things down to an average or something of that nature.

8         Here that's not the type of information that's being

9    summarized.  It's rather pulling a lot of different types of

10   information, phone calls, text messages, e-mails perhaps into

11   a -- usually it's in terms of some type relationship to one

12   another.

13        I do not find that Exhibit 1-1 pulls that information

14   together in some type of way that is inappropriately

15   argumentative or that would not be helpful to the jury.  In

16   fact, I think that 1-1 would be helpful to the jury.  And the

17   limiting instruction that will cover all of these summary

18   exhibits will advise the jury that they have to look to the

19   underlying material to establish the reliability of it.

20        In terms of the exhibits already been admitted and

21   published, of course as *Renteria* notes, that is -- that doesn't

22   mean that they can't be used as an appropriate summary under

23   Rule 611(a) and 1006, and those objections will be overruled

24   too.

25        Mr. Penn argued that the information was not

1    voluminous and therefore it would be inappropriate subject

2    matter for a summary exhibit.  The Court has already rejected

3    that argument.  I haven't heard anything new based upon the

4    state of the evidence up until the time that we talked about

5    these last week that would cause the Court to change its mind.

6    I think that it would be an appropriate summary and helpful to

7    the jury.

8            Mr. Beller made a somewhat omnibus objection on behalf

9    of Mr. Fries last week, I'm not sure if it was Friday, maybe it

10   was Thursday, but to the extent that by admitting some or all

11   of the summary exhibits, we would have the equivalent of the

12   Superseding Indictment be introduced, something that the Court

13   had previously ruled would be inappropriate.

14           It is true that the Court has indicated that the

15   Superseding Indictment will not be going back to the jury as a

16   record of what the charges are in this particular case, but, of

17   course, the documents that are underlying the various summary

18   exhibits are a completely different type of document than the

19   Superseding Indictment.  They are actually pieces of evidence

20   that have been admitted.  They don't contain the type of

21   charging information that is apparent on the Superseding

22   Indictment.  And as a result, I don't find that that is a basis

23   to preclude the use of the summary or certain summary exhibits.

24           Moreover, of course, we've already made corrections to

25   them.  The government has in response to various objections,

1    for instance, with limitations in terms of which exhibits can

2    be admitted against which defendants or incorporating other

3    types of limiting instructions to them, so that objection will

4    be overruled.

5         Mr. Brady argued that this is -- Exhibit 1-1 is not

6    really Rule 1006 material and that the jury may not be able to

7    understand how to use these particular exhibits, particularly

8    given the fact that many of the exhibits or at least sometimes

9    some of the exhibits were subject to limiting instructions.

10   Mr. Brady also argued that the government has merely taken a

11   small snippet of a particular e-mail and put it in a summary

12   which would be misleading and unfair.  The Court will overrule

13   each of those particular objections.

14        As indicated before, this is -- I am admitting these

15   under 611(a) and also 1006.  The Court believes that we've made

16   the appropriate changes through the process of the objections

17   to indicate appropriately on summaries that are admitted, such

18   as this one, that the -- what limiting instructions may exist.

19   And, if anything, the Court believes that the annotations with

20   the limiting instructions will enable the jury to keep better

21   track of what exhibits are subject to limiting instructions.

22   And the Court also does not feel that the summary that consists

23   of Exhibit 1-1 is unfair.

24        And then finally, Mr. Lovette objected on the basis of

25   the King testimony which had at one point in time been noted on

1    this exhibit.  That reference has been removed from it.  Also

2    the Court overrules Mr. Lovette's objection that this is not a

3    voluminous exhibit.  I think it is an appropriate summary.  The

4    Court will admit Exhibit 1-1.

5         As to Exhibit 2-1, Mr. Mulrenin, Mr. Lovette,

6    Mr. Fries had -- and Mr. Little had made the objection about

7    various limiting instructions that were associated with some of

8    the exhibits.  We've addressed all of those.  The government

9    has made those particular corrections, so that particular

10   objection is now moot.

11        Mr. Little made a different objection which is that

12   this is merely another closing argument.  The Court has already

13   ruled in its written orders that it is not that and has

14   rejected that argument based upon the state of the evidence up

15   until last week.  The Court finds no reason to reconsider its

16   ruling on that point and not applying a standard that would be

17   for a motion for reconsideration.  I just haven't heard

18   anything that would cause me to reconsider it.  I am

19   considering that argument *de novo*.

20        Mr. Fries made an argument that essentially under

21   Rule 1006 that the evidence cannot be conveniently presented to

22   the jury.  This objection is overruled.  This is a different

23   type of exhibit, namely one under 911(a) and 1006.  Mr. Fries

24   also argued that the time line aspects of this particular

25   summary is prejudicial.  The Court has considered that

1    particular argument and I don't find that the time line aspect

2    is prejudicial.  I think that this is a summary that because of

3    its time line aspect can be helpful to the jury, and with a

4    limiting instruction that will accompany it, the jury will be

5    able to put it into proper perspective.

6         Mr. Kantola argued that the reference to -- in the

7    summary to Exhibit 1047, specifically the term "they" was

8    misleading.  The Court has looked at that particular one and in

9    the context of the summary 2-1, I don't find that the use of

10   the term "they" is misleading.  I don't think the jury would be

11   confused about that.  But even if there was some issue, of

12   course they are being directed to look back at the underlying

13   documents.

14        Mr. Little argued that there would be an inference

15   that the phone calls a month after the December 26 e-mails

16   relate to the e-mail where, in fact, they are unrelated.  The

17   Exhibit 2-1 doesn't actually say that, of course.  It has a

18   summary.  And, of course, one side could argue one thing, the

19   other side could argue the other, but for that reason given the

20   fact even if you could argue it both ways, the summary itself I

21   don't believe is inappropriate or a misleading summary, and I

22   will overrule that objection.

23        Mr. Lavine had argued that this is merely the

24   government's interpretation of this particular evidence, that

25   the phone calls are a month after the e-mails and there are

 1   various types of time gaps.  I will overrule that objection.

 2   It is true that that's -- it's apparent on the face of it.

 3   Both sides could argue it a little bit differently, but I do

 4   not find that it's misleading; and as a result, I will overrule

 5   that objection and I will admit Exhibit 2-1.

 6           As to Exhibit 3-1, Mister -- have to take a look -- I

 7   know Mr. Mulrenin had made an argument and now I am trying to

 8   find the corrected version.  Yeah, I think that one was -- that

 9   particular objection was already -- I think it was edited in

10   the data of February 11th of 2014.  Is that your recollection?

11   I will ask Ms. LaBranche.  I am trying to make sense of my

12   notes.

13           MS. LaBRANCHE:  If I recall, Your Honor, I think my

14   objection was to the e-mail that was being sent by Mr. Mulrenin

15   forwarding the press release.  Based on the Court's ruling that

16   anything that came in under 801(d)(2)(A) could not be used in a

17   summary chart, that was taken out.

18           THE COURT:  Right, that was taken out.  So that

19   particular objection of which I was thinking has already been

20   taken care of.  Yes, and in terms of there is also an objection

21   just generally to a phone call.  That phone call is referred to

22   in the text message down below, "I talked to Tim."  The fact

23   that there is a phone call before that one is an appropriate

24   part of the summary.  That objection will be overruled and 3-1

25   will be admitted.

1        Exhibit 4-1, there were various objections by

2   Mr. Mulrenin, by Mr. Brady, by Mr. Kantola, by Mr. Little and

3   by Mr. Fries as to things we had talked about with other ones,

4   namely limiting instructions, references to the King testimony.

5   All of those have been addressed at this point and those will

6   be denied as moot.

7        Mr. Fries additionally argued that what's really going

8   on here is that the government is cherry-picking particular

9   pieces of evidence and simply putting them into a time line

10  without a reasonable basis to do that.  I will overrule that

11  objection.  Once again, under *Renteria* and other authority that

12  I have noted in the written orders, it's appropriate for the

13  government or any party who is doing so to summarize the

14  evidence.  The summary process can oftentimes reflect a

15  particular view of the evidence by that particular party.  I do

16  not find that the summary in the case of Exhibit 4-1 creates

17  any type of unfairness.  I believe it is an appropriate summary

18  under Rule 611(a) and Rule 1006.

19       Ms. Pletcher on behalf of Mr. Penn basically made the

20  point that the jury would be able to evaluate the text messages

21  quite easily between Mr. Penn and Mr. Stiller without the need

22  for a summary.  But the exhibit doesn't consist of just that

23  evidence.  It consists of more.  And I believe that there is an

24  appropriate basis for the use of a summary here and the summary

25  would be helpful to the jury.  I will overrule Mr. Penn's

1  objection.

2       Mr. Penn also argued that the information is

3  cumulative.  It's already been published to the jury.  Once

4  again, under Rule 611(a) and 1006 the fact that the evidence

5  has already been admitted is not a proper basis to exclude the

6  use of it, and I don't find that the particular exhibit is

7  argumentative either.  It's an appropriate use of Rule 611 and

8  1006.

9       Both Mr. Fries and Mr. Kantola have argued that there

10  is an overlap of the time periods in Exhibit 4-1 and that the

11  government has just cherry-picked certain types of phone calls

12  to include in either 4-1 or 5-1, and also that Exhibits 500 and

13  528 inappropriately pull out quotes from the underlying

14  documents.  The fact that there were multiple events going on

15  perhaps at the same time does not mean that the use of the

16  summaries were incorrect, so I will overrule those objections.

17       The Court finds that the summary is proper.  I think

18  it would help the jury and I don't find that it's

19  inappropriately argumentative either.  Once again, the fact

20  that quotes are taken from a document such as Exhibits 500 to

21  528 is really the only way to summarize it, but I don't think

22  that the excerpts that were used in this particular exhibit

23  were unfairly or misleadingly excerpted from those exhibits,

24  particularly given the fact that the jurors will be instructed

25  in how those -- what those exhibits really mean.  Namely, they

1   are not evidence themselves and their reliability has to be

2   determined by the exhibits that they purport to summarize.

3        And finally, Mr. Byrne on behalf of Mr. Little noted

4   that once again there was cherry-picking involved, that

5   organizing the phone calls that the government thinks relate to

6   Pollo Tropical is just really an argument pulling together a

7   relationship that may not necessarily be, except as an

8   argument.  I will overrule that objection.

9        Once again, I don't believe that the summary is

10  inappropriate.  It's true that the government pulled together a

11  number of things that relate to Pollo Tropical, but that in and

12  of itself doesn't mean that the exhibit is an inappropriate

13  summary or that it's by its nature misleading, so I will

14  overrule that objection.

15       Now, on Exhibit 5-1, Mr. Lovette's objection -- this

16  is one that we talked about today as to Exhibit 563 -- will be

17  overruled.  It's true we did, as we talked about on the record,

18  we talked about outside the presence of the jury admitting that

19  with a limitation, but when it was moved into evidence by one

20  of the defendants, there were no objections to its admission

21  and therefore that's an appropriate reference.  We have

22  corrected the -- the government has removed various statements

23  that were admissible only against Mr. Little.

24       Mr. Fries argued, and I think that this is maybe a

25  similar argument to what we discussed in 4.1, I think, I

1    hopefully am not conflating two different -- actually, as I

2    recall, Mr. Beller made the same argument as to Exhibits 500

3    and 528, namely that they were inappropriate cherry-picking of

4    quotes from particular exhibits.  I will overrule both of those

5    objections.  Once again, I don't find them to be an

6    inappropriate choice of quotes from it and I don't find that

7    that would be misleading.  The Court will admit Exhibit 5-1.

8         The next exhibit is Exhibit 7-1.  There was --

9    Mr. Brady had a couple of different objections to this.  One of

10   them was the fact that Exhibit 744 was subject to a limiting

11   instruction.  That has been taken care of in the revision.

12   Mr. Brady also made an objection to the date there of

13   September 5th.  And I agree with the government on that one.

14   The date September 5th is noted in the summary too.  I don't

15   find there is any misleading nature to it.

16        Mr. Brady argued that the reference on September 5th

17   at 10:23 p.m., that the excerpt used there was too limited.  I

18   don't find that that particular excerpt from that exhibit to be

19   an inappropriate or unfair excerpt from it and that particular

20   quote I think is appropriate to use in a summary, so I will

21   overrule that exhibit.

22        Both Mr. Brady and also Mr. Blake made objections I

23   think to different parts of the exhibit about the times that

24   are noted.  The exhibits are what they are.  The jury can look

25   back on them in order to figure out whether the times that are

1    noted should have some type of different conversion applied to

2    them, but I don't find that the failure, assuming that there is

3    a failure by the government, to change the times so that they

4    all match up prevents the document from being admissible, so I

5    will overrule both of those objections.

6         Mr. Beller on behalf of Mr. Fries -- actually, I think

7    this maybe goes back to Mr. Penn's argument citing *Cameron* that

8    a summary chart can turn non-testimonial evidence into

9    testimonial.  And Mr. Fries then brought up a point about the

10   independent legal significance and also confrontation clause

11   issues.  I don't find in the circumstances here that anything

12   like *Cameron* discussed, which I don't find to be on point,

13   would be applicable here.  There is not a danger that with the

14   Court's limiting instruction that will accompany this

15   particular exhibit that there would be confusion on that, so I

16   will overrule both Mr. Penn and Mr. Fries' arguments to that

17   effect.

18        Let me ask the government, because Mr. Brady made an

19   argument, too, about the September 6, 2017 -- no, I take that

20   back.  Yeah, that's right, September 6, 2017, 9:07 a.m. entry

21   noting that Exhibit 746-1 would be offered on Monday.

22   Ms. Call, is that still the intention of the government?  I

23   can't remember if we talked about that one later on Friday.  I

24   don't remember right now.

25        *MS. CALL:*  Let me confirm that.  One moment, Your

1    Honor.  I believe it is, yes.

2         THE COURT:  I am sorry, is what?

3         MS. CALL:  I believe it is the intention to offer it.

4         THE COURT:  So that's conditional.  We will have to --

5    once again, the underlying documents have got to be

6    admissible -- I am sorry, admitted in order for my ruling

7    regarding those that will be admitted under 611 and 1006, so

8    the admission of this document is subject to Exhibit 746-1

9    being admitted.

10        Mr. Kantola had made an objection regarding the

11   reference once upon a time to the King testimony.  That

12   objection is now moot.

13        Mr. Penn had made a general argument -- we talked

14   about this one before in regard to another exhibit -- but it

15   was to the effect that sending this exhibit back would in

16   effect be analogous to sending the Superseding Indictment back.

17   For the same reasons I rejected that argument previously in

18   regard to Mr. Fries' objection, I will overrule that objection

19   now.

20        Mr. Lovette made an objection that the entries in this

21   particular summary exhibit are very different than the entries

22   that were discussed in the *Renteria* case.  And Mr. Lovette made

23   the point that these particular entries aren't like the

24   business records that were the subject of *Renteria*.  The fact

25   that the -- there is a difference between this case and

1    *Renteria*, of course, which is quite apparent.  *Renteria* was a

2    drug case.  These are different types of exhibits being

3    summarized in this case.  But I don't find any relevance to the

4    fact that business records may have been at issue in *Renteria*.

5         Of course, business records would be reliable, would

6    be a lot more reliable than e-mails, which are not business

7    records.  Nonetheless, the Court doesn't find any significance

8    to that detail or difference in *Renteria*, particularly given

9    the discussion in *Renteria* about the general nature of 611 and

10   1006 summaries and the fact that in this case the Court will

11   provide a limiting instruction that accompanies each of the

12   summary exhibits that are admitted.

13        All right.  The Court will admit 7-1.

14        The Exhibit 8-1 was withdrawn.

15        The next one is 9-1.  Mr. Fries made an objection

16   pointing out accurately that the first entry in this summary

17   relates to Mr. Ledford's -- or related to the fact that

18   Mr. Ledford was leaving and his replacement was coming onboard

19   at RSCS.  The United States responded that what is relevant and

20   the reason that the government is citing that particular e-mail

21   is not that fact, but rather because of the discussion in the

22   excerpt of the small chicken market.  I believe at that time

23   the government has identified an appropriate purpose for it and

24   I will overrule that objection.

25        Mr. Fries also -- yes, Mr. Fries also talked about the

1   fact that there has been no testimony from Mr. Wildes and that

2   also what's going on here is a discussion about a grain-based

3   model that's not comparable to Pilgrim's cost-plus model.  The

4   government responded to that by noting that what is important

5   is the increase in price, not the nature of the model itself,

6   and pointed out the fact that Mr. Wildes did get an e-mail.

7        Mr. Beller on behalf of Mr. Fries then pointed out

8   that there is no evidence the price went up.  The Court will

9   overrule the objection.  The relevance there is not, in fact,

10  whether the price did go, but the discussion about raising the

11  prices.  I think that there is sufficient relevance to the

12  excerpt at that particular entry, which is the 7/2/2014 at

13  12:06 p.m., and that justifies its reference in this particular

14  summary.  The Court will admit Exhibit 9-1.

15       The next exhibit is Exhibit 10-1.  And in that one

16  Mr. Tegtmeier on behalf of Mr. Roberts pointed out that -- a

17  couple of things.  One is that there is certain information,

18  for instance, the receipt of a letter that isn't mentioned in

19  this particular exhibit.  And then, of course, Mr. Tegtmeier

20  pointed out that there are various colors that are listed here

21  and the colors, while they may not be apparent on the face of

22  the document, undoubtedly were added for a reason and could

23  cause the jury to either speculate about why the colors were

24  used or to draw certain conclusions that may be inappropriate.

25       An objection was made too as to the August 11, 2014

1   entry at 3:32 p.m. Eastern, a purported call between

2   Mr. Roberts and Mr. Brady.  Mr. Tegtmeier in reference to the

3   underlying exhibit pointed out that that call lasted zero

4   minutes.  The government responded back that the metadata shows

5   that, in fact, a voicemail was left for it.  The Court will

6   overrule the objections.

7          In terms of the colors, the government explained the

8   use of the colors in Docket No. 744.  In any event, I don't

9   find that on its face, even if there is a use of colors that

10  doesn't have an apparent explanation at the time, that there is

11  any type of unfairness.  In fact, it isn't the typical, you

12  know, red, green or other types of standard color association,

13  things that marketing people may use.  And I don't find that

14  the colors, even if the jury doesn't know exactly what they

15  are, and, of course, maybe we'll get some explanation from

16  Ms. Evans, but I don't find that the use of the colors is in

17  any way misleading or argumentative or inappropriate.

18         And Mr. Penn made an argument that the first entry is

19  a selective excerpt and that -- and it had to do with

20  Mr. Lewis.  I don't find that the excerpt here in the first

21  entry regarding Mr. Lewis distorts anything.  Once again, it

22  does talk about meeting follow-up.  The body of it then

23  contains the quote.  But that particular excerpt and even the

24  one below it I don't believe causes any type of misleading

25  effect to it.  Once again, it's just a summary and the jury is

1    referred back to the underlying exhibit.

2          Mr. Little argued generally that Mr. Little had

3    nothing to do with the KFC accounts, but nonetheless gets

4    listed on this particular exhibit.  Ms. Call on behalf of the

5    United States cited to the fact that the Pilgrim's people were

6    to reach out to competitors even if they were not on an

7    account.  The Court finds that that is enough evidence to

8    justify his inclusion on this.  Once again, it can be argued

9    different ways, of course, but the fact that he is included I

10   don't find to be inappropriate or misleading.

11         The various objections to references to testimony I

12   think have been eliminated in this particular document, so

13   those objections are moot.  The Court will admit 10-1.

14         The next exhibit is Exhibit 10-2.  Mr. Fries made an

15   argument today in regard to the entry on Page 1 that cites to

16   Exhibit 953 based upon Mr. Beller's recollection that the

17   limiting language used by the Court did not seem to correspond

18   with the entry at the bottom of the page for 9:32 a.m.  The

19   United States has indicated that it will double-check the

20   transcript and make sure that it conforms to the language

21   actually used by the Court to the jury.  Subject to that

22   particular limitation, I find that that is appropriate.

23         Mr. Lovette argued that these are conversations on

24   this particular exhibit that are between people -- or at least

25   many of them are conversations between people in the same

1    company, which is unlike the *Renteria* case.  I will overrule

2    that particular objection.  I don't find that *Renteria* turns on

3    that fact.  There is no discussion in *Renteria* that would

4    suggest there is some type of limitation of the use of a

5    summary under 611(a) and 1006 that would somehow turn on

6    whether they were people within the same company.

7        Mr. Brady made an argument that witnesses were not

8    used to introduce the exhibits that are referenced in this

9    particular summary exhibit and also made an argument that this

10   is really just a summary that reflects the government's

11   characterization.  As Ms. Call pointed out on behalf of the

12   United States, virtually all of the various persons mentioned

13   here are defendants.  They are unavailable.  They would not

14   have come in through a witness in any event.  The Court will

15   overrule that particular objection.

16       Once again, the *Renteria* case is not limited to cases

17   involving people from just one organization.  And the fact that

18   these exhibits were admitted admittedly not through a

19   particular sponsoring witness does not affect the ability of

20   the government to prepare a summary based upon it.

21       Mr. Kantola has made an objection to -- this is an

22   objection that carries over to many different entries and

23   different summaries, but it's made here for the first time in

24   regard to the August 27, 2014 entry at 10:02 where the

25   government is citing to three exhibits, 1239, 7040 and 90-10.

1    And the argument is essentially that it would be not

2    appropriate to have the jury use those as proof that this was a

3    call to Mr. Kantola as opposed to simply a call to Koch given

4    the fact that the number that's being referenced is a general

5    number for the company and not some type of number that's

6    personal to Mr. Kantola.

7           However, I do find that the government has introduced

8    evidence that associates Mr. Brady -- or Mr. Brady's contact

9    list with that particular number as being related to

10   Mr. Kantola.  It doesn't matter whether he thought it was a

11   home number or what.  The fact that that was a number that he

12   believed was associated to Mr. Kantola is sufficient to provide

13   a basis for the inclusion of this entry in this particular

14   exhibit and also for other exhibits where the government has

15   done that.

16          Moreover, as the government talked about in Exhibit --

17   or as the government pointed out in reference to Government

18   Exhibit 7040, Mr. Kantola has used that general number on his

19   e-mails sending it out to people holding it out as contact

20   information for him.  It's appropriate that it appear on the

21   summary and that objection will be overruled.  So I will admit

22   Exhibit 10-2 and overrule the objections.

23          Exhibit 10-3, Mr. Penn had made an objection that the

24   very first line of this document contained simply a reference

25   to the call coming from Mar-Jac and there was then a reference

1   to our much kicked around Exhibit 1030, which the United States

2   indicated was a good faith basis to believe that the call came

3   from Mar-Jac.  The other argument that the government made was

4   that Exhibit 9672 also indicates that that is a call that was

5   made from Mar-Jac.

6          And I believe that that is correct.  The summary

7   therefore correctly indicates and appropriately indicates that

8   it's simply a call from Mar-Jac to Mr. Penn.  I don't find that

9   that is -- makes it unfair or misleading.  Once again, the jury

10  can look to the exhibit that's cited for that proposition in

11  order to determine whether or not to believe it or determine

12  whether or not it's accurate.

13         And then Mr. Kantola once again made objections to the

14  entry on September 3rd of 2014 at 9:41 a.m.  Based upon the

15  same things that were argued in relationship to the previous

16  summary, I will overrule those objections for the same reason.

17         Mr. Fries made an objection to the second page of this

18  exhibit, the last entry, not only pointing out that there

19  needed to be a limiting instruction -- let me just double-check

20  to see if that was added.  That may be one of those situations

21  that we were talking about before the break where there is no

22  limiting instruction given.  There may have been a limiting one

23  regarding other speakers, but that is probably one that needs

24  to be revised as we were talking about before.

25         But Mr. Fries made an additional argument that

1    Mr. Stiller had not been mentioned before in this particular

2    exhibit; and as a result, him popping up at the very end was

3    inappropriate and misleading.

4          I don't find that there is any leap of logic or

5    inappropriate entry regarding Mr. Stiller at the end.  Once

6    again, the excerpt explains the relationship to it, and because

7    of that I don't think that it's inappropriate to mention

8    Mr. Stiller despite the fact that he hadn't been referenced

9    before.  So I will overrule both of those objections and I will

10   admit Government Exhibit 10-3.

11         Exhibit 14-1, I will admit that as well.  I think it's

12   an appropriate summary and nothing about that would fall

13   outside of the appropriate reasons for a summary under 611(a)

14   and 1006.

15         Exhibit 14-2, in 14-2 Mr. Beller on behalf of

16   Mr. Fries had made a point that Mr. Lovette had made, I think,

17   for an exhibit that's coming up, namely that that type of a

18   reference, namely the quote for the entry in the bottom of the

19   exhibit, the very last -- let's see.  Hold on.  Yeah, on

20   Page 2, the last entry, a reference to, "Subsequent e-mail of

21   Mikell Fries forwards attachment metadata."  That seems of a

22   different character than the rest of them and I am going to

23   sustain that objection.  I think that that reference should

24   appropriately be deleted because I think it adds an additional

25   direction that's not apparent from the exhibits themselves or,

1    if they are, it doesn't need to be summarized.  So I will

2    sustain that objection.

3          Mr. Fries also objects to this particular exhibit

4    because it's simply cumulative.  I will overrule that

5    objection.  Once again, the nature of this type of summary

6    under 611(a) and 1006 means that the information will have

7    already been admitted.  I think that this is a summary that

8    would be helpful to the jury; and as a result, I will overrule

9    that objection and I will admit subject to the deletion of the

10   information that I mentioned Exhibit 14-2.

11         Exhibit 14-3, Mr. Penn argued that the excerpts in

12   this particular exhibit are unlike *Renteria* which was a summary

13   of neutral business records.  Mr. Penn cited in particular

14   Exhibit 1544.  *Renteria* I don't think can be distinguished in

15   that fashion, as I noted previously, and I will overrule that

16   particular objection.  The excerpts here I think are

17   appropriate for the government to pull out in the form of a

18   summary and there is nothing misleading about that.

19         Mr. Kantola argues that there are really only four

20   documents being summarized here and that may be true.  However,

21   as the exhibit demonstrates, they are interspersed with a

22   number of different phone calls.  That is an appropriate use of

23   a summary to summarize the evidence in regard to different

24   types of contacts, so the fact that only four documents may be

25   summarized does not mean it's inadmissible.  I will overrule

1    that objection.

2            Mr. Lovette makes the objection that on Page 2, the

3    last -- well, yeah, the two entries on Page 2 essentially have

4    duplicative types of information on them and that the time

5    entries seem to be confused because there's -- at the top for

6    November 29 of 2012, it indicates that the time of the

7    communication was 9:12 p.m., but at the bottom it's 5:45 p.m.

8    The government responds that there are different recipients and

9    different senders.

10           As to Mr. Lovette's objection, I am going to sustain

11   that one.  There doesn't appear to be any -- the nature of

12   these summaries is that things are organized in terms of a time

13   line, but the time line suddenly changes on Page 2.  If the

14   government wants to interchange those two, I find that to be

15   acceptable, but if the government doesn't do that, then at

16   least Page 2 of the exhibit I find to be inadmissible because I

17   don't think there is a reason that the two time periods would

18   be interchanged like that.

19           Exhibit 16-1 --

20           *MR. FAGG:*  Your Honor, may I make one point of

21   clarification on that?

22           *THE COURT:*  It will have to be real quick.  I am not

23   going to accept general clarifications.

24           *MR. FAGG:*  Just the point of the metadata in the top

25   entry, I think you sustained the objection for Mr. Beller's

1    objection on that.  To the extent the government seeks to

2    readmit that entry on the top of Page 2 where it says

3    subsequent e-mail to Bill Lovette forwards --

4         THE COURT:  Yes.  I am sorry, Mr. Fagg, I did not get

5    to that point.  You are quite right because that was an

6    objection that Mr. -- yes, thank you, Mr. Fagg.  I do sustain

7    that objection as well.  That reference to subsequent e-mail

8    just like I did with the previous one should be removed from

9    that particular entry on Page 2.

10        Okay.  Now 16-1 --

11        MS. CALL:  Your Honor, regarding those two e-mails, so

12   they are actually in the correct order.  One is forwarding the

13   other.  There is actually just a date missing and that will get

14   at it, 11/29/2012 followed by 11/30/2012.  That's where it

15   appears like they were out of order.

16        THE COURT:  Oh, what you are saying is they were sent

17   on different dates?

18        MS. CALL:  Yes.

19        THE COURT:  Okay.  What's the correct date?

20        MS. CALL:  So the second one that does not currently

21   have a date there, that should say 11/30/2012.

22        THE COURT:  Okay.  Well, that's acceptable.  But the

23   defendants need an opportunity to cross-check that, so I will

24   give them an opportunity to do so and bring that up if they

25   disagree in some respect.  If it's missing a date and they are

1    in the correct chronological order, then Mr. Fagg's objection

2    will still be sustained in terms of the language "subsequent

3    e-mail," but Mr. Lovette's objection about the apparent

4    transposition of two things which somehow were not in

5    chronological order will be overruled, assuming that it's true

6    that that was an e-mail sent on 11/30.

7            All right.  On Exhibit 16-1, Mr. Fries is objecting on

8    relevance.  And this goes back to the cross-examination and the

9    dialogue with the -- with Mr. Ledford about what was the true

10   purpose of sending that off.  I am going to overrule the

11   objection.  This is a classic one where it can be looked at in

12   different ways.  Mr. Ledford insisted and even though he knew

13   he was going to take a tremendous amount of flack, he

14   nonetheless sent that e-mail out to people.  And predictably he

15   didn't get much useful information, but he nonetheless did it

16   because he wanted to somehow figure out what the answer was.

17           And I think it's appropriate that the government

18   include that in a summary.  It wasn't that it was just

19   impossible and therefore not relevant.  What Mr. Ledford wanted

20   to do was get information back about that because they were

21   trying to figure out whether it would be -- he just wanted to

22   think it through or get some type of definitive closure to the

23   whole issue, so I do find that that's an appropriate one.

24           Mr. Kantola argued that all three of those documents

25   were already published to the jury.  I'm assuming that that's

1    probably true, but under a summary under 611(a) and 1006, by

2    their nature the documents had to be already admitted.  The

3    fact that they are in addition published doesn't mean that they

4    can't be contained in a summary, so I will admit Exhibit 16-1.

5         Exhibit 17-1, Mr. Mulrenin argues that as to the phone

6    call from November 1st of 2013 at 9:42, that it was only a

7    zero-minute call.  I will overrule that objection.  As we saw

8    before with the zero-minute call, it doesn't necessarily mean

9    that no one was connected or that nothing happened with it.

10   The jury can take that into account with reference to the

11   exhibit, but it's an appropriate reference to Mr. Mulrenin in

12   making a call back.  I think that's fair to include in a

13   summary.  And in addition, the government stated that in fact

14   the evidence does show what the call concerned, which was in

15   response to Mr. Mulrenin's argument that the government doesn't

16   even know what the calls were about.

17        Ms. Henry on behalf of Mr. Kantola made the argument

18   once again about phone numbers, and this is in reference to the

19   two phone calls from Mr. Brady to Mr. Kantola on November 1st

20   of 2013.  The Court will overrule those objections for the same

21   reason that I previously identified.

22        Mr. Fries made the objection concerning the notation

23   in regard to the November 18, 2013 excerpt from Mr. Ledford as

24   to the limiting instruction associated with that, that the jury

25   could be misled by it.  I think especially with the correction

1    the government will make as to a little bit more information

2    about how the statement was limited, that the combination of

3    the jury hearing about the limitation at the time the document

4    was admitted and the subsequent indication on the summary

5    exhibit, that there is not a danger of the jury being confused,

6    misled or anything else, so I think that that objection will be

7    overruled.

8            Mr. Fagg mentioned that on behalf of Mr. Lovette that

9    there was a difference between this case and a case that the

10   United States mentioned in reliance on last week that involved

11   certain types of chat records that were being summarized in

12   the -- in that particular case, chat records which occurred in

13   a relatively short period of time.

14           Once again, the records here I think are quite

15   appropriately summarized.  There is a lot of them.  There are a

16   lot of exhibits in this particular case.  There are a lot of

17   different players, a lot of different contacts of various

18   types.  Under the circumstances, it's appropriate for the use

19   of a summary exhibit and I will overrule that objection.

20           And Mr. Brady argues that with the time gap that

21   exists in a number of these, in particular between November 1st

22   and then November 18th, that summarizing here just amounts to

23   nothing but argument.  I don't find that the time gap generally

24   makes them inappropriate, but here in particular given the fact

25   that there is a Ledford e-mail on November 18th, which then

1    appears to prompt other telephone calls, I think that that's an

2    appropriate summary and would easily be understandable by the

3    jury, so I will overrule that objection.

4        All right.   The next one is 18-1?   I hate to keep you

5    over, but why don't we try to wrap this up since we are getting

6    close to the time.   18-1, Mr. Mulrenin objected based upon the

7    references to testimony from Mr. Bryant and Ms. Fisher on

8    Page 2 of this particular exhibit.   And the United States

9    mentioned the fact that the Court had indicated it would be

10   permissible to cite Ms. Fisher's testimony.   In terms of

11   Mr. Bryant, there is a back-and-forth about what Mr. Bryant

12   testified to.

13       I will overrule the objection to Ms. Fisher's

14   testimony.   I am going to sustain the objection as to

15   Mr. Bryant's testimony.   The problem there is it's being fitted

16   in based upon just kind of a logical conclusion or a hunch or

17   something.   And that could be true, but nonetheless, no matter

18   which way you look at it, it's going to be inserted between

19   different time entries related to something, and I think that

20   that -- the nature of this particular summary would lead the

21   jury to believe that there is a time relationship between them.

22       The government can, of course, argue that Mr. Bryant

23   had testified as to Exhibit 1919, that this was made on or

24   about a certain time, but I don't think it would be appropriate

25   to include that entry from 1919 where it is here or frankly at

1    any other point.  I am not sure how you would be able to do it,

2    so I would sustain that objection.  But otherwise with that

3    deletion, I will admit 18-1.

4         19 -- sorry, 18-3, Mr. Penn makes the argument which,

5    as Ms. Pletcher correctly described, was an entry, and this is

6    the 7:20 entry for February 17 that the Court didn't allow the

7    exhibit to be published back to back because of the fact that

8    it was unrelated.  Consistent with that ruling, I will sustain

9    Mr. Penn's objection as to this particular one and require that

10   if the government uses 18-3, that entry needs to be deleted.

11        And then Mr. Lovette made an objection, and I believe

12   it was to the reference on February 21st of 2017, that the

13   excerpt that is being used here leaves out of the very end of

14   that where there is a reference to use of AgriStats

15   information, other types of things that would help to explain

16   the reference to leaving emotions aside.  Once again, it is

17   excerpted.  There is the thing that Mr. Lovette did identify,

18   but I don't think that the excerpt here is an inappropriate or

19   misleading excerpt.  And I will overrule that particular

20   objection and will, subject to the Court's ruling about

21   sustaining Mr. Penn's objection, I will admit 18-3.

22        And then Exhibit 20-1, Mr. Penn makes a number of

23   different arguments.  One of them refers back to the *Renteria*

24   case noting that the exhibits have to be somehow helpful to the

25   jury, assist the jury in some way, that this exhibit doesn't

1   consist of any type of phone calls.  It's just a summary of

2   various e-mails.  And Mr. Penn makes the point that the more

3   subjective the nature of the evidence being summarized, the

4   less admissible it will be.

5        I think that a Court has -- can take that dynamic that

6   Ms. Pletcher identified into account.  Taking that into account

7   in here in determining whether or not it would be helpful to

8   the jury, although this is a summary of e-mails, I do find that

9   it's an appropriate summary given the number of the e-mails and

10  therefore will overrule that objection.  I don't find anything

11  about *Renteria* that would cause that one not to be admitted.  I

12  think it is appropriately summarized and I will admit 20-1.

13       And then in terms of Exhibit 90-10, Mr. Lovette makes

14  the argument that the number that is listed for Mr. Grendys in

15  Footnote 3, that being Exhibit 803, is reallying argumentative,

16  that there might be some other exhibits that would be more

17  appropriately cited as the basis for that information.  The

18  United States pointed out that the Court has already indicated

19  that 803 is admissible.  Given the fact that 803 is admissible,

20  I am going to overrule that objection.  803 can come in.

21  Therefore, it can be cited as a source for that.

22       Mr. Kantola argued that the footnote regarding

23  Exhibit 1520 is really duplicative of Exhibit 1409.  I overrule

24  that objection.  Not really.  1520 is appropriately cited

25  because it has the contact information for Mr. Buckert, so

1    that's appropriate.  And then Mr. Kantola also made the

2    arguments about the contact information for Mr. Kantola being

3    just a general number for Koch.  For the same reasons that I

4    previously noted, those objections will be overruled.

5    Exhibit 7040 is an example of Mr. Kantola using that particular

6    general number as his contact information.

7         And I can't remember Mr. Lovette's point about

8    801(d)(2)(A), if it was in reference to Exhibit 7040 or not,

9    but in any event, I do overrule that.  I think that was in

10   connection with 7040 because I do believe that Exhibit 7040 is

11   admissible as a business record.

12        And then there was a -- Mr. Feldberg offered up in

13   regard to Mr. -- the contact information for Mr. Durbin that he

14   had prepared on -- on behalf of Mr. Austin a redacted version

15   that would boil it down to just the contact information as

16   opposed to these documents that were otherwise irrelevant.  And

17   I will, assuming that those substitutions are made for those

18   underlying exhibits, I will overrule that objection as moot.

19   But if for some reason the summaries don't meet the form that

20   Mr. Austin thinks is appropriate, we can reconsider -- or we

21   can revisit that particular issue, but otherwise I will

22   overrule the objections to 90-10.

23        All right.  Why don't we real quick, and I don't want

24   to hold you for too long, but let's see if we can take up some

25   of the issues that came up over the weekend.

3855

1           And Mr. Beller, I will start with you.

2           MR. BELLER:  Thank you, Judge.

3           Respecting very much the Court's ruling, the Court had

4    indicated several times that these documents are going to be

5    admitted or the Court will admit the documents.  And Your

6    Honor, I would respectfully ask the Court to delay ruling on

7    the admission of the documents under the *Renteria* case, which

8    specifically holds that one of the things that must be

9    considered is whether the preparer of the documents was

10   available for cross-examination which is important for the

11   Court's determination of prejudice.

12          THE COURT:  Yeah, I agree with you on that.  I think

13   that that is appropriate.  We will -- subject to -- because you

14   are right, we will see what the testimony is like, so I think

15   that's an appropriate limitation.  So I will hold off subject

16   to that cross-examination.

17          MR. BELLER:  Very good.  Thank you, Your Honor.

18          MS. HENRY:  One very quick point.  As you went through

19   the objections, you noted that an attorney may be making the

20   objection on behalf of and usually, obviously, their client.

21   But so that the record is perfectly clear, we certainly were

22   all understanding that when an objection was made by one

23   defendant, it was actually being made on behalf of all

24   defendants unless somebody had opted out of it.  I just want

25   the record clear.

1      THE COURT:  Yes, that's true.  For purposes of helping

2 the appellate record, I wanted to simply indicate who had

3 articulated that, but you're right.

4      MS. HENRY:  Perfectly understood.

5      Secondly, with regard to the proposed instruction that

6 you indicated you would give with the exhibits, we would have a

7 question on that.  And in particular we would ask you to delete

8 the language that says, "because it may assist you in

9 understanding the evidence that has been presented."  We worry

10 that the jury may hear that as because it will or can, and we

11 believe that your instruction without that language still gets

12 across all of the relevant issues.

13      THE COURT:  I will overrule that objection.  I think

14 that the Sixth Circuit instruction as I have modified it not

15 only is consistent with 10th Circuit case law, but is

16 consistent with the law generally.

17      Mr. Pollack?

18      MR. POLLACK:  Thank you, Your Honor.

19      I had a different issue I wanted to raise as to the

20 issue with the instruction which was drafted, and I understand

21 it's basically a pattern instruction.  It seems to presume that

22 the summaries accurately summarize the underlying data.  And I

23 think that is an issue for the jury to determine.  So the

24 sentence that says, "The summary itself is not evidence of the

25 material it summarizes and it's only valid and reliable as the

1  underlying material it summarizes," I think it should say, "The

2  summary itself is not evidence of the material it summarizes

3  and it's only as valid as the material it seeks to summarize

4  and to the extent you find that the summary accurately

5  summarizes the underlying material."

6       THE COURT:  How about this, as reliable as the --

7  yeah, I will add "it seeks to summarize."  I will otherwise

8  overrule the objection.

9       MR. POLLACK:  Thank you, Your Honor.

10      THE COURT:  Okay.  Then let's take up --

11      MR. TUBACH:  One quick point on the timing.  Does the

12 Court tend to give the limiting instruction -- I believe in

13 *Johnson*, which is both in *Ray*, *Renteria*, the Court gave the

14 limiting instruction both before and after the summary charts

15 were introduced.  And actually in *Johnson* I believe the Fourth

16 Circuit said it also can be done in the closing.

17      THE COURT:  Yes, we should include that in the final

18 jury instruction packet as well.  Does the government intend to

19 introduce the summary exhibits all at once and show them or how

20 is it going to work?

21      MS. CALL:  Yes, Your Honor.  It intends to offer them

22 all at once and then show them one by one.

23      THE COURT:  Okay.  So what I will do is I will, after

24 they have been admitted, I am going to give the instruction as

25 to them all.  And then after -- I am not going to do it as

1    to -- for every single one.  I think it's going to be

2    repetitive.  But if I forget, remind me.  Once we are all done,

3    once we are done with the last one, I will read that

4    instruction again.  And then we will include it in the final

5    jury instruction packet, obviously, with a little bit different

6    language.

7              Mr. Beller?

8              MR. BELLER:  Your Honor, given the Court's ruling, it

9    may make sense for the government to show and present the

10   documents and elicit testimony from the witness, then subject

11   the witness to cross-examination.  And that would simply avoid

12   having to do a voir dire on each exhibit during the middle of

13   the government's direct examination.  So in other words, they

14   are being presented under 611(a), but they are actually not

15   admitted until the end of cross-examination once the Court

16   makes a determination under *Renteria*.

17             THE COURT:  Ms. Call?

18             MS. CALL:  I don't believe that's necessary or

19   appropriate under the law.  I believe the law says, you know,

20   that the preparer needs to be subject to cross-examination.

21   There is no question as to whether Ms. Evans will be subject to

22   cross-examination.  And I believe what the law also says is

23   that the purpose of that cross-examination is to test the

24   accuracy of the summary, which the law also says goes to the

25   weight, not the admissibility.  So I don't believe the

1  admissibility of these summaries needs to be dependent on what

2  occurs in cross-examination.

3       THE COURT:  I think so.  I mean, I think for the

4  reason that Mr. Beller indicated at the beginning, I think that

5  the calculus that's noted in *Renteria*, the second aspect of it

6  depends upon the availability of, for instance, a witness.  So

7  I think that that -- we need to honor that and allow the

8  defendants to cross-examine her.

9       So then let me -- we don't necessarily need to take

10  them up at this time because I am sensitive, I want to start at

11  1:30, but we have the issue of Exhibits 6086 and 6087.

12       Ms. Call?

13       MS. CALL:  I am just thinking through that.  I presume

14  showing the charts then in redirect would be what would need to

15  happen for the jury to actually be able to view them during

16  Ms. Evans' testimony, and I don't think there would be a scope

17  issue there.  I was just trying to think it through.

18       THE COURT:  Well, that might be one way to do it.  The

19  other way would be after there has been cross on everything,

20  then offer them at that time.

21       MS. CALL:  All right.

22       MR. BELLER:  Your Honor, my understanding under 611 is

23  that the jury can be shown the exhibits as a demonstrative

24  during the government's direct.

25       THE COURT:  It's possible that it could be shown to

1        the jury at that time as a demonstrative and then move the

2        admission under 611 afterwards.  That would make it much more

3        digestible to the jury.  If there is no objection to that, I

4        think it makes much more sense, but that way at least the

5        defendants preserve the admission under 611 to go back to the

6        jury, although with the limiting instruction.

7                MR. BELLER:  Yes.

8                THE COURT:  That would seem to be a good way to do it,

9        Ms. Call.  Do you agree?

10               MS. CALL:  I believe so, yes.

11               THE COURT:  All right.  So what about 6086 and 6087,

12       when is the government going to -- when would it move the

13       admission of those?  Or maybe we are just at the point where I

14       need to rule on that.  I can't remember how we left that.

15       Mr. Pollack.

16               MR. POLLACK:  Your Honor, we did file last week a

17       response.

18               THE COURT:  Yeah, I have read that.

19               MR. POLLACK:  So I think it has been briefed.  The

20       Court can rule on the papers if the Court is prepared to or the

21       Court can wait until --

22               THE COURT:  At the risk of keeping you, I am going to

23       rule on that one.  And I do sustain the objection as to those.

24       I still don't think there has been sufficient evidence tying

25       Mr. Blake to the handwriting.  As Mr. Blake points out in his

1   brief, Mr. Keck -- I believe Mr. Keck is the person who had

2   more day-to-day contact.  He is at least an additional person

3   who could be the source of that information.

4        It is quite true that the printouts of those e-mails

5   do have Mr. Blake's name at the top of them, but I don't find

6   that that's sufficient given the fact that the documents could

7   have been passed around.  It's really hard to say.  But that is

8   the essence of why I don't think sufficient foundation has been

9   demonstrated, so I will exclude both of those.

10       Okay.  Anything else we need to take up before we --

11  to put us in a position to bring the jury back in at 1:30?

12       Ms. Call?

13       MS. CALL:  Very briefly, Your Honor, just to ensure we

14  have an efficient presentation with the jury when they do come.

15  First off, I wanted to inquire as to how best to address the

16  limiting instructions in the summaries with the witness.

17  Obviously, I don't know that it would be proper for the witness

18  to instruct the jury when reviewing that.  So would that be

19  perhaps something Your Honor would note about the limiting

20  instructions appearing in those summaries?

21       THE COURT:  Well, they already appear.  They are

22  already noted in there, so I think the exhibit would somehow

23  speak for itself.  I am not going to reiterate each of the

24  limiting instructions.

25       MS. CALL:  Okay.  I think I have that.

1        The second thing I wanted to note was just the

2   stipulation that's been reached between the parties, because

3   that will be offered during Ms. Evans' testimony.  Because of

4   the somewhat duplicative nature of that and 90-10, the

5   government doesn't intend to read that into the record when it

6   is offered, but we wanted to confirm the procedure.

7        *THE COURT:*  The whole purpose of my practice standards

8   on stipulations is to avoid and preclude anyone from reading

9   things into the record.  Once it's -- you can offer it, find

10  out if there is any objections to it, and it can be displayed

11  at that point if you want or it can be displayed later.  Of

12  course, the nice thing about doing stipulations that way is

13  that rather than the jury having to remember it, and usually if

14  you have something worthy of a stipulation they might not ever

15  remember it, but then it's an exhibit and it can be -- it will

16  go back to the jury and can be shown during closings whenever.

17       *MS. CALL:*  The third thing I just wanted to flag for

18  Your Honor was the sequestration order.  Because of the

19  instruction from the Court regarding the propriety of putting a

20  reference to Ms. Fisher's testimony, Ms. Evans was provided

21  limited access to a portion of the transcript including that

22  testimony.  And I wanted to flag that to the Court if that came

23  up.  Ms. Evans isn't really a fact witness in the way many

24  others are since her role has been confirming the accuracy of

25  these summaries, but I wanted to raise it before it came up

1    with respect to the summaries.

2            THE COURT:  Okay.  So I am not quite following that.

3    What's the concern again?

4            MS. CALL:  I just wanted to put on the record that

5    Ms. Evans had received the portion of Ms. Fisher's testimony

6    relating to that February 3rd Claxton bid submission to be able

7    to confirm the accuracy of it for purposes of the summary.

8            THE COURT:  Oh, yeah, to the extent that that's an

9    issue, she is excepted from it because it wouldn't make any

10   sense.  She has already testified and that's appropriate for

11   Ms. Evans to review.

12           MS. CALL:  That is all I wanted to raise.  The

13   government has some marching orders during the lunch break and

14   we have been trying to -- because of Your Honor's ruling, we

15   may need a little more time.

16           THE COURT:  How much more time do you think you would

17   need?

18           MS. CALL:  Could we perhaps return at 2:00?

19           THE COURT:  Okay.  We will do that with apologies to

20   the jury.

21           Ms. Prewitt?

22           MS. PREWITT:  Just for logistics, we would like to

23   plan what to do on the defense side, so it would be good to

24   understand what the government expects to do with the remainder

25   of its case in chief, including the anticipated testimony of

 1    Ms. Evans, how long they will expect that to take and so forth.

 2         THE COURT:  Okay.  Well, you can talk about -- I was

 3    suggesting that can be discussed during the lunch break.

 4         MS. PREWITT:  Also, Your Honor, just for the

 5    documents.  With the number of documents that the government

 6    would be displaying to the jury, that would be helpful to know.

 7         THE COURT:  If possible, but the government obviously

 8    has a lot to do over the lunch break, so that's probably

 9    important as well.

10         Anything else we should discuss?  We are going to

11    reconvene at 2:00, then, okay?

12         All right.  We will be in recess.  Thank you.

13       (Recess at 12:31 p.m.)

14       (Reconvened at 2:02 p.m.)

15         THE COURT:  Are we ready to bring the jury in?

16         MR. KOENIG:  Thank you, Your Honor.  If it is okay

17    with the Court, Ms. Call will be coming in just a few minutes

18    late because she is still scrambling to get those exhibits

19    together.

20         THE COURT:  Yes, that's no problem.

21         Can someone remind me where we were with Ms. Hoyt?

22         Mr. Fagg, were you still doing your cross?

23         MR. FAGG:  Yes, Your Honor.

24         THE COURT:  I didn't note whether you'd stopped or

25    whether you were still going.  Okay.  So let's go get the jury

Melissa Hoyt - Cross

1    and we can bring Ms. Hoyt up to the witness stand.

2                (Jury present.)

3                THE COURT:  Good afternoon, ladies and gentlemen.

4    Good to see you.  I apologize for today, not only having you

5    come in late, but without giving you advance notice we are also

6    starting a bit late.  I can assure you we all have been working

7    outside of your presence.  So instead of having you sit there

8    and listen to white noise, we have been trying to spare you

9    from doing that.  These are all conversations that normally

10   would have occurred by side bar, so therefore thought it was

11   appropriate just to have you not be here for those particular

12   conversations.

13               But as you may recall, we were -- Mr. Lovette was in

14   the process of cross-examining Ms. Hoyt and we will continue

15   with that particular cross-examination.

16               Mr. Fagg, go ahead.

17               MR. FAGG:  Thank you, Your Honor.

18          (**Melissa Hoyt** was previously sworn.)

19                      **CROSS-EXAMINATION CONTINUED**

20   BY MR. FAGG:

21   Q.  Ms. Hoyt, good afternoon.

22   A.  Good afternoon.

23   Q.  Sorry we had such a long break.  Thank you for coming back.

24               So let's refresh where we left off last week.  We were

25   speaking about Sysco's campaign to extend payment terms.  Do

Melissa Hoyt - Cross

1   you recall that?

2   *A.*   Yes.

3   *Q.*   And Sysco's decision to extend payment terms was a decision

4   that Sysco made unilaterally, correct?

5   *A.*   That is correct.

6   *Q.*   And it was Sysco's decision that those payment term changes

7   would go into effect immediately, right?

8   *A.*   So our desire was to put those into effect immediately.

9   *Q.*   And that's what you told your suppliers, right?

10  *A.*   That is correct.

11  *Q.*   And so Sysco's change in payment terms was not tied to any

12  specific RFP or bid, correct?

13  *A.*   That is correct.

14  *Q.*   And that would only be logical given that it applied to all

15  of Sysco's suppliers, right?

16  *A.*   Correct.

17  *Q.*   And we talked a little bit last week that that would

18  include things as varied as chicken to butter to spoons to

19  cups, right?

20  *A.*   Correct.

21  *Q.*   And the letters that went out to the suppliers went out in

22  two phases, right?

23  *A.*   Correct.

24  *Q.*   The first one was from your CFO?

25  *A.*   Correct.

3867

Melissa Hoyt - Cross

1   Q.  And then the second one came out from either yourself or

2   your peers, right?

3   A.  That is correct.

4   Q.  Let's talk, if we can, specifically about what Sysco

5   communicated to Pilgrim's, okay?

6   A.  Okay.

7   Q.  You sent the letter to Pilgrim's about the change in

8   payment terms, right?

9   A.  I believe I sent the second letter.

10  Q.  Correct.  Thank you for that clarification.

11          The second letter following the one from the CFO, you

12  sent that one to Pilgrim's, right?

13  A.  Correct.

14  Q.  And you e-mailed that letter to Mr. Penn and to Brenda Ray

15  at Pilgrim's, correct?

16  A.  I believe that's correct.

17  Q.  And you didn't send it to Bill Lovette, right?

18  A.  No.

19  Q.  And you sent the letter to Pilgrim's on or about April 25th

20  of 2016, correct?

21  A.  I believe that was the date on the e-mail.

22  Q.  And by the way, other than that e-mail that you sent

23  attaching your letter, you didn't have any dealings with

24  Mr. Penn as it related to these negotiations, did you?

25  A.  I did not personally have any.

Melissa Hoyt - Cross

1    Q.  And you're not aware that anybody else at Sysco had any

2    interactions with him, are you?

3    A.  Not to my knowledge.

4    Q.  And you talked a little bit how different companies

5    received different letters with their specific proposed payment

6    terms, right?

7    A.  That is correct.

8    Q.  And in that letter that you sent to Pilgrim's, you said

9    that the payment terms would go into effect on June 1.  Do you

10   recall that?

11   A.  I don't recall the exact date that would have been on

12   there.

13   Q.  If we can, if you could take a look at -- and if we could

14   pull up Government Exhibit 844.

15          That's at Tab 2 of your binder.  Do you recognize --

16   has that exhibit been admitted, Your Honor?

17          THE COURT:  It has been.

18          MR. FAGG:  Can we display it, please?

19          THE COURT:  Yes, you may.

20   BY MR. FAGG:

21   Q.  And this is the e-mail we were talking about just a moment

22   ago, correct?

23   A.  Yes.

24   Q.  And you see at the top there was an attachment.  And that

25   was your specific terms for Pilgrim's, correct?

Melissa Hoyt - Cross

1    *A.*  It should have been, yes.

2    *Q.*  If we turn over to the next tab, which is Government

3    Exhibit 844 -- which I believe this also has been admitted into

4    evidence and would ask that it be published.

5              *THE COURT:*  It may, yes.

6    *BY MR. FAGG:*

7    *Q.*  Do you see at the top there where it says that the

8    effective day is June 1?

9    *A.*  I see that.

10   *Q.*  2016.

11   *A.*  Correct.

12   *Q.*  And so that was the day that Sysco chose for Pilgrim's

13   terms to be effective, right?

14   *A.*  That would have been our desired date.

15   *Q.*  Right.  But that date on there, June 1, is what Sysco

16   chose.

17   *A.*  If Pilgrim's signs this form, then the date would have been

18   June 1, yes.

19   *Q.*  My point is that as it relates to this attachment, 844,

20   Sysco put June 1st, 2016 on there, right?

21   *A.*  That is correct.

22   *Q.*  And what was communicated to Pilgrim's here is that their

23   new terms would be -- in the right-hand column it would be net

24   14, right?

25   *A.*  So the way this form reads is their terms would be

Melissa Hoyt - Cross

1    2 percent cash discount 2 or net 14.

2    Q.  I understand.  I am going to get to that.  But net terms

3    were 14, right?

4    A.  Net terms were 14.

5    Q.  Or 2 percent within 2 days.

6    A.  Correct.

7    Q.  And this was the initial demand that Sysco sent to

8    Pilgrim's.

9    A.  This was the initial request that we wanted from Pilgrim's

10   on terms.

11   Q.  Okay.  And so what Sysco was saying here is that Sysco

12   would make payment to Pilgrim's in full either within 14 days

13   or at 98 percent within two days if it was paid in cash,

14   correct?

15   A.  That is correct.

16   Q.  And leading up to these negotiations with Pilgrim's, Sysco

17   had net 10-day terms with Pilgrim's, correct?

18   A.  I don't believe that's correct.  I believe we always had a

19   2 percent cash discount with Pilgrim's.

20   Q.  But was it also -- well, if I showed you something, would

21   it perhaps refresh your recollection?

22   A.  Possibly, sure.

23   Q.  Okay.  So can you take a -- can you turn to Tab 15 in your

24   binder?

25            MR. FAGG:  And can I get a copy of Defense Exhibit

Melissa Hoyt - Cross

1    G-115?

2    *BY MR. FAGG:*

3    *Q.*   And so I would like to draw your -- first of all, do you

4    know Janine Nollkamper?

5    *A.*   I do.

6    *Q.*   In 2016 was she a Pilgrim's employee?

7    *A.*   I believe she was.

8    *Q.*   And was she someone who you had dealings with at Pilgrim's?

9    *A.*   Correct.

10   *Q.*   And so I would draw your attention to her e-mail to you in

11   the middle of the page on June 3rd at 11:02 a.m.  Do you see

12   that?

13   *A.*   Yes.

14   *Q.*   And does that refresh your recollection, the text that's

15   involved, about what the terms were with Pilgrim's prior to the

16   negotiations?

17   *A.*   Okay.  Yes, I see what you're saying.  Our fresh chicken

18   was net 10.

19   *Q.*   And further processed was 2?

20   *A.*   2 percent.

21   *Q.*   Okay.  So Sysco wanted to -- as it relates to fresh, Sysco

22   wanted to change the terms from net 10 to net 14, right?

23   *A.*   Correct.

24   *Q.*   And that would be to Sysco's advantage, correct, from a

25   financial standpoint?

Melissa Hoyt - Cross

1    A.    Yes.

2    Q.    And when we're talking about the amount of chicken that

3    Sysco purchased from Pilgrim's around this time, the difference

4    that we talked about last week that Sysco would earn from those

5    additional days, the value of time, right, that can add up to a

6    lot of money given the amount of chicken that Sysco was

7    purchasing from Pilgrim's, correct?

8    A.    Depending on the amount of spend and the dollars, it could.

9    Q.    Well, don't you have some idea about the amount of spend

10   that Sysco had with Pilgrim's, a general sense?

11   A.    We spent quite a bit with Pilgrim's.  We did a lot of

12   business with them.  I don't know what those numbers are off

13   the top of my head.

14   Q.    So those four additional days would wind up being a

15   significant amount of additional money for Sysco, right?

16   A.    I don't know exactly how much money it is.  It would be an

17   increase.

18   Q.    It would be an increase.

19         And so as you mentioned a moment ago, Sysco also

20   wanted a -- it was also proposing, rather, to Pilgrim's that

21   there would be a 2 percent discount if Sysco paid in cash

22   within two days, right?

23   A.    Yes.  So our goal was to extend the 2 percent across all of

24   their ship locations and products.

25   Q.    And again I think we covered this last week, but just to

Melissa Hoyt - Cross

1    make sure, at the time that this proposal came out from Sysco,

2    Pilgrim's was one of only two chicken suppliers that provided a

3    cash discount, right?

4    A.  That is correct.

5    Q.  And the other one was a company called Renaissance Man?

6    A.  That is correct.

7    Q.  And so Koch Foods did not provide a 2 percent cash

8    discount.

9    A.  They did not.

10   Q.  Or any cash discount.

11   A.  Correct.

12   Q.  And after the negotiations between Pilgrim's and Sysco

13   concluded and you reached an agreement with Pilgrim's,

14   Pilgrim's did agree to a cash discount for some of its product,

15   right?

16   A.  They continued the cash discount that they currently had on

17   the further processed.

18   Q.  And so then after those negotiations were complete, then

19   Pilgrim's was one of only a few chicken companies that provided

20   a cash discount, correct?

21   A.  That is correct.

22   Q.  And is the only other one that you can think of that

23   provided a cash discount post negotiations Renaissance Man?

24   A.  To my knowledge.

25   Q.  So Pilgrim's was in a relatively unique position as it

Melissa Hoyt - Cross

1  relates to cash discount among your poultry suppliers, correct?

2  A.  They were.

3  Q.  Let's look back at Government Exhibit 844, which is Tab 3

4  in your binder.  That is the terms that Sysco proposed to

5  Pilgrim's you said initially.  There is nowhere in there is

6  Sysco proposing 65-day terms to Pilgrim's, correct?

7  A.  Correct.  We adjusted that.

8  Q.  Correct.  But you said this was the first proposal that

9  went to Pilgrim's, right?

10  A.  I believe I said I wasn't sure if we ever sent the net 65

11  to them, but after we made the changes to our policy, this was

12  the one that we desired.

13  Q.  But as you sit here today and testify in this trial, you

14  can't tell us that Sysco ever proposed 65-day terms to

15  Pilgrim's, correct?

16  A.  I do not know if we sent that to them.

17  Q.  And you don't recall ever seeing a document that says that,

18  correct?

19  A.  I don't remember.

20  Q.  You don't recall?

21  A.  I don't recall.

22  Q.  And this 14-day terms that are reflected in your April 25th

23  e-mail to Pilgrim's, that is what you described last week as

24  the more realistic terms that Sysco was proposing, correct?

25  A.  That was terms that we felt were fair for our poultry

Melissa Hoyt - Cross

1    suppliers.

2    Q.   But you described them last week as more realistic, right?

3    A.   True.

4    Q.   So let's talk just a little bit about the negotiations with

5    Pilgrim's and what you heard back from them.  You received a

6    letter in response to your proposal from Pilgrim's, an

7    invitation to negotiate; is that fair?

8    A.   I recall receiving a letter from their parent company, I

9    believe, that they were not in compliance with these terms.

10   Q.   Well, isn't it true that that letter that you received,

11   first it came from Fabio Sandri, correct?

12   A.   That could be correct.

13   Q.   The CFO?

14   A.   I believe it was from somebody at JBS, their parent

15   company.

16   Q.   And in that letter that you received, it was saying that

17   Pilgrim's wanted to negotiate with Sysco, right?

18   A.   I haven't seen that letter in a while, so I don't recall

19   exactly what it said.

20   Q.   If you could take a look at Tab 14 in your binder, and if I

21   could have Defense Exhibit G-083.

22        Does this refresh your recollection that you received

23   this letter back from Pilgrim's?

24   A.   This looks similar to a letter that I believe we received.

25   Q.   And based on your review of that letter, does it refresh

Melissa Hoyt - Cross

1   your recollection that Pilgrim's requested an opportunity to

2   discuss Sysco's terms with Sysco?

3   A.  That's what it says in this letter.

4          MS. SWEENEY:  Objection, Your Honor.  She is reading

5   from the letter as opposed to testifying from refreshed

6   recollection.

7          THE COURT:  Well, she did do that, but the question

8   didn't prompt it.  It was just -- the question was asked not

9   quoting anything from the exhibit, so the objection is

10  overruled.

11  BY MR. FAGG:

12  Q.  You can set that letter aside.

13         Does that refresh your recollection that Pilgrim's

14  said to Sysco that it wished to negotiate about these credit

15  terms?

16  A.  Yes.

17  Q.  And Pilgrim's did not come back to Sysco and say under no

18  circumstances are we agreeing to these terms, did they?

19  A.  I'm not sure I understand what you mean by that.

20  Q.  Well, they asked to negotiate with you which indicates a

21  willingness to perhaps meet in the middle, right?

22  A.  Potentially.  It looks as if they wanted to have a

23  discussion.

24  Q.  And they did, in fact, have a discussion with you, right?

25  A.  We had multiple discussions.

Melissa Hoyt - Cross

1    Q.   Negotiations.

2    A.   Correct.

3    Q.   I believe you said earlier that you got involved in some of

4    the negotiations, right?

5    A.   Correct.

6    Q.   And you were involved in the negotiations as it relates to

7    Pilgrim's.

8    A.   Yes.

9    Q.   And so -- actually, if we could look at -- if you could

10   look at Tab 13 and I could have Defense Exhibit G-082.

11           So Ms. Hoyt, do you see that this is an e-mail to you

12   if you look down at the bottom?

13   A.   Yes.

14   Q.   So does that refresh your recollection that your

15   negotiations with Pilgrim's were occurring in early May of

16   2016?

17   A.   That would have been accurate.

18   Q.   So that was about a week after you sent your initial

19   demand, correct?

20   A.   Roughly.

21   Q.   And then about a month later in June of 2016, you were

22   still having negotiations with Pilgrim's; is that fair?

23   A.   Probably.  I don't know exactly when we reached a final

24   agreement.

25   Q.   The final agreement was in July of 2016.  So I think you

Melissa Hoyt - Cross

1   said earlier that there were multiple discussions with

2   Pilgrim's over the course of the negotiations, right?

3   A.  That is true.

4   Q.  Some of those discussions we have seen were in May?

5   A.  That would have been true.

6   Q.  And some of them were also in June?

7   A.  Possibly.

8   Q.  And those discussions continued off and on throughout that

9   time period; fair?

10  A.  I would assume that's a fair statement.

11  Q.  So ultimately, as we just discussed, Pilgrim's and Sysco

12  entered into an agreement on July 5th of 2016.  Does that sound

13  correct to you?

14  A.  I would have to see the document to see what day we -- they

15  signed the document.

16  Q.  Sure.

17        MR. FAGG:  If we could pull up Government Exhibit 9700

18  which is -- I believe is in evidence.

19        THE COURT:  Yes, it is.

20        MR. FAGG:  If we can display that to the jury, please.

21        THE COURT:  You can.

22  BY MR. FAGG:

23  Q.  So this is the agreement that you testified about last

24  week, right?

25  A.  Correct.

3879

Melissa Hoyt - Cross

1   Q.  And it is dated on the Pilgrim's side July 5th and on the

2   Sysco side July 6th of 2016, right?

3   A.  That is correct.

4   Q.  And in this agreement Sysco got Pilgrim's to agree to

5   14-day terms as opposed to 10-day terms that had been in the

6   previous agreement for fresh chicken, right?

7   A.  That is correct.

8   Q.  And for further processed Pilgrim's agreed to give Sysco a

9   2 percent discount if it was paid in cash within two days,

10  right?

11  A.  That is what they've done on this form.

12  Q.  So let's switch gears a little bit if we can and talk about

13  Koch Foods.  Sysco also sent Koch Foods the two letters that we

14  talked about, the one from the CFO and then one from you,

15  correct?

16  A.  Correct.

17  Q.  And those were sent on or around the same time as the

18  letter to Pilgrim's, the end of April, right?

19  A.  It would have been right around the same time.

20  Q.  And in your letter to Pilgrim's -- I am sorry, to Koch, you

21  also told them like you told Pilgrim's that Sysco's payment

22  terms were considerably out of market, right?

23  A.  I believe that's what the letter said.

24  Q.  So when you said considerably out of market, what you mean

25  is as compared to other large companies like Sysco?

Melissa Hoyt - Cross

1  *A.*  So I did not write the letter.  The letter is computer

2  generated.  That was written by our finance team.  So the words

3  that are in that letter are not my words.

4  *Q.*  It went out under your name, right?

5  *A.*  It did go out under my name.

6  *Q.*  And it said that Sysco's terms were considerably out of

7  market, correct?

8  *A.*  That is true.

9  *Q.*  As you interpret that phrase in the letter that went out

10  underneath your name, that means as compared to other large

11  companies, right?

12  *A.*  That would be what I would think that it would mean, but I

13  had no knowledge of that personally.

14  *Q.*  And prior to Sysco's campaign to change or extend the

15  payment terms, are you aware that Koch had either net 2 or net

16  3-day payment terms?

17  *A.*  No.

18  *Q.*  If you could take a look at Tab 28 in your binder.

19          If I could have Exhibit C-130.

20          So if you just take a look at that top e-mail and look

21  at the second line.  Does that refresh your recollection that

22  Koch had net 2 to 3-day payment terms prior to the Sysco

23  campaign to extend credit terms?

24  *A.*  To my knowledge, Koch always had a net 7 payment terms.  I

25  am not aware of them ever having a 2 or 3 percent -- 2 or 3-day

Melissa Hoyt - Cross

 1  payment term.

 2  *Q.*  And Sysco demanded in the late April e-mail that Koch move

 3  to net 14, correct?

 4  *A.*  We requested that Koch have net 14.

 5  *Q.*  And as far as you're aware, Sysco never proposed to Koch

 6  that they move to net 65, right?

 7  *A.*  Again, I'm not sure if those initial terms went out to any

 8  of the poultry suppliers before we changed them or not, but I

 9  am not aware.

10  *Q.*  You have no knowledge as you sit here today that 65 -- net

11  65-day terms were ever proposed to Koch, right?

12  *A.*  Correct.

13  *Q.*  And unlike the payment terms that were proposed to

14  Pilgrim's, you did not propose to Koch that they provide any

15  sort of cash discount, correct?

16  *A.*  We did not.  If you recall last week, I mentioned that we

17  had three different letters.  We had a letter for a net term

18  supplier.  We had a letter for a 1 percent or 2 percent.

19  *Q.*  I understand.  I am just asking you about Koch.

20  *A.*  They did not have cash discount.

21  *Q.*  And we talked a little bit last week that on October the

22  1st of 2016, Koch sent some signed proposed terms back to

23  Sysco, right?

24  *A.*  I remember seeing one form last week where there was one

25  sent by Koch.  I don't remember exactly what date that was.

Melissa Hoyt - Cross

1    *Q.* Does October of 2016 sound about right to you?

2    *A.* It could be.

3    *Q.* And in that Koch was proposing terms to Sysco.  I

4    understood you from last week that Sysco did not agree to those

5    terms; is that correct?

6    *A.* If you are referring to the net 7 --

7    *Q.* I am, yes.

8    *A.* Yes.  No, we requested net 14.

9    *Q.* And so ultimately your negotiations with Koch continued

10   until January of 2020, right?

11   *A.* That's about accurate.

12   *Q.* Let's switch gears a little bit here, and I want to talk to

13   you about your communications with some other chicken suppliers

14   related to these credit terms, okay?

15   *A.* Okay.

16   *Q.* You had discussions with other chicken suppliers in which

17   you told them that Sysco was -- that Sysco was implementing

18   this 14-day standard terms, right?

19          *MS. SWEENEY:* Objection, Your Honor, as to scope.  On

20   direct Ms. Hoyt testified as to her negotiations with Pilgrim's

21   and Koch.

22          *MR. FAGG:* May I respond, Your Honor?

23          *THE COURT:* Sure.

24          *MR. FAGG:* On direct she testified that she negotiated

25   with a number of different chicken suppliers, and she

Melissa Hoyt - Cross

1    identified them by name and listed out four or five different

2    suppliers.

3              THE COURT:  I think so.  So that question itself, the

4    objection will be overruled.

5    BY MR. FAGG:

6    Q.  One of those companies that you negotiated with was

7    George's, right?

8    A.  So I negotiate with George's.  I don't know that I

9    personally negotiated terms with George's.

10   Q.  Let's take a look at Tab 17, if we can, which is Defense

11   Exhibit I-209.  If you could review that top e-mail that you

12   sent to Greg Nelson at George's.

13   A.  Correct.

14   Q.  So you can set that aside.

15            Do you know Mr. Nelson?

16   A.  I do.

17   Q.  And you negotiated with Mr. Nelson over Sysco's proposed

18   credit terms, right?

19   A.  Yes.  This e-mail reminds me he is the one that I

20   negotiated with.

21   Q.  And in your negotiations with Mr. Nelson, you told him that

22   most of the other suppliers had agreed to 14 days, correct?

23   A.  That's what this e-mail says.

24   Q.  And so in the course of your negotiations with George's,

25   you were telling him what other chicken suppliers had agreed to

Melissa Hoyt - Cross

1   with Sysco, correct?

2   A.   No.   I was telling him that most of our suppliers had come

3   to an agreement.

4   Q.   Did you tell him that most of our suppliers are there?

5          MS. SWEENEY:   Objection, Your Honor.   The witness is

6   being questioned on a document that's not in evidence in

7   addition to the fact that this is far more detailed than the --

8   on the negotiations with other chicken suppliers that she gave

9   on direct.

10          THE COURT:   So scope objection?

11          MS. SWEENEY:   Scope as well.

12          THE COURT:   Go ahead, Mr. Fagg.

13          MR. FAGG:   She testified on direct specifically naming

14   George's.   She also testified on direct that she believed that

15   payment terms with particular suppliers were something that

16   Sysco wanted to keep confidential.

17          THE COURT:   Both of the objections are sustained.

18   BY MR. FAGG:

19   Q.   Just a few more questions, Ms. Hoyt.   You can set that

20   aside.

21          As it relates to these payment term negotiations with

22   Pilgrim's, you did not have any discussions with Bill Lovette

23   about those payment terms, did you?

24   A.   I personally did not.

25   Q.   And you're not aware that anyone at Sysco had any

Melissa Hoyt - Cross

1   communications with him, are you?

2   A.  Not to my knowledge.

3   Q.  And by discussions, I am including phone calls and e-mails

4   or text messages or face-to-face meetings, right?

5   A.  Not to my knowledge.

6   Q.  And you certainly never communicated to Mr. Lovette that

7   Sysco was demanding 65-day terms, correct?

8   A.  I did not communicate that to Mr. Lovette.

9   Q.  Because as far as you're aware as you sit here today, you

10  cannot testify that Sysco ever communicated 65-day terms to

11  Pilgrim's, correct?

12  A.  That's correct.

13          MR. FAGG:  That's all I have.  Thank you.

14          THE COURT:  Thank you, Mr. Fagg.

15          Additional cross-examination?

16          Ms. Henry.

17                    **CROSS-EXAMINATION**

18  BY MS. HENRY:

19  Q.  Good afternoon, Ms. Hoyt.  My name is Roxann Henry and I

20  represent Mr. Bill Kantola.

21          You never had any dealings with Mr. Kantola in

22  connection with anything that you've testified about here today

23  or the other day; isn't that correct?

24  A.  I have not spoken to Mr. Kantola about payment terms.

25  Q.  To your knowledge, Mr. Kantola didn't have anything to do

Melissa Hoyt - Cross

1    with the Sysco account at all, did it?

2    A.  At the time that we were doing payment terms, Mr. Kantola

3    was not the contact that I was working with.

4    Q.  Well, he was not the contact person for Koch Foods,

5    correct?

6    A.  I believe -- when I dealt with him, I thought he was with

7    Pilgrim's.

8    Q.  And the other people that you dealt with at Koch Foods were

9    entirely different people from Mr. Kantola, correct?

10   A.  That is correct.

11           MS. HENRY:  Thank you.

12           THE COURT:  Thank you, Ms. Henry.

13           Additional cross-examination?

14           Ms. Johnson, go ahead.

                              **CROSS-EXAMINATION**

15

16   BY MS. JOHNSON:

17   Q.  Hi, Ms. Hoyt.  I am Wendy Johnson and I represent Ric

18   Blake.  You don't know Mr. Blake, do you?

19   A.  No, ma'am.

20   Q.  You have never met him?

21   A.  Not to my knowledge.

22   Q.  Not to your knowledge, but do you have a question about

23   whether you have met him or not or --

24   A.  What I would say is I meet hundreds, if not thousands, of

25   different supplier reps.  I don't recall ever meeting him.

1    *Q.*  I believe you stated in your direct that you dealt with

2    Greg Nelson from George's; is that right?

3    *A.*  Usually, yes.

4    *Q.*  Thank you.  When you say usually --

5    *A.*  There were a few other gentlemen at George's.  I want to

6    say a Greg Tench might be a name of someone that I dealt with.

7    *Q.*  Greg Tench from George's?

8    *A.*  I am sorry, that might not be the right name, but there

9    were at least two gentlemen at George's that we dealt with.

10   Greg was not the only one, but Greg was usually who I would

11   talk to.

12   *Q.*  But not Mr. Blake.

13   *A.*  No.

14          *THE COURT:*  Thank you, Ms. Johnson.

15          Additional cross-examination?

16          All right.  Redirect?

17          *MS. SWEENEY:*  No further questions, Your Honor.

18          *THE COURT:*  All right.  Is Ms. Hoyt subject to recall?

19          Ms. Hoyt, you are excused.  Thank you very much.

20          *THE WITNESS:*  Thank you.

21          The United States may call its next witness.

22          *MS. CALL:*  Your Honor, the United States has a number

23   of documents to introduce at this time.

24          *THE COURT:*  All right.  Go ahead.

25          *MS. CALL:*  The first is Government's Exhibit 803.

3888

1           THE COURT:  Do you know what date that was, Ms. Call?

2           MS. CALL:  November 12th.

3           THE COURT:  Yes.  Ladies and gentlemen, by previous

4    ruling Exhibit 803 has been admitted.

5           MS. CALL:  Permission to publish?

6           THE COURT:  You may.

7           All right.

8           MS. CALL:  Next is Government Exhibit 2005.

9           THE COURT:  By previous ruling, ladies and gentlemen,

10   that has been admitted as well.

11          MS. CALL:  Permission to publish?

12          THE COURT:  You may.

13          MS. CALL:  If Mr. Berlin could go to the bottom page

14   and zoom in on that portion.

15          THE COURT:  All right.  Everyone have a chance to look

16   at that one?

17          All right.  Let's go to the next part.  Everyone good

18   on that part?  And is there more?

19          MS. CALL:  No, Your Honor.

20          THE COURT:  Next exhibit?

21          MS. CALL:  Next is Government's Exhibit 2001.

22          THE COURT:  Ladies and gentlemen, 2001 is subject to a

23   limiting instruction.  It will be admitted, except that the

24   statements of Mr. Baker are not admitted for the truth of the

25   matters asserted, but rather for the effect on the listener.

 1            MS. CALL:  Permission to publish?

 2            THE COURT:  You may.  Everyone good on that portion?

 3            All right.  Anything else on that one?

 4            MS. CALL:  Yes, one top portion, Your Honor.

 5            THE COURT:  All right.  And why don't we take a short

 6     break.  We will just do 10 minutes at this point.  We will be

 7     in recess until just a little bit after 3:00.  The Court is in

 8     recess.

 9            (Jury excused.)

10        (Recess at 2:52 p.m.)

11        (Reconvened at 3:02 p.m.)

12            THE COURT:  Mr. Koenig?

13            MR. KOENIG:  We just wanted to let the Court know that

14     during the course of the break, we learned that another one of

15     our legal assistants has a fever.  We sent her home.  Nobody

16     here has been in close contact with her.  And according to our

17     regulations, we are still okay to stay, but we just wanted to

18     put it on the record.  She is being tested right now and we'll

19     keep you posted.

20            THE COURT:  Has that person been in court today?

21            MR. KOENIG:  No.

22            THE COURT:  Okay.  Thank you.

23            Let's go ahead and bring the jury back in.

24            MR. FAGG:  Your Honor, just for purposes of the record

25     before we bring the jury back in, could we inquire of the

1   government when the legal assistant was last in court?

2           THE COURT:  Sure, if you know.

3           MS. CALL:  It was sometime last week.  And this person

4   did test negative over the weekend, so --

5           MR. BYRNE:  The only other question would be was that

6   person in close contact with the government lawyers over the

7   weekend.

8           THE COURT:  I think they had indicated according to

9   their regulations there is not an issue, so that would presume

10  whatever contact was not -- didn't meet CDC guidelines.

11          (Jury present.)

12          THE COURT:  All right, Ms. Call.  More exhibits?

13          MS. CALL:  Yes, Your Honor.  Let me inquire one

14  moment.

15          First is Government's Exhibit 2002.

16          THE COURT:  All right.  Ladies and gentlemen,

17  Exhibit 2002 has been previously admitted, but with the same

18  limited purpose for 2001; namely, that the statements of

19  Mr. Baker are admitted not for the truth of the matters

20  asserted, but rather only for the effect that those statements

21  may have on the listener.

22          MS. CALL:  Permission to publish?

23          THE COURT:  You may.  All right.  I think we're good.

24  All right.  We're good.  All right.  We're good.  All right.

25  Good on that one.

1          MS. CALL:  The next is Government's Exhibit 2000.

2          THE COURT:  By previous ruling, ladies and gentlemen,

3   Exhibit 2000 has been admitted.

4          MS. CALL:  I will not be publishing that at this time.

5          The next document is Government Exhibit 948.

6          THE COURT:  I am not seeing that, Ms. Call.  Do you

7   know what day?

8          MS. CALL:  November 18th.

9          THE COURT:  948?

10          MS. CALL:  Yes.

11          THE COURT:  Ladies and gentlemen, 948 is admitted, but

12   for a limited purpose, not for the truth of the matter asserted

13   by Mr. Chambers, Mr. Bean and Ms. Proctor, but rather only for

14   the effect that their statements may have on the listener.

15          MS. CALL:  Permission to publish?

16          THE COURT:  You may.

17          MS. CALL:  And if Mr. Berlin could please zoom in on

18   the bottom portion of the e-mail.  All right.

19          THE COURT:  All right.  Ladies and gentlemen, I may

20   have said Chambers.  It's Mr. Chalmers, obviously.  All right.

21   All right.  All right.

22          MS. CALL:  The next exhibit is marked as Defense

23   Exhibit E-873.  I will note it has an Attachment E-874.

24          THE COURT:  I don't see them.  What date?

25          MS. CALL:  This was discussed on November 18 at the

1  same time as Government Exhibit 1056.

2  THE COURT:  Yes, I see them, yes.  Both of those,

3  E-873 and E-874, have been admitted.

4  MS. CALL:  Permission to publish?

5  THE COURT:  You may.

6  All right.

7  MS. CALL:  If you could turn to E-874, please.

8  THE COURT:  All right.

9  MS. CALL:  Next Is Government Exhibit 1056.

10  THE COURT:  By previous ruling, ladies and gentlemen,

11  Exhibit 1056 is already admitted.

12  MS. CALL:  Permission to publish?

13  THE COURT:  You may.

14  All right.  Everyone good?  All right.  All right.

15  MS. CALL:  Next document is Government Exhibit 901.

16  THE COURT:  When was that discussed?

17  MS. CALL:  I believe November 18th.

18  THE COURT:  Okay.  I don't see it.  What exhibits were

19  discussed around that time maybe?

20  MS. CALL:  It may be November 5th.  I apologize.  I

21  believe it was discussed both on the 5th and the 8th.

22  THE COURT:  Ladies and gentlemen, by previous ruling

23  901 will be admitted, but with the following limitation;

24  namely, that it can be considered against Mr. Kantola only.

25  MS. CALL:  Permission to publish?

1            THE COURT:  You may.

2            All right.

3            MS. CALL:  The next is Government Exhibit 3074.

4            THE COURT:  And when was that discussed?

5            MS. CALL:  This one was discussed November 18th.

6            THE COURT:  All right.  Yes, ladies and gentlemen,

7     that exhibit is admitted.

8            MS. CALL:  We will not be seeking to publish this one

9     at this time.

10            THE COURT:  All right.

11            MS. CALL:  Next is Government Exhibit 9703, also

12     discussed on November 18th.

13            THE COURT:  So ladies and gentlemen, as to

14     Exhibit 9703, that exhibit can only be considered against

15     Mr. Roberts and Mr. Mulrenin.  In addition, it is admitted not

16     for the truth of the matters asserted as to Mr. Eddington and

17     Mr. Milbrodt, but rather only for the effect that their

18     statements have on the listener.

19            MS. CALL:  Permission to publish, Your Honor?

20            THE COURT:  You may.

21            All right.  We're good.  Okay.  All right.

22            MS. CALL:  Mr. Berlin, can we move to the next page?

23            THE COURT:  Okay.

24            MS. CALL:  And one more portion on this document.

25            THE COURT:  All right.

1          *MS. CALL:*  The next is Government Exhibit 9704.

2          *THE COURT:*  Ladies and gentlemen, 9704 will be

3    admitted, but only as against Mr. Roberts and Mr. Mulrenin.

4    Also the statements of Mr. Suerken can only be considered by

5    you for the effect on the listener and not for the truth of the

6    matters asserted.

7          *MS. CALL:*  Permission to publish?

8          *THE COURT:*  You may.

9          *MS. CALL:*  Thank you.

10         *THE COURT:*  All right.

11         *MS. CALL:*  If Mr. Berlin could zoom in on the top

12   portion of the screen.

13         *THE COURT:*  Okay.

14         *MS. CALL:*  The next is Government Exhibit 617.

15         *THE COURT:*  Do you know the date?

16         *MS. CALL:*  November 18th.

17         *THE COURT:*  18th?  That's admitted, ladies and

18   gentlemen, Exhibit 617.

19         *MS. CALL:*  Permission to publish?

20         *THE COURT:*  You may.

21         All right.

22         *MS. CALL:*  If Mr. Berlin could please zoom in on the

23   next e-mail in that chain.  All right.  And the last portion of

24   that e-mail, please, Mr. Berlin.

25         *THE COURT:*  All right.

1          MS. CALL:  The next is Government Exhibit 933.  That

2     would also be November 18th.

3          THE COURT:  Ladies and gentlemen, by prior ruling that

4     is admitted, but not for the truth of the matters asserted by

5     Ms. Garland whose statements are not admitted for the truth,

6     but rather only for the effect that her statements may have on

7     the listener.

8          MS. CALL:  Permission to publish?

9          THE COURT:  You may.

10         All right.  Okay.

11         MS. CALL:  The next document is Exhibit 5016.

12         THE COURT:  By prior ruling, ladies and gentlemen,

13    Exhibit 5016 has been admitted.

14         MS. CALL:  Permission to publish?

15         THE COURT:  You may.

16         MS. CALL:  If Mr. Berlin could please zoom -- let me

17    confer one moment.  I believe there is a significant amount of

18    e-mail footers, so we may start halfway up the page.

19         THE COURT:  I think that's appropriate.

20         All right.  All right.

21         MS. CALL:  The next is Government Exhibit 6282.

22         THE COURT:  Ladies and gentlemen, 6282 has been

23    admitted.

24         MS. CALL:  Permission to publish?

25         THE COURT:  You may.

1          All right.

2          MS. CALL:  The next exhibit is Government Exhibit

3    6047.

4          THE COURT:  Do you know the date on that one,

5    Ms. Call?

6          MS. CALL:  Yes.  I have November 18th.

7          THE COURT:  Ladies and gentlemen, 6047 -- is that

8    right, Ms. Call?

9          MS. CALL:  Yes.

10          THE COURT:  That has been admitted.

11          MS. CALL:  Permission to publish?

12          THE COURT:  You may.

13          Okay.  All right.

14          MS. CALL:  Next is Government Exhibit 3025.

15          THE COURT:  Ladies and gentlemen, that exhibit has

16    been admitted.

17          MS. CALL:  Permission to publish?

18          THE COURT:  You may.

19          All right.

20          MS. CALL:  Next is Government Exhibit 219.

21          THE COURT:  Do you know the date on that one,

22    Ms. Call?

23          MS. CALL:  That was the 18th as well.

24          THE COURT:  The 18th?  All right.  Yes.  Exhibit 219

25    has been admitted.

 1          *MS. CALL:*  Permission to publish?

 2          *THE COURT:*  You may.

 3          All right.  Okay.

 4          *MS. CALL:*  The next Is Government Exhibit --

 5          *THE COURT:*  Ladies and gentlemen, as you know, we took

 6  our mid-afternoon break early.  It's 4:00 o'clock now.  Would

 7  you like to take a 10-minute break anyone?  Any of the parties

 8  or attorneys?  Let me know if you want to even though it may be

 9  a little bit after 4:00, okay?

10          *MS. CALL:*  I think we are about halfway through, so

11  there is a bit to go.

12          *THE COURT:*  Okay.  I just wanted to see if anybody

13  needed a break.  Go ahead.

14          *MS. CALL:*  The next is 9026 and associated document

15  9718-1.

16          *THE COURT:*  And it's 9718-1 you said, right?

17          *MS. CALL:*  Correct.

18          *THE COURT:*  Ladies and gentlemen, those exhibits are

19  admitted, but against Mr. Lovette only.

20          *MS. CALL:*  Permission to publish?

21          *THE COURT:*  Yes.

22          *MS. CALL:*  We may defer publishing this one.  We have

23  to switch laptops at our table.

24          *THE COURT:*  Okay.  Hold on.  Let me just make a note.

25  Go ahead.

1        MS. CALL:  May we actually have a brief side bar?

2        THE COURT:  Yes.

3     (At the bench:)

4        THE COURT:  Go ahead.

5        MS. CALL:  As I said, we are about halfway through and

6   the vast majority of these have been previously ruled on.  I

7   believe there are a couple -- I believe there are a couple that

8   were still pending a ruling from a prior hearing, so I wanted

9   to flag that before we got to them.  And there is about three

10  new documents the government did want to offer that were sent

11  to defense counsel yesterday, so I am hoping we don't need a

12  whole new hearing for it and we can handle it here today.

13        THE COURT:  What were the category of documents that

14  require the -- that were awaiting a ruling on or you are

15  awaiting a ruling on?

16        MS. CALL:  Yes, Your Honor.  The first is 959 and its

17  attachment, 960.  I believe Mr. Gillen had objected on

18  authentication grounds last week.

19        THE COURT:  Mr. Gillen, can you hear me?  Can you

20  refresh my memory, who's court was that ball in?  Was I looking

21  up something?  Were we looking up anything regarding

22  authenticity?  I can't recall.

23        MR. GILLEN:  I don't have the exhibit in front of me,

24  so I would probably need to have it before I could comment.

25        THE COURT:  Next on your list, Ms. Call?

1          MS. CALL:  I may be able to resolve this.  As I

2    recall, the objection was to whether the attachment was

3    actually associated with the e-mail.

4          THE COURT:  I think that's right.

5          MS. CALL:  The government is comfortable just

6    admitting the e-mail, not the attachment, if that resolves the

7    issue.

8          THE COURT:  Mr. Gillen, do you still need a chance to

9    take a look at that?  We could go ahead and take a 10-minute

10   break.  That would give you the opportunity to do so.

11         MR. GILLEN:  I would appreciate that.  Thank you.

12         THE COURT:  Ms. Call, what else do you have?

13         MS. CALL:  1177, and I believe Your Honor was

14   reviewing some case law that Mr. McLoughlin had provided on

15   Friday.

16         THE COURT:  I know I took that under advisement.  I

17   don't recall the case law, but I can take -- I will refresh my

18   memory over the break on that one too.  What else do you have?

19         MS. CALL:  I have got two more that were in the

20   category of pending a ruling.  One is 7046 and there was a

21   consideration on that.  It was a spreadsheet relating to

22   Defendant Austin dated back to 1999.  And I believe there had

23   been a 404(b) objection raised.

24         THE COURT:  Do you remember that, Mr. Feldberg?  Oh, I

25   think -- right, this is the -- Mr. Austin's -- a spreadsheet

1    that had entries going way back; was that right?  As I recall,

2    it had many different -- maybe it was a contact list.  Was that

3    it?

4         MR. FELDBERG:  No.  It was -- my recollection, Your

5    Honor, it was a historical spreadsheet that he kept track of

6    prices going back I think to the year --

7         THE COURT:  Oh, prices.

8         MR. FELDBERG:  It was either '99 or 2000.  We did not

9    raise the objection.  We would prefer the entire document to

10   come in.  I think counsel may have a different view.

11        THE COURT:  Okay.  I will -- I just took it under

12   advisement.  I can't recall offhand.  I will have to look that

13   one up too.

14        MS. CALL:  And I believe it was counsel for Mr. Fries,

15   if I am not correct, that had raised the request for a limiting

16   instruction, if I am remembering correctly.

17        THE COURT:  Okay.  I will take a look at that.  What

18   else do you have on your list?

19        MS. CALL:  The one that was I think needing ruling was

20   957 and that was briefed over the weekend.

21        THE COURT:  Yes, I do.  Refresh my memory.  Which one

22   was that?

23        MS. CALL:  Relating to the USAPEEC industry

24   organization and the discussion of forward pricing.

25        THE COURT:  Yeah, I remember that one too.  Why don't

1    we do this and -- and you -- you need to introduce those today

2    since it's already 4:10?

3         MS. CALL:  I think we hoped to introduce the remaining

4    things before the final witness.  We don't think -- we may not

5    get to the final witness at this pace, so we could try and get

6    through the things that are already ruled on and if there is

7    time tomorrow morning perhaps take it up before calling the

8    witness, but there is a couple factors in play there.

9         THE COURT:  Well, let me know what you want to do.  It

10   would necessitate me to refresh my memory.  We would have to

11   take a break and it would have to be a 15-minute break.  On the

12   other hand, if you thought you had enough to keep showing

13   things to the jury, we could see how far that gets us and

14   whether we're at a stopping point in terms of being able to

15   look it up.

16        MS. CALL:  Your Honor, we can keep going for now, and

17   then I'll request another side bar when we get to a point when

18   we would be at the three new documents or we need a ruling.

19        THE COURT:  And Ms. Call, what are the three

20   documents?

21        MS. CALL:  One is Government 518.  And I brought this

22   up a week ago and noted to give counsel an opportunity to

23   review it before we discuss it.  That's regarding Mr. Walter

24   Cooper from Claxton, and that was contained on the *James* log.

25        THE COURT:  Okay.  Are there going to be objections as

1    to that one?

2            MR. KORNFELD:  This is Rick Kornfeld on behalf of

3    Mr. Fries.  I would anticipate there may be, but I would have

4    to refresh myself on that one.

5            THE COURT:  Okay.  Next new exhibit?

6            MS. CALL:  I believe it's four total, if I am counting

7    correctly.  746-1 which we noted our intention to offer this

8    morning that was an e-mail already considered that we had

9    pulled the metadata for showing who it was transmitted to.

10           THE COURT:  Right.  And objections anticipated for

11   Exhibit 746-1?

12           MR. TUBACH:  This is Michael Tubach.  I don't recall

13   who the sender or recipient of that e-mail is.  I apologize.

14           THE COURT:  That's okay.  In other words, you would

15   need to take a look at it.

16           MR. TUBACH:  Yes, Your Honor.

17           THE COURT:  And Ms. Call, what's the next one?

18           MS. CALL:  Next is 9744 which was also included in a

19   chain of -- an already admitted exhibit, but it was relative to

20   the time zone indication on the document.  It is on the *James*

21   log as well.

22           THE COURT:  What's the -- it's a subset of which

23   admitted document?

24           MS. CALL:  I believe it's 1074.

25           THE COURT:  Okay.

1          *MS. PREWITT:*  Elizabeth Prewitt.  Is it possible we

2  could take this up tomorrow so we don't keep the jury waiting?

3  Perhaps we could meet a few minutes early?

4          *THE COURT:*  I think that's going to be the best bet.

5  With the time we are spending now, we could probably let them

6  go early.

7          Mr. Tubach, go ahead.

8          *MR. TUBACH:*  On 9744, that document has already been

9  admitted three prior times, so we would object to the fourth

10  admission.  It's 1074, 1058 and 1075, so I think three is

11  probably enough at this point.

12          *THE COURT:*  Okay.  We'll take a look at that.

13          All right.  Anything else, Ms. Call?

14          *MS. CALL:*  No, Your Honor.  I think we can wait until

15  tomorrow morning.  And on the additional ones, I will assure

16  the defense counsel is fully aware and we can plan on to

17  address those tomorrow morning.

18          *THE COURT:*  When should we have the jury come back

19  tomorrow morning then, in, order to be able to have the jury

20  talk about those?  8:45 and maybe we can meet at 8:15?

21          *MS. CALL:*  That sounds good.  Given our average time

22  frame per document, that sounds appropriate.

23          *MS. PREWITT:*  Your Honor, this is Elizabeth Prewitt.

24  I am going to go ahead and speak on behalf of the defendants

25  here.  We are happy to meet as early as Your Honor would like

1    tomorrow to discuss these issues.

2         THE COURT:  Yeah, it doesn't matter to me.  Given the

3    fact that today -- this week is going to be abbreviated

4    regardless, why don't we say 8:00.  That way we can try to keep

5    our regular schedule.  It might be better for them, okay?

6         MR. TUBACH:  If we could have that fourth document

7    number just so we know what we're looking at.

8         THE COURT:  Go ahead, Ms. Call.

9         MS. CALL:  Yes.  I lost my place.  I believe it is

10   410.  And I will note the other item, just for counsel, there

11   are three excerpts where the longer toll record I believe is in

12   evidence, but we did want the one-page versions, 9716, 9720,

13   9721, 9722.

14        MR. TUBACH:  I am confused about what those four

15   documents are relative to the four we already talked about.

16        THE COURT:  Those contain portions of 410 or --

17   Ms. Call, could you explain that again.

18        MS. CALL:  They were excerpts of toll records.  We

19   noticed they had not previously been admitted.  The larger

20   portion of the several thousand page toll record that they were

21   excerpted from has been admitted.

22        THE COURT:  And what's 410, excerpts?

23        MS. CALL:  410 is actually an e-mail.  And also

24   counsel can review that.  We would only tend to offer it --

25   sorry, it is 410-1.  It is a redacted document that is an

1   e-mail.  We are only offering it for the purposes of the image

2   contained in it.

3            MS. PREWITT:  Your Honor, might I suggest -- this is

4   Elizabeth Prewitt.  If we can get a list from the government,

5   we can just plan to have some time and address those tomorrow

6   morning so we don't keep the jury waiting.

7            THE COURT:  All right.  That was all of those?

8            MS. CALL:  Yes, Your Honor.

9            THE COURT:  All right.  Thank you.

10       (In open court:)

11            THE COURT:  Go ahead, Ms. Call.

12            Next one?

13            MS. CALL:  The next is government Exhibit 1409.

14            THE COURT:  Date, Ms. Call?

15            MS. CALL:  November 12th.

16            THE COURT:  I can't find it, Ms. Call.  Why don't you

17   go to the next one.

18            MS. CALL:  Now we have the laptop ready to publish one

19   we just skipped, 9026, if we can publish that.

20            THE COURT:  Okay.  You may.  All right.

21            MS. CALL:  Then 978-1.  I stand corrected.  I believe

22   it is just 9718, not the -1.

23            THE COURT:  It was admitted as 9718-1, but it is just

24   9718?

25            MS. CALL:  Yes, Your Honor.  I believe we had

1    anticipated doing a native and a paper, and now it is

2    apparently just a paper that we are seeking to actually admit.

3            THE COURT:  So ladies and gentlemen, the exhibit that

4    is being displayed, 9718, is the admitted exhibit, not 9718-1,

5    all right?

6            All right.

7            MS. CALL:  For 1409, Your Honor --

8            THE COURT:  I found it.  1409, ladies and gentlemen,

9    has been admitted.

10           MS. CALL:  Permission to publish?

11           THE COURT:  You may.

12           All right.

13           MS. CALL:  The next group is 1526, 1527 and 1528.

14           THE COURT:  Each of those, ladies and gentlemen, have

15   been admitted.

16           MS. CALL:  And we are not seeking to publish those at

17   this time.

18           THE COURT:  All right.

19           MS. CALL:  Next document is 1521 and 1521-1.

20           THE COURT:  Both exhibits, ladies and gentlemen, have

21   been admitted.

22           MS. CALL:  Permission to publish 1521?

23           THE COURT:  You may.  All right.

24           MS. CALL:  1521-1?

25           THE COURT:  You may.

1    *MS. CALL:*  Mr. Berlin, can you zoom in on the content

2    there?  Thank you.

3         *THE COURT:*  All right.

4         *MS. CALL:*  Next document is Exhibit 1519.

5         *THE COURT:*  Ladies and gentlemen, that has been

6    admitted.

7         *MS. CALL:*  Permission to publish?

8         *THE COURT:*  You may.

9         *MS. CALL:*  Next is Government Exhibit 1427.

10        *THE COURT:*  Exhibit 1427 has been admitted.

11        *MS. CALL:*  Permission to publish?

12        *THE COURT:*  You may.

13        *MS. CALL:*  Thank you.

14        And Mr. Berlin, if you can zoom in on the contents

15   there.

16        *THE COURT:*  Actually, I show that we have previously

17   admitted that one.

18        *MS. CALL:*  If that is the case, I apologize, and we

19   can move on.

20        *THE COURT:*  I think that's true because I think it's

21   been published too.

22        *MS. CALL:*  All right.  The next is 1583 and 1584.  I

23   believe actually those have been admitted, but I wanted to

24   confirm.

25        *THE COURT:*  Let's double-check on that.  Yes, both

1    have been admitted.

2              *MS. CALL:*  The next is Government Exhibit 1544.

3              *THE COURT:*  Ladies and gentlemen, that exhibit has

4    been admitted.

5              *MS. CALL:*  Permission to publish?

6              *THE COURT:*  You may.

7              *MS. CALL:*  I believe this is two pages.  So if

8    Mr. Berlin would perhaps zoom to the top of the bottom e-mail

9    start.

10             *THE COURT:*  Okay.

11             *MS. CALL:*  If we could go lower in that same e-mail.

12             *THE COURT:*  All right.

13             *MS. CALL:*  The bottom portion of that e-mail,

14   Mr. Berlin.  I believe we will leave out the signature block to

15   make it a little more readable.

16             *THE COURT:*  All right.

17             *MS. CALL:*  The next e-mail in the chain, please,

18   Mr. Berlin.

19             *THE COURT:*  Okay.

20             *MS. CALL:*  Now the top of the e-mail, please.

21             *THE COURT:*  Okay.

22             *MS. CALL:*  Next document is 1538 and 1539.

23             *THE COURT:*  Both of those, ladies and gentlemen have

24   been admitted.

25             *MS. CALL:*  Permission to publish?

1          THE COURT:  You may.

2          MS. CALL:  Start with 1538, please.

3          1539, please.  Mr. Berlin, if we could zoom in on

4    where all the content is.

5          THE COURT:  Okay.

6          MS. CALL:  The next exhibits are 9751 and 9752.  Your

7    Honor, these were previously discussed on November 12 as I

8    believe D-538.  It's essentially the same document with a

9    different sticker.

10         THE COURT:  What was the government exhibit number

11   again?

12         MS. CALL:  The government's is 9751 and the attachment

13   is 9752.

14         MR. FELDBERG:  Your Honor, these documents were

15   previously discussed and were subject to the rule of

16   completeness argument.  We had them -- if I have the right

17   documents -- as Defendants' Exhibits D-839 and I-141.  And in

18   keeping with the practice that we've been engaging in, I would

19   suggest we keep the defense exhibit numbers which were

20   initially discussed.

21         THE COURT:  Those were the exhibit numbers that I

22   remember being part of the ruling.  Do we have -- those are the

23   ones that you intend, Ms. Call?

24         MS. CALL:  Yes, Your Honor.

25         THE COURT:  I think we should admit them under the

3910

1      exhibit numbers that Mr. Feldberg just mentioned.

2            *MS. CALL:*  All right.  Let me confirm we have them in

3      electronic copy.

4            *MR. FELDBERG:*  I have physical copies if anyone needs.

5            *MS. CALL:*  Mr. Berlin, could you pull up Exhibit

6      D-839?  I believe we have it.

7            Permission to publish.

8            *THE COURT:*  Yes.  And ladies and gentlemen, I-141 and

9      D-839 have both been admitted.

10           Okay.

11           *MS. CALL:*  I don't believe the government has I-141 on

12     electronic copy.  Perhaps we could switch if the defendants'

13     computer is up and running.

14           Permission to publish.

15           *THE COURT:*  Yes.  And that's I-141?

16           *MS. CALL:*  I believe so.

17           *THE COURT:*  Okay.

18           *MS. CALL:*  The next document, if we could switch the

19     display back to the government's computer, is 1546.

20           *THE COURT:*  And 1546 was admitted.

21           *MS. CALL:*  Permission to publish?

22           *THE COURT:*  You may.

23           All right.

24           *MS. CALL:*  Next is Government's Exhibit 1547.

25           *THE COURT:*  What date was that on, Ms. Call?

1            *MS. CALL:*  November 12th.  I may be mistaken in my

2     notes.  It may be November 8th.

3            *THE COURT:*  I am sorry, I am not finding it.  We will

4     have to skip that one for now.  What was that one again?

5            *MS. CALL:*  It was 1547.

6            The next would be 1522 and 1523.

7            *THE COURT:*  And both of those, ladies and gentlemen,

8     have been admitted.

9            *MS. CALL:*  Permission to publish?

10           *THE COURT:*  You may.

11           *MS. CALL:*  If we can start with 1522, Mr. Berlin.

12           *THE COURT:*  Okay.

13           *MS. CALL:*  Can we have 1523, please?

14           *THE COURT:*  All right.

15           *MS. CALL:*  Next is Government's Exhibit 1722.  This is

16    from November 18, Your Honor.

17           *THE COURT:*  Yes.  1722, ladies and gentlemen, has been

18    admitted.

19           *MS. CALL:*  Permission to publish?

20           *THE COURT:*  You may.

21           All right.

22           *MS. CALL:*  I believe we have a couple to admit but not

23    publish at this time starting with 9010 which is a native file,

24    and 9010-1, which is the paper version.

25           *THE COURT:*  Was that on the 18th?

1          MS. CALL:  Yes, Your Honor.

2          THE COURT:  9010 and 9010-1?

3          MS. CALL:  Correct.

4          THE COURT:  Ladies and gentlemen, both of those have

5   been admitted.  As Ms. Call just mentioned, 9010 is a native

6   file so it's in a form, I think a spreadsheet perhaps, that the

7   jury will have the ability to review back in the deliberation

8   room.  9010-1 is -- a paper excerpt, is it?

9          MS. CALL:  Yes, Your Honor.

10          THE COURT:  Excerpt of that particular exhibit.

11          MS. CALL:  The next is 9264 which is a native and 9759

12   which is the hard copy for that one which is not an excerpt.

13          THE COURT:  What was the excerpt?

14          MS. CALL:  9759 is the paper version, but it's all 31

15   pages.

16          MR. FELDBERG:  Your Honor, we have an issue here.

17   Perhaps we could have a brief side bar?

18          THE COURT:  Yes, you may.

19          MR. FELDBERG:  Your Honor, 9759 as we understand it is

20   condensed in a way that eliminates some of the columns that are

21   in the original document.  And we would ask that if this is

22   going to come in, the entire document come in.

23          THE COURT:  I had recalled, my notes are that we were

24   talking about 9725 and I had indicated that 9725 could not be

25   collapsed.  Has 9725 been remarked as 9759?

3913

1          MS. CALL:  Yes, Your Honor.  So I believe this was

2    done during the day on Friday.  Mr. Feldberg -- we remarked it

3    as 9759 -- had asked for an opportunity to review.  9725 had

4    been kind of excerpted with rows missing and columns missing

5    and 9759 contains every row of the spreadsheet, so it contains

6    every contact in the contact list.

7          But to get it to print in a readable form -- I believe

8    I indicated this on the record on Friday -- there were several

9    columns that did get removed, I believe none of which had phone

10   numbers in them, but there may have been some other

11   information.  But I believe they are mostly blank.  And

12   Mr. Feldberg can correct me if I am incorrect.

13          MR. TUBACH:  Perhaps Ms. Call can step away from the

14   microphone.  At least I can hear her even with my headset on.

15          THE COURT:  Yes, that might be a good idea.

16          Mr. Feldberg, go ahead.

17          MR. FELDBERG:  I don't disagree with what Ms. Call

18   said except for the conclusion.  Columns have been removed.

19   There is information in those columns.  And we would ask that

20   the entire document -- and I think this is consistent with Your

21   Honor's prior ruling, at least indication that the entire

22   document should be presented.  If it has to be folded or

23   somehow put together in an unusual way, so be it, but we would

24   ask that the entire document come in.

25          THE COURT:  Ms. Call?

1          MS. CALL:  Yes, Your Honor.  So I think we're trying

2     to figure out what works here.  And I had no idea I projected

3     so well, but the microphone is off.

4          9759 contains all the entries.  And I believe there

5     had been a concern in the excerpted form that had been in

6     previously that it appeared that Mr. Austin only had

7     competitors in his contact list.  Here the jury is still

8     getting the native, so they will have everything, but I believe

9     we just do need to get it in in a way that is amenable to

10    printing.  And I don't believe it's misleading in any way

11    leaving out certain columns that at least don't contain phone

12    information.

13         MR. FELDBERG:  If that's the concern, why not just

14    admit the native, 9264.

15         THE COURT:  I am going to overrule the objections.

16    9759 will be admitted.  It sounds like it does not remove any

17    type of call information, and therefore the fact that it

18    excludes some columns I don't believe is unfair, and as a

19    result, I will admit 9759 as a paper version.  All right.

20    Thank you.

21         MS. CALL:  Very briefly.  I believe that is -- I stand

22    corrected.  I have four more documents and then we will

23    probably be at or very near 5:00 o'clock.

24         THE COURT:  We are at or very near 5:00 o'clock now,

25    so we'll see.  Thank you.

3915

1          (In open court:)

2                Ladies and gentlemen, Exhibit 9264 is admitted as well

3      as 9759.

4                MS. CALL:  The next is government Exhibit 7040.

5                THE COURT:  Do you know the day, Ms. Call?

6                MS. CALL:  This morning.

7                THE COURT:  Oh.  Mr. Tegtmeier?

8                MR. TEGTMEIER:  Yes.  This is not the form that that

9      exhibit was to be submitted in.

10               THE COURT:  I am not sure what form is being

11     displayed.

12               MS. CALL:  I believe the government had agreed to

13     follow up with some redactions.

14               THE COURT:  Oh, okay.  Are you just moving the

15     admission of it now?

16               MS. CALL:  Yes.  We are not seeking to publish.

17               THE COURT:  And that will be displayed later?  Is that

18     what you are indicating?

19               MS. CALL:  I don't believe we will be displaying it.

20               THE COURT:  That's fine.  Exhibit 7040 will be

21     admitted as well.

22               You might have time for one quick one that's not going

23     to be displayed.

24               MS. CALL:  And that will be Government Exhibit 1520.

25               THE COURT:  Okay.  Do you know the date?

1          *MS. CALL:*  Also this morning.

2          *THE COURT:*  Can you display that to me so I can

3     refresh my memory?

4          *MS. CALL:*  Yes, Your Honor.

5          *THE COURT:*  1520 has been admitted.

6          *MS. CALL:*  This may be a good time to stop for today.

7          *THE COURT:*  Ladies and gentlemen, we are going to

8     convene tomorrow at the usual time, 8:30, okay?

9          Keep the admonitions in mind.  If you see any type of

10    publicity, avert your eyes or ears.  And we'll see you back

11    here at 8:30 tomorrow.  The jury is excused.  Thank you.

12          (Jury excused.)

13          *THE COURT:*  So we have a list of exhibits that we are

14    going to consider at 8:00 tomorrow.  Any additional items that

15    we should take up before then?

16          Mr. Koenig?

17          *MR. KOENIG:*  I am sorry, I am just trying to confer

18    with Ms. Call.

19          *THE COURT:*  Okay.  Mr. Kornfeld?

20          *MR. KORNFELD:*  With the Court's indulgence, I would

21    ask to be excused at 8:00 tomorrow.  I have a brief medical

22    appointment that I rescheduled from Friday.  I should be here

23    by 8:30, but clearly Mr. Fries will be in good hands with

24    Mr. Beller and Ms. Page.

25          *THE COURT:*  Yes, that's fine.

1      *MR. FELDBERG:*  I would actually have the same request.

2   I have a board meeting starting at 6:30 tomorrow morning.

3      *THE COURT:*  No problem.  Ms. Carwile will undoubtedly

4   be here.

5      Anything else?

6      We will check with the government in just a second.

7      *MS. CALL:*  Very briefly, as we finalize and wrap up to

8   the end of the government's case, we'll send defense counsel a

9   list of the documents to be covered tomorrow morning.  I think

10  there may be one or two additions from what I said this

11  afternoon, but we will have it all shared and squared so we can

12  be efficient as possible in the morning.

13     *THE COURT:*  Mr. Tubach?

14     *MR. TUBACH:*  If we could have that shared and squared

15  relatively early today so we know what we are doing tomorrow at

16  8:00.

17     *THE COURT:*  It's dark outside, but yes, the earlier

18  the better I think would be appropriate.

19     *MS. PREWITT:*  Also the summary charts, I am sure you

20  are going to send those too.  Thank you very much.  Thank you.

21     *THE COURT:*  Sure.  Mr. Byrne, in regard to the

22  dismissal of the count, I got your brief that was filed over

23  the weekend.  I am going to go with the following.  I just

24  wanted to mention it to you so you would know what I am going

25  to do.  And my intention was to do this, assuming I remember,

1    right at 8:30, but I would read the following to the jury:

2         At the beginning of the trial, I described to you that

3    Mr. Little in addition to being charged with violating

4    Section 1 of the Sherman Act was charged with obstruction of

5    justice.  For reasons that do not concern you, the obstruction

6    of justice charge against Mr. Little is no longer before you.

7    Do not speculate about why that charge is no longer part of

8    this trial.

9         That's consistent, as I had mentioned to you, with the

10   Ninth Circuit pattern instruction.  I know that's not the one

11   that you want, but that's the one that I intended to read to

12   the jury, so I just wanted to let you know that.

13        *MR. BYRNE:*  Thank you, Your Honor.

14        *THE COURT:*  Anything else that we should take up?

15        Yes, Mr. McLoughlin?

16        *MR. McLOUGHLIN:*  Your Honor, we just wanted to let you

17   know that we will be filing a response to the government's

18   motion filed yesterday with regard to text messages.

19        *THE COURT:*  Okay.

20        *MR. McLOUGHLIN:*  Would Wednesday be efficiently quick?

21        *THE COURT:*  I think so.  It doesn't look like the

22   witness list filed by the defendants include the agents, right?

23        *MR. McLOUGHLIN:*  Yes, Your Honor.

24        *THE COURT:*  But that doesn't moot the motion or --

25   okay.  Yeah, that's fine.  Wednesday I will look for that.

3919

1    Thank you, Mr. McLoughlin.

2          Okay.  Anything else?

3          *MR. FAGG:*  Briefly, the government also filed a motion

4    to compel yesterday regarding witness lists and Rule 26.2

5    disclosures, and we will be filing a response to that.

6          *THE COURT:*  When will that be filed?

7          *MR. FAGG:*  If not tonight, tomorrow.

8          *THE COURT:*  Okay.  Does that work for the government?

9          *MR. KOENIG:*  Yes, I believe it does.  And then I have

10   one other quick thing.

11         *THE COURT:*  Okay.  Does that take care of your

12   concern, Mr. Fagg?

13         *MR. FAGG:*  It does, Your Honor.

14         *THE COURT:*  Thank you.

15         Go ahead, Mr. Koenig.

16         *MR. KOENIG:*  Yeah, sorry.  If the Court could maybe

17   ask the defendants to explain in their response how the text

18   message issue is not moot since they are not calling the

19   agents, that would be helpful so that we -- because I just

20   can't see any relevance at all to the text messages.

21         *THE COURT:*  Well, assuming that there is some, I would

22   imagine that Mr. McLoughlin is going to explain that.  So I

23   think it coming.  I don't know if we need to do it right now

24   just because of the fact that it doesn't seem like it's going

25   to come up right away.  If it is going to come up right away

1    with some exhibit -- sorry, some witness at the very beginning

2    of the defense case, then we probably need advance notice,

3    but...

4             MR. McLOUGHLIN:  Your Honor, we will chat with the

5    government and we will address that in the filing.

6             THE COURT:  Okay.  Anything else?

7             We will be in recess until 8:00 a.m. tomorrow.

8         (Recess at 5:05 p.m.)

9                              INDEX

10   WITNESSES

11     Melissa Hoyt

12            Cross-Examination Continued By Mr. Fagg        3865

13            Cross-examination By Ms. Henry                 3885

14            Cross-examination By Ms. Johnson               3886

15                             EXHIBITS

16   Exhibit        Offered   Received   Refused   Reserved   Withdrawn

17   I-141                    3910

18   219                      3897

19   617                      3894

20   803                      3888

21   D-839                    3910

22   E-873                    3892

23   E-874                    3892

24   901                      3892

25   933                      3895

| | INDEX (Continued) | | | | |
|---|---|---|---|---|---|
| | | EXHIBITS | | | |

| | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|---|
| 4 | 948 | | 3891 | | | |
| 5 | 1056 | | 3892 | | | |
| 6 | 1409 | | 3906 | | | |
| 7 | 1519 | | 3907 | | | |
| 8 | 1520 | | 3916 | | | |
| 9 | 1521 | | 3906 | | | |
| 10 | 1521-1 | | 3906 | | | |
| 11 | 1522 | | 3911 | | | |
| 12 | 1526 | | 3906 | | | |
| 13 | 1527 | | 3906 | | | |
| 14 | 1528 | | 3906 | | | |
| 15 | 1533 | | 3911 | | | |
| 16 | 1538 | | 3908 | | | |
| 17 | 1539 | | 3908 | | | |
| 18 | 1544 | | 3908 | | | |
| 19 | 1546 | | 3910 | | | |
| 20 | 1722 | | 3911 | | | |
| 21 | 2000 | | 3891 | | | |
| 22 | 2001 | | 3889 | | | |
| 23 | 2002 | | 3890 | | | |
| 24 | 2005 | | 3888 | | | |
| 25 | 3025 | | 3896 | | | |

1                       INDEX (Continued)

2                         EXHIBITS

3    Exhibit      Offered   Received   Refused   Reserved   Withdrawn

4    3074                   3893

5    5016                   3895

6    6047                   3896

7    6282                   3895

8    7040                   3915

9    9010                   3912

10   9010-1                 3912

11   9026                   3897

12   9026                   3905

13   9264                   3915

14   9703                   3893

15   9704                   3894

16   9718-1                 3897

17   9718                   3906

18   9759                   3915

19                   REPORTER'S CERTIFICATE

20       I certify that the foregoing is a correct transcript from

21   the record of proceedings in the above-entitled matter.   Dated

22   at Denver, Colorado, this 3rd day of February, 2022.

23

24                            S/Janet M. Coppock

25