IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     JAYSON JEFFREY PENN,
2.     MIKELL REEVE FRIES,
3.     SCOTT JAMES BRADY,
4.     ROGER BORN AUSTIN,
5.     TIMOTHY R. MULRENIN,
6.     WILLIAM VINCENT KANTOLA,
7.     JIMMIE LEE LITTLE,
8.     WILLIAM WADE LOVETTE,
9.     GARY BRIAN ROBERTS, and
10.   RICKIE PATTERSON BLAKE,

      Defendants.

No. 20-cr-00152-PAB

**JAYSON JEFFREY PENN'S MOTION FOR JUDGMENT OF ACQUITTAL**

Now in the midst of its second trial, the government still has advanced almost no evidence against Mr. Penn, and certainly none capable of proving beyond a reasonable doubt that he knowingly and intentionally agreed to conspire. Although the government called two "percipient" witnesses purportedly involved in the alleged conspiracy, both disclaimed any participation by Mr. Penn. Carl Pepper testified that he did not know Mr. Penn and had never spoken to or communicated with him. Robert Bryant explained that Mr. Penn had no involvement in the specific activities about which Mr. Bryant testified. Mr. Bryant also stated that he had no knowledge that Mr. Penn (i) agreed to fix prices or rig bids, (ii) instructed anyone else to fix prices or rig bids, or (iii) otherwise knew anyone was fixing prices or rigging bids.

The government's case against Mr. Penn once again rests entirely on a handful of

ordinary business documents. But even evaluated in the light most favorable to the government—and even ignoring the exculpatory testimony of *every* purported "insider"—those documents at most "show[] that Mr. Penn was aware of competitor price information" on a handful of occasions. Doc. 932 at 10. A reasonable jury cannot convict on the mere basis of such knowledge—it is consistent with lawful behavior, meaning the jury *must* entertain reasonable doubt. In fact, evidence of this kind is not even enough to survive summary judgment and send civil price fixing allegations to a jury. Each email and text message involving Mr. Penn is an internal communication between Mr. Penn and colleagues at Pilgrim's Pride, and each reflects innocuous behavior by Mr. Penn. The documents reflect no instructions by Mr. Penn telling colleagues to take any suspicious actions, and they contain no agreement between Mr. Penn and a competitor to do anything, let alone to fix prices or rig bids. And the one document in the record that purportedly memorializes a conversation between Mr. Penn and an employee of a competitor reflects, at most, that the competitor possessed *incorrect* information about Pilgrim's Pride *after* Pilgrim's had already submitted its bid. It cannot support an inference of conspiracy.

At bottom, there is no evidence that Mr. Penn knowingly and intentionally agreed to join the charged conspiracy. Any other conclusion would require the jury to ignore the testimony of every witness who purportedly participated in that conspiracy. It would also need to make staggering inferential leaps and convict Mr. Penn on the basis of unexplained business documents that are consistent with lawful behavior. No rational jury could do so. The Court should grant Mr. Penn's motion for judgment of acquittal.

## LEGAL STANDARD

The Court must enter a judgment of acquittal when "the evidence is insufficient to sustain

a conviction." Fed. R. Crim. P. 29(a). Evidence is sufficient only when a "rational trier of fact"—viewing the evidence in the light "most favorable to the government"—"could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jones*, 44 F.3d 860, 864-66 (10th Cir. 1995) (reversing conspiracy conviction). No rational factfinder can convict based on a "mere modicum" of evidence, *Jackson v. Virginia*, 443 U.S. 307, 320 (1979) (quotation omitted), or evidence equally consistent with "both innocence and guilt," *United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir. 1971). Evidence that rests on "speculation and conjecture" is insufficient because no rational jury can convict based on "a guess or mere possibility." *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (quotation omitted).

Guilt is always "individual and personal in conspiracy cases—it is not a matter of mass application." *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984). And because the "core" of any conspiracy is an unlawful agreement, *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir. 1991), "it is therefore essential to determine what kind of agreement or understanding"—if any—"existed as to each defendant . . . determined individually from what was proved as to him," *United States v. Borelli*, 336 F.2d 376, 384-85 (2d Cir. 1964); *accord United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989). This requires proof that a defendant had both "knowledge of the anticipated consequences" of the conspiracy and the intent to effectuate the conspiracy's object. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20, 446 (1978). "Knowledge alone" or "mere association" with alleged conspirators is not enough. *United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985).

**ARGUMENT**

**I.       The Trial Testimony Demonstrated That Mr. Penn Did Not Conspire.**

The government called two "percipient" witnesses purportedly involved in the alleged conspiracy. Both disclaimed any involvement by Mr. Penn. The first, former Tyson employee Carl Pepper, testified that he did not know Mr. Penn and had never spoken to or communicated with him. Tr. 201:6-19 (Mar. 7, 2022).[1] When asked specifically who engaged in the alleged conspiratorial conduct, Mr. Pepper named several individuals, but not Mr. Penn. Tr. 244:2-245:4 (Mar. 2, 2022); Tr. 34:14-23, 38:8-17 (Mar. 3, 2022).

The other witness, Pilgrim's Pride employee Robert Bryant, unequivocally testified that he had no knowledge that Mr. Penn agreed to fix prices or rig bids. Tr. 145:1-7 (Mar. 9, 2022). Mr. Bryant also testified that he had no knowledge of Mr. Penn instructing others to fix prices or rig bids, and had no reason to believe Mr. Penn was aware of anyone else purportedly fixing prices or rigging bids. Tr. 145:8-16 (Mar. 9, 2022). Mr. Bryant explained that all of the specific pricing and bidding conduct to which he testified had nothing to do with Mr. Penn, since Mr. Penn was not involved in the relevant meetings, negotiations, strategy sessions, or telephone calls. Tr. 152:6-153:5, 160:21-161:10 (Mar. 9, 2022). And when asked who participated in the alleged conspiracy, Mr. Bryant named several individuals, but not Mr. Penn. Tr. 152:12-154:1 (Mar. 8, 2022). In fact, Mr. Bryant testified that another Pilgrim's Pride employee, Timothy Stiller, warned Mr. Bryant to be careful about what he put on his expense reports because they were temporarily being reviewed by Mr. Penn, who was known to ask a lot of questions. Tr.

---

[1] Mr. Penn's transcript citations are to the unofficial transcript because he does not yet have an official, certified transcript. To the extent the Court's recollection differs from the draft transcript, Mr. Penn defers to the Court's recollection.

174:5-175:6 (Mar. 9, 2022). The only other times Mr. Bryant mentioned Mr. Penn were to note that (i) Mr. Penn was one of up to thirty individuals in ordinary sales meetings attended by Mr. Bryant and (ii) some individuals were among the dozens of employees who reported to Mr. Penn—generally in response to the government's non-sequitur questions. Tr. 172:16-25, 177:16-23 (Mar. 8, 2022); Tr. 150:14-18, 151:1-152:5 (Mar. 9, 2022).

No other witnesses even remotely implicated Mr. Penn. *See, e.g.*, Tr. 126:2-11 (Mar. 2, 2022) (Pete Suerken (RSCS)) (recalling first time he met Mr. Penn); Tr. 93:9-14 (Mar. 8, 2022) (Sara Fisher (RSCS)) (stating she does not know and has never spoken to Mr. Penn); Tr. 95:8-13, 103:2-6, 186:22-188:7 (Mar. 10, 2022) (Joseph Brink (Fiesta Restaurant Group)) (stating he does not know Mr. Penn, has never spoken to him, and did not negotiate contracts with him); Tr. 101:24-102:11 (Mar. 14, 2022) (Robert Lewis (RSCS)) (stating he had no contact with Mr. Penn while Mr. Penn worked at Pilgrim's).

## II.    The Government's Toll Records Are Not Evidence of Conspiratorial Activity.

The government identified three telephone calls between Mr. Penn's phone number and the phone number of a competitor, one of which lasted zero seconds and went to voicemail while a second lasted only thirty seconds. GX10 at 2; *see* GX1231. It also identified one telephone call between Mr. Penn's phone number and the main public number of a competitor company, Mar-Jac Poultry. GX9672. There is no evidence linking those calls to any alleged pricing or bidding actions at any time. And the mere fact of a telephone call does not rationally suggest Mr. Penn knowingly and intentionally agreed to join the charged conspiracy. *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938-39 (7th Cir. 2018) (mere fact of competitor calls insufficient to send case to jury when companies had other potential reasons for contact).

In fact, the only document arguably memorializing any of these calls is a single page of handwritten notes purportedly written by Pete Martin of Mar-Jac. It states the author "[t]alked to Jason [sic] Penn" in August 2014, followed by figures. GX1030. Taken in the light most favorable to the government, the document suggests at most that Mr. Penn and Mr. Martin spoke *after* Pilgrim's submitted its initial bid to RSCS (*see* GX1104), and that Mr. Martin recorded information that did not match Pilgrim's bid. *Compare* GX1105 (Pilgrim's August 20, 2014, bid reflected margin increase of +.10 and total cost increase of +17.86) *with* GX1030 (listing figures "+8 cost +11 margin"). Moreover, the only testimony about the notes is that they related to "an order for corn and soy[bean] meal." Tr. 182:6-8, 15-19 (Feb. 24, 2022). In short, this evidence is consistent with legitimate business activity and cannot sustain a conviction. *Kleen*, 910 F.3d at 938; *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986) (no inference of conspiracy if "conduct is consistent with other, equally plausible explanations").

## III.    The Government's Case Against Mr. Penn Rests on Ordinary Business Communications That Cannot Sustain a Conviction.

The government's case against Mr. Penn rests exclusively on a handful of ordinary business communications. The government introduced almost all of those documents without witness testimony, leaving the jury with nothing but "speculation and conjecture" about their meaning and Mr. Penn's purported connection to any conspiracy. *Rufai*, 732 F.3d at 1188. There is no "clear and unequivocal" evidence demonstrating Mr. Penn "personal[ly] and individual[ly]" conspired. *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992) (quotation omitted).

***Sporadic Awareness of Competitor Actions***. Even when considered in the light most favorable to the government, the business documents at most "show[] that Mr. Penn was aware of competitor price information" on a few occasions. Doc. 932 at 10. But awareness of a

competitor's prices is not illegal. Indeed, the "mere possession" of competitors' pricing information—including advance pricing information—is not "evidence of concerted action to fix prices." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999). "Gathering competitors' price information can be consistent with independent competitor behavior," *id*. at 117, 126 (such evidence is "sorely lacking"), which renders "*impermissible*" any inferences that Mr. Penn agreed to conspire on the basis of that sporadic pricing knowledge, *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179-80 (10th Cir. 2019) (emphasis added); *see Matsushita*, 475 U.S. at 596. In the civil context, this kind of evidence would not even survive summary judgment. *See, e.g.*, *In re Baby Food*, 166 F.3d at 126 (collecting cases); *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 802-03 (M.D. Pa. 2014).

The Court previously identified four instances in which Mr. Penn purportedly was aware of competitor actions. Doc. 932 at 9-10. Taken individually or collectively, a rational jury could not convict Mr. Penn based on that evidence. First, in August 2012, Brenda Ray, a Pilgrim's Pride employee, sent an email to several colleagues, including Mr. Penn, summarizing a conversation she supposedly had with a "friendly competitor," noting that it was "all over the market that Pilgrim's is taking contract pricing up." GX3037. That individual thanked Ms. Ray "for taking the lead" and said his company was "following." *Id*. Ms. Ray's uncontroverted testimony makes clear that the email referred to a call she received from Greg Nelson at George's, and that the exchange related to "[t]he northeast halal market," something *unrelated* to the charged conspiracy or its alleged "episodes." Frist Trial Tr. 4348:9-20 (Dec. 6, 2021). Ms. Ray went on to explain that the conversation was not part of an agreement to fix prices or rig bids. First Trial Tr. 4349:4-21 (Dec. 6, 2021). The fact that a competitor decided to follow

Pilgrim's already-announced actions is not an indication of an agreement, much less that Mr. Penn personally conspired. *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.) ("One does not need an agreement to bring about [a] kind of follow-the-leader effect in a concentrated industry.").

While Mr. Penn forwarded the email to Jason McGuire and wrote, "FYI. Do not fwd. not exactly a legal conversation," GX3037, there is no evidence that Mr. Penn directed Ms. Ray to take any act, approved of Ms. Ray's actions, or had any other knowledge of or involvement in the matter. The jury would have to speculate on each. And it is black letter law that neither Mr. Penn's "mere association with" someone who engaged in a purportedly "illegal" conversation nor his "knowledge" of that conduct "is enough to convict him of conspiracy. The evidence must also show that [Mr. Penn] knowingly joined" the charged conspiracy. *Kendall*, 766 F.2d at 1432 (citation omitted); *see United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991) (not a conspirator "merely by associating with conspirators known to be involved in crime").

Second, over a month *after* negotiations had concluded for 2013 contract pricing with United Food Purchasing Co-op—a purchaser for KFC—Roger Austin, a colleague at Pilgrim's, sent Mr. Penn unsolicited and unattributed pricing information about Case Farms, to which Mr. Penn responded, "Figured they would be lower due to their need to gain access. What about rest of players?" GX1722. It is clear from this exchange that Mr. Penn knew nothing about his competitors' positions at the time of Pilgrim's bid weeks earlier. *Id*. And the fact that Mr. Penn expressed interest in what prices other competitors had *already* negotiated over a month prior is among the most basic of business behaviors—factfinders should, "without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing." *In re Text*

*Messaging Antitrust Litig.*, 782 F.3d 867, 875, 879 (7th Cir. 2015) ("Competitors in concentrated markets watch each other like hawks").

Third, in August 2014, Mr. Penn had a conversation with Jason McGuire, a colleague at Pilgrim's, during which Mr. Penn wrote that "a few owners of small bird companies thank[ed] us via me for getting our act together." DX E-873, DX E-874 (original email and attachment), GX1056 (remainder of email chain). To read conspiratorial meaning into the statement would require the jury to infer the unidentified competitors were conspirators, that Pilgrim's got its "act together" pursuant to an agreement, that getting its "act together" had something to do with prices or bids, that those prices or bids were fixed, and that Mr. Penn was involved in the unidentified action in some unidentified way. No evidence supports this staggering set of inferential leaps. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inference upon inference.").

Finally, in August 2014, Mr. McGuire sent Mr. Penn a potential "range" of competitors' offers to KFC, to which Mr. Penn responded, "Will review with Bill in am. Will advise." GX1074, GX9744, GX1058 (all same email thread).[2] The source of the information is unattributed and the record nowhere suggests that Mr. Penn was aware of its provenance, requested it, instructed anyone to gather it, or took any subsequent action, much less reached an agreement with a competitor about prices. The possession and consideration of a competitor's pricing, moreover, is both lawful and "sorely lacking" as evidence of a conspiratorial agreement. *In re Baby Food*, 166 F.3d at 117, 126; *see In re Text Messaging*, 782 F.3d at 875, 879; *United*

---

[2] Mr. McGuire's suggestion that Pilgrim's be a "leader" on pricing (GX1074) is consistent with independent conduct, and does not suggest Mr. Penn conspired. *Clamp-All*, 851 F.2d at 484.

*States v. Rahseparian*, 231 F.3d 1257, 1262-63 (10th Cir. 2000) ("evidence [that] raises no more than a mere suspicion of guilt" cannot support conviction (quotation omitted)).

What is more, witnesses testified that suppliers received pricing information from a variety of innocuous sources, including the customers themselves. Michael Ledford, the lead purchaser for KFC's purchasing cooperative, explained that he regularly shared competitor pricing out to four decimal places during bidding and negotiation processes and would provide feedback by discussing specific bids. Tr. 225:4-9 (Feb. 28, 2022); Tr. 8:3-19 (Mar. 1, 2022); *see also* Tr. 126:3-127:5, 129:9-17 (Mar. 10, 2022) (similar for Joseph Brink (Fiesta Restaurant Group)); Tr. 70:6-14 (Mar. 14, 2022) (similar for Robert Lewis (RSCS)); GX1544 (Mr. Penn receiving report of Mr. Ledford's detailed feedback about competitor pricing, with Mr. Austin advocating for *lower* prices to be *more* competitive); GX1051 (Mr. Penn receiving feedback about negotiations in which customers discussed "[o]ther suppliers"); GX1247 (same).[3]

***Other Documentary Evidence.*** The balance of the documentary evidence involving Mr. Penn is similarly consistent with lawful conduct. No rational jury could find Mr. Penn guilty beyond a reasonable doubt by relying on it.

1. In the context of negotiations with KFC in 2012, Mr. Penn asked three Pilgrim's Pride colleagues, "Do we have TSN price idea?" GX1547. Notably, Mr. Penn did not instruct his colleagues to contact any Tyson employees, to offer a price consistent with Tyson, or to submit a bid aligned with Tyson's. Equally important, Roger Austin understood Mr. Penn's request

---

[3] *See also* GX1522, GX1523 (receiving and forwarding a spreadsheet showing impact on revenue of recommendation to lower price to be more competitive in light of competitors); GX1035 (Mr. Penn receiving spreadsheet that referenced unattributed information about competitors), GX1036, GX1036-1 (spreadsheet).

simply to be one for market information, as he responded to Mr. Penn's question by stating, "I can give you an educated guess" of ".96 flat." DX E-570. As the record reflects, that "educated guess" was *wrong*. At that time, Tyson's bid was 0.9876, DX G-605, DX G-606, undermining any suggestion that Mr. Penn (or his colleagues) contacted Tyson, possessed sensitive information, or knowingly and intentionally agreed to conspire.

2. Mr. Penn made two off-hand references to the "legality" of *other individuals*' actions, neither of which demonstrates that he knowingly and intentionally conspired. First, in a text message conversation between Mr. Penn and his colleague, Timothy Stiller, GX433-GX447, Mr. Stiller explained to Mr. Penn the state of a specific negotiation, the customer's feedback about competitor pricing, and the fact that Roger Austin and Scott Tucker were negotiating on behalf of Pilgrim's Pride. GX433-437. In that back and forth, Mr. Stiller said, "[t]hey are listening to my direction," GX439, to which Mr. Penn asked, "Who is they?" and "[i]f they is illegal don't tell me," GX440, GX441. Mr. Stiller clarified that Pilgrim's negotiators were listening to Mr. Stiller. GX442. That quick clarification on its face demonstrates that there was nothing illegal afoot—just a misunderstanding.

Mr. Penn's expressed desire not to know about potentially "illegal" conduct—even if taken at face value—is not proof that he engaged in any such conduct himself, and it cannot stand in for proof that he knowingly and intentionally conspired. *See United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995) ("[I]t is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists."). Sherman Act liability attaches only if the defendant had both a "meeting of the minds," i.e., "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465

U.S. 752, 764 (1984) (quotation omitted), and the intent to effectuate the unlawful purposes of the conspiracy, *Gypsum*, 438 U.S. at 443 n.20. Neither is established by these documents.

Second, Mr. Penn made a statement to his boss, William Lovette, that a competitor "was not listening to [Mr. Lovette's] illegal spiel on forward pricing" during remarks at the National Chicken Council, a trade association. GX3025. Even if read literally, Mr. Penn's statement would only describe another individual's public signaling, a theory of liability the Court excluded as unduly prejudicial. Doc. 603 at 5-6. The fact that Mr. Penn also mentions unattributed information about a competitor's *already-submitted* bid is not proof that Mr. Penn knowingly and intentionally conspired. The competitor's price was very different from Pilgrim's price, the possession of competitor information is not indicative of conspiracy, and the jury would, in any event, have to engage in improper speculation to attribute the information to any discussion between Mr. Penn and a competitor, let alone to an unlawful agreement. The record is clear that customers often shared exact pricing information of one supplier with another supplier, especially when, as in this instance, the competing supplier's price was lower. *Supra* at 10.

3. The remainder of the evidence purportedly involving Mr. Penn reflects facially innocuous business behavior or no action by Mr. Penn at all. The government, for instance, introduced an October 2014 text message from Mr. Penn to Mr. McGuire recounting Mr. Penn's statements at a board meeting where he praised Mr. McGuire for "leading the industry to higher '15 prices in FFS and $75M higher YoY pricing." GX940. Praising a colleague to the board of directors is not indicative of a conspiracy or of Mr. Penn's knowing and intentional agreement to join it. In fact, the record is replete with evidence that the 2015 price increases were the result of market dynamics. *See, e.g.*, Tr. 31:24-32:4, 83:13-84:1, 85:1-17, 89:1-4, 112:9-23, 119:3-12

(Mar. 2, 2022) (Pete Suerken (RSCS)); Tr. 130:22-131:6 (Mar. 10, 2022) (Joseph Brink (Fiesta Restaurant Group)); Tr. 15:25-16:13, 36:7-37:16, 39:4-25, 57:13-60:10 (Mar. 14, 2022) (Robert Lewis (RSCS)). And the fact that Mr. Penn praised a colleague for achieving higher prices is consistent with normal business behavior. *Driessen v. Royal Bank Int'l*, 2015 WL 1245575, at *3 (D. Conn. Mar. 18, 2015) ("setting one's own profit-maximizing price is entirely lawful under the antitrust laws" (quotation omitted)).

Every other document on which Mr. Penn appears indicates that he generally sought to make money for Pilgrim's and to compete vigorously, neither of which suggests he conspired. *See* GX449-51, GX9707-09, GX9711-13 (internal text exchange discussing setting a customer's price by giving them "*market price* plus the special A-Hole Premium" in light of "Brand Promise" (emphasis added)); GX448 (update about customer negotiations); GX542 (Pilgrim's employees noting Mr. Penn approved prices); GX1864 (text exchange regarding internal discussions about customer); GX2000 (discussing public financial analyst report about Tyson and the need for Pilgrim's to monitor competitors to learn from "successful" strategies); GX2001 (refusing to cover competitor short); GX2002 (same); GX2005 (same).

* * * * *

Taken together, these documents underscore the central failure in the government's prosecution of Mr. Penn. It spent weeks presenting a case to the jury in which no witness suggested Mr. Penn did anything wrong, and the "insiders" to the alleged conspiracy affirmatively disclaimed any connection to or involvement by him. The jury is left to hunt and peck for evidence about Mr. Penn in the hundreds of ordinary and unexplained business documents the government threw into the record without a sponsoring witness, and then to guess

at their meaning. Yet each of the handful of documents on which Mr. Penn appears is consistent with lawful business behavior; not one reflects an agreement or Mr. Penn's knowing joinder of a conspiracy. When "evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury *must* necessarily entertain a reasonable doubt," which means "no rational trier of fact could [find] that the evidence the Government presented" is sufficient to convict. *United States v. Glenn*, 312 F.3d 58, 60, 70 (2d Cir. 2002) (reversing conviction after district court denied Rule 29 motion) (quotation omitted); *see Ortiz*, 445 F.2d at 1103 (rational jury cannot convict "based upon evidence which is consistent with both innocence and guilt"); *United States v. Jones*, 393 F.3d 107, 111-12 (2d Cir. 2004) (reversing conspiracy conviction after denial of Rule 29 motion because evidence did not show defendants "engaged in purposeful behavior tending to connect" them to conspiracy (quotation omitted)). Indeed, to convict Mr. Penn, a jury would have to make a series of staggering inferences at odds with the testimony and inconsistent with the law. *Direct Sales*, 319 U.S. at 711 The business documents involving Mr. Penn cannot sustain a conviction.

## IV.     The Government's "Summary" Exhibits Cannot Sustain a Conviction.

The government tries to paper over its failure of proof with "summary" exhibits.[4] It groups (and highlights in red) the handful of innocuous and unexplained business documents involving Mr. Penn with evidence about other individuals in an effort to induce the jury into finding meaning, relationships, and connections not otherwise proved against Mr. Penn. But there is no evidence that Mr. Penn had knowledge of or involvement in any of those other

---

[4] The government mentions Mr. Penn in "summaries" GX4, GX10, GX11, GX16, and GX19.

actions. *See* Tr. 76:13-24 (Mar. 10, 2022) ("summaries" are not themselves evidence). In fact, the government's reliance on the "summaries" underscores the Tenth Circuit's concern that when the government "bring[s] many individuals under the umbrella of a single conspiracy" there is "potential for abuse" by using evidence about "other alleged coconspirators" to keep the jury from "differentiat[ing] among particular defendants." *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). Yet a rational jury can only convict based on "clear and unequivocal" evidence that Mr. Penn's "personal and individual conduct" violated the law. *Morehead*, 959 F.2d at 1500 (quotation omitted); *see Borelli*, 336 F.2d at 385. The record against Mr. Penn cannot sustain a conviction—there is no evidence that he knew of any conspiracy, was aware of its objectives, intentionally sought to effectuate them, or agreed to any price fixing or bid rigging.

## CONCLUSION

The government fell far short of proving beyond a reasonable doubt that Mr. Penn knowingly and intentionally conspired. *All* of the trial testimony indicated Mr. Penn did not collude. *Every* document involving Mr. Penn is consistent with ordinary business activity by him. Considered as a whole and in the light most favorable to the government, no rational jury could convict Mr. Penn based on the record against him. The Court should grant Mr. Penn's motion for judgment of acquittal.

Dated: March 21, 2022                                 Respectfully submitted,

                                                                  s/ Michael F. Tubach
                                                            Michael F. Tubach
                                                            O'MELVENY & MYERS LLP
                                                            Attorney for Jayson Jeffrey Penn
                                                            Two Embarcadero Center, 28th Floor
                                                            San Francisco, California 94111-3823
                                                            (415) 984-8700
                                                            mtubach@omm.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all listed parties.

Dated: March 21, 2022

*s/ Michael F. Tubach*

Michael F. Tubach