IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.   JAYSON JEFFREY PENN,
2.   MIKELL REEVE FRIES,
3.   SCOTT JAMES BRADY,
4.   ROGER BORN AUSTIN, and
5.   WILLIAM WADE LOVETTE,

      Defendants.

No. 20-cr-00152-PAB

**JAYSON PENN'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**

The government has now tried this case twice. It has called scores of witnesses, introduced hundreds of exhibits, and spent months trying to prove a conspiracy to rig bids and fix prices. Yet it has failed to secure a single conviction of any Defendant. With respect to Mr. Penn, the government's failure of proof is particularly stark. Both so-called "insiders" to the charged conspiracy disclaimed any participation by Mr. Penn. No other witness even remotely implicated Mr. Penn in illegal conduct. And not one witness suggested that any of the so-called "key evidence" against Mr. Penn—two phone calls and a handful of emails and text messages between Mr. Penn and his colleagues at Pilgrim's Pride—had anything to do with a conspiracy to rig bids and fix prices. What is more, one-third of the government's purported "key" documents against Mr. Penn have nothing to do with him—he was not a recipient of and is not mentioned in the documents. Another is not even in evidence. The rest are ordinary business communications consistent with lawful activity, which means a jury *must* entertain reasonable doubt as to Mr. Penn. Indeed, when viewed in the light most favorable to the government, these documents at

1

most "show[] that Mr. Penn was aware of competitor price information" on a handful of occasions (Doc. 932), which is perfectly lawful.

As two juries have now demonstrated, no rational jury could find beyond a reasonable doubt that Mr. Penn knowingly and intentionally agreed to rig bids and fix prices on the basis of this evidence. Even when considered in the light most favorable to the government, the *only* evidence in the record is that Mr. Penn competed aggressively and acted consistent with Pilgrim's independent business interests. For the reasons discussed in Mr. Penn's Motion for Judgment of Acquittal (Doc. 1214) and supplemented in this motion, the Court should enter a judgment of acquittal for Mr. Penn.

## LEGAL STANDARD

Mr. Penn moved for judgment of acquittal at the close of the government's case. Doc. 1214. Following the close of all evidence, Mr. Penn renewed his motion and the Court ruled that Defendants could file supplemental motions. Tr. 91:23-92:1, 92:11-13 (Mar. 22, 2022).[1] When evaluating a motion for judgment of acquittal after the close of evidence, courts consider all of the evidence adduced at trial. Doc. 932 at 2-3 (citing *United States v. Khanu*, 675 F. Supp. 2d 55, 61 (D.D.C. 2009) (when a defendant renews a Rule 29 motion, there are two decisions before the court—an original Rule 29 motion and the renewed Rule 29 motion)). The standard for granting a judgment of acquittal remains the same. *United States v. Isabella*, 918 F.3d 816, 824-25, 830 (10th Cir. 2019) (evaluating a renewed motion under the same Rule 29 standard); *see* Doc. 1214 at 2-3 (setting out the legal standards under Rule 29). A judgment of acquittal entered after a

---

[1] Mr. Penn's transcript citations are to the unofficial transcript because he does not yet have an official, certified transcript. To the extent the Court's recollection differs from the draft transcript, Mr. Penn defers to the Court's recollection.

mistrial is not appealable. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 575 (1977).

## ARGUMENT

I.  **The Government's So-Called "Key Evidence" Fails to Show Mr. Penn Knowingly and Intentionally Conspired.**

In its closing argument, the government laid bare its failure of proof against Mr. Penn. In a graphic shown to the jury, the government claimed to consolidate in one place the so-called "key evidence" demonstrating that Mr. Penn purportedly participated in the charged conspiracy. Tr. 172:15-173:9 (Mar. 22, 2022). But that "key evidence" makes only one thing clear: there is no proof from which a rational jury could find beyond a reasonable doubt that Mr. Penn knowingly and intentionally agreed to join the charged conspiracy.

***Documents Not in the Record***. To start, one of the "key" documents to which the government directed the jury (in bold and underlined) is not even in evidence. *See* GX 1256. A jury cannot convict a defendant based on information outside the record. *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966) (requiring "that the jury's verdict be based on evidence received in open court"); *United States v. Ellzey*, 936 F.2d 492, 498 (10th Cir. 1991) (prosecutor erred by referring to "evidence not in the record"); Doc. 1232 at 6 (Jury Instruction No. 5: "You must make your decision based only on the evidence that you saw and heard here in court.").

***Documents Unrelated to Mr. Penn***. Roughly one-third of the remaining "key" documents do not mention or involve Mr. Penn. *See* GX 1066, GX 1238, GX 1538, GX 1539, GX 1546, GX 1850-1854, GX 1856, GX 1862. Because guilt is always "individual and personal in conspiracy cases," *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984), such documents tell the jury nothing about "what kind of agreement or understanding"—if any— "existed as to [Mr. Penn] determined individually from what was proved as to him," *United*

3

*States v. Borelli*, 336 F.2d 376, 384-85 (2d Cir. 1964); *accord United States v. Record*, 873 F.2d 1363, 1368 (10th Cir. 1989). Nor do they not constitute proof from which a jury could find Mr. Penn had "knowledge of the anticipated consequences" of the charged conspiracy or the intent to effectuate its object. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 443 n.20, 446 (1978).

***Remaining Documents***. The balance of the government's so-called "key evidence"—ordinary business documents that mention Mr. Penn—is addressed in detail in Mr. Penn's Motion for Judgment of Acquittal. Doc. 1214 at 4-15. Mr. Penn incorporates those arguments, but addresses the "key" documents here to the extent the government made arguments about (or Defendants adduced evidence relevant to) that evidence after the close of the government's case-in-chief. Taken together and in the light most favorable to the government, no rational jury could find beyond a reasonable doubt that Mr. Penn entered into a conspiracy to rig bids and fix prices.

1. The government's principal argument about the "key evidence" against Mr. Penn is that it shows his colleagues sometimes "reported up" competitor intelligence. *See, e.g.*, Tr. 185:2-11, 203:25-204:15, 219:11-23, 230:3-9, 231:9-19, 232:6-24 (Mar. 22, 2022) (discussing GX 1035, GX 1036, GX 1058, GX 1074, GX 1522, GX 1523; GX 1544, GX 1864). As the Court explained after the first trial, this at most "shows that Mr. Penn was aware of competitor price information" on a handful of occasions. Doc. 932 at 10. In many cases, the relevant information came from customers or clearly related to historical information. *See* GX 1544 (Mr. Penn receiving report of Mr. Ledford's (RSCS) detailed feedback about competitor pricing, with Mr. Austin advocating for *lower* prices to be *more* competitive); GX 1051 (Mr. Penn receiving feedback about negotiations in which RSCS discussed "[o]ther suppliers"); GX 1722 (unsolicited communication from Mr. Austin to Mr. Penn with competitor intelligence over one month *after*

4

KFC negotiations had concluded for 2013).

But even if that pricing information came from competitors, awareness and consideration of competitor prices is not illegal and a case premised on such evidence would not even survive summary judgment in the civil context. Doc. 1214 at 6-14 (collecting authority and discussing exhibits); Doc. 1232 at 26 (Instruction No. 21: "It is not unlawful for competitors to meet and exchange information necessary to preparation of a bid or discuss common aims or objectives or exchange information on independently derived prices. . . . It is not illegal for a competitor to obtain, rely upon, and act on pricing and other information received from competitors . . . .").

Indeed, the "mere possession" of competitors' pricing information—including advance pricing information—is "sorely lacking" as a basis to bring an antitrust claim because it is not "evidence of concerted action to fix prices." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117, 125 (3d Cir. 1999). "Gathering competitors' price information can be consistent with independent competitor behavior," *id*. at 126, which renders "*impermissible*" any inferences that Mr. Penn agreed to conspire, *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1179-80 (10th Cir. 2019) (emphasis added). And when "evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury *must* necessarily entertain a reasonable doubt," which means "no rational trier of fact could [find] that the evidence the Government presented" is sufficient to convict. *United States v. Glenn*, 312 F.3d 58, 60, 70 (2d Cir. 2002) (reversing conviction after district court denied Rule 29 motion) (quotation omitted); *see United States v. Ortiz*, 445 F.2d 1100, 1103 (10th Cir. 1971) (rational jury cannot convict "based upon evidence which is consistent with both innocence and guilt").

2. The government also claims that some of the "key evidence" purportedly demonstrates an abstract and unexplained "state of mind." *See* Tr. 221:10-25, 222:2-223:2, 231:20-21 (Mar. 22, 2022) (discussing GX 433-GX 447, GX 3037). But the Sherman Act requires a "meeting of the minds," i.e., a "conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotation omitted), along with an intent to effectuate the unlawful purposes of the conspiracy, *Gypsum*, 438 U.S. at 443 n.20. The mere fact that Mr. Penn uttered the word "illegal" in reference to *other individuals'* actions does not mean he had a meeting of the minds with anyone, much less that he knowingly and intentionally joined the charged conspiracy. *United States v. Kendall*, 766 F.2d 1426, 1432 (10th Cir. 1985) ("knowledge" of another's unlawful conduct "is not enough to convict [a defendant] of conspiracy. The evidence must also show that he knowingly joined" that conspiracy (citation omitted)).

In fact, Mr. Penn's confusion and ignorance about the existence of any "illegal" conduct—as made plain on the face of GX 433-GX 447—makes it "logically impossible" for him to "intend and agree to join a conspiracy if he does not know that it exists." *United States v. Scotti*, 47 F.3d 1237, 1243 (2d Cir. 1995); *see* Doc. 1214 at 11-12 (discussing exhibit). And the uncontroverted testimony from Brenda Ray made clear that the exchange in GX 3037 referred to a call she received from Greg Nelson at George's about "halal meat in the northeast," a product the government has never claimed was part of the charged conspiracy. Tr. 158:6-159:4 (Mar. 21, 2022). Ms. Ray further explained that the conversation was not part of an agreement to rig bids and fix prices, and that Mr. Penn had nothing to do with the subject of the conversation. Tr. 159:2-160:3, 160:7-11 (Mar. 21, 2022); *see* Doc. 1214 at 7-8 (discussing exhibit).

In fact, the *only* evidence that actually speaks to Mr. Penn's state of mind throughout the alleged conspiracy period makes clear that he was a cut-throat competitor who made decisions in Pilgrim's independent interests. Mr. Penn "wanted to be the best, provide the best, be able to support the customer with the best" because he "had a competitive spirit." Tr. 172:6-9 (Mar. 21, 2022). Among other things, this meant he (i) refused to cover competitor shorts, GX 2001, GX 2005, GX 2002 ("We are straight up taking Otis to AA . . . no bailout for you."); Tr. 171:20-173:7 (Mar. 9, 2022) ("Otis" principle meant to "get all of the customer's business" from a competitor); (ii) kept his "[f]oot on the throat" of competitors to ensure Pilgrim's was the "best in our industry," DX D-240; (iii) hated the competition, DX F-459 ("I hate Tyson but I hate Sanderson [Farms] more!!"), (iv) sought out "successful" business strategies to undermine competitor advantages, GX 2000 (discussing public financial analyst report about Tyson and the need for Pilgrim's to monitor competitors to learn from "successful" strategies); and (v) charged prices based on Pilgrim's independent assessment of the relevant customer, GX 449-GX 451 (internal text exchange discussing setting a customer's price by giving them "*market* price plus the special A-Hole Premium" in light of "Brand Promise" (emphasis added)); *see also* GX 448 (receiving unsolicited update about same customer's negotiations).

3. Finally, the government argued that the jury could convict Mr. Penn because he purportedly shared Pilgrim's "bids and negotiating strategies" on a single occasion. Tr. 38:13-19 (Mar. 24, 2022) (discussing GX 1030). Even taken in the light most favorable to the government, the predicate claim that Mr. Penn shared Pilgrim's bids and negotiating strategies with a competitor is demonstrably false. The record reflects that Mr. Penn and Mr. Martin spoke on the phone *after* Pilgrim's submitted its bid to RSCS (GX 1104) and after Pilgrim's had already told

7

RSCS that it would not reduce its bid. RSCS then accepted those exact terms (GX 1126). The information recorded in Mr. Martin's purported handwriting did not match Pilgrim's bid or Pilgrim's RSCS contract. *Compare* GX 1105 (Pilgrim's August 20, 2014, bid reflected margin increase of +.10 and total cost increase of +17.86) *and* GX 1126 (RSCS contract with same figures) *with* GX 1030 (listing figures "+8 cost +11 margin" and "$433"). What is more, the only testimony about the notes, from government witness Flo Becker, is that they reflect "an order for corn and soy[bean] meal," not bid submissions. Tr. 182:6-8, 15-19 (Feb. 24, 2022); *see* DX J-234 ("price of soybean meal futures at close of the market on August 28, 2014 was $433.20."). There is no "clear and unequivocal" evidence of "personal and individual conduct" by Mr. Penn that would allow a rational jury to find beyond a reasonable doubt that he knowingly and intentionally conspired. *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992).

**II.     The Remaining Evidence Could Not Support a Conviction.**

None of the other evidence in the record would allow the jury to find beyond a reasonable doubt that Mr. Penn knowingly and intentionally conspired. First, both of the purported conspiracy "insiders" disclaimed any involvement by Mr. Penn. Doc. 1214 at 4-5. When asked who participated in the alleged conspiratorial conduct, they named several individuals, but never Mr. Penn. *Id*. No other witness even remotely implicated Mr. Penn in any unlawful conduct. *See id*. at 5. Yet the government continues to prosecute Mr. Penn while dismissing with prejudice most of the individuals the conspiracy "insiders" actually identified as purported conspirators. The government's approach is confounding and underscores the troubling, ends-driven nature of this prosecution—namely, trying to convict senior executives at any cost. *Cf. Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (government interest "in a criminal prosecution is not that it shall win a

8

case, but that justice shall be done" (quotation omitted)); *Douglas v. Workman*, 560 F.3d 1156, 1194 (10th Cir. 2009) ("The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall." (quotation omitted)).

Second, the government's toll records—which reflect two phone calls between Mr. Penn's phone number and competitor companies over the course of eight years—are not evidence that Mr. Penn knowingly and intentionally joined the charged conspiracy. Doc. 1214 at 5-6. The first call is discussed above. *Supra* at 7-8 (discussing GX 1030). The government argued in closing that the second call, between Mr. Penn and Brian Roberts of Tyson on August 15, 2014, must have been conspiratorial because Pilgrim's increased the margin in its internal KFC cost model to 12 cents the following day. Tr. 35:15-36:19 (Mar. 24, 2022). But there is no evidence that the call related to KFC negotiations—indeed, the government dismissed the case against Mr. Roberts with prejudice—and the evidence shows that Pilgrim's actually settled on a proposed margin of 10 cents. DX D-152; DX D-154. While the evidence must be viewed in the light most favorable to the government, that does not mean a conspiracy can "be made out by piling inference upon inference," *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943), or that a rational jury can indulge the government's rank "speculation and conjecture," *United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013).

Third, the other documents involving Mr. Penn and not included among the government's so-called "key evidence" do not demonstrate any conspiratorial activity. As one example, the government offered GX 3025. In it, Mr. Penn sent an email to his boss, William Lovette, and stated that a competitor "was not listening to [Mr. Lovette's] illegal spiel on forward pricing" during remarks at a conference for the National Chicken Council (NCC), a trade association. GX

9

3025. The uncontroverted testimony of Mike Brown, president of the NCC, made clear that the statement was a joke. Mr. Brown testified that (i) Mr. Lovette did not write the referenced remarks, Tr. 167:1-168:20 (Mar. 16, 2022); (ii) many individuals from NCC vetted the remarks, including its general counsel, Tr. 168:11-20, 169:1-14 (Mar. 16, 2022); (iii) Mr. Lovette said nothing that could be construed as an attempt to fix prices, Tr. 175:19-176:4 (Mar. 16, 2022); and (iv) Mr. Penn did not even attend the conference, Tr. 195:17-196:8 (Mar. 16, 2022). No reasonable jury could infer that Mr. Penn knowingly and intentionally joined a conspiracy based on GX 3025.

Similarly, the government offered GX 940, an October 2014 text message from Mr. Penn to Mr. McGuire recounting Mr. Penn's statements at a board meeting where he praised Mr. McGuire for "leading the industry to higher '15 prices in FFS and $75M higher YoY pricing." GX 940. The government claims this statement signifies conspiracy. Tr. 214:1-12 (Mar. 22, 2022). But praising a colleague to the board of directors for making money is not indicative of a conspiracy or of Mr. Penn's knowing and intentional agreement to join it; it is entirely consistent with Pilgrim's independent business strategy to be a price leader. *See* Doc. 1214 at 12-13 (collecting citations). And the record is replete with evidence that the 2015 price increases reflected market dynamics. *Id.*; Tr. 105:22-106:18 (Mar. 15, 2022) (Richard Eddington (RSCS)); Tr. 13:5-12 (Mar. 21, 2022) (Professor Edward Snyder). Evidence consistent with legal conduct cannot support a conviction. *See supra* at 5-6.

Finally, the government's "summary" exhibits are not independent proof of anything. *See* Doc. 1214 at 14-15. The government nevertheless listed them as "key evidence," and specifically claimed GX 12, GX 14, and GX 15 are evidence against Mr. Penn, even though his name

appears nowhere on those exhibits. As discussed in Mr. Penn's Motion for Judgment of Acquittal, these tactics underscore the potential for abuse in the government's case. Doc. 1214 at 14-15.

**III.    No Rational Jury Could Find the Charged Conspiracy Existed.**

The government's case fails for a separate and independent reason: no rational jury could find beyond a reasonable doubt that the charged conspiracy existed. In fact, no reasonable jury could even discern the government's theory of the purported agreement, which has repeatedly shifted and conflicted with itself. In its opening, the government claimed that "the defendants conspired for years to raise the price of chicken to [their] customers," and took their prices up "from here to here together." Tr. 129:15-17, 137:18-19 (Feb. 23, 2022). In its closing, the government changed course and argued that "[t]he specific numbers are not the crime," and in fact suppliers agreed to set different prices because it "would be obvious to the customer if you fixed prices to the exact same price." Tr. 175:7-12 (Mar. 22, 2022). In its rebuttal closing, the government changed course yet again, arguing that "defendants decided to increase their prices by 19 cents" and that Mr. Roberts was the "ring leader in the conspiracy." Tr. 36:17-18, 39:14-15 (Mar. 24, 2022). Within a week of that claim, the government had dismissed the case against Mr. Roberts with prejudice. Doc. 1238. As for witnesses, one of the so-called conspiracy "insiders" claimed a vague "understanding" that suppliers "were going to do a substantial pricing increase," Tr. 141:17-19, 143:1-11 (Mar. 7, 2022), while another claimed there was an effort to limit price decreases, Tr. 21:3-5 (Mar. 9, 2022).

This "ever-shifting theory on a crucial element of the case"—i.e., to what Defendants purportedly agreed—requires a judgment of acquittal because it "transcend[s] flexibility in proof

or the particulars of how a defendant effected the crime and instead amounted to a changed essence of the crime." *United States v. Davis*, 2017 WL 3328240, at *29-35 (S.D.N.Y. Aug. 3, 2017) (granting Rule 29 motion); *Borelli*, 336 F.2d at 384-85 (must prove "what kind of agreement" existed as to each defendant). Indeed, the government's shifting theories and flailing approach to the central element of this case underscore its failure to prove beyond a reasonable doubt the eight-year conspiracy charged in the superseding indictment. "Having chosen to allege that [Mr. Penn] joined a single large conspiracy, that is what the government obligated itself to prove." *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). Because the government "fails to prove the conspiracy as charged," it cannot "obtain a conviction" against Mr. Penn. *Id*. at 674 & n.13 (reversing conviction); *United States v. Carnagie*, 533 F.3d 1231, 1239 (10th Cir. 2008) (government must prove defendant "agreed to participate in a conspiracy of the magnitude alleged in the indictment—not just that they knowingly agreed to participate in a conspiracy").

Whatever the government's theory, a reasonable jury could not rely on the testimony of the so-called "insiders" to find beyond a reasonable doubt that the charged conspiracy existed. Robert Bryant testified about a purported "agreement" related to KFC negotiations in 2014 and 2017. The Court sustained Defendants' objection that Mr. Bryant's testimony of an agreement in 2014 amounted to an opinion that was unsupported by facts or personal observations. Tr. 237:17-238:14 (Mar. 8, 2022). It struck that testimony and instructed the jury to disregard Mr. Bryant's "opinion that there was an agreement to raise prices in 2014." Tr. 239:20-24 (Mar. 8, 2022). Mr. Bryant's claim that suppliers would not compete against each other for volume was also directly at odds with the evidence, which demonstrates that competitors aggressively competed on price to steal volume from one another. Indeed, Mr. Bryant himself acknowledged that Pilgrim's lost

*500,000 pounds a week*, or twenty percent of its total sales volume to KFC, during the 2015 negotiations, with additional volume stolen by competitors over the ensuing years. Tr. 139:2-9, 141:4-16, 167:5-168:11, 207:2-23 (Mar. 9, 2022); *see* GX 1729, DX J-027, DX E-014, DX F-796 (Pilgrim's continued to lose volume to competitors). Between 2014 and 2018, Pilgrim's lost half of its KFC business to competitors. Tr. 142:24-143:3 (Mar. 9, 2022).

Mr. Bryant's claim of a conspiracy in 2017 centered on his purported receipt from a colleague of "bid information from . . . six or seven different competitors" prior to Pilgrim's submitting its 2017 bid to KFC. Tr. 174:6-22 (Mar. 8, 2022). Mr. Bryant identified this information as the figures listed in his handwritten notes, GX 1919. Tr. 8:9-9:4 (Mar. 9, 2022). His testimony is demonstrably false. DX I-054, an RSCS document from the relevant period, lists each figure—save a single digit error—in Mr. Bryant's notes as the current, *previously-negotiated* contract price in effect at the time Mr. Bryant made his notes. Tr. 16:17-18:15 (Mar. 8, 2022) (Sara Fischer (RSCS) explaining DX I-054). Such current pricing is not helpful in formulating a bid. Tr. 165:21-167:1 (Mar. 1, 2022) (Michael Ledford (RSCS)). In addition, all of the evidence about the suppliers' actual bids reflects different numbers than those listed in Mr. Bryant's notes. (C-465 (Koch); F-853 (Claxton); C-083 (George's)).

Carl Pepper, the other purported "insider," described only vague conversations with other suppliers about market conditions common to the entire small-bird-chicken industry in 2014. *See* Tr. 251:3-256:4 (Mar. 2, 2022); Tr. 85:15-18 (Mar. 3, 2022). And despite his subjective characterization of these discussions as involving an "understanding" between competitors, Tr. 141:9-23 (Mar. 7, 2022), Mr. Pepper repeatedly testified that he did not discuss actual prices or price ranges when discussing the expected "substantial price increase" with contacts at

13

competing suppliers, Tr. 132:10-21, 143:6-11 (Mar. 7, 2022). Indeed, Mr. Pepper conceded that these discussions with competitors amounted to nothing more than "shop talk or water cooler talk or rumors." Tr. 140:14-24 (Mar. 7, 2022). Such discussions are lawful. *See supra* at 5; Tr. 16:13-16, 22:17-18 (Mar. 21, 2022) (Professor Snyder testified he would expect information exchange in this type of industry without suspecting any type of bid rigging or price fixing).

Third, the evidence makes clear that much of the conduct on which the government relies was the result of customer dictates, not an unlawful conspiracy. Kent Kronauge, the purchaser for Popeyes, testified that he dictated a uniform 14-cent increase on Popeye's contracts between 2014 and 2015. Tr. 23:3-25:10 (Mar. 22, 2022) ("So what I ended up doing was going at the suppliers and we tried to be the first one in and take a stance that look, we are willing to give a substantial increase, but we wanted across the board everybody at 14."); Tr. 67:7-68:5 (Mar. 22, 2022) (similar). Mr. Kronauge also testified that the uniform 2-cent discount for the Popeye's Big Box promotion was his idea. Tr. 14:4-24, 67:7-15 (Mar. 22, 2022). Other purchasers testified that they tried to push suppliers' prices into a tight range, and that doing so benefitted the purchasers and the franchisees they served. Tr. 27:3-8 (Mar. 8, 2022) (Fisher (RSCS)) (a purpose for RSCS's feedback on bid prices was to get suppliers' prices in as close a range as possible); Tr. 129:9-17 (Mar. 10, 2022) (Brink (Fiesta Restaurant Group)) (Brink would share competitor pricing information with the goal to get them to the same price); Tr. 69:5-25 (Mar. 14, 2022) (Lewis (RSCS)) (tight price ranges benefitted KFC franchisees)); Tr. 97:9-11 (Mar. 15, 2022) (Eddington (RSCS)) (RSCS "wanted to try to keep [prices] within a pretty narrow band" between suppliers).

Still other customers explained that the 2015 KFC price increases were justified by

14

market conditions and an effort to "entice" suppliers to stay in the small bird business with those price increases. Tr. 31:24-32:4 (Mar. 2, 2022); *see* Tr. 88:14-89:4 (Mar. 14, 2022) (RSCS wanted small bird profits to be competitive with big birds); Tr. 36:7-37:16 (Mar. 14, 2022) (RSCS was aware that market conditions would lead to a price increase in 2014); Tr. 167:6-8 (Mar. 15, 2022) (RSCS thought price increase "appropriate" based on "expectations" about market conditions). Those same customers shared pricing information with suppliers and told them "[w]here they should come in at" for bids. Tr. 55:8-20 (Mar. 7, 2022) (Carl Pepper); *see* Doc. 1214 at 10. Nothing about Defendants' resulting conduct or their possession of competitor information would allow a rational jury to find beyond a reasonable doubt that the charged conspiracy existed.

## CONCLUSION

After years of investigation, the analysis of millions of documents, hundreds of interviews, two trials, and scores of witnesses, the government has introduced no evidence against Mr. Penn from which a rational jury could find beyond a reasonable doubt that he knowingly and intentionally conspired. Two rational juries failed to make such a finding. The Court should acquit Mr. Penn.

Dated: April 4, 2022                                    Respectfully submitted,

                                             *s/ Michael F. Tubach*
Michael F. Tubach
Anna T. Pletcher
O'MELVENY & MYERS LLP
Attorney for Jayson Jeffrey Penn
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
(415) 984-8700
mtubach@omm.com
apletcher@omm.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all listed parties.

Dated: April 4, 2022             *s/ Michael F. Tubach*

                                                                               Michael F. Tubach