IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-cr-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.  **JAYSON JEFFREY PENN,**
2.  **MIKELL REEVE FRIES,**
3.  **SCOTT JAMES BRADY,**
4.  **ROGER BORN AUSTIN,**
5.  **WILLIAM WADE LOVETTE,**

    Defendants.

---

**UNITED STATES' BRIEF IN SUPPORT OF CALLING
ROBERT BRYANT IN ITS REBUTTAL CASE**

---

The government intends to call Robert Bryant to testify (1) that he participated in, and witnessed, an *agreement* between individuals at Pilgrim's (himself included) and individuals at Pilgrim's competitors, and (2) the *agreement* was to fix the prices of chicken products sold to fast-food restaurant customers (and other customers). Mr. Bryant will supply a colloquial definition for the term "price fixing," rather than attempting to provide a legal definition of that term. He will rebut Professor Snyder's irrelevant, misleading, and confusing direct-examination testimony. Mr. Bryant will also rebut key portions of the testimony of defense witnesses Gregory Finch and Kent Kronauge, as well as assertions made in Defendant Brady's reserved opening that there was not an agreement to fix prices.

While there has been much litigation and argument surrounding Mr. Bryant's ability to testify as to his participation in or existence of an agreement to fix prices or rig bids, none of that has been in the context of rebutting opinion testimony of other witnesses as would be the case here.

## APPLICABLE LAW

Rebuttal evidence allows a party to "explain, repel, contradict or disprove an adversary's proof." *United States v. LiCausi*, 167 F.3d 36, 52 (1st Cir. 1999). Rebuttal evidence can be admitted if the defendant opens the door to specific evidence, even if that evidence has been excluded by the court in the government's case-in-chief. *United States v. Martinez*, 681 F.2d 1248, 1252 (10th Cir. 1982); *see also United States v. DeLeon*, 428 F.Supp. 3d 698, 713 (D.N.M. 2019) ("When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible.") (internal citation omitted).

The admission of rebuttal evidence is within the sound discretion of the trial court. *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005). "[W]hether or not rebuttal evidence is admissible depends on 'whether the initial proof might affect the case and whether the rebuttal evidence fairly meets the initial proof.'" *United States v. Gramajo*, 565 Fed. App'x 723, (10th Cir. 2014) (*citing Tanberg*, 401 F.3d at 1166; *see also United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) ("[W]hen otherwise inadmissible, rebuttal evidence must be reasonably tailored to the evidence it seeks to refute . . . [T]here must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut.").

## PROFESSOR SNYDER OPENED THE DOOR

The Superseding Indictment in this case charges these five defendants with *conspiracy* to fix prices and rig bids in violation of Section 1 of the Sherman Act. (Docket No. 101 at 2). This crime requires proof that two of more persons had an agreement or mutual understanding to fix prices and rig bids. Price fixing is a *per se* violation of the Sherman Act, so the agreement itself is the crime, and no evidence of an anticompetitive effect is required.

Professor Snyder's testimony contains two fundamental errors that created a misleading and confusing impression on the jury. First, Professor Snyder employed a misleading use of the term "price fixing" in rendering his opinion that there is no "price fixing" in this case. As illustrated by his "benchmarking" analysis, Professor Snyder is equating "price fixing" with "higher prices." And whether or not prices were "higher" at any point in time is not relevant to whether the defendants *agreed* to fix prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). So even if one accepts Professor Snyder's opinions *in their entirety*, i.e., any higher prices that are observed at any time (including in 2015) were the result of non-collusive events, that says nothing about whether any defendants committed the offense for which they are charged.[1] Second, under the guise of a "working hypothesis," Professor Snyder created a straw man argument by mischaracterizing the Superseding Indictment. Rather than

---

[1] Professor Snyder, perhaps to his credit, conceded as much. Cert. Tr. at 1942:24-1943:5 ("*All the economic evidence can do* is point to whether the alleged agreement had *objective effects* that I can see in the objective data.").

correctly stating that the Superseding Indictment charges an *agreement* to fix prices, Professor Snyder erased the inconvenient (for him) "agreement" which had the effect of making his work functionally irrelevant to this per se case.[2]

Though cross examination did expose logical fallacies in Professor Snyder's work, the jury is likely left with the impression due to Professor Snyder's opinion that the defendants did not conspire to fix prices, even though Professor Snyder offered no evidence, one way or the other, regarding whether they conspired. Such irrelevant testimony perhaps would not mislead the jury in the situation of a common fact witness, but Professor Snyder's opinion comes with the expert imprimatur. Professor Snyder has no basis to opine about whether there was price fixing in this case. He, of course, has no first-hand knowledge of any of the facts in this case. Also, he conceded on cross-examination that he did not rely on Mr. Bryant's testimony, phone records, text messages, and e-mails (other than bid transmissions). Cert. Tr. at 1894:16-1895:2. This is the very evidence at the core of the government's case that these five defendants conspired to fix prices.

**MR. BRYANT'S TESTIMONY WOULD REBUT AND CLARIFY NUMEROUS ASPECTS OF PROFESSOR SNYDER'S MISLEADING TESTIMONY**

Mr. Bryant, unlike Professor Snyder, of course *has* first-hand knowledge of a price-fixing conspiracy. He participated in it, and witnessed the participation of others, including Defendants Austin and Brady. During the government's case-in-chief, Mr. Bryant laid extensive foundation regarding the events he had personal knowledge of

---

[2] The government objected to Professor Snyder misstating the allegations in the Superseding Indictment. The Court overruled the objection. Cert. Tr. at 1834:20-1835:3.

including: the events in 2014 before and during the bidding for KFC, the events in 2017 surrounding the bidding for KFC, and the events in 2017 surrounding the price increase on boneless breasts to US Foods. Given this foundation, Mr. Bryant has a basis of knowledge to state whether he understood there was an *agreement* between individuals at Pilgrim's and competing chicken suppliers to raise prices and resist price decreases to common customers.[3]

To the extent this is considered opinion testimony it is entirely proper under Fed. R. Evid. 701. First, the opinion is "rationally based" on Mr. Bryant's "perception." *See* Fed. R. Evid. 701(a). It is either events he saw or heard, or actions he personally undertook. Cert. Tr. at 941:17-945:5. Second, the opinion is helpful to determining a key fact: namely whether a conspiracy existed and whether certain individuals were participants in that conspiracy. *See* Fed. R. Evid. 701(b). Third, Mr. Bryant's opinion is based entirely on his personal knowledge gained through observations and not based on specialized knowledge. *See* Fed. R. Evid. 701(c).

More importantly, this evidence, if viewed as opinion, is appropriate *in the context in which it arises*. Professor Snyder was permitted to opine on the *lack of price fixing* despite no knowledge: no personal knowledge and the irrelevancy of the term price fixing as he employed it. The government should be permitted to offer an opinion from the person who *has personal knowledge* from actually participating in the conspiracy.

---

[3] This evidence would not be cumulative because Mr. Bryant did not state during his testimony during the government's case-in-chief that he understood there was an agreement to raise prices/resist price decreases.

5

In addition, Mr. Bryant would also provide testimony on what he understands the term price-fixing to be in the context his own actions in the conspiracy. Like Professor Snyder, Mr. Bryant would not be providing a legal definition of price fixing. Rather, Mr. Bryant would provide a colloquial definition of price fixing, based on his personal knowledge. Mr. Bryant provided this very testimony in the first trial:

> Q. So just so that the jury -- that's your understanding.
> That's what you meant when you said the words price-fixing?
> A. That's correct.
> Q. And was it increasing or resisting a decrease for just
> Pilgrim's?
> A. No.
> Q. For who?
> A. For all the parties involved.
> Q. The competitors.
> A. The competitors, yes.
> Q. Together.
> A. Together, yes.

Penn 1 Cert. Tr. at 788:12-790:16.[4]

His opinion should in fairness be considered alongside Professor Snyder's misleading testimony on the topic. The problematic nature of Professor Snyder's testimony did not stop, however, at his limited understanding of price-fixing. He also opined on the presence of evidence of a price-fixing conspiracy and whether it existed, all under the auspices of his misleading definition:

> Q. Professor Snyder, in your analysis of the objective data in this case, did you see any evidence of *such a quid pro quo*?
> A. No. All of the objective economic evidence concerning bids, prices, price increases, ranges of prices, the benchmark analysis, the umbrella test,

---

[4] As counsel is also aware, Mr. Bryant knew that GX-1919 (which is pages from that notebook) was evidence of price-fixing at the time of the collection of his notebook. *See* Mar. 8, 2022, e-mail from Paul Torzilli to counsel for the defendants.

6

> all of those do not support the Government's hypothesis and, in particular, do not support the idea that there were *quid pro quos* in place.

*Id.* at 1950:16-22 (emphasis in original). Although purportedly couched in "objective economic evidence," Professor Snyder's conclusion that there were no quid pro quos in place misled the jury about the evidence in this case. This is especially true in light of his explanation of what that term meant. As explained by Professor Snyder, quid pro quo meant one supplier would indicate to another "[h]ey, will you do this? If you do this, I'll do that." *Id.* at 1898:6-7. Confusingly, Professor Snyder backtracked, noting that "[he] wouldn't expect that kind of plain exposition of the *quid pro quo* to be reflected in emails or texts." Cert. Tr. at 1898:20-22.

Mr. Bryant has testified, and can further testify, about ample evidence of quid pro quo in the actions of the conspirators. For instance, Mr. Bryant testified that, if a supplier had used shared pricing information to undercut another supplier then whoever misused that information would "have more than likely lost their position." *Id.* at 583:16-17. Punishment for using price sharing in a competitive way, rather than to fix prices, plainly shows that suppliers expected the sharing to be a quid pro quo. Suppliers shared prices with the expectation that they would both take the same action, to raise prices or resist price decreases, not undercut one another.

Bryant similarly testified about actions reflecting a quid pro quo in regards to Pilgrim's efforts to raise prices to U.S. Foods in 2017. Concerned about the possibility that Pilgrim's might lose business to Mar-Jac poultry, who Pilgrim's perceived to be its largest competitor in sales to U.S. Foods, Pilgrim's reached out to Mar-Jac. Penn 1 Cert. Tr. at 586:1-5. Mar-Jac responded that "they were interested in raising prices with*"*

7

Pilgrim's. *Id*. at 587:16-18. After establishing the quid pro quo that the suppliers would act *with* each other in raising prices each company proceeded with the contemplated price increases. *Id.* at 588:4-12.

Last, Mr. Bryant can shed light on misleading aspects of at least one of Professor Snyder's charts. In testifying about exhibit J-256, which compared Pilgrim's prices to purported benchmarking prices from companies not alleged to have engaged in price-fixing, Professor Snyder admitted that the benchmark prices may have potentially included spot sales rather than sales made pursuant to a long-term contract. Cert. Tr. at 1939:18-20. Despite the possibility that the inclusion of spot sales had potentially inflated the benchmarked prices against which Pilgrim's prices were compared, Professor Snyder could not answer how much that might have affected his analysis. He could not explain both how many spot sales might have been included in his analysis as well as whether the effect of that inclusion on his analysis would have been "trivial or something more than that." *Id.* at 1942:13-14. Mr. Bryant has already testified that spot sales made up at least some portion of Pilgrim's revenue, *id.* at 612:3-4, and could shed light on the fact that spot prices are typically much higher than those negotiated as part of a long-term contract. That testimony would shed light on, and potentially cure, at least one way in which Professor Snyder's benchmarking analysis misled the jury.

### MR. BRYANT'S TESTIMONY WOULD REBUT GREGORY FINCH'S TESTIMONY ABOUT CLAXTON'S PRICES AND THE EXISTENCE OF A PRICE-FIXING AND BID-RIGGING AGREEMENT

Mr. Bryant should be permitted to rebut the testimony of Gregory Finch in two key ways: (1) the fact that Claxton Poultry did not set prices independently but instead relied

on an agreement between competitors and (2) the existence of price-fixing and bid-rigging conspiracy.

First, Mr. Finch testified that Claxton Poultry did not ever obtain, rely on, or act on pricing and other information learned from competitors when setting its prices. Cert. Tr. at 2111:11-12 (testifying that Claxton did not rely on competitor pricing); 2129:9-15 (testifying that Claxton does not take input from its competitors on price and that Claxton's price has nothing to do with knowing another supplier's price). Mr. Finch testified that Claxton set its prices independently and that "a competitor's pricing has no bearing on what our costs are or what our bid is going to be to the QSR." Cert. Tr. at 2033:19-21. This testimony can be directly rebutted by Mr. Bryant who can testify to conversations between Defendants Brady and Austin regarding future bids and aligning the bidding strategies at their respective employers.

Second, Mr. Bryant's rebuttal testimony is also necessary to respond to Mr. Finch's testimony as to the ultimate factual issue in the case, specifically whether Defendants Brady and Fries participated in a bid-rigging and price-fixing conspiracy. On direct examination, over the government's objection, Mr. Finch was permitted to testify to whether Defendants Brady and Fries rigged bids, fixed prices, or agreed with a competitor. Cert Tr. 2065:13 ("Mr. Fries did not fix a bid or rig a price with anybody."); Cert Tr. 2065:24-2066:2 ("Q: What is your knowledge of whether Mr. Fries or Mr. Brady ever agreed with any other supplier to manipulate bids of broiler chicken products that you were calculating? A: They never did.") This testimony was permitted despite the fact that Mr. Finch does not have personal knowledge of the calls or text messages that

9

Defendants Brady and Fries had with competitors or with each other discussing the collusive communications at issue:

> Q. Okay. So you don't know what Scott Brady, Mikell Fries, and Roger Austin were doing with respect to pricing during these bids, do you, sir?
> A. Do I know what they were doing?
> Q. Correct.
> A. No, I have no personal knowledge.

Cert Tr. 2153:6-11.  While testimony as to the ultimate fact in issue is inappropriate, even with the requisite factual basis, it is all the more problematic whether the witness who was permitted to opine on the issue admitted to an absence of personal knowledge.

Mr. Bryant, by comparison, was not permitted to testify as to whether he himself—let alone any of the Defendants—participated in a price-fixing and bid-rigging conspiracy despite the fact that he has personal knowledge of his own participation.  Mr. Bryant's testimony from this trial is replete with foundation for testimony that an agreement to fix prices existed and his own participation therein, though he never testified explicitly to the "agreement."  For example, he testified on direct examination that the purpose of sharing pricing information with competitors was to either increase prices or limit a decrease in prices together with competitors.  Cert. Tr. at 430:8-431:21; 599:2-13; 911:13-15.  He testified for hours regarding specific instances where defendant Austin and others coordinated prices with competitors on price without the customers' knowledge.  *Id*. at 404:5-17; 408:20-409:1; 427:10-19; 565:2-20; 583:10-17; 777:23-778:1; 901:21-902:13.  Similarly, he testified that he observed phone conversations between Defendant Austin and Bill Kantola, and phone conversations

10

between Defendant Austin and Defendant Brady during the 2014 negotiations regarding raising prices.  Cert. Tr. at 426:9-427:21; 428:22-430:19.   Even just looking at the 2014 KFC negotiations, he testified to:

(1) Conversations in which he took part where conspirators were directed to both gather from and spread bid information to competitors, s*ee, e.g.*, *id.* at 401:3-17.

(2) Emails he received and conversations he had where he was assured that competitors were carrying out the objectives of the conspiracy, *see, e.g.*, at *id*. 453:21-454:10; 524:10-525:15.

(3)  Observing conversations between competitors reassuring competitors of Pilgrim's negotiating positions, including by defendant Austin telling competitors Brady and Kantola that he told KFC "the price is the price," *see,* e.g., *id.* at 484:6-23.

(4) His understanding that Pilgrim's decided to hold strong on its own price proposals based on its understanding that competitors would follow suit, *see, e.g.*, *id.* at 560:15-561:17.

(5) The ultimate success of Pilgrim's and its competitors at obtaining similar price increases.  See *id*. at 474:23-475:15.

As the record stands, Defendants were permitted to question a fact witness with no personal knowledge as to the non-participation in the conspiracy of two Defendants. By comparison, the one individual who *does* have personal knowledge of the conspiracy and participated in it himself has not been permitted to testify to his own participation. Defendants have therefore opened the door to testimony by individuals as to their own participation in the charged conduct.

### MR. BRYANT'S TESTIMONY WOULD REBUT KENT KRONAGUE'S TESTIMONY ABOUT HIS ABILITY TO CALL A SUPPLIER'S BLUFF IN NEGOTIATIONS

As noted above, rebuttal evidence can be admitted if the defendant opens the door to specific evidence, even if that evidence has been excluded by the court in the

government's case-in-chief.  *Martinez*, 681 F.2d at 1252.  Mr. Bryant's testimony would rebut Kent Kronauge's testimony about his ability to call a supplier's bluff in pricing negotiations.  Mr. Kronauge testified that it was harder for suppliers to bluff with him because he had "10 or 12 people," "confidantes in the industry," that he could "go to and reconfirm or . . . find out what the number is."  Cert. Tr. at 1742:25-1743:5.  Of course, Mr. Kronauge can only call a supplier's bluff if his confidantes are not part of the conspiracy.  Mr. Bryant has already testified to the contrary, stating that as part of the negotiations for the KFC 2015 contract "the plan was working, [] KFC was boxed in, and that we had all submitted higher prices to KFC and that they didn't know what they were going to do in these negotiations."  *Id.* at 478:11-15.  Mr. Bryant made clear that "we" meant "[e]veryone, Pilgrim's and their competitors."  *Id.* at 478:17-18.  In rebuttal, Mr. Bryant would provide testimony directly rebutting Mr. Kronauge's claims of a customer's ability to go to "confidante" suppliers who were not participants in the conspiracy.

### MR. BRYANT'S TESTIMONY WOULD REBUT ASSERTIONS IN DEFENDANT BRADY'S RESERVED OPENING ABOUT THE EXISTENCE OF A PRICE-FIXING AND BID-RIGGING CONSPIRACY

Similarly, Mr. Bryant's would rebut assertions made in Defendant Brady's reserved opening after the government's case-in-chief.  *See United States v. Magallanez*, 408 F.3d 672, 678 (10th Cir. 2005) (finding that a defendant "opened the door" for the government to call a rebuttal witness after defendant's attorney asserted during his opening statement that nothing in documents produced by investigation or testimony given would implicate his client).  During that opening, Defendant Brady's attorney stated that Mr. Bryant "the government's supposed insider, didn't testify that he

had an agreement with Scott Brady, Mikell Fries, or anyone at Claxton to fix price, and he didn't testify that anyone ever told him that they had an agreement. . . ."  Cert. Tr. at 1428:14-20.  Counsel also stated that "Mr. Bryant offers no evidence that Mikell or Scott entered into an agreement to do anything."  *Id*. at 1428:20-22.

Because Defendant Scott Brady's reserved opening opened the door to the idea that there was *not* an agreement to fix prices, Mr. Bryant can testify to the existence of an agreement to fix prices to rebut that evidence, and the government has already elicited foundational testimony for such evidence, the government should now be able to elicit rebuttal testimony from Mr. Bryant about his understanding that there was an agreement to fix prices.  *Martinez*, 681 F.2d at 1252; *DeLeon*, 428 F.Supp. 3d at 713.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court allow the government to call Mr. Bryant in its rebuttal case.

Dated: June 30, 2022        Respectfully submitted,

/s/ *Kaitlyn E. Barry*
KEVIN B. HART
LESLIE A. WULFF
PAUL J. TORZILLI
DANIEL A. LOVELAND, JR.
MATTHEW CHOU
AIDAN D. MCCARTHY
KAITLYN E. BARRY
Antitrust Division
U.S. Department of Justice
450 Fifth Street NW, Suite 11048
Washington D.C. 20530
Tel: (202) 598-8242
Email: kevin.hart@usdoj.gov
*Attorneys for the United States*