1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

2

Criminal Action No. 20-CR-00152-PAB
3  In Re: Penn II
UNITED STATES OF AMERICA,

4

     Plaintiff,

5

vs.

6

JAYSON JEFFREY PENN,
7  MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
8  ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
9  WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
10  WILLIAM WADE LOVETTE,
GARY BRIAN ROBERTS,
11  RICKIE PATTERSON BLAKE,

12     Defendants

13  _____

                    REPORTER'S TRANSCRIPT
14                  Trial to Jury, Vol. 14

15  _____

16          Proceedings before the HONORABLE PHILIP A. BRIMMER,

17  Chief Judge, United States District Court for the District of

18  Colorado, commencing at 8:47 a.m., on the 16th day of March,

19  2022, in Courtroom A201, United States Courthouse, Denver,

20  Colorado.

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A257, Denver, Colorado, 80294, (303) 335-2106

APPEARANCES

           Michael Koenig, Carolyn Sweeney, Heather Call and Paul
Torzilli,, U.S. Department of Justice, 450 Fifth Street N.W.,
Washington, DC 20530, appearing for Plaintiff.

           Anna Tryon Pletcher and Michael Tubach of
O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,
San Francisco, CA 94111-3823;

           Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street
N.W., Washington, DC 20006, appearing for Defendant Penn.

           David Beller, Richard Kornfeld and Kelly Page of
Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,
CO 80202, appearing for Defendant Fries.

           Bryan B. Lavine of Troutman Pepper Hamilton Sanders,
LLP, 600 Peachtree Street NE,  Suite 3000, Atlanta, GA 30308;

           Laura Kuykendall and Megan Rahman of Troutman Pepper
Hamilton Sanders, LLP,  1001 Haxall Point, Richmond VA 23219,
appearing for Defendant Brady.

           Michael Felberg of Reichman, Jorgensen, Lehman,
Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY
10017;

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | APPEARANCES (Continued)                                      |
| 2  | Laura F. Carwile of Reichman, Jorgensen, Lehman,             |
| 3  | Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores, |
| 4  | CA 94065; appearing for Defendant Austin.                    |
| 5  | Elizabeth B. Prewitt of Latham & Watkins, LLP,               |
| 6  | 555 11th Street, N.W., Suite 1000, Washington, DC 20004;     |
| 7  | Marci Gilligan LaBranche of Stimson, Stancil,                |
| 8  | LaBranche, Hubbard, LLC, 1652 North Downing Street, Denver, CO |
| 9  | 80218, appearing for Defendant Mulrenin.                     |
| 10 | James A. Backstrom, Counselor at Law, 1515 Market            |
| 11 | Street, Suite 1200, Philadelphia, PA 19102-1932;             |
| 12 | Roxann E. Henry, Attorney at Law, 5410 Wilson Lane,          |
| 13 | Bethesda, MD 20814, appearing for Defendant Kantola.         |
| 14 | Mark A. Byrne of Byrne & Nixon, LLP, 888 West Sixth          |
| 15 | Street, Suite 1100, Los Angeles, CA 90017;                   |
| 16 | Dennis J. Canty, Canty Law Corporation,                      |
| 17 | 1990 North California Blvd., 8th Floor, Walnut Creek, CA 94596, |
| 18 | appearing for Defendant Little.                              |
| 19 | John Anderson Fagg, Jr. and James McLoughlin of              |
| 20 | Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, |
| 21 | Charlotte, NC 28202-4003, appearing for Defendant Lovette.   |
| 22 |                                                              |
| 23 |                                                              |
| 24 |                                                              |
| 25 |                                                              |

Darrell Bowlin - Direct

1          APPEARANCES (Continued)

2          Craig Allen Gillen and Anthony Charles Lake of

3    Gillen, Withers & Lake, LLC, 400 Galleria Parkway, Suite 1920,

4    Atlanta, GA 30339;

5          Richard L. Tegtmeier of Sherman & Howard, LLC,

6    633 17th Street, Suite 3000, Denver, CO 80202-3622, appearing

7    for Defendant Roberts.

8          Barry J. Pollack of Robbins, Russell, Englert, Orseck

9    & Untereiner, LLP, 2000 K Street N.W., 4th Floor, Washington,

10   DC 20006;

11         Wendy Johnson and Christopher Plumlee of  RMP, LLP,

12   5519 Hackett Road, Suite 300, Springdale, AR 72762, appearing

13   for the Defendant Blake.

14

15                         PROCEEDINGS

16         *THE COURT:*  All right.  Are we ready for the jury?

17         Let's go ahead and do that, and let us get Mr. Bowlin

18   back.

19         (Jury present.)

20         *THE COURT:*  Good morning, Ladies and Gentlemen.  As

21   you will recall, we are continuing with the examination of

22   Mr. Bowlin.

23         Ms. Prewitt, go ahead.

24              **DIRECT EXAMINATION CONTINUED**

25   *BY MS. PREWITT:*

Darrell Bowlin - Direct

1    *Q.*  Good morning, Mr. Bowlin.

2    *A.*  Good morning.

3    *Q.*  Now, you know we are going to continue on the topic we left

4    off yesterday, okay?  We were talking about the KFC

5    negotiations in the summer of 2014, okay?

6    *A.*  Yes, ma'am.

7    *Q.*  Now, you were talking about a model that was initially

8    proposed, a change in the KFC model.  Do you recall that?

9    *A.*  Yes, ma'am.

10   *Q.*  And you testified that RSCS didn't go along with the model

11   that was proposed, correct?

12   *A.*  That's correct.

13   *Q.*  That's where -- let me move on, then.

14         At the time that you were -- that Tyson, Mr. Campbell,

15   you were trying to change the model, how did KFC rate in terms

16   of profitability compared to other quick-serve restaurant

17   contracts?

18   *A.*  I couldn't say for certain.  I would have to go back and

19   look at some of the older e-mails, but I believe at that time

20   we were in the negative position.

21   *Q.*  In what?

22   *A.*  A negative position.

23   *Q.*  And that's refreshed your recollection of what you knew at

24   the time?

25   *A.*  That's what I believe.

Darrell Bowlin - Direct

1  Q.  Now, what do you mean by that, "in a negative position"?

2  A.  You are losing money.

3  Q.  Now, and how -- and so to be clear, you worked on QSR

4  accounts, Popeye's, right?

5  A.  Yes, ma'am.

6  Q.  And you worked on Church's as well?

7  A.  Yes, ma'am.

8  Q.  As well as KFC.

9  A.  Yes, ma'am.

10  Q.  And how did they compare in terms of profitability relative

11  to -- let me just back one second.  That's not a good question.

12       How did, for example, Popeye's or Church's compare in

13  terms of profitability to KFC to your recollection?

14  A.  To the best of my recollection, I would say 2 to 3 cents

15  maybe better.

16  Q.  Now, how did you feel about KFC as a customer at the time?

17  And I am thinking in that sort of 2014 and earlier period.

18  A.  Somewhat frustrated because we could not get paid for all

19  pounds in a box, so -- and I think I've said before, I tried to

20  fire KFC no less than three different times because of their

21  model.

22  Q.  I am sorry?

23  A.  I tried to fire KFC three different times in my career

24  because of the model not being able to get paid for all the

25  pounds in the box.  So I had some frustration toward KFC and

Darrell Bowlin - Direct

1    the model that we were working on.

2    Q.  Do you think you were the only one at Tyson with that

3    frustration?

4    A.  I can't say that.

5    Q.  But there was a move to change the model?

6    A.  Yes, ma'am.

7    Q.  And that would have come from above you.

8         MS. CALL:  Objection, leading.

9         THE COURT:  Sustained.

10   BY MS. PREWITT:

11   Q.  Well, in terms of who makes decisions about the level of

12   profitability or return on sales you need to get the customer,

13   who decides that at Tyson?

14   A.  The business unit would do that.

15   Q.  Would that be you, or would it be somebody above you who

16   would make that decision?

17   A.  It was all inclusive.  Whether it was Charlie Solomon,

18   Steven Cullen or myself, we would have to agree.

19   Q.  You talked about this desire to change the model to make it

20   more profitable.  And it didn't work, right?  KFC did not

21   accept the model?

22   A.  No, ma'am.

23   Q.  Now, what happened after that?

24   A.  The first step was to try to get the case weights

25   corrected, right, and then the second step was to -- if they

3069

Darrell Bowlin - Direct

1  were not going to go for that, we went in with a higher price

2  per pound to offset not getting paid for all the pounds in the

3  box.

4  Q.  And do you remember what that price was?

5  A.  I believe it was 19 cents.

6  Q.  Okay.  Now, was Tim Mulrenin involved in coming up with

7  that margin increase?

8  A.  No, ma'am.

9  Q.  Was Brian Roberts involved in coming up with that margin

10  increase?

11  A.  No, ma'am.

12  Q.  Now, throughout this process, to your recollection, did

13  anyone within sales try to push up the increase above what the

14  business unit wanted to quote?

15  A.  I wouldn't say it never happened, but I don't recall it.

16  Q.  But with respect to this particular contract, do you have a

17  recollection of any effort by the sales team to push it up

18  above what you wanted to quote?

19  A.  I don't recall that.

20  Q.  Now, for this particular KFC contract, did sales have the

21  ability to go and quote anything other than what -- the price

22  that was provided by the business unit?

23  A.  No, ma'am.

24  Q.  Now, have there been other times where small-bird prices

25  increased on this level of magnitude?

Darrell Bowlin - Direct

1   A.  Say that again, please.

2   Q.  Have there been other occasions where there were price

3   increases quoted to small-bird customers that were of the same

4   magnitude or more?

5   A.  I would assume, yes, at that time.

6   Q.  Now, and over that time, you would say that's between 2013

7   and 2019 or --

8   A.  I think the '13 through the '15 year span.

9   Q.  I am going to switch topics a little bit.  I am going to

10  ask you about another QSR customer, a small-bird customer,

11  Popeye's.

12  A.  Yes, ma'am.

13  Q.  Do you recall Popeye's requesting a discount for promotion

14  in September of 2015?

15  A.  After reviewing the e-mails, yes, ma'am.

16  Q.  But it's your recollection sitting here today.

17  A.  Yes, ma'am.

18  Q.  Now, does a big box promo sound -- are we talking about the

19  same thing?

20  A.  Yes, ma'am.

21  Q.  Now, who approved that discount?

22  A.  Ultimately, I would have.  I think what I remember is we

23  were kicking back at that time, and, yes, we had done it in the

24  past as well.

25  Q.  You had done -- this had been a promotion that had gone on

Darrell Bowlin - Direct

1    before?

2    A.  Yes, ma'am.

3    Q.  And you had approved that discount before?

4    A.  Yes, ma'am.

5    Q.  I am going to turn to another Popeye's contract, okay?  And

6    this was one involving pricing for the COB,

7    chicken-on-the-bone, eight-piece, okay, in 2018.  Do you recall

8    that?

9    A.  After looking at the e-mails, yes.

10   Q.  But it's your recollection sitting here today you have a

11   recollection of that negotiation?

12          MS. CALL:  Objection, leading.

13          THE COURT:  Overruled.

14   BY MS. PREWITT:

15   Q.  You can answer the question, sir.

16   A.  Yes, ma'am.

17   Q.  Now, do you recall when those negotiations took place?

18   A.  Say it again, please.

19   Q.  Do you recall when about those negotiations took place just

20   roughly?

21   A.  From the 2018 contract?

22   Q.  For the 2018 contract.

23   A.  I believe it would have been either August or September of

24   2017.

25   Q.  Thank you, sir.

Darrell Bowlin - Direct

1        Now, do you recall whether -- what Popeye's was asking

2   for at the time or what the request was from Popeye's?

3   A.   It was an RFP.  We were going to renew the contract.

4   Q.   Do you know whether -- what Tyson ultimately did with its

5   price from the prior year?

6   A.   The pricing?

7   Q.   Yes.

8   A.   Based on the e-mails, one would assume that it went down

9   potentially.

10  Q.   Do you recall it sitting here today?

11  A.   I don't recall the exact -- where we finalized.

12  Q.   Okay, that's fine, Mr. Bowlin.

13       Just one question.  Who ultimately decided the price

14  that would be quoted to Popeye's?

15  A.   It would have been the small-bird BU, business unit.

16  Q.   Thank you.

17       Now, with respect to -- I am going to switch topics

18  here, and I am going to ask you about quoting costs to

19  customers for changes in the product, okay?  That's where I am

20  going to move topics to.  Are you familiar with the term "cost

21  pass-through"?

22  A.   Yes, ma'am.

23  Q.   And that's what I am going to be asking you questions

24  about, cost pass-throughs, okay, Mr. Bowlin?

25  A.   Yes, ma'am.

3073

Darrell Bowlin - Direct

1    Q.   Now, what is a cost pass-through?

2    A.   I think it's something that flows through the pricing

3    model.  If it's something different than what we agreed to, for

4    example, we had a contract in play.  Sometime in that year of

5    that contract and the customer wanted to change something, and

6    if it would cost us more, we would ask them to pay for that

7    increase.

8    Q.   And so what was -- what would be your goal with the cost

9    pass-through and quoting a price with a -- for a cost

10   pass-through?

11   A.   You need to at least break even.

12   Q.   Did you try to mark it up with a profit for Tyson?

13   A.   I don't recall that, no, ma'am.

14   Q.   Would that be something you would be looking to do?

15   A.   I normally let it go through as a pass-through, and the

16   customer has to pay for any additional cost that we incur.

17   Q.   So in other words, would you say without profit, just

18   straight through to the customer?

19   A.   Yes, ma'am, I would say that.  That would be the goal.

20   Q.   So at least when you were involved, that's what you just

21   tried to do; is that right?

22   A.   Yes, ma'am.

23   Q.   A straight pass-through.

24   A.   Yes, ma'am.

25   Q.   Can you give us some examples of the type of pass-throughs

3074
Darrell Bowlin - Direct

1    that -- cost pass-throughs that you would quote prices for to

2    customers?

3    A.  In this scenario, the customer -- and we agreed upon a

4    price for fresh eight-piece, and the customer came back and

5    said, Hey, we want to freeze some of it, and what that means is

6    you put it in a glass cell, you freeze it, you incur additional

7    costs to do that, and I would have asked that customer to cover

8    that additional cost.

9    Q.  What are quality assurance audits?

10   A.  Quality assurance audits would be samples that we produce

11   in the plant and send it via Fed Ex to the customer to review

12   whether it meets the quality standards, the cut standards, the

13   flavor, they'll do that at their lab, at our customer's lab.

14   Q.  In terms of your role in the business unit, how would you

15   treat that?

16   A.  I like to get paid for those samples being shipped out.

17   Q.  And in your view, would that also be a cost pass-through?

18   A.  Yes, ma'am.

19   Q.  And have you heard of something called NAE or no

20   antibiotics ever?

21   A.  Yes, ma'am, I am familiar.

22   Q.  And what is that generally?

23   A.  No antibiotics ever is the referencing no antibiotics ever.

24   Q.  And if a customer asked you to quote that, how would you

25   treat that?

Darrell Bowlin - Direct

1    *A.*  I would treat it as an increase, because the cost for NAE

2    was higher at that time, and we would ask for additional cost

3    to offset the cost of NAE.

4    *Q.*  Now, if you could walk us through what the business unit

5    would do to work up the costs for those cost pass-throughs,

6    that would be helpful.

7    *A.*  We would engage our pricing department.  I remember on one

8    scenario with reference to the Church's, I remember engaging --

9    going to the plant level even and getting our pricing group and

10   the QSA -- or the quality assurance team also was involved, and

11   we got real numbers from the plant.  And then we were able to

12   share that back to the customer.  They were actual costs that

13   we incurred that we were asking to -- the customer to pay for.

14   *Q.*  So as a general matter, what role, if any, would the Tyson

15   salespeople have in coming up with these cost figures that you

16   talked about?

17   *A.*  The sales team?

18   *Q.*  Yes.

19   *A.*  I don't know that they would.

20   *Q.*  Now, do you sitting here today have any recollection of

21   anyone from the sales team trying to push up the cost quoted

22   for cost pass-through to a customer?

23   *A.*  Again, I would never say never, but I don't believe that to

24   be true.

25   *Q.*  And -- okay.  Let me just shift gears a little bit, and

3076

Darrell Bowlin - Direct

1   we'll talk about a specific customer.  I want to talk to you

2   about Church's, okay?

3   A.  Yes, ma'am.

4   Q.  And I want to talk to you about your recollections to the

5   extent you have them on a cost pass-through in relation to a

6   quality assurance audit, okay?  Do you recall that happening in

7   2013?

8   A.  After reviewing the e-mails, yes, ma'am.

9   Q.  But sitting here today, you have refreshed your

10  recollection?

11  A.  Yes, ma'am.

12  Q.  So what you are testifying about is what you knew at the

13  time.

14  A.  Yes, ma'am.

15  Q.  Now, again, you spoke a little bit about a quality

16  assurance cost, correct?

17  A.  Yes, ma'am.

18  Q.  And could you walk us through how you would cost that up,

19  how you would come up with a cost for performing this audit

20  that Church's requested.

21  A.  I would have engaged the pricing department.  We also had

22  quality assurance involved as well, and we engaged the plant

23  quality assurance, and they gave us live data showing the true

24  cost on that product.

25  Q.  So who was responsible for estimating this cost, actually

3077

Darrell Bowlin - Direct

1    coming up with the final number that would be quoted to

2    Church's?

3    A.   I believe Brandon Campbell took lead on that from a pricing

4    perspective.

5    Q.   Was it your expectation after this request came in that you

6    would be providing a cost for Church's to pay for?

7    A.   Yes, ma'am.

8    Q.   Would competitive intelligence about what other suppliers

9    might charge for a QA cost cause Tyson to increase that cost

10   quote to the customer?

11   A.   No, ma'am.

12   Q.   Why not?

13   A.   Our cost is our cost, and that's what we share with our

14   customer.

15   Q.   I want us to shift -- staying with Church's but shift over

16   to the freezing cost that you testified about earlier, okay?

17   A.   Yes, ma'am.

18   Q.   Now, do you have a recollection of Church's asking for a

19   cost quote for freezing charge in the spring of 2013?

20   A.   After reviewing, yes, ma'am.

21   Q.   And that's your recollection -- you refreshed your

22   recollection from what happened at the time that you recall?

23   A.   Yes, ma'am.

24   Q.   And so, again, walk us through freezer charges so we

25   understand what you are being asked to quote.

Darrell Bowlin - Direct

 1    A.  Say that again, please.

 2    Q.  If you could just walk us through what freezer charges are

 3    so that you can explain to the jury what you were being asked

 4    to quote by Church's.

 5    A.  Yes, ma'am.  So we sell Church's an eight-piece -- cut up

 6    eight-piece.  It's fresh.  It's either ice packed or it's $CO_2$,

 7    whatever we go with.  That product can also be taken to the

 8    glass cell, and you literally freeze it, freeze it and then you

 9    put it on a truck and send it to the customer.

10    Q.  And do you know why Church's wanted to have frozen product?

11    A.  My assumption would be if they had a heavy demand and short

12    supply, they would have been able to use -- if we didn't have

13    enough fresh, they could substitute it with frozen.

14    Q.  So they could just -- at the location for Church's, they

15    could just pull something out of the freezer and defrost it?

16    A.  Yes, ma'am.

17         MS. CALL:  Objection, foundation.

18         THE COURT:  Overruled.

19    BY MS. PREWITT:

20    Q.  Now, so who -- so you testified about cost pass-throughs.

21    Would you consider this to be a cost pass-through that you

22    would just pass on to the customer without a profit?

23    A.  Yes, ma'am.

24    Q.  Now, and so again who is responsible for coming up with

25    this estimate?

Darrell Bowlin - Direct

1    A.  I believe our pricing would have been Rollin Barnes, I

2    believe, and then we would have engaged primarily the pricing

3    department, and then they would determine what would happen or

4    what the price would be.

5    Q.  Just, like, thinking, just generally speaking, how many

6    hands do you think were involved in fixing -- in figuring out

7    what this price was?

8    A.  Well, usually I would call the pricing group and say, Hey,

9    we want to take this product, we want to freeze it.  What do

10   you think it's going to cost?  And he or she would run numbers,

11   and then they come back and say, This is what we are

12   recommending.

13   Q.  You testified earlier about there being warehouse people

14   involved.

15   A.  Yes, ma'am.

16   Q.  How many people do you think were involved in giving you

17   the information to help develop a price?

18          MS. CALL:  Objection, calls for speculation.

19          THE COURT:  Sustained.  If you can lay foundation.

20   BY MS. PREWITT:

21   Q.  So, Mr. Bowlin, you talked about going to the warehouse

22   team to come up with the cost figures, correct?

23   A.  Yes, ma'am.

24   Q.  How many people do you believe -- well, do you have a sense

25   about how many people were involved in coming up with the

Darrell Bowlin - Direct

1   warehouse end of what the cost would be?

2   A.  Ultimately, we -- ultimately, we went directly to the

3   warehousing department, and they gave us a cost that they

4   believed would be true.

5   Q.  And when you say "they," how many people from warehousing

6   do you think were involved in that?

7   A.  Two or three maybe.

8   Q.  And how many people within the pricing unit do you think

9   were involved in this?

10  A.  At least one.

11  Q.  And then yourself.

12  A.  Yes, ma'am.

13  Q.  Anyone else from the business unit?

14  A.  We may have had some cc's on there, but I don't remember

15  specifically.

16  Q.  Okay.  Now, and did -- to your knowledge, did customers

17  have any expectation in terms of understanding how Tyson came

18  up with its cost pass-through number?

19          MS. CALL:  Objection, foundation.

20          THE COURT:  Overruled.

21  A.  I don't believe so.

22  BY MS. PREWITT:

23  Q.  Did customers ever ask you how you came up with your cost

24  pass-through number?

25  A.  If you're referencing this one account where we were

Darrell Bowlin - Direct

1   disagreeing on freezer cost and the cost -- I think what you

2   are referencing is an e-mail that I have reminded myself of,

3   there was -- we were forwarding -- the pricing department

4   quoted, I think, 4, 4 something, 4 cents plus, and then the

5   warehousing team came in with -- I think one ship to came in at

6   2.7 cents, another one came in at maybe 2.4 cents, and that

7   would have been what we went with.

8   Q.  What was the original cost quote to the customer?  What was

9   the original cost?

10  A.  The estimate?

11  Q.  Yes.

12  A.  The estimate was as high as 4.

13  Q.  And just based on your recollection, who was the customer?

14  A.  In this scenario, I believe it was Church's.

15  Q.  Now, and ultimately the cost was quoted at 4, but you are

16  saying that it came down from 4; is that correct?

17  A.  Yes, ma'am.  Ultimately, we gave them the 2.7 or the 2.3.

18  Q.  And who recommended that, to your recollection?

19  A.  I would have agreed to that as well.

20  Q.  And was the sales team involved in passing that on to the

21  customer?

22  A.  We would have had the sales team to go in and pass that

23  through.

24  Q.  And what do you recall about the sales team involvement in

25  passing on that quote to the customer?

3082

Darrell Bowlin - Direct

1    *A.*  Say it again, please.

2    *Q.*  What do you recall about the sales team's involvement in

3  passing that on to the customer?

4    *A.*  They actually work directly with our refrigeration group or

5  warehousing group.  They were on the e-mails as well.

6    *Q.*  What, if anything, were they asking you to do?

7    *A.*  What's the true cost?

8    *Q.*  Now, and, in fact, you lowered the price on this occasion.

9        *MS. CALL:*  Objection, leading.

10        *THE COURT:*  Overruled.

11    *A.*  I believe we did.

12        Can I clarify one thing?

13  *BY MS. PREWITT:*

14    *Q.*  Sure.

15    *A.*  I am not sure that the 4 cents was ever given to the

16  customer other than -- I do believe we gave them the 4 cents,

17  but I do believe that we landed on the cheaper price.

18    *Q.*  So are you referring to -- you ended up -- in response to

19  the customer, you ended up landing on the cheaper price?

20    *A.*  After doing research and after collecting the true cost of

21  it, yes, ma'am.

22    *Q.*  Now, I would like to show you -- so in 2013, did Church's

23  ask you to quote one time for a freezing charge or more than

24  once?

25    *A.*  Say it again, please.

3083

Darrell Bowlin - Direct

1    Q.  In 2013, did Church's ask you to quote a freezer charge one

2    time or more than once?

3    A.  What I am thinking is there is only one time.  It was just

4    a debate of what that would be.

5    Q.  Now, so would any competitive intelligence about what other

6    suppliers might charge for a freezer charge have caused you to

7    increase your cost to the customer?

8    A.  I don't believe so.

9    Q.  Why not?

10   A.  Because we need to get paid for our cost.

11   Q.  And you were trying to make a profit?

12   A.  I wasn't trying to make a profit.  I just wanted to get

13   paid for what we do.

14   Q.  Now, do you recall there being -- I am going to shift to no

15   antibiotic ever, NAE, okay?

16   A.  Yes, ma'am.

17   Q.  And I am going to ask you about whether you recall there

18   being a request from Chick-fil-A for converting to no

19   antibiotic ever or NAE.  Do you recall there being a request

20   from Chick-fil-A for this?

21   A.  I recall that, but also I don't manage that group of

22   customers.

23   Q.  Okay.  Have you ever quoted an NAE cost?

24   A.  Yes, ma'am.

25   Q.  And are you generally familiar with this request to

Darrell Bowlin - Direct

1  Chick-fil-A -- from Chick-fil-A to Tyson at the time?

2  *A.*  I understood that that was happening, yes.

3  *Q.*  So you understood that at the time.

4  *A.*  Yes, ma'am.

5  *Q.*  Okay.  Do you recall knowing what other suppliers were

6  charging or quoting for NAE at the time?

7  *A.*  Not at that time.

8  *Q.*  And would knowing -- would knowing what other suppliers

9  might charge for NAE help Tyson come up with its cost quote for

10  NAE?

11  *A.*  I believe that was the cost quote that we came up with.

12  *Q.*  But did you -- is that -- coming up with a cost quote, what

13  did you take into consideration?

14  *A.*  The cost.

15  *Q.*  Just the cost.

16  *A.*  I believe that to be true.  Again, I do not work with

17  Chick-fil-A.

18  *Q.*  But NAE, you have quoted NAE costs to other customers.

19  *A.*  Yes, ma'am, I have.

20  *Q.*  Are you familiar with something called a live weight cost

21  assumption?

22         *MS. CALL:*  Objection, foundation on this line of

23  questioning about a customer he did not work with.

24         *THE COURT:*  Overruled.  He can answer this question.

25  *BY MS. PREWITT:*

Darrell Bowlin - Direct

1    Q.  I will just ask it again, Mr. Bowlin.  Are you familiar

2    with what's -- with a live weight cost quote assumption?

3    A.  I am not familiar with that.

4    Q.  Okay.  Are you familiar with what live weight is?

5    A.  Yes, ma'am.

6    Q.  What is live weight?

7    A.  That's the weight of the birds that we slaughter.

8    Q.  Is that the same thing as finished cost, like a finished

9    cost?

10   A.  I don't understand the correlation.

11   Q.  Okay.  Now, is the pricing for live weight reflective of

12   the true cost of the product at the end of the day?

13   A.  Say that one more time, please.

14   Q.  So when you are dealing with a processed product, okay?

15   A.  Yes, ma'am.

16   Q.  Is a live weight price the same thing as what the ultimate

17   finished price is for that product?

18   A.  Full transparency, I am not familiar with pricing live

19   weight.  That's not -- I am not familiar with that.

20   Q.  Understood.  Thank you, sir.

21   A.  Yes, ma'am.

22   Q.  Now, I am going to -- just a few more questions for you.

23   What are shortages?

24   A.  Shortages to me is customer X asks for a hundred cases and

25   we only shipped them 80 cases; therefore, we shorted the

3086
Darrell Bowlin - Direct

1   customer by 20 cases.

2   *Q.* So were there occasions when Tyson would provide small-bird

3   chicken products to another supplier to help them deal with the

4   shortage?

5   *A.* Yes, ma'am.

6   *Q.* And how common was that?

7   *A.* I couldn't say the frequency, but, yes, ma'am, it does

8   happen.

9   *Q.* And in terms of that happens with QSR small-bird customers,

10  correct?

11  *A.* Yes, ma'am.

12  *Q.* In those instances where Tyson sold product to another

13  supplier to cover a short, how was that priced?

14  *A.* It would be the contract price that we had with that

15  customer.

16  *Q.* So that would be Tyson's contract price.

17  *A.* Yes, ma'am.

18      *MS. PREWITT:* Your Honor, may I have a moment to

19  confer?

20      *THE COURT:* Yes, you may.

21      *MS. PREWITT:* Thank you.

22      One moment, Mr. Bowlin.

23      *THE WITNESS:* Yes, ma'am.

24      *MS. PREWITT:* I am leaving my binder at the table, so

25  that means you are done, at least as to my questions to you,

Darrell Bowlin - Cross

 1   Mr. Bowlin.  We will see what happens next.  Thank you.

 2             *THE WITNESS:*  Yes, ma'am.

 3             *THE COURT:*  Thank you.

 4             Additional questions of Mr. Bowlin?

 5             All right.  Cross-examination by the government?

 6                      **CROSS-EXAMINATION**

 7   *BY MS. CALL:*

 8   *Q.*  Good morning, Mr. Bowlin.

 9   *A.*  Good morning.

10   *Q.*  I've just got a couple questions for you.  You were

11   discussing cost pass-throughs on direct examination.  Do you

12   recall?

13   *A.*  Yes, ma'am.

14   *Q.*  Now, for every cost that Tyson Foods has, is every single

15   cost passed on to a customer?

16   *A.*  I think -- I would answer that in this way, that our goal

17   is to make money, so if cost goes up, you would assume that

18   your price would go up.

19   *Q.*  Good point.

20             Let me ask it this way.  So you have to make a

21   decision when you get a new cost on whether you're going to ask

22   the customer to pay for it; is that right?

23   *A.*  Yes, ma'am.

24   *Q.*  And the customer, they don't always want to pay for it,

25   right?

Darrell Bowlin - Cross

1   A.  I believe that to be true.

2   Q.  Would you agree with me it's a better deal for the customer

3   when a cost doesn't get passed through?

4   A.  Of course.

5   Q.  Thank you.

6         You testified on direct exam about 2014 and the

7   changes to the KFC model that year.  Do you recall that?

8   A.  Yes, ma'am.

9   Q.  The marination tare?

10  A.  Yes, ma'am.

11  Q.  And the drain-back tare?

12  A.  Yes, ma'am.

13  Q.  Now, at the end of the day, those changes that were made to

14  the model, those were just different ways to get a price

15  increase; is that correct?

16  A.  You could say that, yes.

17  Q.  All right.  Now, Defendant Roberts and Defendant Mulrenin,

18  as I believe you testified on direct, their jobs as salesmen

19  were to go get the prices that you gave them; is that right?

20  A.  Yes, ma'am.

21  Q.  And you wanted them to get as high a price as possible for

22  Tyson Foods, right?

23  A.  Yes, ma'am.

24  Q.  And yesterday you testified there were multiple times where

25  they told you something I think to the effect of, If you take

Darrell Bowlin - Cross

1  that price, you're going to lose business, right?

2  A.  Yes, ma'am.

3  Q.  I think you called it a beat-down.

4  A.  Somewhat.

5  Q.  Okay.  Now, that beat-down, the reason for that was so that

6  Defendant Roberts and Mulrenin could hold onto their volume,

7  right?

8  A.  I believe that to be true.

9  Q.  Because you testified their bonuses depended on hanging

10  onto that volume?

11  A.  Yes, ma'am.

12  Q.  So they went out to get the price that you gave them, and

13  their goal was to hang onto as much volume as they could?

14  A.  Say that again, please.

15  Q.  Yes.  So when they went out to go get the price that you

16  gave them, one of their goals was to keep as much volume as

17  they could with the customer.

18  A.  Yes, ma'am.

19  Q.  Okay.  And you weren't in the negotiations; am I right?

20  A.  No, ma'am, I don't believe so.

21  Q.  And you also weren't on the calls that Defendant Mulrenin

22  and Defendant Roberts had with their competitors during their

23  negotiations.

24  A.  No, ma'am.

25         MS. PREWITT:  Objection, Your Honor.  There is no

Darrell Bowlin - Cross

1  foundation for that.

2          THE COURT:  Sustained.  If you can lay foundation.

3  BY MS. CALL:

4  Q.  Mr. Bowlin, you're not aware of calls that

5  Defendant Roberts and Mulrenin had during their negotiations

6  with their competitors.

7  A.  No, ma'am.

8  Q.  And you would agree with me, sir, that if Tyson Foods'

9  price was higher than its competitors, there would be a risk

10  that Tyson would lose volume?

11  A.  I agree with that, yes.

12  Q.  And, sir, would you agree with me that you did not want the

13  bids that you helped develop shared with Tyson's competitors?

14  A.  Say it again, please.

15  Q.  Sure.

16          Would you agree with me that you did not want the bids

17  that you helped develop shared with Tyson's competitors during

18  negotiations?

19          MS. PREWITT:  Objection.  There is no foundation for

20  the question.

21          THE COURT:  Overruled.

22  A.  I don't understand why.

23  BY MS. CALL:

24  Q.  All right.  And do you in the course of your job ever talk

25  about what's good business or smart business?  Are those terms

Darrell Bowlin - Cross

1   that you use?

2           *MS. PREWITT:*  Objection, Your Honor, vague.

3           *THE COURT:*  Overruled.

4   *A.*  I don't understand the question.  Sorry.

5   *BY MS. CALL:*

6   *Q.*  No problem, Mr. Bowlin.

7           Do you consider yourself a businessman working in the

8   business unit at Tyson?

9   *A.*  Yes, ma'am.

10  *Q.*  And do you have your own understanding of what you consider

11  to be good business and smart business?

12  *A.*  Yes, ma'am.

13  *Q.*  Would you consider sharing your bids with your competitors

14  during negotiations to be good business?

15          *MR. KORNFELD:*  Objection, Your Honor.  I think that

16  question violates a prior order of this Court.

17          *MS. PREWITT:*  And there is also no foundation for this

18  witness to testify on that.

19          *THE COURT:*  Let's have a side bar.

20     (At the bench:)

21          *THE COURT:*  Mr. Kornfeld, go ahead.

22          *MR. KORNFELD:*  Your Honor, I think that question is

23  perilously close to the moral, ethical issue that the Court has

24  already ruled on, so that was the basis of my objection.

25          In addition, Your Honor, I don't think it's a relevant

Darrell Bowlin - Cross

1   question what this witness thinks whether it's good business or

2   bad business.  Who cares?

3        MS. PREWITT:  Also he testified he has no knowledge of

4   what the salesmen were doing in terms of negotiations with the

5   customer, so this would be completely outside of his area of

6   knowledge.  It is just designed to elicit testimony about

7   opinions that Your Honor has already ruled are not relevant.

8        THE COURT:  Ms. Call?

9        MS. CALL:  Your Honor, this is entirely relevant, and

10  this man is the person who developed price models for Tyson.

11  His understanding, he has already laid the foundation of his

12  role in the business unit, his development of the price models,

13  and his opinion whether these prices should be shared with

14  competitors is entirely relevant.  Defendants almost all opened

15  on the fact that sharing bids is just good business and, thus,

16  just data gathering, and this is one of the people at one of

17  their companies who would say the exact opposite.

18        I understand we are not getting in evidence that

19  Defendant Lovette and Penn said it was bad business, that their

20  legal complaints department said it was bad business, that

21  everyone in the room said it was bad business.  But this

22  witness, the defendant testified -- asked about his role in the

23  business in developing bids, and he should be able to testify

24  to that fact.

25        MS. PREWITT:  May I respond?

Darrell Bowlin - Cross

1          THE COURT:  Well, what knowledge does someone from the

2     pricing unit have of how the bid process of Tyson works?

3          MS. CALL:  I am happy to lay some foundation, Your

4     Honor, but I believe at the end of the day he would testify

5     that a part of their decision in developing a margin would be

6     considering win/loss data and the risk of losing business to a

7     competitor in the negotiations when you come in with a high

8     price.  The reason he would testify it was bad business to

9     share a bid, if you share your bid, the obvious possible result

10    is your competitor is going to come in and undercut you.

11         THE COURT:  Right, but the question still is whether

12    he has any -- he works for a specific business unit within

13    Tyson.  He hasn't testified about his experience with the

14    bidding process.  So the question would be what foundation he

15    has to testify about the effect of, for instance, bid sharing.

16         MS. CALL:  Your Honor, I believe the whole basis of

17    his testimony is that pricing, the business unit and sales all

18    together worked on the bidding process.  It's correct that

19    sales are the ones that ultimately are in the room with the

20    customer, but this sharing of bids we are talking about isn't a

21    part of that process.  The sharing of the bids doesn't happen

22    when you're in the room with the customer.  It happens on the

23    side.  The sales team is doing it, and the fact that pricing

24    and the business unit, who the defendants from Tyson are trying

25    to say are entirely in control of this entire process, don't

Darrell Bowlin - Cross

1    want those bids shared.

2         *THE COURT:*  Ms. Prewitt?

3         *MS. PREWITT:*  Your Honor, this witness develops the

4    pricing that is put into models.  He is not involved in the

5    bidding negotiations with the client -- I am sorry, with the

6    customer.  He has a very specific role and doesn't have

7    knowledge of it further.

8         I just want to correct for the record, there has not

9    been argument or testimony that sharing of bid prices is

10   actually what happened here.  We talked about sharing market

11   intelligence, about where the market was, but no one argued, I

12   certainly didn't argue that the bids were being shared and that

13   would have been okay.  So that's what she is trying to elicit.

14   There is no factual basis for it, Your Honor.

15        *MR. GILLEN:*  Your Honor, if I may.

16        *THE COURT:*  Mr. Gillen?

17        *MR. GILLEN:*  And to supplement counsel's remarks, the

18   evidence has not shown that there has been any Tyson sharing of

19   its bid with any of the other competitors.  To the contrary,

20   even Mr. Pepper, a little damaged as he was in terms of his

21   credibility, did not state during his testimony that he shared

22   any specific Tyson bid information, nor did he receive any from

23   any of the other folks that he testified that he spoke with.

24        And that is corroborated, in essence, by the

25   government's own exhibits wherein they show Pilgrim's market

Darrell Bowlin - Cross

1   intelligence circulated via e-mail was displayed in Exhibit 10

2   to show that what the ranges were for others and remarkably the

3   noticeably absent from that list is Tyson.

4        So there is no evidence to support the -- any sort of

5   inference that there was by anybody in Tyson sharing of the

6   Tyson bid, so I would agree with Ms. Prewitt that this line of

7   questioning should be sustained.

8        THE COURT:  That's not the -- that's really not the

9   issue.  The issue is whether or not he has foundation to answer

10  a question about whether the sharing, the concept of sharing

11  bid prices with competitors would be a good idea.

12       Ms. Henry?

13       MS. HENRY:  The government has alleged this as a per

14  se case.  This type of evidence is simply not relevant if they

15  want to believe it's a per se case.

16       THE COURT:  Ms. Call, response to that?

17       MS. CALL:  It's entirely relevant to the defendants'

18  state of mind.  This is the person they worked with day-to-day

19  in internal meetings together throughout these negotiation

20  processes.  This guy is saying, I didn't want them to share the

21  bids.  That speaks to their state of mind of what their purpose

22  was when they were out sharing bids so they could coordinate

23  and make sure they got the prices that he gave them.

24       THE COURT:  Once again, there has to be some

25  foundation for his having knowledge about the bid process,

Darrell Bowlin - Cross

1    because even if that theory were true, there would have to be

2    some interaction between Mr. Bowlin and the people who were

3    conducting the bids, not just the providing of a foundation for

4    a price.  That foundation hasn't been laid yet.

5            So I will sustain the objection in terms of

6    foundation, and we'll see whether there is any foundation for

7    him having some type of knowledge of interaction regarding the

8    bidding process.

9        (In open court:)

10   *BY MS. CALL:*

11   *Q.*  Mr. Bowlin, so you developed or helped develop the bids for

12   Tyson Foods; is that correct?

13           *MS. PREWITT:*  Objection, Your Honor.  That's not what

14   he testified.

15           *THE COURT:*  Overruled.  He can answer.

16   *A.*  Ask again, please.

17   *BY MS. CALL:*

18   *Q.*  Did you help develop bids for Tyson's bids for fast-food

19   customers?

20   *A.*  Yes, ma'am.

21   *Q.*  And during the negotiations, you testified that you weren't

22   in the meetings.  Did you interact with the sales team while

23   the negotiations were underway?

24   *A.*  Interact what way?

25   *Q.*  Did they give you feedback on whether the customer would

Darrell Bowlin - Cross

1    accept Tyson's offer?

2    A.  Yes, ma'am.

3    Q.  Did you work with them on determining whether Tyson would

4    move on its bid?

5    A.  Yes, ma'am.  There would be more collaboration, if you will

6    say that, after they talked to the customer.

7    Q.  And that collaboration you described, was that between the

8    sales team, the business unit, and pricing?

9    A.  Sometimes, yes, ma'am, all three could be involved as well.

10   Q.  And that continued throughout the end of the negotiations?

11   A.  Somewhat, yes.

12   Q.  Now, did you ever ask Defendant Mulrenin to share your bids

13   with competitors?

14          MS. PREWITT:  Objection, Your Honor, lack of

15   foundation.

16          THE COURT:  Overruled.

17          MS. CALL:  You may answer, sir.

18   A.  Okay.  Ask that question again, please.

19   BY MS. CALL:

20   Q.  Did you ever ask Defendant Mulrenin to share Tyson's bids

21   with his competitors?

22          MS. PREWITT:  Objection, Your Honor.  There is no

23   basis for that question.

24          THE COURT:  The question is whether he did.

25   Overruled.

3098

Darrell Bowlin - Cross

1    A.  No.

2    BY MS. CALL:

3    Q.  Did you ever ask Defendant Roberts to share Tyson's bids

4    with its customers?

5            MR. GILLEN:  Objection, absolutely no factual basis

6    for that question.

7            THE COURT:  That wasn't the issue.  The issue is

8    whether he did ask.  Overruled.

9    A.  Ask that again, please.

10   BY MS. CALL:

11   Q.  Did you ever ask Defendant Roberts to share Tyson's bids

12   with your competitors?

13   A.  Not that I know of, no.

14   Q.  Now, in these negotiations, this collaborative process, did

15   you also discuss your strategy in negotiations?

16   A.  In this scenario, the strategy would be to hang onto more

17   volume or lose volume or take price up, those would be the

18   strategies in the conversations we would have.

19   Q.  Those strategies, did you ever ask Defendant Mulrenin to

20   share them with your competitors?

21           MR. PREWITT:  Objection, Your Honor.  There is zero

22   factual basis for the prosecutor to be asking these questions.

23           THE COURT:  Overruled.  He can answer.

24   A.  I don't believe so.

25   BY MS. CALL:

Darrell Bowlin - Redirect

1    *Q.* Did you ever ask Defendant Roberts to share those

2    strategies with your competitors?

3              *MR. GILLEN:* Objection, Your Honor, absolutely no

4    factual basis for that question.

5              *THE COURT:* Overruled.

6    *A.* I don't believe so.

7    *BY MS. CALL:*

8    *Q.* And at the end of the day, Mr. Bowlin, because you weren't

9    in the room of the negotiations, you weren't on any phone calls

10   with competitors, you don't know what steps Defendant Mulrenin

11   and Defendant Roberts took to make sure they could get those

12   prices that you gave them.

13   *A.* You can make that argument.

14             *MS. CALL:* Thank you.  No further questions.

15             *THE COURT:* Redirect?

16             *MS. PREWITT:* Thank you, Your Honor.

17                      **REDIRECT EXAMINATION**

18   *BY MS. PREWITT:*

19   *Q.* So just a few more questions, Mr. Bowlin.  I think we are

20   almost done here today.

21   *A.* Yes, ma'am.

22   *Q.* Now, when the prosecutor, Ms. Call, was asking you

23   questions about the process of coming up with prices to put

24   into price quotes, your responses were as a general matter,

25   correct?

3100

Darrell Bowlin - Redirect

1    A.   Yes, ma'am.

2    Q.   So you are talking generally about the process.

3    A.   A standard operating procedure that we do multiple times.

4    Q.   Okay.  But when it comes to that KFC contract in -- for

5    2015, negotiated in 2014, was Tyson willing to lose sales

6    volume if it didn't get the price that the business unit had

7    gone into the negotiations with?

8    A.   Again, after looking at the e-mails, I think we were

9    aggressive, and we were asking to get paid for every pound in

10   that box.

11   Q.   Were you willing to lose sales volumes, volume to get that

12   price?

13   A.   I would assume that, yes.

14   Q.   That was your understanding at the time.

15   A.   Yes, ma'am.

16        MS. PREWITT:  That's all I have.  Thank you very much

17   for your time, Mr. Bowlin.

18        THE COURT:  Thank you, Mr. Bowlin.  You are excused.

19        THE WITNESS:  Thank you.

20        MR. GILLEN:  I would call Brandon Campbell to the

21   stand, Your Honor.

22        THE COURT:  All right.

23     (**Brandon Campbell** was sworn.)

24        THE WITNESS:  Yes, I do.

25        COURT DEPUTY CLERK:  Please state your name and spell

Brandon Campbell - Direct

1    your first and last name for the record.

2           *THE WITNESS:*  Sure.  Brandon Campbell; B-R-A-N-D-O-N,

3    C-A-M-P-B-E-L-L.

4                        **DIRECT EXAMINATION**

5    *BY MR. GILLEN:*

6    *Q.*  Good morning, Mr. Campbell.  How are you?

7    *A.*  Good morning.  Doing well, thank you.

8    *Q.*  My name is Craig Gillen.  I represent Brian Roberts, and I

9    have some questions for you today.

10   *A.*  Okay.

11   *Q.*  Now, first of all, tell the jury, if you would, where you

12   are currently employed.

13   *A.*  I am currently employed by Tyson Foods.

14   *Q.*  How long have you worked there at Tyson?

15   *A.*  I have worked at Tyson since 2005.

16   *Q.*  Since 2005.  Can you kind of give us a little bit of a

17   narrative about the different roles that you have in terms of

18   your employment there, what you have done with Tyson?

19   *A.*  Yes.  I have worked in our supply chain department.  I have

20   worked in our business unit as a margin manager.  I have worked

21   as a pricing manager, and then in management, and then most

22   recently in international.

23   *Q.*  You mentioned several things.  Have you had any sort of

24   role or experience in pricing of chicken products?

25   *A.*  Yes, ma'am.  I was responsible for a period of time of

Brandon Campbell - Direct

1    pricing our small-bird products.

2    Q.  When, for example, did you begin that process of being

3    involved in pricing for small-bird products?

4    A.  I believe it was late 2013, whenever I took on the pricing

5    manager role.

6    Q.  When you say that you had a role in pricing small-bird

7    products, can you kind of explain what you mean by that?

8    A.  I was responsible for creating the pricing models, updating

9    the models and creating the pricing strategy that we would in

10   turn give to our customers for our products.

11   Q.  Did you have any experience or role in the margin

12   management in the pricing unit?

13   A.  Did I have any experience in margin management at all?

14   Q.  Did you play a role in margin management in the pricing

15   unit?

16   A.  In the pricing unit, I was responsible for pricing, but

17   there was a margin management role that was a separate role

18   which is -- I just want to clarify, so at a separate time I did

19   have a margin management role.  At this time, I was responsible

20   for pricing, which would deliver the ultimate returns for the

21   products, if that answers your question.

22   Q.  When you indicated that you were there in late 2013 -- and

23   how long were you in the -- in that particular role in pricing

24   small-bird product in the pricing unit, in late 2013 to when?

25   A.  It was into sometime in 2015.  I don't remember the exact

Brandon Campbell - Direct

1    date.

2    *Q.*   Now, you mentioned the pricing unit.  Are you familiar with

3    the business unit?

4    *A.*   Yes.   The business unit was an independent group outside

5    the pricing unit.

6    *Q.*   How -- can you explain to the jury how, if it does, does

7    the business unit interact with the pricing unit to formulate a

8    price for a particular small-bird product?

9    *A.*   Sure.  So the business unit had the ultimate responsibility

10   and accountability for the profitability or the P and L of the

11   business.  So the business unit had the final authority on what

12   pricing that we took to a customer.  And so, because in the

13   end, they were responsible and accountable for the

14   profitability of the business.

15   *Q.*   Now, you mentioned the profitability of the business.  Does

16   that have to do with the P and L?  What do you mean?

17   *A.*   Yes.  So the pricing team had the responsibility of

18   creating that pricing strategy.  That price would generate a

19   profit and a loss on that business, so the profit and loss,

20   sort of the profitability of the business was ultimately the

21   responsibility of the business unit.  So since they were

22   accountable of whether or not we made or lost money, they had

23   final authority on what the price was.

24   *Q.*   Now, would margin goals be set by the business unit or by

25   the pricing unit in terms of this -- the business strategy?

3104

Brandon Campbell - Direct

1    A.   So the overall strategy would be set by the business unit,

2    so they would set what are their profitability goals or their

3    margin goals for their business, and then the pricing team

4    would take that and create margin goals specific to bird sizes.

5    And the business unit would approve that strategy.

6    Q.   You mentioned that there might be a different strategy or

7    margin goals as it relates to the specific size of the bird.

8    Can you explain that in more detail, please?

9    A.   Yes.  So whenever you grow a chicken, you target a specific

10   live weight.  Whenever you get that -- the chickens actually

11   come in, they follow a normal distribution curve or a bell

12   curve.  And so depending on how much availability -- we would

13   take the normal distribution and break it into 4-ounce

14   increments, and depending on how much availability of supply

15   was in that 4-ounce increment and what the demand was against

16   it, we would set specific margin goals each 4-ounce increment

17   depending on the supply and demand balance of that bird

18   availability.

19   Q.   So you would take the information about what the margin

20   goal was from the business unit and apply it to that

21   specific -- as you indicated, the size of the bird?

22   A.   Yes, that is correct.

23   Q.   Now, in the pricing unit, would you have specific goals or

24   margins as it relates to the size of the bird as opposed to a

25   specific customer?

Brandon Campbell - Direct

1    A.  The margin goals would be specific to the bird size.  And

2    so all customers that fell into that bird size would have a

3    similar pricing strategy.

4    Q.  So the strategy and the pricing unit had to deal with

5    really the size of the bird and the profitability rather than a

6    customer.

7    A.  Yes.  The margin strategy, the pricing strategy was

8    ultimately to gain a total profitability level for the total

9    business, and then we had profitability goals by 4-ounce

10   increments.  So depending on the customer, the 4-ounce

11   increment that that customer fell into is what would align with

12   what their profitability goals were.  That would build up to

13   the total profit for the business.

14   Q.  Now, in the spring of 2014, was the small bird -- the

15   small-bird model or the small-bird pricing, was it even

16   profitable for Tyson at that time?

17   A.  No.  At that time, there was a change in direction from our

18   leadership, our business unit that our small-bird business

19   historically was not a profitable business, so the direction

20   given was we had to transform the profitability of this

21   business.  And so to do that, here is the new margin goals, and

22   then here is in turn -- the pricing group would come up with,

23   and what is that pricing strategy across all those 4-ounce

24   increments.

25   Q.  So as it relates to the small-bird business, across the

Brandon Campbell - Direct

1   board, whether it was KFC or any of the other folks who were

2   customers, Tyson was losing money.

3         *MS. CALL:*  Objection, leading.

4         *THE COURT:*  Sustained.

5   *BY MR. GILLEN:*

6   *Q.*  Was Tyson losing money in the small-bird unit or the

7   small-bird business across the board in 2014?

8   *A.*  The total business was losing money, yes.

9   *Q.*  Okay.  Now, do you know -- when I use the term "QSR," do

10  you know what that means?

11  *A.*  Yes, I am familiar with the term "QSR."

12  *Q.*  What does that mean?

13  *A.*  QSR means quick-service restaurant.

14  *Q.*  Give us an example, if you would, of some companies that

15  would fall into the quick-service restaurant label.

16  *A.*  Some examples of quick-service restaurants would be KFC,

17  Popeye's, Church's, customers like that.

18  *Q.*  When you were involved in formulating the pricing, what

19  would you do in terms -- what was your interaction with the

20  sales unit?  What role?  Did they sit down with you and work on

21  a model, or how did that work?

22  *A.*  The sales team would come to the pricing team if we had

23  either a new opportunity with the customer or request for RFP

24  or request for proposal that we needed to update the pricing.

25  At that point, the pricing team, which was myself at this time,

Brandon Campbell - Direct

1    would go in and update the pricing model, build out the pricing

2    strategy, and then have a meeting with the business unit around

3    aligning what is the pricing model, what is our pricing

4    strategy, and what are we trying to accomplish.

5    Q.  So let me get it down.  First of all, there is a

6    communication from the business unit to you regarding their

7    margin, what they want in a particular bird like the small

8    bird?

9    A.  The very first step of a pricing season is alignment with

10   the business unit on where the profitability goal is.  And that

11   overarching profitability goal is what guides the individual

12   pricing conversations throughout the year with whatever

13   customers there might be.

14   Q.  So the pricing model in terms of the business unit or the

15   pricing unit was -- which unit was responsible for running the

16   numbers and coming up with the cost model or pricing model?

17   A.  The pricing unit was responsible for updating and creating

18   the pricing models.

19   Q.  Now, in the summer of 2014, specifically as it relates to

20   KFC, who within the pricing unit was responsible for taking the

21   margin request from the business unit and creating a pricing

22   model to be presented on behalf of KFC?

23   A.  That was my responsibility, to create and update the

24   pricing model for KFC for the whole-bird products and then the

25   bone-in and dark-meat products.

3108
Brandon Campbell - Direct

1   *Q.* So we are going to focus on chicken on the bone here.

2   That's something that you were responsible for, correct?

3   *A.* Yes, that is correct.

4   *Q.* Anybody else, or was it just you?

5          *MS. CALL:* Objection, vague.  If we could correct the

6   record.  I believe Mr. Gillen may have misspoke.  He said "on

7   behalf of KFC."

8          *MR. GILLEN:* Well, fine.

9   *BY MR. GILLEN:*

10  *Q.* On behalf of Tyson.  That's what I meant, on behalf of

11  Tyson you were doing this, correct?

12  *A.* Yes, that is correct, on behalf of Tyson, I was creating

13  the pricing model.

14  *Q.* Within the pricing unit, is anyone assisting you or were

15  you the guy handling the whole thing?

16  *A.* I was the guy responsible for completely building the

17  pricing model, so that was me.

18  *Q.* How did you go about -- taking KFC here, how did go about

19  structuring the cost or the pricing model for KFC in the summer

20  of 2014?

21  *A.* Several different factors went into the KFC pricing.  So in

22  any pricing instance, including KFC, we would look at what are

23  the margin goals from the business unit.  We would look at what

24  are fair market values.  So there was a Urner-Barry market, a

25  Georgia Dock market or public markets that we would look at to

Brandon Campbell - Direct

1   see how markets were trending.  And then I would also look at

2   historical wins and losses on business and bids.  So if we lost

3   a business at a certain price point, that would tell us that we

4   were too aggressive.  So we would use those wins and losses as

5   another data point into that model.

6   Q.   Okay.  And when you -- what's the term "profit margin,"

7   what does that mean?

8   A.   Profit margin would be your revenue or your price minus

9   your cost, so it's your net profit or income, I guess.

10  Q.   Now, you indicated that the small-bird business at Tyson

11  was actually negative or losing money during this period,

12  correct?

13  A.   In 2014, yes.

14  Q.   Was there a decision made that that bottom line losing or

15  negative would result in any sort of change in the profit

16  margins that would be presented to customers?

17  A.   The business unit strategy was to go in and to take pricing

18  increases across the board to be able to try to get the

19  business into a profitable state.

20  Q.   Okay.  Now, specifically what, if any, did the sales

21  team -- what role did they have in telling you what price

22  should be set for KFC in 2014?

23  A.   The sales team didn't have the responsibility to tell me

24  what the price was.  They would communicate the need for a

25  price, the timing of the pricing request, and I would create

Brandon Campbell - Direct

1   the pricing model and align with the business unit.

2   Q.   Now, I want to run through some names here so you can

3   explain who might be involved.  I want to talk about some folks

4   in the business unit, okay?

5   A.   Okay.

6   Q.   Who is Charlie Solomon?

7   A.   Charlie Solomon was the senior vice-president over the

8   small-bird business unit.

9   Q.   Was he involved in the KFC business unit presentation to

10  you or the strategy?

11  A.   Yes, Charlie was ultimately responsible for that KFC

12  profitability and price.

13  Q.   When you say that he was responsible for the profitability

14  and price, was that profit and the margin, is that the same

15  term?

16  A.   Yes, profit margin is the same term, yes.

17  Q.   Did he have a team working with him?  Mr. Solomon, did he

18  have a team working with him?

19  A.   Yes.  Mr. Solomon had a team that worked underneath him to

20  manage the business and the margin.

21  Q.   Do you know who they were at this period of time?

22  A.   I remember some of them.  Steven Cullen was over the margin

23  managers, and Darrell Bowlin was a margin manager responsible

24  for the whole-bird products in the business unit.

25  Q.   What about Andy Lubert, do you know whether he was

Brandon Campbell - Direct

1  involved?

2  A.  Andy Lubert was over the food service sales, the commercial

3  team.

4  Q.  Was he superior to or a superior of Mr. Roberts?

5  A.  Of Mr. Roberts, yes, Andy Lubert was a superior of

6  Mr. Roberts.

7  Q.  And who was Joey White?

8  A.  Joey White was my supervisor.  He was the head of the

9  pricing unit.

10  Q.  What role do you remember that Mr. Bowlin played in

11  developing the pricing model for KFC, if any?

12  A.  Mr. Bowlin did not create the pricing model, but he, along

13  with Charlie, had the final say around what the profit goals

14  were for KFC.

15  Q.  Now, in terms of the pricing model that you talked about,

16  did the sales unit in any way tell you what the profit margin

17  should be at any level during this process with KFC?

18  A.  No.  The sales team did not tell me what the margin needed

19  to be.

20  Q.  Now, I want to address your attention or focus your

21  attention to June of 2014, okay?

22  A.  Okay.

23  Q.  Now, this was prior to KFC or RSCS issuing a formal RFP or

24  bid request, correct?

25  A.  I don't remember the timing of what request came in and the

Brandon Campbell - Direct

1    works.  I can't speak to that.

2    Q.  I want to show you a few documents and walk you through

3    these.  I want to show you what has been marked as -- it should

4    be on your screen, but let me --

5            MR. GILLEN:  Your Honor, may I approach with some

6    binders?

7            THE COURT:  Yes, you may.

8    BY MR. GILLEN:

9    Q.  I would like to show you, if we could, if you would look at

10   what is in there as G-624 and ask you if you recognize that

11   document.

12   A.  Yes, I recognize the document.

13   Q.  And was this a document created by you?

14   A.  Yes, this was a document created by me.

15   Q.  During the normal course of business at Tyson?

16   A.  Yes, during the normal course of business.

17   Q.  And was this kept -- it was created at or about the time

18   that is listed on the e-mail here?

19   A.  Yes, that is correct.

20   Q.  Did you have a business duty to inform others within Tyson

21   electronically of the status of your model and work on behalf

22   of Tyson?

23   A.  Yes, I had that responsibility.

24   Q.  And is this an example of your forwarding electronically

25   information as a part of your -- the daily business of Tyson to

Brandon Campbell - Direct

1    communicate regarding your pricing model?

2    A.  Yes, that's correct.

3            MR. GILLEN:  Your Honor, I would move for the

4    admission of G-624.

5            THE COURT:  Any objection to the admission of G-624?

6            MS. CALL:  Your Honor, I would object under 803(6)

7    that it's not sufficient, but no objection to the admission of

8    this as just non-hearsay given the witness' testimony.

9            THE COURT:  G-624 will be admitted.

10   BY MR. GILLEN:

11   Q.  I want to ask you some questions about G-624, please.

12           MR. GILLEN:  And, Your Honor, if we can publish G-624.

13           THE COURT:  Yes, you may.

14   BY MR. GILLEN:

15   Q.  Mr. Campbell, this actually, the top of this is an e-mail

16   from you to Tim Scheiderer; is that correct?

17   A.  To Tim Scheiderer and Tim Mulrenin, yes.

18   Q.  And has a date of June the 9th on that, correct?

19   A.  June 9th, 2014, yes, correct.

20   Q.  Forwarding an e-mail that you had sent earlier, the bottom

21   part of the exhibit?

22   A.  Yes, that's correct.

23           MR. GILLEN:  If we could focus on the bottom part of

24   the exhibit, please.

25   BY MR. GILLEN:

Brandon Campbell - Direct

1   Q.  Now, this -- is this an e-mail from you?

2   A.  Yes, this is an e-mail from me.

3   Q.  To Mr. Roberts and Mr. Lubert and as well as Mr. Solomon,

4   Cullen, White, Bowlin; is that correct?

5   A.  Yes, that's correct.

6   Q.  These are some of the individuals that you told us about

7   earlier who were involved from the business unit perspective

8   for getting you the strategy and the profit margins needed,

9   correct?

10  A.  Yes, that is correct.

11  Q.  Now, this was sent on June the 5th.  And I want to ask you

12  about specifically some of these matters.  The attached model

13  would be the proposed model for KFC for 2015 with the following

14  assumptions.  This equates to a 19-cent-a-pound increase when

15  you do the apples-to-apples comparison, okay?

16  A.  Okay.

17  Q.  Is this the result of work that you had been doing taking

18  information about where the margins needed to be from the

19  business unit and using your model to make a presentation to

20  KFC?

21          MS. CALL:  Objection, leading.

22          THE COURT:  Sustained.

23  BY MR. GILLEN:

24  Q.  Tell me what you were doing here in the latter part of

25  this.  Why did you send this?

Brandon Campbell - Direct

1    *A.*   This was a communication to the sales team and then copying

2    the business unit around the model that I had worked up around

3    what is the pricing and the increase for KFC for 2015.

4    *Q.*   Now, a few questions I want to ask you about this

5    particular document.  We have down here "bird size."  Tell me

6    the importance of that and why that is contained within this

7    document.

8    *A.*   The bird size is referencing the 4-ounce increment that I

9    referenced earlier which ties to the profitability goals for

10   that size of bird.

11   *Q.*   Does this fit within the size that earlier you had

12   indicated that Tyson had been losing money on?

13   *A.*   Yes, this was a part of the total loss that Tyson was --

14   this bird size was part of that.

15   *Q.*   Below that, it has, "Marination profile."  Can you tell us

16   about that?

17   *A.*   The marination profile, the numbers to the right, 25119928,

18   is referencing the product code, and the product code would

19   give the specifications around what types of ingredients or

20   marination were going into the product.

21   *Q.*   And below that, it says, "Marination level:  Up

22   12 percent."  What does that mean?

23   *A.*   The marination level up to 12 percent means that's the

24   maximum level marination can be injected into the product per

25   the customer's specification.

Brandon Campbell - Direct

1   Q.  "No moisture drain-back tare," what does that mean?

2   A.  Once the -- part of the processing of the birds, they go

3   through a chiller to cleanse and to cool down the product.  As

4   they go through that, it's a large vat of water.  As they go

5   through that process, they pick up moisture along the way.  So

6   this is saying given a certain -- there is a drain-back period

7   of time, so after a certain amount of time some of the moisture

8   that's been picked up in the chiller will then be lost again.

9   So this is saying -- and there was a -- KFC required a process

10  to tare out that moisture.  And so this was saying that we did

11  not want to be able to have the tare to tare out that moisture

12  that was picked up in the chiller.

13  Q.  Does your model or the assumptions that you've made here in

14  your model change or alter the cost model that had been dealt

15  with with KFC before regarding marination and 48-hour drain

16  weight?

17  A.  Yes.  This was a proposal to change the existing KFC model.

18  The current model they had in place at this time was to be able

19  to -- was to tare out the moisture that was picked up and to

20  also tare out the marination that was picked up, so this was a

21  proposal to change that process.

22  Q.  When you state this equals 19-cents-a-pound increase when

23  you compare apples to apples, what do you mean by that?

24  A.  So if you look at a -- there is two factors in the total

25  price that a customer is paying.  One is the per pound rate,

Brandon Campbell - Direct

1    and the other is the case weight.  So those two together is the

2    case price.  And so even though in this example the per pound

3    rate went up by roughly 4-1/2 cents per pound, the case weights

4    were going to go up significantly because we were proposing not

5    to drain out the moisture or the marination.  So even though

6    the per pound rate only went up by 4-1/2 cents, the effective

7    increase that KFC would have realized was 19 cents per pound

8    because of the increased case weight that went with it.

9    Q.  Now, when you indicate that this is the proposed model, are

10   you asking for the sales team to make any modifications to your

11   cost model; or are you informing them what it is going to be?

12   A.  No, it's informing the sales team what it's going to be.

13   It's the proposal to KFC.

14   Q.  I would like to show you what has been -- if you will turn

15   to 521.  And I would like you to look at that document, please,

16   as well.  Do you recognize 521?

17   A.  Yes, I recognize this document.

18   Q.  Is this a document created by you?

19   A.  Yes, this is a document created by me.

20   Q.  Was it a document created by you on or about the time of

21   the entrance here of the date on this e-mail?

22   A.  Yes.

23   Q.  Was this done in the normal course of your business on

24   behalf of Tyson?

25   A.  Yes, it was.

Brandon Campbell - Direct

 1   Q.  And is this a part of your business duty to communicate

 2   information regarding the pricing model to others within Tyson?

 3   A.  Yes, it is.

 4   Q.  Is this an example of your electronic communication within

 5   Tyson as a part of your ability to communicate what the Tyson

 6   position would be?

 7   A.  Yes.

 8   Q.  And is this a document that is kept within the normal

 9   course of business at Tyson?

10   A.  Yes, it is.

11   Q.  And a document that is relied upon by you and others within

12   Tyson for accuracy?

13   A.  Yes, it is.

14   Q.  And did you have -- is this a part of your business duty to

15   inform others accurately about the information you are

16   conveying?

17   A.  Yes, that was my responsibility.

18          MR. GILLEN:  We would move for the admission of G-521,

19   please.

20          THE COURT:  Any objection to the admission of G-521?

21          MS. CALL:  Same objection, not a business record, but

22   no problem with admissibility.

23          THE COURT:  G-521 will be admitted.

24   BY MR. GILLEN:

25   Q.  I would like to ask you some questions about this document,

Brandon Campbell - Direct

1   Mr. Campbell.  Now, the top of this is dated June the 19th,

2   correct?

3   A.  Yes, that's correct.

4   Q.  And this is to Mr. Roberts; is that right?

5   A.  Yes, correct.

6   Q.  The subject is KFC 2015 pricing model; is that correct?

7   A.  Yes, that is.

8   Q.  Contained within 521, there is the e-mail that we had seen

9   in 624 concerning you were forwarding to Mr. Roberts your --

10  the profile of your business or your cost model for KFC; is

11  that true?

12  A.  Yes.  I was forwarding to Mr. Roberts what the pricing

13  model was.

14       MR. GILLEN:  If we could publish this document,

15  Your Honor, please.

16       THE COURT:  Yes, you may.

17  BY MR. GILLEN:

18  Q.  So if we can look at the bottom of that.  And this is -- is

19  this essentially what you would have conveyed to Mr. Roberts on

20  June the 5th in an e-mail that we have already gone over?

21  A.  Yes, it is.

22  Q.  Looking above that, the top of the document, you indicate

23  in this document, Brian, this is where we want to be with KFC

24  for next year.  Let me know if you have any questions or would

25  like to discuss it.

Brandon Campbell - Direct

1             Do you see that?

2    *A.*  Yes, I see that.

3    *Q.*  Are you asking for any kind of modification of this cost

4    model from Mr. Roberts, or are you informing him that this is

5    what we're going to do?

6    *A.*  No, I am informing him this is the price in the model.

7    *Q.*  Now, in addition, Mr. Campbell, I would like to ask you

8    whether or not you also were communicating with folks within

9    the business unit about this model during the summer of 2014.

10   *A.*  Yes, I was in constant communication with the business unit

11   about the model.

12   *Q.*  I would like to show you what has been -- if you will turn

13   to 824 in your binder, please.

14           *COURT DEPUTY CLERK:*  Is this G-824?

15           *MR. GILLEN:*  I am sorry, G-824.  Your Honor, I believe

16   that -- I will ask questions and then I will -- there is some

17   limiting instructions as regards to this, I believe, this one.

18           *THE COURT:*  Okay.  Go ahead.

19   *BY MR. GILLEN:*

20   *Q.*  Do you recognize this document?

21   *A.*  Yes, I recognize the document.

22   *Q.*  And is this a document of your communication with folks

23   within the business unit, specifically Mr. Solomon?

24   *A.*  Yes, the middle part down is.

25   *Q.*  And was this created on or about the date that is listed in

3121

Brandon Campbell - Direct

1  the e-mail?

2  *A.*  Yes, it is.

3  *Q.*  Was this your part of the generation of the document in

4  response to an inquiry to you by Mr. Solomon?

5  *A.*  Yes, it was a response to Mr. Solomon's request.

6  *Q.*  And your response back to him, was that something you did

7  in the normal course of your business on behalf of Tyson?

8  *A.*  Yes, that's correct.

9  *Q.*  And was it done in your ability to electronically

10  communicate responses to Mr. Solomon's requests on behalf of

11  the business unit?

12  *A.*  Yes.

13  *Q.*  Did you have a business duty to make sure that the

14  information conveyed was as accurate as possible?

15  *A.*  Yes.

16  *Q.*  And this document was kept in the normal course of business

17  and relied upon at Tyson?

18  *A.*  Yes.

19          *MR. GILLEN:*  Your Honor, we would move for the

20  admission of G-824.

21          *THE COURT:*  Any objection to the admission of

22  Exhibit G-824, assuming that Mr. Solomon's statements would be

23  only considered for the truth of the matter asserted?

24          *MS. CALL:*  Right, Your Honor.  No objection.  Once

25  again, not a business record.  And then assuming the document

Brandon Campbell - Direct

1    is admitted as redacted on the screen, that's -- the copy I

2    have doesn't have redactions, but the redactions on the screen,

3    no objection.

4         THE COURT:  Is that correct, Mr. Gillen, that there

5    would be redactions that only what is shown on the screen

6    currently would be the actual exhibit?

7         MR. GILLEN:  Yes, Your Honor.  I believe that we have

8    redacted the portion that -- that's what --

9         THE COURT:  Do you see that on the screen, Ms. Call?

10        MS. CALL:  Yes, Your Honor.

11        THE COURT:  With that, any objections?

12        MS. CALL:  No objection.  And just to clarify, I

13   believe Your Honor may have said "assuming Mr. Solomon's

14   statements are admitted for the truth."  I believe perhaps you

15   meant "not for the truth."

16        THE COURT:  If I said for the truth, it would be not

17   for the truth.

18        MS. CALL:  But no objection, Your Honor.

19        THE COURT:  Then G-824 will be admitted.

20        Ladies and Gentlemen, you will see that there are

21   statements -- and that may be displayed -- from a Mr. Charlie

22   Solomon.  Mr. Solomon's statements can be considered only for

23   the effect on the listener, not for the truth of the matter

24   asserted, all right?

25   BY MR. GILLEN:

Brandon Campbell - Direct

1    *Q.* Let's go over the bottom, which is Mr. Solomon to you,

2    which is admitted for the effect on the listener, and I want to

3    go over that with you.  Do you see that where it says

4    Charlie Solomon, July the 9th?

5    *A.* Yes, I see that.

6    *Q.* And, again, Mr. Solomon, what role does he have within the

7    business unit?

8    *A.* Mr. Solomon was the head of the business unit, the senior

9    vice-president of the small-bird business unit.

10   *Q.* Now, he indicates to you that, I need your help on a

11   report.  You see that?

12   *A.* Yes, I see that.

13   *Q.* One, need a brief description of our pricing proposal to

14   KFC.

15           And you understood that he wanted to find out what was

16   going on with your proposal to KFC, correct?

17   *A.* Yes, he wanted an update on where we were at in the pricing

18   proposal for KFC.

19   *Q.* Need to show margin current versus planned with the new

20   increase.

21           What does that mean?

22   *A.* He wanted to see a comparison around the current -- at this

23   time, the current profitability of KFC versus what the new

24   profitability of KFC would look like after the price increase.

25   *Q.* Need a revised priorities report that shows two columns,

3124

Brandon Campbell - Direct

1   current and future, with new KFC pricing in place.  Keep all

2   customer pricing as is.

3           Is that correct?

4   A.  Yes, that's correct.

5   Q.  Need by noon, if possible.

6           He wanted it quickly, right?

7           MS. CALL:  Objection, leading.

8           THE COURT:  Overruled.

9   A.  Yes.

10  BY MR. GILLEN:

11  Q.  Now, you respond to Mr. Solomon's inquiry on the same day,

12  correct?

13  A.  Yes, I respond on the same day.

14  Q.  Six minutes later, I guess, right?

15  A.  Yes.

16  Q.  Let's go over what you say.  You indicate that, in the

17  second paragraph, KFC's pricing proposal is .045 pounds

18  increase on a per-pound basis.  What does that mean?

19  A.  It was going to be a 4-1/2-cent-per-pound increase not

20  considering case weight, just on a per-pound rate.

21  Q.  You state, We are requiring KFC to pay for all of the

22  product in the case, which means that we will no longer apply a

23  moisture or a marination tare.

24          Correct?

25  A.  Yes, correct.

Brandon Campbell - Direct

1   *Q.*  Tell the jury again just for the purpose of completeness

2   what you mean by that sentence.

3   *A.*  So the assumption built into this model was that KFC would

4   not require us to apply a moisture or marination tare which

5   would effectively increase the case weight.  So the combination

6   of the per-pound weight plus the increased case weight would be

7   a total increase on the case price.

8   *Q.*  You indicate that when you take into account the 7.5-pound

9   increase per case that we will be invoicing for (with the same

10  head) the true price increase is 19 cents per pound.

11        Do you see that?

12  *A.*  Yes, I see that.

13  *Q.*  What do you mean when you say that when you take into

14  account the 7.5-pound increase per case that we will be

15  invoicing, what does that mean?

16  *A.*  That means with the previous changes around the moisture

17  and marination tare, the case weight would go up 7-1/2 pounds.

18  So, again, the combination of the increase of 7-1/2 pounds in

19  every case, plus the per-pound rate, if you took those two

20  factors together, it would be a net effect of a,

21  apples-to-apples, 19-cent-per-pound increase.

22  *Q.*  So that's when you say the true price increase is 19 cents.

23  *A.*  Yes, that's correct.

24  *Q.*  And that was forwarded on to Mr. Solomon.

25  *A.*  Yes.  I sent that to Mr. Solomon and Mr. Bowlin.

Brandon Campbell - Direct

1   Q.  When we -- when you had the cost model that reflected the

2   profit margin, do you remember what the profit margin -- when

3   you added in what you wanted, the marination and the 48-hour

4   tare weight, do you remember what that projected cost model had

5   for the profit margin?

6   A.  The line item on the model or in this e-mail?

7   Q.  The line item on the model.

8   A.  At this specific time, I don't remember the exact line

9   item.

10  Q.  Now, one of the things that we can move forward to is that

11  the cost models that were presented to KFC -- to RSCS

12  throughout the summer of 2014, were you the only person that

13  had any input in decision, ultimate decision on what those cost

14  models said?

15  A.  I was directly responsible for the pricing model, but the

16  business unit also had the authority to say what they wanted in

17  the model to approve.

18  Q.  So during this time, there was no one else other than you

19  coordinating with the business unit setting the cost model and

20  the pricing?

21         MS. CALL:  Objecting, leading.

22         THE COURT:  Overruled.

23  A.  It was the pricing team, which was myself, and the business

24  unit that created the model and the pricing target and the

25  margin target at this time.

Brandon Campbell - Direct

1    *BY MR. GILLEN:*

2    *Q.*  I want to show you what -- fast-forward a bit, and I want

3    to show you if you can take a look at 1190, which is in

4    evidence.

5         *MR. GILLEN:*  Your Honor, I would ask to have that

6    published, please.

7         *THE COURT:*  You may.

8    *BY MR. GILLEN:*

9    *Q.*  Now, 1190, Mr. Campbell, is an e-mail from Mr. Roberts to

10   Mr. Eddington regarding the KFC marinated model.  Do you see

11   that?

12   *A.*  I see that.

13   *Q.*  You were not cc'd on this, correct?

14   *A.*  That is correct, I am not on this e-mail.

15   *Q.*  The date on this is August the 11th.  Were you aware or had

16   a recollection of whether we submitted an early bid to KFC

17   ahead of everybody else?

18   *A.*  Could you restate the question, please.

19   *Q.*  Were you aware that we submitted -- or were you aware of

20   whether we submitted an early bid to KFC on our cost model?

21   *A.*  I cannot remember if it was an early bid or part of the

22   normal process, I can't remember.

23   *Q.*  It says, Attached is the model.  And I want you to take a

24   look at Exhibit 1191, if you would.

25   *A.*  Okay.

3128
Brandon Campbell - Direct

1          MR. GILLEN:  Your Honor, I believe that's also been

2   admitted.

3          THE COURT:  Yes, it is.

4          Do you want that published, Mr. Gillen?

5          MR. GILLEN:  If we could publish 1191.

6          THE COURT:  You may.

7          MR. GILLEN:  If you can turn to the second page of

8   that exhibit, please.

9   BY MR. GILLEN:

10  Q.  And if you can examine that, please, Mr. Campbell.  Is the

11  data or information contained within this exhibit information

12  or data that came from your cost model that was put down here

13  and submitted to RSCS?

14  A.  Yes.  This would come from my cost model.

15  Q.  Now, a few questions on that.  We mention the margin down

16  here as we see margin at 16, correct?

17  A.  Yes, correct, on the proposed.

18  Q.  Now, the proposed model that was sent in on August the 11th

19  and this attachment as a part of that, did that include the

20  marination and the 48-hour tare that you told us about?

21  A.  The marination is included at the 110 percent.  From this

22  document, I can't speak to the tare, but the marination is.

23  Q.  Now, the profit margin that is listed here without the

24  marination or the tare, 48-hour tare weight taken away, would

25  that profit margin from Tyson's perspective go up?  Would you

Brandon Campbell - Direct

1   ask for more profit margin if they take that away from us?

2   A.  Can you restate the question?  I want to make sure I am

3   understanding.

4   Q.  Yeah.  This profit margin that is listed as 16 contains the

5   marination cost which would make the bird heavier, correct?

6   A.  It contains the marination which would cause the bird to be

7   heavier, yes.

8   Q.  And if we take away the 48-hour tare, we wanted to take

9   that away, and that would make the bird heavier, correct?

10  A.  If you take away the tare, yes, it would make the bird

11  heavier.

12  Q.  And when you were factoring in the profit margin in this

13  particular model, did you factor in whether we -- if we got the

14  marination and the 48-hour tare, that this would be what we

15  would ask for in the profit margin because the birds would

16  weigh more, right?

17          MS. CALL:  Objection, leading and vague as to "we."

18          THE COURT:  Sustained as to leading.

19  BY MR. GILLEN:

20  Q.  So if you take away the -- if we take away the

21  marination -- excuse me, if we include the marination that

22  makes the bird heavier and the 48-hour tare weight, do we need

23  a smaller profit margin because we are going to get -- the bird

24  is going to weigh more?

25          MS. CALL:  Objection, vague as to "we" again.

1        THE COURT:  Overruled.

2    A.   If you're -- I am trying to make sure I understand your

3    question.  The net effect is going to be the same margin.

4    You're looking at a combination of, because the case weight

5    going up or the case weight going down, if they are asking for

6    more, if we are saying more marination is going to be in or

7    more drain back is in, it increases the case weight.  But

8    either way you are managing the same margin.  It's just what

9    are the mechanisms to get there.

10        MR. GILLEN:  Is this a convenient time to take the

11   break?

12        THE COURT:  Ladies and Gentlemen, why don't we take

13   the mid-morning break now.  The jury is excused.  Thank you.

14        (Jury excused.)

15        THE COURT:  We will be in recess.  Thank you.

16      (Recess at 10:18 a.m. until 10:36 a.m.)

17        THE COURT:  All right.  Are we ready for the jury?

18   Let's bring them back, and our witness.

19        MR. KORNFELD:  Your Honor, before we do that, I know

20   the Court is aware of the recent filing.

21        THE COURT:  Why don't we hold Mr. Campbell up for just

22   one second.

23        MR. KORNFELD:  I would ask to be briefly heard on

24   that.

25        THE COURT:  Yeah, I think that the question would be,

Brandon Campbell - Direct

1    the two witnesses that are referred to on footnote 1 of that

2    motion, do they have counsel?

3            MR. KORNFELD:  Yes.  Well, one of them that's

4    associated with our company, yes, is in Denver, and that

5    witness is slated to testify today.

6            THE COURT:  Sure.  The question is really whether the

7    witnesses have counsel and counsel who will be present and

8    whether they anticipate invoking the Fifth Amendment during the

9    course of direct presumably and then whether their counsel have

10   discussed their Fifth Amendment rights with them and whether

11   their counsel want me to additionally talk to them about those

12   subjects.

13           I would anticipate the answers to all of those

14   questions in terms of whether they would anticipate invoking

15   the Fifth or whether they want me to talk to them would be no.

16   And then, of course, it would be the issue of whether or not

17   somehow a question on cross-examination by the government would

18   raise an issue along those lines.

19           MR. KORNFELD:  Well, Your Honor, I think the issue is

20   a little broader than that, I agree with all of that, had this

21   footnote not been dropped 15 minutes ago.  The witness that's

22   associated with our company was on the government's witness

23   list, frankly both of the people in that footnote were.  One is

24   a fact witness.  Our associated witness, as a custodian, due to

25   stipulations, that person fell off as a custodian.  He has

1    always been on our witness list as a fact witness.  He was

2    interviewed by the government the last trial.  At no time, to

3    my knowledge, and I would know, although I don't represent the

4    company, but I represent the president of the company, at no

5    time was he informed that he is a target or a subject.

6              And at, you know, whatever, 10:00 o'clock on the

7    day -- on our witness list, which the government has been

8    saying tell us when we are calling our witnesses, we put him on

9    for today, and they drop that on us.  So, you know, Your Honor,

10   I would respectfully suggest this is a bigger issue than what

11   the Court raised.

12             This is a crass and an overt attempt by the government

13   to chill a fact witness that they know is coming.  And it's

14   about as subtle as the severed horse head in Godfather I, I

15   mean, really.  They know this witness is coming.  He has never

16   been informed that he has any, any personal exposure.  They've

17   interviewed him.  They've listed him as a witness.  There has

18   been no contact, and now all of the sudden we're calling him as

19   a fact witness, and he has got to worry about his Fifth

20   Amendment.

21             So I think, you know, I think there is a couple

22   things.  No. 1, I think this conduct is not a tempest in a

23   teapot.  I think it's a conscious attempt by the government to

24   interfere with our presentation and to obstruct our

25   presentation and to chill a fact witness.

Brandon Campbell - Direct

1            I think there is remedies both in terms of a potential

2     jury instruction, which we can talk about at an appropriate

3     time.  And while I am not this individual's lawyer, I think

4     this lawyer may very well be asking for the Court to immunize

5     this witness if, in fact, there is any real criminal exposure

6     or if, in fact, this is just a footnote designed to chill that

7     testimony.

8            So he and his lawyer can be present whenever the Court

9     wants, but, you know, we were talking, many of us at the break,

10    it's a lot of collective experience in this room on both sides

11    of the aisle, and I have never, ever seen something like this

12    in this district, in this courthouse, or in any of the other

13    Colorado courthouses.

14         THE COURT:  Let's see if we can arrange to have the

15    attorneys for the witnesses available at noon just in case we

16    need to talk to them at that time.

17         MR. KORNFELD:  For sure the one associated with our

18    company, and if Ms. Page can step out and communicate with

19    them.

20         THE COURT:  If possible.  Let's hear from --

21    Mr. Lavine, did you want to add something?

22         MR. KORNFELD:  Your Honor, Mr. Lavine makes a good

23    point.  The counsel that is here is corporate counsel.  This

24    individual has never had personal counsel because he has never

25    been informed that he has any potential criminal exposure.  So,

Brandon Campbell - Direct

1    you know, company counsel will have to sort that through very

2    quickly, the ethics of that.

3           But, you know, if we have to get this individual

4    separate individual counsel, then we are going to have to

5    rearrange much to the government's consternation our witness

6    order, or we're going to have to take a break so he can seek

7    independent legal advice if, in fact, corporate counsel

8    determines that to be a conflict.  That's not my issue.

9           *THE COURT:*  Sure.

10          Mr. Koenig?

11          *MR. KOENIG:*  Sure.  Your Honor, sorry.  There is no

12   bad faith at all on behalf of the government.  The one witness

13   that Mr. Kornfeld has primarily been talking about was a

14   document custodian last time.  This time he is being called as

15   a fact witness, and he was just yesterday moved up, and so we

16   were reviewing documents for him and realized there might be a

17   problem.

18          *THE COURT:*  Why do you say that?  I mean,

19   Mr. Kornfeld's concern and the concern of some of the other

20   defendants is that it's not just that he happens to be a fact

21   witness.  That could have been true, and that could be true for

22   a lot of the people who testified as document custodians in the

23   past.  But is there something about his anticipated testimony

24   or what your prediction of what he may say to cause government

25   to think he has got some type of criminal exposure and,

Brandon Campbell - Direct

1   therefore, needs to -- perhaps should retain an attorney, for

2   instance?

3        MR. KOENIG:  Well, I guess I don't -- let me back up.

4   We got the list of documents for him.  Looking through them,

5   it's clearly a fact heavy direct examination.  They have got

6   our summary exhibits in there for him.  I am not sure exactly

7   what he would be testifying to those about.  There is all sorts

8   of communications like the text messages, a lot of inculpatory

9   stuff in his direct exhibit list.

10        THE COURT:  But is his name on any of those?

11        MR. KOENIG:  No, but we were doing our research, you

12   know, because we wanted to cross him and came across some

13   documents that are of concern.  And so --

14        THE COURT:  Well, what does that mean?  I can't even

15   remember seeing -- I don't know which witness you are talking

16   about, but one witness I have seen his name on a number of

17   documents.  The other one not.  So what is the government's

18   concern, and should that person if he doesn't have personal

19   counsel obtain it based upon whatever concern the government

20   has?

21        MR. KOENIG:  I mean, he is the CFO of an indicted

22   company, so I don't know what -- whether corporate counsel --

23   whether he is represented by corporate counsel or separate,

24   but, you know, there is definitely indications in the documents

25   of communications with competitors.  And --

 1          THE COURT:  By him?

 2          MR. KOENIG:  Yes, yes.

 3          THE COURT:  Okay.

 4          MR. KOENIG:  I mean, I know he was forwarded a lot of

 5   stuff by one of the defendants, but, you know, I did this

 6   review last night, and I am -- there is definitely indications

 7   of it, you know, like, you know, we know what our competitors

 8   are doing, those kind of things that wouldn't normally have

 9   absent communications, not necessarily, you know, an e-mail

10   from one to another.

11          THE COURT:  All right.  Mr. Kornfeld?

12          MR. KORNFELD:  Well, a couple things, Your Honor.

13   First of all, failure to articulate exposure is prima facie

14   evidence that this is witness tampering.  He can't even say how

15   he is exposed.  They say he is the CFO of the company.  He has

16   been the CFO of the company for about 10 years and certainly

17   during the entire scope of the government's investigation.  The

18   antitrust division has indicted the company, so they have

19   investigated both my client, Mr. Brady of Claxton, and the

20   company which is under indictment in a companion case in this

21   building as the Court is aware.

22          So you can't just drop a footnote and then as a

23   federal prosecutor stand up and not articulate to the Court,

24   Well, he is on -- we were looking at some documents and he is

25   the CFO.  I mean, how could -- if we got a lawyer this

Brandon Campbell - Direct

1    afternoon, if the company got a separate lawyer, how could that

2    lawyer even make an assessment in a 16-million-document case, a

3    second trial, and that lack of articulation, even the -- this

4    is such a rush job that even the case -- the caption of the

5    motion is a non sequitur.  It doesn't say anything.

6          This is a rush job, and it's -- like I said, it's, you

7    know, they are trying to chill our presentation.  And they are

8    also trying to chill the presentation of co-defendants who

9    listed Mr. Oare.  I am not as up on Mr. Oare because he is not

10   my witness, but it's the same thing.

11         He was listed on the government's witness list, unlike

12   our witness, as a fact witness.  Now, I don't know what -- in

13   preparing for him, what, you know, lightning bolt the

14   government and all of the sudden they figured out that

15   Mr. Oare's got potential problems.  The government has yet to

16   indicate that.

17         But this is a major, major problem, and it's not,

18   well, you just moved him up a day.  They knew he was coming.

19   They've known he was coming since whatever day we had to file

20   our first good-faith witness list.  And like I said, this is

21   crass, it's overt, and it's inarticulate.

22         *THE COURT:*  Mr. Lavine?

23         *MR. LAVINE:*  Your Honor, there is not one document

24   that was sent to the government that they didn't have for a

25   long time.  And they have sat here, and they knew it, and this

Brandon Campbell - Direct

1    is nothing more than witness intimidation.  And I think that

2    government counsel's flailing and trying to explain to the

3    Court and answer the Court's question clearly shows this is

4    nothing more than intimidation, Judge.

5         This man was interviewed by the government with regard

6    to documents.  They know he has been the CFO, and now they are

7    turning it around and saying potentially he is a target,

8    potentially he has to take the Fifth Amendment with no ability

9    to articulate anything.  This is nothing more than witness

10   intimidation.  As flat as it can be, that's all it is.

11        I am asking for sanctions, Judge.  I am going to

12   figure out which ones we are asking for, but I think this is

13   appropriate at this time.  This is a pattern going on with

14   these lawyers, and this is wrong.

15        THE COURT:  Mr. Koenig?

16        MR. KOENIG:  Your Honor, first of all, let me just

17   read you one of the e-mails we came across last night.  This is

18   to Mr. Brady, and this is with the witness in question

19   speaking.

20        I would be curious to know where our feed conversion

21   is in relation to our competitors.

22        Mr. Brady:  Thank you.  I will see what I can find

23   out.

24        This is not, you know, just some whimsical things.

25   It's something we came across.

Brandon Campbell - Direct

1          Second, we had a list for weeks and weeks that is 130

2     witnesses long.  I mean, we are not going to just -- it was

3     obvious they were not going to call all these people, and now

4     it became a reality.  And so that's why we filed this.  If we

5     didn't file it, we would be derelict in our duties.

6          I just don't understand how, you know, they can claim

7     that somehow looking out for somebody is a problem.  This is

8     not just whimsy.  As far as the other evidence goes, the

9     witness you're talking about, he has protection for his time at

10    Pilgrim's.  He does not have protection for his time at

11    Marshall Durbin.  And that is the conduct that provides the

12    exposure.

13         To be clear, the CFO, we interviewed him with respect

14    to documents only, and now he has come in as a fact witness.

15    They have clearly put the facts of the conspiracy in their

16    direct exam binder, and in prepping for the witness, this is

17    what we found.  So, you know, if we find this and don't do

18    anything, we are, you know, doing wrong by the witness.  If we

19    find it and we do do something, we are doing wrong by the

20    witness.

21         *THE COURT:*  Well, from a little bit broader

22    perspective, it seems like the documents were ones that the

23    government was aware of and the witness has been interviewed,

24    right?

25         *MR. KOENIG:*  Sure, with respect to documents.

Brandon Campbell - Direct

1          THE COURT:  Yeah, but --

2          MR. KOENIG:  The custodian, that's what I mean, as a

3   custodian.

4          THE COURT:  But the other documents, the government

5   wasn't aware of those documents before?  In other words, the

6   question would be, you know, there are lots of people in these

7   cases, and there has also been indictments handed down, and

8   some of the other judges in the court have cases against

9   individuals.  But this obviously is not one of those people.

10         So, you know, I mean, does the government really think

11  that this is a person who has exposure, or are you just being

12  precautionary and listing the person?

13         MR. KOENIG:  I mean, based on the document that I just

14  read, I think he has exposure.  That is not, you know --

15  it's -- the answer to both your questions is yes.  We are being

16  cautionary.

17         THE COURT:  Why not immunize him like you did in the

18  last trial with a witness?

19         MR. KOENIG:  We can certainly consider that.  And, you

20  know, I have to talk to people several pay grades above me, but

21  I can certainly do that if that's what Your Honor would like.

22         THE COURT:  I can't immunize people.  But that would

23  seem -- I mean, once again, maybe the witness doesn't want to,

24  but that would seem to be in the mix just to try to put this

25  matter to rest, because, I don't know, it seems like there is a

Brandon Campbell - Direct

1    solution, there should be some type of solution with this.

2         MS. PREWITT:  I will note for the record that senior

3    DOJ leadership is sitting in the courtroom right now who would

4    have the authority, just for the record, Your Honor.

5         THE COURT:  Well, DOJ has its own hierarchy, and

6    that's its business, but ...

7         MR. KOENIG:  And I would say saying that we are aware

8    of the documents, you know, when you have 15 million documents

9    and you are doing late-night witness prep the day before a

10   person is supposed to be called and you come across stuff like

11   this, I mean, it puts us in sort of an untenable situation.

12        THE COURT:  Well, I know.  My only point, that it

13   seems as if there has been an effort on behalf of the

14   Department of Justice to indict certain people already, and for

15   that reason, it may be that the document review, despite it

16   being voluminous, has concluded -- has focused on certain

17   people, but ...

18        Mr. Beller?

19        MR. BELLER:  Your Honor, I will stay in my lane.

20   Mr. Kornfeld has already articulated our position on behalf of

21   the client.  I do want to be very clear to assist the Court in

22   analyzing this, quote/unquote, Fifth Amendment immunity issue.

23   Feed conversion, Your Honor, is how much feed a chicken eats

24   and how that is -- how that results in a particular weight for

25   the chicken.  And so it's a grower issue.  It has absolutely

Brandon Campbell - Direct

1  nothing to do with price whatsoever.  It is purely how much

2  food a chicken eats and what size the chicken gets.

3          So somehow manipulating that basic fact into being

4  somehow a price-related issue such that this particular witness

5  needs to be advised of his Fifth Amendment right, it's elusory.

6  It's simply a made-up detail without a whole lot of context.

7  Either the government knows that, in which this is further

8  evidence of witness intimidation as being a pretext, or the

9  government does not know that, in which case that's simply a

10 concern, but, again, this is an elusory issue.  So I won't

11 rearticulate or reargue the points that are made by

12 Mr. Kornfeld.  I just simply wanted the Court to have that

13 factual understanding of that particular notation.

14         THE COURT:  Hold on, Mr. Beller.  One second.  And

15 that is your point, then, is responding to the subject matter

16 of the e-mail that Mr. Koenig gave as an example.

17         MR. BELLER:  That's exactly right.

18         MR. KOENIG:  May I respond to that?  I am looking at

19 another one right now, and this has to do with the Chick-fil-A

20 no antibiotics conversion.  And he says, We are projecting this

21 will cost us 1-1/2, 2 cents a pound across all pounds of NAE

22 versus the 5 to 6 cents we have heard from our competitors.

23         It's not to say that anything is, you know, some sort

24 of, you know, extremely damning document, but the person, you

25 know, doing a cursory review last night -- and not cursory, but

3143

Brandon Campbell - Direct

1    diving into the person, someone we haven't really focused on

2    except as a custodian, you see stuff like this, and you're

3    like, gosh, this might be a problem.

4         So I don't know if we could do, like, a no direct use

5    letter that -- when we interview people for his testimony.

6    It's certainly not our goal to keep this person from

7    testifying, but we do have obligations that we have to -- and

8    when we become aware of them, we have to bring it up.

9         THE COURT:  Mr. Tubach?

10        MR. TUBACH:  Your Honor, we have been talking solely

11   about the Claxton witness at this point.  But there is the

12   other witness.  And what they said is that that witness has

13   immunity based on his conduct at Pilgrim's, but not immunity

14   before that.  This witness left the prior company in January of

15   2014.  The government interviewed him about his work at that

16   prior company a long time ago and never raised any concerns

17   about there being a potential Fifth Amendment issue about

18   conduct they allege he might have engaged in before January of

19   2014.  This is pure, unadulterated witness tampering.

20        THE COURT:  Mr. Koenig, how would you anticipate to

21   the extent questioning of Mr. Oare would -- people probably

22   know what the scope of it would be, but would he be asked about

23   any activity that took place before he -- he worked at

24   Pilgrim's; is that right, Mr. Tubach?

25        MR. TUBACH:  Yes.

Brandon Campbell - Direct

1        THE COURT:  Would he be asked about anything regarding

2   Marshall Durbin?

3        MR. KOENIG:  I am quite certain he probably would.

4   And, again, we have -- we did interview him a while back, but

5   the witness list has recently gone from 130 down to 30 and

6   still, quite frankly, seems a bit unrealistic.  So if we -- it

7   really doesn't matter when we would have done it.  It just --

8   it just -- we did what we needed to do.  And if we have to take

9   steps to, you know, make it so they don't have the Fifth

10  Amendment problem, you know, sobeit.

11       But I just -- I think, you know, once we see that

12  somebody is really actually going to be called, and we know

13  from the last trial that -- and this trial the witnesses

14  disappear from witness lists all the time, and we shouldn't be

15  held to have to notify people that we think they have exposure

16  if we don't even think they are really going to be called or

17  don't even know.

18       THE COURT:  Mr. Fagg?

19       MR. FAGG:  Your Honor, Mr. Oare was on the

20  government's witness list as a fact witness.  They apparently

21  intended and had a good-faith basis to believe they were going

22  to call him in their case in chief, and they took him off.  And

23  so the notion that they just came to some realization based on

24  him appearing on a shrunken-down version of the defendants'

25  list just doesn't hold water.

Brandon Campbell - Direct

1           MR. KOENIG:  If I may, we were preparing to deal with

2       the issue.  We took him off our list.  And then when their

3       witness list shrunk down to make it look like he actually was

4       going to be called, that's, you know, when we decided.

5           THE COURT:  But how were you -- if he is on your

6       witness list, how were you going to, quote/unquote, deal with

7       it?  I mean, how could you deal with a Fifth Amendment

8       question?

9           MR. KOENIG:  The same way we would deal with it if

10      they are on the defendants' witness list.

11          THE COURT:  Which they are.

12          MR. KOENIG:  Right.  I am saying that there are

13      remedies and solutions to this.  It's just, you know, we

14      weren't sure if we were going to call him.  We knew we would

15      have to deal with the issue.  We decided not to call him.  And

16      so, you know, once he became a realistic witness on the

17      defendants' list, we filed our notice.  I mean, that's about as

18      simple as I can state it.

19          THE COURT:  Mr. Kornfeld?

20          MR. KORNFELD:  I just have to take issue.  There is

21      this implicit notion, well, we had this 130-person witness

22      list, and that was just sort of subterfuge.  And as soon as we,

23      quote/unquote, got real with our witness list, then they start

24      focusing on this as if our good-faith filing of a witness list

25      before trial, before we know their case, as if this is somehow

1   burden shifting like this issue is an issue of our making.

2   This is not of our making.  This is of the government's making.

3   They were aware of these witnesses.

4        I don't need to repeat all that stuff, but this notion

5   that it's somehow our fault because of our amendments, which

6   they demanded minute after minute, day after day to our witness

7   list, and it's somehow on us that this is a problem, that is

8   just complete sophistry.

9        THE COURT:  Well, I disagree with that.  I mean, when

10  you have a witness list that is so unrealistic as the

11  defendants did and it's so huge, I mean, what's the government

12  supposed to file motions *in limine* on every single person?  The

13  government had a good reason to believe that that was not going

14  to be the final witness list, and the government's intuition on

15  that subject was true.  So I don't buy that.

16       But what we're getting down to now is we need to

17  figure out a solution to this problem, and it needs to be done

18  fairly soon.

19       MR. KOENIG:  If I may, with respect to the witness

20  Mr. Tubach is talking about, we had a notice drafted last trial

21  when they had their huge witness list in that trial, and then,

22  you know, it dropped -- he dropped off.  And, you know, so we

23  never filed it.  So it's not like this is something we haven't

24  considered in the past.  I mean, the notice we filed was

25  really -- what we filed today was really just a carbon copy of

Brandon Campbell - Direct

1   what we had ready to go last time if he looked like he was

2   going to be a real witness.  This is not like a last-minute,

3   let's try to intimidate somebody.

4          *THE COURT:*  Mr. Lavine?

5          *MR. KOENIG:*  Just one more, if I may.  And we also

6   informed the witness of his exposure when we interviewed him.

7          *THE COURT:*  Mr. Lavine?

8          *MR. LAVINE:*  I would beg to differ with government

9   counsel.  I think what I heard from government counsel is they

10  looked at one of the documents in reference to NAE, and if the

11  witness is going to testify about NAE, that he must be a target

12  or subject of this information which is pretty much what he

13  said.

14         But, Your Honor, we sent the documents over on

15  Mr. Finch yesterday, and we told counsel we were sending them

16  because we had to move up witnesses.  There aren't that many

17  documents there, Your Honor, and there is not one document on

18  there that these people haven't seen, studied, reviewed, and

19  sent to us.  And you are telling me -- not you, Your Honor, but

20  government telling us that they have just all of the sudden

21  decided?  Why didn't they send it last night?  They sent it at

22  10:02 this morning.  If they had such a major concern and that

23  was a real concern to them, they would have filed that thing

24  last night and put us on notice and -- instead of filing it at

25  10:00 o'clock this morning.

Brandon Campbell - Direct

1          I think all the government counsel has done is dance

2     here, and they can't explain what they've done because it's

3     nothing more than intimidation.

4          THE COURT:  Here is what we need to do, because this

5     is going on and on.  We need to get the jury back in here and

6     continue with Mr. Campbell's testimony.  What I would suggest

7     is, as I mentioned before, have counsel -- I recognize that one

8     of the attorneys is just corporate counsel, but let's try to

9     have counsel here at noon, and we'll further discuss this, and

10    maybe your so-called teams might have a chance to look into

11    some of these issues in the meantime.

12         MR. KORNFELD:  Counsel for Claxton will be here.  I

13    don't know about Mr. Oare.

14         MR. TUBACH:  I believe counsel for the other witness,

15    Your Honor, is not here in this state, so they won't be able to

16    be here, at least not at noon.  He wasn't planning to be here

17    until next week.

18         THE COURT:  If it's possible, someone could be in

19    contact with him.  We could always link him in by phone, have

20    him standing by on a phone call or something of that nature,

21    whatever his attorney might think is appropriate if he wanted

22    to talk it over.

23         MR. TUBACH:  We'll make an effort.

24         THE COURT:  All right.  Mr. Feldberg, did you have

25    anything?

Brandon Campbell - Direct

1          MR. FELDBERG:  No, I just wanted to say something to

2     Mr. Tubach.

3          THE COURT:  No problem.  Then let's get the jury back

4     in and Mr. Campbell back in.

5          (Jury present.)

6          THE COURT:  My apologies, Ladies and Gentlemen, we had

7     an issue come up.  But now we will get back on track.

8          Mr. Gillen, go ahead.

9          MR. GILLEN:  Thank you, Your Honor.

10    BY MR. GILLEN:

11    Q.  Mr. Campbell, back at it.  So when we left, we were talking

12    about that proposal in 1190, 1191 that was the bid that was

13    sent in by Tyson.  Do you remember that?

14    A.  Yes, sir, I remember.

15    Q.  Now, as we went over, and we don't need to go over it

16    again, the model that had been developed in June and proposed

17    to RSCS by Tyson had that issue about marination and 48-hour

18    tare, correct?

19    A.  Yes, that's correct.

20    Q.  And do you have a recollection of whether RSCS on behalf of

21    Kentucky Fried Chicken agreed to that?

22    A.  No, they did not agree to it.  They rejected the proposal.

23    Q.  So they rejected the proposal that had the marination

24    issues and the 48-hour weight tare, correct?

25    A.  Yes, that's correct.

3150

Brandon Campbell - Direct

1   *Q.* So who was -- were you in charge or was somebody else in

2   charge of then responding back to them in terms of what would

3   be the next position that Tyson would take?

4   *A.* Once we received the feedback that they rejected that

5   model, then that was my responsibility to re-create a new model

6   based upon that direction and then, again, to align it with the

7   business unit prior to resubmitting.

8   *Q.* Were you in charge of that?

9   *A.* Yes, I was in charge of re-creating the model.

10  *Q.* The model that you re-created, was that done by you or by

11  others?

12  *A.* No, the re-creation of the model was completed by me.

13  *Q.* I want to show you what has been marked as G-570 and ask

14  you if you recognize that document.  Do you recognize that

15  document?

16  *A.* Yes, I recognize it.

17  *Q.* Was that a document that was -- on 570, this has your

18  e-mail on it, correct?

19  *A.* Yes.  This is from my e-mail address on the lower half.

20  *Q.* And who were you sending this to?

21  *A.* I was sending this to Brian Roberts and Tim Mulrenin and

22  copying Charlie Solomon, Steven Cullen, Darrell Bowlin, and

23  Tim Scheiderer.

24  *Q.* Tell me what you were doing here in terms of your new model

25  as it related to the proposal to RSCS on behalf of

Brandon Campbell - Direct

1  Kentucky Fried Chicken.

2  A.  So this was adjusting the model to account for the current

3  marination tare in place and then in turn adjusting the

4  per-pound price increase as a result of that.

5  Q.  The e-mail that you were sending to Mr. Roberts, was that

6  made on or about the date which is listed here on the e-mail in

7  570?

8  A.  Yes.

9  Q.  Was it generated by you?

10  A.  Yes, the e-mail was generated by me.

11  Q.  Did you do that on behalf of a business duty to communicate

12  the Tyson position to others within the Tyson community such as

13  Mr. Roberts and the others?

14  A.  Yes.

15  Q.  Was this kept, this e-mail kept in the ordinary course of

16  Tyson's business activities?

17  A.  Yes, it was.

18  Q.  And relied upon by Tyson individuals to make business

19  decisions on behalf of Tyson?

20  A.  Yes.

21  Q.  And did you have a business duty to convey accurate and

22  concise information to others within Tyson for them to rely

23  upon it?

24  A.  Yes, that was my responsibility.

25          MR. GILLEN:  Your Honor, I would move for the

Brandon Campbell - Direct

1   admission of 570.

2          THE COURT:  You mean G-570?

3          MR. GILLEN:  Excuse me, G-570.  I apologize.

4          THE COURT:  Any objection to the admission of G-570?

5          MS. CALL:  For this statement, same objection, not a

6   business record, but no objection to the admissibility.  The

7   part counsel is not showing right now at the top of the

8   document is hearsay.  I see it's redacted.  As long as it's

9   redacted, no objection.

10         THE COURT:  Then G-570 will be admitted.

11         MR. GILLEN:  And if we can publish that, Your Honor.

12         THE COURT:  You may.

13  BY MR. GILLEN:

14  Q.  Now, let's take a look at what you're saying here in G-570,

15  Mr. Campbell.  You indicated this is going to Mr. Roberts,

16  correct?

17  A.  Yes, correct.

18  Q.  Mr. Mulrenin.

19         And you indicated also, I think you also gave us the

20  roles that Mr. Solomon, Mr. Cullen, Mr. Bowlin, Mr. Scheiderer

21  would be playing within Tyson on this, correct?

22  A.  I don't believe I ever talked about Tim Scheiderer before,

23  but the other ones I had.

24  Q.  Tim Scheiderer, for the record, what was his role in 2014

25  at Tyson?

Brandon Campbell - Direct

1   *A.*  Tim Scheiderer in 2014 was a part of the sales team.  He

2   supported the sales team through the bid process and RFP

3   process.

4   *Q.*  Now, here you're indicating that -- you say attaches the

5   updated pricing model for KFC which accounts for leaving the

6   current marination tare in place.  What do you mean when you

7   say "leaving the current marination tare in place"?

8   *A.*  That is -- that was the current model prior to the proposed

9   change, which means that we would have to tare out the case

10  weight as a result of picking up marination, so it would

11  effectively lower the case weight.

12  *Q.*  And the word "tare" is a fancy word for subtracting out?

13  *A.*  Yes, that's correct.

14  *Q.*  Making the bird lighter or the weight lighter that you

15  would be paid on.

16  *A.*  Making the case weight lighter, correct.

17  *Q.*  It indicates also the marination percentage has been

18  dropped to 100 percent.  Do you see that?

19  *A.*  Yes, I see that.

20  *Q.*  What does that mean?

21  *A.*  By the marination percent dropping to 100 percent, it's

22  effectively lowering the case weight, and in turn you would

23  increase the price on a per-pound basis.

24  *Q.*  And the next sentence says, In addition, the margin has

25  been increased to 19 cents per pound which delivers the same

Brandon Campbell - Direct

1  case price as was originally presented.

2         Do you see that?

3  A.  Yes, I see that.

4  Q.  Now, what do you mean when you say that "The margin has

5  been increased to 19 cents per pound which delivers the same

6  case price as was originally presented"?  What do you mean?

7  A.  That the 19 cents per pound is referencing the specific

8  margin line item on the cost-plus model, but what I am saying

9  is by increasing the margin line item on the cost-plus model,

10  that the same case price is achieved.  So the same case margin

11  is the same, but your case price is going to -- and your case

12  price is going to be the same, but the per-pound rate is going

13  to change.

14  Q.  When you say as "originally presented," in other words,

15  when you take that out, are you basically having the same,

16  apples to apples, that you had in 19 cents back in June?

17  A.  Yes, the case price is the same.  It's just the mechanics

18  of how the model works is what's changing.

19  Q.  The reason for the increase is to bring the revenue per

20  bird to the same level as it was under the marinated model.

21         And, again, if you could explain that, please.

22  A.  So it's saying that if you look at the -- there is a

23  certain amount of birds in a case, and so if the case price

24  doesn't change, the cost per bird doesn't change.  So by

25  increasing the per-pound rate, I am saying that the revenue per

Brandon Campbell - Direct

1   bird or the price per bird is going to be the same in both of

2   the models because your case price is the same.

3   Q.   Now, when you were creating this new model, did you do that

4   on your own or did you do that at the direction of sales or

5   anybody in sales?

6   A.   I created the model on my own and then aligned with the

7   business unit on what the new proposal was prior to submitting

8   back to sales.

9   Q.   And on the issue about the margin, the 19 cents per pound,

10  was that something that you generated or was that something

11  that the sales unit told you to do?

12  A.   The 19 cents per pound is something that I generated on my

13  own.

14  Q.   Were you asking to -- for the opinion of sales, or were you

15  telling sales what the new proposal would be to RSCS on behalf

16  of Kentucky Fried Chicken?

17         MS. CALL:   Object as to vague, the time frame we are

18  talking about here.

19         THE COURT:   Overruled.

20  BY MR. GILLEN:

21  Q.   Go ahead.  You can answer.

22  A.   No, it was not a consideration of sales.  It was a

23  direction of what the new change was going to be.

24  Q.   I want to show you what has been --

25         MR. GILLEN:   If we can take that down, please.

Brandon Campbell - Direct

1  *BY MR. GILLEN:*

2  Q.  And I want you to look at 467 in your binder, please.

3          *COURT DEPUTY CLERK:*  Is that G-467?

4          *MR. GILLEN:*  I am sorry, it is G-467.

5  *BY MR. GILLEN:*

6  Q.  Do you recognize this document?

7  A.  Yes, I recognize the document.

8  Q.  And is this a document that was created by you?

9  A.  Yes, it was created by me.

10  Q.  Is this a document that was created by you on or about the

11  date that is listed in this particular e-mail?

12  A.  Yes.

13  Q.  Was it generated by you as a result of a business duty to

14  inform others within Tyson about the position of Tyson

15  regarding the KFC bid?

16  A.  Yes, it was.

17  Q.  Is this a means by which you would electronically

18  communicate to others within the business unit and the sales

19  unit about your position regarding the final pricing?

20  A.  Yes.

21  Q.  And is this document kept in the normal course of business

22  at Tyson?

23  A.  Yes.

24  Q.  And is it relied upon by Tyson and its employees to make

25  business decisions on Tyson's behalf?

Brandon Campbell - Direct

1   A.   Yes.

2   Q.   And is it accurate to the best of your knowledge and

3   belief?

4   A.   To the best of my knowledge, yes.

5          MR. GILLEN:   I would move, Your Honor, G-467.

6          THE COURT:   Any objection to the admission of G-467?

7          MS. CALL:   Objection, Your Honor, 803(6), but no

8   objection as to admissibility otherwise.

9          THE COURT:   G-467 will be admitted.

10          MR. GILLEN:   May we publish, Your Honor?

11          THE COURT:   You may.

12   BY MR. GILLEN:

13   Q.   So here we have, Mr. Campbell, we've got -- this is an

14   e-mail that you sent on September the 25th, 2014; is that

15   right?

16   A.   Yes.

17   Q.   Now, we have got a whole list of folks.  You mentioned

18   Tim Scheiderer.  You talked about him.  Mr. Bowlin, it's been

19   sent to him, correct?

20   A.   Correct.

21   Q.   Was he still within the business unit at that time for

22   small bird?

23   A.   Yes, he was.

24   Q.   And Steven Cullen, you indicated that he was within the

25   business unit as well?

Brandon Campbell - Direct

1    A.   Yes, in the small-bird business unit.

2    Q.   And to Mr. Mulrenin and to Mr. Pepper and to Mr. Roberts in

3    sales, correct?

4    A.   Yes, those three individuals which were in sales.

5    Q.   Charlie Solomon, I believe you indicated his position was

6    head of the small-bird unit; is that right?

7    A.   Yes, correct.

8    Q.   Now, what are you telling us or what is this document doing

9    here?  What are you telling us in this document?

10   A.   This document is communicating the final KFC pricing model

11   for the 2015 year for KFC to be given to KFC.

12   Q.   So I want to go over this with you and ask you questions

13   about this.  Increased margin from .1681 to .1931 on the

14   eight-piece model, what does that mean?

15   A.   That's increasing the margin line item on the cost-plus

16   model from 1681 to 1931.

17   Q.   Now, the 1931, earlier in June, you were looking at

18   19 cents, correct?

19   A.   Correct.

20   Q.   And here it seems to be 19.3 cents, correct?

21   A.   Yes, correct.

22   Q.   And it has underneath that a .015-pound increase in margin

23   due to not removing the 48-hour drain-back tare.  Tell us what

24   you mean there.

25   A.   Again, because the -- because KFC requested to not remove

Brandon Campbell - Direct

1    the drain-back tare, we increased the per-pound rate.

2    Q.   Now, this was sent over -- you say this was the final

3    Kentucky Fried Chicken pricing model for 2015, right?

4    A.   Yes, correct.

5    Q.   And that's the model that was agreed upon by the parties,

6    correct?

7    A.   Yes.

8    Q.   I want to go back a bit and ask you some questions about

9    some other areas other than the Kentucky Fried Chicken.  And I

10   want to ask you some questions, for example, about Popeye's,

11   2015 Popeye's, the contract for 2015 for Popeye's, okay?

12   A.   Okay.

13   Q.   What role, if any, did the pricing unit have in developing

14   the Popeye's 2015 pricing model which was developed in 2014?

15   A.   The pricing unit was responsible for creating the Popeye's

16   pricing model.

17   Q.   Within the pricing unit, were you the individual who had

18   the responsibility for working up that pricing model?

19   A.   Yes.  It was my responsibility.

20   Q.   And how did you go about pricing the proposal on small bird

21   for Popeye's for that proposal for the 2015 contract?

22   A.   It would have been the same process as I described for KFC

23   where we looked at the overall business unit margin goals and

24   then looked at the margin goals specific to that bird size that

25   Popeye's utilized, then we look at the Urner-Barry,

Brandon Campbell - Direct

1   Georgia Dock, and then wins and losses on other bids, in

2   between all those components, then triangulate a price.

3   Q.   I wanted you to look at G-949 in your binder, please.  949,

4   is that a document that you recognize?  Have you gotten there

5   yet?

6   A.   I am almost there.  Okay.  I just am there.  I recognize

7   the e-mail.

8   Q.   I will ask you some questions about it.  Is this a document

9   that was created by you?

10   A.   The e-mail I am looking at, yes, was created by me.

11   Q.   And was this a document, this e-mail generated by you on or

12   about the date listed in the e-mail?

13   A.   Yes, it was.

14   Q.   Was it sent to an individual within Tyson over -- who had

15   supervisory authority over you?

16   A.   Yes, it was sent to Joey White who was my supervisor.

17   Q.   Was this e-mail sent to Mr. White by you as a part of your

18   business duty to inform your superior of various matters within

19   the Tyson analysis of the small-bird market?

20   A.   Yes, it was.

21   Q.   Was this e-mail sent -- was it kept in the normal course of

22   business at Tyson?

23   A.   Yes.

24   Q.   And was it relied upon by individuals within Tyson?

25   A.   Yes.

Brandon Campbell - Direct

 1    *Q.*  Did you have a business duty -- I think I asked you that --

 2    business duty to inform your superior of the factual

 3    information that would be relevant to Tyson's decisions on

 4    small birds?

 5    *A.*  Yes.

 6         *MR. GILLEN:*  Your Honor, I would move for the

 7    admission of G-949, please.

 8         *THE COURT:*  Any objection to the admission of G-949?

 9         *MS. CALL:*  Same objection, not a business record.  No

10    objection to admissibility.

11         *THE COURT:*  G-949 will be admitted.

12    *BY MR. GILLEN:*

13    *Q.*  I would like to show you what has been marked as --

14         *MR. GILLEN:*  If we can just publish that briefly.

15         *THE COURT:*  Yes, you may.

16    *BY MR. GILLEN:*

17    *Q.*  You indicate that your comments on the attached spreadsheet

18    are attached.  Do you see that?

19    *A.*  Yes, I see that.

20    *Q.*  Now I would like to show you what has been marked as G-950

21    and ask you if you would look at that document, please.

22    *A.*  Okay.

23    *Q.*  Is this a document that was attached to the e-mail that you

24    submitted to Mr. White which is contained within G-949?

25    *A.*  Yes, this was the attachment.

3162

Brandon Campbell - Direct

1   Q.  Now, the date on the 949 was August the 1st; is that
2   correct?
3   A.  Yes, correct, August the 1st.
4   Q.  And in the 950, is that a document that was created or that
5   was created within Tyson in order to inform Mr. White and
6   others about various matters concerning the small-bird business
7   that Tyson had?
8   A.  Yes.
9   Q.  Was this document -- did you have a part in generating 950?
10  A.  Yes.  I was responsible for the customers and products that
11  I had responsibility for filling out that information.
12  Q.  So the information contained within 950, your involvement
13  in the creation of that was your personal comments about
14  specific clients?
15  A.  Yes.  They were my comments relative to anything that said
16  Brandon Campbell as the pricing manager.
17  Q.  Now, and this document was then created with your comments
18  to be sent to Mr. White for his review within Tyson?
19  A.  Yes, that's correct.
20  Q.  Was this document generated around the time that the e-mail
21  was sent on August the 1st, which is contained within 949?
22  A.  Yes, it was in that same time period.
23  Q.  Was the purpose of this document and your comments on the
24  document, did you have a business duty to inform your superior
25  of the status of the particular accounts for which you were

Brandon Campbell - Direct

1    responsible?

2    A.   Yes.   I was responsible for providing an update on where we

3    were at on the pricing for each of those.

4    Q.   And is this document which was a part of 949, the

5    attachment, a document contained within the business records of

6    Tyson?

7    A.   Yes, it was.

8    Q.   Is it something upon which Tyson employees would make

9    decisions on behalf of Tyson?

10   A.   Yes.

11   Q.   Is this a way in which you would communicate electronically

12   to inform others within Tyson of relevant information necessary

13   for their determinations and decisions on behalf of Tyson?

14   A.   Yes.

15   Q.   And I believe I mentioned, did you have a business duty to

16   make sure that your comments were as accurate as you could

17   possibly make them?

18   A.   Yes, that was my responsibility.

19   Q.   And to your knowledge, is this 950 an accurate document

20   that you forwarded to your boss, Mr. White?

21   A.   To the best of my knowledge, yes.

22        MR. GILLEN:   Your Honor, I will tender 950, please.

23        THE COURT:   Any objection to the admission of G-950?

24        MS. CALL:   Objection on hearsay grounds, unclear

25   precisely what in here is the witness' statements.   If perhaps

Brandon Campbell - Direct

1    some clarity could be laid for whose comments are in column H

2    and I, whose statements those are.

3             THE COURT:  Sustained.  If you, Mr. Gillen, if you

4    could lay some foundation, it was a little unclear on what

5    parts of this document Mr. Campbell wrote.

6    BY MR. GILLEN:

7    Q.  Let's focus on that.  Specifically, is the document laid

8    out where certain individuals within Tyson are responsible for

9    a particular account?

10   A.  Yes.  So each -- there is a current pricing manager, and so

11   the person responsible for that account and that pricing

12   activity is the name that's addressed under "current pricing

13   manager."

14   Q.  And specifically as it relates to you, I want to ask you

15   whether or not contained within here is a column regarding

16   Popeye's.

17   A.  Yes, there is a column regarding Popeye's.

18   Q.  Were you designated on this document as the current pricing

19   manager under the columns that would delineate who within Tyson

20   had that responsibility?

21   A.  Yes.  It was mine.

22   Q.  And with the -- would it also have in the columns business

23   unit and then small bird?

24   A.  Yes.

25   Q.  Now, did you -- you indicated that you -- that you wrote or

Brandon Campbell - Direct

1    you commented yourself on certain aspects of this document, and

2    I want to ask you about one more entry, KFC.  Was that -- under

3    the current pricing manager, are you listed there?

4    A.  Yes, I am.

5    Q.  And is that also the business unit small bird?

6    A.  Yes, it is.

7    Q.  So did you personally make comments in the far column of

8    this exhibit that reflected information that you felt needed to

9    be passed on to your superior regarding those accounts that I

10   just mentioned, the Popeye's and the KFC?

11   A.  Yes.  Those were my specific comments that I typed in on

12   those last two columns.

13   Q.  So in the far right column under I, under the Popeye's and

14   the KFC, those were generated by you; is that correct?

15   A.  Yes, that's correct.

16   Q.  And you did -- what you wrote down, you wanted to make it

17   as accurate as possible for information to be forwarded to your

18   boss.

19   A.  Yes, it would have been as accurate as possible.

20        MR. GILLEN:  Your Honor, I would re-tender the

21   document and have no objection to actually redacting the other

22   components other than the Popeye's and KFC columns.

23        THE COURT:  All right.  Ms. Call, then as redacted,

24   any objection to admission of G-950?

25        MS. CALL:  No objection, but just for the record's

Brandon Campbell - Direct

1   clarity, I believe counsel meant the "rows" for KFC and

2   Popeye's, not the "columns."

3          THE COURT:  Yes, I think that would be accurate for

4   this type of document.

5          MR. GILLEN:  That is correct.  Thank you, Counsel.  It

6   is "rows" rather than "columns."

7          THE COURT:  Can we scroll to the very top of it?  Let

8   me just see.  So, Mr. Gillen, then the column headings would be

9   left on, but just the KFC and, I forgot, was it Church's?

10          MR. GILLEN:  It's KFC and Popeye's.

11          THE COURT:  Those would be the only rows left on it,

12   right?

13          MR. GILLEN:  Correct, Your Honor.

14          THE COURT:  Then with that redaction, G-950 will be

15   admitted.

16          MR. GILLEN:  Thank you, Your Honor.

17   BY MR. GILLEN:

18   Q.  Now, I wanted to ask you some questions about --

19          THE COURT:  Do you want to display that, Mr. Gillen?

20          MR. GILLEN:  Yes, Your Honor.

21          THE COURT:  Okay.  It may be.

22   BY MR. GILLEN:

23   Q.  Mr. Campbell, I want to ask you some questions about this.

24   Let's go to the Popeye's, okay?  You see that?

25   A.  Yes, I see it.

Brandon Campbell - Direct

1  Q.  And then it indicates on the row that goes over, it says,

2  The pricing for this deal was negotiated to achieve a 5 percent

3  ROS on a grain-based model.

4       Do you see that?

5  A.  Yes, I see that.

6  Q.  Now, right next to that, we have something that's typed in.

7  Are those your comments that you are making to send on to

8  Mr. White?

9  A.  Yes, those are my comments.

10 Q.  I am going to ask you about them.

11      We will begin 2015 contract negotiations in the near

12 future.  A price increase of point -- looks like 12 cents -

13 15 cents per pound will be taken to Popeye's.

14      Correct?

15 A.  Correct.

16 Q.  Now, it seems, or you tell me, is that a range that's being

17 given there in your analysis to Mr. White?

18 A.  Yes, that's a range that the price increase will be

19 somewhere between 12 to 15 cents.

20 Q.  So as it relates to the Popeye's negotiation in 2015, there

21 was a range that you saw from the pricing unit that was a range

22 of 12 cents to 15 cents that you were looking for, correct?

23 A.  Yes, that was the acceptable range of what we were trying

24 to accomplish.

25 Q.  And so within -- if you gave a range to the sales unit,

Brandon Campbell - Direct

1    then they would be -- they could negotiate with the range set

2    by you; is that right?

3    A.  Different instances, this being one, that there would be a

4    range that they would work within, so we would have a ceiling

5    and a floor, and they could not drop below the floor without

6    reengaging the pricing team and the business unit.

7    Q.  So here on this one we have a range, right?

8    A.  Yes, correct.

9    Q.  Let's go down to KFC.  And here it says, Currently in the

10   process of negotiating .19/pound price increase for 2015

11   contract.

12        Do you see that?

13   A.  Yes, I see that.

14   Q.  No range there, is there, Mr. Campbell?

15        MS. CALL:  Objection, leading.

16   BY MR. GILLEN:

17   Q.  Is there a range there on KFC?

18   A.  On KFC, it's just 19 cents per pound.

19   Q.  So there wouldn't be any range or any sort of negotiation

20   range for sales or anybody under that analysis on August

21   the 1st; is that correct?

22        MS. CALL:  Objection, form and leading, reference to

23   "anybody."

24        THE COURT:  Overruled.

25   A.  Could you repeat the question?

Brandon Campbell - Direct

1   *BY MR. GILLEN:*

2   Q.   Yeah.  So in other words, this document was sent to your

3   boss on August the 1st of 2014, correct?

4   A.   Yes, correct.

5   Q.   And here you have indicated no range for KFC, correct?

6   A.   Correct.

7   Q.   So the direction from the pricing unit was that was the

8   number that was to be hit by the sales unit, correct?

9        *MS. CALL:*  Objection, leading.

10       *THE COURT:*  Sustained.

11  *BY MR. GILLEN:*

12  Q.   Is it the pricing unit's directive to sales to hit that

13  number?

14  A.   Yes, this is the direction to sales to hit the 19 cents per

15  pound.

16  Q.   As opposed to Popeye's with a range.

17  A.   Yes, Popeye's was a range.

18       *MR. GILLEN:*  You may put that aside, please.

19  *BY MR. GILLEN:*

20  Q.   Now, I want to ask you about another area, and I'll ask you

21  about Church's QA.  Are you familiar with that topic?

22  A.   At Church's, quality assurance, yes, I am familiar with

23  that term.

24  Q.   I want to ask you some questions about that.  Do you recall

25  being involved in estimating a cost for quality assurance

Brandon Campbell - Direct

1    specifications to Church's in 2013?

2    A.  Yes, I am familiar with working through cost estimates and

3    price estimates for change in the QA program.

4    Q.  Well, what role did you play in that?

5    A.  In that one as well as others, the sales team would come

6    with what the customer is asking to change either from a

7    specification standpoint or a QA standpoint.  It was my

8    responsibility to go in and understand what are the operational

9    and the cost impacts of that request, to capture those, and

10   then be able to come back with a pricing recommendation based

11   upon the additional cost per whatever that request was.

12   Q.  Now, was the pricing unit involved in running these

13   calculations on the Church's quality assurance cost?

14   A.  Yes.  Everything flowed through the pricing team.  So if

15   there was a spec change or a QA change, those would come

16   through the pricing team to do the homework around trying to

17   understand the impact of the business.

18   Q.  Did the sales unit or the sales team tell the pricing unit

19   what to do on the QA cost model for Church's?

20   A.  Not that I can remember.  No, that would have been out of

21   normal practice.

22   Q.  Within the pricing unit, were you the one responsible for

23   running the calculations on the QA cost?

24   A.  Yes, I was responsible for running the calculations and

25   aggregating the cost impact.

Brandon Campbell - Direct

1          MR. GILLEN:  Your Honor, if I may approach, I want to

2   show the witness a document which is not contained within the

3   binder, if I may?

4          THE COURT:  You may.

5   BY MR. GILLEN:

6   Q.  Do you recognize this document which is handed to you,

7   G-794?  Do you recognize that document?

8   A.  Yes, I do recognize it.

9   Q.  Is this an e-mail generated by you?

10  A.  The top section was generated by me, yes.

11  Q.  Focusing on the top section, was the top section of this

12  document, this e-mail, generated by you?

13  A.  Yes, it was.

14  Q.  Was it generated by you on or about the date which is

15  listed on the document?

16  A.  Yes, it was.

17  Q.  Was it generated by you in the normal course of your

18  business on behalf of Tyson?

19  A.  Yes.

20  Q.  Was it kept, this document kept in the normal course of

21  business by Tyson as a business record?

22  A.  Yes.

23  Q.  Did you have a business duty to deliver or to send to the

24  recipient information concerning your work in the Church's QA

25  cost model?

Brandon Campbell - Direct

 1  | *A.*  Yes.

 2  | *Q.*  Was this a means by which you electronically communicated

 3  | within Tyson's in order for Tyson to make an accurate business

 4  | decision?

 5  | *A.*  Yes.

 6  | *Q.*  And did you send this to anyone else or just the individual

 7  | that was listed here on the document?

 8  | *A.*  To the best of my knowledge, just to the individual on the

 9  | document, Darrell Bowlin.

10  |      *MR. GILLEN:*  Your Honor, I will tender G-794, but only

11  | the top part of it that was generated by Mr. Campbell.

12  |      *THE COURT:*  All right.  Just as to the top e-mail from

13  | Mr. Campbell, then, any objection to the admission of G-794?

14  |      *MS. CALL:*  No, Your Honor, not just for the top

15  | e-mail.

16  |      *THE COURT:*  Then that portion of G-794 will be

17  | admitted and may be published.

18  |      *MR. GILLEN:*  Thank you, Your Honor.  May we publish

19  | G-794?

20  | *BY MR. GILLEN:*

21  | *Q.*  Now, in G-794, the date here is January the 3rd, 2014; is

22  | that right?

23  | *A.*  Yes, it is.

24  | *Q.*  And, again, who was -- for the record, who was Mr. Darrell

25  | Bowlin?

Brandon Campbell - Direct

1    *A.*  Darrell Bowlin was a margin manager within the small-bird

2    business unit.

3    *Q.*  Why did you send Mr. Bowlin this e-mail?

4    *A.*  I wanted to make sure he was in alignment with the cost

5    projection and in turn what the price impact would be for the

6    QA cost.

7    *Q.*  For the record, the reference in this e-mail information

8    from Tim, that's not Tim Mulrenin, is it?

9            *MS. CALL:*  Objection, leading.

10           *THE COURT:*  Sustained.

11   *BY MR. GILLEN:*

12   *Q.*  Is that Tim Mulrenin that you are referring to?

13   *A.*  No, I am not referring to Tim Mulrenin in that e-mail.

14   *Q.*  So you got this together.  You sent it to Mr. Bowlin,

15   correct?

16   *A.*  Yes, I sent it to Mr. Bowlin, correct.

17   *Q.*  I would like to show you what has been marked as G-795.

18           *MR. GILLEN:*  May I approach the witness, Your Honor?

19           *THE COURT:*  You may.

20   *BY MR. GILLEN:*

21   *Q.*  Do you recognize G-795?

22   *A.*  Yes, I recognize this document.

23   *Q.*  Was this a document generated by you?

24   *A.*  Yes, this document was generated by me.

25   *Q.*  Is it the document that you forwarded that was referenced

Brandon Campbell - Direct

1    in G-794 your e-mail that we just went over?

2    A.  Yes.  This is the spreadsheet I am referencing.

3    Q.  And was this e-mail -- excuse me, this document, G-795, was

4    this a document that was generated by you in the normal course

5    of your business at Tyson?

6    A.  Yes, it was.

7    Q.  Was it something that you -- that was created on or about

8    the time that you forwarded the e-mail to Mr. Bowlin in January

9    of 2014?

10   A.  Yes, it would have been created in that same time period.

11   Q.  Was this generated or this information sent to him as a

12   result of your business duty to inform others within Tyson

13   about your analysis concerning certain costs regarding Church's

14   quality assurance?

15   A.  Yes.

16   Q.  And is this document kept in the normal course of business

17   at Tyson?

18   A.  Yes, it is.

19   Q.  And relied upon by Tyson employees to conduct the business

20   of Tyson?

21   A.  Yes.

22        MR. GILLEN:  I would move for the admission of G-795,

23   Your Honor.

24        THE COURT:  Any objection to the admission of G-795?

25        MS. CALL:  Objection that it's a business record, but

Brandon Campbell - Direct

1   as a statement of this witness, it appears, there is no

2   objection.

3           THE COURT:  G-795 will be admitted.

4           MR. GILLEN:  Thank you, Your Honor.  May we publish?

5           THE COURT:  You may.

6   BY MR. GILLEN:

7   Q.  If you could briefly explain to us what you are doing here

8   in your spreadsheet that you forwarded on 795.

9   A.  So the far left, Carthage, Mississippi, Monett, Seguin,

10  those are our complexes or production facilities.  The next

11  column over is referencing what is the product, whether it's

12  the eight-piece, bone-in product, or dark meat.  And then the

13  right columns that are the months are the incremental QA cost

14  for that complex and that product line for each month as a

15  result of the QA change.

16  Q.  Explain that when you say "incremental QA cost."  When you

17  say "QA," you are referring to what?

18  A.  So this would be a sampling program, so the cost of

19  actually the product to send, the shippers, the freight, the

20  cost associated with the sampling program.

21  Q.  And you indicated that the column indicates an incremental

22  additional cost.  Is that what you said?

23  A.  Yes.  These are additional costs as a result of the QA

24  program change.

25  Q.  And this is what you were forwarding to Mr. Bowlin based on

Brandon Campbell - Direct

1    your gathering the documents about what the Tyson actual cost

2    would be for this additional Church's quality control matter?

3    A.   Yes.

4    Q.   I would like to ask you about another area, so we can put

5    that aside.

6             And do you recall being involved in the Chick-fil-A --

7    and ultimately was the quality control cost actually removed?

8    A.   The quality control cost, was that removed at that time?

9    Q.   Yeah, the Church's quality control cost.

10   A.   I don't remember where we landed on it.

11   Q.   I want to ask you about the Chick-fil-A for a second.  Were

12   you involved in providing a price to Chick-fil-A for converting

13   product to the NAE in 2014?

14   A.   I was a part of the process.  I didn't have the direct

15   responsibility, but I was part of it, yes.

16   Q.   Just for the record, when we say "NAE," what does that

17   mean?

18   A.   NAE means no antibiotics ever administered.

19   Q.   And what sort of involvement were you involved in regarding

20   the Chick-fil-A NAE program?

21   A.   I was working with the other pricing manager,

22   Kelly Davidson, to try to understand what are the cost impacts

23   of converting our complexes and our program over to NAE.

24   Q.   Do you recall when you were first asked to provide a price?

25   A.   No, I don't remember the timing of when I was first asked.

3177

Brandon Campbell - Direct

1   Q.  I would like to show you a document to see if it refreshes

2   your recollection.

3        MR. GILLEN:  If we could put up 9715, please.

4   BY MR. GILLEN:

5   Q.  Mr. Campbell, you will have to look on the screen.  It's

6   not in your binder.  I am sorry.

7   A.  Okay.

8   Q.  Just look at that document and then look away.  Does that

9   refresh your recollection about when approximately you may have

10  been asked to provide pricing regarding this matter?

11  A.  No.  I mean, that was a notification, a public statement,

12  but I don't know how that correlates to the timing of the

13  request.

14  Q.  At the time that you were involved, did you have any clear

15  understanding of all the variables at full scale that you were

16  being asked to price?

17  A.  Could you repeat the question, please.

18  Q.  Yeah.  Did you have any clear understanding of all the

19  different variables that might be involved in the pricing for

20  the Chick-fil-A NAE program?

21  A.  Yes, I was aware of a large amount of the variables that

22  would have been impacted.  I don't know if I could say every

23  variable, but, yes, a lot of the variables.

24  Q.  Who was involved in the early rounds of the pricing

25  discussions, if you remember?

Brandon Campbell - Direct

1    *A.* Well, the early conversations were with the business unit

2    on whether or not, one, we had the ability to do it; and, two,

3    whether we wanted to and what the cost impact would be

4    associated with that.

5    *Q.* Do you recall any meeting or a meeting at Tyson on May the

6    1st of 2014 to discuss this matter?

7    *A.* No, I don't remember a meeting specifically.

8    *Q.* I would like to show you what is marked as G-815.

9         *MR. GILLEN:* If I may approach, Your Honor?

10        *THE COURT:* You may.

11   *BY MR. GILLEN:*

12   *Q.* Looking at G-815, do you recognize this document?

13   *A.* It appears to be a meeting invitation to speak to the

14   Chick-fil-A price model discussion.

15   *Q.* Are you listed as one of the individuals to attend that

16   meeting?

17   *A.* Yes, I am listed as a recipient of the meeting.

18   *Q.* And when was the meeting to take place?

19   *A.* The meeting was to take place on May the 1st, 2014.

20   *Q.* This was a business record within Tyson that was sent out

21   as sort of a calendar invite to folks?

22   *A.* Yes.  It would have been a calendar invite and a business

23   record.

24   *Q.* And kept in the normal course of business?

25   *A.* Yes.

Brandon Campbell - Direct

1    Q.  Relied upon by folks within Tyson?

2    A.  Yes.

3           MR. GILLEN:  Your Honor, I would move for the business

4    invite on G-815, please.

5           THE COURT:  Any objection to the admission of G-815?

6           MS. CALL:  No objection.

7           THE COURT:  G-815 will be admitted.

8           MR. GILLEN:  May we publish that, Your Honor?

9           THE COURT:  Yes, you may.

10   BY MR. GILLEN:

11   Q.  G-815, does this refresh your recollection about when the

12   meeting at Tyson took place regarding the discussions on the

13   Chick-fil-A NAE matter?

14   A.  Yes.  According to the document, May the 1st is when it

15   would have initiated the conversations for the Chick-fil-A

16   pricing model.

17   Q.  What kinds of considerations went into what the Tyson

18   offering would be on the NAE price?

19   A.  What cost components or what --

20   Q.  What sort of considerations -- sorry, what kind of

21   considerations went into decisions about what Tyson would be

22   offering on the NAE price to Chick-fil-A?

23   A.  We were considering what is the impact to the live program

24   of growing out the birds, what's the cost associated with it,

25   and then what is the total cost impact of that entire program

Brandon Campbell - Direct

1    and our other customers requesting this as well, so we

2    understand the total cost impact, is there more than one

3    customer that would be absorbing that cost through pricing.

4    Q.  Now, are you familiar with what's called a live weight cost

5    assumption?

6    A.  Yes, I am familiar with the term "live weight" and a "cost

7    assumption."

8    Q.  What is that?

9    A.  That is the cost associated with growing out the bird, the

10   live bird prior to going to the processing by the slaughter

11   facility.

12   Q.  I apologize.  I couldn't hear --

13   A.  The live weight cost assumption is what is the cost of the

14   bird, of actually growing the bird up until the point that it's

15   received at the slaughter facility or processing facility to be

16   processed into product.

17   Q.  How about the production facilities factor, how did that

18   factor into the pricing decision?

19   A.  Could you repeat the question?

20   Q.  How did the production facilities -- is there a production

21   facilities factor that went into the pricing decision?

22   A.  We would look at the production facility, the size of the

23   complex, how many live birds were going into that complex to

24   understand the total impact of the cost of converting that

25   program.

Brandon Campbell - Cross

1    Q.  Now, to your knowledge, did the price quoted or the NAE

2    conversion factor input, did that come from the -- did that

3    come from the sales team?

4    A.  The cost impact would have come from a combination of

5    pricing, the business unit, understanding what are the

6    operational impacts of that.

7         MR. GILLEN:  That's all I have.  Excuse me one moment.

8    I have to check to see whether there is anything else I need to

9    ask.

10        That's all I have, Your Honor.

11        THE COURT:  Thank you.

12        Additional questions for Mr. Campbell?

13        Cross-examination, Ms. Call.

14        MS. CALL:  Your Honor, may I approach to hand up some

15   documents?

16        THE COURT:  Yes.

17                      **CROSS-EXAMINATION**

18   BY MS. CALL:

19   Q.  Good morning, Mr. Campbell.

20   A.  Good morning.

21   Q.  Don't let the binder intimidate you.  I don't have too many

22   questions.

23        First off, we were just -- you were just being asked

24   on direct exam about NAE.  That was quite an extended process

25   figuring out Tyson's price, correct?

Brandon Campbell - Cross

1    A.   Yes, it was an extended process.

2    Q.   So you were asked about the meeting, but there was more

3    than one meeting about pricing?

4    A.   I can't remember specifically, but it would be reasonable

5    to think there was more than one meeting.

6    Q.   All right.  Now, I just want to ask a little bit about the

7    process you used in determining pricing models, okay?

8    A.   Okay.

9    Q.   Now, on direct exam you mentioned a couple factors you took

10   into account.  I think you mentioned Urner-Barry?

11   A.   Yes.

12   Q.   Georgia Dock?

13   A.   Yes.

14   Q.   And past win/loss data, right?

15   A.   Correct.

16   Q.   Do any of those sources or did any of those sources tell

17   you competitors' bids?

18   A.   Competitors' bids, no, they did not.

19   Q.   Did any of those sources tell you your competitors'

20   upcoming strategy for bids?

21   A.   Not their future strategy for new bids.

22   Q.   And did any of those sources tell you whether your

23   competitors were going to seek a price increase for bids?

24   A.   Not for future bids, no.

25   Q.   All right.  Now, just to ask a little bit about the process

Brandon Campbell - Cross

1    at Tyson with pricing and the other units, did you have

2    internal meetings where you discussed price negotiations with

3    customers?

4    *A.*  Yes, we had internal meetings at Tyson where we discussed

5    pricing for customers.

6    *Q.*  And those included the pricing unit?

7    *A.*  Yes, the pricing unit was a part of those pricing

8    conversations.

9    *Q.*  And you would meet with the business unit?

10   *A.*  Yes, I would.

11   *Q.*  And sales would be a part of those meetings.

12   *A.*  Sales would be a part of the meeting as we were

13   communicating what the pricing model and changes were, yes.

14   *Q.*  For example, this calendar invite you just looked at in

15   G-815, there are sales team members on that, right?

16   *A.*  Yes, correct.

17   *Q.*  Now, is it right, Mr. Campbell, that following those

18   internal meetings, sales job was to communicate that to the

19   customer?

20   *A.*  Yes, correct.

21   *Q.*  And they handled the negotiation with the customer, right?

22   *A.*  They handled the communication with the customer.

23   *Q.*  And their job was to actually secure the price that you

24   gave them?

25   *A.*  Yes, their job was to secure the price.

Brandon Campbell - Cross

1    *Q.*  Okay.  And as you testified earlier, sometimes you gave

2    them a specific price to get and sometimes you gave them a

3    range?

4    *A.*  Yes, depending on the account and what we were doing, yes.

5    *Q.*  Could you turn to tab 13 in the binder I just gave you,

6    Government's Exhibit 984?

7    *A.*  Okay.

8    *Q.*  Do you see that, Mr. Campbell?

9    *A.*  Yes, I do.

10   *Q.*  Is that top e-mail written by you?

11   *A.*  Yes, it is.

12   *Q.*  And is it an accurate reflection of your statement at the

13   time?

14   *A.*  Yes, it would be.

15           *MS. CALL:*  Government offers Exhibit 984.

16           *THE COURT:*  Any objection to the admission of

17   Exhibit 984?

18           *MR. GILLEN:*  No, Your Honor.

19           *THE COURT:*  Mr. Gillen, was that a no?

20           *MR. GILLEN:*  No.

21           *THE COURT:*  984 will be admitted.

22           *MS. CALL:*  Permission to publish.

23           *THE COURT:*  You may.

24   *BY MS. CALL:*

25   *Q.*  So, Mr. Campbell, this is an instance of you working with

Brandon Campbell - Cross

1   Defendant Roberts in Popeye's negotiations?

2   A.  Yes, it is.

3   Q.  And is it correct that when he negotiated this contract, he

4   increased the margin?

5   A.  He was within the 12- to 15-cent range.  He had increased

6   it from whatever the previous model was.

7   Q.  So as a salesman, you gave him a range, and he worked for a

8   higher part of that range?

9   A.  Within that range, yes.

10  Q.  We can move on.

11          Now, is it correct when you gave Defendant Roberts or

12  Defendant Mulrenin a range from your perspective, you wanted

13  them to get on the higher part of that range?  Right?

14  A.  Yes, within the range, we would always want the highest we

15  could get within the range, yes.

16  Q.  You wanted Tyson to make as much money as it could?

17  A.  As possible, yes.

18  Q.  All right.  Now, in wanting that outcome, did you ever tell

19  Defendant Roberts or Defendant Mulrenin to share the pricing

20  models that you gave them with competitors?

21          MS. PREWITT:  Objection, Your Honor.  The prosecutor

22  has zero factual basis to be asking that question.

23          MR. GILLEN:  I join that objection.

24          THE COURT:  That's not the question.  Overruled.

25  A.  I am sorry, could you repeat it?

Brandon Campbell - Cross

1    *BY MS. CALL:*

2    *Q.* Did you ever tell Defendant Roberts or Defendant Mulrenin

3    to share the bids that you gave them with their competitors?

4    *A.* No, I did not.

5    *Q.* Did you ever tell them to share the strategies that were

6    discussed in your internal Tyson meetings with competitors?

7          *MS. PREWITT:* Objection, Your Honor. The prosecutor

8    has zero factual basis to ask that question.

9          *THE COURT:* Overruled. He can answer.

10         *MS. CALL:* Exhibit 355 would be a factual basis.

11   *BY MS. CALL:*

12   *Q.* Did you ever ask Defendant Roberts or Defendant Mulrenin or

13   anyone in sales, including Mr. Pepper, did you ever ask them to

14   share the fact that Tyson would be seeking price increases with

15   its competitors?

16   *A.* No, I never asked them to share the information with a

17   competitor.

18   *Q.* Did you ever ask them to get that information from

19   competitors?

20   *A.* No, I never asked them to get competitive information.

21   *Q.* So, for example, for the NAE negotiations we were just

22   discussing, did you ever ask Defendant Roberts or

23   Defendant Mulrenin to get Claxton, Perdue's, or Pilgrim's

24   anticipated price increases?

25   *A.* No, I did not request that.

Brandon Campbell - Cross

1    *Q.* And you don't know whether they did; is that correct?

2    *A.* No, I have no knowledge of that.

3            MS. CALL: No further questions, Your Honor.

4            THE COURT: All right. Ladies and Gentlemen, it's

5    noon. So we'll resume with the redirect after lunch, and we

6    will be in recess until 1:30. Keep the admonitions in mind,

7    yellow juror buttons visible, and the jury is excused for the

8    lunch recess. Thank you.

9            (Jury excused.)

10           THE COURT: Mr. Campbell, you are excused until after

11   lunch. Thank you very much.

12           MS. PREWITT: Your Honor, can I be heard on something?

13           THE COURT: Yeah, one second. Let's hear from

14   Ms. Prewitt, I think, on an unrelated matter.

15           MS. PREWITT: Thank you, Your Honor.

16           After you overruled my objection, the prosecutor

17   called out to the jury Exhibit 3355 would be a factual basis.

18   The prosecutor was testifying before the jury about another

19   exhibit, and, Your Honor, I don't think that's appropriate.

20           THE COURT: Well, those objections that you and

21   Mr. Gillen are making are speaking objections. She responded

22   on what would have been an appropriate answer to provide a

23   factual basis, so that wasn't inappropriate for her to do given

24   the objection.

25           Mr. Feldberg?

Brandon Campbell - Cross

1          MR. FELDBERG:  Your Honor, this is simply about

2    scheduling.  I know there is an important discussion to be had

3    about the government's filing a little after 10:00 o'clock this

4    morning.

5          THE COURT:  And that being Docket No. 1186?

6          MR. FELDBERG:  Exactly.  I have the next two

7    witnesses.  They have schedule issues.

8          THE COURT:  The ones we talked about yesterday.

9          MR. FELDBERG:  I may have lost one already.  We are

10   trying to rearrange flights.  If there is any way we can get

11   them on and off the stand before the discussion about the

12   government's filing this morning.  I appreciate the discussion

13   is a very important discussion, but I am just trying to deal

14   with the scheduling issues.

15         THE COURT:  Well, obviously, we are not going to have

16   them testify over the lunch hour, but what you are suggesting

17   is that you would hope that after Mr. Campbell is done, that

18   those witnesses would get on.

19         MR. FELDBERG:  That would be my hope.

20         THE COURT:  And there wouldn't be too much of a delay

21   based on 1186 in terms of when we start the afternoon session.

22         MR. FELDBERG:  That's correct.  It only may be one

23   witness.  I have got to check on witness situations.

24         THE COURT:  Got it.

25         So, Mr. Koenig, go ahead.

Brandon Campbell - Cross

1          MR. KOENIG:  So during the examination, we reached out

2    to both Mr. Oare's lawyer, we have a call set up for as soon as

3    court adjourns over the lunch hour, we have reached out to the

4    Claxton lawyer, and I don't think we -- we haven't heard back

5    yet, but we will talk to them as soon as possible and try to

6    make some accommodation with them.  And then we can report

7    back.

8          THE COURT:  When you say "accommodation," talk about

9    the issues and see if you can reach some solution?

10          MR. KOENIG:  Yup.

11          THE COURT:  Okay.  I am not sure who wants to spring

12    up.  Go ahead, Mr. Kornfeld.

13          MR. KORNFELD:  First, Claxton's counsel, Mr. James

14    Herbison, is present in court.

15          Second, just a couple things to supplement the record

16    we made at 10:30.  The government repeatedly indicated, well,

17    when we talked to Mr. Finch, Mr. Finch was a record custodian.

18    Records custodians also have a Fifth Amendment privilege if, in

19    fact, those individuals are somehow implicated in criminal

20    wrongdoing.  And Mr. Finch was never so advised.

21          But more importantly, Your Honor, you will recall that

22    Walter Cooper, a salesman at Claxton whose name is on some of

23    the exhibits, he was identified in the *James* log essentially as

24    an unindicted co-conspirator, and Mr. Finch was not.  So the

25    government prior to putting together the *James* log, whenever it

Brandon Campbell - Cross

 1   was, September of last year, you know, had sort of scrubbed the

 2   documents and made a determination that another Claxton person

 3   should be on the *James* log.  Mr. Finch was not on the *James*

 4   log.

 5          In terms of other communications or whatever, if the

 6   Court wants to make inquiry of Mr. Herbison, he is here.

 7          THE COURT:  I am not going to make inquiry of him

 8   unless Mr. Herbison wants to mention anything at this time

 9   given the fact it may be more productive for him to talk to

10   Mr. Koenig before doing so.

11          MR. HERBISON:  I think that's productive, Your Honor,

12   to speak with the government.

13          THE COURT:  Sure.

14          Mr. Tubach -- Mr. Kornfeld, did you have anything

15   else?

16          MR. KORNFELD:  No, thank you, Your Honor.

17          THE COURT:  Mr. Tubach, go ahead.

18          MR. TUBACH:  Very briefly, Your Honor.  I believe at

19   the last trial the similar issue came up and government agreed

20   to give an immunity letter to Brenda Ray who then subsequently

21   testified.  We have a similar issue.  They made the same

22   representations about another witness, a second witness in the

23   filing that they made there.  They never actually contacted

24   that witness' lawyer, to this day they haven't contacted that

25   witness' lawyer, but I think that that immunity letter is the

Brandon Campbell - Cross

1    appropriate remedy for getting witnesses to testify here today

2    as opposed to anything else.

3          THE COURT:  Right.  Just so, you know, the premise is

4    that only the government can grant immunity.  It's crystal

5    clear, only the government can grant immunity, so --

6          MR. TUBACH:  That's not --

7          THE COURT:  That is true, Mr. Tubach.  If you want to

8    take a look at *United States v. Serrano*, it makes it crystal

9    clear in the 10th Circuit.  So, you know, with operating under

10   that premise, then, you know, that's why I suggest that the

11   government have those conversations.

12         Why don't -- maybe we need to come back.  I am

13   sensitive to Mr. Feldberg's witness scheduling issue.  Do you

14   want to come at 1:10 and would that give you, Mr. Koenig,

15   enough time to talk to those who need to be talked to?

16         MR. KOENIG:  Yes, I think it would.  I just want to

17   put on the record as well that the purpose of the *James* log was

18   for statements that we anticipated entering under 801(d)(2)(E).

19   It doesn't mean that just because a person's not on there that

20   they aren't a co-conspirator.  It's just these are statements

21   we planned to introduce, so just for the sake of the record.

22         THE COURT:  Yeah, once again, there can be lots of

23   back-and-forth about when the notice should have been filed and

24   all those things, but bottom line is that only the government

25   can grant immunity.  And as Mr. Tubach referenced, there was

3192
Brandon Campbell - Cross

1    something similar, not quite the same, but something similar

2    came up in the last trial.  A solution, the government figured

3    out a solution, and then things could proceed.

4           So if the government's intent is not to chill any

5    witnesses and if the intent is not to provide last-second

6    notice of these things, then perhaps we can arrive at a similar

7    solution with these two witnesses so that defendants can call

8    them, and we don't have any issues regarding invocation of the

9    Fifth or chilling their testimony or anything of that nature.

10          MR. KOENIG:  Understood.

11          THE COURT:  Anything else that we should take up

12   before we break?

13          MS. PREWITT:  I didn't find Exhibit 3355 on the

14   exhibit list, so if Ms. Call could provide that.

15          MS. CALL:  355 was the number.

16          THE COURT:  We will be in recess, then, until 1:10.

17   Thank you.

18      (Recess at 12:09 p.m. until 1:12 p.m.)

19          THE COURT:  Mr. Koenig or anyone have an update?

20          MR. KOENIG:  Sure, Your Honor.  So we talked with

21   Claxton's counsel, sent them -- or sent him a draft letter

22   relating to testimony today.  And we have been in touch with

23   Mr. Oare's lawyer, sent him a draft, something similar, but he

24   is not coming until Monday so I don't think there is the

25   urgency with that one.

Brandon Campbell - Cross

1           THE COURT:  "He" meaning?

2           MR. KOENIG:  Oare.  But for this afternoon's purposes,

3      we are moving swiftly.  I think it should resolve the issue.

4           THE COURT:  Anyone want to comment?  Anyone from the

5      Claxton defendants want to comment?

6           MR. KORNFELD:  Your Honor, I note that Mr. Herbison

7      was reviewing the e-mail from the government along with the

8      Claxton's criminal counsel who is in Atlanta.  So he is out in

9      the hallway, and I certainly can go get him.

10          THE COURT:  I don't think I really need to talk to him

11     unless he wanted to talk to me or there was some need for that,

12     but I am afraid it might just interrupt him if he is looking at

13     something right now.

14          MR. KORNFELD:  I will let him know the Court is

15     available, and he is aware, because he was in court, aware of

16     the time constraints that Mr. Feldberg indicated earlier.

17          THE COURT:  Right.

18          MR. KORNFELD:  May I be excused to just go tell him

19     that?

20          THE COURT:  Absolutely.  And I will stay on the bench

21     just in case he wanted to bring something up.

22          MR. KORNFELD:  Thank you.

23          THE COURT:  Anyone else have anything on that subject?

24          MR. FAGG:  It's not that subject, but it's related to

25     Mr. Feldberg's.  I don't know when this issue that we have been

Brandon Campbell - Cross

1    discussing about the letters the government sent to counsel is

2    going -- if there is going to be further discussion about it,

3    but the witness who is up after Mr. Feldberg's two witnesses,

4    which is Mike Brown, he has significant scheduling issues.  He

5    is going to be very short, and so I am hopeful that we can get

6    through his testimony before --

7            THE COURT:  It seems like -- it doesn't seem like this

8    issue is going to cause us not to start on time, and I think,

9    Mr. Feldberg, I am not sure if you have one or two witnesses,

10   but they wouldn't be very long anyway.

11           MR. FELDBERG:  They will not, Your Honor, and it's

12   two.  One of the gentlemen was able to manipulate something

13   with flights.

14           THE COURT:  Okay.  So it sounds like that will work

15   out.

16           Ms. Call?

17           MS. CALL:  Slightly separate issue.  During the last

18   two direct exams, I know Your Honor noted this during opening

19   arguments, but there appeared to be a significant head-nodding

20   issue again in tables around the room, specifically --

21           THE COURT:  Yeah, I think that we have to watch that.

22   I have noticed a little bit of head nodding, but I assume it's

23   inadvertent, but we need to be careful on that.  So we can't be

24   trying to signal the jury with head nodding or other types of

25   movements.

Brandon Campbell - Cross

1              MS. CALL:  Thank you, Your Honor.

2              THE COURT:  We will hang on for just a second while --

3              MR. KORNFELD:  Mr. Herbison would like to confer with

4    the government if that's okay.

5              THE COURT:  Oh, sure.

6              MS. SWEENEY:  Your Honor, may we be excused to go

7    confer with Mr. Herbison?

8              THE COURT:  Why don't we do this.  Maybe one member of

9    the conferral group can duck out if it doesn't seem that I need

10   to stay on the bench, and then we will let people do what they

11   need to do until 1:30.

12             Anything else that we can take up?

13             Let me bring up one issue, and that is some

14   exhibits -- this is somewhat random, but it was unclear to me

15   whether there was both a PDF and a native version, because it

16   seems like what's being admitted is just one version.  And this

17   is a long time ago, but it came up in regard to A-113, that's

18   just by an example.

19             So think about that, because, of course, what we did

20   last time is we had, I think, a thumb drive that had native

21   versions in the event that the jury wanted to look at those

22   spreadsheets.  But if we have just one exhibit number but there

23   is confusion about whether that's the PDF or the native, we

24   should try to figure out what's what for the appellate record.

25             Also, here is another thing, and that is while I have

Brandon Campbell - Cross

1    given people the permission to go ahead and refer to their

2    clients by first name in openings and the same in closings, you

3    should not do that when you are asking other witnesses

4    questions.  You should refer to your client by his last name.

5    Witnesses, of course, as we've talked about before, they are

6    perfectly free to call people by whatever they call them by.

7        MR. FAGG:  Your Honor, can I go ask if we need to

8    continue?

9        THE COURT:  Yeah, people don't have to stick in here

10   if they have something else to check on.

11       MS. CALL:  Your Honor, we are working out resolution

12   with counsel.  It's not going to be immediate, so perhaps it

13   makes sense to break, and we can try to resolve this in the

14   next 10 minutes.

15       THE COURT:  Sure.  And if a member of the prosecution

16   team needs to work with him once even that we maybe start at

17   1:30, that's perfectly fine.  And that member of the team can

18   come in and out without any permission of the Court.  Once the

19   person is at a point where he or she can come back in, they can

20   just come back in.

21       MS. CALL:  Thank you, Your Honor.  We may take leave

22   of that.

23       THE COURT:  Right.  Then we will be in recess until

24   1:30.  Thank you.

25       (Recess at 1:21 p.m. until 1:36 p.m.)

Bruce Bagshaw - Direct

1          THE COURT:  All right.  Why don't we get Mr. Campbell.

2      (Jury present.)

3          THE COURT:  Mr. Gillen, redirect?

4          MR. GILLEN:  Thank you, Your Honor.  We have no

5      further questions of Mr. Campbell.

6          THE COURT:  All right.  Well, Mr. Campbell, I hope you

7      enjoyed being here over the lunch hour, and you are excused.

8          THE WITNESS:  Thank you, sir.

9          THE COURT:  Mr. Feldberg.

10         MR. FELDBERG:  Your Honor, we call Mr. Bruce Bagshaw.

11     And I think we are getting him from the witness room.

12     (**Bruce Bagshaw** was sworn.)

13         THE WITNESS:  I do.

14         COURT DEPUTY CLERK:  Please state your name and spell

15     your first and last name for the record.

16         THE WITNESS:  My name is Bruce Bagshaw; B-R-U-C-E,

17     B-A-G-S-H-A-W.

18                    **DIRECT EXAMINATION**

19     BY MR. FELDBERG:

20     Q.  Mr. Bagshaw, where do you live, sir?

21     A.  Hillsboro, Ohio.

22     Q.  How long have you lived there?

23     A.  About 50 years now.

24     Q.  That was 50, 5-0?

25     A.  50, yes, sir.

3198

Bruce Bagshaw - Direct

1   Q.   Have you worked in the chicken industry?

2   A.   Yes.  Our family were franchisees for 47 years.

3   Q.   Franchisees for what franchise?

4   A.   Kentucky Fried Chicken.

5   Q.   And how old were you when you began working in the chicken

6   business?

7   A.   About seven years old, sir.

8   Q.   What did you do when you were seven years old in the

9   chicken business?

10  A.   I would stand on two milk crates and break chicken, and my

11  dad would cook it.  And my sister was nine years old, and she

12  would run the front cash register, and my mom would pack the

13  chicken.

14  Q.   As you grew older than seven, did you progress in your

15  responsibilities in the chicken industry?

16  A.   Yes, sir.  When I came back from college, I still had to

17  cook chicken, and I still had to wash dishes and all that kind

18  of stuff, so, yes, sir.

19  Q.   And you mentioned that your family owned KFC franchises.

20  How many franchises did your family end up owning?

21  A.   At one time, I think we were up to 33.

22  Q.   And where were those franchises located?

23  A.   Mostly in Ohio, and then we had a group of restaurants in

24  northern Kentucky, which is right across the river from

25  Cincinnati.

Bruce Bagshaw - Direct

1    Q.  And what position did you end up assuming in your family's

2    business owning 33 KFC franchises?

3    A.  Various.  I was in charge of operations for many years.  At

4    the latter part, I was the chief real estate officer, and I had

5    many roles.  I took care of all of our maintenances of our

6    restaurants, our new builds, purchasing, remodels, the whole

7    nine yards.

8    Q.  Did there come a time when you ran the family business?

9    A.  Yes, sir.  The last probably 15 years my sister and I did.

10   Q.  And when you and your sister were running the 33

11   franchises, what was the nature of your day-to-day

12   responsibilities?

13   A.  Six or seven days a week we were busy.  We had a lot of

14   responsibilities and had to take care of all of our people.  We

15   had at one time, I believe, over 700 people that worked for us,

16   and it was -- you never knew.  Every day was different.

17   Especially at the end when the labor issue took its toll, it

18   was really tough.

19   Q.  Has your family sold the business, sir?

20   A.  Yes.  In December of 2018, we sold -- at that time, we had

21   24 KFC restaurants, and we sold them all.

22   Q.  So for roughly how many years were you working in the

23   chicken business?

24   A.  I was a franchisee for 30 of the 47 years.

25   Q.  Now, who owns KFC restaurants?

3200

Bruce Bagshaw - Direct

1    *A.*   The individuals, the KFC franchisees.

2    *Q.*   So the franchisees are the owners?

3    *A.*   Of that business, yes.

4    *Q.*   Does that mean that you and your family were the owners of

5    33 franchises?

6    *A.*   Yes, sir.

7    *Q.*   We've heard some testimony in the case about --

8          *MS. SWEENEY:*   Objection as to form, relevance.

9    Mr. Feldberg talked about testimony that's happened in this

10   case that this witness has no foundation for.

11         *THE COURT:*   Well, let's see what the question is

12   first.

13   *BY MR. FELDBERG:*

14   *Q.*   We have heard some testimony about a buying cooperative

15   called Restaurant Supply Chain Solutions.  I think I got that

16   right, RSCS.  Do you know RSCS?

17   *A.*   Yes.

18   *Q.*   What is RSCS?

19   *A.*   It was a purchasing co-op that was started by the KFC

20   franchisees.  And over the years we added the rest of the

21   Yum Brands group, which was Taco Bell and Pizza Hut.  And at

22   one time Yum owned A&W and Long John Silvers.  So at one time

23   there was five organizations that were a part of that.

24   *Q.*   In the relationship between RSCS and the KFC franchisees,

25   who's the boss?  Who reports to whom?

Bruce Bagshaw - Direct

1    A.  Well, there was many structures set up, but the franchisees

2    were the ones that owned the purchasing co-op.

3    Q.  Does that mean that the purchasing -- withdrawn.

4        Does that mean that the purchasing co-op reports to

5    the owners, to the franchisees?

6    A.  Yes.

7        MS. SWEENEY:  Objection, leading.

8        THE COURT:  Overruled.

9    BY MR. FELDBERG:

10   Q.  Let me try it another way.  Who reports to whom in that

11   relationship?

12   A.  Well, there is a board of directors for the purchasing

13   co-op, and then there was seven, I believe seven regions in the

14   United States.  I belonged to the southeast region.  There was

15   a region called the Great Lakes and many more, and each region

16   had people that sat on -- that were representatives to that.

17   And they would have meetings and oversee what was going on.

18   And then the purchasing co-op would have professionals, whether

19   it was in commodities, whether it was in chicken and all dry

20   goods and all that.

21   Q.  So RSCS reported to you and the other franchisees, correct?

22   A.  Yes, during our meetings, yes.

23   Q.  And you told us that you began working in the stores when

24   you were seven.  Is that in the early '70s?

25   A.  Yes, sir.

Bruce Bagshaw - Direct

1    *Q.*  Did you have occasion to meet Colonel Sanders?

2    *A.*  Yes, sir.

3    *Q.*  When was that?

4    *A.*  Many times.  I lived in Indiana for the first six years

5    and -- Henryville, Indiana, and that's where the Colonel grew

6    up at.  It's actually the most franchisees of any town is from

7    Henryville, Indiana.  They would have a lot of parades at that

8    time.  But even after that, I met him once we were franchisees.

9    We would have different functions at conventions, different

10   functions on the Belle of Louisville, in Louisville, it's a

11   boat, and I have my picture with him and met him many times.

12   *Q.*  Mr. Bagshaw, do you know Roger Austin?

13   *A.*  Yes, sir.

14   *Q.*  For how long have you known him?

15   *A.*  Oh, probably over 30 years.

16   *Q.*  How do you happen to know Mr. Austin?

17   *A.*  Well, he was in charge of negotiating in our -- I talked to

18   him about -- in the early years before the purchasing co-op, we

19   would do deals, whether it was Gold Kissed, Tyson, Pilgrim's or

20   whoever it was, they would negotiate the deals with us, so I

21   got to meet him through that.

22   *Q.*  And over the years how often have you had personal contact

23   with Mr. Austin?

24   *A.*  Very regularly.  He became a very good friend of mine.

25   *Q.*  And could you describe for the jury, please, the business

Bruce Bagshaw - Direct

1    dealings that you've had with Mr. Austin?

2    A.   Mr. Austin was a man of his word.  You know, when you buy

3    chicken by the pound and you sell it by the piece, it's really

4    important when the weights come in that those weights are

5    accurate.  And there was times where we would question that,

6    and he was the man of integrity that would stand up to us and

7    say, You weigh those.  In over a month's time if that was not

8    what you got, we would compensate you for that.

9    Q.   And in terms of the nature of the business relationship

10   that you had with Mr. Austin, was it in the context of

11   purchasing chicken?

12   A.   Yes, sir.

13   Q.   So how often during the course of an average year would you

14   see Mr. Austin?

15   A.   For sure I would see him three times because there was two

16   regional meetings and then there was also a KFC convention, so

17   that was always then.  And then every once in a while I would

18   see him in between months, whether he came to one of our

19   functions, we typically invited him to our awards banquets that

20   we had for our people, and may see him at another function.

21   Q.   And you mentioned awards functions.  Has Mr. Austin to your

22   knowledge received any awards from franchisees?

23          MS. SWEENEY:  Objection, Your Honor, specific

24   instance, character at the time.

25          THE COURT:  Response?

3204
Bruce Bagshaw - Direct

1       MR. FELDBERG:  Your Honor, I am leading up to asking

2   him the questions prescribed by the Rules of Evidence, and this

3   is essentially part of the basis of his opinion.

4       THE COURT:  Let's have a side bar real quick.

5     (At the bench:)

6       THE COURT:  So Ms. Sweeney's objection is specific

7   instances.  It seems like you may be leading up to awards he's

8   received.  Why wouldn't that be a specific incident?

9       MR. FELDBERG:  Well, Your Honor, it's establishing in

10  part the basis for his opinion and his opinion of Mr. Austin's

11  reputation in the community, both of which are permissible

12  under I think it's Rule 405(a).

13      THE COURT:  True.  I mean, he can testify as to the

14  reputation in the community, his personal opinion, but him

15  describing the nature of the award seems like a specific

16  incident.  If he testifies that he is aware of what the awards

17  are without having mentioned what they are, I think that you're

18  right, but it does seem like if he is describing the awards

19  that he received, that that would be a specific incident.

20          Any response to that?

21      MR. FELDBERG:  Well, I just want to understand the

22  boundaries.  May I ask him if he is aware of awards given by

23  franchisees in the industry?

24      THE COURT:  Right.  But if he then starts talking

25  about what the awards are, that does sound like a specific

Bruce Bagshaw - Direct

 1   incident.

 2          MR. FELDBERG:  I will be guided by the Court's

 3   instructions.

 4          THE COURT:  Okay.  Thank you.

 5          Anything else, Ms. Sweeney?

 6          MS. SWEENEY:  Nothing further.  Thank you.

 7      (In open court:)

 8   BY MR. FELDBERG:

 9   Q.  Mr. Bagshaw, without telling us what the awards are, do

10   franchisees from time to time give awards to suppliers?

11   A.  Yes, sir, they do.

12   Q.  And has that occurred with Mr. Austin?

13   A.  Yes, sir, that has.

14   Q.  Now, Mr. Bagshaw, you've known Mr. Austin for many years

15   and done business with him for many years.  Do you have an

16   opinion on Mr. Austin's reputation for honesty and

17   truthfulness?

18   A.  Mr. Austin is guided by his religion.  He is a true leader.

19   He is very truthful.  He is honest.  And if he tells you he is

20   going to do something, he is going to do it.  You can count on

21   him.  He is a good person.

22   Q.  What's the basis of your opinion, sir?

23   A.  The truth.

24   Q.  Can you give the jury some examples that help you form the

25   basis of your opinion of Mr. Austin's reputation?

Bruce Bagshaw - Direct

1          MS. SWEENEY:  Objection, same objection as before.

2          THE COURT:  Response?

3          MR. FELDBERG:  I am just asking for the basis of his

4     opinion, Your Honor.

5          THE COURT:  Sustained.

6          MR. FELDBERG:  We won't go into the material discussed

7     at side bar.

8          THE COURT:  It sounds like the question would call for

9     that.  Sustained.

10    BY MR. FELDBERG:

11    Q.  You mentioned earlier, Mr. Bagshaw, that you bought chicken

12    by the pound and sold it by the piece.  Do you recall that?

13    A.  Yes, sir.

14    Q.  Can you explain what you meant by that?

15    A.  Well, we would buy chicken by case weights which was

16    measured in poundage.  And then when our customers came in the

17    door, we sold it by the piece, whether it was two pieces, three

18    pieces, 10 pieces, 20 pieces, 21 pieces.  So when you do that,

19    you've got to make sure that your weights are right, because if

20    it's not, over a period of time you may not be getting the best

21    of the deal.  And we are a for-profit business, and our goal is

22    to make a profit in our business so we could take care of the

23    people that work for us.

24    Q.  And was Mr. Austin involved in this business of buying by

25    the case and selling by the pound -- buying by the pound and

Bruce Bagshaw - Direct

1   selling by the piece?  Excuse me.

2   A.  Well, selling it by the pound, but he wasn't involved in

3   selling it by the piece because that was on the franchisees.

4   Q.  And when you do business that way, are case weights

5   important?

6   A.  Absolutely.

7   Q.  In what way?

8   A.  Because that told you what size chicken was in that box.

9   Q.  And what would happen if the case weights didn't average

10  out to what they were expected to be?

11  A.  Then you are paying more than what you are supposed to be

12  paying for that product.

13  Q.  And what would Mr. Austin do if that happened?

14          MS. SWEENEY:  Objection, same objection.

15          THE COURT:  He has already talked about this before.

16  He can answer.

17  A.  If -- when I gave him the report, he would make it right.

18  So if it was short a certain amount and it equaled up to so

19  many cases, he would credit us those cases of chicken.

20  BY MR. FELDBERG:

21  Q.  Do you have an opinion for Mr. Austin's reputation in the

22  community for honesty and truthfulness?

23  A.  Well, from what I know of Mr. Austin, as I said before, he

24  is guided by his religion, and, I mean, he is very -- he has a

25  family.  I know his wife and his son, Andy, and his daughter,

Bruce Bagshaw - Cross

1    Sarah, and he is very focused.  He takes care of his whole

2    family and he is just a good person.

3    Q.  Now, Mr. Bagshaw, you know, do you not, that Mr. Austin is

4    charged in this case with entering into a conspiracy to agree

5    to fix prices and rig bids?

6           MS. SWEENEY:  Objection, relevance.

7           THE COURT:  Let's hear what the question is.  Go

8    ahead.

9           MR. FELDBERG:  Thank you.  May he answer, Your Honor?

10          THE COURT:  He can answer that yes or no.

11   A.  Yes.

12   BY MR. FELDBERG:

13   Q.  Does that affect your opinion of his reputation for

14   truthfulness and honesty?

15   A.  No, sir, because that's not the Roger Austin that I have

16   known for 30 years.

17          MR. FELDBERG:  We have no further questions, Your

18   Honor.

19          THE COURT:  Thank you.

20          Any additional questions of Mr. Bagshaw?

21          Ms. Sweeney, cross-examination?

22          MS. SWEENEY:  Yes, Your Honor.

23                        **CROSS-EXAMINATION**

24   BY MS. SWEENEY:

25   Q.  Good afternoon, Mr. Bagshaw.

Bruce Bagshaw - Cross

1    *A.*  Thank you.

2    *Q.*  My name is Carolyn Sweeney, and I represent the government.

3    I am just going to ask you a few questions, okay?

4    *A.*  Okay.

5    *Q.*  So you just described a relationship with Defendant Austin

6    of many years; isn't that right?

7    *A.*  Yes, ma'am.

8    *Q.*  And I think you said 30 years?

9    *A.*  Yes, ma'am.

10   *Q.*  And you just called him a good friend; isn't that right?

11   *A.*  Yes.

12   *Q.*  And is it true to say you flew in from Ohio to testify here

13   in this courtroom?

14   *A.*  Yes.

15   *Q.*  Because you want to help Defendant Austin.

16   *A.*  Yes.

17   *Q.*  And you don't want to see him get in trouble, right?

18   *A.*  I want to tell the truth.

19   *Q.*  Now, you said that Mr. Austin is truthful; isn't that

20   right?

21   *A.*  Yes.

22   *Q.*  And that he is accurate?

23   *A.*  Yes.

24   *Q.*  And that in your experience he doesn't bluff.  Is that fair

25   to say?

Bruce Bagshaw - Cross

1   *A.*  He doesn't what?

2   *Q.*  Bluff.

3          *MR. FELDBERG:*  I am not sure that was his testimony,

4   Your Honor.

5          *MS. SWEENEY:*  I can rephrase, Your Honor.

6          *THE COURT:*  Sustained.  If you could rephrase.

7   *BY MS. SWEENEY:*

8   *Q.*  Mr. Bagshaw, is it fair to say that in your experience with

9   Mr. Austin he doesn't bluff?

10  *A.*  I am not sure what you mean by the word "bluff."

11  *Q.*  Do you understand -- or what's your understanding of the

12  word "bluff"?

13  *A.*  Acting like you're going to do something and you don't.

14  *Q.*  So in your experience, is it fair to say that Mr. Austin

15  doesn't bluff, doesn't act like he is going to do something and

16  then he does something else?

17  *A.*  He doesn't do that.

18  *Q.*  Now, Mr. Bagshaw, you haven't seen the government's

19  evidence in this case, have you?

20  *A.*  Say that again.

21  *Q.*  You have not seen the government's evidence in this case,

22  have you?

23  *A.*  No, ma'am.

24  *Q.*  And you're not aware of any phone records that show calls

25  between Defendant Austin and competing chicken suppliers, are

Bruce Bagshaw - Cross

1    you?

2    *A.*  No, ma'am.

3    *Q.*  You are not aware of any text messages about those

4    communications between Defendant Austin and competing chicken

5    suppliers, right?

6    *A.*  No, ma'am.

7    *Q.*  And you're not aware of e-mails about communications

8    between Defendant Austin and his competitors, right?

9    *A.*  No, ma'am.

10   *Q.*  Defendant Austin never told you about whether he had those

11   calls or communications, did he?

12   *A.*  No, ma'am.

13   *Q.*  So you don't know whether Defendant Austin rigged bids or

14   fixed prices with his competitors, do you?

15          *MR. FELDBERG:*  Objection.

16          *THE COURT:*  Overruled.

17   *A.*  Say that again.

18   *BY MS. SWEENEY:*

19   *Q.*  You don't know whether Defendant Austin rigged bids or

20   fixed prices with his competitors, do you?

21   *A.*  No, I don't.

22          *MS. SWEENEY:*  No further questions.

23          *THE COURT:*  Thank you.

24          Redirect?

25          *MR. FELDBERG:*  No, Your Honor.

 1          THE COURT:  Thank you very much, Mr. Bagshaw.  You are

 2    excused.

 3          MR. FELDBERG:  Your Honor, my colleague, Ms. Withers,

 4    is going to examine the next witness with the Court's

 5    permission.

 6          THE COURT:  Yes, of course, she may.

 7       (**Marcus Shelton** was sworn.)

 8          THE WITNESS:  I do.

 9          COURT DEPUTY CLERK:  Please state your name and spell

10    your first and last name for the record.

11          THE WITNESS:  My name is Marcus Glen Shelton.  Spell

12    my first name Marcus, M-A-R-C-U-S, last name Shelton,

13    S-H-E-L-T-O-N.

14                    **DIRECT EXAMINATION**

15    BY MS. WITHERS:

16    Q.  Good afternoon, Mr. Shelton.  I am Julie Withers.  I

17    represent Roger Austin.

18          Where do you live?

19    A.  I live in Summerfield, North Carolina.

20    Q.  And how long have you lived there?

21    A.  About eight years.

22    Q.  And what do you do for a living?

23    A.  I just sold my business November the 2nd of this past year,

24    but for about 26 years, I owned and operated Kentucky Fried

25    Chicken and Taco Bell restaurants.

Marcus Shelton - Direct

1    Q.  And about how many Kentucky Fried Chicken restaurants did

2    you operate?

3    A.  13 at any given time.  That was the max that we owned.  And

4    Taco Bells we owned two.

5    Q.  I am sorry, what was that?

6    A.  And we owned two Taco Bells.

7    Q.  And two Taco Bells.

8             And before you were a franchisee for KFC, did you work

9    in any KFC restaurants?

10   A.  I did.  I am a third-generation franchisee, so my

11   grandfather, Layton Bacon, my grandmother, Evelyn Bacon, they

12   actually started out the business with somewhat of a handshake

13   deal with Colonel Sanders.  So we have been in business since

14   1964.  I was born in 1972.

15   Q.  So did you know the Colonel?

16   A.  I did -- well, I didn't know him.  I was a young child when

17   he passed away.  I was eight years old when he passed, but I

18   met him on several occasions.  The last one was his 90th

19   birthday party in Louisville, Kentucky.  He blew the candles

20   out on his cake.  It was a 10-foot-tall cake.  He blew the

21   candles out with a hair dryer.

22   Q.  And how old were you when you first started working in your

23   family's KFC restaurants?

24   A.  Well, working and getting paid for it at age 14, because it

25   wasn't legal to work any sooner than that and get paid for it.

Marcus Shelton - Direct

1    Q.  When you were a kid, did you have responsibility for the

2    family business or responsibilities in the family business?

3    A.  I would say I was learning the family business at that

4    point.

5    Q.  What kind of tasks did you do?

6    A.  I cooked, anything that was legally possible in the

7    restaurant.  We had pieces of equipment in the restaurant that

8    you couldn't operate unless you were 18 years old, but I

9    cooked.  I did prep.  I packed.  I did just about anything that

10   they needed me to do.

11   Q.  Are the KFC franchisees, do they have organizations that

12   they become members of?

13   A.  They do.

14   Q.  And did you participate in any of those organizations?

15   A.  I did.  I participated in them, and I was in the leadership

16   of them.

17   Q.  Which ones?

18   A.  The Southeast Regional Association represents about a

19   thousand KFCs.  And it is what it says it is.  It's a Southeast

20   Regional.  In addition to that, all KFC franchisees are part of

21   the Association of Kentucky Fried Chicken Franchisees, which is

22   a national organization.

23   Q.  And do you recall if Mr. Austin was involved in any of

24   those organizations?

25   A.  Absolutely.

3215

Marcus Shelton - Direct

1    Q.   And what was his involvement?

2    A.   How long was his involvement?

3    Q.   What was his involvement?  Describe his role and his

4    involvement.

5    A.   Roger was a vendor, of course.  You know, at any of these

6    association meetings, we would go to see the vendors at parts

7    of the association meeting.  Obviously, those were our partners

8    in business.

9         In addition to that, you know, that's pretty much his

10   involvement is he -- Pilgrim's Pride sponsored -- Roger worked

11   for Pilgrim's, ConAgra, and Gold Kissed, but at any given time

12   these organizations also helped sponsor our association and

13   ensure that we were viable.

14   Q.   You mentioned ConAgra and Gold Kissed.  Are those also

15   chicken suppliers?

16   A.   They are.

17   Q.   And when Mr. Austin was working with those chicken

18   suppliers, was he also working with KFC?

19   A.   Yes, he was.  I'm sorry.

20   Q.   What was his role?

21   A.   He didn't work for KFC, but he was working with KFC

22   franchisees, correct.

23   Q.   And what was his role?

24   A.   Up until the early 2000s prior to the RSCS pretty much

25   taking care of -- taking over chicken procurement for most

Marcus Shelton - Direct

1    franchisees, we had a direct relationship with our vendors, so

2    with Gold Kissed and ConAgra we were negotiating prices either

3    as the Southeast Regional or as a specific franchise with our

4    vendors.

5            In addition to that, Roger, he was part of our KFC

6    family to us, the Southeast Regional and at the national level.

7    Q.  So regardless of whether he was working for Pilgrim's and

8    he was working for another supplier, he was still involved as a

9    customer representative and account representative supporting

10   the KFC franchisee community?

11   A.  Absolutely.  The transition from one organization to the

12   other was seamless to us as franchisees.  Roger was still the

13   guy we went to.

14   Q.  All right.  Are you familiar with his reputation for his

15   honesty in the community?

16   A.  I am very familiar with it.

17   Q.  And what's that reputation?

18   A.  Well, I can tell you of three awards that I know that he

19   won in 2018.

20           MS. SWEENEY:  Same objection as before.

21           THE COURT:  He can talk about the number of awards,

22   but he should not indicate what they were.

23   BY MS. WITHERS:

24   Q.  Without going into specifics on the type of award, can you

25   just describe the number of awards?

Marcus Shelton - Direct

1    *A.*  Yes, three awards.  2018 primarily -- well, two awards in

2    2018, and then prior to that, Roger was designated as our

3    vendor relation --

4         *MS. SWEENEY:*  Same objection as before.

5         *THE COURT:*  I don't think he was about ready to

6    mention an award, so as long as he wasn't, he can answer.

7    *A.*  He was designated as our vendor relations lead, and,

8    obviously, in a system like KFC, you have hundreds of vendors.

9    And the southeast KFC board and the southeast liaison to the

10   vendors felt it prudent to put Roger in a position where he

11   could help us have a better relationship with our other

12   vendors.  We could have chosen any one of the vendors to

13   represent us.  We chose him.

14   *BY MS. WITHERS:*

15   *Q.*  And how did you first meet Mr. Austin?

16   *A.*  Probably in -- I came to Bacon Enterprises or back to

17   Bacon Enterprises in August of '96.

18        Go ahead.

19   *Q.*  Do you recall how old you were at the time?

20   *A.*  I was born in '72, so 24.  But I came back to

21   Bacon Enterprises at that point.  I was working -- I had

22   graduated from the University of North Carolina.  I was working

23   in Myrtle Beach.  And my dad would call me up every other week

24   and say, Son, I sure could use your help.  Son, I sure could

25   use your help.  And I eventually came back into the business.

Marcus Shelton - Direct

1        Obviously, I had to work with Roger as a vendor after

2   I came -- I ran one restaurant for two years, came out, ran

3   multiple restaurants, and then went on to help my dad with the

4   entire business.

5        At that point, I would sit in on meetings with Roger

6   and my dad and other vendors of my dad.  But the one thing

7   sticks out in my mind, and that's early 2000s, about that time

8   frame.  Again, you're negotiating as a one-off --

9        MS. SWEENEY:  Objection, Your Honor.  I fear we are

10  getting into the same territory we were just talking about.

11       THE COURT:  I am not sure, but if you can ask leading

12  questions perhaps, Ms. Withers, just to guide him on that.

13       MS. WITHERS:  Sure.

14  BY MS. WITHERS:

15  Q.  So in the early 2000s, there was some particular concerns

16  in the KFC community; is that correct?

17  A.  Well, I think that in the early 2000s most of the

18  procurement was transitioning to the RSCS.  There was one

19  concern, and that was not a concern, but most of the system had

20  moved to average weight was how they were charged on their

21  invoices.  And we were one of the last holdouts in

22  Bacon Enterprises to still pay by actual weight.

23       And one example that I wanted to bring up was in this

24  situation Roger was tasked with coming in and talking to us --

25       MS. SWEENEY:  Objection, same objection.

Marcus Shelton - Direct

 1          *THE COURT:*  It's not entirely clear, so overruled.

 2    *A.*  Roger was tasked with coming in and talking to our

 3    organization about the possible transition to moving to average

 4    weight.  Most of the suppliers wanted that.  It was easier for

 5    them.  It was more efficient for them.  And we were opposed to

 6    it.  But he asked us to just test it for a period of time,

 7    three to six months.

 8          And I remember that summer being extremely hot, and

 9    the chickens weren't growing the way they normally would.  And

10    I remember actually average weight turned out to our

11    disadvantage after about a three- to six-month time frame.  And

12    I remember Roger coming to our office and handing my father a

13    check personally and saying, This is not the normal.  And it

14    wasn't.  Most people on average weight were turning out -- it

15    was in their favor, but in that situation it panned out to our

16    detriment.

17          *MS. SWEENEY:*  Under the Rules of Evidence, I don't

18    know that this is the testimony of counsel.

19          *THE COURT:*  Sustained.

20    *BY MS. WITHERS:*

21    *Q.*  What is your opinion of Mr. Austin's character for honesty?

22    *A.*  I don't know anybody in this room that has any more.  I

23    have never seen anything out of Roger in his interaction with

24    his family, and I have met all of his family, Kristy, his wife,

25    Andy, his son, and Sarah, his daughter, I have seen them

Marcus Shelton - Direct

1   interact at different regional meetings, at different functions

2   that we've had over the years.  His family adores him.

3          I have been in numerous situations with Roger

4   personally, and when I say "personally," I mean, obviously when

5   you go to regional meetings, you have entertainment-type things

6   that you do off-site and these type things and dinners.  I have

7   never broken bread with Roger that he didn't give reverence to

8   his God, which is important to me.  As far as business

9   dealings, I have never seen the man do anything but what he

10   said he was going to do.

11  *Q.*  Now, Mr. Bagshaw, obviously, you are here -- Mr. Shelton, I

12  am sorry, you are here in a criminal trial, and Mr. Austin is

13  the defendant in this courtroom.  He is charged with entering

14  into an agreement to rig bids and fix the price of chicken.

15  Does that change your opinion of his character?

16  *A.*  Absolutely not.  You know, I left my home first on Sunday,

17  canceled flight, then again on Monday to travel halfway across

18  the country leaving my 8 and 10-year-old and my wife.  If I had

19  any reserve whatsoever about Roger's character, I wouldn't be

20  here.

21          *MS. WITHERS:*  Thank you very much.  No further

22  questions.

23          *THE COURT:*  Thank you.

24          Additional questions?  Cross-examination.

25  Ms. Sweeney, go ahead.

Marcus Shelton - Cross

1                        **CROSS-EXAMINATION**

2      *BY MS. SWEENEY:*

3      *Q.*  Good afternoon, Mr. Shelton.

4      *A.*  Hello, ma'am.

5      *Q.*  My name is Carolyn Sweeney.  I represent the government.  I

6      am going to ask you a few questions, okay?

7      *A.*  Yes, ma'am.

8      *Q.*  So you described a relationship just now that you've had

9      with Mr. Austin of many years; is that right?

10     *A.*  Correct.

11     *Q.*  And you would call him a friend, fair to say?

12     *A.*  I would call him a friend.

13     *Q.*  You said he was honest, right?

14     *A.*  I did.

15     *Q.*  And I think you said that you don't know of anyone, at

16     least anyone in this room that's more honest than Mr. Austin;

17     is that right?

18     *A.*  Well, I don't know everybody in this room, so maybe that

19     was an overstatement.

20     *Q.*  That's fair, sir.

21             But I believe you said something that you hold him in

22     high esteem for his honesty; is that right?

23     *A.*  I do, yes, ma'am.

24     *Q.*  I believe you also said that he always did what he said he

25     was going to do --

Marcus Shelton - Cross

 1    *A.*   Yes, ma'am.

 2    *Q.*   -- is that right?

 3            And you just said that you flew here halfway across

 4    the country from North Carolina to testify on his behalf?

 5    *A.*   Yes, ma'am.

 6    *Q.*   Because you want to help him.

 7    *A.*   Because I think it's the right thing to do.

 8    *Q.*   And -- but you don't want to see him get in trouble, do

 9    you?

10    *A.*   My intentions today are to state the truth.

11    *Q.*   Now, sir, you haven't seen the government's evidence in

12    this case, have you?

13    *A.*   No, ma'am.

14    *Q.*   You're not aware of the phone records showing calls between

15    Defendant Austin and his competitors?

16    *A.*   No, ma'am.

17    *Q.*   And you're not aware of text messages about those

18    communications between Defendant Austin and his competitors?

19    *A.*   No, ma'am.

20    *Q.*   And you're not aware of e-mails that reflect communications

21    between Defendant Austin and his competitors?

22    *A.*   No, ma'am.

23    *Q.*   And Defendant Austin never told you about these or whether

24    he was involved in these calls and communications, did he?

25    *A.*   No, ma'am.

Michael Brown - Direct

1   *Q.*  So you don't know whether Defendant Austin rigged bids or

2   fixed prices with his competitors, do you?

3   *A.*  I believe in my heart he did not.

4   *Q.*  But you don't know either way, do you?

5   *A.*  I can't sit here on the stand with absolute clarity and say

6   one way or the other.

7          *MS. SWEENEY:*  Thank you.

8          No further questions.

9          *THE COURT:*  Thank you.

10         Ms. Withers, any redirect?

11         *MS. WITHERS:*  No, Your Honor.

12         *THE COURT:*  Mr. Shelton, you are excused.  Thank you

13   very much.

14         *THE WITNESS:*  Thank you, sir.

15         *THE COURT:*  Next witness.

16         *MR. FAGG:*  We call Mike Brown.

17     (**Michael Brown** was sworn.)

18         *THE WITNESS:*  I do.

19         *COURT DEPUTY CLERK:*  Please state your name and spell

20   your first and last name for the record.

21         *THE WITNESS:*  My name is Michael James Brown,

22   M-I-C-H-A-E-L, B-R-O-W-N.

23         *MR. FAGG:*  Your Honor, may I approach with a binder?

24         *THE COURT:*  Yes.

25                        **DIRECT EXAMINATION**

3224

Michael Brown - Direct

1    *BY MR. FAGG:*

2    Q.   Good afternoon, Mr. Brown.

3    A.   Good afternoon.

4    Q.   My name is John Fagg, and I represent Bill Lovette.  I have

5    just a few questions for you today.

6              Where do you work, sir?

7    A.   I work at the National Chicken Council in Washington DC.

8    Q.   Does the National Chicken Council sometimes go by an

9    acronym?

10   A.   Yes.  We go by NCC.

11   Q.   Is that how the National Chicken Council is frequently

12   referred, the "NCC"?

13   A.   Yes, sir.

14   Q.   How long have you worked at the NCC?

15   A.   I just had my 11th year last week.

16   Q.   Can you tell the jury what the NCC is?

17   A.   Yes, sir.  The National Chicken Council is a trade

18   association for chicken integrators in the broiler industry.

19   There is approximately 29 chicken integrators in the country,

20   and they are our primary membership.  We also have what is

21   known as allied members.  They are suppliers to the industry.

22   So as you could imagine, it could be machinery, things for

23   sanitation, things in that way to support our plants.

24   Q.   Mr. Brown, what's your position at the NCC?

25   A.   I am the president.

Michael Brown - Direct

1   Q.  And has that been your role the entire time you have been

2   at the NCC?

3   A.  It has been.

4   Q.  What did you do before you joined the NCC?

5   A.  Before I joined the NCC, I worked for the American Meat

6   Institute which represents red-meat packers.

7   Q.  And you mentioned that -- approximately how many members

8   does the NCC have?

9   A.  Well, we have 29 integrators, and I would say we probably

10  have about 75 members.

11  Q.  And you were describing the purpose just a little bit ago

12  of the NCC.  Does it have anything to do with the pricing of

13  chicken?

14  A.  No, sir, it does not.

15  Q.  You mentioned that broiler chicken suppliers are members of

16  the NCC.  Can you tell us a little bit about the different

17  types of broiler suppliers that are members of the NCC?

18  A.  Suppliers to the industry, they would be machine

19  manufacturers.  As you can imagine in the plants, we have all

20  types of machinery, chains, coolers, refrigeration, could be

21  chemical suppliers, things of that nature.

22  Q.  Anyone who was allied or associated with the industry from

23  a business perspective; is that fair?

24  A.  Can you repeat that?

25  Q.  Sure.  Any kind of company that might be associated with

3226

Michael Brown - Direct

1   the chicken industry would be an allied member?

2   A.   Yes.   They would gravitate towards NCC.

3   Q.   And then for the broiler suppliers themselves, the chicken

4   producers, are there different types of producers that are

5   members of the NCC?

6   A.   Well, integrators are integrators.   They all process

7   chickens.   They are of different size and scale.

8   Q.   You said "of different size and scale."   Can you give us

9   some sense of what you mean there?

10  A.   Well, of the 29 processing companies, you would have your

11  largest companies, say a Tyson Foods, a Pilgrim's, a Sanderson,

12  and then you would go down in volume of business to some other

13  more localized-type companies.

14  Q.   From your work in the NCC, are you familiar with how the

15  industry works, at least at a high level?

16  A.   I am at a high level.

17  Q.   Are you familiar with what's referred to as buying

18  cooperatives?

19  A.   Yes.

20  Q.   And do you know -- can you give us some examples of some of

21  the companies who are buying cooperatives or have buying

22  cooperatives that work on their behalf?

23  A.   Some of your larger restaurant chains that purchase a lot

24  of chicken on a daily basis to bring you your chicken

25  sandwiches for Popeye's or KFC and others.

Michael Brown - Direct

1    Q.   So would RSCS be an example of a buying cooperative?

2    A.   They would.

3    Q.   And SMS?

4    A.   They would.

5    Q.   Are those companies allied members of the National Chicken

6    Council?

7    A.   They are allied members.

8    Q.   Does the NCC have a board?

9    A.   Yes, we do.

10   Q.   And who makes up the board?  Who serves on the board?

11   A.   On our board of directors, we have our -- let me call

12   integrators, and they are people that actually process

13   chickens, and then they are on the board all the time yearly.

14   And then the rest of the members in the allied area, they would

15   rotate on and off.  They would be appointed to the board for

16   three years, and then they rotate off to let other allied

17   members serve on the board.

18   Q.   So when you say "integrators," you are talking about the

19   companies that you mentioned earlier, Pilgrim's, Sanderson?

20   A.   Right, all the chicken companies that Americans would be

21   familiar with.

22   Q.   Thank you.

23           Sir, do you know Bill Lovette?

24   A.   I do.

25   Q.   How do you know Mr. Lovette?

Michael Brown - Direct

1    A.  I know Mr. Lovette through joining the chicken council 11

2    years ago.  He -- I became acquainted with him.  He got into my

3    officer core.  He was a former chairman.  I have worked a lot

4    with him, and I know him at a high professional level and I

5    like to believe a level of friendship.

6    Q.  So you mentioned that he was chairman.  Do you recall the

7    time period when he was chairman?

8    A.  I do.  He was my third chair, so that would have been 2013,

9    but we technically changed chairmanships at the end of October

10   each year, so that would have been in October '12 through

11   October '13.

12   Q.  So I want to focus a little bit on that 2013 time period

13   that you mentioned.  In 2013, did the NCC hold any conferences

14   that year?

15   A.  Yes.  We hold board meetings during the year, and we have

16   one standing conference that we hold each year which is known

17   as the marketing conference.

18   Q.  And did you attend the marketing conference in 2013?

19   A.  I did.

20   Q.  What -- can you explain to the jury a little bit about what

21   the marketing conference is?

22   A.  Well, in my view, it's kind of a misnomer.  There is not a

23   lot of marketing of chicken that takes place there.  There is a

24   lot of mid to lower senior level employees that are in the

25   communications professionals, some in sales group professionals

3229

Michael Brown - Direct

1    that attend.  Also I attend, some people on my staff attend,

2    and I have counsel present.

3    *Q.*  Do you recall where the conference was in 2013?

4    *A.*  Yes.  It was in -- forgive me for butchering it, but

5    Coeur d'Alene, Idaho.  I'm Irish.

6    *Q.*  And for these marketing conferences, generally speaking,

7    does the NCC prepare an agenda for those?

8    *A.*  We traditionally did, and we did for that year.

9    *Q.*  And can you tell us, did your team -- you said you were the

10   president of the NCC in 2013?

11   *A.*  Yes, sir.

12   *Q.*  And did you prepare the agenda?

13   *A.*  No.  They would have been prepared by professional staff on

14   my team.  My former chief economist, Bill Roenigk, my senior

15   vice-president for communication is Tom Super, would have

16   prepared those materials.  They would have come before me for

17   approval.  But prior to approving it, I take all of our agendas

18   and presentations and I provide that to my general counsel.

19   When my general counsel signs off, I then make that available

20   to the chairman, and at that time it was Mr. Lovette.

21   *Q.*  And so fair to say that that agenda was prepared at your

22   direction?

23   *A.*  Yes, sir.

24   *Q.*  And then ultimately you approved it.

25   *A.*  Yes, sir.

3230

Michael Brown - Direct

1    Q.  After it went to the chairman.  Was it then distributed to

2    the attendees?

3    A.  Yes, sir.

4    Q.  I would like for you, sir, to take a look in your binder at

5    B-849.  Do you see that?

6    A.  Yes, I do.

7    Q.  And have you seen this before?

8    A.  No, sir.  Am I looking at the line where it mentions

9    Fieldale, or am I in a different area?

10        MR. FAGG:  May I approach, Your Honor?

11        THE COURT:  Yes, you may.

12   A.  I am sorry, I flipped it.  Where it has "chicken marketing

13   seminar"?

14   BY MR. FAGG:

15   Q.  Yes.

16   A.  Oh, yes, that I've seen.

17   Q.  Have you seen this before?

18   A.  Yes, I've seen this.

19   Q.  And is this an example of an agenda for a conference that

20   was prepared at your direction?

21   A.  Yes, sir.

22   Q.  And is this something that the NCC prepares in the ordinary

23   course of its business?

24   A.  For this conference, yes, sir.

25   Q.  And is it something that the NCC expects its members to

Michael Brown - Direct

1    rely on?

2    A.  Yes, sir.

3    Q.  And is it something that the NCC itself relies on?

4    A.  Yes, sir.  Well, let me clarify.  Relying on it, if we

5    stick to this agenda, yes, sir.

6    Q.  So is it important that these agendas be accurate?

7    A.  Yes.

8         MR. FAGG:  Your Honor, we offer Exhibit B-849.

9         THE COURT:  Any objection to the admission of B-849?

10        MS. SWEENEY:  No objection.

11        THE COURT:  B-849 will be admitted.

12   BY MR. FAGG:

13   Q.  If we can turn to the second page, sir, of this exhibit.

14   Is that the agenda for the day?

15        MR. FAGG:  May we publish, Your Honor?

16        THE COURT:  You may.

17        MR. FAGG:  If we could look at the second page.

18        MS. NIELSEN:  Your Honor, may we use the document

19   viewer, please?

20        THE COURT:  You certainly may.

21   BY MR. FAGG:

22   Q.  Mr. Brown, do you remember if Mr. Lovette spoke at this

23   2013 marketing conference?

24   A.  Yes, he did.

25   Q.  And I believe you said earlier that this was targeted to I

3232

Michael Brown - Direct

1    think what you said was mid-level employees of chicken

2    producers --

3    A.   Yes.

4    Q.   -- is that correct?

5         Why did Mr. Lovette speak at this event?

6    A.   Well, as chairman of the council, it would be part of his

7    responsibilities for the year.  A chairman is expected to

8    preside over our January, June, and November board of directors

9    meetings, as well as preside over any scheduled or unscheduled

10   executive committee meetings, and to preside over the marketing

11   conference.  He goes in, gives a speech.  I am not going to sit

12   here and convince anybody that I remember everything Bill

13   talked about, but it was a pep talk.

14   Q.   And so did you ask him to speak at this event?

15   A.   I did.

16   Q.   Do you recall, sir, when Mr. Lovette arrived in Idaho?

17   A.   He would have arrived on the 21st.  I know I arrived on the

18   20th.

19   Q.   And he was speaking on the 22nd; is that correct?

20   A.   He was.

21   Q.   And how do you know that he arrived on the 21st?

22   A.   Because I was in contact with him prior to his attending,

23   and he had requested that I join him for dinner that evening.

24   Q.   And did you and he have dinner that evening?

25   A.   Yes, I did with Bill.

Michael Brown - Direct

1    Q.  Was there anyone else that was with you?

2    A.  No.  It was the two of us.

3    Q.  And after the dinner, did you all do anything else or did

4    you just go back to your room?

5    A.  No.  We went back to our room.  It was kind of a late

6    dinner.

7    Q.  Did Mr. Lovette say anything at that dinner that caused you

8    any concern?

9    A.  No, nothing that caused me concern.

10   Q.  Did he say anything that you thought might be improper?

11   A.  He caused me delight.

12   Q.  If he had said something that was concerning or you thought

13   was improper, is that something that you think you would

14   remember?

15   A.  Yes, absolutely.  It was strictly a social dinner and ...

16   Q.  In looking at the agenda here, Mr. Lovette was due to speak

17   at 7:45 the next morning.  Do you remember when you first saw

18   Mr. Lovette that next morning?

19   A.  I can't give you a time specific, but it was probably

20   around the beginning of the 7:00 o'clock continental breakfast.

21   I generally would escort Mr. Lovette or whomever would have

22   been in his position in prior subsequent years through the

23   conference.

24        MR. FAGG:  Your Honor, I am sorry, I thought it was

25   published.  May we publish?

Michael Brown - Direct

 1              THE COURT:  Yes, you may.

 2              MR. FAGG:  Thank you.

BY MR. FAGG:

 4    Q.   So I am sorry, sir.  You said you met with him before the

 5    event started around 7:00 a.m.?

 6    A.   Yeah, I met him downstairs.  I am sure that night we

 7    probably said, Hey, we will meet downstairs at X time.  I don't

 8    recall what that was.  I met him, walked him through the

 9    continental breakfast and then into the conference room.

10    Q.   So was it -- it seems as though you are escorting him prior

11    to him coming and speaking at the event; is that fair?

12    A.   Yeah.  I staff them.  These roles in the industry are very

13    prominent roles, so, of course -- well, they are rock stars in

14    the industry.  So you get a mid-level management, they like to

15    see these people.  I escort them around, talk to people, shake

16    hands, and I keep him on pace.

17    Q.   Do you recall, did Mr. Lovette give his opening remarks at

18    this event?

19    A.   Yes, he did.

20    Q.   So that would have been on July 22nd; is that correct?

21    A.   Yes, sir.

22    Q.   Can you tell us what generally in your own words, you said

23    you couldn't remember exactly everything he said, but generally

24    in your own words how would you describe --

25              MS. SWEENEY:  Objection.  I believe it calls for

Michael Brown - Direct

1    hearsay.

2            *THE COURT:*  Sustained.

3            *MR. FAGG:*  I am just asking him, Your Honor, to

4    describe generally what the nature of it was.  I am not asking

5    him to summarize or to say what Mr. Lovette said.

6            *THE COURT:*  As long as he is talking about just the

7    subject matter.

8            *MR. FAGG:*  The nature of it.

9            *THE COURT:*  The nature, that's fine.

10   *BY MR. FAGG:*

11   *Q.*  Mr. Brown, can you describe the nature of the remarks that

12   Mr. Lovette gave?

13   *A.*  Yeah, it was, you know -- again, I call it a pep talk.  The

14   industry had just come out of about three years of great

15   difficulties.  You had the ethanol and the RFS put into place.

16   12 to 13 chicken companies disappeared that were there.  And I

17   think Bill was trying to give these other people in the

18   industry a, hey, the future is bright type of speech.

19   *Q.*  As president of the NCC, was it part of your job -- let me

20   ask you this.  Who prepared the remarks that Mr. Lovette gave?

21   *A.*  It would have been Bill Roenigk would have taken the lead.

22   *Q.*  And who is he?

23   *A.*  Bill Roenigk is my former chief economist.  He has long

24   since retired.

25   *Q.*  So did you ask Mr. Roenigk to prepare remarks for

Michael Brown - Direct

1  Mr. Lovette to deliver?

2  A.  I probably didn't have to.  He was in the position for

3  about 35 years, but, yeah, under my direction, he knows it was

4  in his bucket.

5  Q.  And so building off of that and Mr. Roenigk, knowing that

6  was his job, fair to say that when you invite a chairman to

7  come and speak at one of these events, the NCC regularly

8  prepares those remarks for the chairman to deliver?

9  A.  Oh, absolutely.

10 Q.  And after Mr. Roenigk prepared the remarks, what will be

11 done with that draft script next?

12 A.  The draft script would have then gone to my senior

13 vice-president for communications to check on Bill's grammar,

14 et cetera.  It then would have come to my desk for a quick

15 scan, and then I would have sent it to general counsel.

16 Q.  You will send it to general counsel for their review?

17 A.  Yes, sir.

18 Q.  And then what would happen next?

19 A.  It would come back to me, and generally either myself or my

20 VP for communications would send that to the chairman of the

21 committee, in this case Mr. Lovette.

22 Q.  Did you do that here, sir?

23 A.  We did full vetting.

24 Q.  And did you -- do you know who provided the remarks to

25 Mr. Lovette?

Michael Brown - Direct

1    *A.*  I don't recall whether it was myself or Tom Super.

2    *Q.*  Would it help refresh your recollection if I showed you a

3    document?

4    *A.*  Yes, sir.

5    *Q.*  Can you turn in your binder, sir, to tab E-078?

6    *A.*  Mike Brown.

7    *Q.*  Does that refresh your recollection -- you can put that

8    e-mail aside, sir.  Does that refresh your recollection as to

9    who sent the script to Mr. Lovette?

10   *A.*  Yes, sir.  I, in fact, sent it.

11   *Q.*  Do you know if Mr. Lovette had any comments, or do you

12   recall whether or not Mr. Lovette responded with any comments

13   to you?

14   *A.*  I don't recall him providing any edits.  It would be

15   unusual for a chairman to provide edits.

16   *Q.*  And is that specific to Mr. Lovette, or are you speaking

17   generally?

18   *A.*  Generally, but Bill's a pretty buttoned-down guy.

19   *Q.*  So you don't recall him sending you back any revisions to

20   it?

21   *A.*  No.  It probably would stand out to me if he did because I

22   take corrections seriously.

23              *MR. FAGG:*  Your Honor, we would offer Exhibit E-078.

24              *THE COURT:*  Any objection to the admission of E-078?

25              *MS. SWEENEY:*  Your Honor, I believe the bottom e-mail

3238

Michael Brown - Direct

1    is hearsay.

2           THE COURT:  Response?

3           MR. FAGG:  Sure, Your Honor.  We are happy to redact

4    the bottom portion of this e-mail.

5           THE COURT:  Okay.  So in other words, just the top

6    e-mail is being offered?

7           MR. FAGG:  Yes, Your Honor.

8           THE COURT:  With that limitation, then, Ms. Sweeney,

9    any objection to E-078?

10          MS. SWEENEY:  No objection.

11          THE COURT:  E-078 will be admitted, the first e-mail

12   on the top part.

13          MR. FAGG:  May we publish it, Your Honor?

14          THE COURT:  Yes, you may.

15   BY MR. FAGG:

16   Q.  Sir, you indicated that you sent these remarks to

17   Mr. Lovette.  You don't recall him providing any comments back.

18   A.  No.

19   Q.  But you invited him to give you any comments if he had any,

20   right?

21   A.  Oh, of course.

22   Q.  Was there an attachment to your e-mail, sir?

23   A.  There would have been an attachment, yes.

24   Q.  And so what would the attachment have been?

25   A.  It would have been the prepared remarks as suggested by

Michael Brown - Direct

1   myself and my team.

2   Q.  So those prepared were the same remarks that you're talking

3   about that had been reviewed by your team?

4   A.  It would have been his script from the podium addressing

5   the conference, yes.

6   Q.  And remarks that you approved?

7   A.  And vetted, yes.

8   Q.  And these were the types of remarks that you prepared

9   regularly in the course of the NCC, your role in the NCC for

10  chairman?

11  A.  Yes, sir.

12  Q.  Take a look at, sir, if you will, Exhibit E-079.

13  A.  079?

14  Q.  Yes, sir.  Do you recognize that document?

15  A.  I do.

16  Q.  And what is it?

17  A.  It's the prepared remarks for Mr. Lovette at the

18  conference.

19  Q.  The remarks that were prepared by the NCC?

20  A.  Yes, sir.

21  Q.  And the same remarks that were attached to your e-mail that

22  we just talked about?

23  A.  Yes, sir.

24          MR. FAGG:  Your Honor, we offer Exhibit E-079.

25          THE COURT:  Any objection to the admission of E-079?

Michael Brown - Direct

1          MS. SWEENEY:  Yes, Your Honor, it's hearsay.

2          THE COURT:  Response?

3          MR. FAGG:  We are not offering it for the truth of the

4    matter asserted in any of the -- in the script itself.  We are

5    offering it for the fact that this is the document that

6    Mr. Brown sent to Mr. Lovette and that Mr. Lovette then relied

7    upon and used in this conference.  And we would also offer it

8    for the effect on the listener, here being Mr. Lovette, in that

9    they -- Mr. Brown provided these remarks, and the effect is

10   that Mr. Lovette then gave the speech.

11         THE COURT:  Sustained.  That's for the truth.

12         MR. FAGG:  Sir, you can set that exhibit aside.

13   BY MR. FAGG:

14   Q.  Do you recall -- I want to talk a little bit about the

15   speech, okay, that Mr. Lovette gave.  I would like to set the

16   stage a little bit for that.  Can you describe for the jury who

17   was in attendance -- who was in the audience when he gave this

18   speech?

19   A.  Sure.  They were the marketing conference attendees.

20   Again, I am -- probably well over a hundred people in

21   attendance in various roles in various chicken companies.

22   There was the media who is always present, in fact, WATT Media,

23   Global Media, and during those days helped sponsor the event

24   for us, and now actually I have handed the entire event off to

25   them a number of years ago.  So it would have been media, my

Michael Brown - Direct

 1   staff, part of my staff, my senior vice-president, my

 2   economist, and members of the chicken council, those

 3   mid-management folks who attend.

 4   Q.   Were there any attorneys in the audience?

 5   A.   Yes, sir.  My general counsel is always present.

 6   Q.   General counsel of the NCC?

 7   A.   Yes, sir.

 8   Q.   And are those types of attendees that you just mentioned,

 9   are those the same types of folks who normally attend these NCC

10   market conferences?

11   A.   Yes, the market conferences, yes.

12   Q.   About approximately how many people were in the audience,

13   do you think?

14   A.   Over a hundred, I would say.  I usually get an enrollment

15   of about 150.

16   Q.   And what was the setting?  Was it in a ballroom, conference

17   room?

18   A.   Yeah, a ballroom setting at a hotel.

19   Q.   And so Mr. Lovette delivered his remarks you said earlier,

20   right?

21   A.   Yes.

22   Q.   And about how long were those remarks?

23   A.   I can't imagine they were 10 minutes.

24   Q.   And you mentioned earlier that there were -- this was

25   generally for lower-level -- or mid-level, I am sorry,

Michael Brown - Direct

1    employees.  You know Mr. Penn, don't you?

2    A.  Yes, I do.

3    Q.  Do you recall whether or not Mr. Penn was at that meeting?

4    A.  I do not recall.

5    Q.  Do you believe that he was there?  Do you have any

6    recollection that he was there?

7    A.  He may well have been there because I do know that Bill and

8    Jayson would attend board meetings together, but I can't say a

9    hundred percent without looking at a roster.  I can't tell you

10   that he was there.

11   Q.  Mr. Penn, was he on the board for a number of years?

12   A.  Yes, he was on the board.

13   Q.  And the individuals who were on the board are senior-level

14   officials at different companies?

15   A.  Yeah, on my board for the NCC, they are typically CEOs or

16   senior VP for a division.

17   Q.  Do you recall, is there anything about Mr. Lovette's

18   remarks that he gave that day that stood out to you?

19   A.  I hate to say it, Bill, but no.

20   Q.  Do you believe that he stuck to the script that you had

21   prepared?

22   A.  I believe he would have.

23        MS. SWEENEY:  Objection, foundation.

24        THE COURT:  Overruled.

25   BY MR. FAGG:

Michael Brown - Direct

1   Q.  Sorry, could you say that again?

2   A.  I believe that he did.  Bill is not -- Bill is, like I said

3   earlier, a buttoned-down guy.

4   Q.  When he delivered those remarks, did he say anything at all

5   that was controversial in your opinion?

6          MS. SWEENEY:  Objection, calls for hearsay.

7          THE COURT:  Overruled.

8   A.  No.  And whether or not my antenna would have found that

9   objectionable or not, I had my general counsel present, so my

10  general counsel didn't bring anything to my attention either.

11  BY MR. FAGG:

12  Q.  Did your counsel bring anything to your attention with

13  regard to Mr. Lovette's remarks?

14  A.  No, sir.

15  Q.  After Mr. Lovette delivered his remarks, what happened

16  next?

17  A.  When his remarks concluded, he left the podium.  I joined

18  him exiting the room.  Of course, in his position, a lot of

19  people come up and shake his hand.  I was with him.  You know,

20  brief, how-do-you-do-type conversations.  And then Bill and I

21  left the hotel.

22  Q.  When you say "left the hotel," where did you go?

23  A.  I went back to Washington, and I assume Bill went back to

24  his headquarters or wherever his business took him.

25  Q.  So you both left the event?

Michael Brown - Cross

1    *A.*  Yes, left the property.

2    *Q.*  And went to the airport to catch your flights?

3    *A.*  Yeah.

4    *Q.*  So, sir, in terms of the amount of time where Mr. Lovette

5    was present for this event, it sounds like you spent a

6    significant amount of that time personally with him; is that

7    fair?

8    *A.*  That's correct, yes.

9    *Q.*  And throughout that entire time period, did you hear him

10   say anything that you thought was inappropriate?

11   *A.*  Never.

12   *Q.*  Did you ever hear anything that you thought was alarming?

13   *A.*  Never.

14   *Q.*  Anything that was concerning?

15   *A.*  Never.

16        *MR. FAGG:*  Thank you, Mr. Brown.  That's all I have.

17        *THE COURT:*  Additional questions for Mr. Brown?

18        Mr. Tubach?

19                        **CROSS-EXAMINATION**

20   *BY MR. TUBACH:*

21   *Q.*  Good afternoon, Mr. Brown.  My name is Michael Tubach.  I

22   represent Jayson Penn.  I have a quick question for you.  If

23   you look at J-142 in your binder.

24        *MR. TUBACH:*  Actually, Your Honor, I take that back.

25   J-142 is not going to answer the question I had.  I apologize.

Michael Brown - Cross

1    There is not a document.

2    *BY MR. TUBACH:*

3    *Q.*  You don't know one way or the other whether Mr. Penn was at

4    the 2013 event; is that right?

5    *A.*  I honestly don't recall.  I spent my time predominant --

6    with Bill.

7         *MR. TUBACH:*  I appreciate that.  Thank you very much,

8    sir.

9         *THE COURT:*  Thank you.

10        Additional questions?  Mr. Feldberg?

11                        **CROSS-EXAMINATION**

12   *BY MR. FELDBERG:*

13   *Q.*  Mr. Brown, I am Michael Feldberg.  I represent

14   Roger Austin.

15        You mentioned that the NCC holds an annual chicken

16   marketing seminar that's attended by low- to mid-level

17   employees of chicken companies, correct?

18   *A.*  Mid-level.

19   *Q.*  Fair enough.  And is that an annual event?

20   *A.*  It is an annual event.

21   *Q.*  Was the event held in July of 2014?

22   *A.*  It would have been held in July of each year since and

23   prior.

24        *MR. FELDBERG:*  Could we call up, please, J-142 just

25   for the witness and the Court and counsel, please.

Michael Brown - Cross

1    *BY MR. FELDBERG:*

2    *Q.*  Mr. Brown, do you recognize J-142?

3    *A.*  Yes.  I recognize it as an attendee list for our marketing

4    conference in 2014.

5    *Q.*  And was this a document prepared by the NCC in the regular

6    course of its business?

7    *A.*  Yes.  It would have been prepared by Maggie Ernst, who

8    would have been my meeting coordinator.

9    *Q.*  Was it the regular practice of the NCC to make and keep

10   lists of attendees at its conferences?

11   *A.*  It was a regular practice, yes.

12           *MR. FELDBERG:*  Your Honor, we move into evidence

13   J-142.

14           *THE COURT:*  Any objection to the admission of J-142?

15           *MS. SWEENEY:*  No objection.

16           *THE COURT:*  J-142 will be admitted.

17           *MR. FELDBERG:*  May we publish, Your Honor?

18           *THE COURT:*  You may.

19   *BY MR. FELDBERG:*

20   *Q.*  Looking at the first page, Mr. Brown, where was the

21   conference held in July of 2014?

22   *A.*  Greensboro, Georgia.

23   *Q.*  At what facility?

24   *A.*  At the Reynolds Plantation, Ritz-Carlton.

25   *Q.*  Typically when the NCC holds its annual marketing seminar,

Michael Brown - Cross

1    do most of the attendees stay at the facility where the seminar

2    is held?

3    A.   Yes, sir.  I would be surprised if anyone didn't.

4    Q.   And would that also be true in July of 2014?

5    A.   Yes, sir.

6    Q.   And what were the dates of this seminar at the Ritz in

7    Greensboro, Georgia, in July of 2014?

8    A.   July 20th through 22nd.

9    Q.   And looking at the first page, sir, do you know whether

10   Mr. Austin attended?

11   A.   Yes, it looks like he was accompanied by his wife.

12   Q.   It says Roger and Kristy Austin, correct?

13   A.   Yes, sir.

14   Q.   And we looked at the agenda for the 2013 seminar.  Was

15   there an agenda for the 2014 seminar?

16   A.   There would have been an agenda, yes, sir.

17        MR. FELDBERG:  Could we call up J-143, please, just

18   for the witness, Court, and counsel.

19   BY MR. FELDBERG:

20   Q.   Sir, do you recognize J-143?

21   A.   Yes, sir.

22   Q.   And I will ask you the same questions about it, or maybe we

23   can even skip them, that Mr. Fagg asked you about the 2013

24   agenda.  Was this kept in the ordinary course of the NCC's

25   business?

1    A.  Yes, sir.

2    Q.  And was it the regular practice of the NCC to make and keep

3    agendas such as J-143?

4    A.  Yes, sir.

5         MR. FELDBERG:  We offer it, Your Honor.

6    A.  And it would have been vetted in the same manner as the

7    prior meeting with the staff preparing and then my vetting

8    through general counsel before sharing with whomever the

9    chairman was that year.

10   BY MR. FELDBERG:

11   Q.  Thank you, Mr. Brown.

12        THE COURT:  Any objection to the admission of J-143?

13        MS. SWEENEY:  No objection.

14        THE COURT:  J-143 will be admitted.

15        MR. FELDBERG:  Your Honor, I have nothing further for

16   Mr. Brown.

17        Thank you, Mr. Brown.

18        THE COURT:  Thank you, Mr. Feldberg.

19        Additional questions?

20        All right.  Cross-examination, Ms. Sweeney?

21        MS. SWEENEY:  Thank you, Your Honor.

22                        **CROSS-EXAMINATION**

23   BY MS. SWEENEY:

24   Q.  Good afternoon, Mr. Brown.

25   A.  Good afternoon.

Michael Brown - Cross

1  Q.  My name is Carolyn Sweeney, and I represent the government.

2  I have a few questions for you today, okay?

3  A.  Sure.

4  Q.  So, Mr. Brown, you testified that you are the president of

5  the National Chicken Council, right?

6  A.  Yes, ma'am.

7  Q.  And the National Chicken Council is a trade association

8  that represents America's chicken producers, fair to say?

9  A.  Yes, ma'am.

10 Q.  Chicken producers are companies like Pilgrim's Pride,

11 Tyson, Claxton, George's, Koch Foods, among others; is that

12 right?

13 A.  That's correct.

14 Q.  And I believe you testified earlier the NCC sponsors annual

15 marketing seminars, right?

16 A.  Yes.  I just want to correct that by saying we always

17 traditionally have, and while to this day I lend our brand to

18 it, it's now run by WATT Global Media probably for the last, I

19 am going to give you a guess here, maybe four to five years.

20 Q.  And the 2013 and 2014 seminars that you talked about on

21 direct, those were sponsored by the NCC?

22 A.  They would have still been under my domain, yes.

23 Q.  Now, you testified the NCC has entities from lots of

24 different chicken producers at these seminars?

25 A.  Yes.

Michael Brown - Cross

1   Q.  And many of these chicken suppliers compete with each other

2   for business, right?

3   A.  Yes.

4   Q.  And there is usually representatives from each of the

5   chicken suppliers that attends, correct?

6   A.  A fair amount of them.  Not everybody attends.

7   Q.  So focusing our attention on 2013 and 2014, there is

8   typically a representative from a company like -- or from

9   Tyson?

10  A.  Typically, yes.

11  Q.  And from Pilgrim's Pride?

12  A.  Well, that year indeed they were.  He was the chairman.

13  Q.  And from Claxton.

14  A.  Probably Jerry Lane.

15  Q.  So that's a yes?

16  A.  No, actually, I don't know without reviewing the roster if

17  they were there or not.

18  Q.  Okay.  And we'll get there.

19      Now, I believe you testified has Defendant Penn

20  attended these meetings, these chicken marketing seminars?

21  A.  It's hard for me to answer that because Bill was always

22  senior to Jayson.  I know Jayson attended board meetings that

23  we held, but I don't know if Jayson attended the marketing

24  conferences unless even -- I don't know that he did.

25      MS. SWEENEY:  Okay.  So let's pull up Defendants'

Michael Brown - Cross

1   Exhibit J-142, which, Your Honor, I believe was just admitted

2   into evidence.

3                THE COURT:  Yes.

4   BY MS. SWEENEY:

5   Q.  Mr. Brown, once you have gotten there, just look up at me,

6   and we'll keep going.  We also have it up on the screen as

7   well.

8   A.  Are you having me look for Mr. Penn's name?

9   Q.  At the moment, we are just looking for the first page of

10  the document.

11  A.  Okay, I am there.

12  Q.  So this was the attendee list of that 2014 meeting, the

13  National Chicken Council marketing seminar meeting, correct?

14  A.  Yes, ma'am.

15                MS. SWEENEY:  Your Honor, permission to publish J-142.

16                THE COURT:  Yes, you may.

17                MS. SWEENEY:  Thank you.

18  BY MS. SWEENEY:

19  Q.  Now, sir, I would like to direct your attention to the

20  fifth page.  I am going to ask if -- do you see if

21  Defendant Roberts attended this 2014 chicken marketing seminar?

22  A.  I see he is registered.

23  Q.  And you testified on direct that these rosters were

24  accurate; isn't that right?

25                MR. FELDBERG:  He testified they were kept in the

Michael Brown - Cross

1   ordinary course of business.  I don't recall him saying

2   anything about accuracy.

3            THE COURT:  Overruled.  He can answer.

4   A.  I don't know if it's accurate.  It's like RSVP'ing for a

5   wedding and not showing up.  I don't know who came.

6   BY MS. SWEENEY:

7   Q.  All right.  So, sir, you see that Defendant Roberts is

8   listed as an attendee for this 2014 meeting; isn't that right?

9   A.  Yes, ma'am.

10  Q.  And at that time he worked for Tyson Foods?

11  A.  Yes, ma'am.

12  Q.  I would like to direct your attention to the third page.  I

13  think it's just one back.  And at the top right-hand corner, do

14  you see that Defendant Fries was also registered for this

15  conference in 2014?

16  A.  I do see that he is registered.

17  Q.  And he worked at Claxton Poultry at the time?

18  A.  He did work at Claxton Poultry, but I don't know if he

19  attended.

20  Q.  Understood.

21            And my question was if he -- that he is registered for

22  this meeting, correct?

23  A.  He was registered.

24  Q.  And if we could go to the next page, the fourth page.  At

25  the bottom, Mr. Mitch Mitchell is registered for this meeting

Michael Brown - Cross

1    as well, isn't he?  It's on the fourth page, right-hand column
2    most of the way to the bottom.
3    A.  Mitch Mitchell at Case Farms is registered.
4    Q.  Thank you.
5          And he was at Case Farms?
6    A.  I'll be honest, I don't know Mitch.
7    Q.  It says here he was at Case Farms?
8    A.  Yes.
9    Q.  I am sorry to turn back, but turning back to the third
10   page, most of the way to the bottom on the left-hand column, do
11   you see the name Tommy and Allison Francis there?
12   A.  Yes.
13   Q.  Tommy Francis was associated with Mar-Jac Poultry, right?
14   A.  Yes.
15   Q.  Now Tyson, Claxton, Case, and Mar-Jac, they are all poultry
16   suppliers, fair to say?
17   A.  Processors, integrators.
18   Q.  They supply?
19   A.  They send chickens to heaven, yes.
20   Q.  And they sell chicken to quick-service restaurants?
21   A.  Yes.
22   Q.  And they all sold small bird in 2014, right?
23   A.  I didn't hear you.
24   Q.  They all sold small bird in 2014?
25   A.  I don't know.

Michael Brown - Cross

1  *Q.*  But they all were processers and sold to quick-service

2  restaurants?

3  *A.*  I don't know each company's customer.  There is small

4  birds.  There is big birds.  There is antibiotic-free birds.

5  There is -- we will grow it on the moon for you if you'll pay

6  for it.

7  *Q.*  During the marketing seminar, we have looked at a few

8  agendas, they are -- not every minute of every day is

9  scheduled.  Is that right?

10  *A.*  I am sorry, again?

11  *Q.*  In looking at the marketing seminars, talking about the

12  seminars generally, not every minute of every day is scheduled;

13  isn't that right?

14  *A.*  Well, I mean, if you look at the calendar there before

15  breakfast, I guess not, but you have workshops.  You have a

16  lunch.  You have workshops.  You have a reception.  And that's

17  the end of the day.

18  *Q.*  And I realized it was a poorly worded question, sir.  There

19  are times during these seminars where participants in the

20  seminars can talk to each other and gather and chat that aren't

21  sitting in presentations, correct?

22  *A.*  I -- I don't know.

23         *MS. SWEENEY:*  All right.  If we could pull up Exhibit

24  J-143.

25         And, Your Honor, while we are pulling it up,

Michael Brown - Cross

1    permission to publish to the jury?

2            THE COURT:  Yes, you may.

3    BY MS. SWEENEY:

4    Q.  I would like to direct your attention to page 3.

5            MS. SWEENEY:  And if we could zoom in just above

6    Tuesday, July 22nd.

7    BY MS. SWEENEY:

8    Q.  Do you see the 6:30 entry there?

9    A.  I do.

10   Q.  That says, "Dinner on your own," doesn't it?

11   A.  It does.

12   Q.  So this is a time during the chicken marketing seminar

13   where there is not a scheduled presentation, correct?

14   A.  That is correct.

15           MS. SWEENEY:  Your Honor, brief moment to confer.

16           THE COURT:  You may.

17           MS. SWEENEY:  Thank you, Your Honor.

18   BY MS. SWEENEY:

19   Q.  I would like to just confirm a few more people who were

20   registered for the 2014 chicken council marketing seminar.

21           MS. SWEENEY:  If we could pull up J-142, and if we

22   could publish that, please?

23           THE COURT:  You may.

24           MS. SWEENEY:  Thank you.

25   BY MS. SWEENEY:

3256

Michael Brown - Cross

1   Q.   Now, Mr. Brown, you already testified that Defendant Austin

2   was listed as an attendee at this meeting, correct?

3   A.   Austin?

4   Q.   Yes.  When you were speaking with Mr. Feldberg, I believe

5   you confirmed that Defendant Austin was an attendee at this

6   meeting.

7   A.   Yes, I see him.  I have to look at it to make sure I am

8   being accurate with you.

9   Q.   I appreciate that.  Thank you.

10          And staying on the same page in the upper right-hand

11  corner, do you see the name Ric Blake listed there as well?

12  A.   I do.

13  Q.   And at the time he is listed, he is associated with

14  George's, correct?

15  A.   Yes.

16  Q.   Sir, one last topic.  You mentioned or you testified that

17  the board of the NCC is typically comprised of people from

18  chicken processers; is that right?

19  A.   Yes.

20  Q.   And those are typically executives, I believe you called

21  them high-level executives from chicken processers?

22  A.   I would -- well, some of the names on here are higher

23  level, but it's typically a mid-level marketing conference.

24          MS. SWEENEY:  And we can take this down.

25

Michael Brown - Redirect

1   *BY MS. SWEENEY:*

2   *Q.*  I am specifically asking you about members of the board of

3   the NCC.

4   *A.*  Yes.

5   *Q.*  Members of the board of the NCC are typically I think you

6   said --

7   *A.*  Higher-level management, yes, ma'am.

8   *Q.*  High-level management, thank you.

9          They are not all from the same chicken supplier,

10  chicken processor, are they?

11  *A.*  No.

12  *Q.*  They are from competing chicken suppliers?

13  *A.*  Yes.

14  *Q.*  At the time of the 2013 chicken marketing meeting, as you

15  testified, Defendant Lovette was the chair of the board; is

16  that right?

17  *A.*  He was the chair of the NCC.

18  *Q.*  And Mr. Jerry Lane who was then the president of Claxton

19  Food was also on the board?

20  *A.*  He would have been on the board, yes.

21          *MS. SWEENEY:*  Thank you.  No further questions.

22          *THE COURT:*  Thank you.

23          Redirect?

24                    **REDIRECT EXAMINATION**

25  *BY MR. FAGG:*

Michael Brown - Redirect

1    *Q.*  Just a few more questions for you, Mr. Brown.  Thank you.

2          Sir, you have been in the trade association business

3    for quite some time; is that fair?

4    *A.*  Since 1995.

5    *Q.*  And is it a -- in your experience, is it a normal practice

6    for trade associations to put on events for their members?

7    *A.*  Yes, sir.

8    *Q.*  And based on your experience in the trade association

9    industry, is it your opinion that that's very normal across all

10   industries?

11   *A.*  Yes, sir.

12          *MS. SWEENEY:*  Objection as to foundation.

13          *THE COURT:*  Overruled.

14   *A.*  Certainly for meat and poultry, but other trade

15   associations in other industries that I am aware conduct

16   themselves in the same way, generally on issues that confront

17   the industry.  It could be a food safety issue, an

18   environmental issue.  You bring your membership together to

19   address those so that I can advocate on their behalf in

20   Washington.

21   *BY MR. FAGG:*

22   *Q.*  So that you can advocate on their behalf?

23   *A.*  Yes, sir.

24   *Q.*  When you say that, what do you mean by that?

25   *A.*  Well, I am a lobbyist.  By the end of the day, I am paid to

3259

Michael Brown - Redirect

1    effect one way or another legislation or regulations that the

2    United States Government is looking to bear upon in industry.

3    That could be food safety, any number of issues.

4    Q.  And is it your opinion based on all of your time in trade

5    associations that the members of the trade associations rely on

6    an organization like the NCC to educate their members?

7            MS. SWEENEY:  Objection, leading.

8            THE COURT:  Overruled.

9    A.  Yes.  It's twofold.  It's to educate our members on

10   legislation or regulations that are being proposed so they are

11   aware of it, and then it's further my job to then educate a

12   regulator, a member of Congress or the Senate or a cabinet

13   official on how these policies may negatively or positively

14   impact our industry.

15   BY MR. FAGG:

16   Q.  So when you host these events, you expect that there is

17   going to be attendees from all of your different members or at

18   least as many as can possibly attend.  I assume that's your

19   hope.

20   A.  I do.

21   Q.  There is nothing unusual about that.

22   A.  No, sir.

23   Q.  But I would like to circle back to this exhibit that

24   Ms. Sweeney was asking you about, which is J-142.  Do you have

25   that one?

Michael Brown - Redirect

1    A.   Yes, the '14?

2    Q.   Yes, sir.

3         And she went through and asked you about a number of

4    employees of various producers who were there.  You testified

5    earlier when I was asking you questions that it was common for

6    the purchasers of chicken to also attend; is that right?

7    A.   Some would attend.

8    Q.   And so for some examples, if you look on the first page of

9    that document, would -- you see the name Christina Bongo-Box?

10        MR. FAGG:  Can we publish that, Your Honor?

11        THE COURT:  Yes, you may.

12   A.   Yes, I see that name.

13   BY MR. FAGG:

14   Q.   Where does she work?

15        MS. SWEENEY:  Object, Your Honor, scope of

16   cross-examination.

17        THE COURT:  Overruled.

18   BY MR. FAGG:

19   Q.   Where does she work?

20   A.   For Popeye's Chicken.

21   Q.   Do you see two below there a name Dean Bradley?

22   A.   I do.

23   Q.   Where does he work?

24   A.   Church's Chicken.

25   Q.   They are both purchasers of chicken?

Michael Brown - Redirect

1   A.   Yes.

2   Q.   Turn over, sir, to page 4, which is the one that ends in

3   448 down in the bottom right-hand corner.  Do you see that?

4   A.   I do now, yes.

5   Q.   If you look at the second-to-last name that's on the

6   left-hand column, what does that say?

7   A.   Mike and Tamara Ledford working for Chick-fil-A.

8   Q.   And if you turn to the next page, sir, page 5, you look at

9   the exact same spot, second to the left, second from the

10   bottom, do you see that name?

11   A.   Yes, sir, David Rothmeier with Chick-fil-A.

12   Q.   And Mr. Ledford and Mr. Rothmeier working for Chick-fil-A,

13   that's a chicken purchaser.

14   A.   Yes, sir.

15   Q.   Let's look on the next page, page 6, again, the same spot.

16   Do you see who is listed there?

17   A.   Second from the bottom?

18   Q.   Yes, sir.

19   A.   Gary Thornton with WATT Global Media.

20   Q.   What is WATT Global Media?

21   A.   WATT Global Media is a large media company who focused on

22   agri food and pet foods and the supplies within our chain such

23   as feed.

24   Q.   And I believe you said earlier that the media frequently

25   writes articles about these events?

Michael Brown - Redirect

1   A.  They do.

2   Q.  And when your speakers get up to speak, do you ever remind

3   them that the press is there?

4        MS. SWEENEY:  Again, object as to scope.  There was no

5   testimony about speeches or press on cross-examination.

6        THE COURT:  Response?

7        MR. FAGG:  Sure, Your Honor.  She was insinuating that

8   there was some problem with the suppliers all being at this.  I

9   am simply asking him about other attendees and why it might be

10  important that those attendees are there.

11       THE COURT:  Overruled.

12  A.  Could you repeat your question?

13  BY MR. FAGG:

14  Q.  Sure, sir.

15       Before your speakers get up at these types of events,

16  do you ever remind them that the media is in the audience?

17  A.  We remind them, but it's commonplace particularly since

18  this organization sponsors the events, so it's a little common

19  sense, but we do it as well.

20  Q.  And why do you remind them?

21  A.  Because the media is there and people could be

22  misinterpreted, mischaracterized or things of that nature.

23  Q.  Let's look back at one other, sir.  If you could look at

24  page 3 of the attendee list.  On the left-hand column, the

25  fifth person down, do you see that name?

Michael Brown - Redirect

1    A.   Yes, sir, Brian Eyink.

2    Q.   And who is Mr. Eyink?

3    A.   He is my general counsel.

4    Q.   And you mentioned earlier that the general counsel attends

5    all these events?

6    A.   Absolutely.

7    Q.   And Ms. Sweeney was asking you some questions about dinner

8    on your own at the 2014 event.  Mr. Lovette wasn't at this

9    event, was he?

10   A.   To the best of my knowledge, no.

11   Q.   Because he was no longer chairman?

12   A.   That's correct.

13   Q.   And if you look at this exhibit is in alphabetical order.

14   A.   Yes.

15   Q.   So if you turn, sir, to page 4.

16   A.   Yes.

17   Q.   Mr. Penn's name is not on there either, is it?

18   A.   It does not show up alphabetically, no.

19   Q.   And you believe the whole list is in alphabetical order,

20   right?

21   A.   Yes.

22   Q.   And, sir, I would like to ask you about one other document.

23   You said earlier that you didn't recall whether or not Mr. Penn

24   was at the 2013 event.

25   A.   No, I don't recall.

Michael Brown - Redirect

1   *Q.* Would it help refresh your recollection if I showed you a

2   document?

3   *A.* It may.

4         *MR. FAGG:* May I approach, Your Honor?

5         *THE COURT:* You may.

6   *BY MR. FAGG:*

7   *Q.* Sir, if you could take a look at that document and look

8   through the names, and then you can set it aside, and I will

9   ask you a question.

10  *A.* Okay.

11  *Q.* You can set that aside. Does that refresh your

12  recollection that Mr. Penn was not at that event?

13  *A.* It does, that he was not at the event, yes.

14        *MR. FAGG:* No further questions, Your Honor.

15        *MR. FELDBERG:* Moment to confer, Your Honor?

16        *THE COURT:* Yes.

17        *MR. FAGG:* That's all.

18        *THE COURT:* Thank you, Mr. Brown. You are excused.

19        *MS. SWEENEY:* I am sorry, I apologize, can we just get

20  the exhibit number the witness was shown on the record? It's

21  J-135. I just believe that was not stated on the record, Your

22  Honor.

23        *THE COURT:* Thank you, Mr. Brown.

24        *MS. CALL:* May we have a brief side bar?

25        *THE COURT:* Yes, we certainly may.

Michael Brown - Redirect

1      (At the bench:)

2          MS. CALL:  I wanted to provide an update on our

3   discussions from earlier regarding Mr. Finch.  The government

4   was able to reach a letter agreement with Mr. Finch through

5   counsel for the company.  I wanted to propose perhaps and bring

6   it up early just to give the parties notice that when Mr. Finch

7   is called to testify, we do something similar to the procedure

8   we used for Ms. Ray last trial, which is having the attorneys

9   at the back of the room prepared to execute the letter outside

10  the presence of the jury, execute the letter with Mr. Finch

11  before he takes the stand.

12         THE COURT:  Any problem with that particular procedure

13  for Mr. Finch before he testifies?

14         MR. BELLER:  Your Honor, David Beller for Mr. Fries.

15  I have no objection to that as long as it's obviously not done

16  in the presence of the jury.

17         One notation, given that this was -- came up

18  unexpectedly, and that is, Mr. Finch is not going to be asked

19  about this letter on his testimony.  Obviously, it's not

20  something I will be doing in direct, and I assume the

21  government is also not going to elicit it in cross-examination.

22         THE COURT:  Is that correct, Ms. Call, or whoever is

23  handling -- Mr. Torzilli, or I don't know who is handling the

24  cross of Mr. Finch.

25         MS. CALL:  Yes, Your Honor.  We do not plan to elicit

3266

Michael Brown - Redirect

 1   testimony regarding the letter.  And just to inform the parties

 2   and the Court, I think what I will propose to do once the side

 3   bar is over, I will -- since I have the letter here, I will

 4   bring it to the back so there is not much of any kind of show

 5   when Mr. Finch is called.

 6        MR. LAVINE:  Your Honor, perhaps the execution of this

 7   letter can be done at a break time -- we are approaching 3:15,

 8   so -- that it doesn't have to be done anything in front of the

 9   jury.

10        THE COURT:  I think that's a good idea.  Is Mr. Finch

11   the next witness?

12        MS. JOHNSON:  No, Your Honor.  The next witness is

13   Ms. Rhonda Warble.

14        THE COURT:  That's what I kind of figured.  So we can

15   do it over the break regardless, but we are pretty close to the

16   break, so why don't we go ahead and do that now.  All right.

17   Thank you.

18      (In open court:)

19        THE COURT:  Let's do the mid-afternoon break, Ladies

20   and Gentlemen.  We are about there.  Why don't we plan on

21   reconvening at 3:30.  Keep the admonitions in mind, and the

22   jury is excused for the afternoon break.  We will be in recess.

23   Thank you.

24        (Recess at 3:14 p.m. until 3:31 p.m.)

25        THE COURT:  All right.  Let's go ahead and get the

Rhonda Warble - Direct

 1   jury.

 2          (Jury present.)

 3          THE COURT:  Ms. Johnson, you may call the next

 4   witness.

 5          MS. JOHNSON:  Yes, Your Honor.  The defense calls

 6   Ms. Rhonda Warble.

 7          THE COURT:  And Ms. Warble has already positioned

 8   herself up in the witness stand.

 9       (**Rhonda Warble** was sworn.)

10          THE WITNESS:  Yes.

11          COURT DEPUTY CLERK:  Please state your name and spell

12   your first and last name for the record.

13          THE WITNESS:  Rhonda Warble; R-H-O-N-D-A, W-A-R-B-L-E.

14          MS. JOHNSON:  Your Honor, I have provided a binder to

15   the Court and Ms. Warble and the government.

16          THE COURT:  Thank you.  Go ahead.

17                     **DIRECT EXAMINATION**

18   BY MS. JOHNSON:

19   Q.  Good afternoon, Ms. Warble.

20   A.  Hi.

21   Q.  It's nice to see you again.  We have spoken a couple times;

22   is that correct?

23   A.  Yes.

24   Q.  Can you tell the jury, where do you work?

25   A.  George's.

Rhonda Warble - Direct

1   Q.   And how long have you worked at George's?

2   A.   25 years.

3   Q.   And what is the location of the George's facility where you

4   work?

5   A.   In Harrisonburg, Virginia.

6   Q.   What's your current title?

7   A.   Production planning manager.

8   Q.   And I am going to ask you to lean into the microphone.  The

9   masks make it difficult to hear.  So thank you.

10         And tell the jury, what does your job entail?

11  A.   I am responsible for making sure that customer orders are

12  met.

13  Q.   And customer orders pertaining to what product?

14  A.   Could be KFC, could be Popeye's, could be Bojangles.

15  Q.   But it's chicken?

16  A.   Chicken, yes, ma'am.

17  Q.   Do you know Mr. Ric Blake?

18  A.   I do.

19  Q.   And how do you know Mr. Blake?

20  A.   We worked together.

21  Q.   For how long did you work with Mr. Blake?

22  A.   From 2001 until he retired.

23  Q.   Okay.  Now, Mr. Blake does not work in Virginia; is that

24  correct?

25  A.   No, ma'am.

Rhonda Warble - Direct

1   Q.   Where did he work for George's?

2   A.   In Arkansas.

3   Q.   And what kind of work did you do with Mr. Blake?

4   A.   I was responsible for making sure that his customer orders

5   were covered.

6   Q.   Are you familiar with the term "shorts" and "covers" in

7   relation to your job fulfilling chicken?

8   A.   Yes.

9   Q.   Tell the jury a little bit about what that is and what you

10   do in relation to those terms "shorts" and "covers."

11   A.   It's basically making sure that we have the right bird size

12   coming into the plant to cover the demand that we have going

13   out to customers.

14   Q.   And how would you normally find out if George's was going

15   to be short on a specific day or for a specific order?

16   A.   Based off of the quantity of orders going out versus the

17   size of the chickens coming into the plant.

18   Q.   And if George's, it appeared to you, was going to be short,

19   what would you do?

20   A.   I would contact the sales department and let them know.

21   Q.   And now, did Mr. Blake work in the sales department?

22   A.   Yes.

23   Q.   Did other people as well?

24   A.   Yes.

25   Q.   I am going to show you, and it's tab 2 in your binder, if

Rhonda Warble - Direct

1   you will turn to that page, what is this document?

2   A.  It's an e-mail.

3   Q.  Okay.  And have you seen this e-mail before?

4   A.  Yes.

5   Q.  Were you the recipient on this e-mail?

6   A.  Yes.

7   Q.  Were there other recipients besides you?

8   A.  Yes.

9   Q.  And if you will not look -- just look up at me.  Did this

10  e-mail require some action by you and others when you received

11  it?

12  A.  Yes.

13  Q.  Okay.  And is this a typical e-mail that you would receive

14  during the normal course of your business?

15  A.  Yes.

16  Q.  And can you tell me the date of the e-mail?

17  A.  Sorry.

18  Q.  That's okay.

19  A.  11/7/2012.

20  Q.  November 7, 2012?

21  A.  Yes.

22  Q.  And who was this e-mail from?

23  A.  Darrel Keck.

24  Q.  Was he one of your supervisors?

25  A.  Yes.

Rhonda Warble - Direct

1    *Q.*  Did you know if he was Ric Blake's supervisor?

2    *A.*  I don't know.

3    *Q.*  All right.

4          *MS. JOHNSON:*  Your Honor, at this time, I would like

5    to move for introduction Exhibit I-440.

6          *THE COURT:*  Any objection to the admission of I-440?

7          *MS. SWEENEY:*  Yes, Your Honor, on hearsay grounds, and

8    if we could just have a brief side bar?

9          *THE COURT:*  Yes.

10       (At the bench:)

11         *MS. JOHNSON:*  I have been asked to tell the Court that

12   the live feed transcription is out.

13         *THE COURT:*  Okay.  Universally.

14         *MS. SWEENEY:*  Your Honor, that's the reason I asked

15   for the side bar.

16         *THE COURT:*  Okay.  Ms. Coppock, do you think that --

17   it does seem to be out with mine too.  Is there a reboot that

18   needs to be done?  Okay.  Then we'll stop the side bar and try

19   to get that taken care of, and we'll hold off until we do that,

20   all right.

21         (Brief recess.)

22         *THE COURT:*  I think we are ready, Ms. Johnson.

23       (At the bench:)

24         *MS. JOHNSON:*  Your Honor, I think there was an

25   objection to the document.  Is that what we are taking up, or

Rhonda Warble - Direct

1    do you want me to do that from the podium?

2            MS. SWEENEY:  Your Honor, if I may, I asked for the

3    side bar, perhaps I didn't need to, but just to raise the

4    transcript issue.  The only objection I had was hearsay, which

5    I made in front of the jury.

6            THE COURT:  Oh, okay.  Yeah.  Response on the hearsay?

7            MS. JOHNSON:  Yes, Your Honor.  The document is not

8    offered for the truth of the matter, the truth of the matter

9    being let's buy some Popeye's.  It's for the effect on the

10   listener that -- not just Ms. Warble but the others, the action

11   that they would have taken in response to the e-mail.

12           THE COURT:  Okay.  And Ms. Warble is going to talk

13   about that action that she took in response to this e-mail?

14           MS. JOHNSON:  Yes, Your Honor.

15           THE COURT:  Ms. Sweeney, anything else on that?

16           MS. SWEENEY:  Nothing further.

17           THE COURT:  I will admit it for the effect on the

18   listener only, and I will instruct the jury to that effect.

19        (In open court:)

20           THE COURT:  Ladies and Gentlemen, so I-440 will be

21   admitted, but not for the truth of the matters that are

22   asserted by Mr. Keck, but only for the effect of those on the

23   listener, Ms. Warble, all right?

24           I-440 will be admitted.

25           MS. JOHNSON:  Thank you, Your Honor.  May we publish?

Rhonda Warble - Direct

1          THE COURT:  You may.

2     BY MS. JOHNSON:

3     Q.  Ms. Warble, I know you see it in the binder and on the

4     screen, whichever is easiest for you.  I believe you told the

5     jury you received this e-mail; is that correct?

6     A.  Yes.

7     Q.  And the e-mail is instructing you to get on the phone

8     tomorrow and see if we can buy some Popeye's; is that right?

9     A.  Yes.

10    Q.  Who else received this e-mail?

11    A.  Ric Blake, Greg Nelson, and Tom Lopez.

12    Q.  So when you get it, is this typical or common in your line

13    of work?  What would you do in response to an e-mail like this?

14    A.  Yes, it's typical, and I would call other chicken suppliers

15    to see if they had any availability.

16    Q.  And likewise, the others on the e-mail who received it?

17    A.  Yes.

18    Q.  Do you know if they would act similarly to what you just

19    described?

20    A.  Yes.

21    Q.  And I am assuming you don't buy Popeye's from other

22    suppliers unless you're short; is that a fair assumption?

23    A.  Correct.

24    Q.  Now, when there was a shortage at George's or in your

25    plant, did Mr. Blake sometimes assist you in that process of

Rhonda Warble - Direct

1    trying to cover those shorts?

2            *MS. SWEENEY:*  Objection, leading.

3            *THE COURT:*  Overruled.

4    *A.*  Yes.

5    *BY MS. JOHNSON:*

6    *Q.*  And how -- in what way?

7    *A.*  He would contact other suppliers, and he would also call me

8    and help me if I needed help.

9    *Q.*  Now, were you able to approve the purchase of chicken from

10   other suppliers on your own?

11   *A.*  No.

12   *Q.*  Did you have to seek approval?

13   *A.*  Yes.

14   *Q.*  And to whom would you seek approval from when you were

15   trying to cover a short or purchase chicken from another

16   supplier?

17   *A.*  Darrel Keck, Greg Nelson, or Ric Blake.

18   *Q.*  Who were some of the common suppliers that you would

19   typically call in a period like this involving a short or a

20   cover in order to find chicken?

21   *A.*  Normally called Claxton Poultry.

22   *Q.*  Did you have a point of contact there that you spoke with

23   most often?

24   *A.*  Yes, Scott Brady.

25   *Q.*  So in the above-described situations, and let's use Claxton

Rhonda Warble - Direct

1    for the example, when Claxton would cover a shortage for

2    George's, or vice versa, would you learn Claxton's price for

3    chicken at that time?

4    A.   Yes.

5    Q.   And likewise, if you were selling chicken if you had an

6    overage, would the other buying supplier learn your -- George's

7    price?

8    A.   Yes.

9    Q.   Would a purchase order be created to effectuate these

10   sales?

11   A.   Yes.

12   Q.   And likewise an invoice?

13   A.   Yes.

14   Q.   And would the price of chicken involved in the sale be

15   reflected on the purchase order?

16   A.   Yes.

17   Q.   Also would case weights be reflected on the purchase order?

18   A.   Yes.

19   Q.   And whatever specifications involving the transaction also?

20   A.   Yes.

21   Q.   I am now showing you, ma'am, what's been marked as

22   Exhibit I-448.  And it is tab 3 in your binder.  Do you see

23   this document?

24   A.   Yes.

25            MS. JOHNSON:  Your Honor, I believe in a previous

Rhonda Warble - Direct

1   discussion with the government, the next three exhibits, 448,

2   452, and I-444, I believe there may be a stipulation to the

3   admissibility.

4           THE COURT:  What was the last one, Ms. Johnson?

5           MS. JOHNSON:  Your Honor, I-448, I-452, and I-444.

6           THE COURT:  Are you moving the admission of each of

7   those at this time?

8           MS. JOHNSON:  Yes, Your Honor.

9           THE COURT:  Any objection to the admission of I-444,

10  I-448, and I-452?

11          MS. SWEENEY:  No objection, Your Honor.

12          THE COURT:  Each of those will be admitted.

13          MS. JOHNSON:  Thank you, Your Honor.

14          May we publish Exhibit I-448?

15          THE COURT:  Yes.

16  BY MS. JOHNSON:

17  Q.  Ms. Warble, I believe you said you recognized this

18  document?

19  A.  Yes.

20  Q.  What is this?

21  A.  It's a purchase order.

22  Q.  And would this be the type of document created when

23  George's is having to purchase chicken from a fellow supplier?

24  A.  Yes.

25  Q.  Did you sign this document?

Rhonda Warble - Direct

1    A.   Yes.

2    Q.   What's the date on it?

3    A.   March 27, 2014.

4    Q.   And who was the chicken purchased from?

5    A.   Claxton Poultry.

6    Q.   And can you tell the jury there in the middle the product

7    description?  What were you purchasing?

8    A.   Popeye's eight-piece.

9    Q.   So "PE," is that an abbreviation for Popeye's?

10   A.   Yes.

11   Q.   And does it have the case weight listed?

12   A.   Yes.

13   Q.   And also the number of cases ordered?

14   A.   Yes.

15   Q.   Is it 924?

16   A.   Yes.

17   Q.   Finally on the far right, the cost per pound, do you see

18   that number, .9044?

19   A.   Yes.

20   Q.   You would have written this on the purchase order, correct?

21   A.   Yes.

22   Q.   Where would you have gotten that information, the price per

23   pound?  Where would you have gotten that information?

24   A.   From Claxton.

25   Q.   Now, just for informational purposes, it says, "All

Rhonda Warble - Direct

1   Thursday kill."  What does that mean?

2   A.  That is the approved -- the only approved date that we

3   would accept on the load, because Popeye's spec has a certain

4   number of days that we are allowed to deliver to their stores.

5   Q.  And finally, "Temp recorder must be on trailer," what does

6   that mean?

7   A.  That's a temperature recorder that monitors the temperature

8   of the trailer during transit.

9           MS. JOHNSON:  Your Honor, we would like to publish

10  I-452.

11          THE COURT:  You may.

12          MS. JOHNSON:  Thank you.

13  BY MS. JOHNSON:

14  Q.  Similar to the previous document, is this a purchase order?

15  A.  Yes.

16  Q.  Did you sign it?

17  A.  Yes.

18  Q.  What is the date on this?

19  A.  April 28, 2015.

20  Q.  Again, is this a situation where George's is purchasing

21  chicken?

22  A.  Yes.

23  Q.  And what was purchased on this purchase order?

24  A.  KFC eight-piece.

25  Q.  How many cases were ordered?

Rhonda Warble - Direct

1    A.   640.

2    Q.   At a price of what?

3    A.   $1.0382 per pound.

4    Q.   Again, same question, ma'am, where did you get that

5    information on the price?

6    A.   From Claxton.

7    Q.   Because was this chicken being purchased from Claxton?

8    A.   Yes.

9    Q.   Thank you, ma'am.

10        I believe this may be a two-page document, so if we

11   could turn to the second page.  Is this another purchase order?

12   A.   Yes.

13   Q.   And what's the date on it?

14   A.   April 28th, 2015.

15   Q.   Now, does it have a separate or a different delivery date

16   or pickup date?

17   A.   Yes.

18   Q.   What date is that?

19   A.   April 29th, 2015.

20   Q.   So do I understand this correctly, would it be a purchase

21   order on one day for delivery or pick up the next day?

22   A.   Yes.

23   Q.   Similar question.  Is this -- where is this chicken

24   purchased from?

25   A.   Claxton.

Rhonda Warble - Direct

1    *Q.*  And what was purchased in this purchase order?

2    *A.*  KFC eight-piece and Popeye's eight-piece.

3    *Q.*  And how many cases of each?

4    *A.*  450 on the KFC and 365 on the Popeye's.

5    *Q.*  What do those numbers tell you with regard to is this a

6    full truckload, a half truckload, or can you tell us?

7    *A.*  It's a full truckload between both products.

8    *Q.*  So a full truckload comprising of half KFC approximately

9    and the rest Popeye's?

10   *A.*  Yes.

11   *Q.*  And does it have the price for each, the KFC and the

12   Popeye's?

13   *A.*  Yes.

14   *Q.*  And what are they?

15   *A.*  The KFC was $1.0382 per pound, and the Popeye's was $1.0112

16   per pound.

17   *Q.*  Again, where did this pricing come from?

18   *A.*  Claxton.

19   *Q.*  And you signed this, ma'am?

20   *A.*  Yes.

21   *Q.*  And then finally, tab 5, which is Exhibit I-444.

22        *MS. JOHNSON:*  If we could publish that, Mr. Brian.

23        *THE COURT:*  You may.

24        *MS. JOHNSON:*  Thank you.

25   *BY MS. JOHNSON:*

Rhonda Warble - Direct

1    *Q.*   Is this yet another purchase order, ma'am?

2    *A.*   Yes.

3    *Q.*   And what is the date on this purchase order?

4    *A.*   September 9th, 2016.

5    *Q.*   And who was this purchased from?

6    *A.*   Claxton.

7    *Q.*   What is purchased in this purchase order?

8    *A.*   KFC eight-piece.

9    *Q.*   And does it have a case weight listed?

10   *A.*   Yes.

11   *Q.*   And what is 52.5?

12   *A.*   That's the average case weight for KFC eight-piece.

13   *Q.*   And there were 650 cases ordered?

14   *A.*   Yes.

15   *Q.*   So that would have been the average for all of those?

16   *A.*   Yes.

17   *Q.*   And, again, the price is what?

18   *A.*   .9987 per pound.

19   *Q.*   Where did that pricing information come from?

20   *A.*   Claxton.

21   *Q.*   And did you sign this, ma'am?

22   *A.*   Yes.

23   *Q.*   Were these documents used by other departments within

24   George's?

25   *A.*   Yes.

3282

Rhonda Warble - Direct

1  Q.  And can you give us a couple of examples of those other

2  departments?

3  A.  The transportation department, they would need the purchase

4  order number to give to Claxton when they picked the load up,

5  and to give it to our shipping dock when they delivered the

6  product to our plant; and also accounting, because they would

7  have to pay the invoice based off of the purchase order number.

8  Q.  Thank you.

9       So we've just looked at some purchase orders from

10  2014, 2015, and '16.  Are these examples that were common

11  occurrences during that time with regard to your job?

12  A.  Yes.

13  Q.  Now, let's switch gears a little bit.  This process of

14  buying and selling to cover shorts, what type of communication

15  did it require of you and others in order to effectuate this

16  transaction?

17  A.  Phone calls and e-mails.

18  Q.  And would these transactions take one or more phone calls,

19  if you can tell us?

20  A.  Normally multiple.

21  Q.  So, again, for shortages or surpluses, who inside of

22  George's were some of the individuals that you would be

23  required to communicate with?

24  A.  Darrel Keck, Greg Nelson, Ric Blake.

25  Q.  And the same question for the other suppliers.  Who are

3283

Rhonda Warble - Direct

1    some of those individuals that you would typically communicate

2    with to effectuate these covers or shorts?

3    *A.*  Normally, Scott Brady at Claxton.  I did have conversations

4    with Bill Kantola at Koch.  Claxton was mainly the one that I

5    communicated with.

6    *Q.*  During the time that Mr. Blake worked at George's, did you

7    ever receive information regarding shortage situations for

8    Mr. Blake?

9    *A.*  Yes.

10   *Q.*  And during those instances, did Mr. Blake assist you in

11   trying to cover these shortages?

12   *A.*  Yes.

13   *Q.*  So I am going to show you what we've marked for purposes of

14   identification Exhibit I-337.  It's tab 6 in your binder.  Do

15   you recognize this e-mail?

16   *A.*  Yes.

17   *Q.*  The bottom of this e-mail, if you will start at the bottom,

18   was this e-mail generated by you?

19   *A.*  Yes.

20        *MS. JOHNSON:*  And if we can scroll to the second page,

21   Mr. Brian.

22   *BY MS. JOHNSON:*

23   *Q.*  Is that your signature block?

24   *A.*  Yes.

25   *Q.*  And to whom did you send this e-mail?

Rhonda Warble - Direct

1   *A.*   To Scott Brady.

2   *Q.*   Was this e-mail sent by you to Mr. Brady in order to

3   involve some type of issue related to your job duties?

4           *MS. SWEENEY:*  Objection, leading.

5           *THE COURT:*  Overruled.

6   *BY MS. JOHNSON:*

7   *Q.*   You can answer.

8   *A.*   Yes.

9   *Q.*   Was this e-mail generated at or near the time of the

10  business events you were describing in the e-mail?

11  *A.*   Yes.

12  *Q.*   Now, without reading from the e-mail, can you tell the jury

13  what was in general the situation that you were dealing with in

14  the course of your job duties?

15  *A.*   We had purchased a load of product from Claxton and

16  delivered it to our customer, and our customer had called with

17  complaints.

18  *Q.*   Did you send this e-mail in order to get Mr. Brady to take

19  some type of action?

20  *A.*   Yes.

21  *Q.*   Now, what's the date of the e-mail?

22  *A.*   November 14th, 2012.

23  *Q.*   And was this a common manner in which you communicated as

24  part of your job duties back in 2012?

25  *A.*   Yes.

Rhonda Warble - Direct

1    *Q.* And did you have personal knowledge of the issues that you

2    were e-mailing Mr. Brady about?

3    *A.* Yes.

4    *Q.* Would this information be relied upon by you and Mr. Brady

5    in conducting your business activities?

6    *A.* Yes.

7    *Q.* And as the author of this e-mail, the information you put

8    into it, was it correct to the best of your knowledge?

9    *A.* Yes.

10   *Q.* And would a record of the communication be kept or stored

11   in the regular course of business activities in order to

12   properly refer to the details?

13   *A.* Yes.

14            *MS. JOHNSON:* Your Honor, at this point in time, we

15   would move to introduce and publish I-337.  We are happy to

16   redact the top part.

17            *THE COURT:* So what would be left, Ms. Johnson, would

18   just be the e-mail from Ms. Warble?

19            *MS. JOHNSON:* Yes, Your Honor.  If we can scroll up.

20            *THE COURT:* Sure.

21            *MS. JOHNSON:* That's correct, Your Honor.  Where -- I

22   think we would be happy to redact that top part, yes.

23            *THE COURT:* With that limitation, then, Ms. Sweeney,

24   any objection to I-337?

25            *MS. SWEENEY:* The government does not believe I-337 is

3286

Rhonda Warble - Direct

1    a business record, but no objection to its admission.

2            *THE COURT:*  I-337 as redacted will be admitted.

3            *MS. JOHNSON:*  Thank you, Your Honor.

4            May we publish?

5            *THE COURT:*  You may.

6    *BY MS. JOHNSON:*

7    *Q.*  So, Ms. Warble, can we talk about this e-mail and explain

8    to the jury what's going on.  As I see it, is there two

9    situations that you are dealing with with Mr. Brady?

10   *A.*  Yes.

11   *Q.*  Can you tell us about the first one?

12   *A.*  Yes.  The customer has a spec of a certain number of pieces

13   in each case that they receive, and the customer is complaining

14   that they had missing pieces in these cases.

15   *Q.*  Okay.  And those are -- the missing pieces are the things

16   that you listed in the e-mail?

17   *A.*  Yes.

18   *Q.*  And what is the action you are asking from Mr. Brady?

19   *A.*  Credit for the missing pieces so that we can pass the

20   credit on to our customer.

21   *Q.*  Now, did this involve both white meat and dark meat, or can

22   you tell?

23   *A.*  I don't know based off of this e-mail.

24   *Q.*  Now, is there another issue that you're dealing with in

25   this same e-mail?

Rhonda Warble - Direct

1   A.   Yes.

2   Q.   Can you tell the jury what that was?

3   A.   We had booked, it looks like, a load to arrive that morning

4   that did not arrive on time, so it missed our outbound trucks.

5   So we would have to use it the next day.  And it looks like we

6   had purchased a load to come in the following day that we were

7   probably going to cancel because the other truck was late.

8   Q.   So the date of this e-mail is what?

9   A.   November 14th, 2012.

10  Q.   So the load in No. 2 that I think you've listed, the load

11  that you booked to come in that morning, the 14th, when would

12  it have been purchased?

13  A.   Probably the day before.

14  Q.   November 13th?

15  A.   Yes.

16  Q.   2012?

17  A.   Yes.

18         MS. JOHNSON:  If we could scroll up just a little bit,

19  Mr. Brian, to where the jury could see that part.

20  BY MS. JOHNSON:

21  Q.   Is that what you are referring to?

22  A.   Yes.

23  Q.   Now, if we could move on, we are going to talk about some

24  phone records.  You've testified that the e-mail we just

25  discussed indicates that one of the purchases would likely have

Rhonda Warble - Direct                   3288

1    taken place the day prior or November 13th, 2012; is that

2    correct?

3    A.   Yes.

4    Q.   Would that have been consistent with your routine and

5    practice to have contacted the Claxton representative via

6    telephone?

7    A.   Yes.

8    Q.   I would like to show for you, which is tab 7 of your

9    binder, Exhibit I-442.

10        MS. JOHNSON:   Your Honor, this has not previously been

11   admitted, but I believe there is a stipulation from the

12   government.

13        THE COURT:   Are you offering it at this time, then?

14        MS. JOHNSON:   I would, Your Honor.

15        THE COURT:   Any objection to the admission of I-442?

16        MS. SWEENEY:   No objection.

17        THE COURT:   I-442 will be admitted.

18        MS. JOHNSON:   Thank you, Your Honor.   May we publish?

19        THE COURT:   You may.

20   BY MS. JOHNSON:

21   Q.   Ms. Warble, what you see before you are excerpts which are

22   phone records of Scott Brady.   Do you recognize the number at

23   the top, 256-536-6120?

24   A.   Yes.

25   Q.   And what do you recognize that number -- to whom do you

Rhonda Warble - Direct

1   recognize it belonging?

2   *A.*   Scott Brady.

3   *Q.*   Would you agree with me that these records appear to be

4   from November 9th through 15th, 2012?

5           *MS. SWEENEY:*   Objection, leading.

6           *THE COURT:*   Overruled.

7   *A.*   Yes.

8   *BY MS. JOHNSON:*

9   *Q.*   I would like to direct your attention to item 3933 on this

10  sheet.  It's a little more than halfway down the page.  Do you

11  see that?

12  *A.*   Yes.

13  *Q.*   I apologize.  It's very small script.  Do you recognize the

14  two numbers involved in this call?

15  *A.*   Yes.

16  *Q.*   And can you tell the jury who is the owner, if you will, of

17  these two numbers?

18  *A.*   The first one is mine, and the second one is Scott Brady's.

19  *Q.*   And when did this call occur, what day?

20  *A.*   November 13, 2012.

21  *Q.*   And do you see the time which is 14:28 UTC?

22  *A.*   Yes.

23  *Q.*   And if I suggest to you that that's 9:28 a.m., would you

24  agree with me?

25          *MS. SWEENEY:*   Objection.

Rhonda Warble - Direct

1           THE COURT:  She can answer if she knows.

2    A.  Yes.

3           MS. JOHNSON:  Your Honor, if I may, I believe there

4    has been an agreement on UTC time and the conversions before

5    the Court, but we are happy to go through the process with each

6    and every phone call.

7           THE COURT:  I think that an exhibit was entered

8    regarding that conversion and that can be used if necessary.

9           MS. SWEENEY:  To clarify, Your Honor, my objection was

10   simply as to form.

11          THE COURT:  Understood.

12          MS. JOHNSON:  Thank you, Your Honor.

13   BY MS. JOHNSON:

14   Q.  And the length of this call, how long is it, Ms. Warble?

15   A.  37 seconds.

16   Q.  Thank you.

17          I would like to move to tab 8 in your binder, which is

18   Exhibit I-441.  Do you see that?

19   A.  Yes.

20          MS. JOHNSON:  Likewise, Your Honor, I would move to

21   introduce I-441 subject to the previous agreements.

22          THE COURT:  Any objection to the admission of I-441?

23          MS. SWEENEY:  No objection.

24          THE COURT:  I-441 will be admitted.

25          MS. JOHNSON:  Thank you, Your Honor.  May we publish?

Rhonda Warble - Direct

1          *THE COURT:*  You may.

2     *BY MS. JOHNSON:*

3     *Q.*  Ms. Warble, do you recognize the phone number at the top of

4     this set of phone records?

5     *A.*  Yes.

6     *Q.*  And who do you know that phone number to belong to or at

7     least did in the past?

8     *A.*  Ric Blake.

9     *Q.*  Would you agree that these records appear to be from

10    November 9th through the 14th of 2012?

11    *A.*  Yes.

12    *Q.*  I would like to direct your attention to item 4253.  It's

13    toward the top of the second page.  Do you see that item?

14    *A.*  Yes.

15    *Q.*  What was the date and time of this call?

16    *A.*  November 13, 2012, 14:40:43.

17    *Q.*  And would you agree with me that's 9:40 Eastern time a.m.?

18    *A.*  Yes.

19    *Q.*  Does this record indicate there was a call between you and

20    Ric Blake?

21          *MS. SWEENEY:*  Objection, leading.

22          *THE COURT:*  Overruled.

23    *A.*  Yes.

24    *BY MS. JOHNSON:*

25    *Q.*  Now, on this same exhibit, I want to direct your attention

Rhonda Warble - Direct

1   to item 4263.  Do you see that line item?

2   A.  Yes.

3   Q.  And do you recognize those two phone numbers?

4   A.  Yes.

5   Q.  And who do they belong to?

6   A.  The first one is mine, and the second one is Ric Blake's.

7   Q.  And the date of that call?

8   A.  November 13, 2012.

9   Q.  And what is the UTC time?

10  A.  18:47:48.

11  Q.  Would you agree with me that's 1:47 p.m. Eastern time?

12  A.  Yes.

13  Q.  Staying with this same record, Ms. Warble, I would now like

14  to direct your attention to item 4266 just three lines down.

15  Do you see that?

16  A.  Yes.

17  Q.  What's the date and time of this call?

18  A.  November 13, 2012, 19:06:25.

19  Q.  Would you agree with me that's 2:06 p.m. Eastern time?

20  A.  Yes.

21  Q.  And the numbers involved in this line item, do you

22  recognize them?

23  A.  Yes.

24  Q.  And whose are they?

25  A.  The first one is the George's main line.  The second one is

Rhonda Warble - Direct

1    Ric Blake.  And the third one is mine.

2    Q.  Tell us a little bit about that.  Why would there be three

3    numbers on here?

4    A.  Because I dialed through the George's main line because my

5    phone system was not on the George's system at that time.

6    Q.  So you would dial the main line?

7    A.  Yes.

8    Q.  And then what happens?

9    A.  They would transfer me to Ric's extension.

10   Q.  Finally, let's move to tab 9, which is Government's Exhibit

11   1426.

12          MS. JOHNSON:  Your Honor, we would move to introduce

13   1426.

14          THE COURT:  1426?  That's been admitted already.

15          MS. JOHNSON:  My apologies.  I see that it was

16   admitted February 28.  We would like to publish, then, Your

17   Honor.

18          THE COURT:  You may.

19          MS. JOHNSON:  Thank you, Your Honor.

20   BY MS. JOHNSON:

21   Q.  First of all, Ms. Warble, do you see the number at the top,

22   and do you recognize it?

23   A.  Yes.

24   Q.  And who do you recognize it as belonging to?

25   A.  Scott Brady.

3294

Rhonda Warble - Direct

1   Q.  Would you agree these records appear to be from

2   November 10th through the 17th, 2012?  This is I think a

3   three-page document.

4   A.  Yes.

5   Q.  I would like to direct your attention to page 2, a call

6   occurring at 1:42 p.m.  Do you see that line item?

7   A.  Yes.

8   Q.  Do you recognize the numbers involved?

9   A.  Yes.

10  Q.  And whose number is that?

11  A.  Mine.

12  Q.  And what's the time of this call?

13  A.  1:42 p.m.

14  Q.  On this same record, can you look at the entry again on

15  page 2 at 2:40 p.m.?  Do you see that?

16  A.  Yes.

17  Q.  Do you recognize the number on that line?

18  A.  Yes.

19  Q.  And whose is it?

20  A.  Mine.

21  Q.  Finally, just two lines down, is there a call at 2:43 p.m.,

22  just three minutes later?

23  A.  Yes.

24  Q.  And whose number is also on that line?

25  A.  Mine.

Rhonda Warble - Direct

1    *Q.*  Ms. Warble, having reviewed the calls we've just walked

2    through with the jury, did these calls in these time periods

3    have any significance to you based on what we looked at from

4    the November 14 e-mail?

5    *A.*  Yes.

6    *Q.*  And what is that?

7    *A.*  Phone calls between me and Scott and me and Ric to purchase

8    chicken.

9    *Q.*  That purchase being evidenced, is it the No. 2, the second

10   part of that e-mail we discussed with the jury?

11            *MS. SWEENEY:*  Objection as to leading.

12            *THE COURT:*  Sustained.

13   *BY MS. JOHNSON:*

14   *Q.*  What part of the e-mail that we discussed with the jury

15   would signify this to you?

16   *A.*  The second part.

17   *Q.*  Ms. Warble, the process as you've just described to the

18   jury on how George's interacted with other suppliers and

19   handled shorts and covers, was this a common part of your job

20   duties during the years we discussed, 2014, 2015, and 2016, but

21   also as far back as 2012?

22   *A.*  Yes.

23   *Q.*  Were these types of telephone communications typical

24   between George's and the other supplier companies they bought

25   or sold chicken from?

Rhonda Warble - Cross

1    A.   Yes.

2    Q.   When you bought chicken from another company to cover a

3    short, did you necessarily learn their current prices at that

4    time?

5    A.   Yes.

6    Q.   And likewise, if you sold chicken to another company, would

7    they necessarily learn George's current prices at that time?

8    A.   Yes.

9    Q.   Did the government ever contact you and ask you to explain

10   these procedures to them?

11   A.   No.

12   Q.   And if they had, would you have told them just what you

13   told them today in this trial?

14   A.   Yes.

15          MS. JOHNSON:  Your Honor, that's all I have.  Thank

16   you.

17          THE COURT:  Thank you.

18          Additional questions?

19          Cross-examination?

20                         **CROSS-EXAMINATION**

21   BY MS. SWEENEY:

22   Q.   Good afternoon, Ms. Warble.

23   A.   Good afternoon.

24   Q.   My name is Carolyn Sweeney, and I represent the government.

25   I just have a few questions for you today.

Rhonda Warble - Cross

1   *A.*  Okay.

2   *Q.*  So you testified on direct examination about your

3   communications and work with Defendant Blake, so I would like

4   to ask you a few questions about that.

5   *A.*  Okay.

6   *Q.*  So you used to work with Defendant Blake, right?

7   *A.*  Yes.

8   *Q.*  And you worked with him for many years.

9   *A.*  Yes.

10  *Q.*  He was responsible for sales to national accounts at

11  George's?

12  *A.*  Yes.

13  *Q.*  And his job involved negotiating contracts with those

14  accounts?

15        *MS. JOHNSON:*  Objection, Your Honor, exceeds the scope

16  of direct.

17        *THE COURT:*  Overruled.  She can answer.

18  *A.*  I am not sure.

19  *BY MS. SWEENEY:*

20  *Q.*  And you had responsibilities for product planning?

21  *A.*  Correct.

22  *Q.*  Which included selling chicken to other chicken suppliers

23  as you testified when there was a shortage.

24  *A.*  Yes.

25  *Q.*  So in your work on covering shortages, you testified, I

Rhonda Warble - Cross

1    believe, that Defendant Blake was sometimes involved; is that

2    right?

3    *A.*   Yes.

4    *Q.*   And sometimes others at George's were involved as well.

5    *A.*   Correct.

6    *Q.*   And in order to purchase chicken, you needed approval from

7    Defendant Blake when he was involved; is that right?

8    *A.*   Yes.

9    *Q.*   So you testified on direct examination about the phone

10   calls that you made when you were purchasing chicken.  Do you

11   recall that?

12   *A.*   Yes.

13   *Q.*   And you -- I think you just looked at a lot of phone

14   records.  Is that fair to say?

15   *A.*   Yes.

16   *Q.*   And you described a number of calls between yourself and

17   Defendant Blake?

18   *A.*   Yes.

19   *Q.*   And yourself and Defendant Brady?

20   *A.*   Yes.

21   *Q.*   And on those phone records that you looked at, there was a

22   phone number that you identified as a main line; is that right?

23   *A.*   Yes.

24   *Q.*   And that would be the main line for the Arkansas facility,

25   right?

Rhonda Warble - Cross

1    A.   Yes.

2    Q.   And you testified that the Virginia facility that you

3    worked in was not part of the internal network, right?

4    A.   Correct.

5    Q.   Based on your experience, is it fair to say that anyone

6    calling the Arkansas facility from outside of the George's

7    network would need to go through that main line in order to be

8    routed to a desk?

9    A.   Not necessarily.  They could call them direct.  They could

10   call a direct number.

11   Q.   Okay.  And in your experience in working with Mr. Blake,

12   you would call the main line to be routed to his number; isn't

13   that correct?

14   A.   Sometimes I called the main line; sometimes I called

15   direct.

16   Q.   And the records that we looked at showed you calling the

17   main line; is that right?

18   A.   The one that we looked at showed the main line, yes.

19   Q.   Yes, thank you.

20        And that system was in place, I believe as you

21   testified, in the time period that you have been testifying

22   about, 2014 to 2016?

23   A.   Yes.

24   Q.   And was that system in place with the main line from 2012

25   and 2013 as well?

Rhonda Warble - Cross

1    A.   Yes.

2    Q.   So in addition to phone calls, you testified about how

3    George's purchases chicken from competing chicken suppliers,

4    right?

5    A.   Yes.

6    Q.   And when George's didn't have enough chicken for its

7    customers, that's called a shortage?

8    A.   Yes.

9    Q.   So first, I am going to ask you a little bit about the

10   timing of your job when you would learn about a shortage.  So

11   when you learned about that George's needed to purchase

12   chicken, the time line for that was usually pretty quick,

13   right?

14   A.   Yes.

15   Q.   When you learned about a problem, you would have to address

16   it within a matter of hours or days?

17   A.   Yes.

18   Q.   In between the two, would you say it's closer to hours or a

19   day?

20   A.   Hours.

21   Q.   You typically couldn't wait a week or two before beginning

22   to make the calls, correct?

23   A.   Correct.

24   Q.   So now I'm going to ask you some questions about the

25   information that's included in some of the purchase orders that

Rhonda Warble - Cross

1    you testified about.  So you told the Ladies and Gentlemen of

2    the Jury about your communications with competing chicken

3    suppliers, right?

4    A.  Yes.

5    Q.  And specifically I believe it was Claxton and Koch?

6    A.  Yes.

7    Q.  And you testified about how sometimes George's would

8    purchase chicken from competing chicken suppliers?

9    A.  Yes.

10   Q.  And at times, George's would sell chicken to competing

11   chicken suppliers.

12   A.  Yes.

13   Q.  And I believe, just to make sure I understand, you

14   testified that when there was a shortage to a customer, let's

15   say to KFC, you would need to go to another current KFC

16   supplier, right?

17   A.  Correct.

18   Q.  And that's because another current KFC supplier would have

19   chicken at the specifications that KFC requires?

20   A.  Yes.

21   Q.  And you testified a little bit about the paperwork that was

22   involved in that process.  When George's was purchasing

23   chicken, it would send a purchase order?

24   A.  Yes.

25   Q.  When George's was selling chicken, it would send an

Rhonda Warble - Cross

1   invoice?

2   *A.*   Yes.

3   *Q.*   And on those purchase orders and invoices, they both

4   included the amount of chicken George's was purchasing, right?

5   *A.*   Yes.

6   *Q.*   Describing the number of cases?

7   *A.*   Yes.

8   *Q.*   And it would include the price that George's was buying at.

9   *A.*   Yes.

10  *Q.*   And for invoices, it would include the price that George's

11  was selling at?

12  *A.*   Yes.

13  *Q.*   And sometimes that was listed as a price per pound?

14  *A.*   Yes.

15  *Q.*   But purchase orders didn't include any planned price

16  increases to customers, right?

17       *MS. JOHNSON:*   Objection, Your Honor.  May we go on

18  side bar, please?

19       *THE COURT:*   Yes.

20     (At the bench:)

21       *THE COURT:*   Ms. Johnson, go ahead.

22       *MS. JOHNSON:*   Your Honor, I object to this line of

23  questioning.  This is precisely the same questions that

24  Ms. Sweeney asked this witness in the first trial.  The Judge,

25  Your Honor, sustained each and every objection that we made.

Rhonda Warble - Cross

1           This is, No. 1, outside the scope of the direct.

2    There is absolutely no foundation for these questions.

3    Obviously, margins, contracts, bid negotiations are not part of

4    a purchase order.  If Ms. Sweeney wants to ask Ms. Warble if

5    she was ever involved in bid negotiations, that would be an

6    appropriate question.  But, Your Honor, there is no basis for

7    Ms. Sweeney to ask these questions other than to infer to the

8    jury that there is this type of information being shared.

9           THE COURT:  Ms. Sweeney, response?

10          MS. SWEENEY:  Yes, Your Honor.  As to this particular

11   question, I am simply asking the witness what information was

12   and was not included in the purchase orders that she testified

13   about on direct examination.

14          The next set of questions, as I am sure Ms. Johnson

15   knows, is the question about profit margin, I believe she may

16   have misspoken, but were not -- those objections were not

17   sustained in the last trial.

18          With regard to asking whether the profit margin was

19   included on the purchase orders, there were a number of

20   questions in the last trial that were not -- I can't find if

21   they were objected to, but they were not sustained if they

22   were.

23          THE COURT:  And as to the objection that it's beyond

24   the scope?

25          MS. SWEENEY:  Yes, Your Honor.  As I said, I am simply

Rhonda Warble - Cross

 1   asking about information that was and was not contained in

 2   these purchase orders, as the defense theory of the case is

 3   that a lot of the communications that the government is

 4   pointing to as evidence of this crime related to shortages and

 5   purchase orders, and there is other evidence in the case about

 6   competitors having information about the future bid prices.  So

 7   that's simply what I am attempting to do to show if that

 8   information, in fact, did come from shortages purchase orders.

 9          THE COURT:  Ms. Johnson?

10          MS. JOHNSON:  Your Honor, it's appropriate to ask what

11   is included.  The reference of what is not included, there is

12   no basis to ask those questions about purchase orders from

13   someone who was not involved in the bid process.

14          THE COURT:  Yeah, I am going to sustain the objection

15   on the grounds that you would have to lay foundation.  Right

16   now the witness has just testified that this is the Claxton

17   price or, you know, some price, but she hasn't testified about

18   any component of it.  You can ask her what components are, but

19   to ask a question that infers that there is something that she

20   does not know about or which there is -- you know, she knows is

21   not included I think would be inappropriate.  So if you could

22   just ask her about her foundation for what the price includes.

23      (In open court:)

24   BY MS. SWEENEY:

25   Q.  Ms. Warble, we were talking about the purchase orders that

Rhonda Warble - Cross

1    you created and sent when George's was purchasing chicken,

2    correct?

3    A.  Yes.

4    Q.  Those purchase orders, as you testified, included a price,

5    correct?

6    A.  Yes.

7    Q.  And that price, were there any other price components

8    listed on the purchase orders?

9    A.  No.

10   Q.  And you reviewed in your -- have you reviewed in your

11   business the contracts that George's would enter with its

12   customers?

13   A.  I haven't.

14   Q.  Do you have a database or a way -- you must have a database

15   or a way to see what George's price was that George's was

16   buying and selling chicken at, correct?

17   A.  No, ma'am.  That was not part of my job.

18   Q.  So when you were selling chicken that George's had, how did

19   you know what price you were selling at?

20   A.  I would have to get approval for that.

21   Q.  How would you know the specific price?

22   A.  If I was selling it, it would have to come from someone

23   above me.

24   Q.  And the information that you received from someone above

25   you, did you receive anything aside from just the specific

Rhonda Warble - Cross

1    price?

2    *A.*   No, ma'am.

3    *Q.*   So when you were filling out purchase orders, the only

4    information you included on those were the specific price.

5    *A.*   For that load.

6    *Q.*   And you did not include, for example, George's profit

7    margin because you didn't have it?

8          *MS. JOHNSON:*  Objection, Your Honor.

9          *THE COURT:*  Sustained.

10         *MS. SWEENEY:*  A moment to confer, Your Honor?

11         *THE COURT:*  Yes, you may.

12   *BY MS. SWEENEY:*

13   *Q.*   So, Ms. Warble, when you would receive the price from

14   someone who would give you approval, you don't know if that was

15   your contract price, right?

16   *A.*   Correct.

17         *MS. SWEENEY:*  All right.  No further questions.

18         *THE COURT:*  Thank you.

19         Redirect?

20         *MS. JOHNSON:*  No, Your Honor, thank you.

21         *THE COURT:*  Thank you very much, Ms. Warble.  You are

22   excused.

23         *THE WITNESS:*  Thank you.

24         *THE COURT:*  Next witness.

25         *MR. BELLER:*  Thank you, Your Honor.  We call

3307
Gregory Finch - Direct

1    Gregory Finch.

2        (**Gregory Finch** was sworn.)

3            THE WITNESS:  I do.

4            COURT DEPUTY CLERK:  Please state your name and spell

5    your first and last name for the record.

6            THE WITNESS:  My name is Gregory Scott Finch,

7    F-I-N-C-H.

8            MR. BELLER:  Good afternoon, Mr. Finch.  Before we get

9    started, would you please close the binder in front of you and

10   set it aside, please.  Thank you, sir.

11           Your Honor, may I approach with binders, please?

12           THE COURT:  Yes, you may.

13           MR. BELLER:  Thank you.

14                     **DIRECT EXAMINATION**

15   BY MR. BELLER:

16   Q.  Mr. Finch, if you could please introduce yourself to the

17   jury and spell your last name for the record.

18   A.  Yes, sir.  My given name is Gregory Scott Finch, F-I-N-C-H.

19   Q.  Mr. Finch, where do you live?

20   A.  I live in Statesboro, Georgia.

21   Q.  Is Statesboro, Georgia, near the town of Claxton, Georgia?

22   A.  Yes.

23   Q.  Do you have an education beyond high school?

24   A.  Yes.

25   Q.  And what is that, sir?

Gregory Finch - Direct

1   A.   I have a bachelor of science degree in accounting.

2   Q.   How are you currently employed?

3   A.   I am employed by Norman W. Fries, Inc., doing business as

4   Claxton Poultry.

5   Q.   How long have you worked for Claxton Poultry?

6   A.   I went to work for Claxton April the 4th, 2011, so

7   approaching 11 years.

8   Q.   What is your position at Claxton?

9   A.   I am chief financial officer.

10  Q.   CFO?

11  A.   CFO, yes.

12  Q.   Generally, what are your responsibilities as CFO of

13  Claxton?

14  A.   Well, it's what you might think a chief financial officer

15  would be over, general ledger, bank accounts, banking and

16  lending relationships, insurance relationships, negotiations of

17  contracts with customers, with vendors, reconciliations of

18  accounts, legal matters, workers' comp, IT reports to me.  So

19  being a small shop, I have a bunch of different hats that I

20  wear.

21  Q.   Does it also include cost information in connection with

22  supplying chicken to various customers?

23  A.   Absolutely, yes.  I am responsible for the cost matrix for

24  our cost-plus and really for all of our contracting.

25  Q.   Do you have any general knowledge -- or do you have a

Gregory Finch - Direct

1    general knowledge of operations, specifically the supply of

2    chickens?

3    A.   Yes.

4    Q.   And is that for QSR customers and QSR customer products?

5    A.   It's for all of our products.

6    Q.   Does that --

7    A.   And all of our customers.

8    Q.   Excuse me for interrupting you.

9         Does that also include the sale of chicken to other

10   QSR producers?

11   A.   Yes.

12   Q.   How about the growing of chicken, do you have a general

13   knowledge about the growing of chicken?

14   A.   Yes.

15   Q.   Mr. Finch, have you worked for any poultry companies beyond

16   Claxton?

17   A.   Yes.

18   Q.   And where is that, sir, or what is that?

19   A.   Just prior to coming to work at Claxton, I worked for

20   Harrison Poultry.

21   Q.   And what was your position at Harrison Poultry?

22   A.   Chief financial officer.

23   Q.   How long were you at Harrison Poultry?

24   A.   I went to Harrison in July of 1997, and I left in March of

25   2011, so approaching 14 years.

3310

Gregory Finch - Direct

1    Q.   So does that mean you have been in the poultry industry now

2    for about 25 years?

3    A.   Approaching that, yes.

4    Q.   All of your, so to speak, adult working life?

5    A.   Yes.

6    Q.   Mr. Finch, have you ever been interviewed by the Department

7    of Justice?

8    A.   Yes.

9    Q.   When were you interviewed, sir?

10   A.   Last fall on my birthday.

11   Q.   Did they interview you at all about the underlying facts

12   regarding this case?

13   A.   No.  It was my understanding the interview was about me

14   being a custodial document witness for Claxton Poultry.

15   Q.   Did they ask you about any of your knowledge regarding the

16   underlying facts of this case?

17   A.   No.

18   Q.   How many employees does Claxton Poultry have?

19   A.   Approximately 2,000.

20   Q.   Of those 2,000, does that also include Mr. Mikell Fries and

21   Mr. Scott Brady?

22   A.   Yes.

23   Q.   To the best of your knowledge, other than that one

24   interview they did of you regarding being a custodian of

25   records, has the Department of Justice ever done or even

Gregory Finch - Direct

1    requested an interview of anybody at Claxton Poultry?

2    A.  Not to my knowledge.

3    Q.  So, Mr. Finch, I want to talk to you a little bit about

4    Claxton's history and background, okay?  Are you familiar with

5    Claxton's company background?

6    A.  Yes.

7    Q.  How long has Claxton been in business?

8    A.  Mr. Fries started Claxton in 1949 in Savannah as a

9    distribution company.  And then in 1958, he incorporated it

10   under his current style, Norman W. Fries, Inc., d/b/a Claxton

11   Poultry Farms, and he began processing chickens in Claxton in

12   the current location in 1959.

13   Q.  I want to understand who we are talking about because you

14   say Mr. Fries.

15   A.  Yes.

16   Q.  Is that -- I think you said this, is that Mr. Norman Fries?

17   A.  It's Norman W. Fries, Sr.

18   Q.  How is Norman W. Fries, Sr. related to Mr. Mikell Fries?

19   A.  That's his grandfather.

20   Q.  How many plants does Claxton Poultry have?

21   A.  Claxton has one processing plant in Claxton, and we have a

22   second deboning plant, further processing plant about

23   45 minutes away that we built in 2018, '19 for Chick-fil-A.

24   Q.  So despite that deboning plant, is it accurate to say that

25   Claxton is a single-plant facility?

Gregory Finch - Direct

1   A.   Correct.

2   Q.   Who controls the ownership of the company?

3   A.   Who controls the ownership?  Doris Fries.

4   Q.   Who is Doris Fries?

5   A.   Doris Fries is our CEO and chairman, and she is also

6   Michael's grandmother.

7   Q.   How is she related to Norman W. Fries?

8   A.   She was his spouse.

9   Q.   Norman W. Fries has passed on?

10  A.   Yes.  He passed in December of 2001.

11  Q.   So does Mikell Fries own Claxton Poultry?

12  A.   No.

13  Q.   So I say Mikell Fries.  What is Mikell Fries' current

14  position with Claxton Poultry?

15  A.   Currently, he is president of the company.

16  Q.   And when was Mr. Fries promoted to that position?

17  A.   We announced it internally in February of 2016, and we

18  announced it to the public in March of 2016.

19  Q.   And how long has Mr. Fries -- now whenever I say Mr. Fries

20  from this point forward, I am going to be speaking about

21  Mr. Mikell Fries, okay?

22  A.   Fair.

23  Q.   How long has Mr. Fries worked at Claxton?

24  A.   Mr. Fries started at Claxton when he was 14 years old, so

25  he has been with the company over 30 years.

Gregory Finch - Direct

1    Q.   So what was Mr. Claxton's -- excuse me.  What was

2    Mr. Fries' role in 2014?

3    A.   2014, he was a sales manager.

4    Q.   Who supervised him as a sales manager?

5    A.   Jerry Lane.

6    Q.   And who is Mr. Lane to the company in 2014?

7    A.   Jerry Lane was the president.

8    Q.   So was Mr. Lane the individual who held the position of

9    president prior to the promotion of Mr. Mikell Fries?

10   A.   Yes.

11   Q.   So you say that he was a salesman or a sales manager.  What

12   were his responsibilities as a sales manager?

13   A.   Well, his primary responsibility was a quick-service

14   restaurant or what we call QSRs was primarily what he did, but

15   as a sales manager, he would coordinate production with the

16   plant.  He would make sure orders were filled, make sure trucks

17   were there to deliver the product, and he would have influence

18   over pricing as well as product mix.

19   Q.   And how many other salespeople work at Claxton Poultry?

20   A.   Presently five.

21   Q.   And how about in 2013, 2014 time period?

22   A.   We've probably been between five and seven in that time

23   period.  I don't think it was a static number, but somewhere

24   between five and seven.

25   Q.   And so, Mr. Finch, I want to understand, Mikell Fries is

Gregory Finch - Direct

1   the president of the company.  You're the CFO.  Have you

2   discussed your testimony that you're giving today with

3   Mr. Fries?

4   A.   Absolutely not.

5   Q.   Have you felt any pressure from Mr. Fries as the president

6   or even Mr. Fries' lawyers regarding your testimony?

7   A.   Absolutely not.

8   Q.   So I want to switch gears now that we've spoken about

9   Mr. Fries, and I want to better understand the role of

10  Mr. Brady.  Do you know Mr. Scott Brady?

11  A.   Yes.

12  Q.   How is Mr. Scott Brady employed at Claxton?

13  A.   He is one of two national account sales managers with QSR

14  responsibility.

15  Q.   And does Mr. Brady work out of the offices in Claxton,

16  Georgia?

17  A.   He does on occasion.  He works primarily remotely from his

18  home in Alabama, but he will come to the plant on occasion to

19  visit customers when they come to visit the plant or just to

20  work from the plant to handle some issues there that he cannot

21  handle remotely.

22  Q.   Do you know approximately how long the drive is or how long

23  it takes to drive from where Mr. Brady is located in Alabama to

24  the plant in Claxton, Georgia?

25  A.   Well, depending on traffic, I don't know exactly, but I am

Gregory Finch - Direct

1   going to guess 5-1/2 to 6 hours.

2   *Q.* And when Mr. Brady travels from his home in Alabama to the

3   plant in Claxton, do you know if he does that by car, or does

4   he do that by plane?

5   *A.* Car mostly.  On occasion, he will go to Atlanta to meet

6   Chick-fil-A who might be coming to the plant, and he may fly to

7   Claxton from Atlanta with the customer.

8   *Q.* And what are Mr. Brady's main accounts?

9   *A.* As I said, he is responsible for a lot of our QSR business,

10  so specifically he sells to Chick-fil-A, KFC, and Popeye's.

11  Additionally, he sells to the other broiler producers that are

12  in the approved joint supply network for those QSRs.

13  *Q.* So you say "joint supply network."  What do you mean by

14  "joint supply network"?

15  *A.* Well, within the QSR network, there is certain producers

16  that are approved, and we are all running basically the same

17  size and same specification bird.  So within that network of

18  approved suppliers, those other broiler producers are our

19  customers, so Scott interacts with them just like he would with

20  any other customer.

21  *Q.* And so when we say "joint supply network," that's going to

22  vary.  Who those individuals are are going to vary based on who

23  the QSR customer is; is that right?

24  *A.* Correct.

25  *Q.* For example, are we talking about Tyson, Pilgrim's,

Gregory Finch - Direct

1    George's, Mar-Jac, Koch?

2    *A.*  Just to name a few.

3    *Q.*  Just to name a few.

4         So who decides who is in this joint supplier network?

5    *A.*  The QSRs.

6    *Q.*  Does Mr. Scott Brady have pricing authority to set the

7    prices on behalf of Claxton for the QSRs that he oversees?

8    *A.*  No.

9    *Q.*  Does Mr. Brady have the authority to sign contracts for

10   those customers?

11   *A.*  Well, authority is a little bit too strong of a word.  We

12   prefer corporately that an officer of the company sign a

13   contract.  However, the officers within their discretion can

14   delegate the signing of a contract from time to time.  And

15   oftentimes, Mikell will delegate the signing of the contract

16   once an agreed-upon price and volume has been reached, and

17   he'll delegate that to Scott or to Walter depending on who the

18   customer is.

19   *Q.*  When you say "Scott," you mean Scott Brady; and "Walter"

20   meaning Walter Cooper?

21   *A.*  Correct.

22   *Q.*  So if I summarize or understand your answer, you're saying

23   they don't have pricing authority, but from time to time they

24   may sign contracts.

25   *A.*  Correct.

Gregory Finch - Direct

1    *Q.*  So let's switch gears just a little bit, and I want to

2    speak with you about how Claxton prices its products, okay?

3    Are you involved in that process?

4    *A.*  Yes.

5    *Q.*  What is your role in the process of determining pricing of

6    chicken?

7    *A.*  Well, it really depends on what contract or customers we

8    are talking about.  We have various types of contracts.  So,

9    for instance, on our contract with our rendering company,

10   Darling, I am the lead negotiator on that account.

11          For our retail customers, which Tom Scarborough, our

12   sales manager, is responsible for, I help him understand what

13   our cost structure is and where it's going to be for the next

14   year, because largely our retail customer base is on what's

15   called a fixed contract, which means once we set the price for

16   the year, it doesn't change within the year.

17          Some of those contracts have grain escalators and

18   de-escalators on them, meaning if corn or soybean gets outside

19   of the range that we've agreed on with that customer, they have

20   to be adjusted.  So I will help set up that escalator,

21   de-escalator on the freight side -- on the ingredient side.

22          On the QSRs, we have a couple of different ways we

23   price those.  One is annually we have negotiations with them,

24   and then we have what's called period pricing which largely

25   tracks the calendar month, but for some customers it doesn't.

Gregory Finch - Direct

1   So for that group of customers, I take the cost-plus model that

2   they dictate that we use that has probably somewhere between 40

3   and 60 variables in it, and I put our actual costs in to each

4   one of those lines on that variable.  And then if I know what

5   costs are coming, for instance, if we know that we are going to

6   give a raise next year or we know the utilities are going up or

7   box and packaging are going up, so any known increases, I will

8   add that in to what our actual cost is, and then we give that

9   to the QSR.

10  Q.   Thank you, Mr. Finch.  We will break that down a little

11  further here in just a moment.

12       What are Claxton's goals in choosing a price for its

13  chicken?  And I am speaking specifically about QSR chicken.

14  A.   Well, we want to keep the volume that we've already worked

15  so hard to get from the QSR, and then we would like to grow

16  that volume.  And we do that by communication with the QSR and

17  by following their directional guidance on price.

18  Q.   And does that also mean that you're trying to maintain or

19  maximize profits for the company?

20  A.   Well, we want to sell our chicken for as much as they will

21  allow us to sell it for.

22  Q.   So in terms of either maintaining or maximizing or growing

23  the volume of chicken to maintain or grow profits, what

24  strategy does Claxton have to accomplish those goals, again,

25  speaking in the QSR market?

Gregory Finch - Direct

1   A.  Well, we are a small player in the industry as a whole and

2   also in the QSR community, although we have been a supplier for

3   KFC for close to 40 years, if not more.  So as one of the

4   approved suppliers, we have that tonnage that we did, like, the

5   year before, and so what we like to try to do strategy-wise is

6   be somewhere in the middle of the pricing.

7           We already know the QSRs are trying to keep all of the

8   suppliers within a very tight range because they don't want the

9   case prices that their franchisees are paying to get into a

10  big, wide spread.  So we communicate with the QSR and say,

11  look, we want to be in the middle because we want to grow our

12  volume.  So you tell us where you want us to be in order to

13  give us the extra two or three loads that we're looking for.

14          By doing that, we are oftentimes undercutting the

15  others in the supply chain in order to get that volume.

16  Q.  Why would Claxton not want to be in terms of a strategy at

17  the highest end of the pricing -- excuse me, let me ask that

18  again.  With all the different suppliers, why would Claxton not

19  want to be the highest price?

20  A.  It's just always been our approach to not stick out like a

21  sore thumb.  So we don't want to be the highest in the chain,

22  and we don't want to be the cheapest in the chain because, as I

23  said, we want to sell the chicken for the most amount that QSR

24  will allow us to sell for.

25          So by being in the middle, what we found is we are

Gregory Finch - Direct

1   able to take volume away from the other suppliers in there, and

2   then when it comes to shorts and covers, when others in the

3   supply chain are short and we have to cover those loads because

4   we're kind of in the middle, oftentimes Claxton becomes the

5   go-to for either the QSR themselves to try to cover those loads

6   or for the other broiler producers inside the joint network to

7   cover their loads.

8   Q.  Is Claxton Poultry able to undercut competitors and take

9   volume from competitors if Claxton is priced at the highest

10  price?

11  A.  No way.  We're just too small.  We cannot go toe-to-toe

12  with any of the big boys in the industry.  We know that.  We

13  can't possibly do that.  They would crush us.  So there is

14  no -- absolutely no reason for us to try to compete at that

15  level.  Instead, we try to compete in the middle.  And like I

16  said, we tell the QSR that.  That was our approach.

17          And some people look at you and go, That's really

18  weird.  Well, I mean, it is weird, but it's worked for almost

19  70 years.  So we have been supplying Chick-fil-A for over 50,

20  and we have been supplying KFC for 40 and Popeye's for nearly

21  20.  And so the strategy works for us.  I am not saying it

22  would work for everybody, but it works for us.  We have no way

23  to compete with the big guys that have multiple plants.

24  Q.  How does Claxton know if it's priced in the middle?

25  A.  Well, a couple of ways.  I mentioned a little bit earlier

Gregory Finch - Direct

1    period pricing, so what that means is if we're covering a load

2    for somebody in the supply chain, we know what their price is

3    and they know what our price is because we have to issue

4    purchase orders in order to effect that transaction.  So we

5    have an idea of where our number is relative to somebody else's

6    as a result of coverage and shorts, covers and shorts.

7         But we ask the QSR.  We tell them we want to be in the

8    middle.  Can you give us some directional guidance of where we

9    need to be.  We find out from distributors.  Oftentimes

10   distributors will call us and go, Hey, why are you guys a penny

11   and a half less than so and so?  And we're like, Well, we don't

12   know.  So there is various different ways.

13        And the QSR feedback oftentimes will be, you know,

14   You're 5 percent high.  You're a penny high.  Sometimes they

15   tell us the specific line item they think we are out of whack

16   on, so that's kind of how that feedback works.  And we have to

17   trust that they're telling us the truth.  You know, a lot of

18   times when we are going through these negotiations, we don't

19   know if the QSR is being honest with us or not.  I mean,

20   bluffing has been a part of negotiations forever and continues

21   to be.  So we trust that, you know, Hey, we're trying to be a

22   good supply partner with you.  We want you to, you know, be

23   trustworthy and trust what you're telling us is accurate.

24   Q.  So I want to break that down just a little bit because you

25   said that sometimes you may or Claxton may learn pricing from a

3322
Gregory Finch - Direct

1    distributor.  What is a distributor in this industry?

2    A.  Well, a name you might recognize, Sysco, US Foods, a

3    regional player like Kelly Foods, Imlers.  There is a bunch of

4    them out there, but that's just to name a few, would be some of

5    the -- McLain.

6         Oftentimes the QSRs dictate to us where we sell the

7    chicken to, and that distributor becomes our wheels, because

8    most of them are what I call a broad-line distributor.  So they

9    are taking cups and plates and napkins and all kinds of things

10   to the restaurants with the chicken.  So they become our

11   wheels.

12        So they place the orders for those restaurants that

13   they supply to.  The QSR says, Hey, for these stores, send it

14   to McLain in Louisiana.  For these stores, send it to

15   Kelly Foods in Florida.  So that's how that works.

16   Q.  Mr. Finch, does that mean that if, say, RSCS negotiates a

17   truckload, that the chicken goes from Claxton's loading docks

18   to one of these distributors and then the distributors

19   transport it to the actual restaurant?

20        MR. KOENIG:  Objection, leading.

21        MR. BELLER:  It's purely foundational, Your Honor, to

22   understand the answer.

23        THE COURT:  Overruled.

24   A.  Please repeat that.

25   BY MR. BELLER:

Gregory Finch - Direct

1    Q.   I am happy to.

2            If RSCS negotiates a contract of a truckload, does

3    that mean that the load -- the chicken will go from the loading

4    docks of Claxton to a distributor and then from the distributor

5    to the actual store?

6    A.   If the product is sold through a distributor, yes.  We have

7    our own fleet of trucks at Claxton, and so we deliver what we

8    call store-door deliver.  We store-door deliver to some of the

9    locations that are close to our plant.  So in that case, they

10   are leaving my shipping dock on my truck and going straight to

11   the KFC or Popeye's door.

12   Q.   Sir, I want to go back to your answer that sometimes you

13   get the pricing from a distributor.  Do you know if a

14   distributor has the pricing for all the different supply

15   companies in this joint supplier network that you've referred

16   to?

17           MR. KOENIG:  Objection.  Can we lay some foundation

18   for his knowledge of this?

19           MR. BELLER:  I asked "do you know," so that's a

20   foundational question.

21           THE COURT:  Overruled.

22   A.   Would you repeat that, please.

23   BY MR. BELLER:

24   Q.   Yes.  Do you know if the distributors have pricing

25   information for all the different suppliers in the QSR joint

Gregory Finch - Direct

1   supply network?

2   *A.*  Well, all would be a stretch, because it would be very

3   atypical for one distributor to have product from seven or

4   eight producers.

5          *THE COURT:*  Hold on one minute.

6          *MR. KOENIG:*  My understanding is this was supposed to

7   be a foundational question or starting to establish foundation,

8   and he is launching right into an answer.

9          *THE COURT:*  Well, the answer demonstrates that he has

10  got the knowledge.  Overruled.

11  *BY MR. BELLER:*

12  *Q.*  You may continue, Mr. Finch.

13  *A.*  Thank you.  Sorry.

14          Sorry, Your Honor.

15          So it would be atypical for every one in the supply

16  chain to sell through the same distributor, but it would not be

17  out of the norm for the distributor to have two or three

18  suppliers out of that out of their warehouse.  So they would

19  have information from at least two of us, perhaps three.  I

20  don't know that it would be much over three in a single

21  distributor.

22  *Q.*  So going back to general questions in terms of Claxton's

23  negotiation and pricing with QSRs, to the best of your

24  knowledge as CFO, has Claxton Poultry ever taken a position

25  with a QSR buyer of the price is the price?

3325

Gregory Finch - Direct

1    A.  Not to my knowledge.  We wouldn't be big enough to have

2    that kind of power to tell a customer that.

3    Q.  What do you mean when you say "we wouldn't be big enough;

4    we don't have that power"?

5    A.  Well, within the poultry industry, we are only about

6    1 percent of the industry, so --

7           MR. KOENIG:  Objection, relevancy of market power in a

8    per se.

9           THE COURT:  Overruled.

10   BY MR. BELLER:

11   Q.  So the question was, what do you mean when you say "we

12   don't have the power"?

13   A.  Well, because of our size, we're roughly 1 percent of the

14   industry, we can't go around dictating to anybody what our

15   price is going to be at a QSR level.  So, you know, we have to

16   succumb to whatever they give us directional guidance-wise as

17   to what pricing they'll take.  We can't dictate to them what

18   our price is.

19   Q.  Now, you've used the phrase "directional guidance," so let

20   me ask you this.  Has Claxton to the best of your knowledge

21   ever refused to reduce its price when the customer offered you

22   or gave you this directional guidance on what it takes to be

23   priced in the middle of the pack?

24   A.  Well, it's a multi -- it's a multi-submission bid process

25   with most QSRs.  Typically, it's three to four rounds.  So

Gregory Finch - Direct

 1   certainly within those three to four rounds of bids we have

 2   held on our price and not gone down at their guidance, but for

 3   our final price that we've given to them that we're going to

 4   contract with, I am not aware of Claxton ever not following

 5   directional guidance from the QSR.

 6   Q.  Mr. Finch, you had stated that Claxton is a little bit

 7   under 1 percent of the poultry market.  By being less than

 8   1 percent of the poultry market, do you have knowledge of how

 9   important Claxton is to this large supply chain?

10   A.  Well, we've been supplying to them for 40 years, so clearly

11   we have a --

12          MR. KOENIG:  Objection.

13          THE COURT:  Overruled.  He can answer.

14   A.  So we can clearly have a role.  So we're a small player in

15   the southeast for them, and so it works out for us to be part

16   of that supply chain.  And obviously, we've done a good job

17   over the years because we have grown our volume with them, and,

18   like I said, they've allowed us to stay in the supply chain for

19   over 40 years.

20   BY MR. BELLER:

21   Q.  Mr. Finch, earlier you had testified to the jury about a

22   cost-plus contract, so I am going to ask you to explain to the

23   jury what that is.  And because this is dense, I am going to

24   also ask you to slow down a little bit.

25   A.  Okay.

Gregory Finch - Direct

1    *Q.*  So if you could explain to the jury what a cost-plus

2    contract is.

3    *A.*  Sure.  A cost-plus contract is a contract that has multiple

4    different costs that make up what the end price is going to be,

5    and it typically has as one of the line items in there a

6    margin.  So some examples of those, there is probably 40 to 60

7    of them I am guessing without having counted them, but our

8    labor, chick cost, grower pay, yields, feed conversions,

9    utilities, depreciation, those types of things are in that

10   model to come up with what it's going to cost to produce that

11   bird to the specification that the particular QSR is asking us

12   to produce that bird to.

13   *Q.*  And are all those different 40 to 60 line items given to

14   the QSR, in other words, given to the customer?

15   *A.*  Yes.

16   *Q.*  So is the cost-plus model or system transparent to the

17   customer?

18   *A.*  Transparent, I call it open.  It's open between the

19   customer and us.  You know, transparent can be a little

20   ambiguous, but it's very open.  We give them the cost numbers

21   that they want.  They are actual costs, as I said, unless we

22   knew of an increase that was coming that would be part of that,

23   so it's certainly a very open process between the QSR and the

24   supplier.

25   *Q.*  So by being an open process, do you know if the QSR

Gregory Finch - Direct

1    customer is able to see where a line item has gone up from one

2    year to the next, for example?

3    A.  I would imagine they could.  I don't know exactly their

4    process because I don't work for them, but certainly you would

5    think they could lay our current period pricing down or our

6    last contract pricing down next to the contract pricing that

7    we're submitting and see where our cost had increased.

8    Q.  Do customers, Mr. Finch, ever tell you to change certain

9    data entries for costs on that cost-plus model?

10   A.  By "customers," are you referring to QSRs?

11   Q.  I am always referring to QSRs.  Thank you.

12   A.  Thank you.

13           Yes, all the time.

14   Q.  You say "all the time," but you also said those actually

15   reflect your cost.  So can you explain that?

16   A.  Sure.  For us, Claxton Poultry, we want each one of those

17   line items to reflect what our actual cost is.  But that

18   doesn't mean the QSR really cares about that.  Largely, the QSR

19   cares about the bottom-line price.  So they'll tell us, Greg,

20   your labor cost is too high.  Your chick cost is too high.  We

21   are like, Well, that's our actual labor or chick cost.

22   Q.  But they will, in fact, tell you whether to raise it or

23   lower it without actually knowing what your true cost is?

24   A.  Correct.

25   Q.  Other than what's stated on the cost-plus model?

Gregory Finch - Direct

1    *A.*  Correct.  To be clear, though, we rarely follow that

2    directional guidance on the individual line items.  If we have

3    to go down to meet their price, we take that out of our margin

4    line.

5    *Q.*  We'll talk about margin in just a moment, thank you,

6    Mr. Finch.

7         Which customers use a cost-plus model?  Which QSR

8    customers that Claxton has uses a cost-plus model?

9    *A.*  The traditional cost-plus model I just described would be

10   Popeye's and KFC.

11   *Q.*  What about Chick-fil-A?

12   *A.*  Well, during the relevant period of this matter, we were on

13   two different pricing models with Chick-fil-A.  So prior to

14   2015, we were on a market-based model which I believe they

15   called the breast model.  And then since then, we have been on

16   a grain-based model, which has the grain, the corn and soybean

17   components that make up the price as well as an escalator and

18   de-escalator for wings and dark meat.

19   *Q.*  So let's stick with just KFC and Popeye's for just a moment

20   since those are the two companies you said that are on a

21   cost-plus model.  Who develops that model?  In other words, who

22   says what factors, what those 40 to 60 factors are?

23   *A.*  The QSR dictates the model.

24   *Q.*  And how do you, Mr. Finch, as the CFO determine the costs

25   and the prices that are put into that cost-plus model?

Gregory Finch - Direct

1    A.  Well, I look at my -- I have got the cost in my general

2    ledger, so I know what my actual costs are for each one of

3    those line items.  And then as I said, if I know what costs are

4    coming to me, then I'll put those costs in there as well.  If I

5    don't know what they are, I don't know how to put them in

6    there.

7    Q.  And are one of those costs feed for the chickens?

8    A.  Yes.

9    Q.  Who determines what number to put into that model during

10   negotiation, or at the start of negotiation who determines what

11   the price is that is put into that model for feed?

12   A.  The QSR dictates that.  They tell us when we're putting the

13   pricing model together.  For instance, they'll tell us to use,

14   say, $5 for corn and $350 for soybean meal.  So that's what we

15   plug in there to come up with the feed cost component of the

16   cost-plus matrix.

17   Q.  So there is another number that you had mentioned to the

18   jury, and that is one of margin.  Is margin the same thing as

19   profit?

20   A.  No.

21   Q.  Can you explain that?

22   A.  Sure.  So in the QSR cost-plus model, the margin is largely

23   a plug-the-balance number for us, for Claxton, in order to get

24   to that bottom-line number the QSR wants.  But if we

25   underperform on any of those line items in that cost-plus

Gregory Finch - Direct

1    model, then it starts to erode whatever that margin is.

2          So if we've got a wheel off on labor or utilities go

3    crazy or fuel goes nuts, all those things happen, then even if

4    that cost-plus margin says our margin is 7 cents a pound, let's

5    say, then all those things that we underperformed on to get to

6    that bottom-line number are going to erode what our actual

7    profit may be on those chickens.

8    Q.  So is it fair to say, then, that that margin number is both

9    hopeful and aspirational, but not necessarily controlling?

10   A.  It's controlled by the QSRs for sure, but, yes,

11   historically we like that number to be 10 cents.  And in most

12   first-round negotiations with the QSRs, we'll reset that number

13   to 10 even if they beat us down in the prior negotiation to

14   something less than 10.

15   Q.  Well, does that also mean, Mr. Finch, that if you have your

16   estimating labor in October, that labor price that you

17   estimated may be different when May the following year comes

18   around?

19   A.  Certainly it could be.

20   Q.  And if that happens, that margin line in the model, does

21   that operate, is that a bit of an equalizer?

22   A.  I wouldn't call it an equalizer.  It's what number we

23   needed to put in the model because we didn't want to change the

24   actual cost lines.  It's what number we needed to put in the

25   model to get to the bottom-line price that the QSR gave us

1    guidance that they needed us to arrive at.

2    *Q.*   And in a QSR cost-plus model, does the customer weigh in

3    and sometimes dictate what number goes into that margin

4    category?

5    *A.*   Yes.

6    *Q.*   How does a cost-plus model protect the customer or protect

7    the buyer?

8    *A.*   The QSR in this case?

9    *Q.*   Always.

10   *A.*   Well, I mean, there is openness between us and them in what

11   the cost construct is to make the chicken that they're asking

12   us to make to the specification they are asking us to make it.

13   So all of those 40 to 60 levers are just levers that they can

14   pull to help control the process, because I really don't know

15   if my labor cost is a penny higher than everybody else's or not

16   because I don't see everybody else's model.  Only they know

17   that.  So they can use those levers inside of that model they

18   dictate to us to influence the price and to use their power to

19   get what they want on the bottom line.

20        *MR. BELLER:*  Thank you, Mr. Finch.

21        Your Honor, this is a good time if it works for the

22   Court.

23        *THE COURT:*  It's a great time.

24        Ladies and Gentlemen, right at 5:00.  Ladies and

25   Gentlemen, we will adjourn for the day.  Looks like there will

1   be some snow overnight, but hopefully because the pavement is

2   wet and it's somewhat warm, hopefully the traffic conditions

3   won't be so bad.  But if you need to leave early, do, if you

4   don't mind.  Drive safely in the morning if you are driving in.

5   We will plan on reconvening at 8:30.  The jury is excused.

6   Thank you.

7            (Jury excused.)

8            THE COURT:  Mr. Finch, you are excused until tomorrow

9   at 8:30.

10           THE WITNESS:  Thank you.

11           THE COURT:  Thank you very much.

12           Issues to take up?  Mr. Koenig?

13           MR. KOENIG:  Your Honor, if I may, I believe I wasn't

14  clear on the basis for my objections.  And what I meant to say,

15  and I just wanted to let you know, let the Court know because I

16  should have been clearer, so but what I meant was it was a

17  yes-or-no question, do you know about this.  And then he just

18  launches into the substantive answer rather than going through

19  the sort of three-step process, do you know, what's your basis

20  for knowing.  So I could have been clearer, and I apologize.

21           THE COURT:  Yeah, understood.  There are some

22  witnesses, and Mr. Finch is an example thereof, who does seem

23  to have foundation through the answers.  You know, the

24  foundation is evident.  For a witness who may have tenuous

25  foundation, you're right, it's better to go through that

3334

1    process so that it's clear that the foundation actually exists.

2    But so occasionally there are people where the foundation is

3    there.  The formality may not necessarily need to come out.

4         Anything else that we should take up?  All right.  We

5    will be in recess until tomorrow at 8:30.  Thank you.

6        (Recess at 5:02 p.m.)

7                               INDEX

8    WITNESSES

9        Darrell Bowlin

10           Direct Examination Continued By Ms. Prewitt        3065

11           Cross-examination By Ms. Call                      3087

12           Redirect Examination By Ms. Prewitt                3099

13       Brandon Campbell

14           Direct Examination By Mr. Gillen                   3101

15           Cross-examination By Ms. Call                      3181

16       Bruce Bagshaw

17           Direct Examination By Mr. Feldberg                 3197

18           Cross-examination By Ms. Sweeney                   3208

19       Marcus Shelton

20           Direct Examination By Ms. Withers                  3212

21           Cross-examination By Ms. Sweeney                   3221

22

23

24

25

```
 1                          INDEX (Continued)
 2    WITNESSES
 3       Michael Brown
 4            Direct Examination By Mr. Fagg              3224
 5            Cross-examination By Mr. Tubach            3244
 6            Cross-examination By Mr. Feldberg          3245
 7            Cross-examination By Ms. Sweeney           3248
 8            Redirect Examination By Mr. Fagg           3257
 9       Rhonda Warble
10            Direct Examination By Ms. Johnson          3267
11            Cross-examination By Ms. Sweeney           3296
12       Gregory Finch
13            Direct Examination By Mr. Beller           3307
14                           EXHIBITS
15    Exhibit       Offered  Received  Refused  Reserved  Withdrawn
16    E-078                  3238
17    J-142                  3246
18    J-143                  3248
19    I-337                  3286
20    I-440                  3272
21    I-441                  3290
22    I-442                  3288
23    I-444                  3276
24    I-448                  3276
25    I-452                  3276
```

1                              INDEX (Continued)

2                                 EXHIBITS

3    Exhibit        Offered   Received   Refused   Reserved   Withdrawn

4    G-467                     3157

5    G-521                     3118

6    G-570                     3152

7    G-624                     3113

8    G-794                     3172

9    G-795                     3175

10   G-815                     3179

11   G-824                     3122

12   B-849                     3231

13   G-949                     3161

14   G-950                     3166

15   984                       3184

16                        REPORTER'S CERTIFICATE

17       I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.  Dated

19   at Denver, Colorado, this 1st day of June, 2022.

20

21                              S/Janet M. Coppock

22

23

24

25