1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 20-CR-00152-PAB
3    In Re: Penn III

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    JAYSON JEFFREY PENN,
     MIKELL REEVE FRIES,
8    SCOTT JAMES BRADY,
     ROGER BORN AUSTIN,
9    WILLIAM WADE LOVETTE,

10       Defendants
    _____

11                    REPORTER'S TRANSCRIPT
12                    Trial to Jury, Vol. 9
    _____

13

14          Proceedings before the HONORABLE PHILIP A. BRIMMER,

15   Chief Judge, United States District Court for the District of

16   Colorado, commencing at 8:31 a.m., on the 27th day of June,

17   2022, in Courtroom A201, United States Courthouse, Denver,

18   Colorado.

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Therese Lindblom, 901 19th Street,
25        Room A257, Denver, Colorado, 80294, (303) 335-2105

1    APPEARANCES

2         Kevin Hart, Leslie Wulff, Paul Torzilli and Daniel

3    Loveland, U.S. Department of Justice, 450 Fifth Street N.W.,

4    Washington, DC 20530, appearing for Plaintiff.

5         Anna Tryon Pletcher and Michael Tubach of

6    O'Melveny & Myers, LLP, Two Embarcadero Center, 28th Floor,

7    San Francisco, CA 94111-3823;

8         Brian Quinn of O'Melveny & Myers, LLP, 1625 I Street

9    N.W., Washington, DC 20006, appearing for Defendant Penn.

10        David Beller, Richard Kornfeld and Kelly Page of

11   Recht & Kornfeld, P.C., 1600 Stout Street, Suite 1400, Denver,

12   CO 80202, appearing for Defendant Fries.

13        Bryan B. Lavine and Laura Anne Kuykendall of Troutman

14   Pepper Hamilton Sanders, LLP, 600 Peachtree Street NE,  Suite

15   3000, Atlanta, GA 30308;

16        Megan Rahman of Troutman Pepper Hamilton Sanders, LLP,

17   1001 Haxall Point, Richmond VA 23219, appearing for Defendant

18   Brady.

19        Michael Felberg of Reichman, Jorgensen, Lehman,

20   Feldberg, LLP, 750 Third Avenue, 24th Floor, New York, NY

21   10017;

22        Laura F. Carwile of Reichman, Jorgensen, Lehman,

23   Feldberg, LLP, 100 Marine Parkway, Suite 300, Redwood Shores,

24   CA 94065; appearing for Defendant Austin.

25

1            APPEARANCES (Continued)

2            Dru Nielsen of Eytan Nielsen, 3200 Cherry Creek Drive

3    South, Suite 720, Denver, CO 80209;

4            John Anderson Fagg, Jr. and Frank Schall of

5    Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700,

6    Charlotte, NC 28202-4003, appearing for Defendant Lovette.

7                    *    *    *    *    *

8                        PROCEEDINGS

9            (In open court at 8:31 a.m.)

10           THE COURT:  Thank you.  Please be seated.

11           All right.  We're back on the record in 20-cr-152.

12   Anything to take up before we bring the jury in?

13           MR. HART:  Nothing from the Government, Your Honor.

14           THE COURT:  All right.  Great.  Let's go ahead and

15   bring the jury back in.

16           I should introduce Terri Lindblom, who is helping out

17   Ms. Coppock today.  If you will mention your name, that will

18   help her out considerably.  I'll introduce Ms. Lindblom to the

19   jury, as well.

20           (Jury in at 8:34 a.m.)

21           THE COURT:  Thank you.  Please be seated.

22           Good morning, ladies and gentlemen.  Here you are;

23   right on time, after a week's absence.  So I really appreciate

24   that.

25           Why don't I start off by introducing Terri Lindblom,

1   she is a court reporter down there who is substituting for

2   Ms. Coppock today, Ms. Coppock is out this week.  So

3   Ms. Lindblom is going to be filling in for her.  So I asked the

4   attorneys if they would help her out a little bit by mentioning

5   their names at the beginning, when they say something, so you

6   may notice a little bit of that.

7          As you will recall, ladies and gentlemen, the

8   Government had rested its case.  We heard the reserved opening

9   of Mr. Brady, and now we're ready for any defendant who issues

10  to start introducing evidence, and I'll ask whether defendant

11  wishes to call witnesses at this time.

12         *MR. BELLER:*  Mr. Fries calls Mr. Ledford, please.  If

13  I may step out and get him.

14         *THE COURT:*  You may do that.

15         Mr. Ledford, if you would please come forward and

16  stand over there by the witness stand.  Ms. Buchanan, who is

17  there, will administer an oath to you.

18         (**MICHAEL LEDFORD, DEFENDANTS' WITNESS, SWORN**)

19         *COURTROOM DEPUTY:*  Please be seated.

20         Please state your name and spell your first and last

21  name for the record.

22         *THE WITNESS:*  Michael Ledford, M-I-C-H-A-E-L,

23  L-E-D-F-O-R-D.

24         *THE COURT:*  Go ahead, Mr. Beller.

25         *MR. BELLER:*  Thank you, Your Honor.

Michael Ledford – Direct

1          **DIRECT EXAMINATION**

2     *BY MR. BELLER:*

3     *Q.*  Good morning, Mr. Ledford.  I'm David Beller representing

4     Mikell Fries.

5     *A.*  Good morning.

6     *Q.*  Mr. Ledford, can you start by tell the jury where you

7     currently work?

8     *A.*  I work at the corporate office for Chick-fil-A

9     Incorporated.

10    *Q.*  How long have you worked for Chick-fil-A?

11    *A.*  Eight years.

12    *Q.*  In what position?

13    *A.*  Senior director of supply continuity.

14    *Q.*  Can you break that down as to what that means?  What are

15    your responsibilities?

16    *A.*  Yeah, so the main responsibility is procurement for

17    anything basically that it takes to run a chicken restaurant,

18    all the food items, packaging equipment, beverages, team member

19    uniforms, procurement part of it.  Then I also lead a team

20    called a launch team, which is in part of the test and rollout

21    of all new menu items and the program management functions that

22    are related to that.  I'm also in charge of the supply planning

23    and logistics group.

24    *Q.*  So when you say supply planning and logistics and also

25    purchasing, does that include negotiating and purchasing

Michael Ledford - Direct

1    broiler chicken products?

2    *A.*  Yes.

3    *Q.*  Mr. Ledford, is that the same position you've held with

4    Chick-fil-A for the eight years you have been there?

5    *A.*  When I first got there, I was just over the food

6    procurement section, after the first two years, have been

7    generally speaking in the same role I'm in now.

8    *Q.*  Thank you, Mr. Ledford.

9         Where did you work prior to starting at Chick-fil-A in

10   2014?

11   *A.*  I worked at the purchasing co-op for Yum Brands, which is

12   RSCS, Restaurant Supply Chain Solutions.

13   *Q.*  If I say Yum Brands or Chick-fil-A, are you comfortable --

14   or KFC, are you comfortable with me using those terms somewhat

15   interchangeably?

16   *A.*  Yes.

17   *Q.*  Sir, what is RSCS?

18   *A.*  It is the purchasing co-op for Yum Brands.  They handle all

19   of the supply chain functions for the three brands underneath

20   Yum Brands.

21   *Q.*  How long did you work at RSCS, Mr. Ledford?

22   *A.*  I was there for six years.

23   *Q.*  And what was your role at RSCS?

24   *A.*  I was the senior director of poultry purchasing.

25   *Q.*  How is that different or -- actually, let me ask a better

Michael Ledford – Direct

1  question.  Can you explain to the jury what you did as the

2  senior director of poultry purchasing?

3  A.  Main responsibility was leading the team that purchased all

4  of the chicken for all of the Yum Brand concepts.  At my time

5  there, five, Kentucky Fried Chicken, Pizza Hut, Taco Bell, Long

6  John Silver's and S&W restaurants, purchasing chicken and doing

7  the negotiations, running the day-to-day activities with that

8  category, as well.

9  Q.  Okay.  And you mentioned a "team."  Who are the other

10  members of your team?

11  A.  Last two years, it consisted of Mary Hester, Steve

12  Campisano, Mark Oechsli, and Carol Knight.

13  Q.  Mr. Ledford, how much chicken did you and your team at RSCS

14  purchase through contracts with suppliers on an annual basis?

15  A.  It ranged in my time there when I first got there, it was

16  around a billion pounds a year.  I think towards the end it was

17  around 700 million pounds a year.

18  Q.  We're talking about chicken products, was there one product

19  in particular that was the focus of your team?

20  A.  Yes, the king of the hill, so to speak, at Yum Brands was

21  the KFC eight-piece fried product.

22  Q.  So when we say "eight-piece," is eight-piece the same thing

23  as if we're talking about COB?

24  A.  The COB stands for chicken on the bone, which is sort of a

25  moniker for fried eight-piece chicken.

Michael Ledford – Direct

1  Q.  Again, similar to Yum Brands, KFC, and RSCS, if I use both

2  COB and eight-piece interchangeably, is that something that is

3  appropriate for this examination?

4  A.  Yes, it is.

5  Q.  Okay.  So was your job at RSCS the first job you had in the

6  chicken industry?

7  A.  No.

8  Q.  When did you start working in the chicken industry?

9  A.  I had internship in 1995 and then started with the company

10  called Gold Kist, which was a fully integrated chicken

11  supplier, right out of college in 1996.

12  Q.  And from Gold Kist, where did you go?

13  A.  I went to a company called Seaboard Farms, and then after

14  they got bought out, I actually came back to Gold Kist a second

15  time.

16  Q.  And in your roles at both Seaboard Farms and Gold Kist, did

17  you gain experience negotiating chicken or chicken contracts

18  with customers.

19  A.  Yes, absolutely.  I started in the international sales,

20  dealt with international customers, negotiating contracts, and

21  then negotiated for at least ten years of my time on that side

22  of the business with domestic customers like Chick-fil-A and

23  RSCS and Popeyes and people like that.

24  Q.  When you say, Mr. Ledford, on that side of the business,

25  does that mean, for our purposes, you were a supplier of

Michael Ledford - Direct

1  chicken?

2  *A.*  Yes.

3  *Q.*  And now you are a buyer of chicken?

4  *A.*  Exactly.

5  *Q.*  Okay.  What other job responsibilities did you have when

6  you worked for a chicken supplier?

7  *A.*  I started out in operations, spent the first year and a

8  half or so as a -- started as a supervisor, did multiple

9  different departments within the processing operations, then

10  moved into international sales, then into domestic sales, and

11  in my last few years at Gold Kist, I actually started up -- we

12  called it something different, but, in essence, it was a supply

13  chain department.

14  *Q.*  While you anticipated my next question, would you say that

15  your work on both the supplier and the customer side has given

16  you an expertise in the chicken supply chain?

17  *A.*  Yes.

18  *Q.*  How so?

19  *A.*  I have done just about every aspect of the business, both

20  on the seller side, working in operations, working

21  international sales, working in logistics, and also working in

22  supply chain on the other side of the desk, so to speak, buying

23  chicken and negotiating chicken for some of the world's largest

24  brands.  I'd say I've gained a lot of experience as it relates

25  to chicken in the last 26 or 27 years.

Michael Ledford - Direct

1   Q.  Thank you, sir.

2        Are there any other buyers that you worked for?

3   A.  Yes, I also worked for the purchasing co-op for Popeyes.

4   Q.  So, Mr. Ledford, I want to turn specifically to the years

5   2000 -- excuse me -- 2012 to 2014.  Were you in charge of

6   negotiations for the purchase of chicken on the bone, or COB,

7   from suppliers for KFC?

8   A.  Yes, I was.

9   Q.  And for those two years, Mr. Ledford, who are the suppliers

10  you negotiated with?

11  A.  I believe we had seven suppliers at that time.  It would

12  have been Pilgrim's, Tyson, Koch Foods, George's, Claxton,

13  Marshall Durbin, and Mar-Jac.

14  Q.  And I'm sorry, you may have said it, did you also include

15  Pilgrim's?

16  A.  Yes, I started with them.

17  Q.  Thank you.

18        Did your team, Mr. Ledford, have a process that you

19  used to negotiate with those suppliers?

20  A.  Yes, we did.

21  Q.  Can you explain that process to the jury, please?

22  A.  Sure.  We had multiple-stage sourcing process, typically

23  started with an RFI, what is a request for information, and you

24  would send that out to all the suppliers to really get after --

25  it was the first part of kind of conducting what your strategy

Michael Ledford - Direct

1    was going to be that year.  It was to kind of see if there was

2    any cost-saving initiatives we could go after and maybe

3    changing a specification or promoting a different product or

4    whatever.  Then you would receive that back, and we would

5    actually -- sometimes we would meet with them before we sort of

6    kick things off face to face, at least with our largest

7    suppliers.

8         At this time period at RSCS, we roughly had about 14

9    or 15 suppliers over all the chicken, not just the COB, so we

10   weren't going to meet with all of them face to face.  Some of

11   them would be phone calls.  The bigger suppliers we would bring

12   in to kind of kick things off, give them a chance to speak

13   their mind, so to speak, about where they saw the marketplace,

14   give us a chance to do the same, then we would initialize

15   round 1 of the RFP, that's typically what we would call when

16   the negotiations started.  Suppliers, we give them a deadline

17   on when to have their numbers for volume and pricing back in by

18   item.  In that first round also included freight.  And then

19   once we received that, we would typically provide the suppliers

20   with feedback and go into a round 2 and do the same thing over

21   again, and in normal years try to close things out after

22   round 2.  This is all happening, typically speaking, in the

23   fall of the year.

24        And then we'd close things out, issue contracts, send

25   them out for signatures, and that sort of thing.  This

Michael Ledford – Direct

1    particular year that you're asking about, though, I believe we

2    went through four rounds instead of two.

3    Q.   Thank you, Mr. Ledford.

4         I want to break that down just a little bit.  If we

5    can start with sort of kicking off the RFP, would there be a

6    cost-plus model that would be sent out to the different

7    suppliers?

8    A.   Yes.

9    Q.   And when I say "cost-plus model," can you explain to the

10   jury, what is a cost-plus model?

11   A.   Yeah, we had a cost-plus model.  It went by a couple of

12   different names, cost-plus, feed flow-through, or some people

13   called it a grain model.  It was how we priced our chicken on

14   the bone or eight-piece items.  It would start with the cost of

15   grain, because that's the largest cost when you're growing a

16   chicken is the corn and soybean meal that it eats.  It flows

17   through from the grain that you're feeding the chicken on the

18   farms all the way through the cost on every step of the way

19   that it takes to not only grow that chicken but process that

20   chicken in the processing plant.

21   Q.   Mr. Ledford, what are some of the different factors that

22   you and your team took into consideration in determining both

23   an acceptable price, as well as volume being awarded to a

24   supplier?

25   A.   Sure.  We took a lot into consideration.  You know, we

Michael Ledford - Direct

1    wanted the best price we could get.  We wanted it to be the

2    lowest cost that it could be that was sustainable, but we would

3    take into consideration things like what was the grain market

4    doing, things like what was the overall chicken market doing

5    that we benchmarked ourselves against.  There was a couple of

6    different markets at the time that we would benchmark,

7    Urner-Barry and the EMI market, and you would -- we'd look at

8    things like egg placements, hatchability, supply and demand,

9    what was going on in a marketplace to try and formulate what we

10   felt like was a fair price.

11   Q.  You mentioned Urner-Barry, what is Urner-Barry?

12   A.  It's the quoted market, it's been around for a long time,

13   and it's -- it's, in essence, a service that is provided that

14   is considered the marketplace by and large for most of the

15   chicken industry that they sell product off of.

16   Q.  So is that something that you could reference and get a

17   general idea as to what the price is for a particular -- what

18   the price trends are for a particular product?

19   A.  Yes.

20   Q.  Chicken product?

21   A.  Yes, it was.

22   Q.  And then what is EMI, sir?

23   A.  EMI is a very similar service, but it actually takes

24   actually invoices, where Urner-Barry is literally the folks

25   that -- picking up the phone, calling buyers, sellers, brokers,

Michael Ledford – Direct

1    traders, trying to sort of triangulate on all the information

2    they're getting to; where Express Market, Inc. is a service

3    that takes the suppliers' invoices and reports what the market

4    price is based on those invoices.

5    Q.  Switching gears just a moment, Mr. Ledford, what is

6    CombineNet?

7    A.  CombineNet was our internal system at RSCS that we used to

8    conduct our RFP process through.  It was the central system

9    that the suppliers would enter in their bids and their volume

10   and their freight rates.  We could also do some things on the

11   back end of that, so -- to really look at how do we optimize

12   this, where should we ship to product, that sort of thing.

13   Q.  Did Combine -- let me back up.  Was CombineNet a software

14   program?

15   A.  Yes, it was.

16   Q.  Would that assist you in determining location of different

17   suppliers and being able to assist you in identifying where to

18   place certain volume within the country?

19   A.  Yes, we had a functionality within that that we called

20   lease land and cost modeling.  That's exactly what it did, it

21   helped us to optimize where to send what volume from which

22   suppliers based on not only FOB price but also freight rates

23   quoted us to get the most optimized, most cost out of the

24   system, the best way to ship everybody's product.

25   Q.  Do you know, Mr. Ledford, whether CombineNet ever changed

Michael Ledford - Direct

1   names?

2   *A.*   They did change names.  I believe they went by -- I think

3   it was Sciquest was the name, so something very similar to

4   that.

5   *Q.*   Mr. Ledford, you left RSCS in what year?

6   *A.*   2014.

7   *Q.*   Do you know, Mr. Ledford, if RSCS continued to use

8   CombineNet or their new sort of name after you left?

9   *A.*   Yes, I believe they did.  I'm not sure for how long.  But I

10  know it was at least probably within my first two years at

11  Chick-fil-A, the Sciquest people called on me to get us to use

12  their software at Chick-fil-A.  And they gave a reference as

13  Yum Brands, and so I remember early calling somebody at Yum

14  Brands saying, Have you guys switched from CombineNet to

15  Sciquest?  And if so, what do you think about it?  And they

16  said, that's just the new name.  CombineNet is the same thing.

17  *Q.*   All right.  Thank you.  I appreciate that.

18         I want to switch gears -- I shouldn't say "switch

19  gears."  Let me back up and go back to the cost-plus model for

20  just a moment.  Okay?  What are some of the different

21  categories that are included in the cost-plus model, which

22  you've already mentioned grain.  What else is in there?

23  *A.*   So you've got grain, you've got the feed conversion that it

24  takes for the -- how many pounds of feed that the chickens are

25  going to eat on to put on a pound of weight, you've got freight

Michael Ledford – Direct

1 and basis for that freight to get to the chicken farms and the

2 feed mill, then you've got feed-milling expenses, hatch costs,

3 what it costs to actually hatch that chicken at the hatchery,

4 grow it through incubation period, got delivering that to

5 farms, grow out expense on the farms for the -- you know, the

6 four or five weeks that those chickens are growing on the

7 broiler farms, then you've got the cost to bring them into the

8 plant, you've got some first processing costs, to eviscerate

9 the chicken, take the feathers off, all of that good stuff,

10 you've got second processing costs, which is the cost to

11 actually turn that whole chicken into your eight-piece chicken

12 for KFC, you've got a marination cost, marinade that has got a

13 special formula just for KFC product in it, then you've got

14 packaging cost.  At the very bottom, you've got a margin line

15 for each supplier, theoretical margin line.  I'm hitting the

16 high points.

17 Q.  Are all of these costs built into that cost-plus program so

18 that -- cost-plus spreadsheet so that you as the buyer can

19 actually see what the supplier's costs are for each one of

20 those stages that you just explained?

21 A.  Yes.

22 Q.  So I want to focus for just a moment on the actual growing

23 of the chicken in the chicken house.  I'm wondering if you

24 could describe that to the jury and also different costs

25 associated with the actual growth of the chicken.

Michael Ledford - Direct

1   *A.*   Sure.  So in the grow-out model, in the broiler chicken

2   industry, the grower or the -- usually it's a family farm, and

3   they're our contract grower for the suppliers.  They own the

4   farm, they own the land, and they own the building, but the

5   poultry company will deliver to them one-day-old chicks, and

6   they also deliver all the feed that those chicks are going to

7   need throughout their life, then the former providing the

8   electricity for that chicken house, he also provides the water,

9   then the chicken suppliers have somebody they call broiler

10  serviceman that's going to go out periodically check on the

11  chickens at all of the different chicken houses, so there is

12  costs associated for that.  Cost associated for that feed,

13  electricity, to heat the chickens in the winter and to cool

14  them down in the summer, and all of the costs associated with

15  that.  Then actually transporting those chickens from the farm

16  into the processing, all of that would be what I would call

17  grow-out expenses.

18  *Q.*   Mr. Ledford, how about cages, are there costs associated

19  with caging the chickens?

20  *A.*   Well, broiler chickens aren't caged; they're in these

21  hundreds-of-yards-long chicken houses, that's kind of a myth

22  that they're in cages.  They go in cages when they're

23  transported from the short drive from the farm to the plant.

24  *Q.*   They're all free to roam in these houses?

25  *A.*   Yes.

Michael Ledford – Direct

1  *Q.*  Okay.  How about access to water at all times?

2  *A.*  All the time.

3  *Q.*  And you mentioned heating, how about air circulation or

4  ventilation, do they have ventilation in the chicken houses?

5  *A.*  Yes, so most of these houses run on tunnel ventilation, big

6  fans on each end that suck the air through.

7  *Q.*  Bedding for the chicken?

8  *A.*  Chicken litter is what we call it, bedding.

9  *Q.*  Does that have to be changed from time to time?

10  *A.*  Absolutely.

11  *Q.*  Now you also mentioned electricity, does that mean there is

12  lighting in the chicken houses, as well?

13  *A.*  Yes, there is.

14  *Q.*  And then, finally, you said something about somebody has to

15  check on them from time to time.  Do you know, Mr. Ledford, how

16  often the chickens are checked?

17  *A.*  So the farmer is going to check on them one or two times a

18  day, then that broiler serviceman -- each company sort of has

19  its own standards, but typically speaking, they're going to try

20  to come by once a week to each farm.

21  *Q.*  Mr. Ledford, do you know, is it fair to say that the

22  chickens are grown humanely?

23  *A.*  Yes.

24  *Q.*  Is that humane growth of these chickens, cage-free, humane

25  growth of the chickens, is that true for Popeyes, KFC, and

Michael Ledford – Direct

1  Chick-fil-A?

2  *A.*  Yes.

3         *MR. HART:*  Objection.  Foundation.

4         *THE COURT:*  Overruled.

5  *BY MR. BELLER:*

6  *Q.*  You may answer, Mr. Ledford.

7  *A.*  Yes.

8  *Q.*  So we spoke about growing the chicken.  You started to talk

9  a little bit about processing the chicken.  I'm hoping you can

10  explain the costs associated with the actual processing.

11  *A.*  Okay.  When the chickens get to the plant, the first thing

12  they do is they have to -- they have to be slaughtered, which

13  isn't the pretty part of the business, but that's what it

14  takes; right.  So they're typically going to be electronically

15  stunned so to render them unconscious in a humane way so that

16  they do not -- so they don't feel it when their necks are slit

17  and drained of blood.  So those chickens, they have no sense

18  about them.  They do not know what's happening.

19         So once that happens, then they are efficiently

20  slaughtered, then they go through -- and they go through a

21  scalder, and the feathers are taken off of that chicken.  They

22  go through evisceration where all of the internal organs are

23  taken out and the feet are cut off, they're having to harvest

24  things like livers and gizzards, the rest of the insides are

25  going to go to what they call offal, which ultimately is going

Michael Ledford – Direct

1    to go rendering plant and probably go into pet food.  But that

2    whole chicken that is left, which is called a WOG -- which

3    stands for without giblets -- after that comes through first

4    processing, that's going to be dumped into a huge chiller that

5    looks like from the outside like a really long submarine.  And

6    it's going to travel through that with paddles, that's going to

7    be in there -- depending on the plant and the different

8    operations, there is different times, let's just say on average

9    about an hour.  That's going to bring the core temperature down

10   of that product to the USDA standard of under 40 degrees.

11          And then when it exits that chiller, now it's what is

12   called second processing.  So that's going to go -- it's

13   actually weighed to fit the different specifications for the

14   product mix that the chicken suppliers, whoever they're selling

15   to, has a different weight range that fits into their

16   specifications.  So they're going to weigh those WOGs, send

17   certain ones and certain sizes to different lines, and then

18   it's going to be cut up into eight-piece for the folks like

19   Popeyes or KFC or Bojangles or whoever.

20          And then for KFC, it's going to go through a

21   marination process.  Actually, it's inject marinade, so it's

22   this machine with a bunch of little needles that sticks into

23   the meat, lets marination in under the skin.  And there is a

24   cost for all of these different aspects.  It's going to be

25   packaged.  It's going to put into -- for KFC, it's put into two

Michael Ledford - Direct

1    chickens' worth or 16 pieces are going to go into each bag.

2    Those bags are sealed, then they're packed in roughly 50-pound

3    boxes, and then are shipped off to distribution centers for

4    KFC.

5    Q.   Thank you, Mr. Ledford.

6         And I think you said this, but are there costs

7    associated with each one of those?

8    A.   Each and every step along the way.  Yes.

9    Q.   And then sticking with the processing for just a moment.

10   Is some of the processing, meaning the cutting, is that done by

11   hand?

12   A.   No.  Most of it's done by machine.

13   Q.   Okay.  And are those machines going to be spec'd to process

14   a chicken of a different size?

15   A.   Yes, absolutely.

16   Q.   And then another cost item that I want to ask you about,

17   that is margin, what is margin in this cost-plus model?

18   A.   In the cost-plus model, they're theoretical profit that

19   each supplier is making on that chicken.

20   Q.   You say "theoretical," what do you mean by theoretical?

21   A.   Because of our negotiations driving the cost down,

22   sometimes people would take it out of margin, sometimes they

23   would take it out of different line items in the cost, we

24   wouldn't particularly care where they took it out of, as long

25   as they got to the price we were agreeable to.  That's why I

Michael Ledford – Direct

1  say "theoretical margins," some of the suppliers were -- they

2  had different strategies, and they also had different

3  accounting practices.  We had used a standard model with every

4  supplier to make sure that we could compare apples to apples

5  across every line item of the cost, which it might not have

6  particularly been the way that that poultry company counted

7  their chickens, and then that factor, combined with, they could

8  take it out of anywhere they wanted to when we're negotiating

9  with them, is why I call it theoretical number.  If they had

10  11 cents on their margin, on my seat on the bus, I didn't know

11  exactly if they were making 11 cents or something close to

12  that, less than that, or more than that.

13  Q.  Did you care?

14  A.  No, I did not.

15  Q.  As long as that bottom-line price was where you wanted it;

16  is that right?

17  A.  Right.

18  Q.  So would it be accurate, then, to compare different

19  suppliers' margins across different contracts and identify that

20  with profitability?

21  A.  No, that would not be a good way to do that.

22  Q.  Okay.  Understood.

23          So is margin just one part of the cost-plus model that

24  people fill in numbers to in order to get to that bottom line

25  for you?

Michael Ledford – Direct

1    A.  Yes.

2    Q.  Mr. Ledford, in terms of negotiations, do you have access

3    to the historical pricing for the different producers?

4    A.  Yes.

5    Q.  Do you have cost models dating back some years for the

6    different suppliers?

7    A.  Yes.

8    Q.  Does that allow you, Mr. Ledford, to be able to look and

9    compare different line items regarding going up versus going

10   down from one year to the next?

11   A.  Yes, typically during the chicken-on-the-bone negotiations,

12   I kept a master spreadsheet with on one tab every supplier's

13   price for the year before, then the round 1 bid, so it allowed

14   me to not only compare each supplier's price to the price year

15   before, it allowed me to compare all of their prices to each

16   other by line item.

17   Q.  Mr. Ledford, did your experience with the cost-plus model

18   on the supply side help in your position at RSCS negotiating

19   contracts with chicken suppliers?

20   A.  Absolutely.

21   Q.  How so?

22   A.  I had a very intimate knowledge of that side of the

23   business and how it was run.  And every company has a different

24   strategy for sure, but, you know, I think it was 12 years on

25   that side of the business, and part of my responsibilities my

Michael Ledford - Direct

1    last few years at Gold Kist was actually writing the cost

2    models for the various suppliers and coming up with the math.

3    I had a very good understanding based on my historical

4    experience on what was going on, what it took to run these

5    guys' operations and the costs associated with it.

6    Q.   Mr. Ledford, I want to switch gears for just a moment, and

7    I want to now talk about the different goals that you at

8    RSCS -- RSCS had in the negotiation, okay.

9            So when you were at RSCS, KFC, what were your main

10   goals in the negotiations with the chicken suppliers?

11   A.   We wanted to get the lowest sustainable price that also

12   ensured supply, that was our two main goals in this time period

13   that we're talking about.

14   Q.   What about price disparity between the different producers,

15   was that a goal?

16   A.   Yes.  I would say it was secondary to those first two; but,

17   you know, it was kind of right behind it.  It was really

18   important to me and my team to get the smallest spread on

19   chicken on the bone that we could, from the cheapest supplier

20   to highest-priced supplier.

21   Q.   When we say "low price disparity," is it also to say, you

22   wanted them in a tight range?  You wanted those costs to be as

23   close as possible?

24   A.   Yes.

25   Q.   Why is that important?

Michael Ledford – Direct

1    *A.*  So you have a lot -- in the KFC system, you've got a lot of

2    franchisees that own a lot of restaurants.  They can own

3    restaurants across multiple states.  The other thing about the

4    KFC franchise system -- I don't really know if this was

5    different for KFCs, but it's really the same in any franchise

6    system -- the franchisees speak to each other.  And they all

7    the time are sharing each other's -- what's your price of

8    chicken this month, is typically how that conversation would

9    go.  So when there is huge disparity, and you've got an

10   operator -- let's just keep it in the most simplistic example.

11   If you've got an operator that has restaurants in Florida and

12   he also has them in Kansas City, he doesn't want a huge price

13   discrepancy amongst these two locations.

14          By the same token, if he hears of an operator in

15   Atlanta, Georgia, that has a much better price, he's going to

16   be calling me aggravated, why don't I have that price?

17   Everybody can't have the cheapest-price chicken because there

18   is only so much of to go around.  So it takes a lot of noise

19   and a lot of aggravation out of the system, so to speak, both

20   on the franchisee side and day-to-day running the businesses of

21   supplying, you know, 5,000 restaurants, whatever it was at this

22   time with chicken if you have a tight range on that.  To just

23   keep the franchisees happy, basically.

24   *Q.*  And so working off of your example here, generally

25   speaking, who was going to be the poultry supplier supplying

Michael Ledford – Direct

1    chicken to that franchisee in Florida?

2    A.   So oftentimes because of their geographical location, it

3    was Claxton Poultry, because they were in South Georgia and

4    about as close to Florida as you could get.

5    Q.   What about that franchisee -- the same franchisee,

6    different store in Kansas City, what supplier was most likely

7    to be supplying that chicken to that store?

8    A.   Kansas City was probably at this time either going to come

9    out of Tyson's Monett, Missouri, plant or George's Cassville,

10   Missouri, plant.

11   Q.   Okay.  Were there different methods that you used to keep

12   suppliers in that tight range?

13   A.   I wouldn't necessarily say there was different methods.  I

14   did it by -- during the negotiations, providing them feedback

15   on all of their bids to try to get people down to where I

16   needed them to be to make that work.

17   Q.   What about the supplier who had, like, the cheapest price,

18   for example, or the least expensive bid, would you be

19   encouraging them to come up?

20   A.   No.

21   Q.   Would you be encouraging that lowest bid to be going down

22   even further?

23   A.   I think it depends on the situation.  Sometimes, you know,

24   typically speaking, you weren't going to accept a first-round

25   bid.  Even if it was the cheapest one, you were going to

1505

Michael Ledford - Direct

1    continue to try to negotiate that, but we certainly had moving

2    volume around, you know, as another tactic that we used to get

3    that spread close.

4    Q.  Okay.  Would you ever give this feedback that you

5    mentioned, would you ever tell the suppliers how far away they

6    were from a competitive bid, for example?

7    A.  Yes, we typically could give that in any manner or fashion

8    from a percentage from competitive to actually telling them a

9    cents per pound.  You're X percent from a competitive bid, or

10   you are this amount of cents per pound from a competitive bid.

11   Q.  The two examples you gave, sometimes you would give

12   percentage and sometimes you would give actual dollar and cents

13   feedback; is that right?

14   A.  Yes.

15   Q.  Did this type of feedback to suppliers about their pricing

16   happen throughout the entire negotiation process?

17   A.  Yes.

18   Q.  In other words, was it limited to just particular rounds;

19   or would it be from beginning to end?

20   A.  From beginning to end.

21   Q.  Was that type of feedback to you as the buyer helpful in

22   getting that tight pricing range?

23   A.  Yes.

24   Q.  How would you convey your feedback to the different

25   suppliers, Mr. Ledford?

Michael Ledford - Direct

1   *A.*  It varied.  Some of it was by email, some of it was by

2   phone call, and some of it was by face-to-face meetings.

3   *Q.*  Or a combination of the three?

4   *A.*  Oftentimes, a combination of the three.

5   *Q.*  Okay.  When you gave feedback to the suppliers after --

6   after the different round bid, did you have an expectation that

7   they would follow your feedback?

8   *A.*  Typically speaking, yes.

9   *Q.*  And you say "typically speaking," what if they didn't, what

10  would happen?

11  *A.*  Then I would tell them they were going to lose volume,

12  typically, and give it to one of the cheaper -- lower-priced

13  suppliers.

14  *Q.*  When you say "take away volume," what does that mean to the

15  jury?

16  *A.*  So we would have a weekly -- the net result of these

17  negotiations was not only would you get to an agreement on

18  price, but you would get to an agreement on volume, and you

19  would do that in the amount of product that they were going to

20  ship you weekly.  And so when I say "move volume," you would

21  take their weekly commitment down, the guy -- the supplier that

22  was the higher, and give it to one of the suppliers that had a

23  lower price and move their weekly commitment up.

24  *Q.*  And while you were at RSCS, is that something you ever did,

25  and that is actually take away volume or award volume to other

Michael Ledford – Direct

1  producers?

2  A.  Yes, typically speaking, I believe it happened every year,

3  moving volume around to some degree.

4  Q.  How about with Georgia's Poultry, for example, do you

5  remember an incident where you took volume away from George's?

6  A.  Yes, one year in particular, prior to 2012 where they were

7  extremely aggressive on their pricing and refused to come down

8  and were really in a different ballpark from everybody else,

9  and gave them about three or four chances to take that volume

10  down, and they really drew a line in the sand, so we got ready

11  to award business -- we took a substantial amount of volume

12  away from them, after we got off the phone telling them they

13  were losing this volume, it was effective January 1, kind of

14  got one of those, oh, we were kidding.  We'll lower our price

15  now.  It was one of those things, sorry, it's too late.  I've

16  already committed it to these other suppliers.

17  Q.  Mr. Ledford, in your experience, is the threat of taking

18  away volume usually enough to cause the supplier to move their

19  price?

20  A.  Yes.

21  Q.  So I want to switch gears and go to sort of the lawyerly

22  side of the examination, and we're going to go through some

23  documents together.  Okay?

24  A.  Okay.

25          MR. BELLER:  Your Honor, if I may hand out some

Michael Ledford – Direct

1    binders, please.

2            THE COURT:  Yes, you may.

3            MR. BELLER:  Thank you.

4            And, Your Honor, the Department of Justice has already

5    been given their binder, as well.

6            THE COURT:  Okay.  Great.

7    BY MR. BELLER:

8    Q.  Mr. Ledford, prior to testifying today, or even as early as

9    this morning, did you have the opportunity to review all the

10   final contracts between the suppliers and RSCS for the KFC 2012

11   contract?

12   A.  Yes, I did.

13   Q.  Did you also have the opportunity to review the cost-plus

14   models submitted by all the suppliers who bid on the KFC 2013

15   contract?

16   A.  Yes, I did.

17   Q.  And how about the different rounds of bids submitted by the

18   suppliers for the KFC 2013 contracts?

19   A.  I reviewed the bids for Claxton, for all the bids.

20   Q.  Okay.  What about the final contracts for the 2014

21   contracts for the different suppliers?

22   A.  Yes.

23   Q.  Mr. Ledford, in front of you is a binder with some of these

24   contracts.  Have you had the opportunity to review the exhibits

25   that are marked tabs 1 through 23?

Michael Ledford - Direct

1    A.  Give me just a second.

2    Q.  Take your time, sir.

3    A.  You said 23?

4    Q.  Yes, sir.

5    A.  Yes, I reviewed all of these.

6            MR. BELLER:  Thank you.

7            Your Honor, I'm happy to list these for the record, if

8    I may.

9            THE COURT:  Yes.  Go ahead.

10           MR. BELLER:  F-750, F-759, F-678, F-777.  Perhaps I

11   missed one, F-768, F-786, F-790, F-798, F-742, F-769, F-778,

12   F-787, F-799.

13   BY MR. BELLER:

14   Q.  Sir, the contracts -- rather, the tabs that you just went

15   through, do those appear to be 2012, 2013 contracts?

16   A.  Yes.

17           MR. BELLER:  Your Honor, at this time, I would move

18   for the admission of all of those exhibits that I just cited.

19           THE COURT:  Any objection to the admission of the

20   exhibits that Mr. Beller just read the list of?

21           MR. TORZILLI:  Just to clarify, counsel is not moving

22   into evidence F-678?

23           THE COURT:  No, he mentioned 768, but it was out of

24   order.

25           MR. TORZILLI:  Then no objection.

1          THE COURT:  Each of those exhibits will be admitted

2   and may be displayed.

3          (Exhibits F-750, F-759, F-678, F-777, F-768, F-786,

4   F-790, F-798, F-742, F-769, F-778, F-787, F-799 admitted.)

5          MR. BELLER:  Thank you.

6          I don't need them displayed at this point, Mr. Brian,

7   but I will in a moment.

8   BY MR. BELLER:

9   Q.  Mr. Ledford, if you could look at tabs 28 through 46,

10  please.

11  A.  Did you say 40?

12  Q.  46.

13  A.  46.  Okay.

14  Q.  Please, sir.

15  A.  Okay.

16  Q.  Do those appear to you, Mr. Ledford, to be bids for 2013

17  and/or cover emails for the same period of time?

18  A.  Yes, they are.

19         MR. BELLER:  Your Honor, if I may list the exhibit

20  numbers?

21         THE COURT:  Yes, go ahead.

22         MR. BELLER:  A-559, A-560, A-574, A-575, 1402, A-579,

23  A-580, A-129, F-818, D-531, D-545, and G-597.

24         Your Honor, if I, for purposes of this, may remove

25  A-129 and F-818.  I'll get to those in just a moment.  Excuse

Michael Ledford – Direct

1   me.

2          THE COURT:  What was the F number?  818?

3          MR. BELLER:  818.

4          THE COURT:  Okay.

5          MR. BELLER:  Your Honor, at this time, I would move

6   for the admission of exhibits that I just listed.

7          THE COURT:  Okay.  Then with the exception of A-129

8   and F-818, any objection to the admission of the exhibits that

9   Mr. Beller listed?

10          MR. TORZILLI:  No objection.

11          THE COURT:  All right.  Each of those will be

12   admitted.

13          (Exhibits A-559, A-560, A-574, A-575, A-579, A-580,

14   D-531, D-545, G-597, 1402 admitted.)

15          MR. BELLER:  Thank you.

16   BY MR. BELLER:

17   Q.  One more of these, Mr. Ledford, and we're done.  If you

18   could please look at tabs 50 through 68, please.

19   A.  Okay.

20   Q.  Do those, Mr. Ledford, appear to be bids and/or RSCS slide

21   decks that you prepared?

22   A.  Yes, they.

23          MR. BELLER:  Your Honor, if I may list these, please?

24          THE COURT:  You may.

25          MR. BELLER:  A-129, F-818, D-198, A-115, A-288, A-613,

Michael Ledford – Direct

1   A-622, A-623, F-815, D-564, D-574, D-589, D-591, A-129, B-926,

2   C-59, G-421.  And at this time, I would move for the admission

3   of those documents.

4          THE COURT:  I think you listed A-129 twice, but -- in

5   any event, no problem.

6          MR. BELLER:  To the extent that I did, Your Honor,

7   that was my error, and I am only moving for it to be admitted

8   once.  I believe what I may have been -- may have intended

9   instead of C-59 is C-159.

10         THE COURT:  Okay.  C-159.

11         MR. BELLER:  Yes, thank you.

12         THE COURT:  Any objection to the admission of the

13  exhibits that Mr. Beller read off?

14         MR. TORZILLI:  One moment, Your Honor?

15         THE COURT:  Sure.

16         MR. TORZILLI:  No objection, Your Honor.

17         THE COURT:  Each of those will be admitted.

18         (Exhibits A-129, F-818, D-198, A-115, A-288, A-613,

19  A-622, A-623, F-815, D-564, D-574, D-589, D-591, B-926, C-159,

20  G-421 admitted.)

21  BY MR. BELLER:

22  Q.  Mr. Ledford, one more time, you and I are going to play

23  bingo, then we're done with this.

24  A.  All right.

25  Q.  If you could turn to tab 71, 72, 73, and 74.

Michael Ledford – Direct

1          THE COURT:  While Mr. Ledford is looking through

2    those, I show A-559 has previously been admitted.  I'm not sure

3    if other people do as well.

4          MR. BELLER:  May I have a moment to check with my

5    team, Your Honor?

6          THE COURT:  Sure.

7          MR. BELLER:  Your Honor, our internal notes show that

8    it was not admitted previously.  I think it was a typographical

9    error.

10         MR. TORZILLI:  Our notes are similar to his.

11         THE COURT:  All right.  Good.  It will be admitted, in

12   any event.

13         (Exhibit A-559 admitted.)

14         MR. BELLER:  Thank you.  If I may proceed, Your Honor?

15         THE COURT:  Yes.

16         MR. BELLER:  Thank you.

17   BY MR. BELLER:

18   Q.  Mr. Ledford, are those summaries?

19   A.  Yes, they are.

20         MR. BELLER:  Your Honor, at this time, I would move

21   for the admission of J-260, J-261, J-263, and J-265.

22         THE COURT:  Any objection to the admission of those

23   exhibits?

24         MR. TORZILLI:  No further objection.

25         THE COURT:  Okay.  Then previous objections overruled.

Michael Ledford – Direct

1  J-260, 261, 263, and J-265, those are all J exhibits, will be

2  admitted.

3          (Exhibits J-260, J-261, J-263, J-265 admitted.)

4          MR. BELLER:  Thank you.

5  BY MR. BELLER:

6  Q.  Mr. Ledford, we're done with the boring part; let's go to

7  the fascinating exciting part of negotiating chicken.  Okay?

8  A.  Yes.

9  Q.  I'm done with the binders, but you're welcome to leave it

10 open.  If I need you to access anything, I'll let you know.

11 A.  Okay.

12 Q.  Focusing on the 2013 and 2014 contracts, do you recall who

13 the suppliers were that bid for RSCS/KFC's business?

14 A.  Yes, I do.

15 Q.  And who were those suppliers, if you recall?

16 A.  It was that same list that I gave you before, which I can

17 run through again but with the addition of Case Farms.

18 Q.  When did Case Farms join?

19 A.  I believe that was the first year that they joined.

20 Q.  Okay.  Thank you, Mr. Ledford.

21          So I want to start asking you specifically about the

22 2013 contract.  Did Claxton Poultry bid for chicken in 2012 for

23 the 2013 contract?

24 A.  Yes.

25 Q.  Yes.  Going into this negotiation, did you prepare a

Michael Ledford - Direct

1    PowerPoint slide deck?

2    *A.*  Yes, I did.

3    *Q.*  What was the purpose of that slide deck, Mr. Ledford?

4    *A.*  The main purpose of that slide deck was to inform the

5    brands on sort of what we were anticipating, and we also had in

6    my internal leadership at RSCS as well as we had this poultry

7    team that we had put together that consisted of a couple of

8    franchisees also to inform those parties as sort of what our

9    expectations were leading into that particular year's

10   negotiations, based on what was going on in the market, what we

11   were hearing out there in the industry, and supply and demand,

12   things like that.

13   *Q.*  Who is the audience for that slide deck?

14   *A.*  It's an internal audience.

15   *Q.*  Meaning within RSCS?

16   *A.*  Within RSCS and the five brands that we purchased for.

17   *Q.*  How about franchisees?

18   *A.*  Just the two that were on the team would have seen that,

19   and then there is a chance that the board -- the RSCS board,

20   which was comprised of franchisees, would have eventually have

21   seen it.  They wouldn't have seen it right when it was

22   produced.  Probably the next quarterly board meeting they would

23   have seen a high-level summary of that slide deck.

24   *Q.*  What was the status, Mr. Ledford -- well, let me back up,

25   the first slide deck that you did going into the 2013

Michael Ledford - Direct

1    negotiations, do you recall when that was written, roughly?

2    A.   The very first one?

3    Q.   Yes, sir.

4    A.   I believe it was September.

5    Q.   Okay.   September of 2012?

6    A.   Yes.

7    Q.   So I think you mentioned it analyzed -- rather, you

8    analyzed what was going on in the market at that time?

9    A.   Right.

10   Q.   What was the status of suppliers' margins going into that

11   particular negotiation?

12   A.   They were negative.

13   Q.   What do you mean by "negative"?

14   A.   They were losing money.

15   Q.   Meaning that suppliers themselves were losing money on

16   chicken?

17   A.   Yes.

18   Q.   When we say "losing money," would it be fair to say that

19   there were actually record losses in that period of time?

20           MR. TORZILLI:   Objection.   Leading.

21           THE COURT:   Sustained.

22   BY MR. BELLER:

23   Q.   How would you describe their losses?

24   A.   They were record losses that year.

25   Q.   Were there poultry companies going bankrupt?

Michael Ledford – Direct

1    *A.*  Yes, there was.

2    *Q.*  Do you know how many poultry companies or suppliers,

3    small-bird suppliers went bankrupt in the preceding 24 months?

4    *A.*  I do not remember an exact number, but it was -- it was

5    more than a few, and it was significant enough to have our

6    attention.

7    *Q.*  If you had a chance to take a look at your slide deck,

8    would that assist in refreshing your recollection?

9    *A.*  Yes, it would.

10   *Q.*  All right.  So, Mr. Ledford, if you would turn in your

11   binder to tab 48.  I'm going to ask you to switch to --

12   actually, I can actually have it put on your screen if that

13   would be easier, to page 10 of that.

14        *MR. BELLER:*  Your Honor, if I may publish this to the

15   jury, as well.

16        *THE COURT:*  You may.

17        *MR. TORZILLI:*  Might I ask that the exhibit be

18   identified for the record, please?

19        *MR. BELLER:*  Yeah, I'm happy to, Your Honor.  Jumping

20   in.  This is Exhibit F-810, already admitted.

21        *THE COURT:*  Let me check that.

22        *MR. BELLER:*  Your Honor, may I --

23        *THE COURT:*  I don't show F-810 admitted.

24        *MR. BELLER:*  That's exactly what I was going to say.

25   I'm looking at my notes.  I don't see that I specifically moved

Michael Ledford – Direct

1    for that one.  I would now move for F-810.  I'm happy to lay

2    additional foundation.

3            THE COURT:  Any objection to the admission of F-810?

4            MR. TORZILLI:  No objection.

5            THE COURT:  F-810 will be admitted.

6            (Exhibit F-810 admitted.)

7            MR. BELLER:  Your Honor, may I publish Exhibit F-810

8    to the jury, please?

9            THE COURT:  Yes, you may.

10           MR. BELLER:  Mr. Brian, if we can switch to page 10

11   and bullet 1, please.

12   BY MR. BELLER:

13   Q.  Mr. Ledford, if you can take just a moment and review page

14   10, bullet 1, it's also on your screen if it's easier than

15   looking at the piece of paper.

16   A.  I'm ready.

17   Q.  Does that refresh your recollection as to how many poultry

18   companies went bankrupt in the preceding 24 months?

19   A.  Yes, six poultry companies had gone bankrupt in the

20   preceding 24 months.

21   Q.  Thank you, Mr. Ledford.

22           MR. BELLER:  And thank you, Mr. Brian.  We can pull

23   that down.

24   BY MR. BELLER:

25   Q.  You said that, to the jury, it was enough to get our

Michael Ledford – Direct

1   attention, what do you mean by that?

2   A.  You know, it goes back to our objectives that I stated

3   earlier, that sustainable price, that's exactly what we're

4   talking about.  We wanted at RSCS the lowest price possible,

5   but we didn't want it to happen at the expense of the suppliers

6   not making money and going out of business.  So when you've got

7   multiple poultry companies filing bankruptcy or going out of

8   business or selling to somebody, when you're a buyer of

9   chicken, that gets your attention because you don't want to

10  lose supply, and it also can deleverage us when you get

11  consolidation and you have poultry companies becoming larger

12  and larger from buying those entities that went out of

13  business, so it was something certainly we were keeping a keen

14  eye on.

15  Q.  Okay.  And how was supply going into -- in 2012, going into

16  the 2013 negotiation?

17  A.  Supply was very tight, because of the record losses.  The

18  suppliers were cutting back on supply to -- to counterbalance,

19  your basic seventh-grade-supply-and-demand economics that you

20  learned, you know, less supply, price is going to go up.

21  Q.  Does -- do droughts across the country have an impact on

22  supply?

23  A.  They certainly do.  Droughts are going to force up the

24  price of the grains that the -- the corn and the soybean meal

25  that we went through earlier that the chickens are going to

Michael Ledford - Direct

1    eat, which are the single largest cost driver to grow a

2    chicken, when that -- that's what was causing -- that was

3    really the catalyst for the record losses was the high grain

4    prices.

5    Q.   Was -- so we already talked about certain suppliers having

6    gone bankrupt, but was supply down as a result?

7    A.   Yes.

8    Q.   And, Mr. Ledford, if you know, what was happening with the

9    long-term margins in the bigger-bird categories?

10   A.   The margins were better in big bird.

11   Q.   So what was your expectation regarding market inflation for

12   2013?

13   A.   I was expecting the price to go higher.

14   Q.   Higher?

15   A.   Yes.

16   Q.   Okay.  What was your expectation regarding demand for

17   chicken going into 2013?

18   A.   Demand was also high.

19   Q.   Was it record high?

20   A.   You know, for that time period, yes.  Those records would

21   be broken in the subsequent years, but, yes.

22   Q.   Sure.  But at this particular time period, obviously, not

23   future, was it a record high at that time?

24   A.   Yes, it was.

25   Q.   Mr. Ledford, going into that negotiation, sir, how was the

Michael Ledford - Direct

1  wing market?

2  *A.* The wing market was very tight.  There had been a lot of

3  wing promotions, and we were also in September when I wrote

4  this deck.  Football season would have just started, and that

5  is -- typically speaking, wing market is very seasonal.  As

6  soon as Labor Day weekend gets here and football season starts,

7  wing market is going to go up.  It's going to stay up through

8  the Super Bowl, if not March Madness.  At the time I was

9  writing that deck, wing market was starting its climb for the

10  year as well as on top of the -- all of the other high demand

11  on just chicken as a general category.

12  *Q.* Mr. Ledford, you explained to us what Urner-Barry and EMI

13  is.  Is it fair to call those the market?

14  *A.* Yes.

15  *Q.* Mr. Ledford, was RSCS paying -- going into negotiations,

16  were they paying less for wings than the market price?

17  *A.* Yes, we were.

18  *Q.* How about dark meat, was RSCS paying below market on dark

19  meat?

20  *A.* Yes.

21  *Q.* Was RSCS paying below market on eight-piece?

22  *A.* Yes.

23  *Q.* So I want to better understand Claxton's role to RSCS.  And

24  so I have a big question, did RSCS need Claxton that year?

25  *A.* Yes, we did.

Michael Ledford – Direct

1    Q.   What is Claxton's role to ensure chicken supply to RSCS?

2    A.   Well, one for one, they represent a share of our volume.

3    Being a one-plant operation, they certainly don't have the

4    share that some of the other providers have, but that share is

5    important, nonetheless.  Especially when you're in a

6    cutback-type year, every pound is important.  And also a

7    supplier like a Claxton Poultry, bluntly put, is also -- sort

8    of helps us keep the big guys honest by having somebody that is

9    a smaller operation that you have somebody to sort of

10   cross-reference what you hear from those suppliers as well as

11   somebody that doesn't have their weight to throw around as

12   much.

13   Q.   Did Claxton have a tendency to offer more competitive

14   pricing?

15   A.   Yes.

16   Q.   So going into the 2013 negotiation, assuming that there was

17   going to be a price increase of some type, did you have a goal

18   regarding the FOB price spread?

19   A.   I did.  I want that price spread to be as tight as I could

20   get it.

21   Q.   I just realized I said "FOB."  Please, would you explain

22   what FOB is and how that's different than COB or WOG?

23   A.   FOB is free on board, and, basically, that's a term that

24   means the chicken is at their dock door of the supplier.  It

25   does not include any freight to get it from their processing

Michael Ledford – Direct

1   facility to a distribution center or to our restaurants.  It's

2   just, after it's produced, sitting there ready to load onto a

3   truck.

4   Q.  Thank you, Mr. Ledford.

5        Before I move on, I want to ask you about two

6   additional exhibits.  If you can turn to tabs 47 and also 49,

7   and take a moment and review those.

8        MR. BELLER:  Your Honor, I'm referencing Exhibits

9   F-808 and F-813.

10        THE WITNESS:  Okay.

11   BY MR. BELLER:

12   Q.  Mr. Ledford, do you recognize those two exhibits, sir?

13   A.  Yes, I do.

14   Q.  Are those also PowerPoint presentations or slide decks that

15   you drafted during the negotiation processes?

16   A.  Yes, they are.

17        MR. BELLER:  Your Honor, at this time, I would move

18   for the admission of F-808 and F-813.

19        THE COURT:  Any objection to those two exhibits?

20        MR. TORZILLI:  No objection, Your Honor.

21        THE COURT:  F-808 and F-813 will both be admitted.

22        (Exhibits F-808, F-813 admitted.)

23        MR. BELLER:  Thank you.

24   BY MR. BELLER:

25   Q.  Thank you, Mr. Ledford.

1524

Michael Ledford – Direct

1        I want to switch gears for just a moment, and I want

2   to talk specifically about your negotiations with individuals

3   at Claxton Poultry.  Okay?

4   *A.*  Okay.

5   *Q.*  During these particular negotiations between 2012 for the

6   2013 contract, who at Claxton were you negotiating with or

7   working with?

8   *A.*  Main contact would have been Scott Brady, but then also

9   Mikell Fries, and I would have conversations, as well.

10  *Q.*  Okay.  Was the first year -- focusing on Mr. Brady, was

11  this the first year you had negotiated with Mr. Brady at

12  Claxton Poultry?

13  *A.*  Yes.

14  *Q.*  Did you work with Mr. Brady when he was with any other

15  supplier?

16  *A.*  Yes, I did.

17  *Q.*  What supplier was that?

18  *A.*  Pilgrim's.

19  *Q.*  Okay.  So in terms of him switching jobs and going to

20  Claxton, was it fair to say he was the new guy on the

21  negotiations this year?

22  *A.*  Yes.

23  *Q.*  Do you know, Mr. Ledford, if he had pricing authority over

24  the chicken?

25  *A.*  I would say no.  I would -- he did not have sole pricing

1525

Michael Ledford – Direct

 1  authority.

 2  Q.  And who else -- I think you just said this, but who else

 3  did you work with at Claxton in 2012?

 4  A.  Mikell Fries.

 5  Q.  Was Mr. Fries your usual point of contact for KFC

 6  negotiations in the past?

 7  A.  Yes, prior to this period, yes.

 8  Q.  Do you know, Mr. Ledford, in 2012 what Mr. Fries' title

 9  was, job title?

10  A.  I believe it was sales manager.

11  Q.  Do you know an individual by the name of Jerry Lane?

12  A.  Yes.

13  Q.  Who is Jerry Lane in 2012?

14  A.  In 2012, Jerry Lane was the president of Claxton Poultry.

15  Q.  Was he the president during both the 2013 and the 2014

16  negotiations?

17  A.  Yes.

18  Q.  Do you know, Mr. Ledford, when Mikell Fries became

19  president of Claxton Poultry?

20  A.  I believe it was 2016.

21  Q.  Okay.  So talking again about that 2012 negotiation for the

22  2013 contract, I want to look at Defense Exhibit J-261.

23          MR. BELLER:  Your Honor, I believe this was just

24  admitted, and I'm asking to be able to publish, please.

25          THE COURT:  Yes, you may.

Michael Ledford - Direct

1

2      *BY MR. BELLER:*

3      Q.  Mr. Ledford, are you able to see J-261 on your screen?

4      A.  Yes.

5      Q.  Can you tell the jury what is depicted in J-261 --

6      A.  Is a summary for the 2013 contract year of the initial bids

7      and the final prices that we contracted with each supplier.

8      Q.  How many suppliers were contracted with in 2013?

9      A.  There is eight.

10     Q.  And so I want to focus on the blue bar for just a moment.

11     Does the blue bar reflect the first-round bids?

12     A.  It appears so, yes.

13     Q.  And what dollar amount did Claxton submit for its

14     first-round bid for the 2013 contract?

15     A.  9620.

16     Q.  Was Claxton your least expensive supplier for 2013

17     first-round bid?

18     A.  Yes.

19     Q.  Who is your most expensive bid for the 2013 contract?

20     A.  Tyson.

21     Q.  Who is your second-most expensive bid for your 2013

22     contract?

23     A.  Pilgrim's.

24     Q.  Do you recall, Mr. Ledford, how many rounds of negotiations

25     there were in 2012 for the 2013 contract?

Michael Ledford - Direct

1   *A.*  Four.

2   *Q.*  Mr. Ledford, I'm showing you Exhibit J-406 --

3          *MR. BELLER:*  Thank you, Mr. Brian.

4          Your Honor, I believe this one was also just admitted,

5   and I'm asking to be able to publish, please.

6          *THE COURT:*  Let me check that.  I don't recall that on

7   the list.

8          *MR. BELLER:*  If I can correct myself, Your Honor, this

9   has not yet been admitted.  I'm asking to be able to use it as

10  a demonstrative, please.

11         *THE COURT:*  All right.  Any objection to the use of

12  J-406 at this time for demonstrative purposes only?

13         *MR. TORZILLI:*  Not for demonstrative.

14         *THE COURT:*  It may be displayed to the jury for

15  demonstrative purposes only.

16         *MR. BELLER:*  Thank you.

17  *BY MR. BELLER:*

18  *Q.*  Mr. Ledford, this is also going to be on your screen, it's

19  also in your notebook as tab 75, if you would prefer that.

20         Mr. Ledford, does this accurately reflect the

21  different round bids in 2012 for the 2013 contract?

22  *A.*  Yes, it does.

23  *Q.*  And let me be even more precise, for Claxton Poultry

24  specifically?

25  *A.*  Yes.

1528

Michael Ledford – Direct

1    Q.  Mr. Ledford, through the different rounds of negotiations,

2    it appears that Claxton's eight-piece price never changed; is

3    that right?

4    A.  Yes.

5    Q.  Do you know why that is, sir?

6    A.  There is two reasons.  The first one is, they're the lowest

7    supplier I had, which in this year which would have been the

8    feedback I'm giving to other suppliers, this is the most

9    competitive price.  Also, if I'm not mistaken, I believe this

10   year we also had them lower their case weight, which you take

11   the case price times the case weight to get what an invoice is

12   billed off.  It equated to about one penny a pound.

13   Q.  When we look at the eight-piece price specifically, the

14   final contract price, Mr. Ledford, is .9625, which is

15   .0005 cents higher than their bid.  Why did it go up with the

16   final contract price?

17   A.  I know that looks a little odd, but this particular year,

18   at the very end after we got to a price agreement with every

19   supplier, we asked them to upcharge us that .0005 to pay --

20   help pay for some consultants that we had that year, and it was

21   really -- it was kind of a little bit of a convoluted deal.  It

22   was passed through -- we had made a spec change that reduced

23   the price, but we didn't want them to pass all of that through

24   to us.  We took half of it and added it back to the price.

25   That was with -- at our instruction.

Michael Ledford – Direct

1    *Q.*  Does that also mean that's not a profit that went back to

2    the supplier?

3    *A.*  No, actually ended up coming back to us.

4    *Q.*  Okay.  Thank you.

5           I want to pause here for just a moment, talk a little

6    bit about the dark-meat price.

7           *MR. BELLER:*  If we can keep that up, Mr. Brian,

8    please.

9    *BY MR. BELLER:*

10   *Q.*  Will you explain to the jury how dark-meat formula works?

11   *A.*  Yes.  So the dark-meat formula is really a cents-per-pound

12   less than the eight-piece price.  So instead of having that

13   long cost model that we walked through earlier this morning

14   with every line item, you just take that same eight-piece final

15   price -- like on the first bid, it says 30 back.  That's

16   30 cents less than eight-piece.  If your eight-piece is 9620,

17   30 back for supplemental dark meat would be 6620.  It's just a

18   simple subtraction.

19   *Q.*  So does that also mean -- with the simple subtraction --

20   that in order to know a supplier's dark-meat price, you also

21   have to know their eight-piece or COB price?

22   *A.*  That's correct.

23   *Q.*  Similar to, like, a 20 percent off at a store, if there is

24   a sign that says 20 percent off, you don't actually know what

25   you're paying for that product unless you know the price that's

Michael Ledford - Direct

1   on that tag?

2   A.  Right.

3   Q.  If we say, for example, you want everyone to be at 31 back,

4   you would -- the buyer wants everyone to be at 31 back, is that

5   just a formula number or actual cost?

6   A.  It's a formula.

7   Q.  So, Mr. Ledford, if I know that my neighbor is selling

8   dark-meat chicken for 31 back, do I know what he's actually

9   charging for that dark-meat chicken?

10  A.  No, I do not.

11  Q.  Conversely, Mr. Ledford, if I do know the eight-piece price

12  and I know the dark-meat formula, can I use those numbers to

13  undercut my competitor's price?

14  A.  You certainly could, yes.

15  Q.  Keeping this demonstrative on the screen for just a moment,

16  did the suppliers also submit prices for wings for the 2013

17  contract?

18  A.  Yes, they did.

19  Q.  Yes.  When we say on the chart there is a wings bulk and

20  wings precounted, we're talking about chicken wings?

21  A.  Right.

22  Q.  What is the difference between bulk and precounted?

23  A.  Bulk is 40 pounds of wings in a box.  You get there by

24  weight.  You don't know how many actually pieces of the wings.

25  Precounted, you're actually having the supplier, in this

Michael Ledford - Direct

1    case -- they're actually counting and making sure there is a

2    certain number in each and every box.  They're guaranteeing you

3    by count instead of weight.  We pay them typically -- we paid

4    about 10 cents extra for that added labor to count each wing.

5    Q.  Okay.  Because there is additional cost, of course,

6    incurred, you mentioned labor, to do the actual counting?

7    A.  Exactly.

8    Q.  Okay.  Mr. Ledford, I'm showing you Defense Exhibit 559.

9         MR. BELLER:  Your Honor, I believe this was just

10   admitted, and I would request permission to publish.

11        THE COURT:  You may.

12   BY MR. BELLER:

13   Q.  Mr. Ledford, are you able to see Exhibit A-559 on your

14   screen?

15   A.  Yes, I am.

16   Q.  Okay.  And so what does A-559 say?

17   A.  It -- it's an email from Scott Brady to Mark Oechsli, who

18   was on my team at this time, saying, Here is our updated KFC

19   COB cost model; the only thing I changed was wings; we want to

20   be at market on wings.

21   Q.  Okay.

22        MR. BELLER:  With that in mind, if we can please go

23   back, Your Honor, to J-406 for demonstrative purposes at this

24   time.

25        THE COURT:  You may.

Michael Ledford - Direct

1

2    *BY MR. BELLER:*

3    *Q.*  So do you believe the number -- I'm talking about rounds 2

4    and rounds 3, that dollar 7620, based on the email you read,

5    did you believe that to be the market price at that time?

6    *A.*  I don't believe it was.

7    *Q.*  Okay.  So do you know -- a dollar 7620, do you know what

8    the market price was?

9    *A.*  I do not.

10   *Q.*  If you don't, that's okay.

11   *A.*  I don't remember, no.

12   *Q.*  No problem.  In this particular case, is it fair to say

13   that wings is also taken off the eight-piece price?

14   *A.*  Yes.

15   *Q.*  So if we say --

16        *MR. BELLER:*  Going back to A-559, please, Mr. Brian --

17   *BY MR. BELLER:*

18   *Q.*  We want to be at market on wings, at this period of time,

19   what does "market" mean?

20        *MR. TORZILLI:*  Objection.  Foundation.  He's being

21   asked to interpret it.

22        *MR. BELLER:*  I'm happy --

23        *THE COURT:*  Sustained.  If you can lay foundation.

24        *MR. BELLER:*  Thank you.

25   *BY MR. BELLER:*

Michael Ledford – Direct

1    Q.   Let's speak a little bit more generally, because you spoke

2    about Urner-Barry, and you spoke also about EMI.

3    A.   Right.

4    Q.   Is that market?

5    A.   In this particular case, since it's a supplier that's using

6    the term "market," I would say that it's not EMI; it's

7    Urner-Barry.  Typically speaking, if somebody is going to use

8    EMI, it's typically a buyer.  The EMI buyer, especially at this

9    time, was not widely adopted by any of the suppliers.  But

10   Urner-Barry had been the long-established market price for

11   products.  So this is Urner-Barry.

12   Q.   Excuse me for jumping on top of your answer.

13        If someone were to say, Listen, we want to be priced

14   at market, what does that mean?

15   A.   Urner-Barry.

16   Q.   And so how would that price go about being calculated?

17   A.   So you would take, typically speaking, when we had

18   something that was priced off of market -- because we had

19   different pricing periods, you would have some sort of an

20   agreement with the suppliers on when you would calculate that

21   for every pricing period.  So, for instance, you would -- for

22   the month of June, market price would have been calculated off

23   of the month of May's price, to set up the price for June.

24   When you got to July, you'd do the same thing for June.

25   Q.   Is wings something -- that is something that is reflected

Michael Ledford – Direct

1    on the Urner-Barry?

2    *A.*  Yes.

3    *Q.*  When we are talking about the different categories on the

4    Urner-Barry market, can you as a buyer or the poultry supplier

5    reference Urner-Barry and identify a price based on that

6    particular category?

7    *A.*  Yes.

8    *Q.*  So in 2012, 2013, was pricing wings in the industry a

9    pretty common practice to price wings based on market?

10   *A.*  Yes, it was the -- it was the standard, really.

11   *Q.*  Is that a commonplace for negotiation, is to go to the

12   market price?

13   *A.*  It is.

14   *Q.*  And would you have said in 2012, 2013 that it was also a

15   fair starting place for negotiations?

16   *A.*  Yes.

17   *Q.*  And you may have mentioned this, but was the wing market in

18   2012 having record highs in the last half of the year?

19   *A.*  Yes, it was.

20        *MR. BELLER:*  So if we can go back to, Mr. Brian, J-406

21   for just a moment.

22   *BY MR. BELLER:*

23   *Q.*  We have wings bulk, and we have wings precounted.  You

24   mention a 10 cent add-on for precounted wings.  Is that 10-cent

25   add-on for precount, is that pretty standard?

1535

Michael Ledford - Direct

 1   A.  Yes.

 2         MR. BELLER:  If I may have just a brief moment, Your

 3   Honor.

 4         THE COURT:  You may.

 5   BY MR. BELLER:

 6   Q.  What does flat pricing mean?

 7         I'm done with this for just a moment.  Thank you,

 8   Mr. Brian.

 9   A.  Flat pricing, when you lock in a price for a period of

10   time, it just stays that price every pricing period.  If you

11   pick, say, a dollar 75 flat price, that price is going to be a

12   dollar 75 for whatever the duration of that contract is.

13   Q.  And do you recall, Mr. Ledford, for this particular

14   contract year if you wanted flat pricing for wings?

15   A.  We did.

16   Q.  So let's talk a little bit about this word "feedback" that

17   you had used.  Just like in past negotiations, after the

18   suppliers submitted their bids for the 2013 contract, did you

19   give them feedback?

20   A.  Yes.

21   Q.  And remind us how you would go about doing that.

22   A.  Again, it could be a combination of in-person, on the

23   phone, or by email.  And it could be, you're X percent from

24   competitive or X price from competitive price.

25

Michael Ledford - Direct

1   Q.  If some of it is done in person and by telephone, is that

2   a -- yes -- I guess, does it go without saying that not all of

3   your feedback and not all of the negotiation appears on paper?

4   A.  Absolutely not.  It does not all appear on paper.

5   Q.  So, really, the paper is only telling half the story?

6   A.  At least.

7   Q.  Did you continue to have negotiation calls and meetings

8   with Claxton before they submitted subsequent pricing proposals

9   for the 2013 contract?

10  A.  Yes.

11  Q.  Do you know, Mr. Ledford, if you had calls with Claxton in

12  November of 2012?

13  A.  Yes.

14  Q.  Do you know who from Claxton was included in the November

15  of 2012 calls?

16  A.  Mikell and Scott.

17  Q.  What was the purpose of those calls?

18  A.  From our end, it was really to see if we could get a better

19  price.  And by November, you're really trying to close things

20  out.

21  Q.  Does that include sort of hammering down the terms of the

22  final contract?

23  A.  Yes.

24       MR. BELLER:  So if we can put the exhibit back up,

25  please, for demonstrative purposes.  I believe that is J-406.

Michael Ledford – Direct

1        And published, Your Honor.

2    *BY MR. BELLER:*

3    *Q.*  So looking at J-406, did Claxton ever change any of its

4    prices from one round to the next?

5    *A.*  Yes.

6    *Q.*  Which prices were adjusted and changed?

7    *A.*  Both wings and dark meat.

8    *Q.*  And is this following or after feedback that you provided?

9    *A.*  Yes.

10   *Q.*  Now, you mentioned to the jury something earlier, and that

11   was that they reduced a case weight --

12   *A.*  Yes.

13   *Q.*  -- at some point.

14         What effect does lowering a case weight have on the

15   check that you as the buyer have to write?

16   *A.*  It lowers -- it lowers what they charge me.

17   *Q.*  And so in terms of this eight-piece price, while the price

18   itself does not change, if we lower that case weight, do you

19   pay less?

20   *A.*  Yes, it would have been the same thing on the sheet if they

21   had changed that 9620 to 9520.

22   *Q.*  Okay.  Does that also mean, Mr. Ledford, that while it may

23   not necessarily be reflected when you look at the hard numbers

24   that Claxton actually reduced their price?

25   *A.*  Yes.

Michael Ledford – Direct

1  Q.  So I want to focus on December 3 for just a moment because

2  we have what is marked here as a round 3 and a second round 3.

3  Do you see that?

4  A.  Yes.

5  Q.  Do you recall any discussion, negotiation that happened

6  between either Mr. Brady or Mr. Fries on that particular day?

7  A.  Yes, I do.

8  Q.  I --

9  A.  I believe that's why -- there wasn't an official second

10  round 3, they called it, based on the conversation that we had

11  and the feedback that I had given them and then their response

12  to that.  It was their second round 3.

13  Q.  When you say the feedback that you had given them, do you

14  recall the feedback that you had given them, Mr. Ledford?

15  A.  I was wanting them to come down on their dark-meat price.

16  Q.  And we had spoken earlier about some times when you wanted

17  people to come down on price, you would threaten to take

18  volume.  Do you know if you threatened to take volume from

19  Claxton Poultry?

20  A.  I don't specifically remember in this case.

21  Q.  Would it help you if you had the opportunity to review a

22  document that may refresh your recollection?

23  A.  Yes.

24  Q.  If you could turn to tab 38, please.

25           MR. BELLER:  Your Honor, this is Exhibit 1402.

Michael Ledford – Direct

1    Your Honor, I believe this is admitted.  I would ask

2  to publish, please.

3    THE COURT:  It has been admitted, and it may be

4  published.

5  BY MR. BELLER:

6  Q.  Mr. Ledford, it's both in paper in front of you and it's

7  also on the screen, whichever is easier.  If you can take just

8  a moment and review this particular document, please.

9  A.  Okay.

10  Q.  Mr. Ledford, if we could go right back up again, do you

11  recall making a statement of, If these are your final numbers,

12  Claxton will likely lose some volume?

13  A.  Yes.

14  Q.  What did you mean by that?

15  A.  That I would take some of their weekly commitment away and

16  give it to another supplier.

17  Q.  And were you trying on December 3 at it looks like

18  8:58 p.m. were you trying to get Claxton to lower its price?

19  A.  Yes, I was.

20  Q.  Mr. Ledford, do you know if your -- I'm going to politely

21  call it a threat, to take away volume, do you know if it had

22  its intended effect?

23  A.  I believe it did.

24  Q.  I'm sorry?

25  A.  Yes, it did.

Michael Ledford - Direct

1   *Q.* If we can go back to J-406, please.  So if the prior

2   correspondence was sent at approximately 9:00 p.m., do you

3   recall getting a response in a very short order?

4   *A.* I do.

5   *Q.* And did your threat to reduce -- to take away volume result

6   in Claxton submitting that same night another bid to you?

7   *A.* Yes, it did.

8   *Q.* And did that fourth bid more or less become the basis of

9   your contract that year?

10  *A.* Yes, it did.

11  *Q.* We talk about why you wanted a flat price on wings.  Did

12  you ultimately negotiate a flat price on wings from Claxton

13  Poultry?

14  *A.* I don't believe so.

15  *Q.* Was the price that you ultimately negotiated lower than any

16  of the prior bid submissions?

17  *A.* Yes, it was.

18  *Q.* About 15 cents lower?

19  *A.* Yes.

20  *Q.* And on dark meat, did RSCS ultimately negotiate a lower

21  price to dark meat from Claxton Poultry?

22  *A.* Yes.

23  *Q.* So doing the math -- I'm going to do it off the top of my

24  head here -- it's about -- boy, 1.2 pennies less; is that

25  right?

Michael Ledford – Direct

1    A.   Yes.

2    Q.   So ultimately, did Claxton Poultry respond to your

3    feedback, Mr. Ledford?

4    A.   Yes, they did respond.

5         MR. BELLER:   Thank you, and I'm done with that

6    exhibit, Mr. Brian.

7    BY MR. BELLER:

8    Q.   Mr. Ledford, despite the challenges that you identified

9    going into the negotiations for 2013, I want to talk a little

10   bit about how they wrapped up.  Did you believe you had a

11   successful 2012 negotiation for the 2013 contract?

12   A.   Yes, I did.

13   Q.   Did you as the buyer negotiate a savings?

14   A.   Yes.

15   Q.   Do you recall how much savings were negotiated on fresh

16   chicken that year?

17   A.   It was over $5 million.

18   Q.   Were you able to negotiate a tight range between the

19   different suppliers?

20   A.   Yes.

21   Q.   At that time, Mr. Ledford, was it the tightest range in

22   recent history?

23   A.   Yes, it was.  I believe it was .0085 cents per pound from

24   the highest to the lowest.

25   Q.   Does that mean that the suppliers' prices were very, very

Michael Ledford - Direct

1  close together?

2  A.  Yes.

3  Q.  Was that at your negotiation?

4  A.  Yes.

5  Q.  Do you know what the result of Claxton's case weight

6  savings on a per-pound basis was?

7  A.  Yes, it was 1 cent per pound.

8  Q.  So we talk about this very, very tight range between the

9  different suppliers.  Was there an even tighter range on the

10  per-piece cost?

11  A.  Yes, there was.

12  Q.  Were you successful in keeping dark meat in the same

13  roughly 30-cent back area from all the different suppliers?

14  A.  Yes.

15  Q.  Was that even lower for Claxton Poultry?

16  A.  Yes, it was 30 1/2.

17  Q.  Was wing inflation that year below the forecast for the

18  2013 market?

19  A.  Yes, it was.

20  Q.  Do you know, looking at all the different Yum suppliers, if

21  there was a savings across the different companies of almost

22  $18 million?

23  A.  Yes, it was 17 something, but, yeah, it was almost

24  18 million.

25  Q.  I think you said that was the year you added a new supplier

Michael Ledford - Direct

1    in Case Farms, yes?

2    *A.*  Yes.

3    *Q.*  Did all of this also provide savings in less FOB cost and

4    freight?

5    *A.*  Yes.

6    *Q.*  FOB meaning again?

7    *A.*  At the chicken plant door, no freight included.

8    *Q.*  Did Tyson's, Pilgrim's come back generally in line with

9    where you asked them to be?

10   *A.*  Yes, they did.

11   *Q.*  Your top three lowest price suppliers -- so your three

12   least expensive suppliers, were they awarded additional volume?

13   *A.*  Yes, they were.

14   *Q.*  Was Claxton one of those companies awarded additional

15   volume by being amongst your lowest three priced suppliers?

16   *A.*  Yes, they were.

17   *Q.*  Mr. Ledford, what happens to the volume from the highest

18   four priced suppliers?

19   *A.*  All four of them lost volume.

20   *Q.*  Do you recall who those four suppliers were that lost

21   volume?

22   *A.*  I believe it was Pilgrim's and Tyson.  I do not remember

23   the other two.

24   *Q.*  Could it possibly have been Mar-Jac and also Marshall

25   Durbin?

Michael Ledford - Direct

1    A.  That sounds correct.

2    Q.  Okay.  Fair to say in 2013 contracts that the suppliers

3    competed over volume, and the lowest-price suppliers won?

4    A.  Yes.

5    Q.  Let's move on, Mr. Ledford, and let's talk about the

6    negotiations for the 2014 contract.  Okay?

7    A.  Okay.

8    Q.  So this is negotiation, if I'm correct, that happens in the

9    fall of 2013?

10   A.  Correct.

11   Q.  Okay.  So I want to focus on dark meat for that particular

12   year, okay.

13          Prior to kicking off negotiations in the fall of '13,

14   did you have any meetings with suppliers?

15   A.  Yes.

16   Q.  Do you recall -- which suppliers did you have meetings

17   with?

18   A.  We met with more strategic suppliers face to face.  We

19   brought them in to RSCS for some face-to-face meetings.  With

20   others, we would have phone meetings.

21   Q.  What was discussed in those face-to-face meetings,

22   Mr. Ledford?

23   A.  It was really, I think I said this earlier today, I think

24   those meetings were really more of a chance for us to sort of

25   hear out the suppliers on how they saw the marketplace going

Michael Ledford - Direct

1    into it, but it was also a chance for us to tell them how we

2    saw the marketplace and kind of go over what some of our goals

3    were going to be.

4    Q.  Compared to 2012 negotiations, was 2013 negotiations a much

5    more ideal time for you as a buyer to purchase chicken or

6    negotiate chicken?

7    A.  Yes, it was.

8    Q.  Why is that?

9    A.  We had come out of that drought in the Midwest that

10   impacted the grain prices, and things were more profitable for

11   the poultry suppliers, and the cutbacks that they had taken the

12   year before had sort of rolled off, and they were back to what

13   I would call a more normal production and not being constrained

14   as much as they were the year before.  So all of that lead to a

15   better supply and demand situation, with better input cost on

16   the grain.  It certainly set us up for a better marketplace

17   that we were walking into for these negotiations than the year

18   before.

19   Q.  How was your leverage as a buyer going into that

20   negotiation?

21   A.  Well, it was -- on those particular items that I just

22   listed, it was higher than it was the year before because there

23   was more supply.

24   Q.  Mr. Ledford, you mentioned having meetings with sort of

25   your five most strategic or most important customers -- excuse

Michael Ledford - Direct

1   me, suppliers.

2   *A.*   Suppliers.

3   *Q.*   Thank you.

4           Was Claxton one of those that you had an in-person

5   meeting with?

6   *A.*   No, they were not.

7   *Q.*   Why not?

8   *A.*   Because they were not one of our largest strategic

9   suppliers.

10  *Q.*   Was that different than Pilgrim's, for example?

11  *A.*   Yes, we had a face-to-face meeting with Pilgrim's.

12  *Q.*   Let's talk about the actual negotiations for that contract.

13  If we can look at Defense Exhibit J-260.

14          *MR. BELLER:*   Your Honor, I believe this is admitted,

15  and I would ask to publish, please.

16          *THE COURT:*   You may.

17  *BY MR. BELLER:*

18  *Q.*   If you can take just a moment, Mr. Ledford, and look at

19  J-260 that was previously admitted.  And I want to talk first

20  about the blue bar.  What is the blue bar?

21  *A.*   The blue bar represents the initial bids for eight-piece.

22  *Q.*   Looking at that chart, how many suppliers bid on the 2014

23  contract?

24  *A.*   Eight.

25  *Q.*   Do you recall, Mr. Ledford, how many rounds of negotiations

Michael Ledford – Direct

1   there were in 2013 for the 2014 contract?

2   A.  Four.

3   Q.  Did Claxton's first-round bid for eight-piece change at all

4   during the four rounds of negotiations?

5   A.  Yes.

6   Q.  How so?

7   A.  It came down dramatically, almost 4 cents a pound.

8   Q.  So I would like to show you Exhibit J-407.

9         MR. BELLER:  Your Honor, this is not admitted, and I'm

10  asking to be able to show it for demonstrative purposes.

11        THE COURT:  Any objection to the display of J-407 for

12  demonstrative purposes?

13        MR. TORZILLI:  One moment, Your Honor?

14        THE COURT:  Sure.

15        MR. TORZILLI:  No objection for demonstrative.

16        THE COURT:  It may be displayed for demonstrative

17  purposes only, J-407.

18  BY MR. BELLER:

19  Q.  Mr. Ledford, do you see J-407 on your screen?

20  A.  Yes.

21  Q.  What is depicted in J-407?

22  A.  It is a summary of each round bid for Claxton for that 2014

23  contract here on eight-piece formula and dark-meat price.

24  Q.  Is this a correct summary of Claxton's bid for eight-piece

25  and dark meat?

Michael Ledford – Direct

1    A.  Yes, it is.

2    Q.  Now, there is an additional column, which is the dark-meat

3    price, is that simply the math of eight-piece minus the

4    dark-meat formula?

5    A.  Yes.

6    Q.  During the different rounds of bidding, Mr. Ledford, did

7    you provide feedback to Claxton on each one of its bids?

8    A.  Yes.

9    Q.  Did Claxton respond to your feedback, sir?

10   A.  Yes, they did.

11          MR. BELLER:  Your Honor, this is a nice time for the

12   morning break if -- or I'm happy to continue.

13          THE COURT:  It is a perfect time; right on time,

14   10:15.

15          Ladies and gentlemen, we'll plan on reconvening

16   at 10:30.  Keep the admonitions in mind we talked about

17   earlier.  You have to wait to deliberate until all of the

18   evidence is completed, you've heard closings and the jury

19   instructions, and are released to do that.  The jury is

20   released for the midmorning break.  Thank you.

21          (Jury out at 10:15 a.m.)

22          THE COURT:  We'll be in recess.  Thank you.

23          (Recess at 10:15 a.m.)

24          (In open court at 10:34 a.m.)

25          THE COURT:  Let's go ahead and bring the jury back in.

Michael Ledford – Direct

1           (Jury in at 10:35 a.m.)

2   *BY MR. BELLER:*

3   *Q.*  Welcome back, Mr. Ledford.

4   *A.*  Thank you.

5   *Q.*  Quick housekeeping matter.  So we've been talking about

6   RSCS.  Has RSCS ever gone by a different name?

7   *A.*  Yes, they have.  They used to go by UFPC, which stood for

8   Unified Foodservice Purchasing Co-op.

9   *Q.*  When we're looking at different communications and

10  different contracts and we see UFPC, is that the same thing as

11  RSCS?

12  *A.*  It's the exact same thing.

13  *Q.*  Okay.  So when we broke for our break, Mr. Ledford, we were

14  talking about Exhibit J-260.

15       *MR. BELLER:*  And I'm wondering if we could please put

16  that back up on the screen and publish for the jury?

17       *THE COURT:*  Yes.

18  *BY MR. BELLER:*

19  *Q.*  So, Mr. Ledford, you had mentioned that through the

20  different rounds of negotiations, that Claxton had a reduction

21  of approximately 4 cents; is that right?

22  *A.*  Yes.

23  *Q.*  And is that reflected between the blue bar and the yellow

24  bar in J-260?

25  *A.*  Yes, it is.

Michael Ledford - Direct

1  Q.  And if we can go to page 2 of J-260, what is page 2 of 260,

2  please, Mr. Ledford?

3  A.  It's similar to the page before, but it is the dark meat

4  instead of the eight-piece price on the bone.

5  Q.  Okay.  What happened with the price of dark meat with

6  Claxton Poultry between the first-round bid and the final

7  contract price.

8  A.  Same thing there, it came down about 3-1/2 cents.

9  Q.  Isn't a 3-1/2 or 4-cent reduction in eight-piece and dark

10  meat something that you would generally consider to be

11  substantial?

12  A.  Yes.

13  Q.  Why, Mr. Ledford --

14      MR. BELLER:  Thank you, I'm done with that exhibit,

15  Mr. Brian.

16  BY MR. BELLER:

17  Q.  You had mentioned to the jury, Mr. Ledford, that there were

18  four rounds of bids in this particular year, and I'm wondering

19  why four rounds.

20  A.  Four rounds in -- I'd say there is two main reasons for

21  that.  Any subsequent round after round 2 is we didn't get to

22  where we found like we needed to be by round 2, and, in

23  addition, this year, we had some outside consultants in.  They

24  were also helping shape the narrative internally and driving us

25  to continue to go on with additional rounds, as well.

Michael Ledford - Direct

1   Q.   Who were the consultants in this year?

2   A.   It was PricewaterhouseCoopers, or PWC.

3   Q.   And at PWC's encouragement or suggestions, did you

4   continue to give feedback to the different suppliers beyond

5   round 2?

6   A.   Yes.

7   Q.   Did Claxton Poultry follow your feedback?

8   A.   Generally speaking, yes.

9   Q.   Did Claxton Poultry give you the price as you directed them

10  to move it?

11  A.   I can't say with 100 percent certainty that they did

12  everything I asked them to do in that feedback, but, generally

13  speaking, yes.

14  Q.   Do you recall or do you know of -- have general

15  understanding in this particular time period of through the

16  different rounds of negotiations and in consultation with

17  PricewaterhouseCoopers, you -- moving the goalpost, so to

18  speak?

19  A.   Yes.

20  Q.   What does that mean, generally speaking?

21  A.   You know, when you give feedback, typically, through

22  round 1 and 2 in the normal year, your feedback -- the number

23  that we were trying to drive to would be a standard number.

24  That typically did not change from round 1 to round 2.  These

25  years we entered into a third and fourth round, sometimes it

Michael Ledford - Direct

1  became a new number that was sort of our internal -- what we

2  were going after.

3  Q.  Okay.  So going back to J-260, please --

4       MR. BELLER:  If we can again publish that.

5       THE COURT:  Yeah.

6  BY MR. BELLER:

7  Q.  Were the prices negotiated, the final price, the yellow --

8  the price that is reflected by the yellow bar, were those

9  prices negotiated to a point that you believed was below

10  sustainability?

11  A.  At this point -- at the time period that we negotiated

12  them, the answer to that would be no.

13  Q.  Okay.  How about after that?

14  A.  I think as you headed in towards Mother's Day of 2014, I

15  think with hindsight being 20/20, Monday morning quarterback,

16  so to speak, living through that year and how much we were

17  seeing folks exit from the small bird and going to bigger-bird

18  chicken, how tight the market was on small bird, we were

19  actually running stores out of chicken in early May of 2014, I

20  think it's fair to say we took this a little too far.  If all

21  of us working on the poultry team at RSCS in May of 2014 could

22  have gone back and undone something, it would have been that

23  aggressive negotiation.

24  Q.  Okay.  In terms of where the final contract price ended up

25  financially?

Michael Ledford – Direct

1   A.   Right.

2   Q.   So that question was about sustainability.  Do you have an

3   opinion as to whether these prices were negotiated below

4   profitability?

5           MR. TORZILLI:  Objection, 701.

6           THE COURT:  Sustained.  If you could lay a foundation.

7           MR. BELLER:  I'm happy to.

8   BY MR. BELLER:

9   Q.   So, Mr. Ledford, you had testified earlier regarding the

10   different objectives, and one of the objectives that you had

11   articulated was one of maintaining profitability for the

12   suppliers.  Why is that, sir?

13   A.   Two reasons, you want them to not only stay in business and

14   be thriving, but you also want them to stay in the bird

15   category, the small-bird category.

16   Q.   Do you generally have an understanding as to what is

17   profitable for your particular suppliers?

18   A.   We have a general understanding based off of, again, like I

19   testified to earlier, what the grain inputs are and some of the

20   other dynamics going on in the economy, like labor costs and

21   things like that, generally speaking, yes.

22   Q.   Does four rounds of negotiation contribute to or can it

23   contribute to negotiating prices below profitability for the

24   companies?

25   A.   It's a possibility.  I would -- I wouldn't say that it with

Michael Ledford – Direct

1  certainty does that.

2  Q.  Do you have knowledge one way or the other as to whether or

3  not the prices negotiated going into -- for 2014 going into the

4  2015 contract were negotiated below profitability, the way they

5  were in prior years that you testified to?

6  A.  I don't think necessarily they were below profitability.

7  But what they were was, they were below the alternative, and

8  that was to grow these into a larger chicken and sell them to

9  folks who buy big-bird chickens.

10  Q.  And as a result, did that end up contributing to a lack of

11  supply of small-bird chicken going into 2015?

12      MR. TORZILLI:  Objection.  701.

13      THE COURT:  Sustained.  If you could lay a foundation.

14  BY MR. BELLER:

15  Q.  Do you know, Mr. Ledford, if there was a problem with

16  supply of chicken on Mother's Day of 2014?

17  A.  Yes, there was.

18  Q.  What was that caused by?

19  A.  It was caused by a lack of supply and over-demand in the

20  small-bird category.

21  Q.  So, Mr. Ledford, let's talk a little bit more about

22  feedback given to Claxton Poultry --

23      MR. BELLER:  And I'm done with this exhibit, thank

24  you, Mr. Brian.

25  BY MR. BELLER:

Michael Ledford – Direct

1  *Q.*  So we spoke about feedback given to Claxton for the 2013

2  contract.  Did you also provide feedback to Claxton Poultry for

3  the 2014 contract?

4  *A.*  Yes.

5  *Q.*  What kind of feedback would you give to Mr. Brady and/or

6  Mr. Fries about negotiations for the 2014 contract?

7  *A.*  It would have been very similar to the 2013.  It would have

8  looked like you're this far off from competitive.  When we got

9  down to sort of closing things out, would be a little more

10  direct.  Oftentimes tell them, hey, you need to be at this

11  number.  You're going to lose volume.  If you don't do that,

12  you're going to lose volume.  Very similar to the email we

13  saw earlier from 2013.

14  *Q.*  Do you ever say things, Mr. Ledford, like, I take business

15  away from the highest-priced supplier every chance I get?

16  *A.*  Yes.  I wrote that in an email to Mr. Brady.

17  *Q.*  What did you mean by that?

18  *A.*  Again, I think we talked about this earlier this morning.

19  The highest-priced suppliers each year would get volume taken

20  away from that.  In that particular case that you're

21  referencing in that email, if memory served me correctly,

22  Claxton was .003 from the highest-priced supplier.  And so, in

23  essence, what I was signaling them by giving them that feedback

24  out to that many decimal places, in essence, the way I'm

25  viewing you, you might as well be the highest-priced supplier.

Michael Ledford – Direct

1    And if you stay there, you will lose volume.

2         MR. BELLER:  Okay.  So if we can please look at

3    Government Exhibit 9 –– 9004.

4         Your Honor, I believe this is already admitted.

5         THE COURT:  Yes, it has been admitted.  It may be

6    published.

7         MR. BELLER:  Thank you.  If we may publish that to the

8    jury, please.

9    BY MR. BELLER:

10   Q.  If you can take just a moment and look at Exhibit 9004, is

11   this the email that you're referencing?

12   A.  Yes, it is.

13   Q.  Now, in this email, Mr. Ledford, you say, I don't think

14   that's where y'all want to be.

15        "Want to be," what did you mean by that?

16   A.  I've known Mikell Fries for a long time and know his

17   strategy, I guess is the word, he doesn't want to be the

18   highest-priced supplier, he doesn't want to be the

19   lowest-priced supplier.  When I was on that side of the

20   business, that was the philosophy, I felt the same way when I

21   was selling chicken, really.  What I'm conveying to Scott there

22   is that I know Mikell's preference, and that's not to be the

23   second-highest priced supplier.  When I say I don't think

24   that's where y'all want to be, it's through that many, many

25   years of working with Claxton Poultry and negotiating, that

Michael Ledford - Direct

1    wasn't the strategy they wanted to be the highest-priced

2    supplier.

3           MR. BELLER:  Thank you, Mr. Brian, I'm done with this

4    one.

5    BY MR. BELLER:

6    Q.  Mr. Ledford, you also mentioned that when you yourself were

7    supplying chicken you didn't want to be the highest and you

8    didn't want to be the lowest?

9    A.  Right.

10   Q.  Why is that?

11   A.  If you're the highest, you're going to lose volume.  Nobody

12   wants to be the lowest.  That's like coming in last in a race,

13   right?  So you definitely don't want to be the cheapest person

14   out there.  If you're somewhere in the middle, I feel like both

15   parties feel like that at the end of that contract, that you

16   got a good deal.  If you're the highest priced or the lowest

17   priced, one of those parties, depending on what end of that

18   spectrum that you land on, is probably going to be upset about

19   the deal they did.

20   Q.  Well, isn't it a risky position to tell your buyer, I want

21   to be in the middle; I want -- don't want to be the highest or

22   lowest?

23          MR. TORZILLI:  Objection.  Leading.

24          THE COURT:  Overruled.

25          THE WITNESS:  I don't know.  I think, you know, one of

Michael Ledford – Direct

1  the things about this business -- I think any business -- is

2  those relationships.  And there is trust that is built over

3  time within those relationships.  So if this was a

4  transactional only thing here, yes, that's very risky.  I think

5  when you're dealing, you know, day in, day out, year in, year

6  out with the same people, you have to develop a relationship

7  and you have to have some level of trust.  When they say to me,

8  I don't want to be the highest, I don't want to be the

9  cheapest, I'll do everything I can to sort of live up to my end

10  of the deal, so to speak.

11  BY MR. BELLER:

12  Q.  And the fact that you -- you as the buyer are also placing

13  the suppliers in a very, very tight range, does that lessen the

14  risk of having a strategy and being asked to be placed in the

15  middle?

16  A.  Yeah, I think it definitely does.  Also not every

17  supplier's strategy is to be in the middle.  There is --

18  clearly some of the bigger suppliers don't have a qualm with

19  being the highest-priced supplier.  It's not like you have

20  every supplier asking to be in the middle.  Yeah, the tight

21  range, it's not like you're talking being off any large amount

22  when you're talking in a .0085 range from smallest to largest.

23  Q.  This strategy -- and that is, telling the buyer where they

24  want to be placed within this range of other suppliers, is that

25  common in the poultry procurement industry?

Michael Ledford – Direct

1   A.  Yeah, it is.  It's not uncommon.

2   Q.  Not uncommon.  Is this something that anyone or someone

3   with experience or expertise in actually purchasing chicken

4   would have heard of before?

5   A.  Yes.

6   Q.  Good news, Mr. Ledford, I think I'm done asking about all

7   the different contracts in 2013 and 2014.  Just a couple more

8   follow-up questions, and then I'm finished.

9        Looking again at J-406, sir, is this an accurate

10  depiction of all of Claxton Poultry's bids and the numbers in

11  those bids and ultimately reflects the final contract price?

12  A.  Yes.

13  Q.  Does this assist in your testimony regarding having the

14  jury understand your knowledge regarding these different bids?

15  A.  Yes.

16  Q.  And I'm going to show you J-407 for just a moment.  J-407,

17  same question, just to the 2014 KFC contract, is this accurate

18  and did this assist and does it assist in your testimony?

19  A.  Yes, it does.

20       MR. BELLER:  Your Honor, at this time, I would move

21  for the admission of J-406 and J-407 under 611(a) and also

22  1006.  Your Honor, these were previously published to the jury

23  as demonstratives only.

24       THE COURT:  Any objection to the admission of J-406

25  and J-407?

1        MR. TORZILLI:  No.

2        THE COURT:  Both of them will be admitted.

3        Ladies and gentlemen, obviously, you saw them for

4   demonstrative purposes, this means that you will now be able to

5   see them -- they'll go back to the jury room with you so you

6   can look at them, if you choose to do so, during deliberations.

7   Both of those will be admitted.

8        MR. BELLER:  Thank you, Your Honor.

9        (Exhibits J-406, J-407 admitted.)

10  BY MR. BELLER:

11  Q.  Mr. Ledford, I want to switch topics for just a moment, and

12  I want to talk about what has been referred to as a

13  reduced-weight bird.  Are you generally familiar with what I'm

14  talking about when I say "reduced-weight bird"?

15  A.  Yes, I am.

16  Q.  Okay.  So, Mr. Ledford, I want to start by showing you

17  Exhibit 1615.  This is tab 25 in your binder.

18        MR. BELLER:  Your Honor, I believe that this is

19  already admitted.  And I would ask to publish.

20        THE COURT:  Yes, it has been admitted.  May be

21  published.

22  BY MR. BELLER:

23  Q.  If you could take just a moment, Mr. Ledford, and review

24  that.  Let me know when you've had the opportunity to do so.

25  A.  Okay.

Michael Ledford – Direct

1    Q.  Mr. Ledford, are you a participant in this discussion?

2    A.  I am not.

3    Q.  Okay.  Are you generally aware of the subject matter being

4    discussed here?

5                MR. TORZILLI:  Objection.  Foundation.

6                THE COURT:  Overruled.  He can answer if he knows.

7                THE WITNESS:  Yes.

8    BY MR. BELLER:

9    Q.  Okay.  Thank you.  And I'm done showing that exhibit.

10           Mr. Ledford, does Kentucky Fried Chicken or KFC, RSCS,

11   use a specific size bird for its product?

12   A.  Yes, they do.

13   Q.  And what is that size, Mr. Ledford?

14   A.  It's a 2-pound 8-ounce WOG.

15   Q.  So a 2-pound 8-ounce WOG, does that mean that the bird has

16   already been processed, and what we have left over before being

17   cut up is the target weight of 2 pounds 8 ounces?

18   A.  That's correct.

19   Q.  Okay.  What is a 2 -- 2-pound 8-ounce bird, what is their

20   live weight -- what is it's live weight?

21   A.  Around a 4-pound live weight.

22   Q.  Can you explain to the jury very briefly what a 4-pound

23   live weight means compared to a 2-pound 8-ounce WOG weight?

24   A.  Basically, you're going to multiply -- take a yield of that

25   bird of around -- back during this time period, I'm going to

Michael Ledford – Direct

1  say it was around a 72 percent yield, WOG yield to live weight,

2  to come to that 2-pound 8-ounce, which equates to a 4-pound

3  live weight chicken.

4  Q.  When I say a "4-pound live weight," does that mean

5  targeted, that chicken when alive is 4 pounds?

6  A.  Right.

7  Q.  Cryptic.  Go ahead.  Thank you.

8        Do other fast-food restaurants to the best of your

9  knowledge use different sized birds?

10  A.  Yes, they do.

11  Q.  For example, what size does Chick-fil-A use?

12  A.  4-1/2-pound target live weight.

13  Q.  How about Popeyes, if you know?

14  A.  So they're a little bit smaller.  It's kind of that 375 to

15  390.  And their WOG weight is, you know, lower -- it's lower

16  than the 2.8.  I think it was like -- it's been a long time

17  since I was there.  It's 2.4, 2.6, somewhere in that ballpark.

18  Q.  How about grocery stores, if I were to go into a grocery

19  store and buy chicken breasts or WOG, for example, what type

20  bird is that?

21  A.  If you get a WOG or like rotisserie or deli bird, it's on

22  the larger -- like, a 3-pound WOG weight or even larger than a

23  3-pound, top end of the distribution of a bell curve you're

24  going to get.

25  Q.  You mentioned bell curve.  Let's talk about that.  Can this

Michael Ledford – Direct

1   differentiation in bird sizes needed for each customer be

2   depicted as a bell curve?

3   A.  Yes, absolutely.

4   Q.  Is that also -- is a bell curve sometimes called a

5   histogram?

6   A.  Yes, it is.

7   Q.  In order to assist the jury, if we can put up a

8   demonstrative that shows the bell curve that we just discussed.

9          MR. BELLER:  Your Honor, I'm asking to use for

10   demonstrative purposes I-733.

11          THE COURT:  Any objection to the display of I --

12   you're asking it be displayed to the jury at this time?

13          MR. BELLER:  That's correct, Your Honor.

14          THE COURT:  Any objection to the display of I-733 for

15   demonstrative purposes only?

16          MR. TORZILLI:  No, Your Honor.

17          THE COURT:  All right.  I-733 may be so displayed.

18   BY MR. BELLER:

19   Q.  Mr. Ledford, can you please explain to the jury what is

20   depicted in I-733?

21   A.  This is the weight distribution or bell curve histogram of

22   a target 4-pound live weight bird with representation of where

23   each exact size can typically go in sort of the fast-food

24   arena, retail arena with those chickens in the marketplace.

25   Q.  So looking at sort of a 4-pound live weight bird -- then we

Michael Ledford - Direct

1   have a series of weights that are in the bottom.  So the series

2   of weights in the bottom, WOG weight, does that mean that this

3   would be sort of the processed or final product, eight-piece or

4   WOG size?

5   A.  Yes.

6   Q.  Okay.  Does this particular bell curve represent a single

7   house or flock?

8   A.  Yes.

9   Q.  So what does that mean that they're of a single house?

10  A.  So just like people, chickens aren't all the same size.

11  You can target in this case a 4-pound chicken, but you're going

12  to have chickens that weigh 3 pounds and some weigh 5.  Male

13  chickens weigh more than the females.  Most of the males are on

14  the right half and females on the left half.  When they bring

15  that flock of chickens into the processing -- if everybody has

16  done their job along the way, they're going to come as close as

17  they can to weighing 4 pounds on average when they come

18  through, but the bell curve representing the difference in the

19  smallest chicken to the largest chicken and the distribution of

20  the sizes throughout that range.

21  Q.  So, Mr. Ledford, when the house is created or populated,

22  are all the chicks put in the house at the same time?

23  A.  Yes.

24  Q.  And does that mean they were also all hatched at roughly

25  the same time too?

Michael Ledford - Direct

1    A.  Yes.

2    Q.  And for how many days or how many weeks are those chicks

3    fed before processing?

4    A.  For a 4-pound chicken, they're going to be somewhere around

5    38 days.

6    Q.  In that 38-day period of time, do the different chickens or

7    chicks grow at different rates?

8    A.  Yes.

9    Q.  And do they eat different amounts of feed, for example?

10   A.  Yes.

11   Q.  Is it possible or maybe I should say practical to separate

12   male from female chicks before putting them in a grow house?

13   A.  It is not.

14   Q.  So even between the males and the females, do they all grow

15   at the same rate to the same size?

16   A.  No.

17   Q.  So in looking at this particular bell chart, we've spoken

18   just a little bit about big birds, does this chart reflect what

19   the industry would refer to as a big bird?

20   A.  No.

21   Q.  Can you explain that?

22   A.  So this is a small bird.  Again, 4 -- a big-bird chicken,

23   the industry is going to call a big-bird chicken probably

24   anything over 6 1/2 pounds.  Today's -- most of them are

25   probably 7 to 9, 9 1/2 pounds would be a big bird, but if

Michael Ledford – Direct

1   you're looking at this chart, it would be way off to the right,

2   much bigger numbers that would be, you know, take it 75 percent

3   of 9 pounds.  7-pound WOG, for instance, that's way off to the

4   right off of this page.

5   Q.  That would be a completely different bell curve?

6   A.  Yes.

7   Q.  So this particular bell curve, even though we're talking

8   about large presumably males with a WOG weight at, you know,

9   3.87 pounds, we're still talking about a small bird, or it's

10  just the large side of the small bird?

11  A.  Right.  You'd have to grow it much longer to be considered

12  a big bird.

13  Q.  Okay.  Looking at this particular histogram, are the

14  different QSRs, different restaurants buying different sizes

15  within this histogram?

16  A.  Yes, they are.

17  Q.  Is Chick-fil-A buying in this same particular histogram?

18  A.  We would overlap with the far right side, the largest size

19  of this, but when you're looking down there at, like, the KFC

20  and Popeyes and Bojangles, we did not overlap with that.

21  Q.  Does that mean, Mr. Ledford, now with Chick-fil-A as you're

22  purchasing chicken, you may get some of the really large males

23  out of this flock?

24  A.  Right.

25  Q.  But most of your chickens are going to be coming from a

Michael Ledford - Direct

1    larger bird, a little bit larger histogram?

2    A.  Yes.

3    Q.  Now, once this particular flock of birds is ready to be

4    processed, is it practical to go into a broiler house and only

5    collect the little females, for example?

6    A.  No, it is not.

7    Q.  Or, hey, let's go in and just get the large males and we'll

8    let the small females continue to grow for a couple of extra

9    days?

10   A.  No.

11   Q.  Do they have to be gathered up, practically, all at the

12   same time for processing?

13   A.  Yes, they do.

14   Q.  So in this particular example, when you have a house come

15   in to be processed, what size bird does Popeyes want?

16   A.  They're taking this -- the 2.25 to 2 -- 2.375.

17   Q.  How with KFC/RSCS, what size do they want?

18   A.  2-1/2 to 2.75.

19   Q.  And so when we're talking about, like, a Popeyes, for

20   example, wanting a 2 and a quarter to 2 -- 2 and a third,

21   really, is there only a certain percentage of chickens coming

22   out of a single broiler house that is going to satisfy that

23   size specification?

24   A.  Right.  Yes, Popeyes being on the far left of the curve,

25   there is a lot less chickens in that chicken house that is

Michael Ledford - Direct

 1   going to fall into the Popeyes size range as you're going to

 2   have chickens fall into, say, the KFC size range.

 3   Q.   Okay.  Say for just a moment that a supplier loses KFC

 4   volume, RSCS, you remove volume from, say, Pilgrim's, you give

 5   it to Claxton, looking at that histogram, is the supplier

 6   always going to have a customer who is willing to take or be

 7   available to take at that moment those RSCS-sized birds?

 8   A.   No.

 9   Q.   So does that also mean that to a supplier it can be a

10   really big deal to lose volume of a particular customer?

11   A.   Yes.

12   Q.   So I want to look at the very far left side of this

13   histogram, specifically the yellow bars.  Who is the buyer for

14   that very small chicken?

15   A.   There is really two places that can go, and neither one of

16   them are that great of an option.  One is a -- a lot of those

17   chickens get torn up in the machinery, they're too small to

18   sell to anybody, they're going to downgrade to wherever they

19   can get rid of them:  Mom-and-pop place, prison, whatever, a

20   little bit of that falls into MRB in the industry, which is

21   marinated raw breaded, that goes into, like, school systems and

22   military purchases and things like that.

23   Q.   So, Mr. Ledford, if we're looking at this particular

24   histogram -- this is for a 4-pound live weight bird, say, for

25   example, that a supplier decides instead of a 4-pound live

Michael Ledford - Direct

1    weight bird, I want to try to grow a 3-1/2-pound live weight

2    bird, what happens to that left side of that histogram in that

3    case?

4    *A.*  You get more of those chickens.

5    *Q.*  More of those really tiny, small chickens with very little

6    market for them?

7    *A.*  Yes, that's right.

8    *Q.*  And does that also mean that the labor would go up, because

9    the small tiny birds would be chewed up in the machinery?

10   *A.*  Well, it would go up because of that, all fixed costs would

11   go up, because the amount of pounds that you get through a

12   plant would lower, and so all of your overhead cost would be

13   higher as a result of having a smaller chicken go through

14   there.

15   *Q.*  Does that mean, Mr. Ledford, that it's really not realistic

16   or practical for a supplier to simply start producing a smaller

17   live weight bird?

18   *A.*  Well, two things.  No, it's not practical.  There is that

19   reason that you just stated, but there is also, that disrupts

20   their whole product mix, so it's not just starting over for

21   that -- having more of the yellow, you've got to have all of

22   your customers lined out for that smaller chicken as well in

23   every one of these color ranges on this chart.

24   *Q.*  When we look at a histogram, and specifically, we're

25   talking about a chicken producer who sells to the QSR industry,

Michael Ledford - Direct

1   are there many different -- many different buyers for that

2   particular house of chicken?

3   *A.*   Yes.

4   *Q.*   Is that necessary because the producer needs all of these

5   different customers to be able to purchase all the different

6   sizes?

7   *A.*   Yes, because every -- like it's depicted on this bell

8   chart -- bell graph, that everybody's specification is so tight

9   that it's impossible to have all of your chickens go to one

10   customer, because every single one of these brands has a tight

11   range, because every one of these brands wants size uniformity.

12   When you go to a KFC, and there is two of you, we want your

13   product to be the same size as the person that came in with

14   you.  When you're looking at your plate, you don't want to

15   think, I'm getting ripped off; I got a bunch of small pieces.

16   Every one of these chains wants a tight range for a customer

17   experience that is uniform, no matter who it is.

18   *Q.*   Is that part of the reason why volume and planning for

19   volume is so crucial to a supplier?

20   *A.*   Yes.

21   *Q.*   So you mentioned size -- excuse me -- try it again.

22        You mentioned the importance of size uniformity.  Why

23   is size uniformity important to a buyer like KFC?

24   *A.*   So the first reason, I just mentioned, for customer

25   experience, so that they're all getting a similar experience.

Michael Ledford – Direct

1  But the most important reason is for cooking.  All of the

2  fryers in the KFC or Popeyes or any of these places that are

3  frying chicken are set up to fry a certain size product at a

4  certain temperature for a certain amount of time.  If you get a

5  piece of chicken that is outside that range and it's too big,

6  you have -- you would run the risk of serving undercooked

7  chicken to a customer, and they could get sick.

8       By the same token, if you have a piece that is too

9  small, you're going to overcook that piece of chicken, and

10  you're going to get a customer complaint for a tough, chewy, or

11  burnt piece of chicken.  You have to have that size uniformity

12  to make sure you're cooking safe product and an experience the

13  customer would enjoy.

14  Q.  Thank you for that.

15       So going to specifically a request that you made of

16  the suppliers in March of 2013.  Do you recall making a request

17  of the suppliers regarding their sizes?

18  A.  Yes, I do.

19  Q.  Now, remind us, you said that KFC targets about a 2.8-ounce

20  bird; is that right?

21  A.  Yes.

22  Q.  What was your request of the suppliers in March of 2013?

23  A.  I asked them if they could go down to a smaller-sized

24  chicken that was a few ounces smaller than that and still

25  supply their same volume needs to KFC.  If they could, what

Michael Ledford – Direct

1    would it cost?

2    *Q.*  So, Mr. Ledford, in your binder under tab 70, about to be

3    on your screen, is Government Exhibit 1600, and I'm hoping that

4    you can take just a moment and review Exhibit 1600, please.

5    *A.*  Yes, I remember this.

6    *Q.*  Is 1600 a complete and accurate copy of what you sent to

7    different suppliers in March of 2013?

8    *A.*  Yes.

9          *MR. BELLER:*  Your Honor, at this time, I would move

10   for the admissions of Exhibit 1600.

11         *THE COURT:*  Any objection to the admission of

12   Exhibit 1600?

13         *MR. TORZILLI:*  No, provided the copy is redacted.

14         *THE COURT:*  Could you take a look on the screen now,

15   Mr. Torzilli?

16         *MR. TORZILLI:*  Now that I can see the entirety of the

17   screen, I have no objection to the way it is on the screen.

18         *THE COURT:*  Exhibit 1600 as redacted will, then, be

19   admitted.

20         (Exhibit 1600 admitted.)

21         *MR. BELLER:*  Your Honor, may we also publish, please?

22         *THE COURT:*  Yes, you may.

23   *BY MR. BELLER:*

24   *Q.*  Mr. Ledford, you said you had made a request of them of

25   what it would take to produce a smaller bird.  What was your

Michael Ledford – Direct

1   intention or what was your request regarding whether they

2   produced that bird at a larger, smaller, or the same volume

3   that you were currently purchasing?

4   *A.*   Smaller, 2-pound 4-ounce.

5   *Q.*   And what about the volume?

6   *A.*   At the same volume.

7   *Q.*   Why did you make this ask?

8   *A.*   This was something that the consultants that we talked to

9   earlier -- talked about earlier, they were already in at this

10  time period not doing negotiation stuff but doing other ways to

11  try to come up with margin, and I had already internally

12  explained this a multitude of times on sort of the

13  impracticality of this ask, and kept getting asked it in

14  different ways internally.  And so I decided to ask each of the

15  suppliers and get their responses and not only get their

16  responses on, was it possible but really trying to show the

17  magnitude of how little volume there was there, and if it was

18  even possible, the great price that it would come to, to help

19  me internally tell the story I had already been telling.

20  *Q.*   When you say the "consultants," are you talking about

21  PricewaterhouseCooper?

22  *A.*   Yes.

23  *Q.*   Are the consultants you're working with specialists in

24  chicken, chicken production, and chicken growth?

25  *A.*   No.

Michael Ledford – Direct

1    Q.   In order to understand the impossibility of their ask, did

2    they need to know or should they have known this histogram?

3    A.   Yes.

4    Q.   Did these particular consultants know or understand the

5    histogram that we just went through?

6    A.   I had explained it to them, yes.

7    Q.   Was that an effort to try to explain the impossibility of

8    their ask?

9    A.   Yes.

10   Q.   Okay.  Did you view this email to the different suppliers

11   as a bit of a research project then?

12   A.   That's correct.

13   Q.   Okay.  Was that intended to provide you some ammunition to

14   push back against the consultants?

15   A.   That's correct.

16   Q.   Mr. Ledford, did you know if there was available volume at

17   the low end of that bell curve?

18   A.   I knew there was not.

19   Q.   So let's go back, if we may, to I-733, please.

20         To the best of your knowledge, did Popeyes and

21   Bojangles, amongst others, already have a hold over the small

22   bird at that low end of the bell curve range?

23   A.   Yes, especially considering that this was not –– the time

24   of year we were doing this ask was not during the typical time

25   period when restaurant chains are negotiating pricing.  So

Michael Ledford - Direct

1   everything would have been locked in, regardless of who they

2   were selling it to.  But, I mean, yes, as it's depicted on

3   here, the Bojangles and the Popeyes of the world, but it was

4   definitely committed to somebody, not KFC.

5   Q.  Okay.  This ask that you made of the suppliers, did you

6   deem it to be a laughable one?

7   A.  I knew they would laugh when they got my response, yes.

8   Q.  This request for reduced-sized bird, did you make the

9   request different than like a formal negotiation process that

10  we were just talking about regarding the different rounds of

11  bids?

12  A.  Yes.

13  Q.  So was it a request to enter into a contract?

14  A.  No.

15  Q.  Did you view the request as being a bit outrageous?

16  A.  Yes.

17  Q.  So given the difficult and outrageous nature of the

18  request, did it surprise you that the suppliers may talk with

19  each other about your email or about your request?

20  A.  No, that would not have surprised me.

21  Q.  Did this 2.4-ounce bird project for KFC ultimately die?

22  A.  Yes.

23  Q.  And is that because, well, it couldn't be done; it was

24  impossible?

25  A.  Yes.

Michael Ledford – Direct

1    Q.  Would it concern or surprise you if the producers talked

2    and agreed that it couldn't be done; it was impossible?

3    A.  No.

4    Q.  Thank you.

5            Actually, Mr. Ledford, this I-733 histogram chart, is

6    this something that you believe would assist in understanding

7    bird size and bird size availability and the size of birds in a

8    grow house?

9    A.  Yes.

10           MR. BELLER:  Your Honor, at this time, I would move

11   for the admission of I-733 under 611(a).

12           THE COURT:  Any objection to the admission of I-733?

13           MR. TORZILLI:  No objection.

14           THE COURT:  I-733 will be admitted.

15           (Exhibit I-733 admitted.)

16           MR. BELLER:  Thank you, Your Honor.  If I may

17   continue.

18           THE COURT:  Yes.

19   BY MR. BELLER:

20   Q.  Thank you, Mr. Ledford.

21           I want to switch gears for just a moment, sir.  And

22   we're almost done.  Okay?

23           Have you heard of a term in the chicken industry

24   called "cover and short"?

25   A.  Yes.

Michael Ledford - Direct

1   *Q.*  What is that?

2   *A.*  So, again, like we went through with that bell curve,

3   you're targeting a certain weight, there is any number of

4   things that can happen when you're growing chickens that can

5   cause them not to come in at target weight, I think the bell

6   curve demonstrates the response of not shifting that one way or

7   the other drastically.  You could have a weather event, you

8   could have a huge heatwave or, opposite, ice storm.  Let's say

9   an ice storm comes through and power goes out in one of the

10  chicken houses for a day or two, and those chickens, they don't

11  have electricity, they don't have the light or heat, they don't

12  get as much feed coming through the system, those chickens are

13  going to show up at the processing plant -- if they went a

14  period of time without power and heat, they're going to come in

15  lighter.  When they get to the processing facility, they've got

16  less chickens that day because of that disruption in their

17  production and grow-out, and so it's sort of an unexpected

18  thing.

19         And so they're going to call one of the other

20  suppliers, say, Do you have any extra KFC, for instance, or

21  whoever their customers are, that we can buy from you today so

22  that we fulfill our orders to KFC?  So they actually become

23  customers and suppliers of each other, in those instances.

24  *Q.*  Are there only certain approved suppliers of KFC chicken,

25  for example?

Michael Ledford - Direct

1    A.  Yes.

2    Q.  Does that mean that not everybody knows the Colonel's

3    secret recipe, that you have to be approved to be able to

4    marinate?

5    A.  Exactly.

6    Q.  Okay.  What is feed conversion?

7    A.  Feed conversion is how much feed it takes to feed a chicken

8    for every -- how many -- for every pound of feed you get, how

9    much pound of weight that chicken is going to put on.

10   Q.  Will feed conversion be a little bit different depending on

11   different producers and also different flocks?

12   A.  Yes, and also different geographic areas.

13   Q.  And so, for example, what feed is given to chickens?

14   A.  Feed is mainly corn, about 65 percent of it is corn, and

15   then the second most, probably about 25 to 30 percent is

16   soybean meal, and then there is a little bit that is left over,

17   that is other, like, vitamins and minerals and different things

18   like that.

19   Q.  So you had mentioned that all sorts of different factors

20   can contribute to, I guess, a flock not producing the right

21   size that you need in the right amount.

22         Can it happen for other reasons like a truck breaking

23   down?

24   A.  Yes.

25   Q.  Or equipment in a plant isn't working properly?

Michael Ledford – Direct

1   A.   Right.

2   Q.   I think you said that different suppliers can be both

3   competitors but also customers of each other to be able to

4   handle these covers and shorts?

5   A.   Yes.

6   Q.   Mr. Ledford, when you were working at RSCS, regardless of

7   the reason, did you always want to be notified of every time

8   one of your suppliers was short on a particular order?

9   A.   No, I did not.

10   Q.   Was your thought different if it was a systemic problem?

11   A.   Yes, if it was going to happen every week, week in, week

12   out, yes, I did want to know.

13   Q.   You mentioned you didn't want to know if there was a

14   problem.  Why is that?

15   A.   Again, if it was, like, the first example I went through,

16   the weather-related event, sort of one-off that wasn't going to

17   be happening every week, they were shipping I think it was

18   around 300 truckloads a week of eight-piece, I didn't have the

19   time in my day or neither did my staff to worry about every

20   single load that every supplier was producing and have to

21   babysit the loads.  If they had a problem that was a one-off, I

22   did not want to know.  If it was something that was going to

23   happen each and every week, I wanted to know about it so we

24   could correct that problem and make sure that your restaurants

25   got chicken.  So if it was going to happen every other week,

Michael Ledford - Direct

1   then I would take the volume away and give it to somebody else,

2   not during a contract cycle, just for their inability to

3   perform on the contract because of the regular occurrences.

4   Q.  So when you were at RSCS, was there a policy, either

5   written or otherwise, a specific policy that the suppliers

6   needed to pick up the phone and call you if there was a cover

7   situation?

8   A.  There was unwritten policy to not call us every time that

9   there was a problem.

10  Q.  So they didn't have to clear the cover/short through you;

11  right?

12  A.  No, they did not.

13  Q.  Can distribution centers also fill shorts?

14  A.  Yes, they can.

15  Q.  Did KFC use only fresh chicken?

16  A.  Yes.

17  Q.  So does that mean that covers --

18  A.  For clarity, for chicken on the bone.

19  Q.  For chicken on the bone, excuse me.

20  A.  Yes.

21  Q.  For chicken on the bone, KFC used fresh chicken?

22  A.  Yes.

23  Q.  Did that also, the fact that it was fresh chicken and not

24  frozen, did that also, I guess, cause covers and shorts to

25  happen more frequently?

Michael Ledford - Direct

1   A.   Yes.

2   Q.   Were you, Mr. Ledford, involved in the negotiations and

3   purchase orders for these covers and shorts?

4   A.   No.

5   Q.   Do you know if a purchase order for these shorts was sent

6   to RSCS, for example?

7   A.   No, they were not.

8   Q.   So negotiation and payment for covers and shorts, do you

9   know if it was handled between the suppliers themselves?

10  A.   Yes, it was.

11  Q.   For you as the buyer, do covers assist in making sure that

12  there are no gaps in the product supply chain?

13  A.   Absolutely.

14  Q.   Let's switch gears and talk a little more about sort of

15  economic variables in 2014 going into 2015.  Was there -- well,

16  let me back up.  You left RSCS at what time point?

17  A.   Early May 2014.

18  Q.   So I want to ask you a little bit about product

19  availability during that time frame, which obviously would have

20  gone into any sort of 2015 contract.  Was there a problem with

21  the availability of birds in the spring of 2014?

22  A.   Yes, there was availability issues.

23  Q.   So I want to ask you a little bit more about the cause of

24  that.  As we've established, you know a lot about the industry.

25  Do you also know a lot about the market and market conditions?

Michael Ledford - Direct

1    *A.*  Yes.

2    *Q.*  Fair to say that there is a lot that goes into pricing

3    chicken?

4    *A.*  Yes.

5    *Q.*  I think you had mentioned some of those earlier, feed

6    conversion, for example?

7    *A.*  Yes.

8    *Q.*  How much and for how long you raise a chicken for a target

9    weight?

10   *A.*  Yes.

11   *Q.*  How about a current news issue, avian flu, does that factor

12   into pricing chicken?

13   *A.*  Yes.

14   *Q.*  What about freight and basis?

15   *A.*  Yes.

16   *Q.*  Can you very briefly describe to the jury what freight and

17   basis is.

18   *A.*  So the -- yes.  The freight and basis are really the

19   difference between what a farmer that grows corn or soybeans,

20   what they're willing to sell product for out of their silos to

21   what the market -- to what the Chicago Board of Trade is.

22   Chicago Board of Trade is going to quote a price of what the

23   market price is based on supply and demand, but you've actually

24   got to buy that from a farmer.  If the farmer is not willing to

25   sell that for market price, we call it in the business,

Michael Ledford – Direct

1    difference is basis.  The freight is to actually get it from

2    the grain silos somewhere in the Midwest out to the feed mill

3    in the Southeast where the chickens are grown.

4    Q.  Okay.  Thank you for that.

5         Does the price -- not just freight and basis, but does

6    the price of corn and soy play a part in both bird availability

7    as well as bird price?

8    A.  Yes, it does.

9    Q.  How about the popularity of certain other foods, does that

10   also impact or can that also impact the price of chicken?

11   A.  Yes.

12   Q.  Such as the price of beef or the price of pork?

13   A.  Yes.  For instance, when beef is very high priced, people

14   are going to substitute down to chicken, and it's going to

15   drive up demand on chicken.

16   Q.  Are there also fads in the population, like wings, for

17   example?

18   A.  Yes.

19   Q.  Is the popularity of wings today different than what it was

20   25 years ago when you started?

21   A.  Oh, absolutely, by far.

22   Q.  Did all of these different things that we've been talking

23   about play a factor in bird availability in 2014?

24   A.  Yes.

25   Q.  How was demand for chickens in 2014, how would you describe

Michael Ledford - Direct

1    it?

2    *A.*   Demand was very high in 2014.

3    *Q.*   How was supply of small-bird chicken in 2014?

4    *A.*   It was shrinking.

5    *Q.*   Now, when you went from RSCS to Chick-fil-A, during that

6    period of time, did you have concern that small-bird producers

7    would continue to stop producing small birds?

8    *A.*   Yes, I did.

9    *Q.*   Why -- why?

10   *A.*   They were making better returns in the bigger-bird segment,

11   and that was one of the things driving that supply-and-demand

12   situation, is these conversions over, and they were making a

13   better profit.  Grain prices were not high at the time, and

14   when grain prices are not high and demand is up, they can make

15   a lot more money growing a bigger chicken.

16   *Q.*   When we say grain prices were not high, to be very simple,

17   is it cheap or relatively cheap to continue to feed that bird

18   for a longer period of time, have the bird get a lot bigger,

19   and then sell it for much larger profit since we're selling by

20   the pound?

21   *A.*   That's exactly right.

22   *Q.*   All right.  For Chick-fil-A, was Chick-fil-A willing to pay

23   a premium for ongoing and continuous supply of birds?

24   *A.*   Nuance you a little bit on the word "premium."

25   *Q.*   Yeah.

Michael Ledford - Direct

1   A.  If you're selling chicken, that's a term you would use.  If

2   you're buying chicken, you would not typically use that term.

3   I would say we were willing to pay more; we were not trying to

4   drive the cost down as low as somebody like RSCS was.

5   Q.  Okay.  Since you were willing to pay more, did you go in

6   during -- when you worked for CFA, feeling relatively confident

7   that you could ensure supply because you're willing to pay a

8   little bit more?

9   A.  Yes, supply was not a concern at Chick-fil-A in 2014.

10  Q.  Okay.  Do you know if supply was a concern at RSCS in 2014?

11          MR. TORZILLI:  Objection.  He wasn't at RSCS for part

12  of the year.

13          THE COURT:  He can answer if he knows.  Overruled.

14          THE WITNESS:  At the time period I was there, they

15  were concerned, yes.

16  BY MR. BELLER:

17  Q.  Significant concerns?

18  A.  Significant concern.

19  Q.  What involvement did you have in trying to secure supply

20  for RSCS/KFC before you left in May of 2014?

21  A.  I was actively trying to secure supply for -- it was

22  probably a regular activity from about the March time period

23  through when I left.

24  Q.  Of trying to secure --

25  A.  Trying to secure additional supply.

Michael Ledford – Direct

1   Q.  Why is that, if you already had a contract to produce

2   certain volume?

3   A.  Well, for one thing, we were leading up to Mother's Day,

4   and Mother's Day is the single largest week of the year for

5   KFC.  They're going to do anywhere 20 to 25 percent above their

6   regular volume that week.  And, really, that kind of starts a

7   few weeks out, not just for that week, if you actually want to

8   make that happen.  And not only were we not able to find that

9   25 percent extra chickens to cover that, we were actually

10  running out of chicken, and we had sporadic outages at

11  restaurants.  Restaurants were closing.  It was a very big

12  deal.

13  Q.  Was that due to this lack of supply of chicken?

14  A.  Yes.

15  Q.  Were there any internal discussions while you were present

16  regarding negotiating during this time period for the 2015 KFC

17  contract?

18  A.  There were conversations about that in between -- there was

19  a three-week window when I turned in my resignation at RSCS

20  before I started at Chick-fil-A, when they -- when I guess

21  that -- the first two weeks of that three-week time period, I

22  was still technically getting paid by RSCS but not actually

23  actively working for them in the four walls of the office, that

24  they had me on sort of a consultation basis while I was still

25  getting a paycheck from them, that certainly was a conversation

Michael Ledford - Direct

1    during that two-week period.

2    Q.  Did you have an opinion, Mr. Ledford, on what RSCS should

3    do with respect to the 2015 negotiations?

4    A.  Yes.

5    Q.  What was your opinion as to what RSCS should do?

6    A.  My opinion and the guidance that I gave them at the time

7    was to find as much volume as they could, like we had been

8    doing between March and that time period to get them through

9    Mother's Day, and to let that buy them some time, because

10   you're in the peak of the summer -- you're going into, really,

11   the summer, and everybody's grilling, markets are going to go

12   up, like we already have established here in this conversation,

13   supply was down.  If you're a buyer of chicken, if supply is

14   down and prices are up and you're closing restaurants, that's

15   not the time -- you have zero leverage to negotiate a contract.

16   And so my guidance was to wait until the fall like we normally

17   did.

18           What also happens in the fall is chicken markets are

19   on their way down, and also you're not dealing with the

20   Mother's Day boom that KFC has, and you're going to take a lot

21   of the urgency of having additional supply off of the table

22   when you're not sort of buying from a panic position at that

23   point.

24   Q.  How about a multi-year contract, did you have an opinion as

25   to whether that was in RSCS's interests?

Michael Ledford - Direct

1   A.   I did.

2   Q.   What was that opinion?

3   A.   That's the last thing I would have done.

4   Q.   Because?

5   A.   Locking in at the all-time highest prices, the shortest

6   that marketplace had ever been, if anything, you would have

7   wanted to do the shortest contract that you could, not the

8   longest one you've ever done, multi-year deal at record prices.

9   I would have avoided that as greatly as I could have.

10  Q.   Fair to say that RSCS in May, June, July of 2015 did not

11  have much leverage compared to the market conditions?

12  A.   That's correct.

13  Q.   Who was Pete Suerken?

14  A.   Pete Suerken at this time period was an employee of RSCS.

15  Q.   What was his role while you were there?

16  A.   He was vice president of what we called centralized

17  purchasing.  It was another way to say that was -- it was all

18  of the non-large categories, so for Yum Brands, obviously,

19  chicken was a large category, beef was a large category for

20  Taco Bell, cheese was a large category because of Pizza Hut,

21  wheat products because of the pizza dough was a large product

22  for Pizza Hut, those categories when I was there reported

23  directly to the chief purchasing officer, Todd Imhoff, and Pete

24  had the other things like the sauces and the seasonings,

25  dressings, desserts, the kind of the various other small --

Michael Ledford - Direct

1    produce, things like that.

2    Q.   What about chicken?

3    A.   He did not have chicken responsibilities.

4    Q.   To the best of your knowledge, did Pete Suerken ever have

5    responsibility for the negotiation of chicken prior to your

6    departure?

7              MR. TORZILLI:  Objection.  Foundation.

8              THE COURT:  He can answer if he knows.  Overruled.

9              THE WITNESS:  Prior to my departure?

10   BY MR. BELLER:

11   Q.   That's correct.

12   A.   No, he never had any involvement.

13   Q.   How about after your departure, do you have knowledge of

14   whether or not Mr. Suerken took over chicken?

15   A.   Yes, he did.

16   Q.   Do you have knowledge over -- about whether your departure

17   in the summer of 2014 was Mr. Suerken's first time negotiating

18   chicken?

19   A.   Yes, I believe so.

20   Q.   And likewise, was that also his first time to the best of

21   your knowledge negotiating with any of the chicken suppliers?

22   A.   Yes.

23   Q.   Who is Mr. Bob Lewis, sir?

24   A.   Bob Lewis is the man that I replaced at RSCS when he

25   retired.  He is also the person they brought in when I left,

Michael Ledford - Direct

1    like on a short contract basis, to kind of come back in and run

2    the chicken team until they hired my replacement.

3    Q.  So if you replaced Bob Lewis, remind the jury as to when

4    Mr. Lewis retired.

5    A.  Let's see.  We overlapped six months when I came in.  I

6    came in in 2008.  I'm not sure if he actually retired in the

7    calendar year 2008 or if it was actually 2009 because of that

8    six-month gap.  Somewhere beginning of '9, end of '08 is when

9    he retired.

10   Q.  In that interim, had you continued to work with Bob Lewis

11   on negotiation of contracts for chicken?

12   A.  No.

13   Q.  Did you meet with Mr. Suerken prior to you leaving RSCS?

14   A.  Yes.

15   Q.  Did you also meet with Mr. Lewis prior to you leaving RSCS?

16   A.  Yes.

17   Q.  Did you discuss with either Mr. Suerken or Mr. Lewis the

18   opinion that you've expressed today, meaning, the strategy RSCS

19   should employ when negotiating with the suppliers for the 2015

20   KFC eight-piece contract?

21   A.  Yes.

22   Q.  Did you give them your opinions regarding the timing of

23   when they should negotiate?

24   A.  Yes, I did.

25   Q.  Did you give them your opinion regarding whether they

1591

Michael Ledford – Direct

 1    should enter into a single or a multi-year contract?

 2    A.  Yes, I did.

 3            MR. BELLER:  If I may have just a brief moment, Your

 4    Honor.

 5            THE COURT:  You may.

 6    BY MR. BELLER:

 7    Q.  Switching gears for just a moment, we're almost done.  I

 8    want to talk a little bit about your knowledge of the different

 9    chicken suppliers.  Are you aware, Mr. Ledford, how long

10    Claxton Poultry has been in business?

11    A.  It's been since the '60s, I believe.

12    Q.  Do you know how long Claxton Poultry has supplied chicken

13    to KFC or RSCS?

14    A.  I do not know exactly.  It's been several decades.

15    Q.  No problem.  If I were able to show you an RSCS PowerPoint,

16    would that help refresh your recollection?

17    A.  Yes.

18            MR. BELLER:  Your Honor, if I may show the jury and

19    publish -- I believe this is admitted -- F-813.

20            THE COURT:  You may.

21            MR. BELLER:  Mr. Brian, if we can -- actually, let's

22    be clear.

23    BY MR. BELLER:

24    Q.  This cover sheet that we're looking at, what is this,

25    Mr. Ledford?

Michael Ledford - Direct

1    *A.*  This is a document that I prepared in September of 2013

2    that we call a category profile.  It was actually the first

3    step in our process of getting ready for negotiation.

4    *Q.*  Thank you.

5            *MR. BELLER:*  If we can, Mr. Brian, turn to page 135 of

6    this particular exhibit.

7            It's very small, if we could zoom in a little bit for

8    Mr. Ledford.

9    *BY MR. BELLER:*

10   *Q.*  So in 2013, Mr. Ledford, is it fair to say that at that

11   point Claxton had been in business for 54 years?

12   *A.*  Yes.

13   *Q.*  And so now if we take 2022, it's been 63 years, if I just

14   did my math properly?

15   *A.*  Right.

16   *Q.*  In terms of supplying chicken to KFC, is that listed at

17   least in 2013 as having supplied to them for the prior 20

18   years?

19   *A.*  Yes, that's correct.

20   *Q.*  Thank you.

21           Mr. Ledford, how many plants does Claxton Poultry

22   have?

23   *A.*  One.

24   *Q.*  Is Claxton Poultry the smallest supplier that RSCS sourced

25   chicken from in 2013 and 2014?

Michael Ledford - Direct

 1   A.  Certainly, the smallest chicken-on-the-bone supplier, yes.

 2         MR. BELLER:  Thank you, I'm done with that.

 3   BY MR. BELLER:

 4   Q.  Mr. Ledford, I want to switch gears and talk a little bit

 5   about your role with Chick-fil-A, your knowledge with

 6   Chick-fil-A, and specifically the use of antibiotics, okay?

 7   A.  Okay.

 8   Q.  Mr. Ledford, I'm showing you what is already admitted --

 9         MR. BELLER:  Your Honor, as Exhibit 355, and once

10   confirmed, if I may also publish.

11         THE COURT:  Yes, it has been admitted and may be

12   published.

13   BY MR. BELLER:

14   Q.  Mr. Ledford, on your screen is Government Exhibit 355.  If

15   you could take just a brief moment and review that.  Once

16   you're done, I'll ask you some questions.

17   A.  Okay.

18   Q.  Mr. Ledford, are you a participant in this discussion?

19   A.  No, I was not.

20   Q.  Are you generally aware of the subject matter of the topic

21   that is actually being discussed in this particular exchange?

22         MR. TORZILLI:  Objection, lacks foundation.

23         THE COURT:  He can answer yes or no.

24         THE WITNESS:  I mean, I see the first communication

25   where it says ABF, yeah, I'm familiar with what that term

Michael Ledford – Direct                                                      1594

1   means.

2   *BY MR. BELLER:*

3   Q.  Thank you.  That's exactly what I'm going to ask you about.

4          *MR. BELLER:*  Mr. Brian, I'm done with this one, sir.

5   *BY MR. BELLER:*

6   Q.  When we say "ABF," what is ABF?

7   A.  Antibiotic free.

8   Q.  What is NAE?

9   A.  NAE is a -- sort of a nuanced version of antibiotic free.

10  It means no antibiotics ever.  There is a key distinction that

11  antibiotic free or ABF, you can actually give the chicken

12  antibiotics when it's still in the egg.  There is a machine

13  called an Embrex machine, which actually they use that to --

14  they can put in vaccines in there, antibiotics or whatever, to

15  kind of help the chicken get a boost when it's first being out,

16  to help its immune system.  That's ABF.  But you cannot in ABF

17  after that chick is hatched give it any antibiotics for it to

18  be considered ABF.  The distinction between ABF and NAE, you

19  cannot even give antibiotics to chicken in the egg either.

20          At first when we were starting these conversations, we

21  called it -- for a period of time before we landed on NAE, we

22  called it "never ever," not just after hatched, but even before

23  hatched, never had antibiotics in its system throughout its

24  life span.

25  Q.  Did there come a time, Mr. Ledford, when Chick-fil-A was

Michael Ledford - Direct

1   considering and ultimately did adopt one of these two

2   USDA-approved programs?

3   *A.*   Yes.

4   *Q.*   When was that?

5   *A.*   It happened right before I got there.  I believe it was

6   in -- it was either in April or the first half of May.

7   *Q.*   And is that, Mr. Ledford, when the program was being

8   conceptualized and Chick-fil-A was starting to consider how to

9   implement the program?

10  *A.*   Yes.

11  *Q.*   So when exactly did Chick-fil-A switch all of their

12  different producers to be NAE producers?

13  *A.*   We did that over the course of a four-and-a-half-year time

14  period.  It was a very big undertaking, not something you could

15  do quickly at the snap of a finger.  We started in 2014, and we

16  concluded that five-year transition in the end of 2019.

17  *Q.*   Were you, Mr. Ledford, involved in that conversion process?

18  *A.*   Yes.

19  *Q.*   What was your involvement, sir?

20  *A.*   Mainly from a strategy.  And there was a gentleman on my

21  team, David Rothmeier, that was -- and another guy that worked

22  for us, Steve Hester.  The two of them were tasked with

23  actually sort of doing the day-to-day.  And my role was more of

24  a strategic nature on helping set up the game plan that made

25  sense logistically and also made sense with where each supplier

Michael Ledford - Direct

1    was and their sophistication or lack of -- lack of

2    sophistication handling NAE products.

3    Q.  And when you say "sophistication or lack of

4    sophistication," on that continuum, where did Claxton Poultry

5    fall?

6    A.  They were what we considered at the time our least

7    sophisticated supplier when it came to NAE chicken.

8    Q.  Just to understand this a little bit better, similar to, I

9    guess, COVID and social distancing, that's also something that

10   would have been taken into account by the suppliers; is that

11   correct?

12   A.  Yes.

13   Q.  Would it require additional houses being built?

14   A.  Yes, it did.  It required -- when you go to -- we did not

15   spec this, and we left it up to each supplier to determine what

16   was the best for them.  Some decided to go with a lower

17   density, so less chickens per house, or the great COVID example

18   that you just used, social distancing.  To reduce the risk of

19   spreading disease, you take a certain number of the chickens

20   out of the house, to help in that effort.  And a lot of the

21   suppliers decided to do that, as how they would implement NAE,

22   which would mean there is this whole infrastructure that they

23   had to build before they could convert -- building additional

24   chicken houses to house the additional needs they would have to

25   help with those lower densities.

Michael Ledford - Direct

1   Q.  And all of those sort of expenses involved in growing an

2   NAE chicken, is there a cost associated with that?

3   A.  Yes.

4   Q.  Who was going to be paying for that cost?

5   A.  Chick-fil-A.

6   Q.  Were suppliers asked -- well, actually, let me back up.  By

7   the time you became involved, was final pricing already

8   determined by all of the suppliers regarding what it was going

9   to cost to convert to NAE?

10  A.  No.

11  Q.  And in 2014 when this is first being conceptualized, were

12  the suppliers asked to the best of your knowledge to submit

13  final pricing?

14  A.  No.

15  Q.  So what was the pricing numbers being submitted to or being

16  given to Chick-fil-A in its early sort of conception, NAE

17  conception?

18  A.  What were the actual prices?  Is that the question?

19  Q.  My question is, how would you categorize -- what would you

20  call that pricing?  Was it final, was it experimental, back of

21  the napkin?

22  A.  I think it was a little different with each supplier.  For

23  instance, we went with Perdue Farms first because Perdue had

24  been doing NAE for a number of years on their own Perdue label

25  before we did.  We started with them first in 2015.  Their

Michael Ledford - Direct

 1   number was more important than Claxton, who we knew we weren't

 2   going to implement until 2018 or 2019.  I would have called a

 3   Claxton number at that time period preliminary placeholder

 4   until we got closer to the time to onboard them.

 5   Q.  And what guidance did Chick-fil-A give to the suppliers

 6   regarding the conversion and the costs?

 7   A.  At this time period, I don't think we were giving a whole

 8   lot of guidance; it was more fact finding and collecting

 9   information.

10   Q.  Research?

11   A.  Yes.

12   Q.  Were suppliers instructed or told to talk to each other

13   regarding their conversion?

14   A.  They were instructed to talk to each other about things

15   that would -- to do with best practices.  In fact, we kept the

16   best practices sheet that we shared, we started it, it was a

17   lot of information from Dr. Bruce with Perdue, who is sort of

18   one of the industry's foremost figures.  Each time we would

19   convert a production facility and all of their chicken farms

20   over to it, we would add to that, and we would learn more, and

21   we would share, and we -- we even welcomed them talking to each

22   other about best practices about how to execute NAE

23   effectively.

24   Q.  So, Mr. Ledford, is the cost associated with NAE a

25   pass-through or an add or a cost adder that .0005 is put on the

Michael Ledford - Direct

1   chicken and supplied to KFC for payment?

2   A.   Yes.

3   Q.   I said KFC --

4   A.   Chick-fil-A.

5   Q.   CFA.  Excuse me.

6           So I think you said as to Claxton Poultry that Claxton

7   did not convert to NAE until approximately 2018; is that right?

8   A.   Correct.

9   Q.   And so when did Claxton's costs for NAE become really a

10  request to contract or a final brass tacks amount?

11  A.   I don't remember specifically what time of year in 2018

12  they converted, but it would have been as early as when we were

13  doing our annual negotiations with them at the end of '17 or at

14  some point in '18, I don't recall exactly when, but it would

15  have been in that window, yes.

16  Q.   Any numbers received from Claxton prior to 2019, was that

17  more or less a guesstimate?

18  A.   I call it a little bit more than a guesstimate.  You know,

19  there is a little more education into being a straight-up

20  guesstimate.  But it certainly wasn't their final number.

21  Q.   Okay.  And Chick-fil-A did not anticipate that being their

22  final number also?

23  A.   No.

24  Q.   Let's switch and talk just a little bit about the

25  Chick-fil-A models themselves, as to how Chick-fil-A prices its

Michael Ledford - Direct

1   chicken.  So we already talked about the grain-based or

2   cost-plus model.  Are you familiar with the term "market-based

3   model"?

4   *A.*  Yes.

5   *Q.*  Is a market-based model sometimes also called the breast

6   model?

7   *A.*  Yes.

8   *Q.*  How is the market-based or breast model different than a

9   grain-based model?

10  *A.*  So very similar to what we were talking about with KFC, a

11  grain-based model is going to start with the cost of the feed

12  and flow through to the cost to produce that product.  So with

13  Chick-fil-A, there is more processes, since it's a deboned

14  product, than a bone-in product.  And so that's very similar to

15  how we discussed earlier.  To where the breast model or market

16  model was taking at the time forever and ever, Chick-fil-A used

17  to be priced off of the market/breast-meat model, which was --

18  it was the select breast-meat market, which is a fancy way of

19  saying a small chicken breast.  The select breast-meat

20  market -- and it was different with each supplier -- but it was

21  something to the effect of the select breast-meat market

22  divided by 52 plus 56, in essence.

23  *Q.*  Okay.  In 2014, did Chick-fil-A have some suppliers on the

24  grain-based model and other suppliers or supplier on the

25  market-based model?

Michael Ledford - Direct

1   *A.*  What year?

2   *Q.*  2014.

3   *A.*  Yes.

4   *Q.*  In between, do you recall which model Claxton was on?

5   *A.*  They were on the market.

6   *Q.*  How about the other suppliers?

7   *A.*  In 2014, I believe we had only one supplier that was on the

8   grain-based model, that was Tyson.  We started out with them in

9   I think 2012, tested it out, 2012 -- which obviously predated

10   me, 2012, '13, and '14, then we started converting the other

11   suppliers, I believe, in that 2014 year for the 2015 contracts.

12   *Q.*  Okay.  Let's switch gears for just a moment and talk about

13   period pricing.

14   *A.*  Okay.

15   *Q.*  Mr. Ledford, what is period pricing?

16   *A.*  Period pricing is -- you're actually going to run -- you

17   negotiate the prices, which we talked about, that's in your

18   contract, the prices actually change every period, and so in

19   the KFC standpoint, that was every four weeks.  So there were

20   13 pricing periods in every year, 52 weeks, and that was

21   simply, you would adjust -- we had a commodity risk management

22   group, and we would instruct the suppliers when to hedge for

23   grain-risk management or, said a different way, when to make

24   the purchases of the corn and the soybean meal that started our

25   whole formula, when to book that, what price to book that, what

Michael Ledford – Direct

1　percentages, at that period.  The only thing that should change

2　that period price is the feed input, and you've locked in all

3　of the other costs that we've talked a lot about here today.

4　　　　And then that would be the price that you were priced

5　at for that four-week period.  Then it would change every four

6　weeks.

7　Q.  Mr. Ledford, is it possible for different suppliers to be

8　able to come to an agreement on what their period price would

9　be?

10　A.  No.

11　Q.  I'm showing you Government Exhibit 6046.

12　　　　MR. BELLER:  Your Honor, I believe this is already

13　admitted, and I'm asking to publish, please.

14　　　　THE COURT:  6046, was it?

15　　　　MR. BELLER:  Yes, sir.

16　　　　THE COURT:  Okay.  Yes, it has been admitted and may

17　be published.

18　　　　MR. BELLER:  Thank you.

19　BY MR. BELLER:

20　Q.  Mr. Ledford, if you could take just a moment and review

21　this particular document, sir.  And let me know when you've had

22　a chance to review.

23　A.  Okay.

24　　　　I'm ready.

25　Q.  Are you generally familiar with what is being discussed in

Michael Ledford - Direct

1    this particular document?

2           MR. TORZILLI:  Objection.  Lack of foundation.

3           THE COURT:  He can answer that question yes or no.

4    Overruled.

5           THE WITNESS:  Yes.

6    BY MR. BELLER:

7    Q.  Okay.

8           MR. BELLER:  Thank you, Mr. Brian, I'm done with this

9    one.

10   BY MR. BELLER:

11   Q.  Mr. Ledford, are there contract negotiations happening for

12   chicken in June of 2013, the date on this particular email?

13   A.  No.

14   Q.  How does grain pricing change period pricing, Mr. Ledford?

15   A.  It's the only thing that really should change it.  That's

16   what it's -- like I just explained, it's the driver of why you

17   have period pricing, because that grain changes.

18   Q.  And is 6046, the exchange that you just looked at, is that

19   consistent with your knowledge of period pricing?

20          MR. TORZILLI:  Objection.  Lack of foundation.

21          THE COURT:  Sustained.

22   BY MR. BELLER:

23   Q.  Mr. Ledford, how does -- can grain or freight and basis

24   change period pricing?

25   A.  Yes.

Michael Ledford - Direct

1    *Q.*  Can it change the period pricing in different ways for

2    different suppliers?

3    *A.*  Yes.

4    *Q.*  From time to time, Mr. Ledford, did suppliers try adding a

5    little bit of their cost to try and recover some of their

6    expenses?

7    *A.*  Yes, we would catch them from time to time trying to slip

8    that in there, yes.

9    *Q.*  Doing that in very small increments?

10   *A.*  Yes.

11   *Q.*  To influence period pricing?

12   *A.*  Yes.

13   *Q.*  Okay.  Thank you.

14         Mr. Ledford, did you ever ask any of the suppliers to

15   communicate with each other about their pricing?

16   *A.*  No.

17   *Q.*  How about their bids?

18   *A.*  No.

19   *Q.*  Did you ever ask the suppliers to learn each other's

20   prices?

21   *A.*  No.

22   *Q.*  Do you know or have personal knowledge if they learned

23   pricing from covers and shorts?

24   *A.*  Do I have any personal knowledge that they gained --

25   *Q.*  Yeah.

1605

Michael Ledford - Direct

 1   *A.*  I don't have any personal knowledge, but it's certainly

 2   possible.

 3   *Q.*  How about learning pricing from distributors, learning

 4   competitors' pricing from distributors?

 5   *A.*  That's a possibility.

 6   *Q.*  Did you want, Mr. Ledford, the negotiations to be

 7   confidential?

 8   *A.*  Yes.

 9   *Q.*  Why?

10   *A.*  So I could get the best price and so, you know -- so I

11   would help control the narrative.  I was the one providing them

12   feedback.  I didn't want them to go out and look for feedback

13   for themselves.

14   *Q.*  Sure.  You wanted to maintain the leverage; right?

15   *A.*  Yes.

16   *Q.*  Mr. Ledford, when did you find out about the Indictment,

17   sir?

18   *A.*  When it came out, June of 2020.

19   *Q.*  Was that huge news in the chicken industry?

20   *A.*  Yes, it was.

21   *Q.*  Do you have knowledge, Mr. Ledford, of whether KFC was the

22   subject of that?

23           *MR. TORZILLI:*  Objection.  Lack of foundation,

24   speculation, and also not relevant.

25           *THE COURT:*  I'll sustain it on the basis of vagueness.

Michael Ledford – Direct

1        MR. BELLER:  Excuse me, on the basis of what, Your

2   Honor?

3        THE COURT:  Vagueness.

4   BY MR. BELLER:

5   Q.  Okay.  Do you know if the suppliers' negotiations with RSCS

6   and KFC was a subject of the Department of Justice's

7   investigation?

8        MR. TORZILLI:  Same objection.

9        THE COURT:  Overruled.

10       THE WITNESS:  Yes.

11  BY MR. BELLER:

12  Q.  Do you have knowledge -- same question -- as to

13  Chick-fil-A?

14  A.  Yes.

15  Q.  Same question as to Popeyes?

16  A.  Yes.

17  Q.  Were these some of the biggest names in the fast-food

18  chicken products?

19  A.  Yes.

20  Q.  And, Mr. Ledford, have you been employed at each one of

21  these companies?

22  A.  Yes.

23  Q.  Were a lot of your suppliers for CFA mentioned?

24  A.  Yes.

25  Q.  How about your suppliers for RSCS, were they mentioned?

Michael Ledford – Direct

1    A.   Yes.

2    Q.   How about your suppliers for Popeyes, were they mentioned?

3    A.   Yes.

4    Q.   At the time of this huge news involving your suppliers and

5    your buyers, yourself as a buyer, had you ever been interviewed

6    by the Department of Justice?

7    A.   No.

8    Q.   Prior to the Government's Indictment and for four months

9    afterwards, had you ever spoken to any federal agent regarding

10   your knowledge?

11   A.   No.

12   Q.   Prior to the Government's Indictment and for four months

13   after, had you ever spoken to a federal prosecutor about your

14   knowledge?

15   A.   No.

16   Q.   Had they ever interviewed you prior to the Indictment or

17   four months after about the negotiation process that you

18   participated in?

19   A.   No.

20   Q.   Anything about 2012 negotiation?

21   A.   No.

22   Q.   Anything about 2013 negotiation?

23   A.   No.

24   Q.   Anything about Chick-fil-A?

25   A.   No.

1608

Michael Ledford - Direct

1    Q.   Anything about your request for a reduced weight size bird?

2    A.   No.

3    Q.   Anything about your -- rather, NAE, no antibiotics ever?

4    A.   No.

5    Q.   About working on the buyer side of the business?

6    A.   No.

7    Q.   How about working on the supplier side of the business?

8    A.   No.

9    Q.   How about your knowledge about small birds?

10   A.   No.

11   Q.   Or big bird?

12   A.   No.

13   Q.   Or anything about any of these five men?

14   A.   No.

15   Q.   Since the Indictment and five months after, have they

16   interviewed you?

17   A.   Yes.

18   Q.   Have they interviewed you several times?

19   A.   Yes.

20   Q.   And you've answered all of their questions?

21   A.   Yes.

22   Q.   Similar to the questions I've asked you today?

23   A.   Yes.

24        MR. BELLER:   Your Honor, I see it's noon.   I have one

25   more minute.

Michael Ledford – Direct

1        THE COURT:  Yeah.  Go ahead.

2        MR. BELLER:  Thank you.

3    BY MR. BELLER:

4    Q.  Mr. Ledford, as you sit here today, do you have any

5    personal knowledge of Mr. Fries agreeing with anyone to raise

6    prices of broiler chicken products?

7    A.  No, I do not have any personal knowledge.

8    Q.  Do you have any personal knowledge of Mr. Fries agreeing

9    with anyone to fix prices?

10   A.  No, I do not.

11   Q.  Or to maintain prices?

12   A.  No, I do not.

13   Q.  Or to rig bids?

14   A.  No.

15   Q.  As you sit here today, do you have any personal knowledge

16   that Mr. Brady of Claxton Poultry agreed with anyone to raise

17   prices of broiler chickens?

18   A.  No.

19   Q.  Or fix prices?

20       MR. TORZILLI:  Objection to asking about fixing

21   prices.  That calls for a legal conclusion, lacks foundation.

22       THE COURT:  Sustained.

23   BY MR. BELLER:

24   Q.  Mr. Ledford, as you sit here today, do you have any

25   personal knowledge of Mr. Brady manipulating prices of broiler

Michael Ledford – Direct

1   chicken products in 2012, 2013, and 2014?

2   A.  No, I do not have any personal knowledge.

3   Q.  Do you have any personal knowledge of anyone at Claxton

4   entering an agreement to manipulate the prices of broiler

5   chicken products?

6   A.  No, I do not.

7   Q.  Mr. Ledford, do you have any personal knowledge of anyone

8   in this courtroom, any of these five men, entering an agreement

9   to raise, manipulate, or reduce a decrease in prices for the

10  broiler chicken industry?

11  A.  No, I do not.

12          MR. BELLER:  Thank you, Mr. Ledford.

13          Your Honor, this is a good time for lunch.

14          THE COURT:  Thank you very much, Mr. Beller.

15          We'll go ahead and take lunch, ladies and gentlemen.

16  Why don't we plan on reconvening same time as usual, 1:30.

17  Keep the admonitions in mind.  Weather is nicer.  Keep your

18  yellow juror buttons visible if you go outside the courtroom or

19  even within the hallways of the courthouse.  The jury is

20  excused for lunch.

21          (Jury out at 12:03 p.m.)

22          THE COURT:  Mr. Ledford, you're excused until 1:30.

23  Thank you very much.

24          Everyone else may be seated.

25          All right.  So with the -- after lunch, we'll get into

Michael Ledford – Direct

1   the issue of whether the defendants can cross-examine a witness

2   called by another defendant.  I am going to rule similarly as I

3   did at the last trial; namely, I don't believe that even though

4   I have the discretion to manage that process, that a defendant

5   who has an individual right to defend himself in this trial

6   would be precluded from cross-examining a witness called by

7   another.  However, if there does seem to be a manipulation of

8   that process that I can detect, then I will exercise my

9   discretion to intervene and prohibit leading questions.

10          For instance, if a witness wasn't able to answer a

11   question that was asked in a non-leading fashion after having

12   been called by defendant but then was being asked leading

13   questions in what I perceive to be an attempt to get the

14   witness to understand what was really being asked or to answer

15   the question in some affirmative fashion beneficial to the

16   defendants as a whole or to a particular defendant, then I

17   would probably sustain an objection to leading.

18          But, otherwise, I think that, technically, the

19   defendants who did not call a witness called by another

20   defendant are not limited to non-leading questions.  All right.

21          Anything else we should take up before we break for

22   lunch?  We'll be in recess until 1:30.  Thank you.

23          (Recess at 12:06 p.m.)

24          (Afternoon session continued at 1:31 p.m.)

25          THE COURT:  All right.  Let's go ahead and bring the

Michael Ledford - Cross

1   jury back in.

2           (Jury in at 1:32 p.m.)

3           THE COURT:  Thank you.  Please be seated.

4           Mr. Feldberg, cross-examination.

5           MR. FELDBERG:  Thank you, Your Honor.

6                    **CROSS-EXAMINATION**

7   BY MR. FELDBERG:

8   Q.  I'm Michael Feldberg.  I'm Roger Austin's lawyer.

9   A.  Hello.

10  Q.  How long have you known Mr. Austin?

11  A.  At a minimum, 22 years.

12  Q.  And during the 20-plus years that you've known Mr. Austin,

13  has he been selling chicken to KFC?

14  A.  Yes.

15  Q.  Whether he worked at Pilgrim's or some of his prior

16  employers, was he always selling chicken to KFC?

17  A.  Yes.

18  Q.  While you were at RSCS, did you speak with Mr. Austin

19  frequently?

20  A.  Yes.

21  Q.  About how often?

22  A.  Probably at least once a day.

23  Q.  At least once a day.  And were some of those discussions

24  about bid negotiations?

25  A.  Yes.

Michael Ledford - Cross

1    Q.  Did you discuss other things, as well?

2    A.  Yes.

3    Q.  What kinds of other things did you discuss with Mr. Austin

4    on an almost daily basis?

5            MR. TORZILLI:  Objection.  Relevance.

6            THE COURT:  Overruled.  He can cite some examples.

7            THE WITNESS:  I mean, some of it could have been

8    personal in nature, family, sports, other business things like

9    franchisees, dealing with complaints on quality, dealing with

10   quality, summits.  They had an R&D center there in Louisville

11   that supported, really, all of the brands.  We would talk often

12   about coordinating samples coming in, getting people over

13   there, looking at product.  Could be any number of things.

14   BY MR. FELDBERG:

15   Q.  Did you talk about market conditions with Mr. Austin from

16   time to time?

17   A.  Yes, very frequently.

18   Q.  Did you talk about new products from time to time?

19   A.  Yes.

20   Q.  Did you talk about supply issues?

21   A.  Yes.

22   Q.  Operations?

23   A.  Yes.

24   Q.  Now, you mentioned a moment ago that they had a R&D center

25   in Louisville.  Could you explain to the jury what that is and

Michael Ledford - Cross

1    how it got set up?

2    *A.*   Yes.  It was somewhere around the 2008 time period, we

3    reached an agreement with Pilgrim's for them to -- basically,

4    we call it an R&D center.  It's really a test kitchen, of

5    sorts.  They would have in there the fryers that are in KFCs,

6    the Henny Pennies, the various equipment that was in any of the

7    five concepts at the time.  It would help us with new product

8    development and testing.  They also turned it into kind of a QA

9    lab of sorts, as well.  They also regularly brought in product

10   from each of their production facilities to do a check of how

11   the product was doing as far as meeting our specifications.

12   *Q.*   And was Mr. Austin involved in setting up and operating

13   that test kitchen for KFC?

14   *A.*   Yes, he lead the entire initiative.  He oversaw its

15   build-out, and then moved from Georgia to Louisville, Kentucky.

16   That's where his office was, and he oversaw those operations.

17   *Q.*   Was that operation of benefit to KFC?

18   *A.*   Yes.

19   *Q.*   Could you explain in what ways it was of benefit?

20   *A.*   Having a supplier providing research and development and

21   product development for you, instead of it coming solely out of

22   the brand's resources and facilities and head count, gave

23   you -- there was a lot of value.  A lot of money is spent every

24   year on research and development for new products.  It was

25   above and beyond what we were getting ourselves in-house with

Michael Ledford - Cross

1   the brands and at the expense of a supplier.

2   Q.   You mentioned that Mr. Austin relocated from Georgia to

3   Louisville.  Was that so he could be close to KFC?

4   A.   Yes.

5   Q.   Where is KFC located?

6   A.   Louisville, Kentucky.

7   Q.   Where is RSCS located?

8   A.   Louisville, Kentucky.

9   Q.   Now, you mentioned franchiseesFries in your examination --

10  examination with Mr. Beller.  Who owns RSCS?

11  A.   In essence, the franchisees do.  Since it's a cooperative

12  made up of franchisees of the brands, they each pay a small fee

13  to be members that actually support the day-to-day running of

14  the operations.  But the board is comprised of franchisees of

15  the various brands, and then also each board has a couple of

16  members from the corporation -- the Yum Brands corporation that

17  are on the board, as well.

18  Q.   Does that mean that the franchisees are the ultimate

19  customers?

20  A.   Oh, absolutely.  Yes.

21  Q.   So they're the ones buying the chicken; correct?

22  A.   The chicken is going to their restaurants, and they're

23  cooking and serving it to customers.  Yes.

24  Q.   Did you have occasion to observe whether or not Mr. Austin

25  had strong relationships with some of the franchisees?

Michael Ledford - Cross

1    A.  Yes, I did.

2    Q.  What observations did you make?

3    A.  Roger has very strong relationships with a lot of

4    franchisees.

5    Q.  With the customers; correct?

6    A.  Yes.

7    Q.  Okay.

8         MR. FELDBERG:  Your Honor, may we distribute some

9    binders through Ms. Buchanan?

10        THE COURT:  Yes.  Of course.

11        MR. FELDBERG:  And I believe we've provided a list of

12   the exhibits we may use to the prosecution team.

13        THE COURT:  Okay.

14   BY MR. FELDBERG:

15   Q.  Mr. Ledford, don't let the size of that binder worry you.

16   I'm going to try very hard not to go back over ground you

17   covered with Mr. Beller this morning.  And if I fail in some

18   way in that regard, please let me know.

19   A.  Okay.

20   Q.  I'd like to call up on the screen initially -- not for the

21   jury -- Exhibit I-241.

22        Mr. Ledford, if you'd like to look at it in the

23   binder, it's at tab 33, or you can look at it on the screen.

24        Do you recognize this document, sir?

25   A.  Yes, I do.

Michael Ledford – Cross

1    Q.  And could you tell us what it is, please.

2    A.  It's a summary of all of the pricing for 2012, '13, and '14

     from each of the chicken-on-the-bone suppliers.

4    Q.  And does it accurately reflect that pricing?

5    A.  It appears to, yes.

6           MR. FELDBERG:  Your Honor, I think this has been

7    approved as a demonstrative; but at this time, given the

8    testimony, we'd like to offer it into evidence.

9           THE COURT:  All right.  Any objection to the admission

10   of I-241?

11          MR. TORZILLI:  May I have a moment to consult?

12          THE COURT:  Yes.

13          MR. TORZILLI:  No objection.

14          THE COURT:  All right.  I-241 will be admitted.

15          (Exhibit I-241 admitted.)

16          MR. FELDBERG:  May we publish, Your Honor?

17          THE COURT:  You may.

18   BY MR. FELDBERG:

19   Q.  Now, Mr. Ledford, this chart showing the prices of the

20   different suppliers for the 2012, 2013 and 2014 contract

21   prices, the prices -- are the prices the same for each supplier

22   or different?

23   A.  They're different.

24   Q.  Given the volume of chicken that RSCS -- these are prices

25   to RSCS, correct?

Michael Ledford - Cross

1   A.  Yes.

2   Q.  Given the volume of chicken that RSCS was buying, does a

3   price difference of, say, .9678 to .9618, the prices for 2012

4   for Pilgrim's and Claxton, is that a significant difference?

5   A.  Yes.

6   Q.  Can you explain why?

7   A.  So that -- call it 60 points, over half a cent per pound,

8   multiplied out over 700 million pounds comes up to a very big

9   number.

10  Q.  Okay.  Now I'd like to focus on the 2012 and 2013 contract

11  prices.  Do you see Pilgrim's went up .0025 in contract price?

12  A.  Yes.

13  Q.  Some of the suppliers went down in contract price, did they

14  not?

15  A.  Yes.

16  Q.  So is it accurate to say that going from the 2012 contract

17  price to the contract price 2013, some suppliers increased

18  their contract price and other suppliers decreased their

19  contract price?

20  A.  Yes.

21          MR. FELDBERG:  Could we call up, please, initially not

22  for the jury, J-237.

23          Mr. Ledford, this is at tab 35 of your binder.

24          And, Mr. Fronzaglia, could you please just show us

25  through 2014.  Thank you.

Michael Ledford - Cross

1          Your Honor, I believe the Court has ruled that this

2    could be admitted, and at this point, we would seek to admit

3    and publish the exhibit through 2014.

4          THE COURT:  What is being displayed now?

5          MR. FELDBERG:  Yes.

6          THE COURT:  Any objection -- do you anticipate adding

7    additional information?

8          MR. FELDBERG:  With a subsequent witness, Your Honor.

9          THE COURT:  You're asking it be admitted for

10   demonstrative purposes?

11         MR. FELDBERG:  I guess that's fair at this point.

12         THE COURT:  Otherwise, we'd have to create new

13   exhibits with each --

14         MR. FELDBERG:  That's a better idea.  I'll ask to have

15   it admitted for demonstrative purposes and shown to the jury.

16         THE COURT:  Okay.  Any objection to the display of

17   what is being shown on the screens as J-237, showing data

18   between 2012 and 2014 for demonstrative purposes only?

19         MR. TORZILLI:  No objection.

20         THE COURT:  All right.  It may be so displayed.

21   BY MR. FELDBERG:

22   Q.  Mr. Ledford, does J-237 accurately reflect the weekly

23   commitment of volume from RSCS to Pilgrim's for the contract

24   years 2012, 2013, and 2014?

25   A.  It appears to, yes.

Michael Ledford - Cross

1    *Q.*  And did RSCS's commitment to Pilgrim's of volume go up or

2    go down in those years?

3    *A.*  It went down.

4    *Q.*  And what were the reasons for that?

5    *A.*  There was at least two reasons.  One would have been during

6    this time period, KFC was closing a couple of hundred

7    restaurants a year, so our volume, especially on chicken on the

8    bone, was declining, and so we had less to offer out each year.

9    And then in these particular years, Pilgrim's seemed to be on

10   the higher side of our pricing.

11   *Q.*  And you took volume away from the higher-priced suppliers

12   and gave it to the lower-priced suppliers, correct?

13   *A.*  That's correct.

14   *Q.*  That was your decision to make, correct?

15   *A.*  Yes.

16   *Q.*  Let's call up, please, Exhibit D-509, which is at tab 17 of

17   your binder.

18           And, Mr. Ledford, the middle portion of this document,

19   which is an email -- well, do you recognize what is on -- what

20   is being displayed on the screen?

21   *A.*  Yes, I do.

22   *Q.*  What is it?

23   *A.*  I'm providing feedback to Mr. Austin on the price of

24   Pilgrim's product.

25   *Q.*  And this is an email from you to Mr. Austin?

Michael Ledford - Cross

1    A.  Yes.

2    Q.  Is this an example of the sort of feedback you would give

3    with respect to pricing and volume?

4    A.  Yes.

5            MR. TORZILLI:  Objection.  It's not in evidence.

6            MR. FELDBERG:  I was about to offer it, Your Honor.

7    Maybe I should have asked the questions in a different order.

8    We offer Exhibit D-509 as displayed on the screen.

9            THE COURT:  Any objection to D-509 as redacted?

10           MR. TORZILLI:  May I consult for a moment?

11           THE COURT:  Yes, you may.

12           MR. TORZILLI:  No objection.

13           THE COURT:  D-509 will be admitted.

14           (Exhibit D-509 admitted.)

15   BY MR. FELDBERG:

16   Q.  Mr. Ledford, is the portion of D-509 --

17           MR. FELDBERG:  May we publish?  Thank you.

18           THE COURT:  You may.

19   BY MR. FELDBERG:

20   Q.  Mr. Ledford, is D-509 an example of the sort of feedback

21   you would give from time to time to Mr. Austin with respect to

22   prices and volume?

23   A.  Yes.

24   Q.  We would definitely have to move volume at current pricing,

25   do you see that?

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  Is that something -- words to that effect that you said to

3    him from time to time over the course of your business

4    relationship?

5    *A.*  Yes.

6    *Q.*  When you were at RSCS, Mr. Ledford, did RSCS determine

7    which suppliers were invited to bid?

8    *A.*  Yes.

9    *Q.*  And did RSCS determine what the bids had to contain?

10   *A.*  Yes.

11   *Q.*  Did RSCS determine when the bids had to be submitted?

12   *A.*  Yes.

13   *Q.*  And did RSCS determine which distribution centers the

14   product was shipped to?

15   *A.*  Yes, we did.

16   *Q.*  And when did the suppliers find out which distribution

17   centers they were assigned to?

18   *A.*  At the very end, when we were awarded the business.

19   *Q.*  Would it be fair to say that until the very end when you

20   were awarded the business, the suppliers couldn't know what

21   their freight costs would be?

22   *A.*  Well, they turned in freight cost to every distribution

23   center at round 1, so they knew that, but they wouldn't know

24   exactly which one of those freight costs they were going to be

25   shipping until they were awarded.

Michael Ledford - Cross

1  Q.  Because if the distribution center was 500 miles away from

2  the plant, the freight cost would be different than if it were

3  100 miles; correct?

4  A.  Correct.

5  Q.  Now, we talked a little bit -- well, you talked a little

6  bit during Mr. Beller's examination about a PowerPoint you

7  prepared at the end of 2012 summarizing the results of the 2012

8  negotiations for the 2013 contract.  I'm not going to go over

9  that, again, but there is one point I'd like to bring out.

10       MR. FELDBERG:  Could we please bring up F-808?

11  BY MR. FELDBERG:

12  Q.  And turn to page 11, Mr. Ledford, that is at tab 31 of your

13  binder, and I'm interested in page 11.

14       It's a very busy chart, Mr. Ledford, but could you

15  summarize what it is, please?

16  A.  It's a summary --

17       THE COURT:  Do you want that displayed, Mr. Feldberg?

18       MR. FELDBERG:  I apologize, yes, I would.

19       THE COURT:  You may.

20       THE WITNESS:  It is a summary of all of the

21  chicken-on-the-bone products and the pricing that we landed at

22  and compared to how much it changed from the year before, and

23  then there is some footnotes at the bottom that call out some

24  successes in the negotiation.

25  BY MR. FELDBERG:

Michael Ledford - Cross

1   *Q.* Were the prices for eight-piece among the eight listed

2   suppliers the same or different?

3   *A.* Different.

4   *Q.* How about dark-meat formula?

5   *A.* The formula was the same for some.

6   *Q.* For some, and was it different for others?

7   *A.* Yes.

8   *Q.* I'd like to call your attention to the negotiations for

9   the -- in the fall of 2012 for the 2013 contract.

10        *MR. FELDBERG:* Could we call up, please, Defense

11   Exhibit 530 and 5 -- well, 530, first, that's at tab 18.

12   D-530.

13   *BY MR. FELDBERG:*

14   *Q.* Mr. Ledford, I'm just showing this to you to give an

15   indication of the date of the next document I'm going to show

16   you.  Do you see the date on this document?

17   *A.* Yes.

18   *Q.* What's the date?

19   *A.* November the 13th, 2012.

20   *Q.* Let's call up, please, D-531.  Do you recognize D-531, sir?

21   It might be easier to look at it in the binder.  It's tab 19.

22   It's multiple pages.

23   *A.* It's the chicken-on-the-bone cost-plus model for Pilgrim's.

24   *Q.* And was this Pilgrim's second-round bid in the fall of 2012

25   for the 2013 contract?

Michael Ledford - Cross

1    A.  Yes.

2            MR. FELDBERG:  We would offer D-531 into evidence,

3    Your Honor.

4            THE COURT:  It's been admitted already.

5            MR. FELDBERG:  Thank you.

6            May I publish it?

7            THE COURT:  You may.

8    BY MR. FELDBERG:

9    Q.  Mr. Ledford, what was Pilgrim's second-round bid for

10   eight-piece?

11   A.  9788.

12   Q.  Did you accept that bid?

13   A.  No, I did not.

14   Q.  Did you give feedback on that bid?

15   A.  Yes.

16           MR. FELDBERG:  Could we call up, please, Exhibit

17   E-799, which is at tab 27 of your binder.

18   BY MR. FELDBERG:

19   Q.  Do you recognize E-799 as displayed?

20   A.  Yes.

21   Q.  We offer -- what is E-799, sir?

22   A.  I'm giving Roger Austin some feedback on his bid

23   submission.

24   Q.  And I asked in a prior question about bids in 2012 for the

25   2013 contract.  Let me correct that.  This is a negotiation in

Michael Ledford – Cross

1  the fall of 2013 for the 2014 contract, correct?

2  A.  Correct.

3         MR. FELDBERG:  We offer E-799 as displayed, Your

4  Honor.

5         THE COURT:  Any objection to the admission of E-799 as

6  redacted?

7         MR. TORZILLI:  May I inquire whether it's a

8  multiple-page document?

9         MR. FELDBERG:  It is not, at least as far as I know.

10         MR. TORZILLI:  Then no objection to the admission of

11  the exhibit.

12         THE COURT:  E-799 will be admitted as redacted.

13         (Exhibit E-799 admitted.)

14  BY MR. FELDBERG:

15  Q.  Mr. Ledford, the first --

16         MR. FELDBERG:  May we publish, Your Honor?

17         THE COURT:  You may.

18  BY MR. FELDBERG:

19  Q.  The first word in the text is "purple," do you see that?

20  A.  Yes.

21  Q.  We've had some testimony about what purple means, but we've

22  been away for a week.  What does purple mean?

23  A.  Purple is synonymous with the fried eight-piece chicken on

24  the bone.  It was the color of the label.  The eight-piece

25  chicken was the purple label product.  So sometimes we refer to

Michael Ledford - Cross

1    that -- instead of saying fried eight-piece, you just call it

2    purple.  Orange label was the grilled product.

3    Q.  And you wrote to Mr. Austin, did you not, on November 19,

4    2013, Purple, if you went down 1.5 cents, you'd still be higher

5    than average but not in a different ballpark like now, correct?

6    A.  Correct.

7    Q.  Would it be fair to say that you were telling Mr. Austin

8    where Pilgrim's needed to be --

9    A.  Yes.

10   Q.  -- on eight-piece?

11   A.  Yes.

12   Q.  Did Pilgrim's do what you asked?

13   A.  I don't recall specifically if they came down a penny and a

14   half.

15   Q.  Did they submit another bid?

16   A.  Yes, they did.

17        MR. FELDBERG:  Could we call up, please, Government

18   Exhibit 1736, which is at tab 13 of your binder.

19   BY MR. FELDBERG:

20   Q.  And does that give you an indication, Mr. Ledford, of when

21   Pilgrim's submitted its next bid?

22   A.  Yes, on the 20th of November.

23        MR. FELDBERG:  Could we call up, please, Exhibit 1737,

24   which is at tab 14.

25        We would offer 1737, Your Honor.

Michael Ledford - Cross

1    *THE COURT:* Any objection to the admission of

2    Exhibit 1737?

3    *MR. TORZILLI:* No objection, Your Honor.

4    *THE COURT:* Exhibit 1737 will be admitted, and may be

5    published.

6    (Exhibit 1737 admitted.)

7    *BY MR. FELDBERG:*

8    *Q.* And what was Pilgrim's next-round bid on eight-piece?

9    *A.* 9250.

10   *Q.* Was that a reduction from their prior bid?

11   *A.* Yes, it was.

12   *Q.* Did they do what you asked?

13   *A.* Yes, it appears that way.

14   *Q.* And was the result acceptable to you?

15   *A.* Yes.

16   *Q.* Now, Mr. Beller asked you a little bit about a

17   consultant-driven request to the suppliers to produce a 2.4 --

18   2-pound 4-ounce bird, correct?

19   *A.* Yes.

20   *Q.* And he showed you your email to Claxton essentially

21   asking about that, correct?

22   *A.* Correct.

23   *Q.* Did you send a similar email to all of the other

24   suppliers, including Pilgrim's?

25   *A.* Yes, I did.

Michael Ledford - Cross

1          *MR. FELDBERG:*  Could we call up, please, Exhibit

2     D-845 -- I'm sorry, D-844, which is at tab 24 of your binder.

3     And could we just display for the moment the emails from

4     Mr. Ledford to Mr. Austin.

5          Actually, could we take that down for a moment, Brian,

6     and could we call up, please, Exhibit F-508.

7     *BY MR. FELDBERG:*

8     *Q.*  Mr. Ledford, that's at tab 28 of your binder.

9          *MR. FELDBERG:*  Could we show just the portion of the

10    document that is from Mr. Ledford.  It's one page.

11         Do we have a physical copy?

12    *BY MR. FELDBERG:*

13    *Q.*  Mr. Ledford, do you see F-508?

14    *A.*  I'm looking at F-058.

15    *Q.*  058.  Sorry, I misspoke.

16    *A.*  Yes.

17    *Q.*  And your email on the bottom half of that page, what's

18    the date of it?

19    *A.*  February 26 of 2013.

20    *Q.*  Is that an email you sent to Mr. Austin?

21    *A.*  Yes, it is.

22    *Q.*  Is that about a week before you sent the email to Claxton

23    and all the other suppliers?

24    *A.*  Yes.

25    *Q.*  Why did you send this -- and is this about the request for

Michael Ledford - Cross

1    the reduced-weight bird?

2    *A.*  That's one -- there is a couple of -- two or three

3    questions in there about a reduced weight, actually, some of

4    the others are about an increased weight.

5    *Q.*  At least one of the questions is about reduced weight,

6    correct?

7    *A.*  Yes.

8    *Q.*  Okay.  And why is it that you sent Mr. Austin of Pilgrim's

9    an email asking about reduced weight on February 26, a week

10   before you sent the email to everybody else?

11        *MR. TORZILLI:*  Objection.  The witness is being asked

12   about a document that's not in evidence.

13        *THE COURT:*  Overruled.

14        *THE WITNESS:*  I asked Mr. Austin first because at this

15   point I was still trying to contain this, to not having to ask

16   everybody, I was asking my largest supplier, because at

17   40 percent of our volume share, their answer, quite frankly,

18   matters more than everybody else's when it comes to something

19   like volume.  And so this was the first way I was trying to

20   skin the cat, so to speak, by just asking Pilgrim's to respond.

21   When that did not get me to where I needed to be internally, I

22   opened it up for everybody to respond.

23   *BY MR. FELDBERG:*

24   *Q.*  And when you say it didn't get you where you needed to be

25   internally, it didn't take the pressure off of you from the

Michael Ledford - Cross

 1    consultants?

 2    A.  Well, yeah, I knew the answer to this question already.

 3    That's what I mean by didn't get me -- didn't take the pressure

 4    off.  They still kept asking.

 5          MR. FELDBERG:  We would offer F-058 into evidence,

 6    Your Honor, just the portion that's displayed presently.

 7          THE COURT:  Any objection to the admission of F-058 as

 8    redacted?

 9          MR. TORZILLI:  May I ask to see the display of the

10    entire page?

11          THE COURT:  Yes.

12          MR. FELDBERG:  Let's redact out the top portion.

13          MR. TORZILLI:  With those redactions, no objection,

14    Your Honor.

15          THE COURT:  All right.  F-058 as redacted will be

16    admitted.

17          (Exhibit F-058 admitted.)

18          THE COURT:  And may be displayed.

19          MR. FELDBERG:  Thank you.

20    BY MR. FELDBERG:

21    Q.  And could you read question No. 2 to the jury, please,

22    Mr. Ledford.

23    A.  How much in a 2-pound 4-ounce size?

24    Q.  That's the request for a reduced-weight bird, correct?

25    A.  Yes.

Michael Ledford - Cross

1    *Q.*  Did Mr. Austin respond?

2    *A.*  Yes, he did.

3    *Q.*  Let's take a look at Exhibit D-845, which is at tab 24 of

4    your binder.  What did he say?

5    *A.*  None.

6    *Q.*  When did he say it?

7    *A.*  February 27.

8    *Q.*  Was that seven days before you even asked the other

9    suppliers?

10   *A.*  I believe that's right, yes.

11   *Q.*  So would it be fair to say that Pilgrim's told you on

12   February 27, a week before you asked the other suppliers, that

13   it had no availability of birds in the 2-pound 4-ounce size?

14   *A.*  That's correct.

15   *Q.*  Mr. Beller asked you a couple of questions about NAE, no

16   antibiotics ever or formerly known as not ever or --

17   *A.*  Never ever.

18   *Q.*  Never ever.  Did any of the Chick-fil-A suppliers produce

19   antibiotic-free chicken to CFA in 2014?

20   *A.*  No.

21   *Q.*  Do you recall when Pilgrim's first converted a plant to NAE

22   for CFA?

23   *A.*  They were in the -- their first plant was in the second

24   wave, so we did Perdue first, Tyson did a plant second, and

25   then Pilgrim's was the next one.  I'm not sure if that was at

Michael Ledford – Cross

1    the end of '15 or the beginning of '16.

2    Q.  But it certainly wasn't in 2014 --

3    A.  No.

4    Q.  -- in connection with the 2015 contract?

5    A.  No, it was not.

6         MR. FELDBERG:  May I confer for a moment, Your Honor?

7         THE COURT:  Yes.

8         MR. FELDBERG:  Thank you, Your Honor.

9         Thank you, Mr. Ledford.  Nothing further.

10        THE COURT:  Thank you.

11        Additional cross-examination?

12        May Mr. Ledford be excused?

13        MR. TORZILLI:  I have a few questions.

14        THE COURT:  Yeah, go ahead.

15                    **CROSS-EXAMINATION**

16   BY MR. TORZILLI:

17   Q.  Good afternoon, Mr. Ledford.  How are you, sir?

18   A.  Good.  How are you?

19   Q.  Good.

20        I have some questions following up on some of the

21   discussion you have been having with defense counsel today.

22   So, first, I'd like to just confirm that it was you who were in

23   charge of the bidding and negotiations for KFC's

24   chicken-on-the-bone products that occurred in the fall of 2012

25   and then 2013; right?

Michael Ledford - Cross

1    A.  Yes.

2    Q.  And you had an -- I think you said you had a staff or you

3    called it a team that worked under you; right?

4    A.  Yes.

5    Q.  Mr. Oechsli?

6    A.  Yes.

7    Q.  Mr. Campisano?

8    A.  Yes.

9    Q.  Ms. Mary Hester?

10   A.  Yes.

11   Q.  And I think you said Ms. Carol Knight, correct?

12   A.  Correct.

13   Q.  And you were in charge of them and the process; right?

14   A.  Correct.

15   Q.  In 2012, Mr. Ledford, you considered all of the

16   chicken-on-the-bone suppliers that were serving KFC at that

17   time to be competitors for KFC's business; right?

18   A.  Yes.

19   Q.  So that would include Pilgrim's; right?

20   A.  Yes.

21   Q.  And Claxton?

22   A.  Yes.

23   Q.  And even Marshall Durbin; right?

24   A.  Yes.

25   Q.  And did -- Marshall Durbin was subsequently acquired;

Michael Ledford - Cross

1    right?

2    *A.*   Yes.

3    *Q.*   They were acquired by Mar-Jac; right?

4    *A.*   Mar-Jac, yes.

5    *Q.*   And for Pilgrim's, it was Defendant Roger Austin who was

6    the lead negotiator for Pilgrim's in 2012, correct?

7    *A.*   Yes.

8    *Q.*   And 2013?

9    *A.*   Yes.

10   *Q.*   And Defendant Scott Brady and Defendant Mikell Fries who

11   were the persons from Claxton that were the lead negotiators?

12   *A.*   Yes.

13   *Q.*   In 2012?

14   *A.*   Yes.

15   *Q.*   And 2013; right?

16   *A.*   Yes.

17   *Q.*   And Pilgrim's and Claxton and the other suppliers were

18   competing with each other to provide volume of

19   chicken-on-the-bone products to KFC restaurants; right?

20   *A.*   Yes.

21   *Q.*   And they were also competing with each other on the basis

22   of price, correct?

23   *A.*   Correct.

24   *Q.*   And I think you said your goal was to get the best price

25   from the competitors in those two bidding processes you were in

Michael Ledford - Cross

1  charge of, correct?

2  *A.*  Yes.

3  *Q.*  By best price, you meant what was sustainable price; right?

4  *A.*  Correct.

5  *Q.*  And price competition was important to KFC especially in

6  2012, but both in 2012 and 2013; right?

7  *A.*  Yes.

8  *Q.*  And it was especially important in 2012, because at the

9  time, KFC was closing a lot of restaurants?

10  *A.*  Correct.

11  *Q.*  And the restaurant margins were slimmer, maybe, or even

12  negative?

13  *A.*  Yes.

14  *Q.*  You were looking to stop the bleeding; is that correct?

15  *A.*  Correct.

16  *Q.*  So you set up a competitive bidding process that you used

17  in 2012 with the competing chicken suppliers; right?

18  *A.*  Yes.

19  *Q.*  You used basically the same process in 2013?

20  *A.*  Yes, that's correct.

21  *Q.*  And the purpose in part was to get the best price; right?

22  *A.*  Yes.

23  *Q.*  Okay.

24       *MR. TORZILLI:*  If we could look at -- if we could call

25  up Government Exhibit 9710, just for the parties, witness, and

Michael Ledford - Cross

1    the Court.

2            May I approach, Your Honor, with the paper copy?

3            THE COURT:  Yes, you may.

4            MR. TORZILLI:  Thank you.

5    BY MR. TORZILLI:

6    Q.  Mr. Ledford, have you had an opportunity to review

7    Government Exhibit 9710?

8    A.  Yes.

9    Q.  Do you recognize it?

10   A.  Yes, I do.

11   Q.  Okay.

12           MR. TORZILLI:  Your Honor, I believe 9710 has been

13   received into evidence?

14           THE COURT:  It has.

15           MR. TORZILLI:  Permission to publish to the jury 9710,

16   please.

17           THE COURT:  You may.

18           MR. TORZILLI:  Ms. Pearce, if we could focus on the

19   top portion of 9710.

20           Wonderful.

21   BY MR. TORZILLI:

22   Q.  So, Mr. Ledford, this is an email signed by you and others

23   on your staff, correct?

24   A.  Yes.

25   Q.  Now, it was sent from an email address that has a domain

Michael Ledford – Cross

1    CombineNet.com.  Do you see that?

2    A.   Yes.

3    Q.   Okay.  Now I think you explained a little bit what

4    CombineNet.com was this morning, but could you remind the jury

5    what the CombineNet system was, please?

6    A.   It was our software we used to conduct our RFPs.  Said

7    another way, our annual negotiation process with the chicken

8    suppliers.

9    Q.   Was it the platform you used for the bidding and

10   negotiation process in 2012?

11   A.   Yes.

12   Q.   Did you wind up using that same CombineNet platform in

13   2013, as well?

14   A.   Yes.

15   Q.   This is a message that says in the "to" field, it has the

16   name Roger Austin at Pilgrims.com; right?

17   A.   Yes.

18   Q.   It was sent to him, correct?

19   A.   Correct.

20   Q.   It was also sent to all of the other competing chicken

21   suppliers, correct?

22   A.   Yes.

23   Q.   So it would have been sent to, say, Claxton as well, right?

24   A.   Yes.

25   Q.   Okay.  Now, the CombineNet system, as we see here, it was

Michael Ledford - Cross

1    used to send messages to suppliers, correct?

2    A.   Yes.

3    Q.   And it was also used for customers to submit bids, as well,

4    right?

5    A.   That's correct.

6    Q.   And in the CombineNet system, Mr. Ledford, is it true that

7    each of the suppliers had their own credentials, like their own

8    user name?

9    A.   Yes.

10   Q.   And their own password?

11   A.   Yes.

12   Q.   And those were all unique credentials?

13   A.   Yes.

14   Q.   And that was so each competitor could only see their

15   information and no one else's; right?

16   A.   That's correct.

17   Q.   That was to keep the information confidential?

18   A.   Correct.

19   Q.   So only you and your staff had access to information about

20   all of the competitors; right?

21   A.   That's correct.

22   Q.   And that each competitor had information only about

23   themselves; right?

24   A.   Yes.

25   Q.   And, Mr. Ledford, it was important to the competitive

Michael Ledford - Cross

1    bidding process that the information stay confidential as you

2    intended it; right?

3    *A.*   Yes.

4    *Q.*   And information not be shared between competitors unless

5    you and your staff did so in the feedback process; right?

6    *A.*   Correct.

7    *Q.*   Now, the CombineNet system was part of a -- is it fair to

8    say part of a closed-bidding system?

9    *A.*   Yes.

10   *Q.*   Could you explain to the jury what a closed-bidding system

11   is, please?

12   *A.*   A closed-bidding system is just what Mr. Torzilli walked

13   through, it's closed where nobody else can see anybody else's

14   information, they can only see their own, as opposed to open,

15   like, auction-type system where everybody can see everybody's

16   system.

17   *Q.*   Is a blind-bidding system, would that be another word for a

18   closed-bidding system?

19   *A.*   Yes, it would.

20   *Q.*   Okay.  Let's go back to focusing in on Government

21   Exhibit 9710.  And in the first sentence there, Mr. Ledford,

22   the email says, In UFPC's -- and that's just another name --

23   I think you mentioned this morning, that's just another name

24   for RSCS, correct?

25   *A.*   Yes.

Michael Ledford - Cross

1    *Q.*  KFC's purchasing cooperative, correct?

2    *A.*  Yes.

3    *Q.*  In their continuing efforts to ensure uninterrupted

4    supply -- I want to ask you, what does that mean to ensure

5    uninterrupted supply?

6    *A.*  The easiest way to explain that would be to make sure our

7    restaurants get the chicken they need every day without

8    disruption.

9    *Q.*  One of the most important things for you running the bid

10   process, to put something in place that enables that; right?

11   *A.*  Yes.

12   *Q.*  And then further along in your sentence here it says, At

13   the lowest sustainable price; right?

14   *A.*  Correct.

15   *Q.*  And that was your other chief objective in the bidding

16   process, to try to get the lowest sustainable price from these

17   competitors; right?

18   *A.*  Yes.

19   *Q.*  And another way to think of that I think you said, get the

20   best price?

21   *A.*  Right.

22   *Q.*  Okay.  By "sustainable," you wanted the suppliers to have

23   an -- some sort of margin that would keep them going, I think

24   you said; right?

25   *A.*  Yes.

1642

Michael Ledford - Cross

1    Q.  So you didn't want the prices to be so low to jeopardize

2    their business, and so forth?

3    A.  That's correct.

4    Q.  And I think you mentioned that around this time there were

5    some bankruptcies you were aware of in the industry?

6    A.  Yes.

7    Q.  And now just to be clear, you did not work at any of those

8    companies at the time of those bankruptcies occurring; right?

9    A.  No, I did not.

10   Q.  Okay.  So you don't have personal knowledge of what

11   actually caused any of those companies to go bankrupt; right?

12   A.  I'm very aware of what made Pilgrim's go bankrupt, from

13   working for the company they bought that put them in the

14   bankruptcy.

15   Q.  You were working at Pilgrim's --

16   A.  I worked at Gold Kist when they bought -- when Pilgrim's

17   bought Gold Kist.

18   Q.  What caused Pilgrim's to go bankrupt?

19   A.  They were overleveraged.  They had purchased Gold Kist,

20   they had financed it, then the grain market skyrocketed in '08

21   and '09.  They were overleveraged and went bankrupt.

22   Q.  Can you explain to the jury -- you used the word

23   "overleveraged" a couple of times in your previous answer, if

24   you could explain what that means.

25   A.  They had a lot of debt.  If a person has too much credit

Michael Ledford - Cross

1     card debt, there is massive inflation, just like a person can

2     go bankrupt, the same things happened with the company.

3     Pilgrim's had way too much debt on their books.  When prices

4     got really high for grain, they couldn't afford to pay for the

5     grain they needed to pay for their chickens, which forced them

6     into bankruptcy.

7     Q.  So it was not directly related to the price of selling

8     chicken to customers like KFC or Popeyes, et cetera, right?

9     A.  It wasn't directly, but they're definitely interrelated.

10    If the markets had kept pace with the grain market inflation,

11    perhaps it wouldn't have happened.

12    Q.  You were asked on direct examination this morning about a

13    couple of sources that I want to spend a moment with you on.

14    One is Urner-Barry, and the other is Express Markets.  And

15    Urner-Barry goes by the letters UB sometimes?

16    A.  Yes.

17    Q.  Express Market is EM or EMI?

18    A.  EMI.

19    Q.  Okay.  And those are sources of information that you relied

20    on in your work at RSCS or KFC --

21    A.  We would refer to them as benchmark.

22    Q.  Benchmark.  Just to be clear, they are not -- the prices

23    reported in there are not replacements for the bidding and

24    negotiation process we're talking about that you were in charge

25    of; right?

Michael Ledford - Cross

1    A.  That's right.

2         MR. TORZILLI:  Okay.  Now, if we can look at 9710 one

3    more time.

4         Permission to publish again, please?

5         THE COURT:  You may.

6    BY MR. TORZILLI:

7    Q.  Did you and your staff set a deadline for a response?

8    A.  Yes, we did.

9    Q.  And what was the date of the deadline for the response that

10   you set?

11   A.  October 10, 2012.

12   Q.  And what were you expecting to receive back from the

13   recipients of this message on or about October 10, 2012?

14   A.  Since this was round 1, we would have been receiving their

15   freight and FOB cost and volumes for each of the products that

16   they supplied the Yum brand system.

17   Q.  Including an -- you talked a lot about the margin over feed

18   or a cost-plus model.  You also expected them to provide you

19   with a draft of that?

20   A.  Yes.

21   Q.  You talked a lot about rounds of bids.  Is this the

22   first-round bid?

23   A.  Yes.

24   Q.  The deadline for the first-round bid was October 10, 2012?

25   A.  That's correct.

Michael Ledford - Cross

1    Q.   Okay.  Now, you also talked about RFI, I think, that was

2    request for information?

3    A.   Correct.

4    Q.   Okay.

5            MR. TORZILLI:  So, Ms. Pearce, if you could call up

6    Government Exhibit 50, please.

7            Your Honor, it has been received into evidence.

8            THE COURT:  You may publish it.

9            MR. TORZILLI:  Thank you, Your Honor.

10           Ms. Pearce, if you could zoom in on the very first

11   entry on the first page of Government Exhibit 50.

12   BY MR. TORZILLI:

13   Q.   Do you see that on your screen, Mr. Ledford?

14   A.   Yes.

15   Q.   So this is an excerpt of a message that you sent to

16   suppliers; right?

17   A.   Yes.

18   Q.   And this was in September of 2012; right?

19   A.   Correct.

20   Q.   And it says up on the subject of the excerpt, it says, 2012

21   UFPC RFI questions.  Do you see that?

22   A.   Yes.

23   Q.   RFI stands for request for information?

24   A.   Yes.

25   Q.   That was you sending to the suppliers a set of questions

Michael Ledford - Cross

1   that you wanted them to answer?

2   A.   Yes.

3   Q.   Could you remind the jury what the purpose of providing

4   those questions to the suppliers and getting those answers back

5   are for your purposes?

6   A.   Yes, generally speaking, this was to see if we could find

7   any cost-saving initiatives or any way we could offer a

8   different product or spec changes or what have you to drive

9   some cost savings in the system for the upcoming year,

10  ultimately, that fed into our ultimate strategy in the RFP.

11  Q.   You set a deadline you wanted the information back to you

12  as well, correct?

13  A.   Yes.

14  Q.   And that was Friday, October 10 of 2012; right?

15  A.   Correct.

16  Q.   So the same date that you wanted the first-round bid

17  information back, as well, right?

18  A.   Yes.

19  Q.   Okay.  Now, if we could focus on the next set of entries in

20  Government Exhibit-- actually, the set of entries associated

21  with October 8 and 9 of 2012.  I want to ask you about some of

22  the words that appear here.

23       MR. TORZILLI:  Thank you, Ms. Pearce.

24  BY MR. TORZILLI:

25  Q.   So first, you see a set of entries that has over on the

Michael Ledford - Cross

1   left-hand column Monday, 10/8/2012; right?

2   A.   Yes.

3   Q.   October is the tenth month of the year?

4   A.   Yes.

5   Q.   For 2012; right?

6   A.   Yes.

7   Q.   October 8 of 2012 was two days before the first-round bids

8   were due; right?

9   A.   Yes.

10  Q.   And the response to the RFI was due; right?

11  A.   Yes.

12  Q.   All right.  Beneath that is a date that says Tuesday,

13  10/9/2012; right?

14  A.   Yes.

15  Q.   And October is the tenth month of the year; right?

16  A.   Yes.

17  Q.   October 9 of 2012 was one day before the first-round bids

18  were due; right?

19  A.   Correct.

20  Q.   One day before the RFI was due; right?

21  A.   Yes.

22  Q.   Mr. Ledford, if you could look at the top --

23  A.   Yes.

24  Q.   -- entry being displayed on your screen, associated with

25  10:15 a.m. ET --

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  There is a telephone icon?

3    *A.*  Yes.

4    *Q.*  Immediately to the right of that are the words Bill Kantola

5    and Roger Austin.  Do you see that?

6    *A.*  Yes.

7    *Q.*  You know who Bill Kantola is?

8    *A.*  Yes.

9    *Q.*  He works for a chicken supplier?

10   *A.*  Yes.

11   *Q.*  He works for Koch Foods?

12   *A.*  Yes.

13   *Q.*  He worked for Koch Foods in October of 2012?

14   *A.*  Yes.

15   *Q.*  And Koch Foods was a chicken-on-the-bone supplier to KFC?

16   *A.*  Yes.

17   *Q.*  And a competitor in the bidding and negotiations you were

18   in charge of?

19   *A.*  Yes.

20   *Q.*  So a competitor of Pilgrim's?

21   *A.*  Yes.

22   *Q.*  A competitor of Claxton?

23   *A.*  Yes.

24   *Q.*  And Mr. Kantola was in charge of the bidding and

25   negotiation for Koch at that time?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And Koch -- I don't know if I asked you this, but Koch is

3    owned by Joe Grendys?

4    A.   Yes.

5    Q.   Joe Grendys owned Koch even in October of 2012; correct?

6    A.   Yes.

7    Q.   I'd like to ask you about a name that appears on the fourth

8    line down, so an entry associated with 2:16 p.m. ET, then there

9    is a telephone.  Do you see that?

10   A.   Yes.

11   Q.   Then there is the name Jimmie Little.  Do you see that?

12   A.   Yes.

13   Q.   You know who Jimmie Little is; right?

14   A.   Yes, I do.

15   Q.   He worked at Pilgrim's at the time; right?

16   A.   Yes.

17   Q.   And he worked in the sales department of Pilgrim's; right?

18   A.   Yes.

19   Q.   And he worked on fast-food restaurant customers; right?

20   A.   Yes.

21   Q.   Did he work on the KFC counter at all, do you know?

22   A.   No -- not much, if any.

23   Q.   Okay.  But he worked on fast-food restaurant accounts;

24   correct?

25   A.   Yes.

Michael Ledford - Cross

1          MR. TORZILLI:  We can take Government Exhibit 50 down,

2    please.

3    BY MR. TORZILLI:

4    Q.  Now, sir, did you ask either Defendant Roger Austin or

5    Defendant Scott Brady to have any telephone calls with Bill

6    Kantola in the two days leading up to the first-round bids in

7    2012?

8    A.  No.

9    Q.  Did you want them talking about their bids before they were

10   submitted?

11         MR. BELLER:  Objection.  Lacks foundation.

12         THE COURT:  I don't think the question assumes that.

13   I think it was more theoretical.  Overruled.

14   BY MR. TORZILLI:

15   Q.  You can answer --

16         THE COURT:  Mr. Beller, did you have a separate

17   objection?

18         MR. BELLER:  We may want to go on sidebar.

19         THE COURT:  Okay.  We can.

20         (Hearing commenced at the bench.)

21         THE COURT:  Mr. Torzilli, can you hear me?

22         MR. TORZILLI:  Yes, Your Honor.

23         THE COURT:  Mr. Beller, go ahead.

24         MR. BELLER:  Thank you, Your Honor.

25         My objection is also as to relevance but specifically

Michael Ledford – Cross

1   I believe the question that was asked was what this particular

2   witness wanted, and I believe that there is already a written

3   order from the Court regarding the wants, wishes, desires of

4   the individual on the stand is not particularly relevant, which

5   is why in Trial 2, the Government rephrased the same line of

6   questioning to, did you ask them to communicate why or why not,

7   but not specifically what they wanted.  And the relevance of

8   what he wanted and why he wanted it would not be relevant.  I

9   just simply wanted to supplement the record with that

10  additional notation.

11          THE COURT:  Mr. Torzilli, response.

12          MR. TORZILLI:  Sure, Your Honor.  I am happy to

13  rephrase to the, did you ask.  I don't think the question

14  actually would be improper along the lines of what Mr. Beller

15  suggested, given the direct examination here where the witness

16  was asked in detail questions about, you know, price fixing and

17  whatever he knew about agreements to fix prices and so forth.

18  I think I can on cross-examination ask questions related to

19  that topic.  And it's certainly been the Government's view

20  throughout this litigation that the exchange of information

21  done in a way that contravenes the bidding process that someone

22  like Mr. Ledford set up is, in fact, part and parcel of the

23  Section 1 invitation that is being projected here.

24          THE COURT:  I'm going to, No. 1, assume Mr. Beller was

25  supplementing by way of making objection; secondly, I will

Michael Ledford - Cross

 1   sustain it.  If you will rephrase it.  I think the distinction

 2   that was made at the second trial between want -- in other

 3   words, perhaps a witness's subjective desire -- versus the

 4   rules of the bidding process is probably a good one to

 5   maintain.  So I'll sustain it with leave for Mr. Torzilli to

 6   ask a different question.

 7          All right.  Thank you.

 8          (Hearing continued in open court.)

 9          THE COURT:  Objection will be sustained.

10          Go ahead, Mr. Torzilli.

11          MR. TORZILLI:  Thank you, Your Honor.

12   BY MR. TORZILLI:

13   Q.  Mr. Ledford, I want to ask you a different question.  And

14   that is, in the two days leading up to the deadline that you

15   had imposed on the competitors on the chicken suppliers, the

16   two days leading up to that deadline for the first-round bids,

17   did you ask Defendant Brady or Defendant Austin to be in

18   communication on the phone with themselves or Mr. Bill Kantola?

19   A.  No, I did not.

20   Q.  Did any of them ever tell you that they were in telephone

21   communication with each other during the two days leading up to

22   the deadline for the first-round bid?

23   A.  No, they did not.

24   Q.  Okay.  Now, you, Mr. Ledford, talked about multiple rounds

25   of bidding; right?  You talked about that on direct exam;

Michael Ledford - Cross

1  right?

2  *A.*  Yes.

3  *Q.*  And the -- a purpose of multiple rounds of bidding was to

4  get the best price or lowest sustainable price, correct?

5  *A.*  Correct.

6  *Q.*  And the number of rounds might vary by year depending on

7  the circumstances; right?

8  *A.*  Correct.

9  *Q.*  I think you talked about in 2013, maybe you had an extra

10  round that you typically didn't have; right?

11  *A.*  Yes.

12  *Q.*  But it was always that there were multiple rounds of

13  bidding each and every year; right?

14  *A.*  Yes.

15  *Q.*  And part of the multiple rounds of bidding process was,

16  after a bid was submitted, you would communicate back to the

17  bidders feedback to each of them?

18  *A.*  Yes.

19  *Q.*  And you did that on a one-on-one setting?

20  *A.*  Correct.

21  *Q.*  For example, if you wanted to give Claxton feedback, you'd

22  either meet, email, or call the Claxton people?

23  *A.*  Right.

24  *Q.*  You didn't have the Pilgrim's people join the

25  communication?

Michael Ledford - Cross

1    *A.*  No.

2    *Q.*  By the same token, you would communicate one-on-one with

the Pilgrim's people and you didn't have the Claxton people in

on the conversation; is that right?

5    *A.*  That's right.

6    *Q.*  Okay.  That's because you wanted to get to the lowest

sustainable price, the best price, correct?

8    *A.*  Correct.

9    *Q.*  And I think you said at some point this morning that less

than -- less than everything is in writing; right?

11   *A.*  Yes.

12   *Q.*  So you would communicate feedback in writing, but you'd

also have telephone calls --

14   *A.*  Correct.

15   *Q.*  -- right?  And you gave the feedback for the purpose of

getting the competitors to in the next round submit lower

prices; right?

18   *A.*  That's right.

19   *Q.*  And you understood, generally speaking, typically, the

bidders were trying to avoid submitting lower prices; right?

21   *A.*  Yes.

22   *Q.*  Or minimize how low they had to go?

23   *A.*  Correct.

24   *Q.*  Because they want to get the -- they want to get the best

price for their product too, right?

Michael Ledford - Cross

 1    A.   Exactly.

 2    Q.   Now, Mr. Ledford, when you gave feedback to the suppliers,

 3    you understood that they would keep the feedback to themselves,

 4    within their company; right?

 5    A.   Yes.  That was the expectation.

 6    Q.   And that was your assumption throughout the bidding and

 7    negotiation process; right?

 8    A.   That's correct.

 9    Q.   That they would keep it to themselves?

10    A.   Yes.

11    Q.   Because you understood that -- or it was your plan to

12    negotiate independently with each and every one of these

13    competitors; right?

14    A.   That's right.

15    Q.   And if they did share their feedback with one another, that

16    would undermine the bidding process that you had set up and you

17    were in charge of; right?

18    A.   Yes.

19    Q.   And could thwart your ability to try to get the best price;

20    right?

21    A.   Yes.

22    Q.   The lowest sustainable price, correct?

23    A.   Correct.

24    Q.   So there was a second round of bidding in 2012, correct?

25    A.   Yes.

Michael Ledford – Cross

1          MR. TORZILLI:  Ms. Pearce, if we could call up

2     Government Exhibit 51, please.

3          This has been received into evidence, Your Honor.  So

4     permission to publish it?

5          THE COURT:  You may.

6          MR. TORZILLI:  Thank you.

7          And if we could focus on the second entry.

8     BY MR. TORZILLI:

9     Q.  Mr. Ledford, up on the screen is the first page of

10    Government Exhibit 51, called out is the second entry.  Do you

11    see that?

12    A.  Yes.

13    Q.  And that entry is dated November 12 of 2012, correct?

14    A.  November the 7th.

15    Q.  Thank you.  Definitely need a little stronger prescription

16    next time I go to the ophthalmologist.

17          November 7 of 2012?

18    A.  Correct.

19    Q.  There is an excerpt over on the right-hand side, correct?

20    A.  Yes.

21    Q.  That's an excerpt of an email you and your staff wrote to

22    the competing chicken suppliers; right?

23    A.  Yes.

24    Q.  And the email that is being excerpted here is inviting

25    the competitors to the second round of the chicken-on-the-bone

Michael Ledford - Cross

1    process that was being conducted in 2012; right?

2    A.   That's right.

3    Q.   And you set a deadline for responses; right?

4    A.   November the 14th.

5    Q.   And that was Wednesday, November 14 of 2012; right,

6    Mr. Ledford?

7    A.   Yes.

8    Q.   And the message that is being excerpted here was sent to

9    all of the competitors; right?

10   A.   Yes.

11         MR. TORZILLI:   Now, if we could look at the next set

12   of entries, please, Ms. Pearce.

13   BY MR. TORZILLI:

14   Q.   So these, Mr. Ledford, these entries are associated with

15   Tuesday, November 13, 2012; right?

16   A.   Yes.

17   Q.   That's the date on the left, 11/13/2012 data; right?

18   A.   Yes.

19   Q.   11 -- November is the 11th month of the year; right?

20   A.   Yes, it is.

21   Q.   And then there are three -- there are three rows there or

22   two rows there with telephone symbols?

23   A.   Yes.

24   Q.   And then another symbol, then another telephone symbol;

25   right?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   And in the second row with the telephone symbol, there is

3    the words Ric Blake.  Do you see that?

4    A.   Yes.

5    Q.   And you know Ric Blake; right?

6    A.   Yes, I do.

7    Q.   He at the time worked for George's, correct?

8    A.   Correct.

9    Q.   George's was another competitor of Claxton and Pilgrim's

10   and the other chicken suppliers in the bidding for

11   chicken-on-the-bone sales to KFC at this time; right?

12   A.   Yes.

13   Q.   And he was involved in the bidding and negotiations on

14   behalf of George's; right?

15   A.   Yes.

16   Q.   Let me withdraw that, ask another question.  Even though he

17   may not have been in charge of the bidding and negotiations,

18   was he one of the people involved?

19   A.   Yes.

20   Q.   Okay.  I want to draw your attention to the third entry

21   down, so the one that's associated with 4:22 p.m. ET.

22   A.   Okay.

23   Q.   And you see the first word there is George's?

24   A.   Yes.

25   Q.   Then there are additional number/letter combination of 30

Michael Ledford - Cross

1    back?

2    *A.*   Yes.

3    *Q.*   Do you see that?

4    *A.*   Yes.

5    *Q.*   And then two additional lines down, there is the word

6    "Pilgrim's"?

7    *A.*   Yes.

8    *Q.*   And then the number/word combination of 30 back?

9            *MR. FAGG:*   Objection, Your Honor.

10           (Hearing commenced at the bench.)

11           *MR. FAGG:*   We object to this entire questioning,

12   seeking to do through this exhibit, he's basically asking this

13   witness to interpret a document, he's asking him to read what

14   Mr. Torzilli is -- what the text message says.  This is not a

15   document that Mr. Ledford has ever seen, that he has any kind

16   of context for.  Mr. Torzilli is essentially trying to give a

17   closing argument with a witness on the stand, and it is not a

18   proper means of cross-examination.

19           *THE COURT:*   Mr. Torzilli.

20           *MR. TORZILLI:*   Sure, Your Honor, I don't think I've

21   asked him to interpret anything.  What I've asked him is to

22   look at words and look at names, and then ask him about whether

23   he knows, you know -- for example, whether he knows someone

24   with the name Ric Blake, so I don't think I've asked him to

25   interpret anything, other than perhaps November is the 11th

Michael Ledford - Cross

1    month of the year.  And certainly, I understand I'm asking him

2    to interpret communications that he wasn't an author or

3    recipient of, I understand the objection to that, but I don't

4    think I've come close to that.

5            THE COURT:  Mr. Fagg, anything else?

6            MR. FAGG:  He is asking questions, do you see the line

7    George's 30 back on dark meat, and he says yes.  Token is 30

8    back.  Mr. Torzilli is simply standing up there and reading

9    this exhibit that's already been displayed to the jury, and

10   it's cumulative, and it's not a proper means of cross-examining

11   this witness.

12           THE COURT:  All right.

13           Mr. Torzilli, anything else?

14           MR. TORZILLI:  I don't have anything else.  I don't

15   think it's improper.  Of course, on this direct exam with this

16   very witness and on cross-examination with Government

17   witnesses, those witness have been shown numerous documents

18   that they weren't an author or any ordinary course recipient of

19   and were being asked to interpret or whether they understood

20   subject matter contained therein, so forth.  So this is

21   definitely a lower level of so-called intensity with respect to

22   questioning the witness about the document.  I don't see

23   anything objectionable.

24           THE COURT:  Well, Mr. Torzilli's right, that with

25   witnesses without any personal knowledge in the second trial, I

Michael Ledford - Cross

1    allowed them to be asked about numbers and things.  And that

2    had some -- that had a purpose in those documents.  There was

3    no objection as to their accuracy.  So that was one thing.

4         But, once again, we have witnesses without personal

5    knowledge being asked to extract numbers and confirm numbers,

6    things of that nature.

7         Mr. Beller today entered into a little bit of a gray

8    area because he was showing witnesses without personal

9    knowledge certain documents -- admittedly, maybe just to call

10   out a particular acronym or something of that nature -- but,

11   nonetheless, documents that the witness didn't have any

12   personal knowledge of were shown to the jury, and that was

13   okay.  The exhibits had been admitted.

14        And, of course, now we have a summary exhibit.  The

15   witness doesn't have any personal knowledge of the phone calls.

16   As a matter of fact, he just said he doesn't have any personal

17   knowledge of the calls taking place, but he's being shown them.

18   Once again, we're in this kind of gray area of things that have

19   been admitted and are appropriate for display for the jury

20   being shown to witnesses who don't know about them.

21        I think at some point the line gets crossed.  I think

22   the Government has crossed the line here, because the witness

23   has already said he doesn't know about these things.  Now those

24   things which he didn't know about are being shown to him in the

25   form of an admitted exhibit.  But I think that the rhetorical

1662

Michael Ledford - Cross

1 purposes of displaying this to the jury are for purposes of --

2 argumentative purpose of showing this to the witness who

3 doesn't know about them is -- I think it's just not relevant to

4 the witness's testimony.

5          So, therefore, even though the exhibit has been

6 admitted, I don't think there is relevance to showing him, so

7 I'll sustain the objection on that ground.

8          All right.  Thank you.

9          (Hearing continued in open court.)

10     MR. TORZILLI:  Thank you, Your Honor.  We can take the

11 exhibit down.

12 BY MR. TORZILLI:

13 Q.  Now, Mr. Ledford, let me ask you, to people that you know,

14 do you go by the name Mike?

15 A.  Yes.

16 Q.  People call you Mike?

17 A.  Yes.

18 Q.  And I think you said this morning you have something like

19 25, 26, 27 years of experience in the chicken business?

20 A.  That's right.

21 Q.  A lot of that 25, 26, 27 years of experience is negotiating

22 chicken supply contracts; right?

23 A.  Yes.

24 Q.  Both on the supplier side --

25 A.  Yes.

Michael Ledford – Cross

1   Q.  And now at Chick-fil-A and at KFC, on the purchaser side;

2   right?

3   A.  Correct.

4   Q.  And bluffing would be a type of negotiating tactic one

5   could employ, correct?

6   A.  Correct.

7   Q.  Okay.  Now, by November 13, 2012, you were approaching the

8   deadline -- the November 14 deadline for second-round bids,

9   correct?

10  A.  Yes.

11  Q.  So you were then in a process of providing feedback on the

12  first-round bids to the competing chicken suppliers; right?

13  A.  Yes.

14  Q.  And I think you this morning said basically what you would

15  do is you would tell someone, you know, You were too high, and

16  you need to come down, or the competitive price or going price

17  is -- you need to be lower, something of that nature; is that

18  right?

19  A.  Yes.

20  Q.  Did you ever telling one chicken supplier, Hey, George's

21  dark-meat price is 30 back?  That's not something you would

22  ever say to George's, is it?

23  A.  No.

24  Q.  Tyson, you wouldn't say, Pilgrim's is 31 back --

25  A.  No.

Michael Ledford - Cross

1    *Q.*  -- right?  Something you would never do?

2    *A.*  No.

3    *Q.*  At any point -- there is no point in the 2012 bidding and

4    negotiation process that you ever told, say, Defendant Scott

5    Brady what George's dark-meat bid was; right?

6    *A.*  No, I did not.

7    *Q.*  Or tell him what Pilgrim's dark-meat bid was; right?

8    *A.*  No.

9    *Q.*  Or tell him what Tyson's dark-meat bid price was; right?

10   *A.*  No.

11   *Q.*  All right.  So you had a bidding and negotiation process in

12   2012, you had multiple rounds, and then you ultimately came to

13   contracts with all of the chicken-on-the-bone suppliers; right?

14   *A.*  Yes.

15          *MR. TORZILLI:*  Now, if we can, Ms. Pearce, call up

16   again Exhibit J-261.

17          Your Honor, this has been received into evidence.

18   Permission to publish it, please.

19          *THE COURT:*  You may.

20   *BY MR. TORZILLI:*

21   *Q.*  Okay.  So you looked at this this morning; right?

22   *A.*  Yes.

23   *Q.*  And this shows -- you understand this to show the

24   difference or the one line on the left, the bluish line,

25   purport to be the first-round bids?

Michael Ledford - Cross

1    A.   Yes.

2    Q.   Ones due October 10 of 2012?

3    A.   Yes.

4    Q.   The lighter ones were the contract price which you actually

5    wound up agreeing to with each of these suppliers; right?

6    A.   Correct.

7    Q.   Okay.  Now first, Mr. Ledford, let me ask what I realize

8    might be an obvious question, but, for example -- let's look at

9    Tyson all the way on the right.  Do you see the blue bar

10   associated with Tyson and then the lighter-colored bar

11   associated with Tyson?

12   A.   Yes.

13   Q.   Let me ask you what I realize is an obvious question to

14   you, but Tyson did not reduce their bids by one-half from their

15   opening-round bid to their contract price; right?

16   A.   No.

17   Q.   Even though the bars look like they cut their price in

18   half, they didn't really do that; right?

19   A.   Well, on the left-hand side, the bottom is 95 cents.

20   Q.   Right --

21   A.   If you look at all the information, if you just look at the

22   bar graphs and didn't look at the rest of the sheet.

23   Q.   They went from about 99 cents to about 96 cents; right?

24   A.   Yes.

25   Q.   Didn't go from 99 cents to 49 cents?

Michael Ledford - Cross

1    A.  Right.

2    Q.  The same is true for Pilgrim's, they didn't cut their bid

3    in half; they did come down a few cents, though?

4    A.  Yes.

5    Q.  The similar idea for Case and George's and Koch?

6    A.  Yes.

7    Q.  They all came down, but not necessarily as much as these

8    bars purport that they did; right?

9    A.  Correct.

10        MR. TORZILLI:  Now, if we could call up just for the

11   lawyers, the Court, and the witness side by side J-261 with

12   Government Exhibit 10701, which I will pass out paper copies

13   of.

14        Your Honor, may I approach with paper copies?

15        THE COURT:  Yes, you may.

16   BY MR. TORZILLI:

17   Q.  Mr. Ledford, have you had an opportunity to review what has

18   been marked as Government Exhibit 10701?

19   A.  Yes.

20   Q.  Okay.  Now, could you just review the 14 numbers -- there

21   are 14 numbers at the top of the bars on Defense Exhibit

22   J-261 -- and see if they match the numbers on top of the bars

23   of the first page of Government Exhibit 10701.

24   A.  They do.

25   Q.  Could you then do the same thing going left to right to see

Michael Ledford - Cross

1    if the logos at the bottom of the Defense Exhibit J-261 match

2    the sequence of logos left to right for Government

3    Exhibit page 1 and Government Exhibit 10701?

4    A.   They do.

5    Q.   Okay.  So as far as you can tell, the information -- the

6    relevant information on Defense Exhibit J-261 matches

7    Government Exhibit-- first page of Government Exhibit 10701;

8    right?

9    A.   Yes.

10   Q.   With one exception, the vertical axis; right, Mr. Ledford?

11   A.   Right.

12   Q.   The vertical axis on the Government exhibit goes all the

13   way to zero, and the vertical axis on the defense exhibit

14   starts at 90 --

15   A.   5.

16   Q.   -- 95 cents.

17            MR. TORZILLI:  Your Honor, at this time, Government

18   moves to admit Exhibit 10701, the first page.

19            THE COURT:  Any objection to the admission of 10701?

20            MR. BELLER:  No objection.

21            THE COURT:  That exhibit will be admitted.

22            (Exhibit 10701 admitted.)

23            MR. TORZILLI:  Permission to publish the two exhibits

24   side by side?

25            THE COURT:  You may.

1668

Michael Ledford – Cross

1     MR. TORZILLI:  Thank you.

2   BY MR. TORZILLI:

3   Q.  So, Mr. Ledford, the suppliers submitted first-round bids

4   and then typically reduced their bids from the first round to

5   signing the contract; right?

6   A.  Typically, yes.

7   Q.  Okay.  And those -- the numbers for the first-round bids in

8   the contracts are the same numbers reflected both in the

9   defense exhibit and the Government exhibit, correct?

10  A.  That's right.

11  Q.  But the defense exhibit shows the bars, the disparity

12  between the bars being dramatic; right?

13  A.  Yes.

14  Q.  In some cases double; right?

15  A.  Yes.

16  Q.  Okay.  But that's not really what happened in the bidding

17  process; right?  They didn't come down by half their price;

18  right?

19  A.  No.

20  Q.  They came down by a few percent?

21  A.  Yes.

22  Q.  A few pennies?

23  A.  Yes.

24  Q.  And a few pennies is significant when you're talking

25  millions of pounds of chicken; right?

Michael Ledford - Cross

1    *A.*  It's extremely significant.

2    *Q.*  Extremely significant.  Just not as significant as the

3    defense exhibit portrays; right?

4          *MR. FELDBERG:*  Objection to that question.

5          *THE COURT:*  Overruled.

6          *MR. TORZILLI:*  You can answer, sir.

7          *THE WITNESS:*  I mean, I'm not going to buy chicken for

8    zero cents a pound.  But if you're paying attention to the axis

9    and see that it says 95, I think everybody -- when I looked at

10   the one on the left, I didn't look at that, oh, they're trying

11   to make it look like it came out 50 percent.  But I'm very

12   close to this.

13   *BY MR. TORZILLI:*

14   *Q.*  Yes, you certainly are.  But it is certainly true that the

15   bidders did not cut their bids in half during the bidding

16   process?

17   *A.*  No, they did not.

18   *Q.*  No matter how many rounds you did, you would never get to

19   that?

20   *A.*  Never.

21          *MR. TORZILLI:*  Okay.  We can take that exhibit down.

22   *BY MR. TORZILLI:*

23   *Q.*  Now, speaking of contracts that were signed in 2012, I

24   think you were asked about Defendant Scott Brady's pricing

25   authority, do you remember that?

Michael Ledford – Cross

1    A.   Yes.

2    Q.   On direct exam; right?

3    A.   Yes.

4    Q.   Now, it is true that Defendant Scott Brady sent you

5    numerous bids over the lifetime of you running bidding and

6    negotiations; right?

7    A.   Yes.

8    Q.   And that includes 2012?

9    A.   Yes.

10   Q.   And that includes 2013?

11   A.   Yes.

12   Q.   And whenever he sent you bids, you took those as being the

13   bids for Claxton; right?

14   A.   Absolutely.

15   Q.   Didn't ever question whether he really had authority to be

16   submitting these bids or not; right?

17   A.   Right.

18   Q.   Okay.  All right.  The same is true with contracts; right?

19   A.   Correct.

20        MR. TORZILLI:  Okay.  If we could call up Government

21   Exhibit 1503.

22        Your Honor, I believe this was received into evidence.

23   If not this morning, previously.

24        THE COURT:  It has been.

25        MR. TORZILLI:  Thank you.  And permission to publish

Michael Ledford - Cross

1  1503, Your Honor?

2          *THE COURT:*  You may.

3          *MR. TORZILLI:*  Thank you.

4  *BY MR. TORZILLI:*

5  *Q.*  Mr. Ledford, do you see the first page of Government

6  Exhibit 1503 on your screen?

7  *A.*  Yes.

8  *Q.*  That's a contract; right?

9  *A.*  Correct.

10  *Q.*  Contract between Claxton and RSCS, correct?

11  *A.*  That's correct.

12  *Q.*  That was part of the conclusion of the bidding and

13  negotiation process in 2012 we've been talking about today;

14  right?

15  *A.*  Yes.

16  *Q.*  Okay.  And Mr. Scott Brady signed on behalf of Claxton

17  Poultry, correct?

18  *A.*  Yes.

19  *Q.*  Who signed on behalf of UFPC?

20  *A.*  I did.

21  *Q.*  And you accepted Defendant Brady's signature as being able

22  to sign on behalf of Claxton and bind Claxton to give you --

23  sell you the chicken that is prescribed under this contract;

24  right?

25  *A.*  Yes.

Michael Ledford - Cross

1    Q.  And do you have a sense, an estimate of how valuable in

2    dollar terms this contract was for calendar year 2013, at all?

3    A.  Ballpark, it was probably around $40 million.

4    Q.  $40 million, ballpark?

5    A.  Yes.

6         MR. TORZILLI:  We can take this down.

7    BY MR. TORZILLI:

8    Q.  So as you said, you were also in charge of the bidding and

9    negotiation for chicken on the bone -- KFC chicken-on-the-bone

10   procurement that occurred in the fall of 2013?

11   A.  Yes.

12   Q.  And, again, that was going to be for a contract that was

13   going to take effect at the beginning of 2014?

14   A.  Correct.

15   Q.  And a one-year contract, so it would end at the end of

16   2014?

17   A.  Yes.

18   Q.  And you had a similar basic process to what you did in

19   2012?

20   A.  Yes.

21   Q.  You'd combine it?

22   A.  Yes.

23   Q.  Requested bids?

24   A.  Yes.

25   Q.  Requested RFI?

Michael Ledford - Cross

1    *A.*  Yes.

2    *Q.*  Had multiple rounds?

3    *A.*  Yes.

4    *Q.*  Wanted it all confidential?

5    *A.*  Yes.

6    *Q.*  As part of a closed-bidding system?

7    *A.*  Yes.

8    *Q.*  And did feedback after each and every round, correct?

9    *A.*  Yes.

10   *Q.*  All with the purpose of trying to get to the best price?

11   *A.*  Yes.

12   *Q.*  Lowest sustainable price?

13   *A.*  Correct.

14        *MR. TORZILLI:*  Okay.  So if we could look at

15   Government Exhibit 9989.

16        Your Honor, permission to approach with paper copies?

17        *THE COURT:*  You may.

18        *MR. TORZILLI:*  Thank you.

19   *BY MR. TORZILLI:*

20   *Q.*  Mr. Ledford, have you had a chance to look at Government

21   Exhibit 9989?

22   *A.*  Yes.

23   *Q.*  Do you recognize it?

24   *A.*  Yes, I do.

25   *Q.*  It's an email that was sent out by Mr. Oechsli, correct?

Michael Ledford – Cross

1    *A.*  Correct.

2    *Q.*  As part of the bidding process that you were in charge of

3    in the fall of 2013?

4    *A.*  That's right.

5    *Q.*  And this email was sent out with your approval, correct?

6    *A.*  Correct.

7    *Q.*  And your -- Mr. Oechsli was one of the people on your staff

8    that helped to coordinate the bidding process of the

9    chicken-on-the-bone competitors; is that right?

10   *A.*  Yes.

11          *MR. TORZILLI:*  Government moves to admit 9989 into

12   evidence.

13          *THE COURT:*  Any objection to 9989?

14          *MR. BELLER:*  May we have just one moment, Your Honor?

15          *THE COURT:*  Yes.

16          *MR. BELLER:*  Thank you.

17          No objection.

18          *MR. TORZILLI:*  Apologies, Your Honor.  Thank you.

19          *THE COURT:*  Exhibit 9989 will be admitted.

20          (Exhibit 9989 admitted.)

21          *MR. TORZILLI:*  Permission to publish Government

22   Exhibit 9989?

23          *THE COURT:*  You may.

24          *MR. TORZILLI:*  Thank you.

25   *BY MR. TORZILLI:*

Michael Ledford - Cross

1    Q.  So, Mr. Ledford, like the -- some of the other emails

2    that we've looked at inviting the competitors to submit bids,

3    this was sent to all of the chicken-on-the-bone suppliers that

4    you wanted to submit bids for the competition you had set up in

5    2013; right?

6    A.  Yes.

7    Q.  And you did put the competing suppliers into a competition;

8    right?

9    A.  Yes.

10   Q.  That was the whole point of the bidding process, to have

11   them compete; right?

12   A.  Yes.

13   Q.  And it was the competition that was going to get you to the

14   best price; right?

15   A.  That's right.

16   Q.  Lowest sustainable price?

17   A.  Yes.

18   Q.  This email was sent out by Mr. Oechsli on September 23,

19   2013; right?

20   A.  Yes.

21   Q.  And was the UFPC -- we know that's the KFC purchasing

22   cooperative -- they're -- invitation for bid for the following

23   calendar year; right?

24   A.  Right.

25   Q.  In the very first line of this email, you say, "In UFPC's

Michael Ledford - Cross

1    continuing efforts to provide a competitive advantage to our

2    members" --

3    A.   Yes.

4    Q.   Now, the members there, is that referring to the KFC

5    restaurant owners?

6    A.   Yes.

7    Q.   Okay.  Could you explain how, if at all, the process that

8    you were kicking off with this email, this invitation to bid,

9    fed into the effort to provide the restaurant operators with a

10   competitive advantage?

11   A.   By getting that lowest sustainable price and providing them

12   with a price that was -- that was advantageous and commensurate

13   with our size in the industry, we felt like we could get to a

14   lower price than most to provide a competitive advantage to the

15   franchisees.

16   Q.   Okay.  And then you say in the highlighted portion of the

17   kind of the shaded portion of the email here, that initial

18   proposals that include price and volume as well as answers to

19   the RFIs are due Monday, October 7, 2013.  So that was the

20   deadline you had set; right, Mr. Ledford?

21   A.   Correct.

22   Q.   And you expected the RFI responses to come in on or before

23   that date?

24   A.   Yes.

25   Q.   And you expected the bids to come in on or before that

1677
Michael Ledford - Cross

1    date?

2    A.   Yes.

3    Q.   And you were expecting both prices and volumes, correct?

4    A.   Yes.

5    Q.   And you were expecting -- speaking of expectations, you

6    expected each of the competing suppliers to make their own

7    independent entity determination of price and volume; right?

8    A.   That's right.

9    Q.   To not be coordinating with each other their bids before

10   submitting them to you; right?

11   A.   That's right.

12        MR. TORZILLI:   Okay.   We can take that exhibit down.

13   Thank you, Ms. Pearce.

14   BY MR. TORZILLI:

15   Q.   And so you went through the process for 2013, and you

16   arrived at ultimately a final contract; right?

17   A.   Yes.

18   Q.   And the final contracts, they get determined approximately

19   what time of year?   Is it like mid-fall or thereabouts?

20   A.   Typically, they're the end of November.   In some cases

21   where we had multiple, we went to four rounds, sometimes it

22   wasn't until December.

23   Q.   It might be a little later?

24   A.   Right.

25        MR. TORZILLI:   Okay.   Ms. Pearce, if we could call up

Michael Ledford - Cross

1  Defense Exhibit J-260.

2  *BY MR. TORZILLI:*

3  *Q.*  So on your screen is Defense J-260, Mr. Ledford.  Do you

4  remember seeing this this morning?

5  *A.*  Yes.

6  *Q.*  And answering questions about it this morning?

7  *A.*  It is, yes.

8  *Q.*  Okay.  And this -- you understand this depicts the

9  first-round bids that were submitted to KFC and that those are

10  the bluish bars; right?

11  *A.*  Right.

12  *Q.*  And then the lighter-colored bars are the bars associated

13  with the final contract price; right?

14  *A.*  Correct.

15      *THE COURT:*  Mr. Torzilli, would you like this one

16  displayed?

17      *MR. TORZILLI:*  Permission to publish to the jury, Your

18  Honor.  Thanks for the reminder.

19      *THE COURT:*  You may.

20  *BY MR. TORZILLI:*

21  *Q.*  And, Mr. Ledford, similar to what we looked at with the

22  chart regarding 2012, the suppliers came down in price from

23  their initial bids to their contract -- ultimate contract

24  price; right?

25  *A.*  Correct.

1679

Michael Ledford - Cross

1    Q.  And that's the purpose of the process, you're giving

2    feedback with the idea they're going to continue to lower their

3    price throughout the process; right?

4    A.  That's right.

5    Q.  Now, in your vast experience working on both sides of the

6    table for these negotiations, it is true, you never go in with

7    your best price in the first-round bid; right?

8    A.  That's correct.

9    Q.  You always know there is going to be a little bit that

10   you're going to need to negotiate down, true?

11   A.  Correct.

12   Q.  And you know the suppliers know that; right?

13   A.  Yes.

14   Q.  You know when that initial bid comes in, that's not the

15   best price?

16   A.  Correct.

17   Q.  So this is all part of the process.  And the suppliers know

18   going into the process -- because they have worked with you on

19   several bids, they know there is going to be multiple rounds;

20   right?

21   A.  Sure.  Yes.

22   Q.  Okay.  So people came down, but it is true, like in the

23   exhibit we looked at previously, people didn't cut their bids

24   in half, they didn't cut their price in half from initial bid

25   to the contract price; right?

Michael Ledford – Cross

1    A.  Right.

2         MR. TORZILLI:  Okay.  If we could just for the

3    lawyers, the Court, and the witness display, Ms. Pearce, this

4    exhibit, J-260, side by side with Government Exhibit 10697.

5         Your Honor, permission to approach with paper copies.

6         THE COURT:  You may.

7         MR. TORZILLI:  Thank you.

8    BY MR. TORZILLI:

9    Q.  Mr. Ledford, have you had an opportunity to review

10   Government Exhibit 10697?

11   A.  Yes.

12   Q.  Have you had an opportunity to review the numbers at the

13   tops of the bars for both of the exhibits you're looking at

14   side by side?

15   A.  Yes, I have.

16   Q.  Do the numbers match up?

17   A.  Yes, they do.

18   Q.  Okay.  And have you had an opportunity to look beneath the

19   bars at the logos going left to right?

20   A.  Yes, they match up as well.

21   Q.  They match up as well?

22   A.  Yes.

23        MR. TORZILLI:  Your Honor, move to admit Government

24   Exhibit 10697.

25        THE COURT:  Any objection to the admission of 10697?

Michael Ledford – Cross

1          MR. BELLER:  No objection.

2          THE COURT:  All right.  Exhibit 10697 will be

3    admitted.

4          (Exhibit 10697 admitted.)

5          MR. TORZILLI:  Permission to publish side by side

6    10697 and J-260.

7          THE COURT:  You may.

8          MR. TORZILLI:  Thank you, Your Honor.

9    BY MR. TORZILLI:

10   Q.  Mr. Ledford, this depicts -- both of these slides depict,

11   then, the first-round picks, right, in kind of bluish bars on

12   the left-hand side?

13   A.  Correct.

14   Q.  Then the contract prices in the lighter-colored bars on the

15   right-hand side?

16   A.  Yes.

17   Q.  And the numbers are the same; right?

18   A.  Yes, they are.

19   Q.  Okay.  And I think you said it's true that the suppliers

20   basically came down from initial bid to final contract price?

21   A.  Yes.

22   Q.  As is typical in these processes; right?

23   A.  Correct.

24   Q.  Okay.  And even though they all came down, they didn't come

25   down like -- they didn't cut their bid in half within the

Michael Ledford - Cross

1    bidding process; right?

2    *A.*   Correct.

3    *Q.*   But they came down a few cents; right?

4    *A.*   Correct.

5    *Q.*   And as we talked about with the exhibit from 2012, a few

6    cents does mean a lot with the volumes of chicken that the

7    KFC's restaurants all around the country are purchasing,

8    correct?

9    *A.*   Correct.

10   *Q.*   Okay.

11          *MR. TORZILLI:*  All right.  We can take this exhibit

12   down.

13          Your Honor, I realize it's a few minutes ahead of the

14   scheduled break, this would be a breaking point, but I'm happy

15   to continue.

16          *THE COURT:*  Why don't we keep going until 3:15.

17          *MR. TORZILLI:*  Absolutely, Your Honor.

18   *BY MR. TORZILLI:*

19   *Q.*   Mr. Ledford, you were you asked some questions about

20   supplier communications that were okayed by you.  Do you

21   remember that?

22   *A.*   Yes.

23   *Q.*   So one example was suppliers communicating with each other

24   on shortages?

25   *A.*   Yes.

Michael Ledford - Cross

1   *Q.*  Covering shortages --

2   *A.*  Yes.

3   *Q.*  -- that might come up?

4   *A.*  Correct.

5   *Q.*  And you -- I think you said you knew it was going on, you

6   did not want to get involved unless it was a big problem?

7   *A.*  Yes.

8   *Q.*  Okay.  Now, in shortages, let's be clear about what the

9   communication is.  Okay?  As you -- have you ever -- when you

10  were working as a supplier on the supply side at Gold Kist --

11  you worked at Gold Kist, correct?

12  *A.*  Yes.

13  *Q.*  You also worked at Seaboard Farms?

14  *A.*  Yes.

15  *Q.*  Did you ever have to deal with shortages on the supplier

16  side?

17  *A.*  Personally, no.

18  *Q.*  You never did.  Do you have familiarity with it from your

19  experience in the industry?

20  *A.*  Yes.

21  *Q.*  Okay.  When a shortage happens, and you are okay with the

22  communication, it's -- the chicken suppliers are talking about

23  purchase and sale of a number of cases, number of truckloads,

24  some amount of chicken; right?

25  *A.*  Right.

Michael Ledford - Cross

1  Q.  So they're talking about what the price is going to be at

2  that moment; right?

3  A.  Yes.

4  Q.  They are not talking about bids; right?

5  A.  Correct.

6  Q.  So when we're talking about the 2012 process you were in

7  charge of, the 2013 process you were in charge of, the bids,

8  the feedback, all of that, that has nothing to do with what

9  these people need to be talking about when filling shortages;

10  right?

11  A.  That's correct.

12  Q.  Because that's a current -- the shortage is a current

13  price; right?

14  A.  Correct.

15  Q.  So it could be a spot -- basically a spot price?

16  A.  Yes.

17  Q.  Could it even be like a contract price?

18  A.  It could be.

19  Q.  Could be a contract price?

20  A.  Yeah.

21  Q.  Or I think you used the -- used the term "period price"

22  today, I think; right?

23  A.  Yes.

24  Q.  Is a period price, basically that's another word for, like,

25  the current price; right?

Michael Ledford - Cross

1    A.  Correct.

2    Q.  And current period price could be used as the price for a

3    cover of a shortage; right?

4    A.  Yes, it could.

5    Q.  But knowing a competitor's period price in your view has

6    nothing to do with bidding and negotiating?

7    A.  That's correct.

8    Q.  Or knowing someone's contract price because you're doing

9    shortages, that has nothing to do with bids; right?

10   A.  Say that again.

11   Q.  Sure.  Just knowing someone's period price because they're

12   doing some shortage --

13   A.  That's correct.

14   Q.  That doesn't have anything to do with the bidding process

15   you were in charge of in 2012, 2013, correct?

16   A.  Correct.

17   Q.  Same is true for any other type of current price; right?

18   A.  That's correct.

19   Q.  Because they're two different things?

20   A.  Right.

21   Q.  I want to ask you about one other thing, one other supplier

22   communication that you were okay with.  And that is I think you

23   were talking about at Chick-fil-A, you were okay with the

24   suppliers consulting on best practices; right?

25   A.  Yes.

Michael Ledford - Cross

1   *Q.* For NAE or ABF?

2   *A.* Yes.

3   *Q.* I think you mentioned -- I think you called him Dr. Bruce?

4   *A.* Yes.

5   *Q.* That's someone -- that's a veterinary scientist, I take it,

6   who is --

7   *A.* Yes, Dr. Bruce Stewart-Brown I think is his official name.

8   *Q.* Okay.  And you wanted competing suppliers to potentially

9   consult with him to figure out the best way to raise the

10  chickens using NAE or ABF?

11  *A.* Yes.

12  *Q.* Okay.  At no time in that process did you instruct those

13  suppliers to be talking about the upcharge that might be

14  associated with NAE or ABF; right?

15  *A.* No.

16  *Q.* Or any other pricing information; right?

17  *A.* That's right.

18  *Q.* And definitely not bids; right?

19  *A.* That's correct.

20  *Q.* Throughout your time at Chick-fil-A, you've never asked any

21  of your competing suppliers to be talking about bids; right?

22  *A.* That's correct.

23  *Q.* Or prices?

24  *A.* That's correct.

25  *Q.* Or even, like, bid strategies?

Michael Ledford - Cross

1    A.  Right.

2    Q.  Right.  Okay.

3           MR. TORZILLI:  I think we're right on the button at

4    3:15, Your Honor.

5           THE COURT:  Yes.  This is a good time.  Ladies and

6    gentlemen, we'll take a mid-afternoon break at this time, and

7    we'll plan on reconvening at 3:30.  Jury's excused.

8           (Jury out at 3:14 p.m.)

9           (Recess at 3:14 p.m.)

10          (In open court at 3:58 p.m.)

11          THE COURT:  Be seated.

12          This goes to show that at some point anything will

13   happen.

14          So I don't know if you looked out the window, but the

15   prognosis from Xcel appears unpromising.  I think 6:30

16   depending on where you look.  It's a city block off.  There are

17   numerous buildings near here that are also without power.

18   Ms. Lindblom I don't think has that much power left in her --

19   one of her machines.

20          What is the request -- I know that -- I heard that

21   people are anxious to get Mr. Ledford out, but I'm not sure how

22   much longer he will go.  I'm not sure -- continuing on with the

23   trial with power out, I'm not sure what the codes say about

24   that.  Anyone who wants to advocate on trying to finish up?

25   It's 4 o'clock now.

1     MR. TUBACH:  At least for Mr. Ledford, we would like

2  to get him on and off today.  I think cross-examination is near

3  an end, I think the redirect could also.  I realize there is no

4  microphones here.  For many hundred of years, people did trials

5  without microphones.  I think Mr. Ledford's voice can carry.  I

6  think it would be great to get him off.

7     THE COURT:  Court reporter.  The answer is yes.  We

8  wouldn't have monitors, so -- we've got some -- we've got

9  issues there.

10    MR. TUBACH:  With respect to the realtime, at least

11 for Mr. Penn, we're fine not having realtime for the rest of

12 the day.

13    THE COURT:  What does the Government say?

14    MR. TORZILLI:  I probably have 10 or 15 minutes more

15 of cross-exam, and I think we -- I think the Government is

16 happy -- or not happy, but is willing to forgo the realtime and

17 would be very interested in getting Mr. Ledford completed today

18 if that could be arranged.

19    THE COURT:  So the next issue, then, is, let's assume

20 that Mr. Torzilli is correct about his estimate, can we get the

21 redirect done and any other cross --

22    MR. BELLER:  Your Honor, I'm guessing I can get the

23 redirect done in 10 or 15 minutes.  Because I don't have

24 exhibits to actually show to the jury easily, I may lead a bit

25 for purposes of describing the exhibit.  So long as they're not

Michael Ledford - Cross

1    objecting to me leading regarding that foundation, I think 10

2    to 15 minutes is plenty.

3              I will advise the Court that Mr. Torzilli and I spoke

4    briefly with Mr. Ledford's counsel, who is also eager to have

5    him hopefully finish up today, if at all possible.

6              THE COURT:  We'll try to get him wrapped up.

7              Fortunately, the emergency lighting is I think good

8    enough.  Hopefully the jurors won't feel uncomfortable.  I'll

9    ask them.

10             MR. FELDBERG:  If permitted, I would have less than

11   five minutes of redirect.  I wanted the Court to be aware of

12   that.

13             THE COURT:  I don't think that you would have any.

14   There is no such thing as multiple direct.  So you either were

15   doing a non-leading cross, but in any event, Mr. Beller would

16   be the only one who would get redirect.

17             MR. FAGG:  If it uses more power for her being

18   connected to the wi-fi --

19             THE COURT:  Let's play it by ear.  We'll have to

20   remember -- I'll have to remember -- I don't know why I'm

21   talking into this microphone -- but remember to talk up.

22             So, Mr. Ledford, you've got a good voice.  Everyone

23   really project.

24             MS. CARWILE:  Mr. Brian is wondering whether you would

25   like his laptop, Your Honor, for realtime.

Michael Ledford - Cross

1          THE COURT:  That is a nice offer, but, once again,

2    back in the day --

3                (Jury in at 4:06 p.m.)

4          THE COURT:  Thank you.  Please be seated.

5          Ladies and gentlemen, anyone afraid of the dark?

6    Okay.  We've got one.  You know, this -- we've never had this

7    problem before.  We decided that we want to try to get

8    Mr. Ledford wrapped up.  Since you probably didn't have any

9    other plans before 5:00, we're going to make a go of it.  The

10   microphones are not working -- they're not working, so we're

11   going to try to speak up.  If you can't hear, raise your hand

12   or let us know, because -- and we're not going to have monitors

13   either, okay.  But, you know, Abraham Lincoln when he was

14   trying cases did it without microphones and monitors, so we

15   should be able to swing it.

16         With that, Mr. Torzilli -- and despite the need for

17   correction of your prescription, hopefully you can move your

18   notes over to a light source.

19         MR. TORZILLI:  I'll make it work, Your Honor.

20         THE COURT:  All right.  Go ahead.

21   BY MR. TORZILLI:

22   Q.  Welcome back, Mr. Ledford.

23   A.  Thank you.

24   Q.  Just a few more questions, and I'll be concluded with my

25   examination.  I do want to go back, though.  We were talking

Michael Ledford - Cross

1   before the break about current prices and how they are

2   different than bids.  Do you remember that?

3   A.   Yes.

4   Q.   Now you were asked on direct examination I think something

5   to the effect of current price -- a supplier can get a current

6   price from a distributor.  Do you remember that?

7   A.   Yes.

8   Q.   Okay.  It is not true that a supplier can get the bids of

9   competing suppliers from distributors; right?

10  A.   That's correct.

11  Q.   Distributors don't have that information; right?

12  A.   They do not have that information.

13  Q.   Okay.  Now I want to switch topics here.  I think you

14  testified that -- you testified that one thing you do in a

15  bidding and negotiating process is you take volume from the

16  highest bidder or bidders and give that volume to the lowest

17  bidder, so the lowest-priced bids, that's a typical strategy

18  you've employed, right?

19  A.   Yes.

20  Q.   And you employed that at KFC during the 2012 and 2013

21  negotiations; right?

22  A.   Yes.

23  Q.   When you take that volume from the highest, you give it to

24  the lowest, that means that the lower bidders get more volume,

25  more sales; right?

Michael Ledford - Cross

1   A.  Yes.

2   Q.  And presumably, more profit, because those sales are

3   profitable to those suppliers; is that correct?

4        MR. TUBACH:  Objection.  Lack of foundation.

5        THE COURT:  Overruled.

6   BY MR. TORZILLI:

7   Q.  You can answer, sir.

8   A.  That's a potential, sir.

9   Q.  And one thing you don't typically do, though, is you don't

10  typically take volume from the highest and give it to someone

11  in the middle; right?

12  A.  Typically not, no.

13  Q.  You want to typically get it to the lowest bidder; right?

14  A.  Correct.

15  Q.  The incentive to get more volume is an incentive for the

16  competitors to lower their bids; right?

17  A.  Yes.

18  Q.  Okay.  Now, sir, I want to switch to Pilgrim's and ask you

19  some follow-up questions to some questions you were asked on

20  direct examination about your knowledge of agreements to raise

21  price or manipulate bids.  Do you remember those questions from

22  this morning?

23  A.  Yes.

24  Q.  Okay.  Now, first of all, just to make one thing incredibly

25  clear, you never asked any suppliers or any competitors to

Michael Ledford - Cross

 1    coordinate on their bids; right?

 2    *A.*  No, I did not.

 3    *Q.*  That's contrary to everything you were trying to do in the

 4    bidding and negotiating process you were in charge of; right?

 5    *A.*  That's correct.

 6    *Q.*  Okay.  And to the extent competitors were coordinating

 7    their bids, you'd be the last person on earth they'd want to

 8    know what they were up to, right?

 9         *MR. BELLER:*  Speculation, lack of foundation, lack of

10    personal information, and assumes facts not in evidence.

11         *MR. FAGG:*  And argumentative, Your Honor.

12         *THE COURT:*  Sustained.

13    *BY MR. TORZILLI:*

14    *Q.*  You agree with me that to the extent suppliers were trying

15    to coordinate bids, they wouldn't want to get caught; right?

16         *MR. BELLER:*  Same objection, Your Honor.

17         *THE COURT:*  Sustained.

18    *BY MR. TORZILLI:*

19    *Q.*  Mr. Ledford, you never asked any competing chicken

20    suppliers to call any other suppliers to discuss bids; right?

21    *A.*  That's correct.

22    *Q.*  Okay.  And you were never informed of any discussions

23    between competing suppliers about discussions of their bids;

24    right?

25    *A.*  Correct.

Michael Ledford – Cross

1    Q.  So, for example, you were never informed that Defendant

2    Austin and Defendant Brady were talking to each other the day

3    before the second-round bids in 2012; right?

4    A.  No, I was not.

5    Q.  Now, had you known that at the time, that would change your

6    answer about whether you had knowledge of coordination of bids

7    by competitors, right?

8           MR. BELLER:  Objection.  Argumentative, lack of

9    foundation.

10          MR. FELDBERG:  Calls for speculation.

11          THE COURT:  Sustained.

12   BY MR. TORZILLI:

13   Q.  You never asked Defendant Roger Austin to call competitors

14   to get the pulse after you had a feedback call with him in

15   2012; right?

16   A.  No, I did not.

17   Q.  He never informed you that he made those calls to

18   competitors; right?

19   A.  No, he did not.

20   Q.  And he never informed you that he told Defendant Jayson

21   Penn what he had learned from those calls?

22          MR. FELDBERG:  Objection.  No foundation.

23          THE COURT:  I'm going to sustain the objection.

24   BY MR. TORZILLI:

25   Q.  And no one ever informed you that they were exchanging

Michael Ledford - Cross

1    spreadsheets that contained competitor bid information in

2    December of 2012, right?  No one ever told you that; right?

3         MR. FELDBERG:  Same objection.  No foundation.  It

4    misstates the evidence.

5         MR. TORZILLI:  It --

6         THE COURT:  I'll overrule that objection, but I'll

7    sustain the objection on relevance.  The witness doesn't have

8    ability to know --

9         MR. TORZILLI:  Thank you, Your Honor.

10   BY MR. TORZILLI:

11   Q.  Mr. Ledford, did you ever ask any chicken supplier to

12   exchange with any other chicken supplier spreadsheets that had

13   their competitors' bids?

14        MR. FAGG:  Objection, Your Honor.  Relevance and asked

15   and answered.

16        THE COURT:  I'm not sure he answered it, but I'll

17   sustain the relevance objection.

18   BY MR. TORZILLI:

19   Q.  Sir, had you known information about competitors

20   communicating with each other, that might have changed your

21   view about whether you had personal knowledge of competitors

22   raising prices together, right?

23        MR. BELLER:  Objection, Your Honor.  That was asked

24   before and objected to.

25        THE COURT:  I'll sustain it on relevance.

Michael Ledford – Redirect

1

2    BY MR. TORZILLI:

3    Q.  Sir, all throughout the process you were in charge of in

4    2012 and 2013, the bidding and negotiating process, you -- I

5    think you already said this, you always wanted the best price,

6    correct?

7    A.  Correct.

8    Q.  The lowest sustainable price, correct?

9    A.  Correct.

10   Q.  And communications between competing suppliers about their

11   bids would undermine that very process, correct?

12        MR. TUBACH:  Objection.  Calls for speculation, lack

13   of foundation.

14        THE COURT:  Overruled.

15   BY MR. TORZILLI:

16   Q.  You can answer, sir.

17   A.  That's a possibility, yes.

18        MR. TORZILLI:  Moment to confer, Your Honor?

19        THE COURT:  You may.

20        MR. TORZILLI:  No further questions.

21        Thank you, Mr. Ledford.

22        THE COURT:  Thank you, Mr. Torzilli.

23        Redirect.

24                    **REDIRECT EXAMINATION**

25   BY MR. BELLER:

Michael Ledford - Redirect

1    Q.   Good dark afternoon to you, sir.

2    A.   Same to you.

3    Q.   Thank you.

4         A few last final questions.  Okay.  We had spoken

5    about negative margins, and Mr. Torzilli had also asked you

6    about negative margins.  Mr. Ledford, if margins are negative,

7    does increase in volume mean that the suppliers are losing even

8    more money?

9         MR. TORZILLI:  Objection.  Outside the scope.  I was

10   asking about negative margins for KFC restaurants, not the

11   subject of this question.

12        THE COURT:  Overruled.

13        THE WITNESS:  I'm sorry, could you ask the question

14   again?

15   BY MR. BELLER:

16   Q.   Yeah, I'm happy to.

17        If margins are negative, does increasing volume to the

18   suppliers mean that the suppliers are actually losing more

19   money?

20   A.   Yes.

21   Q.   Mr. Ledford, you were asked several questions regarding the

22   prosecution's chart No. 50.  That was the chart that had all

23   the different line items and colors.  Did that sound familiar?

24   A.   Yes.

25   Q.   And I'm happy to hand you a paper copy if you need it,

Michael Ledford – Redirect

1    Mr. Ledford.

2    *A.*   Okay.

3    *Q.*   Was that a yes?  I'm sorry?

4    *A.*   Yes.

5    *Q.*   Okay.  And, Mr. Ledford, I'm also going to hand you a paper

6    copy of Exhibit 51, prosecution chart 51.

7             Mr. Ledford, I'm going to ask you first about the

8    questions that Mr. Torzilli asked you about, prosecution chart

9    No. 50.  There is a reference there for an individual by the

10   name of Jimmie Little.

11   *A.*   Yes.

12   *Q.*   Do you know who Jimmie Little is, sir?

13   *A.*   Yes, I do.

14   *Q.*   Is Jimmie Little somebody that you have worked with in your

15   roles as a chicken buyer?

16   *A.*   I have interfaced with him on a handful of occasions over

17   the years, but not in direct negotiation of product.

18   *Q.*   How about direct negotiation of KFC products?

19   *A.*   Never.

20   *Q.*   Do you know Jimmie Little to be a salesman who was assigned

21   to KFC products?

22   *A.*   No.

23   *Q.*   Who is the person at Pilgrim's who was assigned to KFC

24   products?

25   *A.*   Roger Austin.

Michael Ledford - Redirect

1    Q.   Before the Government put Jimmie Little's name on Exhibit

2    50, the prosecution summary chart, did they ask you if it was

3    appropriate to put his name on a KFC chart?

4    A.   No.

5    Q.   And in terms of your -- you were asked about certain phone

6    calls.  Do you have knowledge of any phone calls that happened

7    between the producers that are reflected on Government's chart

8    50?

9    A.   No, I do not.

10   Q.   Do you have any knowledge, Mr. Ledford, as to what was

11   discussed?

12   A.   I have no idea.

13   Q.   Do you have any knowledge as to why the different

14   individuals were speaking at all?

15   A.   No.

16   Q.   Now, you had also said that in addition to being

17   competitors, they were also customers.  How were they customers

18   of each other?

19   A.   When they're covering the shorts that we discussed earlier,

20   they were buying and selling to each other.

21   Q.   You were asked about an individual by the name of Ric

22   Blake, and you didn't quite finish your answer, so I want to go

23   back to that name.

24   A.   Okay.

25   Q.   Who at George's primarily negotiated on behalf of George's?

Michael Ledford – Redirect

1  A.  Darrel Keck.

2  Q.  And what about Charles George, did he also negotiate?

3  A.  Yes, he did.

4  Q.  And so were they really the primary people that were

5  negotiating on behalf of George's?

6  A.  Yes, they were.

7  Q.  If we can switch to Exhibit No. 51.  You were asked about

8  Scott Brady being involved in bidding and negotiation.  Who

9  else at Claxton Poultry was involved in bidding and

10  negotiation?

11  A.  Mikell Fries.

12  Q.  You were shown a contract where Scott Brady had actually

13  signed the contract.  Does knowing that Mr. Brady signed the

14  contract change your answer that Mr. Brady is not the one at

15  Claxton who had final pricing authority?

16  A.  No, it does not.

17  Q.  Were there times, Mr. Ledford, where you would actually go

18  around Scott Brady and talk prices directly with Mr. Fries?

19  A.  Yes.

20  Q.  Why is that?

21  A.  Because Mikell was the decision-maker, and I would get

22  where I could get with Scott.  If I couldn't get any further, I

23  would call Mikell.

24  Q.  Looking at Exhibit 51, Mr. Ledford, this is, again, one of

25  the prosecution's charts that they showed you and asked you

Michael Ledford – Redirect

1    about certain line items; is that right?

2    A.  Yes.

3    Q.  Was this chart ever shown to you by the Government?  Were

4    you asked any questions about this chart in preparing for --

5    well, in their interviews of you?

6    A.  No.

7    Q.  Does Exhibit 51, summary of a time period during the KFC

8    negotiation, does it show any of the feedback you gave to the

9    producers?

10           MR. TORZILLI:  Objection.  Foundation.

11           THE COURT:  Overruled.

12           THE WITNESS:  No, it does not.

13   BY MR. BELLER:

14   Q.  And the feedback that I think you testified happened both

15   on telephone, text message, email, and in person, are any of

16   those your feedback reflected on that chart?

17   A.  No, they are not.

18   Q.  So is that chart a complete and accurate summation of the

19   negotiation that happened between RSCS and the chicken

20   producers?

21   A.  No.

22   Q.  Mr. Ledford, in your experience -- in your 25 or 27 years

23   of experience, sir, in the chicken industry, is it your opinion

24   or do you have knowledge of whether producers would sometimes

25   bluff each other on pricing?

Michael Ledford – Redirect

1    A.  Yes.

2    Q.  And would they?

3    A.  I believe so, yes.

4    Q.  Is it your experience that producers would oftentimes

5    undercut each other on pricing?

6    A.  Yes.

7    Q.  You were asked several times about what communication you

8    are okay with and what communication you are not okay with.

9    What is your title at CFA?

10   A.  The senior director.

11   Q.  What is your education, Mr. Ledford?

12   A.  I have a bachelor of science degree in agriculture business

13   management.

14   Q.  So do you have knowledge of whether your understanding and

15   whether you are okay with a particular communication is the

16   same question that -- the same law that Judge Brimmer is giving

17   to the jury, are those the same things, do you know?

18        MR. TORZILLI:  Objection.  Foundation, calls for

19   speculation.

20        THE COURT:  Sustained.

21   BY MR. BELLER:

22   Q.  You were asked regarding NAE and no antibiotics ever and

23   what the different producers were to discuss with each other.

24   Do you recall that line of questioning from Mr. Torzilli?

25   A.  Yes.

1703

Michael Ledford – Redirect

1    Q.   In terms of mortality of a non- –- of a chicken who is not

2    receiving antibiotics, is the mortality different?

3              MR. TORZILLI:  Objection.  Outside the scope.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    BY MR. BELLER:

7    Q.   And is there a cost associated with that?

8    A.   Yes, there is.

9    Q.   When you said that the different suppliers were encouraged

10   to talk to each other, would that be one of the things that

11   they were encouraged to talk about?

12   A.   Yes.

13   Q.   How about growth rates for a chicken who isn't receiving

14   antibiotics, could that be different?

15   A.   Yes.

16   Q.   And is there a cost associated with that, Mr. Ledford?

17   A.   Yes, there is.

18   Q.   And is that one of the things that they were asked to

19   discuss between each other?

20   A.   Yes.

21   Q.   What about feed modifications, when you were not giving

22   chicken antibiotics, could there be feed modifications made?

23   A.   Yes, there absolutely are.

24   Q.   Is there a cost associated with that?

25   A.   Yes, it is.

1704

Michael Ledford - Redirect

1    Q.  Is that one of the things that Chick-fil-A encouraged the

2    producers to talk about with each other?

3    A.  Yes.

4    Q.  Finally, is there a difference between ABF, antibiotic

5    free -- let me ask the question more precisely.  Is there a

6    cost difference between ABF, antibiotic free, and NAE, meaning

7    no antibiotic ever?

8    A.  Yes.

9    Q.  Ultimately, when did you want or expect a final price, an

10   accurate price from Claxton to Chick-fil-A for the cost of

11   producing an NAE chicken?

12   A.  Right before they started producing it.

13   Q.  And when was that, sir?

14   A.  2017 is when they were probably looking for a final price

15   on NAE.

16   Q.  You were asked at length about charts, the difference

17   between J-260 and the chart shown to you by Mr. Torzilli,

18   10697.  Do you recall that?

19   A.  Yes.

20   Q.  And you were also shown charts J-261, and Mr. Torzilli

21   asked about 10701.  Do you recall that?

22   A.  Yes.

23   Q.  Do you have paper copies of those charts?

24   A.  I do.

25   Q.  Are these the bar charts that are orange, yellow, compared

Michael Ledford - Redirect

1    to blue?

2    *A.*  Yes.

3    *Q.*  And you're holding it up, which is perfect.  Thank you,

4    sir.

5    *A.*  Yes.

6    *Q.*  Are those in front of you, sir?

7    *A.*  Yes.

8    *Q.*  Great.  Let's talk first about J-261.  Well, let me back

9    up.  Did you -- when you were in junior high school, did you

10   take a basic math class?

11   *A.*  Yes, I did.

12   *Q.*  Okay.  And part of that basic math class, did you also

13   learn about bar charts?

14   *A.*  Yes.

15   *Q.*  Do you recall that the axis on the left-hand side is called

16   the Y axis?

17   *A.*  Yes.

18   *Q.*  In a basic math class, does the Y axis always start at

19   zero?

20   *A.*  No.

21   *Q.*  Do you purchase chicken at zero dollars and zero cents?

22   *A.*  Never.

23   *Q.*  How about purchasing chicken at 10 cents, do you purchase

24   eight-piece chicken at 10 cents?

25   *A.*  No.

Michael Ledford – Redirect

1   Q.   Or 20?

2   A.   No.

3   Q.   Or 30?

4   A.   No.

5   Q.   Not in many years; right?

6   A.   Cheapest I have probably purchased eight-piece chicken

7   would be in the 80s.

8   Q.   If that's the case, does that mean a basic bar chart that

9   starts at zero and moves in 10-cent increments is superfluous,

10   in other words, it's unnecessary data?

11   A.   Yes.

12   Q.   When you're negotiating chicken, do you negotiate chicken

13   10 cents at a time?

14   A.   No.

15   Q.   Do you negotiate chicken depending on circumstances as

16   little as a penny or fraction of a penny?

17   A.   Yes.

18   Q.   When you're presenting to your board, do you use a Y axis

19   that starts at zero?

20   A.   No.

21   Q.   Defense Exhibit J-261, what does the Y axis start at?

22   A.   I only have the Government's exhibits in front of me.

23   Q.   N -- if you have --

24   A.   I remember what the -- one of them started at 95, of the

25   defense, and one of them started at 91.

Michael Ledford – Redirect

1   *Q.* Great.  If you need to refresh the charts, I can give you

2   the tab numbers, if you need to refresh your recollection.  Did

3   those charts, then, to the best of your memory go up in 1-cent

4   increments?

5   *A.* Yes.

6   *Q.* Did they reflect the most accurate or at least the most --

7   well, I guess accurate depiction of being able to see the

8   difference in prices?

9   *A.* Yes.

10  *Q.* Does that get limited?  Do you lose some of that detail

11  when you're using an X axis at 10 cents?

12  *A.* Yes.

13  *Q.* Is that chart, J-261, an accurate depiction of both the

14  bids as well as the final contract price?

15  *A.* Yes.

16  *Q.* Okay.  Now, let's turn to Government Exhibit 10697.  Do you

17  have that one in front of you, sir?

18  *A.* Yes.

19  *Q.* And this is for supplier eight-piece initial bid and final

20  prices for KFC 2014 contract; is that right?

21  *A.* Yes.

22  *Q.* And does that chart start at a zero axis?

23  *A.* Yes.

24  *Q.* Again, you don't buy chicken at zero cents; right?

25  *A.* No.

Michael Ledford - Redirect

1   Q.   That one goes up in 10-cent increments?

2   A.   Yes.

3   Q.   Then, again, is the zero to 80 cents in 10-cent increments,

4   is that superfluous information?

5   A.   Yes.

6   Q.   In that case, Mr. Ledford, does it always go up in 10-cent

7   increments?

8   A.   Say that again.

9   Q.   The Government's chart?

10  A.   Yes.

11  Q.   On the Y axis, is that always in 10-cent increments?

12  A.   Yes.

13  Q.   How about the last one?

14  A.   No.

15  Q.   Did they change the Y axis to reflect a different

16  incremental step?

17  A.   Yes, they did.

18  Q.   What is that, sir?

19  A.   7 cents.

20  Q.   In other words, they have nine different steps at 10 cents,

21  then they switched the Y axis to 7 cents; is that right?

22  A.   Yes.

23  Q.   Is that something you learned to do in seventh grade math?

24  A.   No.

25  Q.   Would you ever present to your board a chart, No. 1, that

Michael Ledford – Redirect

1    started at zero?

2    *A.*   No.

3    *Q.*   No. 2, that the Y axis changes?

4    *A.*   No.

5    *Q.*   So recalling the other chart that you were shown, J-260,

6    that one starts, sir, at 91 cents; is that right?

7    *A.*   Yes.

8    *Q.*   And it ends at 97; is that correct?

9    *A.*   Yes.

10   *Q.*   Is that an accurate depiction showing the changes of first

11   bid to final contract price?

12   *A.*   Yes.

13          *MR. BELLER:*   If I may have one moment, Your Honor.

14   *BY MR. BELLER:*

15   *Q.*   Mr. Ledford, final question, sir.  The questions that

16   Mr. Torzilli asked you on cross-examination, were you asked any

17   of those questions prior to the Government's Indictment?

18   *A.*   No.

19   *Q.*   Were you only asked those questions months after the

20   Government indicted these five people?

21   *A.*   Yes.

22          *MR. BELLER:*   Thank you, Your Honor.  I have nothing

23   further.

24          *THE COURT:*   All right.  Thank you.

25          Is Mr. Ledford subject to recall?

1        MR. BELLER:  No, Your Honor, I don't believe so.

2        THE COURT:  Mr. Ledford, thank you very much.  You're

3   excused.

4        THE WITNESS:  Thank you, Your Honor.

5        THE COURT:  All right.  We're going to recess for the

6   day in light of our power outage.  Thanks very much for

7   toughing it out here, although it seemed to work out all right.

8   Hopefully, you could hear.

9        Ladies and gentlemen, who knows when the lights are

10  going to be back on, but plan on coming back tomorrow at 8:30,

11  okay?  Check on -- however you're getting communications from

12  either Ms. Grimm or Ms. Buchanan, if for some reason, you know,

13  we're going to call you off tomorrow, check on that, okay.

14  You'll either get a call or email or whatever.  Hopefully

15  we'll get the power back on this evening at some time, and

16  we'll be ready to go.

17        Assume, same time, and -- but be alert in case there

18  is a message that it's pushed out.  Okay.  Keep all the

19  admonitions in mind, don't look up any information, except Xcel

20  information.  See you back tomorrow hopefully at 8:30.  The

21  jury is excused.

22        (Jury out at 4:32 p.m.)

23        THE COURT:  About 25 minutes of 5:00 now, we didn't

24  lose too much time today.  Anything that we could take up

25  before we recess?  I assume that tomorrow we can start off with

1   our next witness.  Will it be Mr. Kronauge?

2           *MR. BELLER:*  Yes, Your Honor.

3           *THE COURT:*  Anything else we should take up today?

4           (No response.)

5           We'll be in recess until 8:30 hopefully tomorrow.

6   Same thing, we'll try to put out the word if we can't get the

7   jury in, but hopefully we'll be able to start at that time.

8   We'll be in recess.

9           (Recess at 4:33 p.m.)

10                          **I N D E X**

11  **Item**                                                      **Page**

12

       MICHAEL LEDFORD
13          Direct Examination By Mr. Beller              1485
            Cross-examination By Mr. Feldberg             1614
14          Cross-examination By Mr. Torzilli            1635
            Redirect Examination By Mr. Beller           1698
15

16                    DEFENDANTS' EXHIBITS

17  Exhibit      Offered  Received  Refused  Reserved  Withdrawn

18  A-115                   1514
    A-129                   1514
19  A-288                   1514
    A-559                   1513
20  A-559                   1515
    A-560                   1513
21  A-574                   1513
    A-575                   1513
22  A-579                   1513
    A-580                   1513
23  A-613                   1514
    A-622                   1514
24  A-623                   1514
    B-926                   1514
25  C-159                   1514

1                          (Exhibits Continued)

2     D-198                    1514
      D-509                    1623
3     D-531                    1513
      D-545                    1513
4     D-564                    1514
      D-574                    1514
5     D-589                    1514
      D-591                    1514
6     E-799                    1628
      F-058                    1633
7     F-678                    1512
      F-742                    1512
8     F-750                    1512
      F-759                    1512
9     F-768                    1512
      F-769                    1512
10    F-777                    1512
      F-778                    1512
11    F-786                    1512
      F-787                    1512
12    F-790                    1512
      F-798                    1512
13    F-799                    1512
      F-808                    1525
14    F-810                    1520
      F-813                    1525
15    F-815                    1514
      F-818                    1514
16    G-421                    1514
      G-597                    1513
17    I-241                    1619
      I-733                    1578
18    J-260                    1516
      J-261                    1516
19    J-263                    1516
      J-265                    1516
20    J-406                    1562
      J-407                    1562

21

22

23

24

25

1                    GOVERNMENT'S EXHIBITS

2    Exhibit      Offered   Received  Refused  Reserved  Withdrawn

3    1402                   1513
     1600                   1574
4    1737                   1630
     9989                   1676
5    10697                  1683
     10701                  1669

6

7

8                    REPORTER'S CERTIFICATE

9         I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
10

11        Dated at Denver, Colorado, this 27th day of June,
     2022.
12

13

14

15                                    _____

16                                    Therese Lindblom,CSR,RMR,CRR

17

18

19

20

21

22

23

24

25